**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN**

| | |
|---|---|
| DANNY HARRISON, CHRISTOPHER MCCLAVE, MELISSA LUSTER, LEON JORDAN, DANIEL DEMAREST, MARK HAYFORD, RONALD AND MARILYN JETT, and REBECCA PROSSER, individually and on behalf of all others similarly situated, | Civil Action No. |
| Plaintiffs, | |
| v. | |
| GENERAL MOTORS LLC, | |
| Defendant. | |

**PLAINTIFFS' CLASS ACTION COMPLAINT
<u>AND DEMAND FOR JURY TRIAL</u>**

1.      Plaintiffs Danny Harrison, Christopher McClave, Melissa Luster, Leon Jordan, Daniel Demarest, Mark Hayford, Ronald and Marilyn Jett, and Rebecca Prosser ("Plaintiffs") bring this action for themselves and on behalf of all persons in the United States who purchased or leased any 2014 to 2021 Buick, Cadillac, Chevrolet, and GMC vehicle equipped with a 5.3L, 6.0L or 6.2L V8 engines ("Class Vehicles")[1] designed, manufactured, marketed, distributed, sold, warranted, and/or serviced by General Motors LLC ("GM" or "Defendant").

## **INTRODUCTION**

2.      This is a consumer class action concerning a failure to disclose – or omission of – material facts and a safety concern to consumers.

3.      GM manufactured, marketed, distributed, and sold the Class Vehicles without disclosing that the Class Vehicles' Active Fuel Management lifters ("AFM Lifters") were defective in design, workmanship and/or material.

4.      The Class Vehicles are equipped with one of GM's proprietary valve train systems: either the Active Fuel Management system ("AFM") or the Dynamic Fuel Management ("DFM") system. Each system is comprised of software run by

---

[1] Discovery will show that a partial list of the vehicles equipped with these engines includes the following models and model years: 2014-present Cadillac Escalade, 2016-2019 Cadillac CTS-V, 2014-present Chevrolet Silverado and Silverado 1500, certain 2014-2019 Chevrolet Corvette, 2014-2016 Chevrolet Avalanche, 2014-present Chevrolet Suburban, 2014-present Chevrolet Tahoe, 2016-present Chevrolet Camaro, 2014-present Chevrolet Camaro SS, 2014-2016 Chevrolet Corvette, 2014 to present GMC Sierra and Sierra 1500, 2014-present GMC Yukon and Yukon XL.

the Engine Control Module ("ECM"), specially designed and manufactured lifters, and other valve train components such as the valve lifter oil manifold.   The AFM and DFM valve train systems control some or all of the 16 lifters to prevent certain valves to the engine's 8 cylinders from opening at certain times during vehicle operation and allowing fuel to enter.  The result is that some of the 8 cylinders will not consume fuel when the ECM determines that only partial engine power is needed, *i.e*., at highway cruising speeds.  The purpose of the AFM and DFM valve train systems is to improve the overall fuel consumption of the vehicle without reducing the size of the engine.

5.      However, the AFM and DFM valve train systems are defective and malfunction and fail as a result of design, manufacturing, material, and/or workmanship defects (the "Valve Train Defect" or "Defect").

6.      The AFM and DFM valve train systems are substantially similar, if not identical, in each of the Class Vehicles, and therefore suffer from the same Valve Train Defect, irrespective of engine displacement.

7.      Lifters that are used in AFM or DFM valve train systems (sometimes called "AFM Lifters" in both systems because they are the lifters in each system that are able to be turned on and off by each system) malfunction and prematurely fail, both within and outside of the warranty periods, which necessitates costly repairs and replacements. Discovery will show that the lifters fail because: (1) the lifters (including the locking pin) do not conform to design specifications, are installed in

an incorrect position in the lifter guide, and/or are made of sub-standard materials; (2) they are designed improperly without taking into account the expansion and contraction rates of the lifters and the engine block; (3) the bores in which the lifters are inserted are designed and/or manufactured at widths that do not allow for the necessary clearance of the lifter to move freely, which damages the lifters; (4) in designing and/or manufacturing the lifters, GM failed to account for the amount of increased pressure to which the AFM lifters are exposed by the pressurized oil used to operate the lifters, causing them to fail prematurely; and (5) more maintenance of the valve train system is needed than is advised in GM's maintenance guides, including more frequent oil changes, engine flushing and cleaning and/or replacing the valve lifter oil manifold and its filter at regular intervals.

8.      Moreover, other components of the valve train system, namely the valve springs and rocker arms, are also defective and have high rates of premature failure. Discovery will show that the valve springs and rocker arms fail prematurely because the valve springs and rocker arms do not conform to design specifications and/or are made of sub-standard materials.

9.      Further, the Engine Control Module that controls the valve train system is not programmed correctly, leading to mistimed valve train events that damage valve train system components and thus further contribute to the Valve Train Defect.

10.     When valve train components begin to fail, including lifters, rocker arms, and valve springs, the vehicle can lose power while being driven, hesitate, and

4

the engine can misfire, stall, shudder, stutter, or surge. One common symptom of the valve train system failure is a ticking noise emanating from the engine compartment, as well as other abnormal noises, including chirps, squeals, and squeaks.

11. The Valve Train Defect can leave drivers and passengers in dangerous situations. For example, stalling, losing power while driving, and hesitation, especially when trying to merge, increase the risk of a traffic collision. Similarly, if the Defect is unremedied for too long, the entire engine can be damaged, necessitating an expensive full engine replacement.

12. When the Valve Train Defect manifests during the warranty period, GM authorizes its dealerships to merely replace the parts that have failed with the same defective versions. Further, these repairs are often incomplete – not only are the lifters not totally replaced, other engine components that were damaged by the lifter's failure may not be replaced at all. As a result, the Valve Train Defect manifests again, often outside the warranty period, and Class Members are forced to personally expend the costs to replace the lifters, rocker arms, valve springs, and other damaged components, including bearing the cost(s) of any repeat failures. Further, this ongoing damage to the engine eventually and inevitably leads to Class Vehicles requiring full engine replacements, well before the expected lifespan of the engine has elapsed.

13.    The Valve Train Defect is inherent in each Class Vehicle and was present at the time of sale.

14.    GM was well aware of the Valve Train Defect from pre-production testing, design failure mode analysis, calls to its customer service hotline, aggregate part sales, dealer audits, aggregate warranty information, complaints made to the National Highway Transportation Safety Administration ("NHTSA") which GM monitors, and customer complaints made to both GM and its authorized dealers. Further, GM has issued many bulletins to its dealerships regarding the problems with the rocker arms, lifters, and valve springs in Class Vehicles. These sources of knowledge and information were exclusively in the possession of GM and its network of authorized dealers and, therefore, unavailable to consumers.

15.    Despite access to aggregate internal data, GM has actively concealed the existence of the Valve Train Defect by claiming that consumers are responsible for the lifter failures - despite the assurances of dealership technicians that there is no way to prevent the failure - and failing to authorize permanent or complete repairs under warranty.  In this way, GM has effectively and knowingly transferred the costs of repair to consumers, despite the promises of its express warranties.

16.    GM sells the Class Vehicles with a 3-year, 36,000-mile bumper-to-bumper warranty[2]. However, when class members bring their vehicles to GM's

---

[2] As explained in more detail, *infra*, certain Class Vehicles have bumper-to-bumper warranties with longer durational limits.

authorized dealerships having already required repair of the Valve Train Defect, and requesting coverage for a subsequent failure, GM denies coverage. As a result, Class Members are personally exposed to thousands of dollars of out-of-pocket to repair costs, including money that flows to GM when consumers purchase replacement parts through authorized GM dealerships.

17.     The Valve Train Defect is material because it poses a serious safety concern. Losing power while driving, especially at highway speeds or while trying to merge or change lanes, hesitation, surging, and stalling all significantly increase the risk of vehicle collision.

18.     The Valve Train Defect is also material because consumers incur significant and unexpected repair costs. GM's failure to disclose the Valve Train Defect at the time of purchase is material because no reasonable consumer expects to spend thousands of dollars to repair or replace damaged vehicle components that the manufacturer knows will fail well before the expected useful life of the component and knows will also damage other components or destroy the engine entirely.

19.     Had GM disclosed the Valve Train Defect, Plaintiffs and Class Members would not have purchased the Class Vehicles or would have paid less for them.

## THE PARTIES

### Plaintiff Danny Harrison

20.     Plaintiff Danny Harrison is a citizen of Alabama, domiciled in Spanish Fort, Alabama.

21.     On or about February 9, 2021, Plaintiff Harrison purchased a new 2021 GMC Sierra 1500 from McConnell Automotive, an authorized GM dealership located in Mobile, Alabama.

22.     Plaintiff Harrison purchased his vehicle primarily for personal, family, or household use.

23.     Passenger safety and reliability were important factors in Plaintiff Harrison's decision to purchase his vehicle.  Before purchasing the vehicle, Plaintiff Harrison visited the dealership's website, reviewed the Monroney sticker (the "window sticker") which listed the 5.3L engine as a component, and spoke to the authorized salesperson at the dealership who assured him of the quality, safety, and reliability of the vehicle.  Plaintiff Harrison also took the vehicle for a test ride. Plaintiff Harrison selected and ultimately purchased his Class Vehicle because the vehicle was represented to be, and was marketed as, a high-quality vehicle capable of providing safe, reliable transportation.  The purchase was made in part on the advertised safety, reliability, and quality of the vehicle and its components, including its engine.

24.    None of the information provided to Plaintiff Harrison disclosed any defects in the vehicle or its engine.  GM's omissions were material to Plaintiff Harrison.

25.    Had GM disclosed its knowledge of the Valve Train Defect before he purchased his vehicle, Plaintiff Harrison would have seen and been aware of the disclosures. Indeed, GM's misstatements and omissions were material to Plaintiff Harrison.  Like all members of the Class, Plaintiff Harrison would not have purchased his Class Vehicle, or would have paid less for the vehicle, had he known of the Valve Train Defect.

26.    In addition, at the time of Plaintiff Harrison's vehicle purchase, and in purchasing his vehicle, he relied upon GM and its authorized dealerships' representations, which Plaintiff Harrison viewed during his online research, including on GM's website, heard from the salesperson, and reviewed on the Monroney sticker, that the vehicle was fully functional, safe, durable, reliable, and that the engine operated correctly and effectively.  Plaintiff Harrison relied on those representations and the omission of, or failure to disclose, the Valve Train Defect, in purchasing the vehicle, and absent those representations and omissions, would not have purchased the vehicle, or would have paid less for it.

27.    At the time of his purchase, GM issued to Plaintiff Harrison for his vehicle: (1) a bumper-to-bumper basic warranty lasting for three years or 36,000 miles, whichever occurred first; (2) a powertrain warranty lasting for five years or

60,000 miles, whichever occurred first; and (3) an emissions control warranty of eight years or 80,000 miles, whichever occurred first.

28.     Unbeknownst to Plaintiff Harrison, at the time of his purchase, GM had already issued two communications to its authorized dealerships describing problems with the valve train system in the 2021 GMC Sierra 1500.

29.     At all times during his possession of the vehicle, Plaintiff Harrison has properly maintained and serviced his Class Vehicle according to GM's recommended maintenance guidelines.

30.     On or about July 23, 2021, Plaintiff Harrison was driving his vehicle on a 20-mile-long bridge located approximately 250 miles from his home when the vehicle began to sputter, spit, vibrate, misfire, and lose power.  In addition, multiple lights on the dashboard illuminated.   Plaintiff Harrison was only narrowly able to get the vehicle off the bridge, where he called his local GM authorized dealership, Tameron Buick GMC, for assistance.  They directed him to a local GM authorized dealership, Courtesy GMC Truck Center, located in Lafayette, Louisiana.

31.     Plaintiff Harrison's vehicle was towed to Courtesy GMC Truck Center.  At the time, it had approximately 8,250 miles on the odometer.  The dealership inspected the vehicle and found Diagnostic Trouble Code ("DTC") P0300 and DTC P0303 recorded by the vehicle's ECM, indicating misfires in the cylinders. The lifter for the number 3 cylinder had collapsed, causing a bent pushrod and a resulting

tapping noise.  The dealership replaced all the lifters on the left side of the engine, the pushrod, and the gaskets, per Technical Service Bulletin ("TSB") 19-NA-218.

32.     Plaintiff Harrison requested that all the lifters in his vehicle's engine be replaced, reasoning that the failed lifter would have come from the same batch as the others in his vehicle.  The dealership agreed and communicated with GM directly, trying to get authorization under the warranty applicable to Plaintiff Harrison's vehicle to replace the lifters on the ride side of the engine as well.  GM refused to cover a warranty replacement of the right-side lifters.

33.     Plaintiff Harrison was without his vehicle for 43 days, including the 25 days it took for the dealership to receive replacement parts from GM.  He also had to secure alternative transportation to get back home while his vehicle was sitting at Courtesy GMC Truck Center.

34.     Ultimately, GM arranged for Plaintiff Harrison's partially repaired vehicle to be returned to him at his home.

35.     To date, Plaintiff Harrison has not received any notification from GM about any potential permanent repair or modification, or change to the maintenance schedule which would either repair the Valve Train Defect or prevent the Valve Train Defect from causing damage to his vehicle.

36.     As a result of the Valve Train Defect, Plaintiff Harrison has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes.  Further, Plaintiff Harrison will

be unable to rely on GM's advertising or labeling in the future, and so will not purchase or lease another vehicle from GM in the future, though he would like to do so.

37.     At all times, Plaintiff Harrison, like other class members, has attempted to drive his vehicle in a manner that was both foreseeable and in which it was intended to be used.

**Plaintiff Christopher McClave**

38.     Plaintiff Christopher McClave is a citizen of Connecticut, domiciled in New Canaan, Connecticut.

39.     On or about April 20, 2021, Plaintiff McClave leased a new 2021 GMC Yukon equipped with a 5.3L V8 engine from Minchin Buick GMC, Inc., an authorized GM dealership located in Stamford, Connecticut.

40.     Plaintiff McClave purchased his vehicle primarily for personal, family, or household use.

41.     Passenger safety and reliability were important factors in Plaintiff McClave's decision to lease his vehicle.  Before agreeing to the lease, Plaintiff McClave "Googled" the vehicle, visited GM's website, the dealership's website, visited TahoeYukonForum.com, an owners' forum, , reviewed the Monroney sticker (the "window sticker"), which listed the 5.3L engine as a component, and spoke to the authorized salesperson at the dealership who assured him of the quality, safety, and reliability of the vehicle.  Plaintiff McClave also took the vehicle for a test drive.

Plaintiff McClave selected and ultimately leased his Class Vehicle because the vehicle was represented to be, and was marketed as, a high-quality vehicle capable of providing safe, reliable transportation.  The purchase was made in part on the advertised safety, reliability, and quality of the vehicle and its components, including its engine.

42.     None of the information provided to Plaintiff McClave disclosed any defects in the vehicle or its engine.  GM's omissions were material to Plaintiff McClave.

43.     Had GM disclosed its knowledge of the Valve Train Defect before he leased his vehicle, Plaintiff McClave would have seen and been aware of the disclosures. Indeed, GM's misstatements and omissions were material to Plaintiff McClave.  Like all members of the Class, Plaintiff McClave would not have leased his Class Vehicle, or would have paid less for the vehicle, had he known of the Valve Train Defect.

44.     In addition, at the time Plaintiff McClave leased his vehicle, and in leasing his vehicle, he relied upon representations from GM and its authorized dealership that he saw during his online research, including GM's website, heard from the salesperson, and reviewed on the Monroney sticker that the vehicle was fully functional, safe, durable, reliable, and that the engine operated correctly and effectively.  Plaintiff McClave relied on those representations and the omission of the disclosure of the Valve Train Defect, in purchasing the vehicle, and absent those

representations and omissions, would not have leased the vehicle or would have paid less for it.

45.     At the time of his purchase, GM issued to Plaintiff McClave for his vehicle: (1) a bumper-to-bumper basic warranty lasting for three years or 36,000 miles, whichever occurred first; (2) a powertrain warranty lasting for 5 years or 60,000 miles, whichever occurred first; and (3) an emissions control warranty of eight years or 80,000 miles, whichever occurred first.

46.     Unbeknownst to Plaintiff McClave, at the time of his purchase, GM had already issued three communications to its authorized dealerships describing problems with the valve train in the 2021 GMC Yukon.

47.     At all times during his possession of the vehicle, Plaintiff McClave has properly maintained and serviced his Class Vehicle according to GM's recommended maintenance guidelines.

48.     On or around June 12, 2021, Plaintiff McClave was driving his vehicle when he heard a loud ticking from the engine compartment.  Additionally, the dashboard illuminated with various warning lights and the vehicle began to vibrate.  Concerned about the safety and drivability of the vehicle, he immediately took the vehicle to Empire Buick GMC of White Plains, the closest authorized GM dealership at that time, and reported the problems.  The dealership inspected his vehicle and found a failed lifter on cylinder number 3 and a bent pushrod and called GM's Technical Assistance Center ("TAC") for additional diagnostic help.  The dealership

only replaced one bank of lifters, eight in total, rather than replace all of the lifters in his vehicle.  The dealership also checked the ECM.  At the time, his vehicle had approximately 4,500 miles on the odometer.

49.    On or around November 6, 2021, Plaintiff McClave was driving his vehicle when, again, he heard ticking from the engine compartment and felt a vibration.  At the time, he was traveling and ended up stranded six hours away from his home.  He had the vehicle towed to Minchin Buick GMC, Inc. on November 7, 2021, where the dealership diagnosed his vehicle as having another failed lifter, this time on cylinder number 4, along with another bent pushrod.  At the time, his vehicle had approximately 10,400 miles on the odometer. Minchin Buick replaced the lifters on that bank, as well as the pushrod, and returned the vehicle to Plaintiff McClave.

50.    To date, Plaintiff McClave has not received any notification from GM about any potential for a permanent repair or modification, or change to the maintenance schedule which would either repair the Valve Train Defect or prevent the Valve Train Defect from causing damage to his vehicle.

51.    As a result of the Valve Train Defect, Plaintiff McClave has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes.  Further, Plaintiff McClave will be unable to rely on GM's advertising or labeling in the future, and so will not purchase or lease another vehicle from GM in the future, though he would like to do so.

52.     At all times, Plaintiff McClave, like other class members, has attempted to drive his vehicle in a manner that was both foreseeable and in which it was intended to be used.

**Plaintiff Melissa Luster**

53.     Plaintiff Melissa Luster is a citizen of Florida, domiciled in Melbourne, Florida.

54.     On or about March 14, 2017, Plaintiff Luster purchased a new 2017 Cadillac Escalade equipped with a 6.2L V8 engine from Murphy Cadillac, an authorized GM dealership located in Melbourne, Florida.

55.     Plaintiff Luster purchased her vehicle primarily for personal, family, or household use.

56.     Passenger safety and reliability were important factors in Plaintiff Luster's decision to purchase her vehicle. Before making her purchase, Plaintiff Luster "Googled" the vehicle, review the manufacturer's and dealer's websites, created and reviewed a specification sheet with the salespersons which listed the 6.2L engine as a component to order the vehicle directly from GM, and spoke to the authorized salesperson at the dealership who assured him of the quality, safety, and reliability of the vehicle.  Plaintiff Luster selected and ultimately purchased her Class Vehicle because the vehicle was represented to be, and was marketed as, a high-quality vehicle capable of providing safe, reliable transportation.  The purchase was

made in part on the advertised safety, reliability, and quality of the vehicle and its components, including its engine.

57.     None of the information provided to Plaintiff Luster disclosed any defects in the vehicle or its engine.  GM's omissions were material to Plaintiff Luster.

58.     Had GM disclosed its knowledge of the Valve Train Defect before she purchased her vehicle, Plaintiff Luster would have seen and been aware of the disclosures. Indeed, GM's misstatements and omissions were material to Plaintiff Luster.  Like all members of the Class, Plaintiff Luster would not have purchased her Class Vehicle, or would have paid less for the vehicle, had she known of the Valve Train Defect.

59.     In addition, at the time Plaintiff Luster purchased her vehicle, and in purchasing her vehicle, she relied upon representations from GM and its authorized dealership that she saw during her research, heard from the salesperson, and reviewed on the specification sheet that the vehicle was fully functional, safe, durable, reliable, and that the engine operated correctly and effectively.  Plaintiff Luster relied on those representations and the omission of the disclosure of the Valve Train Defect, in purchasing the vehicle, and absent those representations and omissions, would not have purchased the vehicle or would have paid less for it.

60.     At the time of her purchase, GM issued to Plaintiff Luster for her vehicle: (1) a bumper-to-bumper basic warranty lasting for four years or 50,000

miles, whichever occurred first; (2) a powertrain warranty lasting for six years or 70,000 miles, whichever occurred first; and (3) an emissions control warranty of eight years or 80,000 miles, whichever occurred first.

61.     Unbeknownst to Plaintiff Luster, at the time of her purchase, GM had already issued two communications to its authorized dealerships describing problems with the valve train system in 2017 Cadillac Escalades.

62.     At all times during her ownership of the vehicle, Plaintiff Luster has properly maintained and serviced her Class Vehicle according to GM's recommended maintenance guidelines.

63.     Soon after purchasing her vehicle, Plaintiff Luster experienced the vehicle losing power while driving, shifting hard, and occasional stalling.  She repeatedly took her vehicle to the dealership to complain about these issues and request repairs.  Specifically, Luster took her vehicle to the dealership and requested repairs on August 10, 2017, January 4, 2018, October 10, 2018, February 15, 2019, June 27, 2019, February 28, 2020, and March 10, 2020.  Each time, no repairs were attempted and she was told that there was nothing wrong with her vehicle.  Plaintiff Luster's vehicle had 62,079 miles on the odometer as of February 5, 2021.

64.     On or about November 5, 2021, Plaintiff Luster heard a ticking and knocking noise from the engine compartment while she was driving the vehicle.  She took the vehicle to the dealership, which performed a diagnostic and found a bad

lifter and bent pushrod.  In addition, the problem had been ongoing for so long, the camshaft in her vehicle was damaged and had to be replaced.

65.    The dealership informed her that her vehicle was out of warranty and she was responsible for the total cost of the repairs, including a replacement camshaft, eight lifters, and a replacement pushrod.  As a result, Plaintiff Luster paid over $6,000 for repairs, which took two weeks to complete.  At the time, her vehicle had 78,000 miles on the odometer.

66.    To date, Plaintiff Luster has not received any notification from GM about any potential permanent repair or modification, or change to the maintenance schedule which would either repair the Valve Train Defect or prevent the Valve Train Defect from causing damage to his current vehicle.

67.    As a result of the Valve Train Defect, Plaintiff Luster has lost confidence in the ability of her Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes.  Further, Plaintiff Luster will be unable to rely on GM's advertising or labeling in the future, and so will not purchase or lease another vehicle from GM in the future, though she would like to do so.

68.    At all times, Plaintiff Luster, like other class members, has attempted to drive her vehicle in a manner that was both foreseeable and in which it was intended to be used.

**Plaintiff Leon Jordan**

69.     Plaintiff Leon Jordan is a citizen of Georgia, domiciled in Stockbridge, Georgia.

70.     On or about December 31, 2015, Plaintiff Jordan purchased a used 2015 Cadillac Escalade equipped with a 6.2L V8 engine with approximately 7,780 miles on the odometer from Heritage Cadillac, an authorized GM dealership located in Morrow, Georgia.

71.     Plaintiff Jordan purchased his vehicle primarily for personal, family, or household use.

72.     Passenger safety and reliability were important factors in Plaintiff Jordan's decision to purchase his vehicle. Before making his purchase, Plaintiff Jordan reviewed the Monroney sticker (the "window sticker") which listed the 6.2L engine as a component, and spoke to the authorized salesperson at the dealership who assured him of the quality, safety, and reliability of the vehicle.  Plaintiff Jordan also took the vehicle for a test drive.  Plaintiff Jordan selected and ultimately purchased his Class Vehicle because the vehicle was represented to be and was marketed as a high-quality vehicle capable of providing safe, reliable transportation. The purchased was made in part on the advertised safety, reliability, and quality of the vehicle and its components, including its engine.

73. None of the information provided to Plaintiff Jordan disclosed any defects in the vehicle or its engine. GM's omissions were material to Plaintiff Jordan.

74. Had GM disclosed its knowledge of the Valve Train Defect before he purchased his vehicle, Plaintiff Jordan would have seen and been aware of the disclosures. Indeed, GM's misstatements and omissions were material to Plaintiff Jordan. Like all members of the Class, Plaintiff Jordan would not have purchased his Class Vehicle, or would have paid less for the vehicle, had he known of the Valve Train Defect.

75. In addition, at the time Plaintiff Jordan purchased his vehicle, and in purchasing his vehicle, he relied upon representations from GM and its authorized dealership that he heard from the salesperson, and reviewed on the Monroney sticker that the vehicle was fully functional, safe, durable, reliable, and that the engine operated correctly and effectively. Plaintiff Jordan relied on those representations and the omission of the disclosure of the Valve Train Defect, in purchasing the vehicle, and absent those representations and omissions, would not have purchased the vehicle or would have paid less for it.

76. At the time of his purchase, GM transferred to Plaintiff Jordan for his vehicle: (1) a bumper-to-bumper basic warranty lasting for four years or 50,000 miles, whichever occurred first; (2) a powertrain warranty lasting for six years or

70,000 miles, whichever occurred first; and (3) an emissions control warranty of eight years or 80,000 miles, whichever occurred first.

77.    Unbeknownst to Plaintiff Jordan, at the time of his purchase, GM had already issued five communications to its authorized dealerships describing problems with the valve train system in 2015 Cadillac Escalades.

78.    At all times during his ownership of the vehicle, Plaintiff Jordan has properly maintained and serviced his Class Vehicle according to GM's recommended maintenance guidelines.

79.    In around early June 2021, Plaintiff Jordan observed that the vehicle was hesitating while being driven, had a lack of power, ran roughly, produced smoke from the tailpipe, and was making a clacking noise in the engine compartment.  On or about June 14, 2021, he had the vehicle towed to Heritage Cadillac.  At the time, his vehicle had approximately 46,800 miles on the odometer.  The dealership performed a diagnostic check and discovered that there was a "misfire condition due to issue with lifter failure and bent pushrods."  Plaintiff Jordan was charged and paid $1,650 for the diagnostic and the dealership recommended that he replace the engine.

80.    Heritage Cadillac contacted EasyCare, Plaintiff Jordan's third-party warranty provider to submit a claim on his behalf in order to pay for a new engine.  EasyCare sent an adjustor to Heritage Cadillac, who inspected the vehicle and ultimately denied the claim due to coolant mixing with the engine oil.  Heritage Cadillac informed Plaintiff Jordan that the coolant mixing with the oil was the result

of the lifter failure and subsequent damage to the engine it caused and explained that to EasyCare.  However, EasyCase denied the claim three times.

81.     After nearly four months had passed without a resolution, and because Plaintiff Jordan had not been provided with a loaner vehicle in the interim, forcing him to pay for Lyft rides, *inter alia*, to get to his doctors' appointments, he began to search for an alternative.  No dealership, other than Heritage Cadillac, would accept his vehicle as a trade-in, significantly limiting his options at securing new transportation.  Because he is a disabled veteran and has trouble getting in and driving smaller vehicles, Plaintiff Jordan once again considered a Cadillac Escalade.

82.     While his 2015 Cadillac Escalade was sitting in the service area of the dealership, Plaintiff Jordan observed that a 2020 Cadillac Escalade had come in for the same issue—failed lifters.  As a result, he specifically looked at only 2021 Cadillac Escalades and specifically asked if the 2021 Cadillac Escalade had the same issue(s).  He was told that the dealership "had not had that kind of problem" with the 2021 Cadillac Escalade.

83.     On September 30, 2021, Plaintiff Jordan purchased a new 2021 Cadillac Escalade equipped with a 6.2L V8 engine from Heritage Cadillac.  He purchased this vehicle primarily for personal, family, or household use.

84.     Passenger safety and reliability were important factors in Plaintiff Jordan's decision to purchase the 2021 Cadillac Escalade vehicle. Before making his purchase, Plaintiff Jordan reviewed GM's website, reviewed the Monroney

sticker (the "window sticker") which listed the 6.2L engine as a component, and spoke to the authorized salesperson at the dealership who assured him of the quality, safety, and reliability of the vehicle, particularly in comparison to his issues with the 2015 Cadillac Escalade.  Plaintiff Jordan also took the vehicle for a test ride. Plaintiff Jordan selected and ultimately purchased the 2021 Cadillac Escalade because the vehicle was represented to be and was marketed as a high-quality vehicle capable of providing safe, reliable transportation.  The purchased was made in part on the advertised safety, reliability, and quality of the vehicle and its components, including its engine.

85.    None of the information provided to Plaintiff Jordan disclosed any defects in the vehicle or its engine.  GM's omissions were material to Plaintiff Jordan.

86.    Had GM disclosed its knowledge of the Valve Train Defect before he purchased his vehicle, Plaintiff Jordan would have seen and been aware of the disclosures. Indeed, GM's misstatements and omissions were material to Plaintiff Jordan.  Like all members of the Class, Plaintiff Jordan would not have purchased his Class Vehicle, or would have paid less for the vehicle, had he known of the Valve Train Defect.

87.    In addition, at the time Plaintiff Jordan purchased the 2021 Cadillac Escalade, and in purchasing the vehicle, he relied upon representations from GM and its authorized dealership that he saw during his research, heard from the

salesperson, and reviewed on the Monroney sticker that the vehicle was fully functional, safe, durable, reliable, and that the engine operated correctly and effectively. Plaintiff Jordan relied on those representations and the omission of the disclosure of the Valve Train Defect, in purchasing the vehicle, and absent those representations and omissions, would not have purchased the vehicle or would have paid less for it.

88.     At the time of his purchase, GM provided to Plaintiff Jordan for his vehicle: (1) a bumper-to-bumper basic warranty lasting for four years or 50,000 miles, whichever occurred first; (2) a powertrain warranty lasting for six years or 70,000 miles, whichever occurred first; and (3) an emissions control warranty of eight years or 80,000 miles, whichever occurred first.

89.     Unbeknownst to Plaintiff Jordan, at the time of his purchase of the 2021 Cadillac Escalade, GM had already issued six communications to its authorized dealerships describing valve train problems in 2021 Cadillac Escalades.

90.     To date, Plaintiff Jordan has not received any notification from GM about any potential permanent repair or modification, or change to the maintenance schedule which would either repair the Valve Train Defect or prevent the Valve Train Defect from causing damage to his current vehicle.

91.     As a result of the Valve Train Defect, Plaintiff Jordan has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes. Further, Plaintiff Jordan will

be unable to rely on GM's advertising or labeling in the future, and so will not purchase or lease another vehicle from GM in the future, though he would like to do so.

92.    At all times, Plaintiff Jordan, like other class members, has attempted to drive his vehicle in a manner that was both foreseeable and in which it was intended to be used.

### **Plaintiff Daniel Demarest**

93.    Plaintiff Daniel Demarest is a citizen of New Jersey and is domiciled in Montvale, New Jersey.

94.    In or around May 13, 2019, Plaintiff Demarest leased a new 2019 Chevrolet Silverado 1500 equipped with a 5.3L V8 engine from Hawthorne Chevrolet, an authorized GM dealership located in Hawthorne, New Jersey.

95.    Plaintiff Demarest purchased his vehicle primarily for personal, family, or household use.

96.    Passenger safety and reliability were important factors in Plaintiff Demarest's decision to lease his vehicle. Before making his purchase, Plaintiff Demarest reviewed the manufacturer and dealer websites, test drove a 2019 Silverado with the same engine, and spoke to the authorized salesperson at the dealership who assured him of the quality, safety, and reliability of the vehicle. Plaintiff Demarest selected and ultimately leased his Class Vehicle because the vehicle was represented to be and was marketed as a high-quality vehicle capable of

providing safe, reliable transportation.  The lease was made in part on the advertised safety, reliability, and quality of the vehicle and its components, including its engine.

97.    None of the information provided to Plaintiff Demarest disclosed any defects in the vehicle or its engine.  GM's omissions were material to Plaintiff Demarest.

98.    Had GM disclosed its knowledge of the Valve Train Defect before he purchased his vehicle, Plaintiff Demarest would have seen and been aware of the disclosures. Indeed, GM's misstatements and omissions were material to Plaintiff Demarest.  Like all members of the Class, Plaintiff Demarest would not have leased his Class Vehicle, or would have paid less for the vehicle, had he known of the Valve Train Defect.

99.    In addition, at the time Plaintiff Demarest leased his vehicle, and in leasing his vehicle, he relied upon representations from GM and its authorized dealership that he viewed on the website and heard from the salesperson that the vehicle was fully functional, safe, durable, reliable, and that the engine operated correctly and effectively.  Plaintiff Demarest relied on those representations and the omission of the disclosure of the Valve Train Defect, in leasing the vehicle, and absent those representations and omissions, would not have leased the vehicle or would have paid less for it.

100.   At the time of his lease, GM provided to Plaintiff Demarest for his vehicle: (1) a bumper-to-bumper basic warranty lasting for three years or 36,000

miles, whichever occurred first; (2) a powertrain warranty lasting for five years or 60,000 miles, whichever occurred first; and (3) an emissions control warranty of eight years or 80,000 miles, whichever occurred first.

101.   Unbeknownst to Plaintiff Demarest, at the time of his lease, GM had already issued three communications to its authorized dealerships describing problems with the valve train system in 2019 Chevrolet Silverados.

102.   At all times during his ownership of the vehicle, Plaintiff Demarest has properly maintained and serviced his Class Vehicle according to GM's recommended maintenance guidelines.

103.   On or about May 7, 2021, Plaintiff Demarest was driving his vehicle on the highway from New Jersey to Florida when the vehicle began to stutter and shake. The check engine light began to flash and he heard noises coming from the engine. The vehicle became hard to control, but he managed to get to the closest GM authorized dealership, Lumberton GMC, located in Lumberton, North Carolina.  At the time of the malfunction, his vehicle had approximately 14,700 miles on the odometer.

104.   The dealership confirmed that the check engine light was on and found DTC P0300 in the vehicle's computer.  The dealership inspected the vehicle, confirming a misfire in cylinder number 1, on which the rocker arms were not moving.  The dealership identified the cause as failed lifters and cited TSB

PIP5776C. Ultimately, the dealership confirmed that all eight lifters on the left side of the engine would have to be replaced.

105.   Plaintiff Demarest waited five hours at the dealership before he was given a loaner vehicle to continue on his trip, because GM's policies do not allow dealerships to provide loaner vehicles that are not GM-branded vehicles and such a vehicle could not be located.  Later, he had to extend his trip by one day because his vehicle would not be ready in time.  This delay cost him at least $240.00.

106.   To date, Plaintiff Demarest has not received any notification from GM about any potential permanent repair or modification, or change to the maintenance schedule which would either repair the Valve Train Defect or prevent the Valve Train Defect from causing damage to his current vehicle.

107.   As a result of the Valve Train Defect, Plaintiff Demarest has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes.  Further, Plaintiff Demarest will be unable to rely on GM's advertising or labeling in the future, and so will not purchase or lease another vehicle from GM with a gasoline-powered V8 engine in the future, though he would like to do so.

108.   At all times, Plaintiff Demarest, like other class members, has attempted to drive his vehicle in a manner that was both foreseeable and in which it was intended to be used.

**Plaintiff Mark Hayford**

109.   Plaintiff Mark Hayford is an Ohio citizen who is domiciled in Delphos, Ohio.

110.   On or about February 3, 2018, Plaintiff Hayford purchased a 2016 Chevrolet Silverado 1500 equipped with a 6.2L V8 engine with approximately 48,000 miles on the odometer from a dealership located in Defiance, Ohio.

111.   Plaintiff Hayford purchased his vehicle primarily for personal, family, or household use.

112.   Passenger safety and reliability were important factors in Plaintiff Hayford's decision to purchase his vehicle. Before making his purchase, Plaintiff Hayford conducted internet research including at Kelley Blue Book, saw commercials for the Chevrolet Silverado, reviewed the manufacturer and dealer websites, reviewed the Monroney sticker (the "window sticker") which listed the 6.2L engine as a component, and test drove the vehicle. Plaintiff Hayford selected and ultimately purchased his Class Vehicle because the vehicle was represented to be and was marketed as a high-quality vehicle capable of providing safe, reliable transportation. The purchase was made in part on the advertised safety, reliability, and quality of the vehicle and its components, including its engine.

113.   None of the information provided to Plaintiff Hayford disclosed any defects in the vehicle or its engine. GM's omissions were material to Plaintiff Hayford.

114.   Had GM disclosed its knowledge of the Valve Train Defect before he purchased his vehicle, Plaintiff Hayford would have seen and been aware of the disclosures. Indeed, GM's misstatements and omissions were material to Plaintiff Hayford.  Like all members of the Class, Plaintiff Hayford would not have purchased his Class Vehicle, or would have paid less for the vehicle, had he known of the Valve Train Defect.

115.   In addition, at the time Plaintiff Hayford purchased his vehicle, and in purchasing his vehicle, he relied upon representations from GM that he viewed on the website and saw on the Monroney sticker that the vehicle was fully functional, safe, durable, reliable, and that the engine operated correctly and effectively. Plaintiff Hayford relied on those representations and the omission of the disclosure of the Valve Train Defect, in leasing the vehicle, and absent those representations and omissions, would not have leased the vehicle or would have paid less for it.

116.   At the time of his purchase, GM transferred to Plaintiff Hayford for his vehicle: (1) a bumper-to-bumper basic warranty lasting for three years or 36,000 miles, whichever occurred first; (2) a powertrain warranty lasting for five years or 60,000 miles, whichever occurred first; and (3) an emissions control warranty of eight years or 80,000 miles, whichever occurred first.

117.   Unbeknownst to Plaintiff Hayford, at the time of his purchase, GM had already issued six communications to its authorized dealerships describing problems with the valve train system in 2016 Chevrolet Silverados.

31

118.   At all times during his ownership of the vehicle, Plaintiff Hayford has properly maintained and serviced his Class Vehicle according to GM's recommended maintenance guidelines.

119.   In September 2021, Plaintiff Hayford had taken the vehicle to Lima Auto Mall, an authorized GM dealership located in Lima, Ohio.   There, he complained about problems with the vehicle's 8-speed transmission, including lurching and jerking.  The dealership charged him approximate $1,500 for repairs to the transmission, which he paid out-of-pocket.   At the time, his vehicle had approximately 81,300 miles on the odometer.

120.   On or about September 21, 2021, Lima Auto Mall told Plaintiff Hayford that his vehicle was fixed and to pick it up.  When he turned the vehicle on, he immediately heard a loud ticking sound coming from the engine compartment. Concerned that the engine would seize up as he drove away, Plaintiff Hayford insisted that the dealership diagnose his vehicle again.  The dealership inspected the engine and found a failed lifter and a bent push rod.  Plaintiff Hayford was charged approximately $3,300 to repair the engine, which he paid out-of-pocket.   The dealership warned him that the same lifter, or other lifters, could also fail again, and that this was not a permanent repair.

121.   To date, Plaintiff Hayford has not received any notification from GM about any potential permanent repair or modification, or change to the maintenance

32

schedule which would either repair the Valve Train Defect or prevent the Valve Train Defect from causing damage to his current vehicle.

122.   As a result of the Valve Train Defect, Plaintiff Hayford has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes.  Further, Plaintiff Hayford will be unable to rely on GM's advertising or labeling in the future, and so will not purchase or lease another vehicle from GM in the future, though he would like to do so.

123.   At all times, Plaintiff Hayford, like other class members, has attempted to drive his vehicle in a manner that was both foreseeable and in which it was intended to be used.

**Plaintiffs Ronald and Marilyn Jett**

124.   Plaintiffs Ronald and Marilyn Jett are Texas citizens who are domiciled in San Antonio, Texas.

125.   On or about July 17, 2017, Plaintiffs Ronald and Marilyn Jett purchased a new 2017 GMC Sierra equipped with a 5.3L V8 engine from John Roley's AutoCenter, an authorized GM dealership located in Levelland, Texas.

126.   Plaintiffs Ronald and Marilyn Jett purchased their vehicle primarily for personal, family, or household use.

127.   Passenger safety and reliability were important factors in the Jetts' decision to purchase their vehicle. Before making their purchase, the Jetts' reviewed

Kelley Blue Book, saw commercials for the GMC Sierra, reviewed the Monroney sticker (the "window sticker") which listed the 5.3L engine as a component, and spoke to the authorized salesperson at the dealership who assured them of the quality, safety, and reliability of the vehicle.  The Jetts also took the vehicle for a test drive.  Plaintiffs Ronald and Marilyn Jett selected and ultimately purchased their Class Vehicle because the vehicle was represented to be and was marketed as a high-quality vehicle capable of providing safe, reliable transportation.  The purchase was made in part on the advertised safety, reliability, and quality of the vehicle and its components, including its engine.

128.   None of the information provided to Plaintiffs Ronald and Marilyn Jett disclosed any defects in the vehicle or its engine.  GM's omissions were material to Plaintiffs Ronald and Marilyn Jett.

129.   Had GM disclosed its knowledge of the Valve Train Defect before they purchased their vehicle, Plaintiffs Ronald and Marilyn Jett would have seen and been aware of the disclosures. Indeed, GM's misstatements and omissions were material to Plaintiffs Ronald and Marilyn Jett.  Like all members of the Class, Plaintiffs Ronald and Marilyn Jett would not have purchased their Class Vehicle, or would have paid less for the vehicle, had they known of the Valve Train Defect.

130.   In addition, at the time Plaintiffs Ronald and Marilyn Jett purchased their vehicle, and in purchasing their vehicle, they relied upon representations from GM and its authorized dealership's salesperson, and reviewed on the Monroney

sticker that the vehicle was fully functional, safe, durable, reliable, and that the engine operated correctly and effectively.  Plaintiffs Ronald and Marilyn Jett relied on those representations and the omission of the disclosure of the Valve Train Defect, in purchasing the vehicle, and absent those representations and omissions, would not have purchased the vehicle or would have paid less for it.

131.   At the time of their purchase, GM provided to Plaintiffs Ronald and Marilyn Jett for their vehicle: (1) a bumper-to-bumper basic warranty lasting for three years or 36,000 miles, whichever occurred first; (2) a powertrain warranty lasting for five years or 60,000 miles, whichever occurred first; and (3) an emissions control warranty of eight years or 80,000 miles, whichever occurred first.

132.   Unbeknownst to Plaintiffs Ronald and Marilyn Jett, at the time of their purchase, GM had already issued two communications to its authorized dealerships describing problems with the valve trains system in 2017 GMC Sierras.

133.   At all times during their ownership of the vehicle, Plaintiffs Ronald and Marilyn Jett have properly maintained and serviced their Class Vehicle according to GM's recommended maintenance guidelines.

134.   In early October 2021, while on a trip, Plaintiff Ronald Jett began to hear the engine ticking.  The vehicle would also misfire, shutter, lose power, and occasionally stall.  At the time, his vehicle had approximately 73,000 miles on the odometer.

135.   Plaintiff Ronald Jett took his vehicle to an O'Reilly AutoParts store, which found the DTC code for a misfire in cylinder number 4.  On or about October 11, 2021, he took the vehicle to All American Chevrolet, an authorized GM dealership located in San Angelo, Texas.  All American Chevrolet confirmed that there was a misfire in cylinder number 4 and at least one failed lifter.  The dealership recommended a total engine replacement costing over $10,000.00.

136.   Plaintiff Ronald Jett refused the repair and took his vehicle to another authorized GM dealership, North Park Chevrolet, located in Castorville, Texas, which also recommended a full engine replacement.   He also confirmed the diagnosis with two independent auto mechanics, who quoted total engine replacements costing $7,800 and $11,000.

137.   Ultimately, Plaintiffs Ronald and Marilyn Jett's vehicle is being repaired by Premier Auto Repair in San Antonio, Texas for approximately $6,453.00.  Plaintiffs Ronald and Marilyn Jett decided to repair their engine because, due to part and engine shortages, they have been unable to find a replacement engine to purchase.

138.   To date, Plaintiffs Ronald and Marilyn Jett have not received any notification from GM about any potential permanent repair or modification, or change to the maintenance schedule which would either repair the Valve Train Defect or prevent the Valve Train Defect from causing damage to their current vehicle.

139.   As a result of the Valve Train Defect, Plaintiffs Ronald and Marilyn Jett have lost confidence in the ability of their Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes.   Further, Plaintiffs Ronald and Marilyn Jett will be unable to rely on GM's advertising or labeling in the future, and so will not purchase or lease another vehicle from GM in the future, though they would like to do so.

140.   At all times, Plaintiffs Ronald and Marilyn Jett, like other class members, have attempted to drive their vehicle in a manner that was both foreseeable and in which it was intended to be used.

**Plaintiff Rebecca Prosser**

141.   Plaintiff Rebecca Prosser is a citizen of Washington, domiciled in Seattle, Washington.

142.   On or about January 2, 2021, Plaintiff Prosser purchased a new 2021 GMC Yukon equipped with a 6.2L V8 engine from Kirkland Buick GMC, an authorized GM dealership located in Kirkland, Washington.  Kirkland Buick GMC has since become Buick GMC of Bellevue.

143.   Plaintiff Prosser purchased her vehicle primarily for personal, family, or household use.

144.   Passenger safety and reliability were important factors in Plaintiff Prosser's decision to purchase her vehicle. Before making her purchase, Plaintiff Prosser "Googled" the vehicle, reviewed the manufacturer and dealer's websites,

reviewed a Monroney sticker for a 2021 GMC Yukon (the "window sticker") which listed the 6.2L engine as a component, test drove a 2021 GMC Yukon, created and reviewed with a salesperson a specification sheet for her 2021 GMC Yukon which was a custom order directly from GM, and spoke to the authorized salesperson at the dealership who assured her of the quality, safety, and reliability of the vehicle. Plaintiff Prosser selected and ultimately purchased her Class Vehicle because the vehicle was represented to be and was marketed as a high-quality vehicle capable of providing safe, reliable transportation.  The purchase was made in part on the advertised safety, reliability, and quality of the vehicle and its components, including its engine.

145.   None of the information provided to Plaintiff Prosser disclosed any defects in the vehicle or its engine.  GM's omissions were material to Plaintiff Prosser.

146.   Had GM disclosed its knowledge of the Valve Train Defect before she purchased her vehicle, Plaintiff Prosser would have seen and been aware of the disclosures. Indeed, GM's misstatements and omissions were material to Plaintiff Prosser.  Like all members of the Class, Plaintiff Prosser would not have purchased her Class Vehicle, or would have paid less for the vehicle, had she known of the Valve Train Defect.

147.   In addition, at the time Plaintiff Prosser purchased her vehicle, and in purchasing her vehicle, she relied upon representations from GM and its authorized

dealership that she saw during her research, heard from the salesperson, reviewed on the Monroney sticker, and reviewed on the specification sheet that the vehicle was fully functional, safe, durable, reliable, and that the engine operated correctly and effectively.  Plaintiff Prosser relied on those representations and the omission of the disclosure of the Valve Train Defect, in purchasing the vehicle, and absent those representations and omissions, would not have purchased the vehicle or would have paid less for it.

148.   At the time of her purchase, GM issued to Plaintiff Prosser for her vehicle: (1) a bumper-to-bumper basic warranty lasting for three years or 36,000 miles, whichever occurred first; (2) a powertrain warranty lasting for 5 years or 60,000 miles, whichever occurred first; and (3) an emissions control warranty of eight years or 80,000 miles, whichever occurred first.

149.   Unbeknownst to Plaintiff Prosser, at the time of her purchase, GM had already issued at least two communications to its authorized dealerships describing problems with the valve train system in 2021 GMC Yukon.

150.   At all times during her ownership of the vehicle, Plaintiff Prosser has properly maintained and serviced her Class Vehicle according to GM's recommended maintenance guidelines.

151.   In early October 2021, while driving her vehicle, Plaintiff Prosser began to hear a thumping or clunking noise coming from the engine compartment. In addition, several lights illuminated on the dashboard.  Plaintiff Prosser took her

vehicle immediately to the dealership for diagnosis. At the time, her vehicle had approximately 3,600 miles on the odometer.

152. The dealership inspected her vehicle and confirmed hearing the noise. A run of the diagnosis found that the fourth lifter was collapsing and that the associated pushrod was bent. The dealership replaced all of the lifters in her vehicle, the bent pushrod, as well as related seals and gaskets. This repair was provided under warranty.

153. To date, Plaintiff Prosser has not received any notification from GM about any potential permanent repair or modification, or change to the maintenance schedule which would either repair the Valve Train Defect or prevent the Valve Train Defect from causing damage to his current vehicle.

154. As a result of the Valve Train Defect, Plaintiff Prosser has lost confidence in the ability of her Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes. Further, Plaintiff Prosser will be unable to rely on GM's advertising or labeling in the future, and so will not purchase or lease another vehicle from GM in the future, though she would like to do so.

155. At all times, Plaintiff Prosser, like other class members, has attempted to drive her vehicle in a manner that was both foreseeable and in which it was intended to be used.

**Defendant**

156. Defendant General Motors LLC is a Delaware limited liability company with its principal place of business located at 300 Renaissance Center, Detroit, Michigan. General Motors LLC is registered to do business in the State of Delaware. The sole member and owner of General Motors LLC is General Motors Holdings LLC.

157. General Motors Holdings LLC is a Delaware limited liability company with its principal place of business in the State of Michigan. General Motors Holdings LLC's only member is General Motor Company, a Delaware corporation with its principal place of business in the State of Michigan. General Motors Company has 100% ownership interest in General Motors Holdings LLC. General Motor Company also owns ACDelco, a company which makes parts for GM vehicles to be used when the vehicles are manufactured and also to be sold to the public when those parts require repair.

158. General Motors LLC, through its various entities, designs, manufactures, markets, distributes, services, repairs, sells, and leases passenger vehicles, including the Class Vehicles, nationwide and in Delaware. General Motors LLC is the warrantor and distributor of the Class Vehicles in the United States.

159. At all relevant times, Defendant was and is engaged in the business of designing, manufacturing, constructing, assembling, marketing, distributing, and

selling automobiles and motor vehicle components in Delaware and throughout the United States of America.

160. In order to sell vehicles to the general public, GM enters into agreements with dealerships who are then authorized to sell GM-branded vehicles such as the Class Vehicles to consumers such as Plaintiffs. In return for the exclusive right to sell new GM-branded vehicles in a geographic area, authorized dealerships are also permitted to service and repair these vehicles under the warranties GM provides directly to consumers. These contracts give GM a significant amount of control over the actions of the dealerships, including sales and marketing of vehicles and parts for those vehicles. All service and repair at an authorized dealership are also completed according to GM's explicit instructions, issued through service manuals, technical service bulletins ("TSBs"), preliminary information bulletins ("PIs"), information service bulletins, and other documents, often only referred to by a "Document ID." Per the agreements between GM and the authorized dealers, consumers such as Plaintiffs can receive services under GM's issued warranties at dealer locations that are convenient to them.

161. GM also develops and disseminates the owners' manual, warranty booklets, maintenance schedules, advertisements, and other promotional materials relating to the Class Vehicles. GM is also responsible for the production and content of the information on the Monroney Stickers.

42

162.   GM is the drafter of the warranties it provides to consumers nationwide, the terms of which unreasonably favor GM.  Consumers are not given a meaningful choice in the terms of the warranties provided by GM, and those warranties are offered on a "take it or leave it" basis.

## JURISDICTION AND VENUE

163.   This action is properly before this Court and this Court has subject matter jurisdiction over this action under the Class Action Fairness Act. At least one member of the proposed class is a citizen of a different state than GM, the number of proposed class members exceeds 100, and the amount in controversy exceeds the sum or value of $5,000,000.00 exclusive of interests and costs. 28 U.S.C. § 1332(d)(2)(A).

164.   In addition, under 28 U.S.C. § 1367, this Court may exercise supplemental jurisdiction over the state law claims as well as the Magnuson-Moss Warranty Act claims, because all of the claims are derived from a common nucleus of operative facts and are such that Plaintiffs would ordinarily expect to try them in one judicial proceeding.

165.   This Court has personal jurisdiction over Defendant because its principal place of business is in the State of Michigan; it has consented to jurisdiction by registering to conduct business in the state; maintains sufficient minimum contacts in Michigan; and otherwise intentionally avails itself of the markets within

Michigan through promotion, sale, marketing and distribution of its vehicles, which renders the exercise of jurisdiction by this Court proper and necessary as GM is "at home" in Michigan.

166.   Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)-(c). A substantial part of the events or omissions giving rise to the claims occurred in this District. Plaintiffs may properly sue GM in this District, the state of GM's principal place of business.

## FACTUAL ALLEGATIONS

167.   Since 2013, GM has designed, manufactured, distributed, sold, and leased the Class Vehicles. GM has sold, directly or indirectly, through dealers and other retail outlets, thousands of Class Vehicles in Michigan and nationwide. In 2019, GM sold 2,547,000 vehicles in the United States alone and estimated that it was "the market share leader in North America[.]"[3]

168.   GM has thousands of authorized dealerships across the United States, all of which are under GM's control. GM authorizes these dealerships to sell GM vehicles, parts, and accessories and to service and repair GM vehicles using GM parts.[4] Its net automotive sales through those dealerships, for its North American

_____

[3] *See* Exhibit A, General Motors Company 2020 Annual Report (Form 10-K), at 2 (Feb. 5, 2020), available at: https://investor.gm.com/static-files/78f06039-f442-41a0-8929-81021e9ccb17 (last visited December 10, 2021).
[4] *Id.* at 3.

region, totaled $96.733 billion in 2020.[5] GM sells its vehicles to its authorized dealerships, which in turn sell those vehicles to consumers. After these dealerships sell cars to consumers, including the Plaintiffs and Class Members, they purchase additional vehicle inventory from GM to replace the vehicles sold, increasing GM's revenues. Thus, Plaintiffs' and Class Members' purchase of Class Vehicles accrues to the benefit of GM by increasing its revenues. In addition, GM underscores the importance of its dealerships as follows: "The quality of GM dealerships and our relationship with our dealers and distributors are critical to our success given that dealers maintain the primary sales and service interface with the end consumer of our products."[6]

169.  GM provided all purchasers or lessees of the Class Vehicles with a New Vehicle Limited Warranty ("NVLW").  The terms of these warranties are non-negotiable and GM exercises sole authority in determining whether and to what extent a particular repair is covered under the warranties it offers.

170.  Moreover, although GM offers a single type of extended warranty, which merely extends the durational limits for a fee of thousands of dollars, no other terms are changed, leaving GM the sole arbiter of whether it will honor the warranty. In particular, GM may decide that a defect is a "design defect" not covered under

---

[5] *Id.* at 30.
[6] *Id*. at 3.

the warranties its provides, extended or otherwise, and thus not provide warranty coverage.

171.   Further, GM's authorized dealerships also sell extended warranties from third-party suppliers.   However, those warranties exclude manufacturer's defects, including those like the Valve Train Defect.

172.   The NVLW for the Class Vehicles included a "Bumper-to-Bumper" warranty, a Powertrain warranty, and an Emission Control Systems Warranty, stated in relevant part[7]:

**What is Covered**

**Warranty Applies**

This warranty is for [GM] vehicles registered in the United States and normally operated in the United States or Canada, and is provided to the original and any subsequent owners of the vehicle during the warranty period.

**Repairs Covered**

The warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period. Needed repairs will be performed using new, remanufactured, or refurbished parts.

**No Charge**

Warranty repairs, including towing, parts, and labor, will be made at no charge.

---

[7] This sample warranty displays certain durational limits.  Discovery will show that that the warranties issued with the sale or lease of Class Vehicles are identical with the exception of the durational limits.  The durational limits of each named plaintiff's warranty are outlined *supra*.

**Obtaining Repairs**

To obtain warranty repairs, take the vehicle to a [GM] dealer facility within the warranty period and request the needed repairs. Reasonable time must be allowed for the dealer to perform necessary repairs.

**Warranty Period**

The warranty period for all coverages begins on the date the vehicle is first delivered or put in use and ends at the expiration of the coverage period.

**Bumper-to-Bumper Coverage**

The complete vehicle is covered for 3 years or 36,000 miles, whichever comes first, except for other coverages listed here under "What is Covered" and those items listed under "What is Not Covered" later in this section.

**Powertrain Component Warranty Coverage**

Coverage is for the first 5 years or 60,000 miles whichever comes first. []
****

*Exclusions:* Excluded from the powertrain coverage are sensors, wiring, connectors, engine radiator, coolant hoses, coolant, and heater core. Coverage on the engine cooling system begins at the inlet to the water pump and ends with the thermostat housing and/or outlet that attaches to the return hose. Also excluded is the starter motor, entire pressurized fuel system (in-tank fuel pump, pressure lines, fuel rail(s), regulator, injectors, and return line) as well as the Engine/Powertrain Control Module and/or module programming.
****

**Other Terms:**  This warranty gives you specific legal rights and you may also have other rights which vary from state to state.

GM does not authorize any person to create for it any other obligation or liability in connection with these vehicles.  **Any implied warranty of merchantability or fitness for a particular purpose applicable to this**

47

**vehicle is limited in duration to the duration of this written warranty. Performance of repairs and needed adjustments is the exclusive remedy under this written warranty or any implied warranty. GM shall not be liable for incidental or consequential damages, such as, but not limited to, lost wages or vehicle rental expenses, resulting from breach of this written warranty or any implied warranty**.*

* Some states do not allow limitations on how long an implied warranty will last or the exclusion or limitation of incidental or consequential damages, so the above limitations or exclusions may not apply to you.

****

The emission warranty on your vehicle is issued in accordance with the U.S. Federal Clean Air Act. Defects in material or workmanship in GM emission parts may also be covered under the New Vehicle Limited Warranty Bumper-to-Bumper coverage. In any case, the warranty with the broadest coverage applies.

**What Is Covered**

The Emissions related parts covered under Federal and California Warranty are listed under the Emission Warranty Parts List 0 21. How to Determine the Applicable Emissions Warranty State and Federal agencies may require a different emission warranty coverage depending on:

- Whether the vehicle conforms to regulations applicable to light duty or heavy duty emission control systems.
- Whether the vehicle conforms to or is certified for California regulations in addition to U.S. EPA Federal regulations.

All vehicles are eligible for Federal Emissions Control Warranty Coverage. If the emissions control label contains language stating the vehicle conforms to California regulations, the vehicle is also eligible for California Emissions

Warranty Coverage.

**Federal Emission Control System Warranty**

**Federal Emissions Warranty Coverage**

- For Passenger Car or Light Duty Truck with a Gross Vehicle Weight Rating (GVWR) of 8,500 lbs. or less
  - 2 years or 24,000 miles, whichever comes first for Emissions related parts
  - 8 years or 80,000 miles, whichever comes first for Emissions select components; catalytic converters, engine control module, transmission control module and other diagnostic emissions critical-electronic control units

\*\*\*\*

**Federal Emission Defect Warranty**

GM warrants to the owner the following:

- The vehicle was designed, equipped and built to conform at the time of sale with applicable regulations of the U.S. Federal Environmental Protection Agency (EPA).
- The vehicle is free from emissions-defects in materials and workmanship which cause the vehicle to fail to conform to those regulations during the emission warranty period.
- Emission-related defects in the genuine GM parts listed under the Emission Warranty Parts List, including related diagnostic costs, parts, and labor are covered by this warranty.

\*\*\*\*

**Owner's Warranty Responsibilities**

As the vehicle owner, you are responsible for the performance of the scheduled maintenance listed in your owner manual. GM recommends that

you retain all maintenance receipts for your vehicle, but GM cannot deny warranty coverage solely for the lack of receipts or for your failure to ensure the performance of all scheduled maintenance. You are responsible for presenting your vehicle to a Chevrolet dealer selling your vehicle line as soon as a problem exists. The warranted repairs should be completed in a reasonable amount of time, not to exceed 30 days. As the vehicle owner, you should also be aware that Chevrolet may deny warranty coverage if your vehicle or a part has failed due to abuse, neglect, improper or insufficient maintenance, modifications not approved by Chevrolet, or if the defect is not emissions-related.

If you have any questions regarding your rights and responsibilities under these warranties, you should contact the Customer Assistance Center at 1-800-222-1020 or, in California, write to:

State of California Air Resources Board
Mobile Source Operations
Division P.O. Box 8001
El Monte, CA 91731-2990

**The Valve Train Defect**

173.   Every internal combustion engine, including the 5.3L, 6.0L, and 6.2L V8 engines produced by GM and installed in 2014 to present model year vehicles (the "Subject Engines"), has a valve train system, the mechanical system which controls when the intake valves and exhaust valves of the internal combustion chamber open and close.  Intake valves introduce gasoline and air (or simply air in direct injection vehicles), while exhaust valves allow exhaust to escape the chamber. A typical sequence has the intake valve opening to allow gas and/or air into the

chamber, the intake valve then closing, the combustion happening in the chamber, the exhaust valve opening to allow exhaust out, and finally the exhaust valve closing.

174.   In the Subject Engines, the rotational movement of the camshaft leads to the opening and closing of the intake and exhaust valves.  The camshaft itself has lobes, precision designed and crafted egg-shaped pieces that turn as the shaft turns that determine the timing and lift of valve openings.   As a camshaft rotates, its egg-shaped lobes push up on lifters, which are filled with oil to maintain zero valve lash (*i.e.*, to make sure there is no clearance between parts that should be constantly riding on one another, preventing noise and wear, and allowing for quicker valve opening and closing for improved performance).  These are known as hydraulic lifters and sometimes are referred to as tappets.

175.   The lifters then apply this force to the pushrods, metal rods that push into the rocker arm, which turns or pivots on internal bearings, and then opens the valve.

176.   The figure below shows how the valve train system fits together, though this is not a representation of the Subject Engines.



**Figure 1**

177. The valves themselves are opened by the action of the rocker arm and closed by force of a coiled spring called a valve spring.

178. Each of these mechanical pieces must be working properly in order for the valve timing of the engine to run as specified in the engine design.

179. The Subject Engines also have another system involved with the valve train system, known as Active Fuel Management or Dynamic Fuel Management. While most of the Subject Engines have AFM, some have DFM. Both use the valve train system to effectively shut off some of the cylinders at certain time during the vehicle's operation, in order to save fuel. AFM and DFM are trademarked names for this technology in GM vehicles, although AFM was originally called Displacement on Demand ("DoD"). In AFM, four of the cylinders can be deactivated. In DFM, any of the eight cylinders can be deactivated.

180.   Originally introduced in 2005, the GM global chief engineer for small block engines, Jordan Lee, stated, "Rather than adding turbochargers or multi-valve cylinders heads to increase the power of smaller engines, we chose to keep the proven capability of our larger V-8 truck engines, and save fuel by switching off half of the cylinders when they aren't needed."

181.   As described by Lee, "With recent increases in computing power, we can combine sophisticated digital design, powerful control strategies, and simple, robust mechanical systems to bring real benefits with no added cost to our customers."

182.   With AFM, when the Engine Control Module ("ECM") decides that the engine is producing more power than is needed, for example when cruising on highway speeds or other "light load" conditions, the ECM will "deactivate" half of the cylinders of the engine – cylinders 1, 4, 6, and 7.  The ECM accomplishes this by the use of specialized lifters and a valve lifter oil manifold ("VLOM") which delivers pressurized engine oil to the lifters.

183.   The VLOM delivers the pressurized oil to four solenoids, which are normally closed.  When the VLOM provides this oil, the solenoids open and delivery the oil to the AFM lifters, which forces the locking pins into the lifter body. This is demonstrated by Figure 2, below. This allows the outer cylinder of the lifter to continue to follow the motion of the cam lobe, while the inner portion of the lifter

does not.  As a result, the lifter does not transfer the motion of the cam lobe to the pushrod, which does not move the rocker arm, which does not actuate the valve.



**Figure 2**

184.   To activate the lifter, the VLOM turns the solenoid off.  This stops flow of oil to the AFM lifter, spring pressure forces the locking pin out, and locking the inner body of the lifter to the outer body.  Now the lifter engages the pushrod, transferring the force of the cam lobe to the pushrod.

185.   AFM lifter failure, such as collapsed lifters, can be the result of a mistimed switch event, when the lifter is locked or unlocked at the wrong time of the cycle.  If the locking pin is not fully engaged at the proper time, it can damage the lifter latching shelf.  The left most lifter in Figure 3 below is a collapsed lifter.



**Figure 3**

186.   Mistimed switch events can be caused by errors in the ECM, low engine oil pressure including from oil aeration (when too much air gets mixed into the engine oil, causing foaming), and/or leaks in the VLOM.

187.   Stuck lifters can cause the roller on the lifter which rides on the cam lobe to freeze into position, creating a furrow on the cam lobe and sending pieces of metal circulating through the engine.  Collapsed lifters can also cause the pushrods to become bent.

188.   AFM lifters are easily distinguishable from regular lifters, as shown below in Figure 4.  The AFM lifters are on the left, regular lifters are on the right and the plastic lifter guides are on the top.



**Figure 4**

189.   Dynamic Fuel Management is another form of AFM.  Like AFM, it uses AFM Lifters to deactivate certain cylinders at the direction of the ECM.  DFM differs from AFM by having more than 17-cylinder patterns of deactivation, instead of two patterns in AFM engines (8 cylinders in use or 4 cylinders in use).  GM executive Jordan Lee explained in 2018, "DFM is powered by a sophisticated controller that continuously monitors every movement of the accelerator pedal and runs a complex sequence of calculations to determine how many cylinders are required to meet the driver's requested torque.  It can make this determination 80 times per second."[8]

---

[8] *See* "2019 Silverado Leads Industry with Dynamic Fuel Management," GM Press Release (May 5, 2018).

190.   As described by GM, "An electromechanical system deactivates and reactivates all 16 of the engine's hydraulic valve lifters, controlling valve actuation. The system uses solenoids to deliver oil pressure to control ports in the lifters, which activate and deactivate the lifters' latching mechanisms. When a cylinder is deactivated, the two-piece lifters effectively collapse on themselves to prevent them from opening the valves. When the cylinder is reactivated, solenoids send an oil pressure signal to the control ports on the lifters and the latching mechanism restores normal function, allowing the valves to open and close."[9]   As such, DFM operates as AFM does, via the same mechanisms, and AFM and DFM engines share the same components, including AFM lifters, rocker arms, and valve springs.  DFM does not use any non-AFM lifters.

191.   Notably, while AFM lifters are subject to some unique issues, the valve train systems in the Subject Engines are also subject to problems in more traditional valve trains, *i.e.*, problems with other components, like the rocker arms and the valve springs.  In the Subject Engines, the rocker arms shed needle bearings, causing the rocker arm to no longer move in time with the rest of the valve train.

192.   Further, the Subject Engines also have valve springs which breakdown and fail prematurely.  In particular, the valve springs can literally break into multiple

---

[9] *Id.*

pieces, or simply shed pieces of themselves. When this happens, the valve spring can no longer hold the opening to the combustion chamber closed.

193. All of these issues with the valve trains systems, including the problems with the lifters, the rocker arms, and the valve springs, can lead to component debris circulation throughout the engine and damage other key engine components, including the camshaft and the cylinders.

194. The original components of the valve train system in the Subject Engines are made by ACDelco, GM's parts subsidiary. However, some aftermarket manufacturers also make these parts according to GM's specifications.

195. Critically, symptoms of the Valve Train Defect begin with noises, typically chirping, squeaking, and/or ticking when the vehicle is not idling. Eventually, if unremedied, they progress to engine misfires, as the valves fail to open and close at appropriate times. At this point, not only are the valve train components likely damaged, other parts of the engine may become damaged as well, as pieces of the damaged or broken valve train's components begin to circulate through the engine oil.

196. The Valve Train Defect alleged is inherent in and the same for all Class Vehicles. Despite knowing of the Valve Train Defect, GM has continued to manufacture the Subject Engines, install them in Class Vehicles, and has failed to remedy the Valve Train Defect.

**The Valve Train Defect Poses a Serious Safety Concern Not Discussed in GM's Advertising**

197.   The Valve Train Defect is material to consumers because it presents a serious safety concern.  Losing power while driving, especially at highway speeds or while trying to merge or change lanes, hesitation, surging, stalling, as well as full engine failure, all significantly increase the risk of vehicle collision.  Stalled vehicles or those with engine failure can also leave their occupants stranded in dangerous situations, including on the side of busy highways or roads.

198.   Despite having knowledge since at least 2010 of the existence and extent of the Valve Train Defect in Class Vehicles, as discussed further *infra*, and the that no permanent repair exists, GM continued to use AFM and/or DFM in its vehicles, including the defective valve train system needed to make that fuel management system functional.  In fact, GM heavily advertised the reliability, durability, and efficiency of the Class Vehicles, while at the same time knowing that the reliability, durability, and ability of the Class Vehicles to even provide basic transportation was undermined by the Valve Train Defect.

199.   For example, in the brochure for the 2019 Chevrolet Silverado, GM boasts that it was "[t]he strongest, most advanced Silverado ever," offered with one of "six engines designed with Chevy truck power and reliability."   The brochures also promises that the DFM in the vehicles "all happens with seamless precision, so you'll never even notice."



Dynamic Fuel Management (DFM) System. 6.2L V8 engine shown.

FUEL INJECTOR

COLLAPSIBLE LIFTERS

CONTINUOUSLY VARIABLE VALVE TIMING

**DYNAMIC FUEL MANAGEMENT (DFM).** This new technology is included on the 5.3L EcoTec3 V8 engine with 8-speed transmission as well as the available 6.2L EcoTec3 V8. A sophisticated control system continuously monitors every movement of the accelerator pedal and calculates exactly how much torque is needed to handle the current driving condition, from highway cruising to city traffic to hauling a heavy load. Nearly instantaneously, the engine control system will activate or deactivate cylinders in an industry-first 17 different patterns to maximize fuel economy[1] and create the power needed. And it all happens with seamless precision, so you'll never even notice.

**ACTIVE FUEL MANAGEMENT (AFM).** The 2.7L Turbo, the 4.3L EcoTec3 V6 and the 5.3L EcoTec3 V8 engine with 6-speed transmission offer this system. Sensing load and demand, AFM improves efficiency by deactivating cylinders when power demands are light and reactivating cylinders when more power is required.

200.   In the brochure for the 2017 GMC Sierra, GM promotes the use of AFM in the engines without ever mentioning the Valve Train Defect.   "By sensing load and demand, AFM improves efficiency by activating or deactivating cylinders. Under demanding conditions, such as high speeds or heavy loads, the valves'

switching mechanisms is depressurized, re-engaging the cylinder and restoring full power."

201.   The brochures of the 2016 Chevrolet Silverado promise that the engines "deliver power and efficiency" while the brochures for the 2017 Cadillac Escalade also promise that "[e]ngine technologies like Continuous Variable Valve timing, multi-port Direct Injection and Active Fuel Management also ensure this power-plant's 460 lb-ft of torque are harness efficiently."

202.   At no time did GM reveal the existence or extent of the Valve Train Defect in any of its advertising, in the Monroney stickers affixed to each new vehicle it produced, or in the specification sheets for custom ordered vehicles.  Instead, it repeatedly called vehicles with the Subject Engines "reliable," "dependable," and "long-lasting."

**GM Had Superior and Exclusive Knowledge of the Valve Train Defect**

203.   GM is aware of the Valve Train Defect and denies the defect exists. GM is also refusing to extend the warranty for the valve train, or Subject Engines, or fix the condition which causes the Valve Train Defect to occur.

204.   As a result, GM's customers have had or will have to pay thousands in out-of-pocket costs.

205.   GM fraudulently, intentionally, negligently, and/or recklessly omitted and concealed from Plaintiffs and members of the Classes the existence and extent of the Valve Train Defect in Class Vehicles even though GM knew or should have

known of the design, material, manufacturing, or workmanship defects in Class Vehicles.

206.   Knowledge and information regarding the Valve Train Defect were in the exclusive and superior possession of GM, and its dealers, and that information was not provided to Plaintiffs and the members of the Classes.   Based on pre-production testing, pre-production design failure mode analysis, production design failure analysis, knowledge of alternative designs for lifters, quality control audits of lifters and other valve train components, early consumer complaints made to GM's network of exclusive dealers, aggregate warranty data compiled from those dealers, repair orders and parts data received from the dealers, auto parts stores, and/or consumers, consumer complaints to dealers and NHTSA and testing performed in response to those consumer complaints, *inter alia*, GM was aware of and should have been aware of the Valve Train Defect in the Class Vehicles and fraudulent concealed the Valve Train Defect and associated safety risk from Plaintiffs and members of the Classes.

207.   GM knew or should have known that the Valve Train Defect and the associated safety risk was material to owners and lessees of Class Vehicles and was not known or reasonably discoverable by Plaintiffs and members of the Classes before they purchased or leased Class Vehicles or within the applicable warranty periods.

208.   Notwithstanding GM's exclusive and superior knowledge of the Valve Train Defect, GM failed to disclose the defect to consumer at the time of purchased or lease of the Class Vehicles, or any time thereafter, and continues to sell Class Vehicles containing the Defect.  GM intentionally concealed that the Valve Train Defect presents a safety risk to consumers, including Plaintiffs and members of the Classes, and the public.

### GM's Pre-Production Testing Revealed the Valve Train Defect

209.   GM is experienced in the design and manufacture of consumer vehicles. As an experienced manufacturer, GM conducts tests, including substantial pre-sale durability testing, on incoming components, including lifters, rocker arms, and valve springs, to verify the parts are free from defect and align with GM's specifications.[10]

210.   GM also performs durability testing on each model year of vehicles via pre-production testing.  For GM, this work is completed by its Pre-Preproduction Operations ("PPO") unit.  One significant testing facility is located in Warren, Michigan, where team members integrate and test the latest innovations in GM's products, as well as leading validation and quality control efforts.

---

[10]  *See* Exhibit B, Akweli Parker, *How Car Testing Works*, HOWSTUFFWORKS.COM, available at http://auto.howstuffworks.com/car-driving-safety/safety-regulatory-devices/car-testing.htm ("The idea behind car testing is that it allows manufactures to work out all the kinks and potential problems of a model before it goes into full production.") (last visited December 10, 2021).

211.   As described by Betty J. Romsek, executive director for General Motors' global pre-production operations ["PPO"] in an editorial in The Detroit News, "PPO is responsible for building the first, fully functioning version of new and new-generation vehicles. PPO employees…troubleshoot the product build and production processes before any vehicles are built for our customers." [11] She estimated that GM produces 2,500 pre-production models a year and also describes how testing includes real-world driving.

212.   GM has robust durability testing for pre-production vehicles.   As described by GM, "[i]n 18 months, the durability team at General Motors' Milford Proving Group can put a vehicle through an entire lifecycle.   Durability tests are long, repetitive and physically demanding."[12]

213.   As described by GM itself, GM sets "benchmarks a vehicle must endure before the Milford durability team will release it for production," including "100,000 miles of customer use," and placing vehicle in special chambers for hours where the vehicles are exposed to high temperatures and humidity.[13]

---

[11] See Exhibit C, Betty J. Romsek, "GM invests in pre-production, Metro Detroit," *The Detroit News*, available at https://www.detroitnews.com/story/opinion/2015/05/07/romsek-gm-invests-pre-production/70899386/ (May 7, 2015) (last visited December 10, 2021).
[12] See Exhibit D, "Repetitive and Physical: 90 Years of Durability Testing," https://media.gm.com/media/us/en/gm/news.detail.html/content/Pages/news/us/en/2014/Oct/1024-milford.html (last viewed November 19, 2020) (last visited December 10, 2021).
[13] *Id.*

214.   As a result of this testing, which takes place both before new innovations, such as AFM, are introduced into vehicles, and prior to any model year being mass-produced, GM would have learned of the Valve Train Defect not only prior to the sale of the first vehicle with AFM, but also each year before new model year vehicles were produced.

### Communications Issued to Authorized GM Dealerships Demonstrate GM's Knowledge of the Defect

215.   GM's knowledge of the Valve Train Defect can also be shown via its communications to its authorized dealerships regarding symptoms of the Valve Train Defect and describing the exact steps dealership technicians should take in response to consumer complaints.  These communications, known as Technical Service Bulletins ("TSBs") and Preliminary Information Bulletins ("PIs") are issued exclusively to its dealerships and are not disseminated to consumers, even if their vehicles receive services as outlined in the bulletins.

216.   Starting in 2012, NHTSA began to require that manufacturers such as GM provide copies of these bulletins to be posted on the NHTSA website.  However, the bulletins provided usually post-date 2011 and since GM issues bulletins for everything from minor, cosmetic issues to major issues such as the Valve Train Defect, any given model year of vehicle might have over 1,000 bulletins applicable to it.  In fact, some of the model years included in the Class Vehicles have over 2,000 bulletins applicable to them.  Further, NHTSA does not provide a way to search through the bulletins so that consumers can sort major issues from minor issues.

217.   Indeed, GM also includes the following disclaimer on its bulletins:

GM bulletins are intended for use by professional technicians, NOT a "do-it-yourselfer". They are written to inform these technicians of conditions that may occur on some vehicles, or to provide information that could assist in the proper service of a vehicle.  Properly trained technicians have the equipment, tools, safety instructions, and know-how to do a job properly and safely.  If a condition is described, DO NOT assume that the bulletin applies to your vehicle, or that your vehicle will have that condition.  See your GM dealer for information on whether your vehicle may benefit from the information. (emphasis in original)

218.   The information contained in the bulletins reflects months, and sometimes years, of prior knowledge, from GM's collection of information and analysis, including information used to devise a response, and then draft the bulletin and/or address the design and manufacture of parts or software that is needed as part of the response.

219.   On January 17, 2011, GM issued Preliminary Information Bulletin PIP4568K, regarding "Tick Noise And/Or Misfires on AFM Cylinders 1 4 6 And/Or 7."  This bulletin was applicable to 2008-2009 Buick LaCrosse and Allure, 2007 Buick Rainer, 2007-2011 Cadillac Escalade, 2010-2011 Chevrolet Camaro SS, 2007-2011 Chevrolet Avalanche, Silverado, Suburban, and Tahoe, 2006-2009 Chevrolet Trailblazer, 2006-2009 Chevrolet Impala SS, 2006-2007 Chevrolet Monte Carlo SS, 2006-2009 GMC Envoy, 2007-2011 GMC Sierra and Yukon, 2008-2009 Pontiac G8, 2005-2008 Pontiac Grand Prix GXP, and 2006-2009 Saab 97x vehicles with a V8 Engine and Active Fuel Management.  The engines involved included

RPO Codes L76, L77, L94, L99, LC9, LFA, LH6, LMG, LS4, LY5, and LZ1, a collection of 5.3L and 6.0L V8 engines.  The bulletin described that customers may "comment on a SES light, engine misfire on cylinder 1, 4, 6, or 7 and/or tick noise." As noted by GM, "[t]his may be the result of an AFM lifter that unlocks as soon as the engine is started or one that is mechanically collapsed/stuck all of the time." AFM lifters which unlock immediately after the vehicle starts would cause an SES light, DTC P0300, and engine misfires.  AFM lifters which were collapsed or stuck would additionally cause "a consistent valve train tick noise."  Diagnostic procedures were outlined, and the dealerships were directed to replace the Valve Lifter Oil Manifold ("VLOM"), all the AFM lifters and the plastic lifter guides.[14] This bulletin superseded PIP4568J[15], a previous version of the PI, adding that the plastic lifter guides in the engines should also be replaced, and that Police Tahoes additionally needed their Engine Control Modules ("ECMs") reprogramed.

220.  In December 2012, GM issued Preliminary Information Bulletin PIP4138M, regarding "SES Light, DTC P0300, and/or a Chirp, Squeak, Squeal, or

---

[14] Certain vehicles also needed their AFM pressure relief valve shield inspected and possibly replaced.  Technicians were directed to refer to TSB 10-06-01-008. The lead number on TSBs indicates the first year in which they were issued, in this case, 2010.

[15] PIs which are subsequently revised have letters appended to the end of their designation to indicate the version of the bulletin.  Despite Plaintiffs' best efforts, they have been unable to located PIP4568J or any previous version of the PI. However, it is clear such versions exist and pre-date the issuance of this PI by months, if not years.

Tick Noise – Potential Valvetrain Concern." This bulletin was applicable to 2004-2007 Buick Rainier, 2008-2009 Buick LaCrosse and Allure, 2006-2013 CTS-V, 2002-2013 Cadillac Escalade, 2010-2013 Chevrolet Camaro, 2011-2013 Chevrolet Caprice, 2002-2013 Chevrolet Avalanche, 1999-2013 Chevrolet Express, Silverado, Suburban, and Tahoe, 2009-2013 Chevrolet Colorado, 2003-2009 Chevrolet Trailblazer, 2006-2009 Chevrolet Impala SS, 2006-2007 Chevrolet Monte Carlo SS, 2003-2006 Chevrolet SSR, 2005-2013 Chevrolet Corvette, 2009-2013 GMC Canyon, 2003-2009 GMC Envoy, 1999-2013 GMC Savana, Sierra, and Yukon, 2003-2010 Hummer H2, 2008-2010 Hummer H3, 2008-2010 Pontiac G8, 2005-2006 Pontiac GTO, 2005-2008 Pontiac Grand Prix GXP, and 2005-2009 Saab 97x vehicles with a V8 engine. No engine codes were noted. The bulletin described that customers "may complain of an SES light, engine misfire, and/or engine noise" and that "[t]he noise may be described as a chirp, squeak, squeal, or tick noise and may increase off idle." If the cause of the concern was not isolated after SI diagnosis, GM's regular diagnostic review, GM noted that this concern may be the result of several conditions, including a "worn camshaft lobe and/or lifter roller," "a broken valve spring," and "a collapsed AFM lifter." Worn camshaft lobe and/or lifter rollers were to be replaced, as well as the plastic lifter guides and the VLOM. Broken valve springs were to be replaced. If a collapsed AFM Lifter was found, technicians were to "refer to the latest version of PIP4568 for additional information." That PI

directed technicians to replace the lifters, guides, and the VLOM.  The previous version of the PI, PIP4138K, was to be discarded.

221.  In January 2013, GM issued Preliminary Information Bulletin PIP4138M, regarding "SES Light, DTC P0300, and/or a Chirp, Squeak, Squeal, or Tick Noise – Potential Valvetrain Concern."  This bulletin was applicable to 2004-2007 Buick Rainier, 2008-2009 Buick LaCrosse and Allure, 2006-2013 CTS-V, 2002-2013 Cadillac Escalade, 2010-2013 Chevrolet Camaro, 2011-2013 Chevrolet Caprice, 2002-2013 Chevrolet Avalanche, 1999-2013 Chevrolet Express, Silverado, Suburban, and Tahoe, 2009-2013 Chevrolet Colorado, 2003-2009 Chevrolet Trailblazer, 2006-2009 Chevrolet Impala SS, 2006-2007 Chevrolet Monte Carlo SS, 2003-2006 Chevrolet SSR, 2005-2013 Chevrolet Corvette, 2009-2013 GMC Canyon, 2003-2009 GMC Envoy, 1999-2013 GMC Savana, Sierra, and Yukon, 2003-2010 Hummer H2, 2008-2010 Hummer H3, 2008-2010 Pontiac G8, 2005-2006 Pontiac GTO, 2005-2008 Pontiac Grand Prix GXP, and 2005-2009 Saab 97x vehicles with a V8 engine.  No engine codes were noted.   The bulletin described that customers "may complaint of an SES light, engine misfire, and/or engine noise" and that "[t]he noise may be described as a chirp, squeak, squeal, or tick noise and may increase off idle."  If the cause of the concern was not isolated after SI diagnosis, GM's regular diagnostic review, GM noted that this concern may be the result of several conditions, including a "worn camshaft lobe and/or lifter roller," "a broken valve spring," and "a collapsed AFM lifter."  Worn camshaft lobe and/or lifter rollers

were to be replaced, as well as the plastic lifter guides and the VLOM. Broken valve springs were to be replaced. If a collapsed AFM Lifter was found, technicians were to "refer to the latest version of PIP4568 for additional information." That PI directed technicians to replace the lifters, guides, and the VLOM. The previous version of the PI, PIP4138L, was to be discarded because this version updated the warranty information.

222. In July 2013, GM issued an updated Preliminary Information Bulletin, PIP4568M. Dealerships were directed to discard PIP4568L, which was issued sometime after PIP4568K in January 2011. This PI updated the model years of the vehicles to which the PI was applicable, including 2008-2009 Buick LaCrosse and Allure, 2007 Buick Rainier, 2007-2013 Cadillac Escalade, 2010-2013 Chevrolet Camaro SS, 2007-2013 Chevrolet Avalanche, Silverado, Suburban, and Tahoe, 2006-2009 Chevrolet Trailblazer, 2006-2009 Chevrolet Impala SS, 2006-2007 Chevrolet Monte Carlo SS, 2006-2009 GMC Envoy, 2007-2013 GMC Sierra and Yukon, 2008-2009 Pontiac G8, 2005-2008 Pontiac Grand Prix GXP, and 2006-2009 Saab 97x vehicles with a V8 Engine and Active Fuel Management. The engines involved included RPO Codes L76, L77, L94, L99, LC9, LFA, LH6, LMG, LS4, LY5, and LZ1, a collection of 5.3L and 6.0L V8 engines. Again, the PI described that customers may report a SES lift, engine misfire on cylinder 1, 4, 6, and 7 and/or tick noise, which "may be the result of the AFM lifter that unlocks as soon the engine is started or one that is mechanically collapsed/stuck all of the time." The PI

continued, "[t]hese lifter concerns may be the result of internal locking pin damage, which may occur if the response time of an AFM lifter unlocking event is decreased due to low oil pressure, oil aeration, internal engine sludge, or an internal concern with an AFM lifter, VLOM, plastic lifter guide, lifter bore, and/or cam lobe wear." The PI directed dealerships to replace the VLOM, all the AFM lifters, and all plastic lifter guides.  Further, 2008-2009 Full Size Trucks and SUVs, and the 2007-2009 Chevrolet Tahoe with the Police Package also required an ECM update.  Certain vehicles also needed their AFM pressure relief valve shield inspected and possibly replaced.  Technicians were directed to refer to TSB 10-06-01-008 in that case. Technicians were also to carefully inspect the camshaft lobes through the lifter bores to ensure they were not obviously worn, and to clean out the lifter control oil passages with brake cleaner if debris was noted.  The PI indicates that low oil pressure to the VLOM can cause AFM lifter damage.

223.  In August 2013, GM issued Preliminary Information Bulletin PIP4138N, regarding "SES Light, DTC P0300, and/or a Chirp, Squeak, Squeal, or Tick Noise – Potential Valvetrain Concern."  This bulletin was applicable to 2004-2007 Buick Rainier, 2008-2009 Buick LaCrosse and Allure, 2006-2013 CTS-V, 2002-2013 Cadillac Escalade, 2010-2013 Chevrolet Camaro, 2011-2013 Chevrolet Caprice PPV, 2002-2013 Chevrolet Avalanche, 1999-2013 Chevrolet Express, Silverado, Suburban, and Tahoe, 2009-2013 Chevrolet Colorado, 2003-2009 Chevrolet Trailblazer, 2006-2009 Chevrolet Impala SS, 2006-2007 Chevrolet Monte

Carlo SS, 2003-2006 Chevrolet SSR, 2005-2013 Chevrolet Corvette, 2009-2013 GMC Canyon, 2003-2009 GMC Envoy, 1999-2013 GMC Savana, Sierra, and Yukon, 2003-2010 Hummer H2, 2008-2010 Hummer H3, 2008-2010 Pontiac G8, 2005-2006 Pontiac GTO, 2005-2008 Pontiac Grand Prix GXP, and 2005-2009 Saab 97x vehicles with a V8 engine.  No engine codes were noted.  The bulletin described that customers "may complaint of an SES light, engine misfire, and/or engine noise" and that "[t]he noise may be described as a chirp, squeak, squeal, or tick noise and may increase off idle."  If the cause of the concern was not isolated after SI diagnosis, GM's regular diagnostic review, GM noted that this concern may be the result of several conditions, including a "worn camshaft lobe and/or lifter roller," "a broken valve spring," and "a collapsed AFM lifter."  Worn camshaft lobe and/or lifter rollers were to be replaced, as well as the plastic lifter guides and the VLOM. Broken valve springs were to be replaced.  If a collapsed AFM Lifter was found, technicians were to "refer to the latest version of PIP4568 for additional information."  That PI directed technicians to replace the lifters, guides, and the VLOM.  The previous version of the PI, PIP4138M, was to be discarded.

224.  In or around September 2014, GM issued Preliminary Information Bulletin PIP5226 regarding "Needle Bearings Found in the oil pan During an Oil Change."  The PI was applicable to all 2015 and Prior GM Passenger Cars and Trucks with a V6 or V8 push rod engines with Equipped with roller Rocker Arms. The PI described "[i]f a dealer finds roller rocker arm needle bearings during an oil

change [in the oil pan], inspect all of the roller rocker arms.  If a damaged rocker arm is found, only replace the broken roller rocker arm."  The PI repeatedly told technicians, "replacement of the remaining roller rocker arms is not necessary."

225.   In January 2015, GM issued Preliminary Information Bulletin PIP5259, regarding "Engine Misfire Lamp P03000 AFM Cylinders."  The PI was applicable to 2014-2015 Chevrolet Silverado, Suburban, and Tahoe, and 2014-2015 GMC Sierra, Yukon, and Yukon XL vehicles, equipped with 5.3L V8 or 6.2L V8 engines with RPO codes L83 and L86, respectively.  The PI described that "[s]ome customers may comment on an SES light P0300, engine misfire on cylinder 4, 6, and/or tick noise. This may be the result of an AFM lifter that is mechanically collapsed and or stuck all of the time. These lifter concerns may be the result of internal locking pin damage in the lifter, due to oil aeration."  Technicians were directed to use the SI diagnosis to find the cause of the concern, and if that failed to inspect for valve operation.  If the valve or valves were not moving, the AFM lifters and guides on the back with the concern were to be replaced, along with the oil pump and oil pan assembly.

226.  In March 2015, GM issued Preliminary Information Bulletin PIP5259C, regarding "Engine Misfire Lamp P03000 AFM Cylinders."  The PI was applicable to 2014-2015 Chevrolet Silverado, Suburban, and Tahoe, 2014-2015 GMC Sierra, Yukon, and Yukon XL vehicles, and 2015 Cadillac Escalades, equipped with 5.3L V8 or 6.2L V8 engines with RPO codes L83 and L86,

respectively.  This PI superseded PIP5259B, which had been issued between January and March 2015.  Technicians were directed to discard PIP5259B.  The PI described that "[s]ome customers may comment on an SES lift P0300, engine misfire on cylinder 4, 6, and/or tick noise. This may be the result of an AFM lifter that is mechanically collapsed and or stuck all of the time. These lifter concerns may be the result of internal locking pin damage in the lifter, due to oil aeration."  Technicians were directed to use the SI diagnosis to find the cause of the concern, and if that failed, to inspect for valve operation.  If the valve or valves were not moving, the AFM lifters and guides on the back with the concern were to be replaced, along with the Valve Lifter Oil Assembly.

227.  In March 2015, GM issued Preliminary Information Bulletin PIP5259D, regarding "Engine Misfire Lamp P03000 AFM Cylinders."  The PI was applicable to 2014-2015 Chevrolet Silverado, Suburban, and Tahoe, 2014-2015 GMC Sierra, Yukon, and Yukon XL vehicles, and 2015 Cadillac Escalades, equipped with 5.3L V8 or 6.2L V8 engines with RPO codes L83 and L86, respectively.  This PI superseded PIP5259C, which had been issued just a few weeks prior in the same month. Technicians were directed to discard PIP5259C.  The PI described that "[s]ome customers may comment on an SES lift P0300, engine misfire on cylinder 4, 6, and/or tick noise. This may be the result of an AFM lifter that is mechanically collapsed and or stuck all of the time. These lifter concerns may be the result of internal locking pin damage in the lifter, due to oil aeration."

Technicians were directed to use the SI diagnosis to find the cause of the concern, and if that failed, to inspect for valve operation. If the valve or valves were not moving, the AFM lifters and guides on the back with the concern were to be replaced, as well as the oil pump pick up seal.

228. In June 2015, GM issued TSB 15-06-01-002, regarding "Engine Misfire/Tick Noise, Malfunction Indicator Lap (MIL) on, DTC P0300 Set." The TSB was applicable to 2015 Cadillac Escalades, 2014 Chevrolet Silverado 1500, 2014-2015 Chevrolet Corvette, 2014 Chevrolet Silverado, Suburban, and Tahoe, 2014 GMC Sierra 1500, and 2014-2015 GMC Sierra, Yukon, and Yukon XL vehicles, equipped with 5.3L V8 or 6.2L V8 engines with RPO codes L83 and L86 or LT1, respectively. The TSB described "[s]ome customers may comment on a malfunction indicator lamp (MIL) on and/or an engine misfire/tick noise. Technicians may find DTC P0300 set or in history." Again, the TSB noted that "[t]his may be the result of an active fuel management (AFM) lifter that is mechanically collapsed and/or stuck all of them. This may be result of internal locking pin damage in the lifter. Due to oil aeration." Technicians were directed to use the SI diagnosis to find the cause of the concern, and if that failed to inspect for valve operation. If the valve or valves were not moving, the technicians were to replace the valve lifter oil manifold and the affected bank of lifters. Further, "[i]f the lifter has spun the bore, the guides should be replaced also."

229.   In July 2015, GM issued Technical Service Bulletin 15-06-01-002A, regarding "Engine Misfire/Tick Noise, Malfunction Indicator Lap (MIL) on, DTC P0300 Set."  This changed the previous version of the TSB in adding a second part number for the AFM, number 12619820, or the previously noted 12645725.

230.   In January 2016, GM issued Preliminary Information Bulletin PIP5316, regarding "Information On How to Remove Most Stuck Lifters when Completing 15-06-01-002A."  This PI was applicable to 2015 Cadillac Escalade, 2014-2015 Chevrolet Corvette, 2014-2015 Chevrolet Silverado 1500, 2015 Chevrolet Suburban and Tahoe, 2014-2015 GMC Sierra 1500 and 2015 Yukon and Yukon XL vehicles, equipped with RPO 5.3L 6.2L V8 with codes L83, L86, LT1, LT4, and LV3 (as noted above, this engine code seems to be for a 4.3L V6 engine).  Technicians were directed to use vice grips with a slide hammer or with a small pry bar to get the stuck lifter out of the lifter bore.  If these processes failed to remove the lifter, the engine would have to be replaced.

231.   In March 2016, GM issued Preliminary Information Bulletin PIP4568S, regarding "Tick Noise And/Or Misfires on AFM Cylinders 1 4 6 And/or 7."  The PI was applicable to 2008-2009 Buick LaCrosse and Allure, 2007 Buick Rainier, 2007-2014 Cadillac Escalade, 2011-2015 Chevrolet Caprice PPV, 2010-2015 Chevrolet Camaro SS, 2007-2013 Chevrolet Silverado, 2007-2014 Chevrolet Avalanche, Suburban, and Tahoe, 2006-2009 Chevrolet Trailblazer, 2006-2009 Chevrolet Impala SS, 2006-2007 Chevrolet Monte Carlo SS, 2006-2009 GMC Envoy, 2007-

2013 GMC Sierra, 2007-2014 GMC Yukon, 2008-2009 Pontiac G8, 2005-2008 Pontiac Grand Prix GXP, and 2006-2009 Saab 97x vehicles with a V8 Engine and Active Fuel Management.  The engines involved included RPO Codes L76, L77, L94, L99, LC9, LFA, LH6, LMG, LS4, LY5, and LZ1, a collection of 5.3L and 6.0L V8 engines.  The PI was issued to update the applicable model years and technicians were directed to disregard the previous version, PIP4568R, one of five updated versions of PIP4568M issued sometime after July 2013.  Again, the PI described that customers may report a SES lift, engine misfire on cylinder 1, 4, 6, and 7 and/or tick noise, which "may be the result of the AFM lifter that unlocks as soon the engine is started or one that is mechanically collapsed/stuck all of the time."  The PI continued, "[t]hese lifter concerns may be the result of internal locking pin damage, which may occur if the response time of an AFM lifter unlocking event is decreased due to low oil pressure, oil aeration, internal engine sludge, or an internal concern with an AFM lifter, VLOM, plastic lifter guide, lifter bore, and/or cam lobe wear."  The PI directed dealerships to replace the VLOM, all the AFM lifters, and all plastic lifter guides. Further, 2008-2009 Full Size Trucks and SUVs, and the 2007-2009 Chevrolet Tahoe with the Police Package also required an ECM update.  Certain vehicles also needed their AFM pressure relief valve shield inspected and possibly replaced.  Technicians were directed to refer to TSB 10-06-01-008 in that case.  Technicians were also to carefully inspect the camshaft lobes through the lifter bores to ensure they were not obviously worn, and to clean out the lifter control oil passages with brake cleaner if

77

debris was noted.  The PI indicates that low oil pressure to the VLOM can cause AFM lifter damage.

232.   In May 2016, GM issued Technical Service Bulletin 15-06-01-002C, regarding "Engine Misfire/Tick Noise, Malfunction Indicator Lap (MIL) on, DTC P0300 Set."  This TSB replaced 15-06-01-002B, which technicians were to discard, and specifically added models to the applicable vehicles as well as updated parts information.  The TSB was applicable to 2015-2016 Cadillac Escalades, 2016 Cadillac CTS-V, 2014 Chevrolet Silverado 1500, 2014-2016 Chevrolet Corvette, 2015-2016 Chevrolet Silverado, Suburban, and Tahoe, 2016 Chevrolet Camaro, 2014 GMC Sierra 1500, and 2014-2015 GMC Sierra, Yukon, and Yukon XL vehicles, equipped with 5.3L V8 or 6.2L V8 engines with RPO codes L83 and L86, LT1, or LT4 respectively.  The TSB described "[s]ome customers may comment on a malfunction indicator lamp (MIL) on and/or an engine misfire/tick noise. Technicians may find DTC P0300 set or in history."  Again, the TSB noted that "[t]his may be the result of an active fuel management (AFM) lifter that is mechanically collapsed and/or stuck all of them.  This may be result of internal locking pin damage in the lifter. Due to oil aeration." Technicians were directed to use the SI diagnosis to find the cause of the concern, and if that failed to inspect for valve operation.  If the valve or valves were not moving, the technicians were to replace the valve lifter oil manifold and the affected bank of lifters.  Further, "[i]f the lifter has spun the bore, the guides should be replaced also."

233.   In August 2016, GM issued Preliminary Information Bulletin PIP4786C, regarding "Low Oil Pressure Message/Lift – Inspect Valve Lifter Oil Lifter."  It is unknown when PIP4786, a predecessor PI, was issued, but this PI superseded PIP4786B and updated the models to which the PI was applicable.  This PI was applicable to 2007 Cadillac Escalades built before April 1, 2006 with the 6.2L L92 Engine, a vehicle which had AFM hardware but in the AFM system was not enabled.  This PI was also applicable to 2007 Buick Lacrosse Super and Allure Super, 2005-2007 Buick Rainer, 2007-2016 Cadillac Escalade, 2010-2016 Chevrolet Camaro SS, 2014-2016 Chevrolet Corvette, 2007-2016 Chevrolet Avalanche, Silverado, Suburban, and Tahoe, 2007-2009 Chevrolet Impala, 2005-2009 Chevrolet Trailblazer, 2007 Chevrolet Monte Carlo, 2007-2016 GMC Sierra and Yukon, 2005-2009 GMC Envoy, 2007-2008 Pontiac Grand Prix, 2008-2009 Pontiac G8, and 2005-2009 Saab 97x vehicles, equipped with AFM V8 engines. However, the PI specifies that it is applicable to vehicles who RPO engine codes are L76, L77, L83, L86, L94, L99, LC9, LFA, LH6, LMG, LS4, LT1, LTA, LY5, and LV3, which includes 5.3L, 6.0L and 6.2L V8 engines and a 4.3L V6 engine.  Both fourth generation and fifth generation engines are on this list.  The PI described "[s]ome customer may complain of a low oil pressure message/light on the dash and a technician may find a P0521 DTC in the ECM."  Technicians were to "inspect the Valve Lifter Oil Filter for debris/sludge that could be restricting oil flow to the oil

pressure sensor before replacing any parts." The filter was to be cleaned, and if cleaning was not possible, replaced.

234. In October 2016, GM issued Technical Service Bulletin 15-06-01-002E regarding "Engine Misfire/Tick Noise, Malfunction Indicator Lamp (MIL) Illuminated, DTC P0300 Set." This TSB replaced 15-06-01-002D, which was issued sometime after May 2016, adding the 2017 model year, and also replaced PIP5316, which was issued in January 2016. The TSB was applicable to 2015-2017 Cadillac Escalade, 2016-2017 Cadillac CTS-V, 2014 Chevrolet Silverado 1500, 2014-2017 Chevrolet Corvette, 2015-2017 Chevrolet Silverado, Suburban, and Tahoe, 2016-2017 Chevrolet Camaro, 2014 GMC Sierra 1500, and 2014-2017 GMC Sierra, Yukon, and Yukon XL vehicles, equipped with 5.3L V8 or 6.2L V8 engines with RPO codes L83 and L86, LT1, or LT4 respectively. The TSB also identifies LV3 as an applicable engine code, though it is a 4.3L V6 engine. The TSB described "[s]ome customers may comment on a malfunction indicator lamp (MIL) on and/or an engine misfire/tick noise. Technicians may find DTC P0300 set or in history." Again, the TSB noted that "[t]his may be the result of an active fuel management (AFM) lifter that is mechanically collapsed and/or stuck all of them. This may be result of internal locking pin damage in the lifter, due to oil aeration." Technicians were directed to use the SI diagnosis to find the cause of the concern, and if that failed to inspect for valve operation. If the valve or valves were not moving, the technicians were to replace the valve lifter oil manifold and the affected bank of

lifters.  Further, "[i]f the lifter has spun the bore, the guides should be replaced also." If the lifters could not be removed with vice grips, either with a slide hammer or small pry bar, the engine would have to be replaced.

235.   In December 2016, GM issued Preliminary Information Bulletin PIP4138P, regarding "SES Light, DTC P0300, and/or a Chirp, Squeak, Squeal, or Tick Noise – Potential Valvetrain Concern."  This bulletin was applicable to 2004-2007 Buick Rainier, 2008-2009 Buick LaCrosse and Allure, 2006-2017 CTS-V, 2002-2017 Cadillac Escalade, 2010-2017 Chevrolet Camaro, 2010-2017 Chevrolet Corvette, 2011-2017 Chevrolet Caprice PPV, 2002-2013 Chevrolet Avalanche, 1999-2017 Chevrolet Express, Silverado, Suburban, and Tahoe, 2009-2013 Chevrolet Colorado, 2003-2009 Chevrolet Trailblazer, 2006-2009 Chevrolet Impala SS, 2006-2007 Chevrolet Monte Carlo SS, 2003-2006 Chevrolet SSR, 2009-2013 GMC Canyon, 2003-2009 GMC Envoy, 1999-2017 GMC Savana, Sierra, and Yukon, 2003-2010 Hummer H2, 2008-2010 Hummer H3, 2008-2010 Pontiac G8, 2005-2006 Pontiac GTO, 2005-2008 Pontiac Grand Prix GXP, and 2005-2009 Saab 97x vehicles with a V8 engine.  No engine codes were noted.  The bulletin described that customers "may complain of an SES light, engine misfire, and/or engine noise" and that "[t]he noise may be described as a chirp, squeak, squeal, or tick noise and may increase off idle."  If the cause of the concern was not isolated after SI diagnosis, GM's regular diagnostic review, GM noted that this concern may be the result of several conditions, including a "worn camshaft lobe and/or lifter roller," "a broken

valve spring," and "a collapsed AFM lifter." Worn camshaft lobe and/or lifter rollers were to be replaced, as well as the plastic lifter guides and the VLOM. Broken valve springs were to be replaced. If a collapsed AFM Lifter was found, technicians were to "refer to the latest version of PIP4568 for additional information." That PI directed technicians to replace the lifters, guides, and the VLOM. For engine codes L83, L86, LT1 and LT4, technicians were also directed to follow TSB 15-06-01-002E. The previous version of the PI, PIP4138N, was to be discarded, because this PI added model years.

236. In December 2017, GM issued Technical Service Bulletin 15-06-01-002F, regarding "Engine Misfire/Tick Noise, Malfunction Indicator Lamp (MIL) Illuminated, DTC P0300 Set." This bulletin updated 15-06-01-002E, adding the 2018 Model Year, updating the cause and changing a picture. The TSB was applicable to 2015-2018 Cadillac Escalade, 2016-2018 Cadillac CTS-V, 2014 Chevrolet Silverado 1500, 2014-2018 Chevrolet Corvette, 2015-2018 Chevrolet Silverado, Suburban, and Tahoe, 2016-2018 Chevrolet Camaro, 2014 GMC Sierra 1500, and 2014-2018 GMC Sierra, Yukon, and Yukon XL vehicles, equipped with 5.3L V8 or 6.2L V8 engines with RPO codes L83 and L86, LT1, or LT4 respectively. The TSB described that "[s]ome customers may comment on a malfunction indicator lamp (MIL) on and/or an engine misfire/tick noise. Technicians may find DTC P0300 set or in history." The possible causes included an AFM lifter that is mechanically collapsed and/or stuck all of the time, internal locking pin damage in

the lifter, due to oil aeration, lifter that has collapsed and is stuck in the lifter bore, and a bent push rod. Technicians were instructed to inspect the camshaft for damage after the lifters were removed and replace if found to be damaged.  Then technicians were to perform the SI diagnosis, inspect the engine for valve operation, and if found to be not moving, replace the valve lifter oil manifold and affected bank of AFM lifters.  If the lifter has spun the bore, the guides should also be replaced.

237.  On January 24, 2018, GM issued Preliminary Information Bulletin PIP4138Q, regarding "SES Light, DTC P0300, and/or a Chirp, Squeak, Squeal, or Tick Noise – Potential."  This bulletin was applicable to 2008-2009 Buick LaCrosse, 2008-2009 Buick Allure, 2004-2007 Buick Rainier, 2006-2018 CTS-V, 2002-2018 Cadillac Escalade, 2002-2013 Chevrolet Avalanche, 2011-2018 Chevrolet Caprice PPV, 2009-2012 Chevrolet Colorado, 2010-2018 Chevrolet Camaro, 2005-2018 Chevrolet Corvette, 2002-2018 Chevrolet Express, 2006-2009 Chevrolet Impala SS, 2016-2018 Chevrolet LCF Models, 2006-2007 Chevrolet Monte Carlo SS, 2003-2006 Chevrolet SSR, 2002-2018 Chevrolet Silverado, 2002-2018 Chevrolet Silverado HD, 2002-2018 Chevrolet Suburban, 2002-2018 Chevrolet Tahoe, 2003-2009 Chevrolet Trailblazer, 2009-2013 GMC Canyon, 2003-2009 GMC Envoy, 2002-2018 GMC Savana, 2002-2018 Sierra, 2002-2018  Sierra HD, 2002-2018 Yukon, 2003-2010 Hummer H Models, 2008-2010 Pontiac G8, 2005-2006 Pontiac GTO, 2005-2008 Pontiac Grand Prix GXP, and 2005-2009 Saab 9-7x vehicles with a V8 engine.  No engine codes were noted.   The bulletin described that customers

83

"may complain of an SES light, engine misfire, and/or engine noise" and that "[t]he noise may be described as a chirp, squeak, squeal, or tick noise and may increase off idle."  If the cause of the concern was not isolated after SI diagnosis, GM's regular diagnostic review, GM noted that this concern may be the result of several conditions, including a "worn camshaft lobe and/or lifter roller," "a broken valve spring," and "a collapsed AFM lifter."  Worn camshaft lobe and/or lifter rollers were to be replaced, as well as the plastic lifter guides and the VLOM. Broken valve springs were to be replaced.  If a collapsed AFM Lifter was found, technicians were to "refer to the latest version of PIP4568 for additional information."  That PI directed technicians to replace the lifters, guides, and the VLOM.  For engine codes L83, L86, LT1 and LT4, technicians were also directed to follow TSB 15-06-01-002E.  The previous version of the PI, PIP4138P, was to be discarded, because this PI added model years.

238.   On February 2, 2018, GM issued Preliminary Information Bulletin PIP5628.  This provided a diagnostic tree for technicians to determine why a vehicle would have a misfire.  The bulletin was applicable to all GM vehicles model years 2000-2019.  The PI described that "[a] vehicle may come in with a misfire and DTCs P0300-P0308 and/or P050D set" due to an engine misfire.   The PI instructed technicians that before calling TAC for these concerns, the template had to filled out to allow TAC to assist.  The diagnostic list put spark, fuel injector balance testing, and fuel contamination first as possible causes.  Some of the last issues to check

were abnormal engine noises, misfires on AFM cylinders, and verifying rocker arm movement.

239.   On March 1, 2018, Melling Engine Parts ("Melling"), a leading aftermarket parts manufacturer, also issued its own technical service bulletin to GM dealerships, in addition to other auto parts suppliers.  This bulletin stated that most of their lifters returned for failure are good and that "[w]e have found that most lifter faults are caused by oil pressure issues, or control issues."  The bulletin goes on to state:

> The AFM lifter bores in these engines have a spec of .843-.844, and the deactivation lifters require 22 PSI of pressure to release the locking pins.  Taking these two things into consideration a lifter bore that is even slightly worn could bleed off enough oil pressure to prevent the lifter from unlocking.  In addition it has been reported that it is common to find the VLOM oil filter plugged and needing replacement on high mileage engines with miss-fire fault codes.
>
> Melling has received AFM DEAC lifters back for warranty claims where the lifter has been stuck compressed, this condition can be caused by the VLOM commanding activation or deactivation at the wrong point in the cam's rotation, either in the ramp, or at the lobe peak.
>
> Any time an engine has failed AFM lifters the lifter guides must be replaced, the lifter bores must be measured, and the VLOM must also be tested for proper operation, or replaced.  In addition the VLOM oil filter must be replaced as well.

240.   Notably, Melling's instructions call for technicians to measure the lifter bore, a step that the bulletins from GM do not address.

241.   On October 16, 2018, GM issued Preliminary Information Bulletin PIP4138R, regarding "SES Light, DTC P0300, and/or a Chirp, Squeak, Squeal, or Tick Noise – Potential."  This bulletin was applicable to 2008-2009 Buick LaCrosse, 2008-2009 Buick Allure, 2004-2007 Buick Rainier, 2006-2018 CTS-V, 2002-2018

Cadillac Escalade, 2002-2013 Chevrolet Avalanche, 2011-2018 Chevrolet Caprice PPV, 2009-2012 Chevrolet Colorado, 2010-2018 Chevrolet Camaro, 2005-2018 Chevrolet Corvette, 2002-2018 Chevrolet Express, 2006-2009 Chevrolet Impala SS, 2016-2018 Chevrolet LCF Models, 2006-2007 Chevrolet Monte Carlo SS, 2014-2017 Chevrolet SS, 2003-2006 Chevrolet SSR, 2002-2018 Chevrolet Silverado, 2002-2018 Chevrolet Silverado HD, 2002-2018 Chevrolet Suburban, 2002-2018 Chevrolet Tahoe, 2003-2009 Chevrolet Trailblazer, 2003-2009 GMC Canyon, 2003-2009 GMC Envoy, 2002-2018 GMC Savana, 2002-2018 Sierra, 2002-2018  Sierra HD, 2002-2018 Yukon, 2003-2010 Hummer H Models, 2008-2010 Pontiac G8, 2005-2006 Pontiac GTO, 2005-2008 Pontiac Grand Prix GXP, and 2005-2009 Saab 9-7x vehicles with a V8 engine.  No engine codes were noted.   The bulletin described that customers "may complain of an SES light, engine misfire, and/or engine noise" and that "[t]he noise may be described as a chirp, squeak, squeal, or tick noise and may increase off idle."  If the cause of the concern was not isolated after SI diagnosis, GM's regular diagnostic review, GM noted that this concern may be the result of several conditions, including a "worn camshaft lobe and/or lifter roller," "a broken valve spring," and "a collapsed AFM lifter."  Worn camshaft lobe and/or lifter rollers were to be replaced, as well as the plastic lifter guides and the VLOM. Broken valve springs were to be replaced.  If a collapsed AFM Lifter was found, technicians were to "refer to the latest version of PIP4568 for additional information."  That PI directed technicians to replace the lifters, guides, and the

VLOM.  For engine codes L83, L86, LT1 and LT4, technicians were also directed to follow TSB 15-06-01-002E.  The previous version of the PI, PIP4138Q, was to be discarded, because this PI updated model years.

242.   On November 14, 2018, GM issued Preliminary Information Bulletin PIP5606B, regarding "Ticking Noise From The Engine."  This PI was applicable to 2019 Cadillac CTS and Escalade, 2019 Chevrolet Camaro, Corvette, Silverado LD, Silverado 1500, Suburban, and Tahoe, and GMC Sierra 1500 Limited, Sierra 1500, and Yukon vehicles, equipped with 4.3L V6, or 5.3L or 6.2L V8 engines with RPO codes LT4, L86, LT1, LT4, LTI, LT5, L83, LV3, L84, or L87.  The PI described that vehicles "may have a tick noise from the engine cold, initial start in the morning" and stated that the cause was that "[a] lifter may not have sufficient amount of oil during cold start operation (not pumped up)".  Technicians were instructed to allow the engine to sit overnight and attempt to duplicate.  If they could not hear the noise, the vehicle was to be returned to the customer.  If DTCs were found, technicians were to go through SI diagnosis, and if the noise persists, they were to inspect to "isolate the cylinder with the concern" and further inspect for a bent pushrod and/or collapsed lifter.  The faulty piece was to be replaced.  The PI also noted, "[e]ngineering is working to understand the cause for this concern."

243.   On February 18, 2019, GM re-issued Preliminary Information Bulletin PIP5628.  This provided a diagnostic tree for technicians to determine why a vehicle would have a misfire.  The bulletin was applicable to all GM vehicle model years

2000-2019.  The PI described that "[a] vehicle may come in with a misfire and DTCs P0300-P0308 and/or P050D set" due to an engine misfire.  The PI instructed technicians that, before calling TAC for these concerns, the template had to be filled out to allow TAC to assist.  The diagnostic list put spark, fuel injector balance testing, and fuel contamination first as possible causes.  Some of the last issues to check were abnormal engine noises, misfires on AFM cylinders, and verifying rocker arm movement.

244.   In March 2019, GM issued Technical Service Bulletin 15-06-01-002H, regarding "Engine Misfire/Tick Noise, Malfunction Indicator Lamp (MIL) Illuminated, DTC P0300 Set."  This bulletin updated 15-06-01-002G, adding the 2018 Model Year, additional part numbers.  The TSB was applicable to 2015-2019 Cadillac Escalade, 2016-2019 Cadillac CTS-V, 2014 Chevrolet Silverado 1500, 2014-2019 Chevrolet Corvette, 2015-2018 Chevrolet Silverado, 2015-2019 Chevrolet Suburban and Tahoe, 2016-2019 Chevrolet Camaro, 2019 Chevrolet Silverado LD, 2014 GMC Sierra 1500, 2014-2018 GMC Sierra, 2014-2019 GMC Yukon and Yukon XL, and 2019 GMC Sierra Limited vehicles, equipped with 5.3L V8 or 6.2L V8 engines with RPO codes L83 and L86,  LT1, or LT4 respectively. The TSB described that "[s]ome customers may comment on a malfunction indicator lamp (MIL) on and/or an engine misfire/tick noise.  Technicians may find DTC P0300 set or in history."  The possible causes included AFM lifter that is mechanically collapsed and/or stuck all of the time, internal locking pin damage in

the lifter, due to oil aeration, lifter that has collapsed and is stuck in the lifter bore, and a bent push rod. Technicians were instructed to inspect the camshaft for damage after the lifters are removed and replace if found to be damaged. Then technicians were to perform the SI diagnosis, inspect the engine for valve operation, and if found to be not moving, replace the valve lifter oil manifold and affected bank of AFM lifters. If the lifter has spun the bore, the guides should also be replaced.

245. On September 20, 2019, GM issued Service Bulletin Information 19-NA-219, regarding "Diagnostic Tip for Misfire, Chirp, Squeak, Squeal or Tick Noise, Malfunction Indicator Lamp (MIL) Illuminated – DTC P0300, P0301, P0302, P0303, P0304, P0305, P0306, P0307, and/or P0308 Set." This bulletin replaced PIP4138R, issued in October 2018. This bulletin was applicable to all Buick, Cadillac, Chevrolet, GMC, Hummer, Pontiac, and Saab passenger cars and trucks including model years 2002 through 2018 with a V8 engine. The bulletin described that customers might comment on misfire, chirp, squeak, squeal, tick, and MIL illuminated. Technicians might also find certain DTCs in the ECM, indicating engine misfires. If the cause of the concern was not isolated after SI diagnosis, GM's regular diagnostic review, GM noted that this concern may be the result of several conditions, including a "worn camshaft lobe and/or lifter roller," "a broken valve spring," and "a collapsed AFM lifter." Worn camshaft lobe and/or lifter rollers were to be replaced, as well as the plastic lifter guides and the VLOM. Broken valve springs were to be replaced. If a collapsed AFM Lifter was found, technicians were

to "refer to the latest version of PIP4568 for additional information." That PI directed technicians to replace the lifters, guides, and the VLOM. For engine codes L83, L86, LT1 and LT4, technicians were also directed to follow the latest version of TSB 15-06-01-002.

246.  In March 2020, GM re-issued Service Information Bulletin 19-NA-219, regarding "Diagnostic Tip for Misfire, Chirp, Squeak, Squeal or Tick Noise, Malfunction Indicator Lamp (MIL) Illuminated – DTC P0300, P0301, P0302, P0303, P0304, P0305, P0306, P0307, and/or P0308 Set." This bulletin replaced PIP4138R, issued in October 2018. This bulletin was applicable to all Buick, Cadillac, Chevrolet, GMC, Hummer, Pontiac, and Saab passenger cars and trucks including model years 2002 through 2018 with a V8 engine. The bulletin described that customers might comment on misfire, chirp, squeak, squeal, tick, and MIL illuminated. Technicians might also find certain DTCs in the ECM, indicating engine misfires.  If the cause of the concern was not isolated after SI diagnosis, GM's regular diagnostic review, GM noted that this concern may be the result of several conditions, including a "worn camshaft lobe and/or lifter roller," "a broken valve spring," and "a collapsed AFM lifter." Worn camshaft lobe and/or lifter rollers were to be replaced, as well as the plastic lifter guides and the VLOM. Broken valve springs were to be replaced.  If a collapsed AFM Lifter was found, technicians were to "refer to the latest version of PIP4568 for additional information." That PI directed technicians to replace the lifters, guides, and the VLOM. For engine codes

L83, L86, LT1 and LT4, technicians were also directed to follow the latest version of TSB 15-06-01-002.

247.   In March 2020, GM issued Technical Service Bulletin 15-06-01-002I, regarding "Engine Misfire/Tick Noise, Malfunction Indicator Lamp (MIL) Illuminated, DTC P0300 Set."  This bulletin updated 15-06-01-002H, adding the L8B engine code.  The TSB was applicable to 2015-2019 Cadillac Escalade, 2016-2019 Cadillac CTS-V, 2014 Chevrolet Silverado 1500, 2014-2019 Chevrolet Corvette, 2015-2018 Chevrolet Silverado, 2015-2019 Chevrolet Suburban and Tahoe, 2016-2019 Chevrolet Camaro, 2019 Chevrolet Silverado LD, 2014 GMC Sierra 1500, 2014-2018 GMC Sierra, 2014-2019 GMC Yukon and Yukon XL, and 2019 GMC Sierra Limited vehicles, equipped with 5.3L V8 or 6.2L V8 engines with RPO codes L83 or L8B, and L86, LT1, or LT4 respectively.  The TSB described that "[s]ome customers may comment on a malfunction indicator lamp (MIL) on and/or an engine misfire/tick noise.  Technicians may find DTC P0300 set or in history."  The possible causes included AFM lifter that is mechanically collapsed and/or stuck all of the time, internal locking pin damage in the lifter, due to oil aeration, lifter that has collapsed and is stuck in the lifter bore, and a bent push rod. Technicians were instructed to inspect the camshaft for damage after the lifters are removed and replace if found to be damaged.  Then technicians were to perform the SI diagnosis, inspect the engine for valve operation, and if found to be not moving,

replace the valve lifter oil manifold and affected bank of AFM lifters.  If the lifter has spun the bore, the guides should also be replaced.

248.   In May 2020, GM issued Technical Service Bulletin 15-06-01-002J, regarding "Engine Misfire/Tick Noise, Malfunction Indicator Lamp (MIL) Illuminated, DTC P0300 Set."  This bulletin updated 15-06-01-002I, changing a part number and a warranty coverage statement to include both Powertrain and Emissions.  The TSB was applicable to 2015-2019 Cadillac Escalade, 2016-2019 Cadillac CTS-V, 2014 Chevrolet Silverado 1500, 2014-2019 Chevrolet Corvette, 2015-2018 Chevrolet Silverado, 2015-2019 Chevrolet Suburban and Tahoe, 2016-2019 Chevrolet Camaro, 2019 Chevrolet Silverado LD, 2014 GMC Sierra 1500, 2014-2018 GMC Sierra, 2014-2019 GMC Yukon and Yukon XL, and 2019 GMC Sierra Limited vehicles, equipped with 5.3L V8 or 6.2L V8 engines with RPO codes L83 or L8B, and L86, LT1, or LT4 respectively.  The TSB described that "[s]ome customers may comment on a malfunction indicator lamp (MIL) on and/or an engine misfire/tick noise.  Technicians may find DTC P0300 set or in history."  The possible causes included AFM lifter that is mechanically collapsed and/or stuck all of the time, internal locking pin damage in the lifter, due to oil aeration, lifter that has collapsed and is stuck in the lifter bore, and a bent push rod. Technicians were instructed to inspect the camshaft for damage after the lifters were removed and replace if found to be damaged.  Then technicians were to perform the SI diagnosis, inspect the engine for valve operation, and if found to be not moving, replace the

valve lifter oil manifold and affected bank of AFM lifters.  If the lifter has spun the bore, the guides should also be replaced.

249.  In June 2020, GM issued Technical Service Bulletin 19-NA-218, regarding "Ticking Noise from the Engine."  The TSB replaced PIP5606E, which was to be discarded.  The TSB was applicable to 2019 Cadillac CTS, 2019-2020 Cadillac Escalade, 2019-2020 Chevrolet Camaro, 2020 Chevrolet Corvette, 2019 Chevrolet Silverado, 2019-2020 Silverado 1500, 2019-2020 Chevrolet Suburban, 2019-2020 Chevrolet Tahoe, 2019 GMC Sierra Limited, 2019-2020 GMC Sierra 1500, and 2019-2020 GMC Yukon vehicles with equipped with 4.3L V6 or 5.3L, 6.0L, or 6.2L V8 engines with RPO codes LV3, L83, L84, L86, L96, LT1, LT4, or LT5.  The TSB described that customers may comment that they hear a ticking noise from the engine, which the TSB described will mainly occur during the first initial start in the morning.  "This condition may be cause by a lifter not having a sufficient amount of oil during cold start operation (not pumped up)."  Technicians were directed to allow vehicles to sit overnight and return the vehicle to the customer if no ticking noise is heard on start-up.  However, if a noise was found and isolated via cylinder deactivation test, the engine was to be inspected for a bent pushrod and/or a collapsed lifter.

250.  On July 27, 2020, GM issued Preliminary Information Bulletin PIP5226D, regarding "Needle Bearings Found in The Oil Pan During An Oil Change."  The PI superseded PIP522C, updating the information to add model years.

The PI was applicable to all GM models from all brands, including all model years from 2000 to 2021, on vehicles equipped with V6 or V8 push rod engines with roller rockers.  The PI described that the "[t]echnician may find needle bearing in the oil pan during an oil change."  Technicians were to inspect the roller rocker arms and replaced only broken roller rocker arms.  All oil drains were to be cleaned as well.

251.   On October 8, 2020, GM issued Preliminary Information PIP5628C, regarding "Misfire Template."  This provided a diagnostic tree for technicians to determine why a vehicle would have a misfire.  The bulletin was applicable to all GM vehicles model years 2000-2021.  The PI described that "[a] vehicle may come in with a misfire and DTCs P0300-P0308 and/or P050D set" due to an engine misfire.  The PI instructed technicians that before calling TAC for these concerns, the template had to be filled out to allow TAC to assist.  The diagnostic list put spark, fuel injector balance testing, and fuel contamination first as possible causes.  Some of the last issues to check with abnormal engine noises, misfires on AFM cylinders, and verifying rocker arm movement.

252.   In December 2020, GM issued Technical Service Bulletin 15-06-01-002K, regarding "Engine Misfire/Tick Noise, Malfunction Indicator Lamp (MIL) Illuminated, DTC P0300 Set."  This bulletin updated 15-06-01-002J, updating the parts information section.  The TSB was applicable to 2015-2019 Cadillac Escalade, 2016-2019 Cadillac CTS-V, 2014 Chevrolet Silverado 1500, 2014-2019 Chevrolet Corvette, 2015-2018 Chevrolet Silverado, 2015-2019 Chevrolet Suburban and

Tahoe, 2016-2019 Chevrolet Camaro, 2019 Chevrolet Silverado LD, 2014 GMC Sierra 1500, 2014-2018 GMC Sierra, 2014-2019 GMC Yukon and Yukon XL, and 2019 GMC Sierra Limited vehicles, equipped with 5.3L V8 or 6.2L V8 engines with RPO codes L83 or L8B, and L86, LT1, or LT4 respectively.  The TSB described that "[s]ome customers may comment on a malfunction indicator lamp (MIL) on and/or an engine misfire/tick noise.  Technicians may find DTC P0300 set or in history."  The possible causes included AFM lifter that is mechanically collapsed and/or stuck all of the time, internal locking pin damage in the lifter, due to oil aeration, lifter that has collapsed and is stuck in the lifter bore, and a bent push rod. Technicians were instructed to inspect the camshaft for damage after the lifters are removed and replace if found to be damaged.  Then technicians were to perform the SI diagnosis, inspect the engine for valve operation, and if found to be not moving, replace the valve lifter oil manifold and affected bank of AFM lifters.  If the lifter has spun the bore, the guides should also be replaced.

253.  On April 19, 2021, GM issued Preliminary Information Bulletin PIP5752L, regarding "Service Engine Light Misfire Engine Noise with DTC P0300 P0106 P0506."  This PI was applicable to 2021 Cadillac Escalade, 2020-2021 Chevrolet Camaro, 2020 Chevrolet Corvette, 2020-2021 Chevrolet Silverado, 2021 Chevrolet Suburban, 2021 Chevrolet Tahoe, 2020-2021 GMC Sierra, and 2021 GMC Yukon, equipped with 5.3L, 6.2L, or 6.6L V8 engines with RPO codes L82, L84, L87, LT1, LT2, LT4, and L8T.  The PI described that a possible broken valve

spring could cause the service engine light to come on, engine misfires, engine noises, and DTCs P0300, P0106, P0506 P318A, P318B, P318C, P318D, P318E, P318F, P3190.  Technicians were instructed to perform a cylinder leakage test, and if none was observed, to replace the affected valve spring and check to see if the intake manifold was damaged.  If cylinder leakage was found, the extent of damage to the engine would have to be determined and appropriate repairs given, up to and including full engine replacement.  The original version of this PI was issued on September 8, 2020.

254.  On April 23, 2021, GM issued Preliminary Information PIP5776C, regarding "Misfire Due To Collapsed Lifter."  This PI had originally been issued on January 20, 2021 and updated on March 4, 2021 to clarify the applicable models. This PI was applicable to 2021 Cadillac Escalade, 2019 Chevrolet 1500, 2020-2021 Chevrolet Silverado 1500, 2021 Chevrolet Suburban, 2021 Chevrolet Tahoe, 2019 GMC Sierra 1500, 2020-2021 GMC Sierra 1500, and 2021 GMC Yukon vehicles, equipped with 5.3L or 6.2L V8 engines with RPO codes L84 or L87.  The PI described that vehicles "may come in with a P0300 – P0308 set with a bent push rod that leads to a collapsed lifter or a lifter that come apart" due to an "[i]nternal lifter concern."  Technicians were directed to replace all lifters and lifter guides on the affected bank, but not the lifters on the opposite bank or the oil control solenoid.

255.  On May 17, 2021, GM issued Preliminary Information PIP5776D, regarding "Misfire Due To Collapsed Lifter."  This PI was applicable to 2021

Cadillac Escalade, 2020-2021 Chevrolet Silverado 1500, 2021 Chevrolet Suburban, 2021 Chevrolet Tahoe, 2020-2021 GMC Sierra 1500, and 2021 GMC Yukon vehicles, equipped with 5.3L or 6.2L V8 engines with RPO codes L84 or L87 and produced between September 1, 2020 and March 31, 2021. The PI described that vehicles "may come in with a P0300 – P0308 set with a bent push rod that leads to a collapsed lifter or a lifter that come apart" due to an "[i]nternal lifter concern." Technicians were directed to replace all lifters and lifter guides on the affected bank, but not the lifters on the opposite bank or the oil control solenoid.

256. On July 19, 2021, GM issued Preliminary Information PIP5776F, regarding "Misfire Due To Collapsed Lifter." This PI was applicable to 2021 Cadillac Escalade, 2020-2021 Chevrolet Silverado 1500, 2021 Chevrolet Suburban, 2021 Chevrolet Tahoe, 2020-2021 GMC Sierra 1500, 2021 GMC Yukon vehicles, and Holden/GMSV Silverado 1500 4WD, equipped with 5.3L or 6.2L V8 engines with RPO codes L84 or L87 and produced between September 1, 2020 and March 31, 2021. The PI described that vehicles "may come in with a P0300 – P0308 set with a bent push rod that leads to a collapsed lifter or a lifter that come apart" due to an "[i]nternal lifter concern." For vehicles with under 8,000 miles, all lifters and guides on both banks were to be replaced. For vehicles with over 8,000, the lifters and guides were to be replaced on only the affected bank. The oil control solenoid was not to be replaced, regardless.

257.   As explained, these are some of the bulletins issued by GM and others regarding the Defect.  However, these documents make clear that GM was well-aware of the valve train issues with the previous generation engines when it designed, manufactured, tested, and produced the Generation 5 engines, and yet those engines still were sold to Plaintiffs and members of the Classes with the Defect.

## Customer Complaints to NHTSA

258.   GM monitors customers' complaints made to the National Highway Traffic Safety Administration ("NHTSA.") Federal law requires automakers like GM to be in close contact with NHTSA regarding potential auto defects, including imposing a legal requirement (backed by criminal penalties) compelling the confidential disclosure of defects and related data by automakers to NHTSA, including field reports, customer complaints, and warranty data. *See TREAD Act,* Pub. L. No. 106-414, 114 Stat.1800 (2000).

259.   Automakers also have a legal obligation to identify and report emerging safety-related defects to NHTSA under the Early Warning Reporting Requirements. *Id.* Similarly, automakers monitor NHTSA databases for consumer complaints regarding their automobiles as part of their ongoing obligation to identify potential defects in their vehicles, including safety-related defects. *Id.* Thus, GM knew or should have known of the many complaints about the Valve Train Defect logged by NHTSA ODI, and the content, consistency, and large number of those complaints alerted, or should have alerted, GM to the Valve Train Defect.

260.   Exhibit E, attached to this Complaint, is a sampling of the hundreds of complaints concerning the Valve Train Defect available through NHTSA's website, www.safercar.gov, which reveal that GM, through its network of dealers and repair technicians, was made aware of many failures of valve springs, rocker arms, and lifters in the Subject Engines.

### Other Internal Sources of GM's Knowledge of the Valve Train Defect

261.   GM communicates technical information to its network of authorized dealerships in several ways, including issuing TSBs and other documents on its proprietary network which reference problems with GM vehicles and instructions on their repair.  Some of these documents are merely identified by "Document ID" and a specific number.  Often, they are accessed through GM's proprietary software system, on which the SI Diagnosis resides.

262.   Unlike TSBs, which regulations require manufacturers to disclose to NHTSA, the documents on GM's network which are merely identified by a Document ID number are not disclosed or disseminated to the public in any way.

263.   GM also has extensive warranty data and replacement part order data which show the high rate of warranty repair and/or replacement requests for valve train components in the Subject Engines, as well as the high number of replacement parts sold to dealerships and consumers.  GM is also aware of the ongoing shortages

of replacement parts for the Class Vehicles, leading to Plaintiffs and consumers waiting weeks for their repairs, or longer.

264.   Additionally, GM would have additionally learned of this widespread defect from the many reports received from dealerships and from customer complaints directly to GM. GM's customer relations department collects and analyzes field data including, but not limited to, repair requests made at dealerships, technical reports prepared by engineers who have reviewed vehicles for which warranty coverage is being requested, parts sales reports, and warranty claims data.

265.   Defendant's warranty department similarly analyzes and collects data submitted by its dealerships in order to identify trends in its vehicles. It is Defendant's policy that when a repair is made under warranty the dealership must provide GM with detailed documentation of the problem and the fix employed to correct it. Dealerships have an incentive to provide detailed information to GM, because they will not be reimbursed for any repairs unless the justification is sufficiently detailed.

## Customer Complaints on Third-Party Websites

266.   Consumers similarly complained about the Valve Train Defect on various online forums, often describing buying new from GM and discussing various remedies, including more frequently changing the oil or turning off AFM to avoid straining the valve train system.  However, when consumers take their vehicles to

GM dealerships for repairs, they are often told that the Defect is a design defect or that there is nothing that can be done to prevent the damage.

267. While GM itself denies there is a defect and instead claims the noises the vehicles make are the normal operation of the fuel injectors or the AFM/DFM system, as discussed more *supra* and *infra*, GM monitors such third-party websites as a regular practice and would have been aware of such postings regarding issues being complained about relevant to its vehicles. The three largest American car manufacturers in particular, GM, Ford, and Chrysler, have made the monitoring of consumer complaints as posted on third-party websites a part of their brand and reputational management for at least a decade.[16] Below are some examples of complaints regarding the Valve Train Defect on consumer boards (errors in original).

    a. **March 3, 2017, Ndestounis posted "Collapsed lifter AFM issue"[17]:**

> My Silverado 5.3 cre cab was at dealer again for air conditioner issue. I picked it up drove 1/4 mile and all hell broke loose every light light up and it went into safe mode very loud knock started. Drove back and the service manager thought a bad wire or plug.turns out its a colapsed lifter. They are only replacing that lifter nothing else. I would think they would at least do the whole side. Any thoughts or suggestions would be great. Thank you

---

[16] *See* Exhibit F, Read, Richard, "Taking your car complaint online? Chrysler, GM, and Ford will see it.", *Christian Science Monitor*, Aug. 21, 2012 (available at https://www.csmonitor.com/Business/In-Gear/2012/0827/Taking-your-car-complaint-online-Chrysler-GM-and-Ford-will-see-it.) (last visited December 10, 2021).

[17] See Exhibit G, page 1. Original available at https://www.gm-trucks.com/forums/topic/198537-collapsed-lifter-afm-issue/ (last visited December 10, 2021).

b. **November 25, 2019, The Great Oz posted "GM lifter issue!"[18]:**

After buying lots of GM vans over the years and having very few problems, it seems they changed something. The dealer won't talk about it, but it appears that the lifters can collapse across the whole GM range of V-8 engines. The engine will run badly and generate a P0300 code (random misfire), then the collapsed lifter will eat the camshaft, followed by metal fragments destroying the main bearings. We've had two 2017s with less than 30k get a new engine at GM's expense, but my concern is that all of the 2017s are going to need engine replacements, and the replacement engines will use the same bad parts.

If you hear ticking sounds or the engine runs/idles/stumbles it needs to be checked right away. Unless GM gets sued, at this point if you're outside of warranty you will have to pay.

This is supposed to be limited to engines that shut down cylinders to save fuel. Ours don't have that feature but still have the problem. GM issued a service bulletin about it, but the dealership won't talk.



---

[18] See Exhibit G, page 2. Original available at https://mikeysboard.com/threads/gm-lifter-issue.293878/ (last visited December 10, 2021)

c.  **July 15, 2011, kruser79, posted "Latest AFM Victim"[19]:**

> Well, I am the latest victim of GM's horrendous engineering debacle known as AFM. I bought my 2010 ESV mid May and within weeks was experiencing a chronic, yet random misfire (localized cyl #4). I took it to my local indie shop and they said I had a "sticking valve" and gave me a bottle of Lucas fuel system cleaner. Wonder of wonders, it stopped. Except maybe once a day, or every other day, I would get a quick MAF value failure or misfire failure. I would clear them and they would stay off. I just thought I was cleaning up a carboned up or sticking valvetrain and it was still in progress.
>
> So fast forward to a week and a half ago and I am 200 miles from Boise, ID having driven from Central Texas. At the bottom of a long coasting leg, getting back on the throttle brings up a tick, sounds JUST like a collapsed lifter.
>
> I baby it in to Boise, finding the throttle settings that bring the least amount of noise, hoping that that means the least amount of damage being done. The shop digging into it find a collapsed lifter (of course), and it is #4 (of course).
>
> So these guys are loathe to do anything but a full repair, replacing everything involved, Cam and lifters, solenoid pack, everything from the block up. I can understand it. If they cut any corners with this crap, they got me on my way, only to be back on the side of the road a few miles down the road. I was wanting to get them to install an AFM delete kit, but he described the problems I would have with going into another shop, while on the road, with a simple MIL. A lesser shop wouldn't be able to do anything with the custom programming done. So he talked me into letting them rebuild everything, but disabling the AFM through a programmer. I don't want this system running AT ALL. In fact, future plans include a cam swap and an attempt at hitting a minimum of 450 HP.    I    will    take    it    all    out    then    for    sure. Just looking at this system and how it runs pisses me off. Brilliant idea, half-assed engineering, piss poor execution.

d.  **October 26, 2017, Brendon444, posted "6.2 engine destroyed. 25,000km"[20]:**

> 2016 6.2 Denali top end of motor done with only 25,000km. Roller on

---

[19]  See  Exhibit  G,  page  3.  Original  available  at https://www.cadillacforums.com/threads/latest-afm-victim.984178/  (last  visited December 10, 2021)

[20]  *See*  Exhibit  G,  page  4.  Original  available  at https://www.tahoeyukonforum.com/threads/6-2-engine-destroyed-25-000km.97926/ (last visited December 10, 2021)

lifter ruined and pitted. Needs all lifters replaced and cam is also worn. Anyone else hear of this? Not really impressed at this point. Concerned of future reliability.

…

Looks to be known problem.

Condition

Some customers may comment on a malfunction indicator lamp (MIL) on and/or an engine misfire/tick noise.

Technicians may find DTC P0300 set or in history.

Cause

This may be the result of an active fuel management (AFM) lifter that is mechanically collapsed and/or stuck all of the time.

This may be the result of internal locking pin damage in the lifter, due to oil aeration.

This may be the result of a lifter that has collapsed and is stuck in the lifter bore.

Correction

Note: Inspect the camshaft for damage while the lifters are removed from the engine. If damage is found, replace the camshaft per SI.

If SI diagnosis does not isolate the cause of this concern, technicians should inspect for valve operation.

If the valve(s) are not moving, replace the valve lifter oil manifold and affected bank of AFM lifters. Refer to *Valve Lifter Oil Manifold Replacement* and *Valve Lifter Replacement* in SI.

If the lifter has spun the bore, the guides should also be replaced.

e. **December 20, 2017, Hunthearin, posted "Reliability after Lifter failure – 2016 5.3L"[21]:**

Engine was misfiring last week, so I brought it to the dealer. They confirmed that I had a collapsed lifter, and that it had to be replaced under warranty. When going over the repairs with the service writer, they informed me that they only replaced the failed lifter. Out of curiosity, I asked him what such a repair would cost outside of the powertrain warranty. He told me it would cost anywhere between $3500-4000 if it happened again, and that all of the lifters would need to be replaced should I be paying out of pocket. He added that I would be "silly not to replace them all" due to the type and magnitude of service, and because of the likelihood that another fouled or damaged lifter could fail shortly after the first. GM only authorized the dealer to replace the single failed lifter in my engine.

I drive for work, and already have 45,000 miles on my 2016 Sierra. I am happy to let GM replace as many lifters as need be on their dime. That said, as the end of my 60k mile powertrain warranty nears, I am worrying about long term reliability on this truck. I have maintained it meticulously.

What are your thoughts? Since I've had a lifter failure at such low mileage, are there high odds that another will fail on me soon, or at all? Should I dump the Sierra and get another 5.3L? Would a Denali with the 6.2L be more reliable? The styling and interior of this truck have made it my favorite vehicle ever, so I'd hate to see it go.

f. **June 1, 2017, Jeppen, posted "Collapsed Lifter"[22]:**

hello - Driving to work the other day, I heard a noise and then tick tick tick tick. Checked some things out. I have narrowed it down. I removed valve cover on the drivers side and cylinder 1 has a collapsed lifter on the intake. I know that this is an AFM cylinder. Truck ran very smooth up until this point, i did not notice any valve noise on start up or anything.                      125,000                      miles.

I am guessing its a bad lifter, however, could it be the solenoid that controls the AFM part of it? When I put pressure on the rocker while the engine is running, I can feel the up and down motion, so I am assuming the came lob is fine, just no oil in the lifter to "pump" it up.

---

[21]   *See* Exhibit G, page 5. Original available at https://www.gm-trucks.com/forums/topic/208090-reliability-after-lifter-failure-2016-53l/ (last visited December 10, 2021).
[22]   See Exhibit G, page 6. Original available at https://www.silveradosierra.com/threads/collapsed-lifter.624874/ (last visited December 10, 2021).

Of course, the cam could be damaged by a bad lifter. Anything else I can try before tearing down and replacing the lifter?

Thoughts?

Thanks much

g. **May 6, 2020, JPoland1228, posted "600 mile 2020 6.2 collapsed lifters"[23]:**

About 2 weeks ago I purchased a 2020 Sierra 1500 AT4 and just recently upon coming up to 600 miles on the dash I quickly noticed loud ticking noise coming from the engine area. Brought it in for service.

next day I received a call in the morning stating that multiple lifters Have collapsed. Was told they will swap them out on the entire side and was told they'll get it taken care of.

picked up my truck after hours and the noise was the same. Maybe even possibly worse. Needless to say I put the keys back in the box and went back home.

I see people on the forums have ran into similar issues but I don't see how it was rectified in the end. Should I be getting or requesting a new motor? Is my motor just a lemon? Or is there a simple fix? I'm waiting to hear back from the dealer now.

https://youtu.be/sNbxbzToWPI

https://youtu.be/IC5XqTUlEI4

h. **February 2, 2017, Fleet_Manager, posted "Another cam & lifter failure due to AFM"[24]:**

2015 Escalade 94K miles catastrophic engine failure due to AFM components. This is our second Escalade in our fleet to suffer this same failure. We have had two Denalis suffer the same fate as well.This newest failure solidifies my belief that Active Fuel Management is the Achilles heal of modern GM V8's. Now, we have 150K warranty, so this is covered. But, we still lose a ton of money

---

[23] *See* Exhibit G, page 7. Original available at https://www.gm-trucks.com/forums/topic/238603-600-mile-2020-62-collapsed-lifters/ (last visited December 10, 2021).

[24] *See* Exhibit G, page 8. Original available at https://www.cadillacforums.com/threads/another-cam-lifter-failure-due-to-afm.937418/ (last visited December 10, 2021)

while the vehicle is down for the typical 3 weeks it takes for a dealership to complete this repair. Not happy right now.

i. **January 4, 2020, Medicarnp, posted "2017 AFM lifter failure issues"[25]:**

Hope this is the right place to ask a question, I was a bit blindsided a 2017 suburban suddenly developing a severe engine stutter diagnosed as lifter failure after an oil change at the dealership.

Car has 90,000 miles on it has been running fine without any problems whatsoever until we bring it to the dealership for a warranty brake repair and while there we have a simple oil change. Shortly after the oil change my wife who drives the car notices asleep taking which progresses to a more severe stutter and the engine light starts coming on while we're driving.

Of course we go back to the dealer thinking they've done something wrong of course they deny that the oil change anything to do with my lifter failure and quote me $7000 to replace the entire engine??? It's a 2017 car... 90k just outa warranty and The seemingly coincidental timing of it Occurring right after it's been with the dealer.

A little searching online apparently shows that lifter collapse is a known issue with suburbans, such that the part is actually even on back order...

Anyone have any advice on what to do, any workaround address this problem or put a Band-Aid on it for a little while or am I literally stuck getting a new motor or trying to trade this thing in

268. Plaintiffs allege that before Plaintiffs purchased or leased their Class Vehicles, and since 2010, GM knew about the Valve Train Defect through sources not available to consumers, including pre-release testing data, early consumer complaints to GM and its dealers, testing conducted in response to those complaints,

---

[25] *See* Exhibit G, page 9. Original available at https://www.reddit.com/r/Chevy/comments/ejvoht/2017_chevy_afm_lifter_failure_issues/ (last visited December 10, 2021)

high failure rates and replacement part sales data, and other aggregate data from GM dealers about the problem.

269.   GM had superior and exclusive knowledge of the Valve Train Defect and knew or should have known that the defect was not known or reasonably discoverable by Plaintiffs and Class Members before they purchased or leased the Class Vehicles.  Only GM had access to its research and development data, its pre-production testing analyses, aggregate warranty data, its issuance of technical service bulletins and other internal communications provided to authorized dealerships, including those through its proprietary diagnostic systems, and other internal sources of data which corroborate and prove the existence and extent of the Valve Train Defect, as well as consumer complaints made to Defendant, its dealerships, third party forums, and NHTSA.

270.   The existence of the Valve Train Defect is a material fact that a reasonable consumer would consider when deciding whether to purchase or lease a Class Vehicle.  Had Plaintiffs and other Class Members known of the Valve Lifter Defect, they would have paid less for the Class Vehicles or would not have purchased or leased them.

271.   The Valve Train Defect has been so prevalent, and GM and its authorized dealers so unwilling to help, that owners of Class Vehicles have tried numerous repairs on their own, including but not limited to replacing components

with non-OEM parts, including Melling produced lifters, and disabling the AFM or DFM in their vehicles to avoid putting unnecessary strain on the valve train system.

272. Reasonable consumers, like Plaintiffs, reasonably expect that a vehicle's valve train system will last more than 100,000 miles, that the vehicles are safe, will function in a manner that will not pose a safety risk, and are free of dangerous safety defects. Plaintiffs and Class Members further reasonably expect that GM will not sell or lease vehicles with known safety defects, such as the Valve Train Defect, and will disclose any such defects to its consumers when it learns of them. They did not expect GM to fail to disclose the Valve Train Defect to them and to continually deny it.

## GM Has Actively Concealed the Valve Train Defect

273. Despite its knowledge of the Valve Train Defect in the Class Vehicles, GM actively concealed the existence and nature of the defect from Plaintiffs and Class Members. Specifically, GM failed to disclose or actively concealed at and after the time of purchase, lease, or repair:

> (a) any and all known material defects or material nonconformities of the Class Vehicles, including the defects pertaining to the valve springs, rocker arms, and lifters;

> (b) that the Class Vehicles, including the valve train system within their engines, were not in good working order, were defective, and were not fit for their intended purposes; and

(c)    that the Class Vehicles and their engines were defective, despite the fact that GM learned of such defects as early as 2010.

274.    GM actively concealed the defect by denying the existence of a defect, claiming that ticking noises and vibrations were a normal condition for the Subject Engines, and blaming the Class Members for the problems.

275.    When consumers present their Class Vehicles to an authorized GM dealer for diagnosis and repair, GM refused to honor the bumper-to-bumper 3-year, 36,000-mile warranty, powertrain, or emissions, telling the customers that the condition is normal or else providing ineffective and incomplete repairs.

276.    Accordingly, despite GM's knowledge of the Valve Train Defect, GM has caused Class Members to expend money at its dealerships to diagnose, repair or replace the Class Vehicles' lifters, and other damaged components, once the time limitations have run on the bumper-to-bumper warranty.

277.    GM has also concealed the Valve Train Defect by failing to issue any TSBs, recalls, campaigns or any other technical documents that publicly acknowledges the existence of the defect in Class Vehicles.  Instead, in addition to bulletins to its authorized dealers discussing how to diagnose and partially repair the symptoms of the Valve Train Defect, GM has also issued bulletins which direct dealerships and their technicians to tell Plaintiffs and consumers that the noises they are hearing are "normal."

110

278.   For example, in April 2014, GM issued Service Bulletin Information 14-06-04-004A, regarding "Various Engine Noises During Cold Start and Warm Engine Operation."  This bulletin superseded 14-06-04-004A and was applicable to 2014 Chevrolet Corvette, 2014-2015 Chevrolet Silverado 1500, 2015 Chevrolet Suburban and Tahoe, 2014-2015 GMC Sierra 1500 and Denali models, and 2015 GMC Yukon and Yukon XL vehicles equipped with 4.3L V6 (RPO LV3), 5.3L V8 (RPO L83), or 6.2L V8 (RPO L86 or LT1) engines.  The bulletin purported to describe that these new engines "generate noises…that owners of the previous generation multiport fuel injection (MFI) vehicles may not be familiar," including "a subtle ticking noise" at idle or a "higher pitched clicking sound."  The bulletin stresses that the "[t]hese sounds are [] normal characteristics of the DI high pressure fuel system."  No repairs were to be attempted for these noise complaints.

279.   In May 2015, GM issued Preliminary Information PIP5504, regarding "Buffeting Vibration Drone Type Noise Exhaust Tone Change Body Pressuring Booming (AFM Exhaust)."  The PI was applicable to 2015 Cadillac Escalade, Chevrolet Suburban and Tahoe, and GMC Yukon Models with 5.3L or 6.2L V8 engines.  The PI described that "while some slight changes in exhaust tone and/or vibration/drone type noises can be normal when AFM is in 4 cylinder mode, there have been some complaints of them being excessive."  GM instructed technicians to compare to other vehicles and see if the noise is "normal."  If so, no further repairs were to be made.

280.  On June 19, 2017, GM issued Preliminary Information Bulletin PIP5504, regarding "Diagnosing Fishbite Chuggle Misfire Feeling Or Shudder Vibration, with a Light Tip In." This PI was applicable to 2016-2017 Chevrolet Silverado, Suburban, and Tahoe, as well as GMC Sierra and Yukon models, equipped with the 5.3L V8 engine (RPO L83). The PI described that customers may complain about "[a] shake and/or shudder during light throttle acceleration between …30 and 65 mph…steady state driving when transmission is not actively shifting gears." This PI noted "AFM Disturbances can be mislabeled as any of the [conditions] above as well as shudder below, but in fact as to do with the imbalance caused by less cylinders firing." If AFM Disturbances were suspected, technicians were directed to review PIT5404, noted above. If not related to that bulletin, technicians were told, "this may be a normal characteristic of active fuel management mode." This PI was reissued multiple times to update model years and to add applicable engine types. The latest version appears to be PIP5504E, issued sometime after June 2020. The applicable vehicles include 2016-2020 Chevrolet Express, 2016-2018 Chevrolet Silverado, 2019 Chevrolet Silverado, 2020 Chevrolet Silverado 1500, 2016-2020 Chevrolet Silverado 2500/3500, 2016-2020 Chevrolet Suburban, 2016-2020 Chevrolet Tahoe, 2016-2020 GMC Savana, 2016-2018 GMC Sierra, 2019 GMC Sierra, 2020 GMC Sierra 1500, 2016-2020 GMC Sierra 2500/3500, and 2016-2020 GMC Yukon models, equipped with various engines

including the 5.3L, 6.0L, and 6.2L V8 engines with RPO codes of L96, LC8, L82, 83, and L84.

281.   In March 2019, GM issued Information Service Bulletin 06-06-05-001H.  This bulletin was a revision of 06-06-05-001G, adding the 2017 to 2019 model years.  The number of the bulletin suggests it was originally issued in 2006.  The bulletin notes "[s]ome customer may comment on changes in the exhaust tone when an Active Fuel Management (AFM) equipped 6 cylinder or 8 cylinder engine changes to 3 cylinder or 4 cylinder mode.  Some drivers may also notice a very slight vibration in either the accelerator pedal, floor pan and/or the steering wheel.  This is a normal condition for AFM equipped vehicles and no repairs should be attempted."  **Technicians were actually directed to provide a copy of this bulletin to customers.**

282.   In March 2020, GM issued Service Bulletin Information 14-06-04-004F, regarding "Various Engine Noises During Cold Start and Warm Engine Operation."  This bulletin superseded 14-06-04-004E, adding the 2020 model year, and was applicable to 2015-2020 Cadillac Escalade and Escalade ESV, 2016-2019 Cadillac CTS, 2016-2020 Chevrolet Camaro, 2014-2019 Chevrolet Corvette, 2014-2018 Chevrolet Silverado 1500, 2019 Chevrolet Silverado, 2020 Chevrolet Silverado 1500, 2019-2020 Chevrolet Silverado 2500/3500, 2019 Chevrolet Silverado 1500 LD, 2015-2020 Chevrolet Suburban and Tahoe, 2014-2018 GMC Sierra 1500 and Denali models, 2019-2020 GMC Sierra, 2019-2020 GMC Sierra

2500 and 3500, 2019 GMC Sierra 1500 Limited,  and 2015-2020 GMC Yukon and Yukon XL vehicles equipped with 4.3L V6 (RPO LV1, LV3), 5.3L V8 (RPO L82, L83, L84), or 6.2L V8 (RPO L86, L87, LT1, LT4, LT5) engines.  The bulletin purported to describe that these new engines "generate noises…that owners of the previous generation multiport fuel injection (MFI) vehicles may not be familiar," including "a subtle ticking noise" at idle or a "higher pitched clicking sound."  The bulletin stresses that the "[t]hese sounds are [] normal characteristics of the DI high pressure fuel system."  No repairs were to be attempted for these noise complaints.

283.  These bulletins, often issued at the same time as other bulletins proposing actual, if ineffectual, repairs, gave dealerships and technicians reasons to deny repairs when customers came in complaining of ticking and other noises.

284.  Further, some dealership technicians have told customers that the issues they are experiencing with their cars, including unexpected lifter failures, are well-known to GM.  But while some criticize the design of the engines, or AFM/DFM, others have blamed suppliers for producing "bad batches" of sub-standard parts.  As such, customers may believe that a repair with new parts will permanently remedy the symptoms of the Valve Train Defect in their vehicles, when in fact, there is no permanent repair available.  However, if a "bad batch" of sub-standard parts is, in fact, to blame, GM has been concealing the Valve Train Defect by failing to issue a recall.

285.   Additionally, GM also has a policy in place to provide extended warranties, called Component Coverage, when Class Members have had two or more repairs of the Valve Train Defect at an authorized GM dealer.  Component Coverage covers Powertrain components, including all internally lubricated parts, electrical components, control modules, blocks, heads, shafts, and torque converters, among other items for defects related to materials and workmanship.  For example, when Plaintiff Harrison complained to GM directly via the customer service hotline, he was told by a GM Senior Consultant that he would not receive such an extended warranty because he had only one repair.  The dealership which performed this repair intervened on his behalf and got GM to issue this Component Coverage for him, lasting six years or 100,000 miles, whichever comes first.

286.   Similarly, Plaintiff Prosser also received Component Coverage, again after the intercession of the dealership which performed the repair on her vehicle.  However, her Component Coverage is only for five years or 100,000, miles whichever comes first.  Further, this extended coverage does not help Plaintiffs Harrison, Prosser, or any other Class Member avoid the safety risk associated with the Valve Train Defect, including the sudden loss of motive power while driving.

**TOLLING OF THE STATUTE OF LIMITATIONS AND ESTOPPEL**

287.   Any applicable statute of limitations has been tolled by Defendant's knowing and active concealment of the Valve Train Defect and misrepresentations and omissions alleged herein.  Through no fault of their own or lack of diligence,

Plaintiffs and members of the Class were deceived regarding the Class Vehicles and could not reasonably discover the Defect or Defendant's deception with respect to the Defect. Defendant and its agents continue to deny the existence and extent of the Defect, even when questioned by Plaintiffs and members of the Class.

288. Plaintiffs and members of the Class did not discover and did not know of any facts that would have caused a reasonable person to suspect that the Defendant was concealing a defect and/or the Class Vehicles contained the Valve Train Defect and the corresponding safety risk. As alleged herein, the existence of the Valve Train Defect was material to Plaintiffs and members of the Class at all relevant times. Within the time period of any applicable statutes of limitations, Plaintiffs and members of the Class could not have discovered through the exercise of reasonable diligence the existence of the Defect or that the Defendant was concealing the Defect.

289. At all times, Defendant is and was under a continuous duty to disclose to Plaintiffs and members of the Class the true standard, quality and grade of the Class Vehicles and to disclose the Valve Train Defect and corresponding safety risk due to their exclusive and superior knowledge of the existence and extent of the Valve Train Defect in Class Vehicles.

290. Defendant knowingly, actively and affirmatively concealed the facts alleged herein. Plaintiffs and members of the Class reasonably relied on Defendant's knowing, active, and affirmative concealment.

291.   For these reasons, all applicable statutes of limitation have been tolled based on the discovery rule and Defendant's fraudulent concealment, and Defendant is estopped from relying on any statutes of limitations in defense of this action.

## The Agency Relationship Between GM and its Network of Authorized Dealerships

292.   In order to sell vehicles to the general public, Defendant enters into agreements with its nationwide network of authorized dealerships to engage in retail sales with consumers such as Plaintiffs. In return for the exclusive right to sell new, Defendant-branded vehicles, the authorized dealerships are also permitted under these agreements with Defendant to service and repair these vehicles under the warranties Defendant provides directly to consumers who purchased new vehicles from the authorized dealerships. Accordingly, Defendant's authorized dealerships are Defendant's agents, and the consumers who purchase or lease Defendant vehicles are the third-party beneficiaries of these dealership agreements, which allow the consumers to purchase and service their Defendant vehicles locally. Because Plaintiffs and members of the Class there are third-party beneficiaries of the dealership agreements which create the implied warranty, they may avail themselves of the implied warranty. This is true because third-party beneficiaries to contracts between other parties that create an implied warranty of merchantability may avail themselves of the implied warranty. *See In re Toyota Motor Corp.*

*Unintended Acceleration Mktg., Sales Practices, & Prod. Liab. Litig.*, 754 F. Supp. 2d 1145, 1185 (C.D. Cal. 2010).

293.  Further, Plaintiffs and each of the members of the Class are the intended beneficiaries of Defendant's express and implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles, and they have no rights under the warranty agreements provided by Defendant. Defendant's warranties were designed for and intended to benefit the consumers only. The consumers are the true intended beneficiaries of Defendant's express and implied warranties, and the consumers may therefore avail themselves of those warranties.

294.  Defendant issued the express warranty to the Plaintiffs and the Class members. Defendant also developed and disseminated the owner's manual and warranty booklets, advertisements, and other promotional materials relating to the Class Vehicles. Defendant also is responsible for the content of the Moroney Stickers on Defendant-branded vehicles. Because Defendant issues the express warranty directly to the consumers, the consumers are in direct privity with Defendant with respect to the warranties.

295.  In promoting, selling, and repairing its defective vehicles, Defendant acts through numerous authorized dealers who act, and represent themselves to the public, as exclusive Defendant representatives and agents. That the dealers act as Defendant's agents is demonstrated by the following facts:

a.      The authorized GM dealerships complete all service and repair according to Defendant's instructions, which Defendant issues to its authorized dealerships through service manuals, technical service bulletins ("TSBs"), and other documents, often only accessible via Defendant's proprietary computer systems, including the SI Diagnosis referenced in many of the TSBs;

b.      Consumers are able to receive services under Defendant's issued New Vehicle Limited Warranty only at Defendant's authorized dealerships, and they are able to receive these services because of the agreements between Defendant and the authorized dealers. These agreements provide Defendant with a significant amount of control over the actions of the authorized dealerships;

c.      The warranties provided by Defendant for the defective vehicles direct consumers to take their vehicles to authorized dealerships for repairs or services;

d.      Defendant dictates the nature and terms of the purchase contracts entered into between its authorized dealers and consumers;

e.      Defendant controls the way in which its authorized dealers can respond to complaints and inquiries concerning defective vehicles, and the dealerships are able to perform repairs under warranty only with Defendant's authorization;

f.    Defendant has entered into agreements and understandings with its authorized dealers pursuant to which it authorizes and exercises substantial control over the operations of its dealers and the dealers' interaction with the public;

g.    Defendant implemented its express and implied warranties as they relate to the defects alleged herein by instructing authorized Defendant dealerships to address complaints of the Defect by prescribing and implementing the relevant TSBs cited herein; and

h.    GM's authorized dealerships are able to bind GM into the terms of the express warranties by selling vehicles to the public, by reviewing the quality of used GM vehicles and certifying their worthiness to receive GM's Certified Pre-Owned Warranties, and by interceding on consumers' behalf to get GM to issue Component Coverage, as described *supra*.

296.  Indeed, GM's warranty booklets make it abundantly clear that GM's authorized dealerships are GM's agents for vehicle sales, service, and to receive repairs from GM under the warranties it provides directly to consumers such as Plaintiffs. The booklets, which are plainly written for the consumers, not the dealerships, tell the consumers repeatedly to seek repairs and assistance at its "your selling dealer." For example, the booklets state, that GM "will provide repairs to the vehicle during the warranty period" and also that "[t]o obtain warranty repairs, take

the vehicle to a [Buick, Cadillac, Chevrolet, or GMC] dealer facility within the warranty period and request the needed repairs."

297.   The booklets direct Plaintiffs and class members, should they have warranty problems, to first "contact the owners of the dealer facility or the general manager."  Next, Plaintiffs and class members are directed to contact GM directly as a Customer Assistance Center.  However, the booklet states, "[w]hen contacting [GM], remember that your concern will likely be resolved at a dealer's facility."

298.   Accordingly, as the above paragraphs demonstrate, the authorized dealerships are agents of Defendant. Plaintiffs and each of the members of the Class have had sufficient direct dealings with either Defendant or its agent dealerships to establish privity of contract between Defendant, on one hand, and Plaintiffs and each of the members of the Class, on the other hand. This establishes privity with respect to the express and implied warranty between Plaintiffs and Defendant.

## **CLASS ACTION ALLEGATIONS**

299.   Plaintiffs bring this lawsuit as a class action on behalf of themselves and all others similarly situated as members of the proposed Class pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

300.   The Classes are defined as:

**Nationwide Class or Class:** All persons and entities in the United States who purchased or leased a model year 2014 to present GM vehicle with a 5.3L, 6.0L, or 6.2L V8 engine.

**Alabama Sub-Class:** All individuals who purchased or leased as model year 2014 to present GM vehicle with a 5.3L, 6.0L, or 6.2L V8 engine in the State of Alabama.

**Florida Sub-Class:** All individuals who purchased or leased as model year 2014 to present GM vehicle with a 5.3L, 6.0L, or 6.2L V8 engine in the State of Florida.

**Georgia Sub-Class:** All individuals who purchased or leased a model year 2014 to present GM vehicle with a 5.3L, 6.0L, or 6.2L V8 engine in the State of Georgia.

**New Jersey Sub-Class:** All individuals who purchased or leased a model year 2014 to present GM vehicle with a 5.3L, 6.0L, or 6.2L V8 engine in the State of New Jersey.

**Ohio Sub-Class:** All individuals or entities who purchased or leased as model year 2014 to present GM vehicle with a 5.3L, 6.0L, or 6.2L V8 engine in the State of Ohio.

**Texas Sub-Class:** All individuals who purchased or leased any a model year 2014 to present GM vehicle with a 5.3L, 6.0L, or 6.2L V8 engine in the State of Texas.

**Washington Sub-Class:** All individuals who purchased or leased as model year 2014 to present GM vehicle with a 5.3L, 6.0L, or 6.2L V8 engine in the State of Washington.

301. Excluded from the Class are: (1) Defendant, any entity or division in which Defendant has a controlling interest, and their legal representatives, officers, directors, assigns, and successors; (2) the Judge to whom this case is assigned and

the Judge's staff; (3) any Judge sitting in the presiding state and/or federal court system who may hear an appeal of any judgment entered; and (4) those persons who have suffered personal injuries as a result of the facts alleged herein. Plaintiffs reserve the right to amend the Class definitions if discovery and further investigation reveal that the Class should be expanded or otherwise modified.

302.   <u>Numerosity</u>: Although the exact number of Class Members is uncertain and can only be ascertained through appropriate discovery, the number is great enough such that joinder is impracticable. The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and to the Court. The Class Members are readily identifiable from information and records in Defendant's possession, custody, or control, as well as from records kept by the Department of Motor Vehicles of each state.

303.   <u>Typicality</u>: Plaintiffs' claims are typical of the claims of the Class in that Plaintiffs, like all Class Members, purchased or leased a Class Vehicle designed, manufactured, and distributed by GM. The representative Plaintiffs, like all Class Members, has been damaged by Defendant's misconduct in that they have incurred or will incur the cost of repairing or replacing the defective starter and/or other damaged components. Furthermore, the factual bases of GM's misconduct are common to all Class Members and represent a common thread resulting in injury to the Class.

304.   <u>Commonality</u>: There are numerous questions of law and fact common to Plaintiffs and the Class that predominate over any question affecting Class Members individually. These common legal and factual issues include the following:

(a)   Whether Class Vehicles suffer from defects relating to the valve train system;

(b)   Whether the defects relating to the valve train system constitute an unreasonable safety risk;

(c)   Whether Defendant knows about the defects pertaining to the starter and, if so, how long Defendant has known of the defect;

(d)   Whether the defective nature of the valve train system constitutes a material fact;

(e)   Whether Defendant has a duty to disclose the defective nature of the valve train system to Plaintiffs and Class Members;

(f)   Whether Plaintiffs and the other Class Members are entitled to equitable relief, including a preliminary and/or permanent injunction;

(g)   Whether Defendant knew or reasonably should have known of the defects pertaining to the valve train system before it sold and leased Class Vehicles to Class Members;

(h)     Whether Defendant should be declared financially responsible for notifying the Class Members of problems with the Class Vehicles and for the costs and expenses of repairing and replacing the defective valve train system and/or its components;

(i)     Whether Defendant is obligated to inform Class Members of their right to seek reimbursement for having paid to diagnose, repair, or replace their defective valve train system;

(j)     Whether Defendant breached the implied warranty of merchantability pursuant to the Magnuson-Moss Warranty Act;

(k)     Whether Defendant breached written warranties pursuant to the Magnuson-Moss Warranty Act;

(l)     Whether Defendant breached express warranties pursuant to the laws governing each of the state Class jurisdictions;

(m)     Whether Defendant breached the implied warranty of merchantability pursuant to the laws governing each of the state Class jurisdictions;

(n)     Whether Defendant breached the consumer protection laws of the states of Alabama, Connecticut, Florida, Georgia, New Jersey, Ohio, Texas, and Washington;

(o)     Whether Defendant committed fraud by omission;

(p)   Whether Defendant fraudulently concealed the defective nature of the valve train system; and

(q)   Whether Defendant has been unjustly enriched by its actions as complained of herein.

305.   <u>Adequate Representation</u>: Plaintiffs will fairly and adequately protect the interests of the Class Members. Plaintiffs have retained attorneys experienced in the prosecution of class actions, including consumer and product defect class actions, and they intend to prosecute this action vigorously.

306.   <u>Predominance and Superiority</u>: Plaintiffs and Class Members have all suffered and will continue to suffer harm and damages as a result of Defendant's unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy. Because of the relatively small size of the individual Class Members' claims, it is likely that only a few Class Members could afford to seek legal redress for Defendant's misconduct. Absent a class action, Class Members will continue to incur damages, and Defendant's misconduct will continue without remedy or relief.  Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that it will conserve the resources of the courts and the litigants and promote consistency and efficiency of adjudication.

## CAUSES OF ACTION

### COUNT I
### Fraud by Omission or Fraudulent Concealment
### (On behalf of the Nationwide Class, or in the Alternative,
### on Behalf of all Sub-Classes against Defendant)

307.   Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 298 above as if fully set forth herein.

308.   Plaintiffs bring this cause of action on behalf of themselves and the Nationwide Class, or in the alternative, on behalf of each of the State Sub-Classes, against Defendant.

309.   GM knew that the Class Vehicles suffered from an inherent Valve Train Defect, were defectively designed and/or manufactured and were not suitable for their intended use.

310.   Defendant concealed from and failed to disclose to Plaintiffs and Class Members the defective nature of the Class Vehicles.

311.   Defendant was under a duty to Plaintiffs and Class Members to disclose the defective nature of the Class Vehicles because:

    a.   Defendant was in a superior position to know the true state of facts about the safety defect contained in the Class Vehicles;

    b.   The omitted facts were material because they directly impact the safety of the Class Vehicles;

    c.   Defendant knew the omitted facts regarding the Valve Train Defect

were not known to or reasonably discoverable by Plaintiffs and Class Members;

d. Defendant made partial disclosures about the quality of the Class Vehicles without revealing their true defective nature; and,

e. Defendant actively concealed the defective nature of the Class Vehicles from Plaintiffs and Class Members.

312. The facts concealed or not disclosed by Defendant to Plaintiffs and the other Class Members are material in that a reasonable person would have considered them to be important in deciding whether to purchase or lease Defendant's Class Vehicles or pay a lesser price for them. Whether a vehicle's lifter, rocker arm, and/or valve spring is defective, which can cause stalling, losing power while driving, and hesitation, is a material safety concern. Had Plaintiffs and Class Members known about the defective nature of the Class Vehicles, they would not have purchased or leased the Class Vehicles or would have paid less for them.

313. Defendant concealed or failed to disclose the true nature of the design and/or manufacturing defects contained in the Class Vehicles to induce Plaintiffs and Class Members to act thereon. Plaintiffs and the other Class Members justifiably relied on Defendant's omissions to their detriment. This detriment is evident from Plaintiffs' and Class Members' purchase or lease of Defendant's defective Class Vehicles.

314.   Defendant continued to conceal the defective nature of the Class Vehicles even after Class Members began to report the problems. Indeed, Defendant continues to cover up and conceal the true nature of the problem today.

315.   As a direct and proximate result of Defendant's misconduct, Plaintiffs and Class Members have suffered and will continue to suffer actual damages. Plaintiffs and the Class reserve their right to elect either to (a) rescind their purchase or lease of the Valve Train Defective Vehicles and obtain restitution or (b) affirm their purchase or lease of the Valve Train Defective Vehicles and recover damages.

316.   Defendant's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class' rights and well-being to enrich Defendant. Defendant's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**COUNT II**
**Unjust Enrichment**
**(On Behalf of the Nationwide Class, or, in the Alternative, on Behalf of all Sub-Classes against Defendant)**

317.   Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 298 above as if fully set forth herein.

318.   Plaintiffs bring this count on behalf of themselves and the Class or, alternatively, on behalf of all Sub-Classes against Defendant.

319. GM has received and retained a benefit from Plaintiffs and all Class Members and inequity has resulted.

320. GM has benefitted from selling and leasing defective cars whose value was artificially inflated by GM's concealment of the Valve Train Defect, and Plaintiffs and Class Members have overpaid for the cars and have been forced to pay other costs.

321. As a result of its wrongful acts, concealments, and omissions of the defect in its Class Vehicles, as set forth above, GM charged higher prices for their vehicles than the vehicles' true value. Plaintiffs and Class Members paid than higher price for their vehicles to GM's authorized distributors and dealers, which are in GM's control.

322. All Class members conferred a benefit on GM.

323. It is inequitable for GM to retain these benefits.

324. Plaintiffs and all Class members were not aware of the true facts about the Class Vehicles and did not benefit from GM's conduct.

325. GM knowingly accepted the benefits of its unjust conduct.

326. As a result of the Defendant's unjust enrichment, Plaintiffs and Class Members have suffered damages.

327. Plaintiffs do not seek restitution under their Unjust Enrichment claim. Rather, Plaintiffs and Class Members seek non-restitutionary disgorgement of the financial profits that Defendant obtained as a result of its unjust conduct.

328.   Additionally, Plaintiffs seek injunctive relief to compel Defendant to offer, under warranty, remediation solutions that Defendant identifies. Plaintiffs also seek injunctive relief enjoining Defendant from further deceptive distribution, sales, and lease practices with respect to Class Vehicles, enjoining Defendant from selling the Class Vehicles with the misleading information; compelling Defendant to provide Class members with a replacement components that do not contain the defects alleged herein; and/or compelling Defendant to reform its warranty, in a manner deemed to be appropriate by the Court, to cover the injury alleged and to notify all Class Members that such warranty has been reformed. Money damages are not an adequate remedy for the above requested non-monetary injunctive relief.

### COUNT III
**Violation of the Magnuson-Moss Warranty Act**
**15 U.S.C. § 2301**
**(On behalf of the Nationwide Class, or in the Alternative,**
**on Behalf of all Sub-Classes against Defendant)**

329.   Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 298 above as if fully set forth herein.

330.   This claim is brought on behalf of Plaintiffs and the Class, or alternatively, on behalf of all Sub-Classes, against Defendant.

331.   Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

332.   GM is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

333.   The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

334.   15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

335.   Defendant's implied warranty is an "implied warranty" within the meaning of 15 U.S.C. § 2301(7).

336.   Defendant's express warranty is a "written warranty" within the meaning of 15 U.S.C. §2301(6).

337.   Defendant breached the implied warranty and the express warranty by virtue of the above-described acts.

338.   Plaintiffs and the other Class Members notified Defendant of the breach within a reasonable time and/or were not required to do so. GM was also on notice of the Valve Train Defect from, among other sources, the complaints and service requests it received from Class Members and its dealers.

339.   Defendant's breach of the implied warranty and express warranty deprived Plaintiff and Class Members of the benefits of their bargains.

340.   Plaintiffs and the Class Members have had sufficient direct dealings with either GM or its agents (dealerships and technical support) to establish privity of contract between GM, on one hand, and Plaintiffs and each of the other Class Members on the other hand. Nonetheless, privity is not required here because

Plaintiffs and each of the other Class Members are intended third-party beneficiaries of contracts between GM and its dealers, and specifically, of GM's implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

341.    GM breached these warranties, as described in more detail above. Without limitation, the Class Vehicles contain a Valve Train Defect that puts vehicle occupants' safety in jeopardy. The Class Vehicles share a common defect in that they are manufactured with defective materials and/or with poor workmanship. Contrary to GM's representations about its vehicles, the Class Vehicles are defective in manufacture, materials and/or workmanship and are unsafe. The Class Vehicles share a common defect.

342.    Affording GM a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here. Indeed, GM has long been on notice of the claims of Plaintiffs and Class members and has refused to provide a remedy, instead placing the blame on customers or refusing to acknowledge the existence of the defect.

343.    At the time of sale or lease of each Class Vehicle, GM knew, should have known, or was reckless in not knowing of its misrepresentations and omissions concerning the Class Vehicles' Valve Train Defect and inability to perform as

warranted, but nonetheless failed to rectify the situation and/or disclose the Valve Train Defect. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiffs resort to an informal dispute resolution procedure and/or afford GM a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

344.   Plaintiffs and the other Class members would suffer economic hardship if they returned their Class Vehicles but did not receive the return of all payments made by them. Because GM is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the other Class members have not re-accepted their Class Vehicles by retaining them.

345.   Plaintiffs provided notice to GM of their intent to pursue class claims under the MMWA via letters dated October 20, 2021, November 8, 2021, November 19, 2021, and November 23, 2021.

346.   The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

347.   Plaintiffs, individually and on behalf of all members of the Class, seek all damages permitted by law, in an amount to be proven at trial.

**Claims on Behalf of the Alabama Sub-Class**

<u>COUNT IV</u>
**Breach of Express Warranty**
**Ala. Code §§ 7-2-313 AND 7-2A-210**
**(On Behalf of the Alabama Sub-Class against Defendant)**

348.   Plaintiffs repeat and re-allege each and every allegation contained above in paragraphs 1 through 298 above as if fully set forth herein.

349.   Plaintiff Daniel Harrison ("Alabama Plaintiff") brings this count on behalf of himself and the Alabama Sub-Class against Defendant.

350.   GM is and was at all relevant times a "merchant" with respect to motor vehicles under Ala. Code §§ 7-2-104(1) and 7-2A-103(3), and a "seller" of motor vehicles under § 7-2-103(1)(d).

351.   With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Ala. Code § 7-2A-103(1)(p).

352.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Ala. Code §§ 7-2-105(1) and 7-2A-103(1)(h).

353.   The valve train systems were manufactured and/or installed in the Class Vehicles by Defendant and are covered by the express warranty.

354.   Defendant provided all purchasers and lessees of the Class Vehicles with an express warranty described herein, which became a material part of the bargain. Accordingly, GM's express warranty is an express warranty under Alabama state law.

355.   In a section entitled "What is Covered," Defendant's express warranty (or New Vehicle Limited Warranty ("NVLW")) provides in relevant part that "[t]he warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." The warranty further provides that "[w]arranty repairs, including, including towing, parts, and labor, will be made at no charge" and "[t]o obtain warranty repairs, take the vehicle to a Chevrolet dealer facility within the warranty period and request the needed repairs."

356.   According to GM, the "Bumper-to-Bumper Coverage is for the first 3 years or 36,000 miles, whichever comes first," if not longer.

357.   Defendant's NVLW and other warranties regarding the Class Vehicles formed a basis of the bargain that was breached when Alabama Plaintiff and members of the Alabama Sub-Class purchased or leased the Class Vehicles with the defective lifter and/or related components.

358.   Alabama Plaintiff and members of the Alabama Sub-Class experienced defects within the warranty period. Despite the existence of the NVLW, Defendant failed to inform Alabama Plaintiff and members of the Alabama Sub-Class that the Class Vehicles were equipped with defective lifters and related components.  When providing repairs under the express warranty, these repairs were ineffective and incomplete and did not provide a permanent repair for the Valve Train Defect.

359. GM breached the express warranty through the acts and omissions described above, including by promising to repair or adjust defects in materials or workmanship of any part supplied by Defendant and then failing to do so. Defendant has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles materials and workmanship defects.

360. Alabama Plaintiff and members of the Alabama Sub-Class have had sufficient direct dealings with either GM or its agents (i.e., dealerships and technical support) to establish privity of contract between GM, on one hand, and Alabama Plaintiff and each member of the Alabama Sub-Class on the other hand. Nonetheless, privity is not required here because Alabama Plaintiff and members of the Alabama Sub-Class are intended third-party beneficiaries of contracts between GM and its distributors and dealers, and specifically, of GM's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

361. Any attempt by GM to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here. Specifically, the warranty limitation is unenforceable because GM knowingly sold or leased defective products without informing consumers about the Valve Train Defect. The time

limits are unconscionable and inadequate to protect Alabama Plaintiff and the members of the Alabama Sub-Class.  Among other things, Alabama Plaintiff and members of the Alabama Sub-Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by GM and unreasonable favored GM. A gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Valve Train Defect existed between GM and members of the Alabama Sub-Class.

362.   Further, the limited warranty promising to repair and/or correct a manufacturing or workmanship defect fails of its essential purpose because the contractual remedy is insufficient to make Alabama Plaintiff and the members of the Alabama Sub-Class whole, because GM has failed and/or has refused to adequately provide the promised remedies, i.e., a permanent repair, within a reasonable time.

363.   Alabama Plaintiff were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Valve Train Defect from the complaints and service requests it received from Class Members, including those formal complaints submitted to NHTSA, and through other internal sources.

364.   Nonetheless, Alabama Plaintiff and members of the Alabama Sub-Class provided notice to GM of the breach of express warranties when they took their vehicles to GM-authorized providers of warranty repairs.  Alabama Plaintiff

also provided notice to GM of its breach of express warranty by calling their customer service line and by letter dated November 23, 2021.

365.   As a result of GM's breach of the applicable express warranties, owners and/or lessees of the Class Vehicles suffered, and continue to suffer, an ascertainable loss of money, property, and/or value of their Class Vehicles.

366.   As a direct and proximate result of Defendant's breach of express warranties, Alabama Plaintiff and members of the Alabama Sub-Class have been damaged in an amount to be determined at trial.

367.   As a result of GM's breach of the express warranty, Alabama Plaintiff and Alabama Sub-Class Members are entitled to legal and equitable relief against GM, including actual damages, specific performance, attorney's fees, costs of suit, and other relief as appropriate.

## COUNT V
### Breach of the Implied Warranty of Merchantability
### Ala. Code §§ 7-2-314 and 7-2A-212
### (On Behalf of the Alabama Sub-Class against Defendant)

368.   Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 298 as if fully set forth herein.

369.   Alabama Plaintiff brings this count on behalf of himself and the Alabama Sub-Class against Defendant.

370.   GM is and was at all relevant times a "merchant" with respect to motor vehicles under Ala. Code §§ 7-2-104(1) and 7-2A-103(3), and a "seller" of motor vehicles under § 7-2-103(1)(d).

371.   With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Ala. Code § 7-2A-103(1)(p).

372.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Ala. Code §§ 7-2-105(1) and 7-2A-103(1)(h).

373.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Ala. Code §§ 7-2-314 and 7-2A-212.

374.   GM knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. GM directly sold and marketed Class Vehicles to customers through authorized dealers, like those from whom Alabama Plaintiff and members of the Alabama Sub-Class bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. GM knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Alabama Plaintiff and members of the Alabama Sub-Class, with no modification to the defective Class Vehicles.

375.   GM provided Alabama Plaintiff and members of the Alabama Sub-Class with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, inter alia, the Class Vehicles and their lifter suffered from an inherent defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

376.   This implied warranty included, among other things: (i) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold by GM were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

377.   Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles were and are defective at the time of sale or lease and thereafter as more fully described above. GM knew of this defect at the time these sale or lease transactions occurred.

378.   As a result of GM's breach of the applicable implied warranties, Alabama Plaintiff and members of the Alabama Sub-Class suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Valve Train Defect, Alabama Plaintiff and members of the Alabama Sub-Class were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

379.   GM's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

380.   Alabama Plaintiff and members of the Alabama Sub-Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

381.   Alabama Plaintiff and members of the Alabama Sub-Class have had sufficient direct dealings with either GM or its agents (i.e., dealerships and technical support) to establish privity of contract between GM, on one hand, and Alabama Plaintiff and members of the Alabama Sub-Class on the other hand.  Nonetheless, privity is not required here because Alabama Plaintiff and members of the Alabama Sub-Class are intended third-party beneficiaries of contracts between GM and its distributors and dealers, and specifically, of GM's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles.  The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

382.   Alabama Plaintiff and members of the Alabama Sub-Class were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of warranty would have been futile. GM was also on notice of the

Valve Train Defect from the complaints and service requests it received from Alabama Plaintiff and the Class Members and through other internal sources.

383.   Nonetheless, Alabama Plaintiff and members of the Alabama Sub-Class provided notice to GM of the breach of express warranties when they took their vehicles to GM-authorized provider of warranty repairs.  Alabama Plaintiff also provided notice to GM of its breach of express warranty by calling the customer service line and by letter dated November 23, 2021.

384.   As a direct and proximate cause of GM's breach, Alabama Plaintiff and members of the Alabama Sub-Class suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Alabama Plaintiff and members of the Alabama Sub-Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

385.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Alabama Plaintiff and members of the Alabama Sub-Class have been damaged in an amount to be proven at trial.

## COUNT VI
### Violations of the Alabama Deceptive Trade Practices Act
### Ala. Code § 8-19-1, *et seq*.
### (On Behalf of the Alabama Sub-Class against Defendant)

386.   Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 298 above as if fully set forth herein.

387. Alabama Plaintiff brings this cause of action on behalf of himself and on behalf of the members of the Alabama Sub-Class.

388. Alabama Plaintiff and members of the Alabama Sub-Class are "consumers" as defined by the Alabama Deceptive Trade Practices Act ("Alabama DTPA") Ala. Code § 8-19-3(4).

389. GM, Alabama Plaintiff, and the Alabama Sub-Class Members are "persons" within the meaning of Ala. Code § 8-19-3(2).

390. The Class Vehicles are "goods" within the meaning of Ala. Code § 8-19-3(6).

391. Defendant was and is engaged in "trade or commerce" within the meaning of Ala. Code § 8-19-3(14).

392. The Alabama DTPA declares several specific actions to be unlawful, including: "(5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do not have," "(7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another," and "(27) Engaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce." Ala. Code § 8-19-5. GM engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated the Alabama DTPA.

393.   GM participated in unfair or deceptive trade practices that violated the Alabama DTPA.  As described below and alleged throughout the Complaint, by failing to disclose the Valve Train Defect, by concealing the Valve Train Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, GM knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. GM systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Valve Train Defect in the course of its business.

394.   GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

395.   GM's unfair and deceptive acts or practices occurred repeatedly in GM's trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

396.   GM knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

397.   GM knew or should have known that its conduct violated the Alabama DTPA.

398.   Defendant was under a duty to Alabama Plaintiff and the Alabama Sub-Class Members to disclose the defective nature of the Class Vehicles because:

> a.   Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles;
>
> b.   Defendant made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and
>
> c.   Defendant actively concealed the defective nature of the Class Vehicles from Alabama Plaintiff and the Alabama Sub-Class Members at the time of sale and thereafter.

399.    By failing to disclose the Valve Train Defect, Defendant knowingly and intentionally concealed material facts and breached its duty not to do so.

400.   The facts concealed or not disclosed by Defendant to Alabama Plaintiff and the Alabama Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendant's Class Vehicles, or to pay less for them. Whether a vehicle's lifter, rocker arm, and/or valve spring is defective, which can cause stalling, losing power while driving, and hesitation, is a material safety concern. Had Alabama Plaintiff and the Alabama Sub-Class Members known that the Class Vehicles

suffered from the Valve Train Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

401.   Alabama Plaintiff and the Alabama Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Valve Train Defect. That is the reasonable and objective consumer expectation for vehicles.

402.   As a result of Defendant's misconduct, Alabama Plaintiff and the Alabama Sub-Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

403.   As a direct and proximate result of Defendant's unfair or deceptive acts or practices, Alabama Plaintiff and the Alabama Sub-Class Members have suffered and will continue to suffer actual damages.

404.   GM's violations present a continuing risk to Alabama Plaintiffs and the Alabama Sub-Class Members as well as to the general public.  GM's unlawful acts and practices complained of herein affect the public interest.

405.   Alabama Plaintiff provided notice of his claims, including a written demand for relief, by letter dated November 23, 2021 satisfying the requirements of Ala. Code. § 9-19-10(e).

406.   Alabama Plaintiff and members of the Alabama Sub-Class seek actual damages, or the sum of $100, whichever is greater, treble damages for GM's frequent and intentional violation of the Alabama DTPA, an order enjoining GM's

deceptive and unfair conduct, court costs and attorneys' fees as a result of Defendant's violations of the Alabama DTPA as provided in Ala. Code § 8-19-10(a).

**Claims on Behalf of the Connecticut Sub-Class**

**COUNT VII**
**Breach of Express Warranty**
**Conn. Gen. Stat. Ann. § 42A-2-313**
**(On Behalf of the Connecticut Sub-Class against Defendant)**

407.   Plaintiffs repeat and re-allege each and every allegation contained above in paragraphs 1 through 298 as if fully set forth herein.

408.   Plaintiff Christopher McClave ("Connecticut Plaintiff") brings this count on behalf of himself and the Connecticut Sub-Class against Defendant.

409.   GM is and was at all relevant times a "merchant" with respect to motor vehicles under Conn. Gen. Stat. Ann. §42a-2-104(1).

410.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Conn. Gen. Stat. Ann. §42a-2-105(1).

411.   The valve train systems were manufactured and/or installed in the Class Vehicles by Defendant and are covered by the express warranty.

412.   Defendant provided all purchasers and lessees of the Class Vehicles with an express warranty described herein, which became a material part of the bargain. Accordingly, GM's express warranty is an express warranty under Connecticut state law.

413.   In a section entitled "What is Covered," Defendant's express warranty (or New Vehicle Limited Warranty ("NVLW")) provides in relevant part that "[t]he warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." The warranty further provides that "[w]arranty repairs, including, including towing, parts, and labor, will be made at no charge" and "[t]o obtain warranty repairs, take the vehicle to a Chevrolet dealer facility within the warranty period and request the needed repairs."

414.   According to GM, the "Bumper-to-Bumper Coverage is for the first 3 years or 36,000 miles, whichever comes first," if not longer.

415.   Defendant's NVLW and other warranties regarding the Class Vehicles formed a basis of the bargain that was breached when Connecticut Plaintiff and members of the Connecticut Sub-Class purchased or leased the Class Vehicles with the defective lifter and/or related components.

416.   Connecticut Plaintiff and members of the Connecticut Sub-Class experienced defects within the warranty period. Despite the existence of the NVLW, Defendant failed to inform Connecticut Plaintiff and members of the Connecticut Sub-Class that the Class Vehicles were equipped with defective lifters and related components.  When providing repairs under the express warranty, these repairs were ineffective and incomplete and did not provide a permanent repair for the Valve Train Defect.

417.   GM breached the express warranty through the acts and omissions described above, including by promising to repair or adjust defects in materials or workmanship of any part supplied by Defendant and then failing to do so. Defendant has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles materials and workmanship defects.

418.   Connecticut Plaintiff and members of the Connecticut Sub-Class have had sufficient direct dealings with either GM or its agents (i.e., dealerships and technical support) to establish privity of contract between GM, on one hand, and Connecticut Plaintiff and each member of the Connecticut Sub-Class on the other hand.   Nonetheless, privity is not required here because Connecticut Plaintiff and members of the Connecticut Sub-Class are intended third-party beneficiaries of contracts between GM and its distributors and dealers, and specifically, of GM's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles.   The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

419.   Any attempt by GM to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here.   Specifically, the warranty limitation is unenforceable because GM knowingly sold or leased defective products without informing consumers about the Valve Train Defect.   The time

limits are unconscionable and inadequate to protect Connecticut Plaintiff and the members of the Connecticut Sub-Class. Among other things, Connecticut Plaintiff and members of the Connecticut Sub-Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by GM and unreasonable favored GM. A gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Valve Train Defect existed between GM and members of the Connecticut Sub-Class.

420. Further, the limited warranty promising to repair and/or correct a manufacturing or workmanship defect fails of its essential purpose because the contractual remedy is insufficient to make Connecticut Plaintiff and the members of the Connecticut Sub-Class whole, because GM has failed and/or has refused to adequately provide the promised remedies, i.e., a permanent repair, within a reasonable time.

421. Connecticut Plaintiff were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Valve Train Defect from the complaints and service requests it received from Class Members, including those formal complaints submitted to NHTSA, and through other internal sources.

422. Nonetheless, Connecticut Plaintiff and members of the Connecticut Sub-Class provided notice to GM of the breach of express warranties when they took

their vehicles to GM-authorized provider of warranty repairs.  Connecticut Plaintiff also provided notice to GM of its breach of express warranty by letter dated November 19, 2021.

423.   As a result of GM's breach of the applicable express warranties, owners and/or lessees of the Class Vehicles suffered, and continue to suffer, an ascertainable loss of money, property, and/or value of their Class Vehicles.

424.   As a direct and proximate result of Defendant's breach of express warranties, Connecticut Plaintiff and members of the Connecticut Sub-Class have been damaged in an amount to be determined at trial.

425.   As a result of GM's breach of the express warranty, Connecticut Plaintiff and Connecticut Sub-Class Members are entitled to legal and equitable relief against GM, including actual damages, specific performance, attorney's fees, costs of suit, and other relief as appropriate.

## COUNT VIII
### Breach of the Implied Warranty of Merchantability
### Tex. Bus. & Com. Code §§ 2.314 AND 2A.212
### (On Behalf of the Connecticut Sub-Class against Defendant)

426.   Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 298 above as if fully set forth herein.

427.   Connecticut Plaintiff brings this count on behalf of himself and the Connecticut Sub-Class against Defendant.

428.   GM is and was at all relevant times a "merchant" with respect to motor vehicles under Conn. Gen. Stat. Ann. § 42a-2-104(1).

429.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Conn. Gen. Stat. Ann. §42a-2-105(1).

430.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Conn. Gen. Stat. Ann. § 42a-2-314.

431.   GM knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. GM directly sold and marketed Class Vehicles to customers through authorized dealers, like those from whom Connecticut Plaintiff and members of the Connecticut Sub-Class bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. GM knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Connecticut Plaintiff and members of the Connecticut Sub-Class, with no modification to the defective Class Vehicles.

432.   GM provided Connecticut Plaintiff and members of the Connecticut Sub-Class with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.  However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, inter alia, the Class Vehicles and

their lifter suffered from an inherent defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

433.   This implied warranty included, among other things: (i) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold by GM were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

434.   Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles were and are defective at the time of sale or lease and thereafter as more fully described above. GM knew of this defect at the time these sale or lease transactions occurred.

435.  As a result of GM's breach of the applicable implied warranties, Connecticut Plaintiff and members of the Connecticut Sub-Class suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Valve Train Defect, Connecticut Plaintiff and members of the Connecticut Sub-Class were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

436.    GM's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

437.    Connecticut Plaintiff and members of the Connecticut Sub-Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

438.    Connecticut Plaintiff and members of the Connecticut Sub-Class have had sufficient direct dealings with either GM or its agents (i.e., dealerships and technical support) to establish privity of contract between GM, on one hand, and Connecticut Plaintiff and members of the Connecticut Sub-Class on the other hand. Nonetheless, privity is not required here because Connecticut Plaintiff and members of the Connecticut Sub-Class are intended third-party beneficiaries of contracts between GM and its distributors and dealers, and specifically, of GM's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles.  The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

439.    Connecticut Plaintiff and members of the Connecticut Sub-Class were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of warranty would have been futile. GM was also on

notice of the Valve Train Defect from the complaints and service requests it received from Connecticut Plaintiff and the Class Members and through other internal sources.

440.   Nonetheless, Connecticut Plaintiff and members of the Connecticut Sub-Class provided notice to GM of the breach of express warranties when they took their vehicles to GM-authorized provider of warranty repairs.  Connecticut Plaintiff also provided notice to GM of its breach of express warranty by letter dated November 19, 2021.

441.   As a direct and proximate cause of GM's breach, Connecticut Plaintiff and members of the Connecticut Sub-Class suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Connecticut Plaintiff and members of the Connecticut Sub-Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

442.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Connecticut Plaintiff and members of the Connecticut Sub-Class have been damaged in an amount to be proven at trial.

**COUNT IX**
**VIOLATIONS OF THE CONNECTICUT UNLAWFUL TRADE PRACTICES ACT**
**Conn. Gen. Stat. § 42-110A,** *et seq*.
**(On Behalf of the Connecticut Sub-Class against Defendant)**

443. Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 298 above as if fully set forth herein.

444. Connecticut Plaintiff brings this cause of action on behalf of himself and on behalf of the members of the Connecticut Sub-Class.

445. GM, Connecticut Plaintiff, and Connecticut Sub-Class members are "persons" within the meaning of Conn. Gen. Stat. § 42-110a(3) of the Connecticut Unfair Trade Practices Act ("Connecticut UTPA").

446. GM engaged in "trade" or "commerce" within the meaning of Conn. Gen. Stat. § 42-110a(4).

447. The Connecticut UTPA provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a). GM engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated the Connecticut UTPA.

448. GM participated in unfair or deceptive trade practices that violated the Connecticut UTPA. As described below and alleged throughout the Complaint, by failing to disclose the Valve Train Defect, by concealing the Valve Train Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, GM knowingly and intentionally misrepresented and omitted material facts in connection with the sale

or lease of the Class Vehicles. GM systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Valve Train Defect in the course of its business.

449. GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

450. GM's unfair and deceptive acts or practices occurred repeatedly in GM's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

451. GM knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

452. GM knew or should have known that its conduct violated the Connecticut UTPA.

453. Defendant was under a duty to Connecticut Plaintiff and the Connecticut Sub-Class Members to disclose the defective nature of the Class Vehicles because:

      a.    Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

      b.    Defendant made partial disclosures about the quality of the Class

Vehicles without revealing the defective nature of the Class Vehicles; and

c. Defendant actively concealed the defective nature of the Class Vehicles from Connecticut Plaintiff and the Connecticut Sub-Class Members at the time of sale and thereafter.

454. By failing to disclose the Valve Train Defect, Defendant knowingly and intentionally concealed material facts and breached its duty not to do so.

455. The facts concealed or not disclosed by Defendant to Connecticut Plaintiff and the Connecticut Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendant's Class Vehicles, or to pay less for them. Whether a vehicle's lifter, rocker arm, and/or valve spring is defective, which can cause stalling, losing power while driving, and hesitation, is a material safety concern. Had Connecticut Plaintiff and the Connecticut Sub-Class Members known that the Class Vehicles suffered from the Valve Train Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

456. Connecticut Plaintiff and the Connecticut Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Valve Train Defect. That is the reasonable and objective consumer expectation for vehicles.

457.   As a result of Defendant's misconduct, Connecticut Plaintiff and the Connecticut Sub-Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

458.   As a direct and proximate result of Defendant's unfair or deceptive acts or practices, Connecticut Plaintiff and the Connecticut Sub-Class Members have suffered and will continue to suffer actual damages.

459.   GM's violations present a continuing risk to Connecticut Plaintiffs and the Connecticut Sub-Class Members as well as to the general public.  GM's unlawful acts and practices complained of herein affect the public interest.

460.   Connecticut Plaintiff provided notice of his claims by letter dated November 19, 2021.

461.   Pursuant to Conn. Gen. Stat. § 42-110g, Connecticut Plaintiff and the Connecticut Sub-Class seek an order enjoining GM's unfair and/or deceptive acts or practices, and awarding damages, punitive damages, attorneys' fees and costs, and any other just and proper relief available under the Connecticut UTPA.

**Claims on Behalf of the Florida Sub-Class**

**COUNT X**
**Breach of Express Warranty**
**F.S.A. §§ 672.313 AND 680.21**
**(On Behalf of the Florida Sub-Class against Defendant)**

462.   Plaintiffs repeat and re-allege each and every allegation contained above in paragraphs 1 through 298 above as if fully set forth herein.

463.    Plaintiff Melissa Luster ("Florida Plaintiff") brings this count on behalf of herself and the Florida Sub-Class against Defendant.

464.    GM is and was at all relevant times a "merchant" with respect to motor vehicles under F.S.A. §§ 672.104(1) and 680.1031(3)(k), and a "seller" of motor vehicles under § 672.103(1)(d).

465.    With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under F.S.A. § 680.1031(1)(p).

466.    The Class Vehicles are and were at all relevant times "goods" within the meaning of F.S.A. §§ 672.105(1) and 680.1031(1)(h).

467.    The valve train systems and/or installed in the Class Vehicles by Defendant and are covered by the express warranty.

468.    Defendant provided all purchasers and lessees of the Class Vehicles with an express warranty described herein, which became a material part of the bargain. Accordingly, GM's express warranty is an express warranty under Florida state law.

469.    In a section entitled "What is Covered," Defendant's express warranty (or New Vehicle Limited Warranty ("NVLW")) provides in relevant part that "[t]he warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." The warranty further provides that "[w]arranty repairs, including, including towing, parts, and labor, will be made at no

charge" and "[t]o obtain warranty repairs, take the vehicle to a Chevrolet dealer facility within the warranty period and request the needed repairs."

470.   According to GM, the "Bumper-to-Bumper Coverage is for the first 3 years or 36,000 miles, whichever comes first," if not longer.

471.   Defendant's NVLW and other warranties regarding the Class Vehicles formed a basis of the bargain that was breached when Florida Plaintiff and members of the Florida Sub-Class purchased or leased the Class Vehicles with the defective lifter and/or related components.

472.   Florida Plaintiff and members of the Florida Sub-Class experienced defects within the warranty period. Despite the existence of the NVLW, Defendant failed to inform Florida Plaintiff and members of the Florida Sub-Class that the Class Vehicles were equipped with defective lifters and related components.   When providing repairs under the express warranty, these repairs were ineffective and incomplete and did not provide a permanent repair for the Valve Train Defect.

473.   GM breached the express warranty through the acts and omissions described above, including by promising to repair or adjust defects in materials or workmanship of any part supplied by Defendant and then failing to do so. Defendant has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles materials and workmanship defects.

474.   Florida Plaintiff and members of the Florida Sub-Class have had sufficient direct dealings with either GM or its agents (i.e., dealerships and technical

support) to establish privity of contract between GM, on one hand, and Florida Plaintiff and each member of the Florida Sub-Class on the other hand. Nonetheless, privity is not required here because Florida Plaintiff and members of the Florida Sub-Class are intended third-party beneficiaries of contracts between GM and its distributors and dealers, and specifically, of GM's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

475.   Any attempt by GM to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here. Specifically, the warranty limitation is unenforceable because GM knowingly sold or leased defective products without informing consumers about the Valve Train Defect. The time limits are unconscionable and inadequate to protect Florida Plaintiff and the members of the Florida Sub-Class. Among other things, Florida Plaintiff and members of the Florida Sub-Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by GM and unreasonable favored GM. A gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Valve Train Defect existed between GM and members of the Florida Sub-Class.

476.   Further, the limited warranty promising to repair and/or correct a manufacturing or workmanship defect fails of its essential purpose because the contractual remedy is insufficient to make Florida Plaintiff and the members of the Florida Sub-Class whole, because GM has failed and/or has refused to adequately provide the promised remedies, i.e. a permanent repair, within a reasonable time.

477.   Florida Plaintiff were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Valve Train Defect from the complaints and service requests it received from Class Members, including those formal complaints submitted to NHTSA, and through other internal sources.

478.   Nonetheless, Florida Plaintiff and members of the Florida Sub-Class provided notice to GM of the breach of express warranties when they took their vehicles to a GM-authorized provider of warranty repairs.

479.   As a result of GM's breach of the applicable express warranties, owners and/or lessees of the Class Vehicles suffered, and continue to suffer, an ascertainable loss of money, property, and/or value of their Class Vehicles.

480.   As a direct and proximate result of Defendant's breach of express warranties, Florida Plaintiff and members of the Florida Sub-Class have been damaged in an amount to be determined at trial.

481.   As a result of GM's breach of the express warranty, Florida Plaintiff and Florida Sub-Class Members are entitled to legal and equitable relief against GM,

including actual damages, specific performance, attorney's fees, costs of suit, and

other relief as appropriate.

## COUNT XI
### Breach of the Implied Warranty of Merchantability
### F.S.A. §§ 672.314 AND 680.212
### (On Behalf of the Florida Sub-Class against Defendant)

482.   Plaintiffs repeat and re-allege each and every allegation contained in

paragraphs 1 through 298 above as if fully set forth herein.

483.   Florida Plaintiff brings this count on behalf of herself and the Florida

Sub-Class against Defendant.

484.   GM is and was at all relevant times a "merchant" with respect to motor

vehicles under F.S.A. §§ 672.104(1) and 680.1031(3)(k), and a "seller" of motor

vehicles under § 672.103(1)(d).

485.   With respect to leases, GM is and was at all relevant times a "lessor" of

motor vehicles under F.S.A. § 680.1031(1)(p).

486.   The Class Vehicles are and were at all relevant times "goods" within

the meaning of F.S.A. §§ 672.105(1) and 680.1031(1)(h).

487.   A warranty that the Class Vehicles were in merchantable condition and

fit for the ordinary purpose for which vehicles are used is implied by law under

F.S.A. §§ 672.314 and 680.212.

488.   GM knew or had reason to know of the specific use for which the Class

Vehicles were purchased or leased. GM directly sold and marketed Class Vehicles

to customers through authorized dealers, like those from whom Florida Plaintiff and members of the Florida Sub-Class bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. GM knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Florida Plaintiff and members of the Florida Sub-Class, with no modification to the defective Class Vehicles.

489.   GM provided Florida Plaintiff and members of the Florida Sub-Class with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.  However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, inter alia, the Class Vehicles and their lifter suffered from an inherent defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

490.   This implied warranty included, among other things: (i) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold by GM were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

491.   Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe

transportation. Instead, the Class Vehicles were and are defective at the time of sale or lease and thereafter as more fully described above. GM knew of this defect at the time these sale or lease transactions occurred.

492.    As a result of GM's breach of the applicable implied warranties, Florida Plaintiff and members of the Florida Sub-Class suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Valve Train Defect, Florida Plaintiff and members of the Florida Sub-Class were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

493.    GM's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

494.    Florida Plaintiff and members of the Florida Sub-Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

495.    Florida Plaintiff and members of the Florida Sub-Class have had sufficient direct dealings with either GM or its agents (i.e., dealerships and technical support) to establish privity of contract between GM, on one hand, and Florida Plaintiff and members of the Florida Sub-Class on the other hand.   Nonetheless, privity is not required here because Florida Plaintiff and members of the Florida Sub-Class are intended third-party beneficiaries of contracts between GM and its

distributors and dealers, and specifically, of GM's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles.  The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

496.   Florida Plaintiff and members of the Florida Sub-Class were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of warranty would have been futile. GM was also on notice of the Valve Train Defect from the complaints and service requests it received from Florida Plaintiff and the Class Members and through other internal sources.

497.   Nonetheless, Florida Plaintiff and members of the Florida Sub-Class provided notice to GM of the breach of express warranties when they took their vehicles to a GM-authorized provider of warranty repairs.

498.   As a direct and proximate cause of GM's breach, Florida Plaintiff and members of the Florida Sub-Class suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Florida Plaintiff and members of the Florida Sub-Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

499.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Florida Plaintiff and members of the Florida Sub-Class have been damaged in an amount to be proven at trial.

## COUNT XII
### Violations of the Florida Deceptive and Unfair Trade Practices Act
### F.S.A. §§ 501.201-.213
### (On Behalf of the Florida Sub-Class against Defendant)

500.   Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 298 above as if fully set forth herein.

501.   Florida Plaintiff brings this cause of action on behalf of herself and on behalf of the members of the Florida Sub-Class.

502.   GM's business acts and practices alleged herein constitute unfair, unconscionable and/or deceptive methods, acts or practices under the Florida Deceptive and Unfair Trade Practices Act, § 501.201, et seq., Florida Statutes ("FDUTPA").

503.   At all relevant times, Florida Plaintiffs and members of the Florida Sub-Class were "consumers" within the meaning of the FDUTPA. F.S.A. § 501.203(7).

504.   GM's conduct, as set forth herein, occurred in the conduct of "trade or commerce" within the meaning of the FDUTPA. F.S.A. § 501.203(8).

505.   FDUPTA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce" at set forth in the statute. Fla. Stat. § 501.204(1).  Breach of express

and implied warranties constitutes an unfair or deceptive act or practice under FDUTPA. GM engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated the FDUTPA.

506. GM participated in unfair or deceptive trade practices that violated the FDUTPA. As described below and alleged throughout the Complaint, by failing to disclose the Valve Train Defect, by concealing the Valve Train Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, GM knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. GM systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Valve Train Defect in the course of its business.

507. GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

508. GM's unfair and deceptive acts or practices occurred repeatedly in GM's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

509.  GM knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

510.  GM knew or should have known that its conduct violated the FDUTPA.

511.  Defendant was under a duty to Florida Plaintiff and the Florida Sub-Class Members to disclose the defective nature of the Class Vehicles because:

      a.    Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

      b.    Defendant made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

      c.    Defendant actively concealed the defective nature of the Class Vehicles from Florida Plaintiff and the Florida Sub-Class Members at the time of sale and thereafter.

512.  By failing to disclose the Valve Train Defect, Defendant knowingly and intentionally concealed material facts and breached its duty not to do so.

513.  The facts concealed or not disclosed by Defendant to Florida Plaintiff and the Florida Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendant's Class Vehicles, or to pay less for them. Whether a vehicle's lifter, rocker arm, and/or valve spring is defective, which can cause stalling, losing power

while driving, and hesitation, is a material safety concern. Had Florida Plaintiff and the Florida Sub-Class Members known that the Class Vehicles suffered from the Valve Train Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

514.   Florida Plaintiff and the Florida Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Valve Train Defect. That is the reasonable and objective consumer expectation for vehicles.

515.   As a result of Defendant's misconduct, Florida Plaintiff and the Florida Sub-Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

516.   As a direct and proximate result of Defendant's unfair or deceptive acts or practices, Florida Plaintiff and the Florida Sub-Class Members have suffered and will continue to suffer actual damages.

517.   GM's violations present a continuing risk to Florida Plaintiffs and the Florida Sub-Class Members as well as to the general public.  GM's unlawful acts and practices complained of herein affect the public interest.

518.   Florida Plaintiff and the Florida AEB Sub-Class Members seek, inter alia, actual damages in an amount to be determined at trial, reasonable attorneys' fees; and any other just and proper relief available under the FDUTPA. Because GM acted with willful and conscious disregard of the rights and safety of others, GM's conduct constitutes malice, oppression, and fraud warranting punitive damages.

**Claims on Behalf of the Georgia Sub-Class**

<u>COUNT XIII</u>
**Breach of Express Warranty**
**Ga. Code Ann. §§ 11-2-313 and 11-2A-210**
**(On Behalf of the Georgia Sub-Class against Defendant)**

519.   Plaintiffs repeat and re-allege each and every allegation contained above in paragraphs 1 through 298 above as if fully set forth herein.

520.   Plaintiff Leon Jordan ("Georgia Plaintiff") brings this count on behalf of himself and the Georgia Sub-Class against Defendant.

521.   GM is and was at all relevant times a "merchant" with respect to motor vehicles under Ga. Code Ann. §§ 11-2-104(1) and 11-2A-103(3), and a "seller" of motor vehicles under § 11-2-103(1)(d).

522.   With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Ga. Code Ann. § 11-2A-103(1)(p).

523.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Ga. Code Ann. §§ 11-2-105(1) and 11-2A-103(1)(h).

524.   The valve train systems were manufactured and/or installed in the Class Vehicles by Defendant and are covered by the express warranty.

525.   Defendant provided all purchasers and lessees of the Class Vehicles with an express warranty described herein, which became a material part of the bargain. Accordingly, GM's express warranty is an express warranty under Georgia state law.

526.   In a section entitled "What is Covered," Defendant's express warranty (or New Vehicle Limited Warranty ("NVLW")) provides in relevant part that "[t]he warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." The warranty further provides that "[w]arranty repairs, including, including towing, parts, and labor, will be made at no charge" and "[t]o obtain warranty repairs, take the vehicle to a Chevrolet dealer facility within the warranty period and request the needed repairs."

527.   According to GM, the "Bumper-to-Bumper Coverage is for the first 3 years or 36,000 miles, whichever comes first," if not longer.

528.   Defendant's NVLW and other warranties regarding the Class Vehicles formed a basis of the bargain that was breached when Georgia Plaintiff and members of the Georgia Sub-Class purchased or leased the Class Vehicles with the defective lifter and/or related components.

529.   Georgia Plaintiff and members of the Georgia Sub-Class experienced defects within the warranty period. Despite the existence of the NVLW, Defendant failed to inform Georgia Plaintiff and members of the Georgia Sub-Class that the Class Vehicles were equipped with defective lifters and related components. When providing repairs under the express warranty, these repairs were ineffective and incomplete and did not provide a permanent repair for the Valve Train Defect.

530.   GM breached the express warranty through the acts and omissions described above, including by promising to repair or adjust defects in materials or workmanship of any part supplied by Defendant and then failing to do so. Defendant has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles materials and workmanship defects.

531.   Georgia Plaintiff and members of the Georgia Sub-Class have had sufficient direct dealings with either GM or its agents (i.e., dealerships and technical support) to establish privity of contract between GM, on one hand, and Georgia Plaintiff and each member of the Georgia Sub-Class on the other hand.  Nonetheless, privity is not required here because Georgia Plaintiff and members of the Georgia Sub-Class are intended third-party beneficiaries of contracts between GM and its distributors and dealers, and specifically, of GM's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles.  The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

532.   Any attempt by GM to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here.  Specifically, the warranty limitation is unenforceable because GM knowingly sold or leased defective products without informing consumers about the Valve Train Defect.  The time

limits are unconscionable and inadequate to protect Georgia Plaintiff and the members of the Georgia Sub-Class.  Among other things, Georgia Plaintiff and members of the Georgia Sub-Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by GM and unreasonable favored GM. A gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Valve Train Defect existed between GM and members of the Georgia Sub-Class.

533.   Further, the limited warranty promising to repair and/or correct a manufacturing or workmanship defect fails of its essential purpose because the contractual remedy is insufficient to make Georgia Plaintiff and the members of the Georgia Sub-Class whole, because GM has failed and/or has refused to adequately provide the promised remedies, i.e., a permanent repair, within a reasonable time.

534.   Georgia Plaintiff were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Valve Train Defect from the complaints and service requests it received from Class Members, including those formal complaints submitted to NHTSA, and through other internal sources.

535.   Nonetheless, Georgia Plaintiff and members of the Georgia Sub-Class provided notice to GM of the breach of express warranties when they took their vehicles to GM-authorized provider of warranty repairs.  Georgia Plaintiff also

provided notice to GM of its breach of express warranty by letter dated October 20, 2021.

536.   As a result of GM's breach of the applicable express warranties, owners and/or lessees of the Class Vehicles suffered, and continue to suffer, an ascertainable loss of money, property, and/or value of their Class Vehicles.

537.   As a direct and proximate result of Defendant's breach of express warranties, Georgia Plaintiff and members of the Georgia Sub-Class have been damaged in an amount to be determined at trial.

538.   As a result of GM's breach of the express warranty, Georgia Plaintiff and Georgia Sub-Class Members are entitled to legal and equitable relief against GM, including actual damages, specific performance, attorney's fees, costs of suit, and other relief as appropriate.

## COUNT XIV
### Breach of the Implied Warranty of Merchantability
### Ga. Code Ann. § 11-2-314 and 11-2A-212
### (On Behalf of the Georgia Sub-Class against Defendant)

539.   Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 298 above as if fully set forth herein.

540.   Georgia Plaintiff brings this count on behalf of himself and the Georgia Sub-Class against Defendant.

541.   GM is and was at all relevant times a "merchant" with respect to motor vehicles under Ga. Code Ann. §§ 11-2-104(1) and 11-2A-103(3), and a "seller" of motor vehicles under § 11-2-103(1)(d).

542.   With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Ga. Code Ann. § 11-2A-103(1)(p).

543.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Ga. Code Ann. §§ 11-2-105(1) and 11-2A-103(1)(h).

544.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Ga. Code Ann. §§ 11-2-314 and 11-2A-212.

545.   GM knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. GM directly sold and marketed Class Vehicles to customers through authorized dealers, like those from whom Georgia Plaintiff and members of the Georgia Sub-Class bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. GM knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Georgia Plaintiff and members of the Georgia Sub-Class, with no modification to the defective Class Vehicles.

546.   GM provided Georgia Plaintiff and members of the Georgia Sub-Class with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.  However,

the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, inter alia, the Class Vehicles and their lifter suffered from an inherent defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

547.   This implied warranty included, among other things: (i) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold by GM were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

548.   Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles were and are defective at the time of sale or lease and thereafter as more fully described above. GM knew of this defect at the time these sale or lease transactions occurred.

549.   As a result of GM's breach of the applicable implied warranties, Georgia Plaintiff and members of the Georgia Sub-Class suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Valve Train Defect, Georgia Plaintiff and members of the Georgia Sub-Class were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

550.   GM's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

551.   Georgia Plaintiff and members of the Georgia Sub-Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

552.   Georgia Plaintiff and members of the Georgia Sub-Class have had sufficient direct dealings with either GM or its agents (i.e., dealerships and technical support) to establish privity of contract between GM, on one hand, and Georgia Plaintiff and members of the Georgia Sub-Class on the other hand.  Nonetheless, privity is not required here because Georgia Plaintiff and members of the Georgia Sub-Class are intended third-party beneficiaries of contracts between GM and its distributors and dealers, and specifically, of GM's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles.  The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

553.   Georgia Plaintiff and members of the Georgia Sub-Class were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of warranty would have been futile. GM was also on notice of the

Valve Train Defect from the complaints and service requests it received from Georgia Plaintiff and the Class Members and through other internal sources.

554.   Nonetheless, Georgia Plaintiff and members of the Georgia Sub-Class provided notice to GM of the breach of express warranties when they took their vehicles to GM-authorized providers of warranty repairs.  Georgia Plaintiff also provided notice to GM of its breach of express warranty by letter dated October 20, 2021.

555.   As a direct and proximate cause of GM's breach, Georgia Plaintiff and members of the Georgia Sub-Class suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Georgia Plaintiff and members of the Georgia Sub-Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

556.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Georgia Plaintiff and members of the Georgia Sub-Class have been damaged in an amount to be proven at trial.

## COUNT XV
**Violation of Georgia's Fair Business Practices Act,**
**Ga. Code Ann. § 10-1-390, *et seq*.**
**(On Behalf of the Georgia Sub-Class against Defendant)**

557.   Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 298 above as if fully set forth herein.

558. Georgia Plaintiff brings this cause of action on behalf of himself and on behalf of the members of the Georgia Sub-Class.

559. Georgia's Fair Business Practices Act ("GFBPA") declares "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce" to be unlawful. Ga. Code Ann. § 10-1-393(a).

560. Unfair or deceptive acts or practices are defined to include, "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have," "[r]epresenting that goods or services are of a particular standard, quality, or grade … if they are of another," and [a]dvertising goods or services with intent not to sell them as advertised." Ga. Code Ann. § 10-1-393(b). GM engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated the GFBPA.

561. GM participated in unfair or deceptive trade practices that violated the GFBPA. As described below and alleged throughout the Complaint, by failing to disclose the Valve Train Defect, by concealing the Valve Train Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, GM knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. GM systematically misrepresented, concealed, suppressed, or

omitted material facts relating to the Class Vehicles and the Valve Train Defect in the course of its business.

562.    GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

563.    GM's unfair and deceptive acts or practices occurred repeatedly in GM's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

564.    GM knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

565.    GM knew or should have known that its conduct violated the GFBPA.

566.    Defendant was under a duty to Georgia Plaintiff and the Georgia Sub-Class Members to disclose the defective nature of the Class Vehicles because:

> a.    Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles;
>
> b.    Defendant made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and
>
> c.    Defendant actively concealed the defective nature of the Class

Vehicles from Georgia Plaintiff and the Georgia Sub-Class Members at the time of sale and thereafter.

567.    By failing to disclose the Valve Train Defect, Defendant knowingly and intentionally concealed material facts and breached its duty not to do so.

568.    The facts concealed or not disclosed by Defendant to Georgia Plaintiff and the Georgia Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendant's Class Vehicles, or to pay less for them. Whether a vehicle's lifter, rocker arm and/or valve spring is defective, which can cause stalling, losing power while driving, and hesitation, is a material safety concern. Had Georgia Plaintiff and the Georgia Sub-Class Members known that the Class Vehicles suffered from the Valve Train Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

569.    Georgia Plaintiff and the Georgia Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Valve Train Defect. That is the reasonable and objective consumer expectation for vehicles.

570.    As a result of Defendant's misconduct, Georgia Plaintiff and the Georgia Sub-Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

571.   As a direct and proximate result of Defendant's unfair or deceptive acts or practices, Georgia Plaintiff and the Georgia Sub-Class Members have suffered and will continue to suffer actual damages.

572.   GM's violations present a continuing risk to Georgia Plaintiff and the Georgia Sub-Class Members as well as to the general public.  GM's unlawful acts and practices complained of herein affect the public interest.

573.   Pursuant to statute, Georgia Plaintiff provided notice of his claim by letter dated October 20, 2021.  Georgia Plaintiff and members of the Georgia Sub-Class seek all damages and relief to which they are entitled to because GM failed to remedy its unlawful conduct within the requisite time period.

574.   Georgia Plaintiff and members of the Georgia Sub-Class seek monetary relief against Defendant in the amount of damages, exemplary damages for intentional violations, injunctive relief, attorneys' fees, and any other just and proper relief available under Ga. Code Ann. § 10-1-399(a).

## COUNT XVI
### Violation of the Georgia Uniform Deceptive Trade Practices Act, Ga. Code Ann. § 10-1-370, *et seq.* (On Behalf of the Georgia Sub-Class against Defendant)

575.   Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 298 above as if fully set forth herein.

576.   Georgia Plaintiff brings this cause of action on behalf of himself and on behalf of the members of the Georgia Sub-Class.

577. The Georgia Uniform Deceptive Trade Practices Act ("GUDTPA") prohibits "deceptive trade practices,' which include the "misrepresentation of standard or quality of goods or services," and "engaging in any other conduct which similarly creates a likelihood of confusion or of misunderstanding." Ga. Code Ann. § 10-1-372(a). GM engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated the GUDTPA.

578. Defendant, Georgia Plaintiff, and the members of the Georgia Sub-Class are "persons" within the meaning of the GUDTPA, GA. Code Ann. § 10-1-471(5).

579. GM participated in unfair or deceptive trade practices that violated the GUDTPA. As described below and alleged throughout the Complaint, by failing to disclose the Valve Train Defect, by concealing the Valve Train Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, GM knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. GM systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Valve Train Defect in the course of its business.

580. GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression

or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

581. GM's unfair and deceptive acts or practices occurred repeatedly in GM's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

582. GM knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

583. GM knew or should have known that its conduct violated the GUDTPA.

584. Defendant was under a duty to Georgia Plaintiff and the Georgia Sub-Class Members to disclose the defective nature of the Class Vehicles because:

> a. Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles;
>
> b. Defendant made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and
>
> c. Defendant actively concealed the defective nature of the Class Vehicles from Georgia Plaintiff and the Georgia Sub-Class Members at the time of sale and thereafter.

585. By failing to disclose the Valve Train Defect, Defendant knowingly and intentionally concealed material facts and breached its duty not to do so.

586. The facts concealed or not disclosed by Defendant to Georgia Plaintiff and the Georgia Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendant's Class Vehicles, or to pay less for them. Whether a vehicle's lifter, rocker arm, and/or valve spring is defective, which can cause stalling, losing power while driving, and hesitation, is a material safety concern. Had Georgia Plaintiff and the Georgia Sub-Class Members known that the Class Vehicles suffered from the Valve Train Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

587. Georgia Plaintiff and the Georgia Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Valve Train Defect. That is the reasonable and objective consumer expectation for vehicles.

588. As a result of Defendant's misconduct, Georgia Plaintiff and the Georgia Sub-Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

589. As a direct and proximate result of Defendant's unfair or deceptive acts or practices, Georgia Plaintiff and the Georgia Sub-Class Members have suffered and will continue to suffer actual damages.

590.    GM's violations present a continuing risk to Georgia Plaintiff and the Georgia Sub-Class Members as well as to the general public.  GM's unlawful acts and practices complained of herein affect the public interest.

591.    Pursuant to statute, Georgia Plaintiff provided notice of his claim by letter dated October 20, 2021.  Georgia Plaintiff and members of the Georgia Sub-Class seek all damages and relief to which they are entitled to because GM failed to remedy its unlawful conduct within the requisite time period.

592.    Georgia Plaintiff and members of the Georgia Sub-Class seek monetary relief against Defendant in the amount of damages, exemplary damages for intentional violations, injunctive relief, attorneys' fees, and any other just and proper relief available under Ga. Code Ann. § 10-1-373.

**-Claims on Behalf of the New Jersey Sub-Class**

**COUNT XVII**
**Breach of Express Warranty**
**N.J. Stat. Ann. §§ 12A:2-313 and 2A-210**
**(On Behalf of the New Jersey Sub-Class against Defendant)**

593.    Plaintiffs repeat and re-allege each and every allegation contained above in paragraphs 1 through 298 above as if fully set forth herein.

594.    Plaintiff Daniel Demarest ("New Jersey Plaintiff") brings this count on behalf of himself and the New Jersey Sub-Class against Defendant.

595.    GM is and was at all relevant times a "merchant" with respect to motor vehicles under N.J. Stat. Ann. § 12A:2-104(1) and a "seller" of motor vehicles under § 2-103(1)(d).

596.   With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under N.J. Stat. Ann.§ 12A:2A-103(1)(p).

597.   The Class Vehicles are and were at all relevant times "goods" within the meaning of N.J. Stat. Ann.§§ 12A:2-105(1) and 2A-103(1)(h).

598.   The valve train systems were manufactured and/or installed in the Class Vehicles by Defendant and are covered by the express warranty.

599.   Defendant provided all purchasers and lessees of the Class Vehicles with an express warranty described herein, which became a material part of the bargain. Accordingly, GM's express warranty is an express warranty under New Jersey state law.

600.   In a section entitled "What is Covered," Defendant's express warranty (or New Vehicle Limited Warranty ("NVLW")) provides in relevant part that "[t]he warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." The warranty further provides that "[w]arranty repairs, including, including towing, parts, and labor, will be made at no charge" and "[t]o obtain warranty repairs, take the vehicle to a Chevrolet dealer facility within the warranty period and request the needed repairs."

601.   According to GM, the "Bumper-to-Bumper Coverage is for the first 3 years or 36,000 miles, whichever comes first," if not longer.

602.    Defendant's NVLW and other warranties regarding the Class Vehicles formed a basis of the bargain that was breached when New Jersey Plaintiff and members of the New Jersey Sub-Class purchased or leased the Class Vehicles with the defective lifter and/or related components.

603.    New Jersey Plaintiff and members of the New Jersey Sub-Class experienced defects within the warranty period. Despite the existence of the NVLW, Defendant failed to inform New Jersey Plaintiff and members of the New Jersey Sub-Class that the Class Vehicles were equipped with defective lifters and related components.  When providing repairs under the express warranty, these repairs were ineffective and incomplete and did not provide a permanent repair for the Valve Train Defect.

604.    GM breached the express warranty through the acts and omissions described above, including by promising to repair or adjust defects in materials or workmanship of any part supplied by Defendant and then failing to do so. Defendant has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles materials and workmanship defects.

605.    New Jersey Plaintiff and members of the New Jersey Sub-Class have had sufficient direct dealings with either GM or its agents (i.e., dealerships and technical support) to establish privity of contract between GM, on one hand, and New Jersey Plaintiff and each member of the New Jersey Sub-Class on the other hand.  Nonetheless, privity is not required here because New Jersey Plaintiff and

members of the New Jersey Sub-Class are intended third-party beneficiaries of contracts between GM and its distributors and dealers, and specifically, of GM's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles.   The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

606.   Any attempt by GM to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here.   Specifically, the warranty limitation is unenforceable because GM knowingly sold or leased defective products without informing consumers about the Valve Train Defect.   The time limits are unconscionable and inadequate to protect New Jersey Plaintiff and the members of the New Jersey Sub-Class.   Among other things, New Jersey Plaintiff and members of the New Jersey Sub-Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by GM and unreasonable favored GM. A gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Valve Train Defect existed between GM and members of the New Jersey Sub-Class.

607.   Further, the limited warranty promising to repair and/or correct a manufacturing or workmanship defect fails of its essential purpose because the

contractual remedy is insufficient to make New Jersey Plaintiff and the members of the New Jersey Sub-Class whole, because GM has failed and/or has refused to adequately provide the promised remedies, i.e., a permanent repair, within a reasonable time.

608.   New Jersey Plaintiff were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Valve Train Defect from the complaints and service requests it received from Class Members, including those formal complaints submitted to NHTSA, and through other internal sources.

609.   Nonetheless, New Jersey Plaintiff and members of the New Jersey Sub-Class provided notice to GM of the breach of express warranties when they took their vehicles to GM-authorized providers of warranty repairs. New Jersey Plaintiff also provided notice to GM of its breach of express warranty by letter dated November 8, 2021.

610.   As a result of GM's breach of the applicable express warranties, owners and/or lessees of the Class Vehicles suffered, and continue to suffer, an ascertainable loss of money, property, and/or value of their Class Vehicles.

611.   As a direct and proximate result of Defendant's breach of express warranties, New Jersey Plaintiff and members of the New Jersey Sub-Class have been damaged in an amount to be determined at trial.

612.    As a result of GM's breach of the express warranty, New Jersey Plaintiff and New Jersey Sub-Class Members are entitled to legal and equitable relief against GM, including actual damages, specific performance, attorney's fees, costs of suit, and other relief as appropriate.

## COUNT XVIII
### Breach of the Implied Warranty of Merchantability
### N.J. Stat. Ann. §§ 12A:2-314 and 2A-212
### (On Behalf of the New Jersey Sub-Class against Defendant)

613.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 298 above as if fully set forth herein.

614.    New Jersey Plaintiff brings this count on behalf of himself and the New Jersey Sub-Class against Defendant.

615.    GM is and was at all relevant times a "merchant" with respect to motor vehicles under N.J. Stat. Ann. § 12A:2-104(1) and a "seller" of motor vehicles under § 2-103(1)(d).

616.    With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under N.J. Stat. Ann.§ 12A:2A-103(1)(p).

617.    The Class Vehicles are and were at all relevant times "goods" within the meaning of N.J. Stat. Ann.§§ 12A:2-105(1) and 2A-103(1)(h).

618.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under N.J. Stat. Ann. §§ 12A:2-314 and 2A-212.

619.   GM knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. GM directly sold and marketed Class Vehicles to customers through authorized dealers, like those from whom New Jersey Plaintiff and members of the New Jersey Sub-Class bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. GM knew that the Class Vehicles would and did pass unchanged from the authorized dealers to New Jersey Plaintiff and members of the New Jersey Sub-Class, with no modification to the defective Class Vehicles.

620.   GM provided New Jersey Plaintiff and members of the New Jersey Sub-Class with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.  However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, inter alia, the Class Vehicles and their lifter suffered from an inherent defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

621.   This implied warranty included, among other things: (i) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold by GM were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

622.    Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles were and are defective at the time of sale or lease and thereafter as more fully described above. GM knew of this defect at the time these sale or lease transactions occurred.

623.    As a result of GM's breach of the applicable implied warranties, New Jersey Plaintiff and members of the New Jersey Sub-Class suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Valve Train Defect, New Jersey Plaintiff and members of the New Jersey Sub-Class were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

624.    GM's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

625.    New Jersey Plaintiff and members of the New Jersey Sub-Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

626.    New Jersey Plaintiff and members of the New Jersey Sub-Class have had sufficient direct dealings with either GM or its agents (i.e., dealerships and technical support) to establish privity of contract between GM, on one hand, and

New Jersey Plaintiff and members of the New Jersey Sub-Class on the other hand. Nonetheless, privity is not required here because New Jersey Plaintiff and members of the New Jersey Sub-Class are intended third-party beneficiaries of contracts between GM and its distributors and dealers, and specifically, of GM's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

627. New Jersey Plaintiff and members of the New Jersey Sub-Class were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of warranty would have been futile. GM was also on notice of the Valve Train Defect from the complaints and service requests it received from New Jersey Plaintiff and the Class Members and through other internal sources.

628. Nonetheless, New Jersey Plaintiff and members of the New Jersey Sub-Class provided notice to GM of the breach of express warranties when they took their vehicles to GM-authorized provider of warranty repairs. New Jersey Plaintiff also provided notice to GM of its breach of express warranty by letter dated November 8, 2021.

629. As a direct and proximate cause of GM's breach, New Jersey Plaintiff and members of the New Jersey Sub-Class suffered damages and continue to suffer

damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, New Jersey Plaintiff and members of the New Jersey Sub-Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

630.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, New Jersey Plaintiff and members of the New Jersey Sub-Class have been damaged in an amount to be proven at trial.

### COUNT IXX
**Violation of the New Jersey Consumer Fraud Act**
**N.J. Stat. Ann. §§ 56:8-1,** *et seq.*
**(On Behalf of the New Jersey Sub-Class against Defendant)**

631.   Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 298 above as if fully set forth herein.

632.   New Jersey Plaintiff brings this cause of action on behalf of himself and on behalf of the members of the New Jersey Sub-Class.

633.   GM, New Jersey Plaintiff, and the New Jersey Sub-Class Members "persons" within the meaning of the New Jersey Consumer Fraud Act ("New Jersey CFA"), N.J. Stat. Ann. § 56:8-1(d).

634.   GM engaged in "sales" of "merchandise" within the meaning of N.J. Stat. Ann. § 56:8-1(c), (d).

635.   The New Jersey CFA makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false

pretense, false promise, misrepresentations, or the knowing concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby…" N.J. Stat. Ann. § 56:8-2. GM engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated the New Jersey CFA.

636.   GM participated in unfair or deceptive trade practices that violated the New Jersey CFA.  As described below and alleged throughout the Complaint, by failing to disclose the Valve Train Defect, by concealing the Valve Train Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, GM knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. GM systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Valve Train Defect in the course of its business.

637.   GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

638.   GM's unfair and deceptive acts or practices occurred repeatedly in GM's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

639.   GM knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

640.   GM knew or should have known that its conduct violated the New Jersey CFA.

641.   Defendant was under a duty to New Jersey Plaintiff and the New Jersey Sub-Class Members to disclose the defective nature of the Class Vehicles because:

   a.   Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

   b.   Defendant made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

   c.   Defendant actively concealed the defective nature of the Class Vehicles from New Jersey Plaintiff and the New Jersey Sub-Class Members at the time of sale and thereafter.

642.   By failing to disclose the Valve Train Defect, Defendant knowingly and intentionally concealed material facts and breached its duty not to do so.

643.   The facts concealed or not disclosed by Defendant to New Jersey Plaintiff and the New Jersey Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendant's Class Vehicles, or to pay less for them. Whether a vehicle's lifter, rocker arm, and/or valve spring is defective, which can cause stalling, losing power while driving, and hesitation, is a material safety concern. Had New Jersey Plaintiff and the New Jersey Sub-Class Members known that the Class Vehicles suffered from the Valve Train Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

644.   New Jersey Plaintiff and the New Jersey Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Valve Train Defect. That is the reasonable and objective consumer expectation for vehicles.

645.   As a result of Defendant's misconduct, New Jersey Plaintiff and the New Jersey Sub-Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

646.   As a direct and proximate result of Defendant's unfair or deceptive acts or practices, New Jersey Plaintiff and the New Jersey Sub-Class Members have suffered and will continue to suffer actual damages.

647. GM's violations present a continuing risk to New Jersey Plaintiff and the New Jersey Sub-Class Members as well as to the general public. GM's unlawful acts and practices complained of herein affect the public interest.

648. Pursuant to N.J. Stat. Ann. § 56:8-19, New Jersey Plaintiff and the New Jersey Sub- Class Members seek an order enjoining Ford's unlawful conduct, actual damages, treble damages, attorneys' fees, costs, and any other just and proper relief available under the New Jersey CFA.

**Claims on Behalf of the Ohio Sub-Class**

<u>COUNT XX</u>
**Breach of Express Warranty**
**Ohio Rev. Code Ann. § 1302.26,** *et seq.*
**(On Behalf of the Ohio Sub-Class against Defendant)**

649. Plaintiffs repeat and re-allege each and every allegation contained above in paragraphs 1 through 298 above as if fully set forth herein.

650. Plaintiff Mark Hayford ("Ohio Plaintiff") brings this count on behalf of himself and the Ohio Sub-Class against Defendant.

651. GM is and was at all relevant times a "merchant" with respect to motor vehicles under Ohio Rev. Code Ann. §§ 1302.01(5) and 1310.01(A)(20), and a "seller" of motor vehicles under § 1302.01(4).

652. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Ohio Rev. Code Ann. § 1310.01(A)(20).

653.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Ohio Rev. Code Ann. §§ 1302.01(8) and 1310.01(A)(8).

654.   The valve train systems were manufactured and/or installed in the Class Vehicles by Defendant and are covered by the express warranty.

655.   Defendant provided all purchasers and lessees of the Class Vehicles with an express warranty described herein, which became a material part of the bargain. Accordingly, GM's express warranty is an express warranty under Ohio state law.

656.   In a section entitled "What is Covered," Defendant's express warranty (or New Vehicle Limited Warranty ("NVLW")) provides in relevant part that "[t]he warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." The warranty further provides that "[w]arranty repairs, including, including towing, parts, and labor, will be made at no charge" and "[t]o obtain warranty repairs, take the vehicle to a Chevrolet dealer facility within the warranty period and request the needed repairs."

657.   According to GM, the "Bumper-to-Bumper Coverage is for the first 3 years or 36,000 miles, whichever comes first," if not longer.

658.   Defendant's NVLW and other warranties regarding the Class Vehicles formed a basis of the bargain that was breached when Ohio Plaintiff and members

203

of the Ohio Sub-Class purchased or leased the Class Vehicles with the defective lifter and/or related components.

659.   Ohio Plaintiff and members of the Ohio Sub-Class experienced defects within the warranty period. Despite the existence of the NVLW, Defendant failed to inform Ohio Plaintiff and members of the Ohio Sub-Class that the Class Vehicles were equipped with defective lifters and related components.   When providing repairs under the express warranty, these repairs were ineffective and incomplete and did not provide a permanent repair for the Valve Train Defect.

660.   GM breached the express warranty through the acts and omissions described above, including by promising to repair or adjust defects in materials or workmanship of any part supplied by Defendant and then failing to do so. Defendant has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles materials and workmanship defects.

661.   Ohio Plaintiff and members of the Ohio Sub-Class have had sufficient direct dealings with either GM or its agents (i.e., dealerships and technical support) to establish privity of contract between GM, on one hand, and Ohio Plaintiff and each member of the Ohio Sub-Class on the other hand.   Nonetheless, privity is not required here because Ohio Plaintiff and members of the Ohio Sub-Class are intended third-party beneficiaries of contracts between GM and its distributors and dealers, and specifically, of GM's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned

vehicles.  The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

662.  Any attempt by GM to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here.  Specifically, the warranty limitation is unenforceable because GM knowingly sold or leased defective products without informing consumers about the Valve Train Defect.  The time limits are unconscionable and inadequate to protect Ohio Plaintiff and the members of the Ohio Sub-Class.  Among other things, Ohio Plaintiff and members of the Ohio Sub-Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by GM and unreasonable favored GM. A gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Valve Train Defect existed between GM and members of the Ohio Sub-Class.

663.  Further, the limited warranty promising to repair and/or correct a manufacturing or workmanship defect fails of its essential purpose because the contractual remedy is insufficient to make Ohio Plaintiff and the members of the Ohio Sub-Class whole, because GM has failed and/or has refused to adequately provide the promised remedies, i.e. a permanent repair, within a reasonable time.

664. Ohio Plaintiff were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Valve Train Defect from the complaints and service requests it received from Class Members, including those formal complaints submitted to NHTSA, and through other internal sources.

665. Nonetheless, Ohio Plaintiff and members of the Ohio Sub-Class provided notice to GM of the breach of express warranties when they took their vehicles to GM-authorized providers of warranty repairs. Ohio Plaintiff also provided notice to GM of its breach of express warranty by letter dated November 19, 2021.

666. As a result of GM's breach of the applicable express warranties, owners and/or lessees of the Class Vehicles suffered, and continue to suffer, an ascertainable loss of money, property, and/or value of their Class Vehicles.

667. As a direct and proximate result of Defendant's breach of express warranties, Ohio Plaintiff and members of the Ohio Sub-Class have been damaged in an amount to be determined at trial.

668. As a result of GM's breach of the express warranty, Ohio Plaintiff and Ohio Sub-Class Members are entitled to legal and equitable relief against GM, including actual damages, specific performance, attorney's fees, costs of suit, and other relief as appropriate.

## COUNT XXI
### Breach of the Implied Warranty of Merchantability
### Ohio Rev. Code Ann. §§ 1302.27 AND 1310.19.
#### (On Behalf of the Ohio Sub-Class against Defendant)

669.   Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 298 above as if fully set forth herein.

670.   Ohio Plaintiff brings this count on behalf of himself and the Ohio Sub-Class against Defendant.

671.   GM is and was at all relevant times a "merchant" with respect to motor vehicles under Ohio Rev. Code Ann. §§ 1302.01(5) and 1310.01(A)(20), and a "seller" of motor vehicles under § 1302.01(4).

672.   With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Ohio Rev. Code Ann. § 1310.01(A)(20).

673.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Ohio Rev. Code Ann. §§ 1302.01(8) and 1310.01(A)(8).

674.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Ohio Rev. Code Ann. §§ 1302.27 and 1310.19.

675.   GM knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. GM directly sold and marketed Class Vehicles to customers through authorized dealers, like those from whom Ohio Plaintiff and members of the Ohio Sub-Class bought or leased their vehicles, for the intended

purpose of consumers purchasing the vehicles. GM knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Ohio Plaintiff and members of the Ohio Sub-Class, with no modification to the defective Class Vehicles.

676.    GM provided Ohio Plaintiff and members of the Ohio Sub-Class with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.  However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, inter alia, the Class Vehicles and their lifter suffered from an inherent defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

677.    This implied warranty included, among other things: (i) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold by GM were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

678.    Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles were and are defective at the time of sale

or lease and thereafter as more fully described above. GM knew of this defect at the time these sale or lease transactions occurred.

679.    As a result of GM's breach of the applicable implied warranties, Ohio Plaintiff and members of the Ohio Sub-Class suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Valve Train Defect, Ohio Plaintiff and members of the Ohio Sub-Class were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

680.    GM's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

681.    Ohio Plaintiff and members of the Ohio Sub-Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

682.    Ohio Plaintiff and members of the Ohio Sub-Class have had sufficient direct dealings with either GM or its agents (i.e., dealerships and technical support) to establish privity of contract between GM, on one hand, and Ohio Plaintiff and members of the Ohio Sub-Class on the other hand.  Nonetheless, privity is not required here because Ohio Plaintiff and members of the Ohio Sub-Class are intended third-party beneficiaries of contracts between GM and its distributors and dealers, and specifically, of GM's express warranties, including the NVLW, the

Powertrain Warranties, and any warranties provided with certified pre-owned vehicles.  The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

683.   Ohio Plaintiff and members of the Ohio Sub-Class were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of warranty would have been futile. GM was also on notice of the Valve Train Defect from the complaints and service requests it received from Ohio Plaintiff and the Class Members and through other internal sources.

684.   Nonetheless, Ohio Plaintiff and members of the Ohio Sub-Class provided notice to GM of the breach of express warranties when they took their vehicles to GM-authorized providers of warranty repairs.  Ohio Plaintiff also provided notice to GM of its breach of express warranty by letter dated November 19, 2021.

685.   As a direct and proximate cause of GM's breach, Ohio Plaintiff and members of the Ohio Sub-Class suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Ohio Plaintiff and members of the Ohio Sub-Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

686.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Ohio Plaintiff and members of the Ohio Sub-Class have been damaged in an amount to be proven at trial.

## COUNT XXII
### Violations of the Ohio Consumer Sales Practices Act
### Ohio Rev. Code Ann. § 1345.01, *et seq*.
### (On Behalf of the Ohio Sub-Class against Defendant)

687.   Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 298 above as if fully set forth herein.

688.   Ohio Plaintiff brings this cause of action on behalf of himself and on behalf of the members of the Ohio Sub-Class.

689.   Ohio Plaintiff and members of the Ohio Sub-Class are "consumers" as defined by the Ohio Consumer Sales Practices Act, Ohio Rev. Code Ann. § 1345.01 ("Ohio CSPA").

690.   GM is a "supplier" as defined by the Ohio CSPA.

691.   Ohio Plaintiff's and the Ohio Sub-Class Members' purchases or leases of Class Vehicles were "consumer transactions" as defined by the Ohio CSPA.

692.   The Ohio CSPA, Ohio Rev. Code Ann. § 1345.02, broadly prohibits "an unconscionable act or practice in connection with a consumer transaction." Specifically, and without limitation of the broad prohibition, the Act prohibits suppliers from representing "(1) That the subject of a consumer transaction has sponsorship, approval, performance characteristics, accessories, uses, or benefits

that it does not have; [and] (2) That the subject of a consumer transaction is of a particular standard, quality, grade, style, prescription, or model, if it is not." Ohio Rev. Code Ann. § 1345.02. GM engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated the Ohio CSPA.

693.   GM participated in unfair or deceptive trade practices that violated the Ohio CSPA.  As described below and alleged throughout the Complaint, by failing to disclose the Valve Train Defect, by concealing the Valve Train Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, GM knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. GM systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Valve Train Defect in the course of its business.

694.   GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

695.   GM's unfair and deceptive acts or practices occurred repeatedly in GM's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

696.  GM knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

697.  GM knew or should have known that its conduct violated the Ohio CSPA.

698.  Defendant was under a duty to Ohio Plaintiff and the Ohio Sub-Class Members to disclose the defective nature of the Class Vehicles because:

    a.    Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

    b.    Defendant made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

    c.    Defendant actively concealed the defective nature of the Class Vehicles from Ohio Plaintiff and the Ohio Sub-Class Members at the time of sale and thereafter.

699.  By failing to disclose the Valve Train Defect, Defendant knowingly and intentionally concealed material facts and breached its duty not to do so.

700.  The facts concealed or not disclosed by Defendant to Ohio Plaintiff and the Ohio Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendant's Class Vehicles, or to pay less for them. Whether a vehicle's lifter,

rocker arm, and/or valve spring is defective, which can cause stalling, losing power while driving, and hesitation, is a material safety concern. Had Ohio Plaintiff and the Ohio Sub-Class Members known that the Class Vehicles suffered from the Valve Train Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

701.   Ohio Plaintiff and the Ohio Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Valve Train Defect. That is the reasonable and objective consumer expectation for vehicles.

702.   As a result of Defendant's misconduct, Ohio Plaintiff and the Ohio Sub-Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

703.   As a direct and proximate result of Defendant's unfair or deceptive acts or practices, Ohio Plaintiff and the Ohio Sub-Class Members have suffered and will continue to suffer actual damages.

704.   GM's violations present a continuing risk to Ohio Plaintiffs and the Ohio Sub-Class Members as well as to the general public.  GM's unlawful acts and practices complained of herein affect the public interest.

705.   Ohio Plaintiff provided notice of his claims by letter dated November 19, 2021.

706.   Ohio Plaintiff and members of the Ohio Sub-Class seek actual damages, plus an amount not exceeding $5,000 in noneconomic damages, an order enjoining

GM's deceptive and unfair conduct, court costs and attorneys' fees as a result of Defendant's violations of the Ohio CSPA as provided in Ohio Rev. Code Ann. § 1345.09.

**Claims on Behalf of the Texas Sub-Class**

<u>COUNT XXIII</u>
**Breach of Express Warranty**
**Tex. Bus. & Com. Code §§ 2.313 AND 2A.210**
**(On Behalf of the Texas Sub-Class against Defendant)**

707. Plaintiffs repeat and re-allege each and every allegation contained above in paragraphs 1 through 298 above as if fully set forth herein.

708. Plaintiffs Ronald and Marilyn Jett ("Texas Plaintiffs") bring this count on behalf of themselves and the Texas Sub-Class against Defendant.

709. GM is and was at all relevant times a "merchant" with respect to motor vehicles under Texas Bus. & Com. Code §§ 2.104(1) and 2A.103(a)(20), and a "seller" of motor vehicles under § 2.103(a)(4).

710. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Texas Bus. & Com. Code § 2A.103(a)(16).

711. The Class Vehicles are and were at all relevant times "goods" within the meaning of Texas Bus. & Com. Code §§ 2.105(a) and 2A.103(a)(8).

712. The valve train systems were manufactured and/or installed in the Class Vehicles by Defendant and are covered by the express warranty.

713. Defendant provided all purchasers and lessees of the Class Vehicles with an express warranty described herein, which became a material part of the bargain. Accordingly, GM's express warranty is an express warranty under Texas state law.

714. In a section entitled "What is Covered," Defendant's express warranty (or New Vehicle Limited Warranty ("NVLW")) provides in relevant part that "[t]he warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." The warranty further provides that "[w]arranty repairs, including, including towing, parts, and labor, will be made at no charge" and "[t]o obtain warranty repairs, take the vehicle to a Chevrolet dealer facility within the warranty period and request the needed repairs."

715. According to GM, the "Bumper-to-Bumper Coverage is for the first 3 years or 36,000 miles, whichever comes first."

716. Defendant's NVLW and other warranties regarding the Class Vehicles formed a basis of the bargain that was breached when Texas Plaintiffs and members of the Texas Sub-Class purchased or leased the Class Vehicles with the defective lifter and/or related components.

717. Texas Plaintiffs and members of the Texas Sub-Class experienced defects within the warranty period. Despite the existence of the NVLW, Defendant failed to inform Texas Plaintiffs and members of the Texas Sub-Class that the Class

Vehicles were equipped with defective lifters and related components. When providing repairs under the express warranty, these repairs were ineffective and incomplete and did not provide a permanent repair for the Valve Train Defect.

718. GM breached the express warranty through the acts and omissions described above, including by promising to repair or adjust defects in materials or workmanship of any part supplied by Defendant and then failing to do so. Defendant has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles materials and workmanship defects.

719. Texas Plaintiffs and members of the Texas Sub-Class have had sufficient direct dealings with either GM or its agents (i.e., dealerships and technical support) to establish privity of contract between GM, on one hand, and Texas Plaintiff and each member of the Texas Sub-Class on the other hand. Nonetheless, privity is not required here because Texas Plaintiffs and members of the Texas Sub-Class are intended third-party beneficiaries of contracts between GM and its distributors and dealers, and specifically, of GM's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

720. Any attempt by GM to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here. Specifically, the warranty limitation is unenforceable because GM knowingly sold or leased defective products without informing consumers about the Valve Train Defect. The time limits are unconscionable and inadequate to protect Texas Plaintiffs and the members of the Texas Sub-Class. Among other things, Texas Plaintiffs and members of the Texas Sub-Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by GM and unreasonable favored GM. A gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Valve Train Defect existed between GM and members of the Texas Sub-Class.

721. Further, the limited warranty promising to repair and/or correct a manufacturing or workmanship defect fails of its essential purpose because the contractual remedy is insufficient to make Texas Plaintiffs and the members of the Texas Sub-Class whole, because GM has failed and/or has refused to adequately provide the promised remedies, i.e. a permanent repair, within a reasonable time.

722. Texas Plaintiffs were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Valve Train Defect from the complaints and service requests it received from Class Members, including those formal complaints submitted to NHTSA, and through other internal sources.

723.   Nonetheless, Texas Plaintiffs and members of the Texas Sub-Class provided notice to GM of the breach of express warranties when they took their vehicles to GM-authorized providers of warranty repairs.   Texas Plaintiffs also provided notice to GM of its breach of express warranty by letter dated November 8, 2021.

724.   As a result of GM's breach of the applicable express warranties, owners and/or lessees of the Class Vehicles suffered, and continue to suffer, an ascertainable loss of money, property, and/or value of their Class Vehicles.

725.   As a direct and proximate result of Defendant's breach of express warranties, Texas Plaintiffs and members of the Texas Sub-Class have been damaged in an amount to be determined at trial.

726.   As a result of GM's breach of the express warranty, Texas Plaintiffs and Texas Sub-Class Members are entitled to legal and equitable relief against GM, including actual damages, specific performance, attorney's fees, costs of suit, and other relief as appropriate.

## COUNT XXIV
### Breach of the Implied Warranty of Merchantability
### Tex. Bus. & Com. Code §§ 2.314 AND 2A.212
### (On Behalf of the Texas Sub-Class against Defendant)

727.   Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 298 above as if fully set forth herein.

728.   Texas Plaintiffs brings this count on behalf of themselves and the Texas Sub-Class against Defendant.

729.   GM is and was at all relevant times a "merchant" with respect to motor vehicles under Texas Bus. & Com. Code §§ 2.104(1) and 2A.103(a)(20), and a "seller" of motor vehicles under § 2.103(a)(4).

730.   With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Texas Bus. & Com. Code § 2A.103(a)(16).

731.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Texas Bus. & Com. Code §§ 2.105(a) and 2A.103(a)(8).

732.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Texas Bus. & Com. Code §§ 2.314 and 2A.212.

733.   GM knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. GM directly sold and marketed Class Vehicles to customers through authorized dealers, like those from whom Texas Plaintiffs and members of the Texas Sub-Class bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. GM knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Texas Plaintiffs and members of the Texas Sub-Class, with no modification to the defective Class Vehicles.

734.   GM provided Texas Plaintiffs and members of the Texas Sub-Class with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.  However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, inter alia, the Class Vehicles and their lifter suffered from an inherent defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

735.   This implied warranty included, among other things: (i) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold by GM were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

736.   Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles were and are defective at the time of sale or lease and thereafter as more fully described above. GM knew of this defect at the time these sale or lease transactions occurred.

737.   As a result of GM's breach of the applicable implied warranties, Texas Plaintiffs and members of the Texas Sub-Class suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of

the Valve Train Defect, Texas Plaintiffs and members of the Texas Sub-Class were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

738.  GM's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

739.  Texas Plaintiffs and members of the Texas Sub-Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

740.  Texas Plaintiffs and members of the Texas Sub-Class have had sufficient direct dealings with either GM or its agents (i.e., dealerships and technical support) to establish privity of contract between GM, on one hand, and Texas Plaintiffs and members of the Texas Sub-Class on the other hand.  Nonetheless, privity is not required here because Texas Plaintiffs and members of the Texas Sub-Class are intended third-party beneficiaries of contracts between GM and its distributors and dealers, and specifically, of GM's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles.  The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

741.   Texas Plaintiffs and members of the Texas Sub-Class were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of warranty would have been futile. GM was also on notice of the Valve Train Defect from the complaints and service requests it received from Texas Plaintiffs and the Class Members and through other internal sources.

742.   Nonetheless, Texas Plaintiffs and members of the Texas Sub-Class provided notice to GM of the breach of express warranties when they took their vehicles to GM-authorized providers of warranty repairs.  Texas Plaintiffs also provided notice to GM of its breach of express warranty by letter dated November 8, 2021.

743.   As a direct and proximate cause of GM's breach, Texas Plaintiffs and members of the Texas Sub-Class suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Texas Plaintiffs and members of the Texas Sub-Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

744.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Texas Plaintiffs and members of the Texas Sub-Class have been damaged in an amount to be proven at trial.

## COUNT XXV
### Violations of the Texas Deceptive Trade Practices Act –
### Consumer Protection Act,
### Texas Bus. & Com. Code § 17.41, *et seq*.
### (On Behalf of the Texas Sub-Class against Defendant)

745.   Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 298 above as if fully set forth herein.

746.   Texas Plaintiffs bring this cause of action on behalf of themselves and on behalf of the members of the Texas Sub-Class.

747.   GM is a "person" as that term is defined in Tex. Bus. & Com. Code § 17.45(3).

748.   Texas Plaintiffs and the members of the Texas Sub-Class are individuals, partnerships, or corporations with assets of less than $25 million (or are controlled by corporations or entities with less than $25 million in assets), see Tex. Bus. & Com. Code § 17.41, and are therefore "consumers" pursuant to Tex. Bus. & Com. Code § 17.45(4).

749.   GM is engaged in "trade" or "commerce" or "consumer transactions" within the meaning Tex. Bus. & Com. Code § 17.46(a).

750.   The Texas Deceptive Trade Practices – Consumer Protection Act ("Texas DTPA") prohibits "false, misleading, or deceptive acts or practices in the conduct of any trade or commerce," Tex. Bus. & Com. Code § 17.46(a), and an "unconscionable action or course of action," which means "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability,

experience, or capacity of the consumer to a grossly unfair degree." Tex. Bus. & Com. Code §§ 17.45(5) and 17.50(a)(3). GM engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated the Texas DTPA.

751.   GM participated in unfair or deceptive trade practices that violated the Texas DTPA.  As described below and alleged throughout the Complaint, by failing to disclose the Valve Train Defect, by concealing the Valve Train Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, GM knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. GM systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Valve Train Defect in the course of its business.

752.   GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

753.   GM's unfair and deceptive acts or practices occurred repeatedly in GM's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

754. GM knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

755. GM knew or should have known that its conduct violated the Texas DTPA.

756. Defendant was under a duty to Texas Plaintiff and the Texas Sub-Class Members to disclose the defective nature of the Class Vehicles because:

      a.    Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

      b.    Defendant made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

      c.    Defendant actively concealed the defective nature of the Class Vehicles from Texas Plaintiff and the Texas Sub-Class Members at the time of sale and thereafter.

757. By failing to disclose the Valve Train Defect, Defendant knowingly and intentionally concealed material facts and breached its duty not to do so.

758. The facts concealed or not disclosed by Defendant to Texas Plaintiffs and the Texas Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendant's Class Vehicles, or to pay less for them. Whether a vehicle's lifter,

rocker arm, and/or valve spring is defective, which can cause stalling, losing power while driving, and hesitation, is a material safety concern. Had Texas Plaintiffs and the Texas Sub-Class Members known that the Class Vehicles suffered from the Valve Train Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

759. Texas Plaintiffs and the Texas Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Valve Train Defect. That is the reasonable and objective consumer expectation for vehicles.

760. As a result of Defendant's misconduct, Texas Plaintiffs and the Texas Sub-Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

761. As a direct and proximate result of Defendant's unfair or deceptive acts or practices, Texas Plaintiffs and the Texas Sub-Class Members have suffered and will continue to suffer actual damages.

762. GM's violations present a continuing risk to Texas Plaintiffs and the Texas Sub-Class Members as well as to the general public. GM's unlawful acts and practices complained of herein affect the public interest.

763. Texas Plaintiff provided notice of his claims by letter dated November 8, 2021.

764. Pursuant to Tex. Bus. & Com. Code § 17.50, Texas Plaintiffs and members of the Texas Sub-Class seek an order enjoining VW from engaging in

unfair and/or deceptive acts or practices, damages, multiple damages for knowing and intentional violations, pursuant to § 17.50(b)(1), punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Texas DTPA.

**Claims on Behalf of the Washington Sub-Class**

<u>COUNT XXVI</u>
**Breach of Express Warranty**
**Wash. Rev. Code §§ 62A.2-313 AND 62A.2A-210**
**(On Behalf of the Washington Sub-Class against Defendant)**

765.   Plaintiffs repeat and re-allege each and every allegation contained above in paragraphs 1 through 298 above as if fully set forth herein.

766.   Plaintiff Rebecca Prosser ("Washington Plaintiff") brings this count on behalf of herself and the Washington Sub-Class against Defendant.

767.   GM is and was at all relevant times a "merchant" with respect to motor vehicles under Wash. Rev. Code §§ 62A.2-104(1) and 62A.2A-103(1)(t), and a "seller" of motor vehicles under § 2.103(a)(4).

768.   With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Wash. Rev. Code § 62A.2A-103(1)(p).

769.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Wash. Rev. Code §§ 62A.2-105(1) and 62A.2A-103(1)(h).

770.   The valve train systems were manufactured and/or installed in the Class Vehicles by Defendant and are covered by the express warranty.

771.   Defendant provided all purchasers and lessees of the Class Vehicles with an express warranty described herein, which became a material part of the bargain. Accordingly, GM's express warranty is an express warranty under Washington state law.

772.   In a section entitled "What is Covered," Defendant's express warranty (or New Vehicle Limited Warranty ("NVLW")) provides in relevant part that "[t]he warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." The warranty further provides that "[w]arranty repairs, including, including towing, parts, and labor, will be made at no charge" and "[t]o obtain warranty repairs, take the vehicle to a Chevrolet dealer facility within the warranty period and request the needed repairs."

773.   According to GM, the "Bumper-to-Bumper Coverage is for the first 3 years or 36,000 miles, whichever comes first," if not longer.

774.   Defendant's NVLW and other warranties regarding the Class Vehicles formed a basis of the bargain that was breached when Washington Plaintiff and members of the Washington Sub-Class purchased or leased the Class Vehicles with the defective lifter and/or related components.

775.   Washington Plaintiff and members of the Washington Sub-Class experienced defects within the warranty period. Despite the existence of the NVLW, Defendant failed to inform Washington Plaintiff and members of the Washington

Sub-Class that the Class Vehicles were equipped with defective lifters and related components. When providing repairs under the express warranty, these repairs were ineffective and incomplete and did not provide a permanent repair for the Valve Train Defect.

776.   GM breached the express warranty through the acts and omissions described above, including by promising to repair or adjust defects in materials or workmanship of any part supplied by Defendant and then failing to do so. Defendant has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles materials and workmanship defects.

777.   Washington Plaintiff and members of the Washington Sub-Class have had sufficient direct dealings with either GM or its agents (i.e., dealerships and technical support) to establish privity of contract between GM, on one hand, and Washington Plaintiff and each member of the Washington Sub-Class on the other hand. Nonetheless, privity is not required here because Washington Plaintiff and members of the Washington Sub-Class are intended third-party beneficiaries of contracts between GM and its distributors and dealers, and specifically, of GM's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

778.   Any attempt by GM to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here.  Specifically, the warranty limitation is unenforceable because GM knowingly sold or leased defective products without informing consumers about the Valve Train Defect.  The time limits are unconscionable and inadequate to protect Washington Plaintiff and the members of the Washington Sub-Class.  Among other things, Washington Plaintiff and members of the Washington Sub-Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by GM and unreasonable favored GM. A gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Valve Train Defect existed between GM and members of the Washington Sub-Class.

779.   Further, the limited warranty promising to repair and/or correct a manufacturing or workmanship defect fails of its essential purpose because the contractual remedy is insufficient to make Washington Plaintiff and the members of the Washington Sub-Class whole, because GM has failed and/or has refused to adequately provide the promised remedies, i.e., a permanent repair, within a reasonable time.

780.   Washington Plaintiff were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Valve Train Defect

from the complaints and service requests it received from Class Members, including those formal complaints submitted to NHTSA, and through other internal sources.

781.    Nonetheless, Washington Plaintiff and members of the Washington Sub-Class provided notice to GM of the breach of express warranties when they took their vehicles to GM-authorized providers of warranty repairs.

782.    As a result of GM's breach of the applicable express warranties, owners and/or lessees of the Class Vehicles suffered, and continue to suffer, an ascertainable loss of money, property, and/or value of their Class Vehicles.

783.    As a direct and proximate result of Defendant's breach of express warranties, Washington Plaintiff and members of the Washington Sub-Class have been damaged in an amount to be determined at trial.

784.    As a result of GM's breach of the express warranty, Washington Plaintiff and Washington Sub-Class Members are entitled to legal and equitable relief against GM, including actual damages, specific performance, attorney's fees, costs of suit, and other relief as appropriate.

## COUNT XXVII
### Breach of the Implied Warranty of Merchantability
### Wash. Rev. Code §§ 62A.2-314 AND 62A.2A-212
### (On Behalf of the Washington Sub-Class against Defendant)

785.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 298 above as if fully set forth herein.

786.    Washington Plaintiff brings this count on behalf of herself and the Washington Sub-Class against Defendant.

787.    GM is and was at all relevant times a "merchant" with respect to motor vehicles under Wash. Rev. Code §§ 62A.2-104(1) and 62A.2A-103(1)(t), and a "seller" of motor vehicles under § 2.103(a)(4).

788.    With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Wash. Rev. Code § 62A.2A-103(1)(p).

789.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Wash. Rev. Code §§ 62A.2-105(1) and 62A.2A-103(1)(h).

790.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Wash. Rev. Code §§ 62A.2-314 and 62A.2A-212.

791.    GM knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. GM directly sold and marketed Class Vehicles to customers through authorized dealers, like those from whom Washington Plaintiff and members of the Washington Sub-Class bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. GM knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Washington Plaintiff and members of the Washington Sub-Class, with no modification to the defective Class Vehicles.

792.    GM provided Washington Plaintiff and members of the Washington Sub-Class with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.  However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, inter alia, the Class Vehicles and their lifter suffered from an inherent defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

793.    This implied warranty included, among other things: (i) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold by GM were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

794.    Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles were and are defective at the time of sale or lease and thereafter as more fully described above. GM knew of this defect at the time these sale or lease transactions occurred.

795.    As a result of GM's breach of the applicable implied warranties, Washington Plaintiff and members of the Washington Sub-Class suffered an ascertainable loss of money, property, and/or value of their Class Vehicles.

Additionally, as a result of the Valve Train Defect, Washington Plaintiff and members of the Washington Sub-Class were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

796.   GM's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

797.   Washington Plaintiff and members of the Washington Sub-Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

798.   Washington Plaintiff and members of the Washington Sub-Class have had sufficient direct dealings with either GM or its agents (i.e., dealerships and technical support) to establish privity of contract between GM, on one hand, and Washington Plaintiff and members of the Washington Sub-Class on the other hand. Nonetheless, privity is not required here because Washington Plaintiff and members of the Washington Sub-Class are intended third-party beneficiaries of contracts between GM and its distributors and dealers, and specifically, of GM's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty

agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

799.  Washington Plaintiff and members of the Washington Sub-Class were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of warranty would have been futile. GM was also on notice of the Valve Train Defect from the complaints and service requests it received from Washington Plaintiff and the Class Members and through other internal sources.

800.  Nonetheless, Washington Plaintiff and members of the Washington Sub-Class provided notice to GM of the breach of express warranties when they took their vehicles to GM-authorized providers of warranty repairs.

801.  As a direct and proximate cause of GM's breach, Washington Plaintiff and members of the Washington Sub-Class suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Washington Plaintiff and members of the Washington Sub-Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

802.  As a direct and proximate result of GM's breach of the implied warranty of merchantability, Washington Plaintiff and members of the Washington Sub-Class have been damaged in an amount to be proven at trial.

**COUNT XXVIII**
**Violations of the Washington Consumer Protection Act**
**Wash Rev. Code § 19.86.010, *et seq*.**
**(On Behalf of the Washington Sub-Class against Defendant)**

803.   Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 298 above as if fully set forth herein.

804.   Washington Plaintiff brings this cause of action on behalf of herself and on behalf of the members of the Washington Sub-Class.

805.   Washington Plaintiff, members of the Washington Sub-Class, and GM are "persons" within the meaning of Wash. Rev. Code § 19.86.010(2).

806.   The Washington Consumer Protection Act ("Washington CPA") broadly prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Wash. Rev. Code § 19.86.020. GM engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated the Washington CPA.

807.   GM participated in unfair or deceptive trade practices that violated the Washington CPA.  As described below and alleged throughout the Complaint, by failing to disclose the Valve Train Defect, by concealing the Valve Train Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, GM knowingly and intentionally misrepresented and omitted material facts in connection with the sale

or lease of the Class Vehicles. GM systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Valve Train Defect in the course of its business.

808.   GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

809.   GM's unfair and deceptive acts or practices occurred repeatedly in GM's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

810.   GM knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

811.   GM knew or should have known that its conduct violated the Washington CPA.

812.   Defendant was under a duty to Washington Plaintiff and the Washington Sub-Class Members to disclose the defective nature of the Class Vehicles because:

     a.   Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

     b.   Defendant made partial disclosures about the quality of the Class

Vehicles without revealing the defective nature of the Class Vehicles; and

c.      Defendant actively concealed the defective nature of the Class Vehicles from Washington Plaintiff and the Washington Sub-Class Members at the time of sale and thereafter.

813.   By failing to disclose the Valve Train Defect, Defendant knowingly and intentionally concealed material facts and breached its duty not to do so.

814.   The facts concealed or not disclosed by Defendant to Washington Plaintiff and the Washington Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendant's Class Vehicles, or to pay less for them. Whether a vehicle's lifter, rocker arm, and/or valve spring is defective, which can cause stalling, losing power while driving, and hesitation, is a material safety concern. Had Washington Plaintiff and the Washington Sub-Class Members known that the Class Vehicles suffered from the Valve Train Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

815.   Washington Plaintiff and the Washington Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Valve Train Defect. That is the reasonable and objective consumer expectation for vehicles.

816.   As a result of Defendant's misconduct, Washington Plaintiff and the Washington Sub-Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

817.   As a direct and proximate result of Defendant's unfair or deceptive acts or practices, Washington Plaintiff and the Washington Sub-Class Members have suffered and will continue to suffer actual damages.

818.   GM's violations present a continuing risk to Washington Plaintiffs and the Washington Sub-Class Members as well as to the general public.  GM's unlawful acts and practices complained of herein affect the public interest.

819.   GM is liable to Washington Plaintiff and the Washington Sub-Class for damages in amounts to be proven at trial, including punitive damages, attorneys' fees, costs, and any other remedies the Court may deem appropriate under Wash. Rev. Code § 19.86.090. Because GM's actions were willful and knowing, Plaintiffs' damages should be trebled.

## **PRAYER FOR RELIEF**

820.   Plaintiffs, individually and on behalf of all others similarly situated, request the Court enter judgment against Defendant, as follows:

> (a)   An order certifying the proposed Class, designating Plaintiffs as named representative of the Classes, and designating the undersigned as Class Counsel;

(b)    A declaration that Defendant is financially responsible for notifying all Class Members about the defective nature of the starter and/or the heat shielding, including the need for periodic maintenance;

(c)    An order enjoining Defendant from further deceptive distribution, sales, and lease practices with respect to Class Vehicles; compelling Defendant to issue a voluntary recall for the Class Vehicles pursuant to 49 U.S.C. § 30118(a); compelling Defendant to remove, repair, and/or replace the Class Vehicles' defective starter with suitable alternative product(s) that do not contain the defects alleged herein; enjoining Defendant from selling the Class Vehicles with the misleading information; and/or compelling Defendant to reform its warranty, in a manner deemed to be appropriate by the Court, to cover the injury alleged and to notify all Class Members that such warranty has been reformed;

(d)    An award to Plaintiffs and the Class for compensatory, exemplary, and statutory damages, including interest, in an amount to be proven at trial;

(e)    Any and all remedies provided pursuant to the Magnuson-Moss Warranty Act;

(f)    Any and all remedies provided pursuant to the causes of action and statutes alleged herein;

(g)    A declaration that Defendant must disgorge, for the benefit of the Class, all or part of the ill-gotten profits it received from the sale or lease of its Class Vehicles or make full restitution to Plaintiffs and Class Members;

(h)    An award of attorneys' fees and costs, as allowed by law;

(i)    An award of pre-judgment and post-judgment interest, as provided by law;

(j)    Leave to amend the Complaint to conform to the evidence produced at trial; and

(k)    Such other relief as may be appropriate under the circumstances.

## **DEMAND FOR JURY TRIAL**

821.  Plaintiffs hereby demand a trial by jury of all issues in this action so triable.

Dated:  December 15, 2021      Respectfully submitted,

By:*/s/ E. Powell Miller*
E. Powell Miller (P39487)
Sharon S. Almonrode (P33938)
Dennis A. Lienhardt (P81118)
**THE MILLER LAW FIRM, P.C.**
950 West University Drive, Suite 300
Rochester, MI 48307
Tel: (248) 841-2200
Fax: (248) 652-2852

epm@millerlawpc.com
ssa@millerlawpc.com
dal@millerlawpc.com

**BERGER MONTAGUE PC**
Russell D. Paul
Abigail Gertner
Amey J. Park
Natalie Lesser
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel.:   (215) 875-3000
Fax:   (215) 875-4604
rpaul@bm.net
agertner@bm.net
apark@bm.net
nlesser@bm.net

**CAPSTONE LAW APC**
Tarek H. Zohdy
Cody R. Padgett
Laura E. Goolsby
1875 Century Park East, Suite 1000
Los Angeles, California 90067
Telephone:   (310) 556-4811
Facsimile:   (310) 943-0396
Tarek.Zohdy@capstonelawyers.com
Cody.Padgett@capstonelawyers.com
Laura.Goolsby@capstonelaywers.com

**GORDON & PARTNERS, P.A.**
Steven Calamusa
Geoffrey Stahl
4114 Northlake Blvd.,
Palm Beach Gardens, FL 33410
Telephone: (561) 799-5070
Facsimile: (561) 799-4050
scalamusa@fortheinjured.com
gstahl@fortheinjured.com