## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

DANNY HARRISON, JEREMIAH
JOHNSON, ROBIN AND TONY
REIDHAR, RUBEN SOLIS,
CHRISTOPHER MCCLAVE, BOBBY
CHESHIRE, MELISSA LUSTER,
STEPHANIE SPENO, NANCY
VELASQUEZ, JOEY BROWN, LEON
JORDAN, MICHAEL SCOTT,
TRENTON ACREE, RICHARD
ZEMBOL, JOSEPH ATTIA,
ALEXANDER AND NATALIYA
PURSHAGA, LISA SAFFELL, DANIEL
DEMAREST, PAUL MOURADJIAN,
RANDALL THORSON AND SALOME
RODRIGUEZ-THORSON, DAVE
CECCHINI, BRIAN HESS, JESSICA
MARTIN-WASSER, CHAD AND
ADRIA NICOLE LACY, MARK
HAYFORD, DANIEL PODOJIL, ADAM
IBRAHIM AND TYLER ELIZABETH
LAMBERTS, JENNIFER DEERY,
BRIAN AND TAMMY BURTON,
CHRISTOPHER DITTMAN, FORREST
HUDSON, RONALD AND MARILYN
JETT, RYAN FANCHER, AND
REBECCA PROSSER, individually and
on behalf of all others similarly situated,

        Plaintiffs,

   v.

GENERAL MOTORS LLC,

        Defendant.

Civil No. 2:21-cv-12927

Hon. Laurie J. Michelson

Magistrate Judge Anthony P. Patti

**PLAINTIFFS' FIRST
AMENDED CLASS ACTION
COMPLAINT AND DEMAND
FOR JURY TRIAL**

## TABLE OF CONTENTS

Introduction ................................................................................................. 1

The Parties .................................................................................................. 8

    Plaintiff Danny Harrison .......................................................................... 8

    Plaintiff Jeremiah Johnson ..................................................................... 13

    Plaintiffs Robin and Tony Reidhar ........................................................ 17

    Plaintiff Ruben Solis .............................................................................. 20

    Plaintiff Bobby Cheshire ....................................................................... 24

    Plaintiff Melissa Luster ......................................................................... 29

    Plaintiff Stephanie Speno ...................................................................... 33

    Plaintiff Nancy Velasquez ..................................................................... 39

    Plaintiff Joey Brown .............................................................................. 43

    Plaintiff Leon Jordan ............................................................................. 46

    Plaintiff Michael Scott .......................................................................... 53

    Plaintiff Trenton Acree .......................................................................... 57

    Plaintiff Richard Zembol ....................................................................... 60

    Plaintiff Joseph Attia ............................................................................. 64

    Plaintiffs Alexander and Nataliya Purshaga ......................................... 68

    Plaintiff Lisa Saffell .............................................................................. 72

    Plaintiff Daniel Demarest ...................................................................... 76

    Plaintiff Paul Mouradjian ...................................................................... 80

    Plaintiffs Randall Thorson and Salomé Rodriguez-Thorson ................. 83

    Plaintiff Dave Cecchini ......................................................................... 87

    Brian Hess and Jessica Martin-Wasser .................................................. 91

    Plaintiffs Chad and Adria Nicole Lacy ................................................. 94

    Plaintiff Mark Hayford .......................................................................... 98

Plaintiff Daniel Podojil ............................................................... 102

Plaintiffs Adam Ibrahim and Tyler Elizabeth Lamberts ........................... 106

Plaintiff Jennifer Deery ............................................................... 111

Plaintiffs Brian and Tammy Burton ................................................... 114

Plaintiff Chris Dittman ............................................................... 118

Plaintiff Forrest Hudson ............................................................. 122

Plaintiffs Ronald and Marilyn Jett .................................................. 126

Plaintiff Ryan Fancher ............................................................... 130

Plaintiff Rebecca Prosser ............................................................ 134

Defendant .......................................................................... 138

Jurisdiction and Venue .................................................................. 140

Factual Allegations...................................................................... 141

The Valve Train Defect ............................................................. 149

The Valve Train Defect Poses a Serious Safety Concern Not Discussed

in GM's Advertising ............................................................ 159

GM Had Superior and Exclusive Knowledge of the Valve Train Defect . 162

GM's Pre-Production Testing Revealed the Valve Train Defect ............. 164

Communications Issued to Authorized GM Dealerships Demonstrate

GM's Knowledge of the Defect ............................................... 166

Redesigned Parts of the Valve Train System ............................... 202

Customer Complaints to NHTSA ............................................. 204

Other Internal Sources of GM's Knowledge of the Valve Train Defect ... 205

Customer Complaints on Third-Party Websites ...................... 207

Tolling of the Statue of Limitations and Estoppel ............................... 223

The Agency Relationship Between GM and its Network of Authorized

Dealerships.................................................................. 224

Class Action Allegations .......................................................... 228

Causes of Action ................................................................................ 235

Count I ................................................................................................ 235

    Fraud by Omission or Fraudulent Concealment (On behalf of the
    Nationwide Class, or in the Alternative, on Behalf of all Sub-
    Classes against Defendant) ............................................................... 235

Count II .............................................................................................. 237

    Unjust Enrichment (On Behalf of the Class, or, in the Alternative, on
    Behalf of all Sub-Classes against Defendant) .................................. 237

Count III ............................................................................................. 239

    Violation of the Magnuson-Moss Warranty Act 15 U.S.C. § 2301 (On
    behalf of the Class, or in the Alternative, on Behalf of all Sub-
    Classes or Plaintiffs Individually against Defendant) ...................... 239

Count IV ............................................................................................. 243

    Breach of Express Warranty Ala. Code §§ 7-2-313 AND 7-2A-210 (On
    Behalf of the Alabama Sub-Class against Defendant) ..................... 243

Count V .............................................................................................. 247

    Breach of the Implied Warranty of Merchantability Ala. Code §§ 7-2-
    314 and 7-2A-212  (On Behalf of the Alabama Sub-Class against
    Defendant) ......................................................................................... 247

Count VI ............................................................................................. 251

    Breach of the Implied Warranty of Merchantability Alaska Stat. §§
    45.02.314 and 45.12.212 (On Behalf of the Alaska Sub-Class
    against Defendant) ............................................................................ 251

Count VII ............................................................................................ 255

    Breach of Express Warranty Ark. Code Ann. §§ 4-2-313 and 4-2A-210
    (On Behalf of the Arkansas Sub-Class against Defendant) .............. 255

Count VIII ........................................................................................... 260

Breach of the Implied Warranty of Merchantability Ark. Code Ann. §§ 4-2-313 and 4-2A-212  (On Behalf of the Arkansas Sub-Class against Defendant) ........................................................................... 260

Count IX ............................................................................................ 264

Violations of the Arkansas Deceptive Trade Practices Act  Ark. Code Ann. §§ 4-88-101, *et seq.* (On Behalf of the Arkansas Sub-Class against Defendant) ........................................................................... 264

Count X ............................................................................................. 268

Violation of California's Consumers Legal Remedies Act California Civil Code § 1750, *et seq.*  (On Behalf of the CLRA Sub-Class against Defendant) ........................................................................... 268

Count XI ............................................................................................ 273

Violation of California's Unfair Competition Law Cal. Bus. & Prof. Code § 17200, *et seq.* (On Behalf of the California Sub-Class against Defendant) ........................................................................... 273

Count XII ........................................................................................... 275

Breach of Express Warranty CAL. COM. CODE §§ 2313 and 10210 (On Behalf of the California Sub-Class against Defendant) ............. 275

Count XIII .......................................................................................... 280

Breach of the Implied Warranty of Merchantability Cal. Com. Code §§ 2314 and 10212 (On Behalf of the California Sub-Class against Defendant) ........................................................................................ 280

Count XIV .......................................................................................... 284

Breach of the Implied Warranty  Pursuant to Song-Beverly Consumer Warranty Act California Civil Code §§ 1792 and 1791.1, *et seq.* (On Behalf of the California Sub-Class against Defendant) ............. 284

Count XV ........................................................................................... 286

Breach of Express Warranty F.S.A. §§ 672.313 AND 680.21 (On
    Behalf of the Florida Sub-Class against Defendant) ........................ 286

Count XVI ................................................................................................ 290

Breach of the Implied Warranty of Merchantability F.S.A. §§ 672.314
    AND 680.212  (On Behalf of the Florida Sub-Class against
    Defendant) ...................................................................................... 290

Count XVII ............................................................................................... 294

Violations of the Florida Deceptive and Unfair Trade Practices Act
    F.S.A. §§ 501.201-.213 (On Behalf of the Florida Sub-Class
    against Defendant) .......................................................................... 294

Count XVIII .............................................................................................. 298

Breach of Express Warranty Ga. Code Ann. §§ 11-2-313 and 11-2A-
    210 (On Behalf of the Georgia Sub-Class against Defendant) .......... 298

Count XIX ................................................................................................ 302

Breach of the Implied Warranty of Merchantability Ga. Code Ann. §
    11-2-314 and 11-2A-212 (On Behalf of the Georgia Sub-Class
    against Defendant) .......................................................................... 302

Count XX .................................................................................................. 306

Violation of Georgia's Fair Business Practices Act, Ga. Code Ann. §
    10-1-390, *et seq.*  (On Behalf of the Georgia Sub-Class against
    Defendant) ...................................................................................... 306

Count XXI ................................................................................................ 310

Violation of the Georgia Uniform Deceptive Trade Practices Act, Ga.
    Code Ann. § 10-1-370, *et seq.* (On Behalf of the Georgia Sub-
    Class against Defendant) ................................................................. 310

Count XXII ............................................................................................... 314

Breach of Express Warranty IDAHO CODE §§ 28-2-313 AND 28-12-

210 (On Behalf of the Idaho Sub-Class against Defendant).............. 314

Count XXIII ................................................................................. 319

Breach of the Implied Warranty of Merchantability IDAHO CODE §§ 28-2-314 AND 28-12-212 (On Behalf of the Idaho Sub-Class against Defendant) ........................................................................... 319

Count XXIV ................................................................................ 323

Violations of the Idaho Consumer Protection Act  IDAHO CODE § 48-601, *et seq.*  (On Behalf of the Idaho Sub-Class against Defendant)........................................................................ 323

Count XXV ................................................................................. 327

Breach of Express Warranty 810 ILL. COMP. STAT. §§ 5/2-313 AND 5/2A-210 (On Behalf of the Illinois Sub-Class against Defendant) .. 327

Count XXVI ................................................................................ 331

Breach of the Implied Warranty of Merchantability 810 ILL. COMP. STAT. §§ 5/2-314 and 5/2A-212  (On Behalf of the Illinois Sub-Class against Defendant)................................................................. 331

Count XXVII................................................................................ 335

Violations of the Illinois Consumer Fraud and  Deceptive Business Practices Act  815 ILCS 505/1, *et seq.*  (On Behalf of the Illinois Sub-Class against Defendant) ........................................................ 335

Count XXVIII .............................................................................. 339

Breach of Express Warranty Md. Com. Law §§ 2-313 and 2A-210 (On Behalf of the Maryland Sub-Class against Defendant) .................... 339

Count XXIX ................................................................................ 344

Breach of the Implied Warranty of Merchantability Md. Com. Law §§ 2-314 and 2A-212  (On Behalf of the Maryland Sub-Class against Defendant)........................................................................ 344

Count XXX ................................................... 348

> Violations of the Maryland Consumer Protection Act, Md. Code Ann.,
> Com. Law § 13-101, *et seq.* (On Behalf of the Maryland Sub-
> Class against Defendant).................................. 348

Count XXXI ................................................. 352

> Breach of Express Warranty Mass. Gen. Laws ch. 106 §§ 2-313 and
> 2A-210 (On Behalf of the Massachusetts Sub-Class against
> Defendant).................................................. 352

Count XXXII ................................................ 357

> Breach of the Implied Warranty of Merchantability Mass. Gen. Laws
> ch. 106 §§ 2-314 and 2A-212  (On Behalf of the Massachusetts
> Sub-Class against Defendant) ............................ 357

Count XXXIII ............................................... 361

> Violations of the Massachusetts Consumer Protection Act, Mass. Gen.
> Laws 93A, § 1, *et seq.*  (On Behalf of the Massachusetts Sub-
> Class against Defendant).................................. 361

Count XXXIV ............................................... 365

> Breach of Express Warranty, Mo. Rev. Stat. § 400.2-313 AND §
> 400.2A-210)  (On Behalf of the Missouri Sub-Class against
> Defendant).................................................. 365

Count XXXV ................................................ 369

> Breach of the Implied Warranty of Merchantability, Mo. Rev. Stat. §
> 400.2-314 and § 400.2A-212  (On Behalf of the Missouri Sub-
> Class against Defendant).................................. 369

Count XXXVI ............................................... 373

> Violations of the Missouri Merchandising Practices Act, Mo. Rev. Stat.
> § 407.010, *et seq.*  (On Behalf of the Missouri Sub-Class against

Defendant) .................................................................................... 373

Count XXXVII ................................................................................... 377

    Breach of Express Warranty, Nev. Rev. Stat. §§ 104.2313 AND
    104A.2210  (On Behalf of the Nevada Sub-Class against
    Defendant) ................................................................................ 377

Count XXXVIII ................................................................................. 382

    Breach of the Implied Warranty of Merchantability, Nev. Rev. Stat. §§
    104.2314 AND 104A.2212  (On Behalf of the Nevada Sub-Class
    against Defendant) .................................................................... 382

Count XXXIX ................................................................................... 386

    Violations of the Nevada Deceptive Trade Practices Act, Nev. Rev.
    Stat. § 598.0903, *et seq.*  (On Behalf of the Nevada Sub-Class
    against Defendant) .................................................................... 386

Count XL ........................................................................................... 390

    Breach of Express Warranty, N.J. Stat. Ann. §§ 12A:2-313 and 2A-210
    (On Behalf of the New Jersey Sub-Class against Defendant) ........... 390

Count XLI .......................................................................................... 394

    Breach of the Implied Warranty of Merchantability, N.J. Stat. Ann. §§
    12A:2-314 and 2A-212 (On Behalf of the New Jersey Sub-Class
    against Defendant) .................................................................... 394

Count XLII ........................................................................................ 398

    Violation of the New Jersey Consumer Fraud Act, N.J. Stat. Ann. §§
    56:8-1, *et seq.*  (On Behalf of the New Jersey Sub-Class against
    Defendant) ................................................................................ 398

Count XLIII ....................................................................................... 402

    Breach of Express Warranty, N.M. Stat. Ann. § 55-2-313AND 55-2A-
    210  (On Behalf of the New Mexico Sub-Class against Defendant) . 402

Count XLIV ............................................................. 407

    Breach of the Implied Warranty of Merchantability, N.M. Stat. Ann. §§ 55-2-314 and 55-2A-212  (On Behalf of the New Mexico Sub-Class against Defendant) ................................................. 407

Count XLV ............................................................. 411

    Violations of the New Mexico Unfair Practices Act,  New Mexico Stat. Ann. § 57-12-1, *et seq*.  (On Behalf of the New Mexico Sub-Class against Defendant) ........................................................ 411

Count XLVI ............................................................. 415

    Breach of Express Warranty,  N.Y. U.C.C. §§ 2-314 AND 2A-210 (On Behalf of the New York Sub-Class against Defendant) ............. 415

Count XLVII ............................................................. 420

    Breach of the Implied Warranty of Merchantability,  N.Y. U.C.C. §§ 2-314 AND 2A-212  (On Behalf of the New York Sub-Class against Defendant) ................................................. 420

Count XLVIII ............................................................. 424

    Violations of the New York General Business Law § 349,  N.Y. GEN. BUS. LAW § 349  (On Behalf of the New York Sub-Class against Defendant) ................................................. 424

Count XLIX ............................................................. 428

    Violations of the New York General Business Law § 350,  N.Y. GEN. BUS. LAW § 350  (On Behalf of the New York Sub-Class against Defendant) ................................................. 428

Count L ............................................................. 433

    Breach of Express Warranty,  N.C. GEN. STAT. §§ 25-2-313 AND 252A-210 (On Behalf of the North Carolina Sub-Class against Defendant) ................................................. 433

Count LI ................................................................................. 437

    Breach of the Implied Warranty of Merchantability, N.C. GEN. STAT.

        §§ 25-2-314 and 252A-212  (On Behalf of the North Carolina

        Sub-Class against Defendant) ........................................... 437

Count LII ............................................................................... 442

    Violations of the North Carolina Unfair and Deceptive Acts and

        Practices Act, N.C. Gen. Stat. § 75-1.1, *et seq*.  (On Behalf of the

        North Carolina Sub-Class against Defendant) .................................. 442

Count LIII .............................................................................. 446

    Breach of Express Warranty, Ohio Rev. Code Ann. § 1302.26, *et seq.*

        (On Behalf of the Ohio Sub-Class against Defendant) ..................... 446

Count LIV .............................................................................. 450

    Breach of the Implied Warranty of Merchantability, Ohio Rev. Code

        Ann. §§ 1302.27 AND 1310.19  (On Behalf of the Ohio Sub-Class

        against Defendant) .......................................................... 450

Count LV ................................................................................ 454

    Violations of the Ohio Consumer Sales Practices Act,  Ohio Rev. Code

        Ann. § 1345.01, *et seq*.  (On Behalf of the Ohio Sub-Class against

        Defendant) .................................................................... 454

Count LVI .............................................................................. 458

    Breach of Express Warranty, OR. REV. STAT. §§ 72.3130 AND

        72A.2100  (On Behalf of the Oregon Sub-Class against

        Defendant) .................................................................... 458

Count LVII ............................................................................. 462

    Breach of the Implied Warranty of Merchantability, OR. REV. STAT.

        §§ 72.3140 AND 72A.2120  (On Behalf of the Oregon Sub-Class

        against Defendant) .......................................................... 462

Count LVIII ............................................................................ 466

Violations of the Oregon Consumer Protection Act, OR. REV. STAT. § 646.605, *et seq.* (On Behalf of the Oregon Sub-Class against Defendant) ................................................................ 466

Count LIX ............................................................................. 470

Breach of Express Warranty, 6A R.I. Gen. Laws Ann. §§ 6A-2-313 AND 7-2.1-210 (On Behalf of the Rhode Island Sub-Class against Defendant) ........................................................ 470

Count LX ............................................................................. 475

Breach of the Implied Warranty of Merchantability, 6A R.I. Gen. Laws Ann. §§ 6A-2-314 and 6A-2.1-212 (On Behalf of the Rhode Island Sub-Class against Defendant) ................................. 475

Count LXI ............................................................................. 479

Violations of the Rhode Island Unfair Trade Practice and Consumer Protection Act, 6 R.I. Gen. Laws §§ 6-13.1-1, *et seq.* (On Behalf of the Rhode Island Sub-Class against Defendant) ........................... 479

Count LXII ............................................................................ 483

Violations of the Rhode Island Regulation of Business Practices Among Motor Vehicle Manufacturers, Distributors, and Dealers, 31 R.I. Gen. Laws Ann. § 31-5.1-1, *et seq.* (On Behalf of the Rhode Island Sub-Class against Defendant) ...................................... 483

Count LXIII ........................................................................... 487

Breach of Express Warranty, TENN. CODE §§ 47-2-313 AND 47-2A-210 (On Behalf of the Tennessee Sub-Class against Defendant) ..... 487

Count LXIV ........................................................................... 492

Breach of the Implied Warranty of Merchantability, TENN. CODE §§ 47-2-314 AND 47-2A-212 (On Behalf of the Tennessee Sub-

Class against Defendant)................................................... 492

Count LXV ..................................................................... 496

Violations of the Tennessee Consumer Protection Act,  TENN. CODE
ANN. § 47-18-101, *et seq*.  (On Behalf of the Tennessee Sub-
Class against Defendant)................................................... 496

Count LXVI ..................................................................... 500

Breach of Express Warranty, Tex. Bus. & Com. Code §§ 2.313 AND
2A.210  (On Behalf of the Texas Sub-Class against Defendant) ...... 500

Count LXVII ..................................................................... 505

Breach of the Implied Warranty of Merchantability, Tex. Bus. & Com.
Code §§ 2.314 AND 2A.212   (On Behalf of the Texas Sub-Class
against Defendant) ........................................................... 505

Count LXVIII ..................................................................... 509

Violations of the Texas Deceptive Trade Practices Act –  Consumer
Protection Act,  Texas Bus. & Com. Code § 17.41, *et seq*. (On
Behalf of the Texas Sub-Class against Defendant) .......................... 509

Count LXIX ..................................................................... 513

Breach of Express Warranty, Wash. Rev. Code §§ 62A.2-313 AND
62A.2A-210  (On Behalf of the Washington Sub-Class against
Defendant).................................................................... 513

Count LXX ..................................................................... 517

Breach of the Implied Warranty of Merchantability,  Wash. Rev. Code
§§ 62A.2-314 AND 62A.2A-212  (On Behalf of the Washington
Sub-Class against Defendant) ............................................. 517

Count LXXI ..................................................................... 521

Violations of the Washington Consumer Protection Act,  Wash Rev.
Code § 19.86.010, *et seq*.  (On Behalf of the Washington Sub-

Class against Defendant)..................................................... 521

Prayer for Relief ................................................................. 525

Demand for Jury Trial ....................................................... 527

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiffs Danny Harrison, Jeremiah Johnson, Robin and Tony Reidhar, Ruben Solis, Christopher McClave, Bobby Cheshire, Melissa Luster, Stephanie Speno, Nancy Velasquez, Joey Brown, Leon Jordan, Michael Scott, Trenton Acree, Richard Zembol, Joseph Attia, Alexander and Nataliya Purshaga, Lisa Saffell, Daniel Demarest, Paul Mouradjian, Randall Thorson and Salomé Rodriguez-Thorson, Dave Cecchini, Brian Hess, Jessica Martin-Wasser, Chad and Adria Nicole Lacy, Mark Hayford, Daniel Podojil, Adam Ibrahim and Tyler Elizabeth Lamberts, Jennifer Deery, Brian and Tammy Burton, Christopher Dittman, Forrest Hudson, Ronald and Marilyn Jett, Ryan Fancher, and Rebecca Prosser ("Plaintiffs") bring this action for themselves and on behalf of all persons in the United States who purchased or leased any 2014 to 2021 Buick, Cadillac, Chevrolet, and GMC vehicle equipped with a 5.3L, 6.0L or 6.2L V8 engines ("Class Vehicles") designed, manufactured, marketed, distributed, sold, warranted, and/or serviced by General Motors LLC ("GM" or "Defendant").   In support thereof, plaintiffs state as follows:

## INTRODUCTION

1.     This is a consumer class action arising out of Defendant's failure to disclose – or omission of – material facts, including facts critical to safety, to the public and consumers purchasing its automobiles.

2.     General Motors LLC manufactured, marketed, distributed, and sold the Class Vehicles without disclosing that the Class Vehicles' valve train systems, including the Active Fuel Management lifters ("AFM Lifters"), were defective in design, workmanship and/or material. As set forth *supra,* the Class Vehicles are all 2014 to present Buick, Cadillac, Chevrolet, and GMC vehicles equipped with a 5.3L, 6.0L or 6.2L V8 engine.

3.     Discovery will show that a partial list of the vehicles equipped with these Generation 4 and Generation 5 engines includes the following models and model years: 2014-present Cadillac Escalade, 2016-2019 Cadillac CTS-V, certain 2014-present Chevrolet Silverado, certain 2014-2019 Chevrolet Corvette, 2014-2016 Chevrolet Avalanche, 2014-present Chevrolet Suburban, 2014-present Chevrolet Tahoe, 2016-present Chevrolet Camaro, 2014-present Chevrolet Camaro SS, 2014-2016 Chevrolet Corvette, certain 2014 to present GMC Sierra, 2014-present GMC Yukon and Yukon XL.

4.     The Class Vehicles are equipped with one of two GM proprietary valve train systems: either the Active Fuel Management system ("AFM") or the Dynamic Fuel Management ("DFM") system. Each system is comprised of software run by the Engine Control Module ("ECM"), specially designed and manufactured AFM lifters, and other valve train components, such as the valve lifter oil manifold ("VLOM").   The AFM controls eight of the lifters in the engine and the DFM

controls all sixteen of the lifters.  These valve train systems prevent certain valves within the engine's eight cylinders from opening at certain times, such as partial throttle and light engine load conditions during vehicle operation, which prevents air and fuel from entering the cylinder(s) chosen to be deactivated.  In the case of AFM, four of the cylinders will not receive fuel and air during deactivation; and in the case of DFM, any combination of the eight (8) cylinders will not receive fuel and air per the calibrated instructions of the ECM to deactivate cylinders.  The result is fuel and air necessary for combustion will not enter selected deactivated cylinders when the ECM determines that only partial engine power is needed, *i.e*., at highway cruising speeds, partial throttle which equate to light engine loads. Cylinder deactivation also reduces the energy the engine devotes to taking in air and fuel into the selected cylinder and expelling exhaust through the exhaust port and manifold.  The purpose of the AFM and DFM valve train systems is to reduce the fuel consumption of the vehicle's engine without reducing vehicle weight, frictional losses, the size of the engine, etc.

5.    However, the AFM and DFM valve train systems are defective and malfunction and fail as a result of design, manufacturing, material, and/or workmanship defects (the "Valve Train Defect" or "Defect").

6.    The AFM and DFM valve train systems are substantially similar, if not identical, in each of the Class Vehicles, and, therefore, suffer from the same Valve Train Defect, irrespective of engine displacement.

3

7.     Lifters that are used in AFM or DFM valve train systems (sometimes called "AFM Lifters" in both systems because they are the lifters in each system that are able to be activated and deactivated by each system) malfunction and prematurely fail, both within and outside of the warranty periods, which necessitates costly repairs and replacements.

8.     Discovery will show that the lifters fail because: (1) the AFM lifters (including the locking pin) do not conform to design specifications, are installed in an incorrect position in the lifter guide, and/or are made of sub-standard materials; (2) all the lifters are designed improperly because they fail to properly take into account the expansion and contraction rates of the lifters and the engine block; (3) the bores in which the lifters are inserted are designed and/or manufactured at widths that do not allow for the necessary clearance of the lifter to move freely, which damages the lifters; (4) in designing and/or manufacturing the lifters, GM failed to account for the amount of increased pressure to which the AFM lifters are exposed by the pressurized oil used to operate the lifters, causing them to fail prematurely; and (5) more maintenance of the valve train system is needed than is advised in GM's maintenance guides, including more frequent oil changes, engine flushing and cleaning, and/or replacing the VLOM and its filter at regular intervals.

9.     Moreover, other components of the valve train system, namely the valve springs and rocker arms, are also defective and have high rates of premature failure. Discovery will show that the valve springs and rocker arms fail prematurely

because the valve springs and rocker arms do not conform to design specifications and/or are made of sub-standard materials.

10.     Further, the ECM that controls the valve train system is not programmed and/or calibrated correctly, leading to mistimed valve train events that damage valve train system components and thus further contribute to the Valve Train Defect.

11.     When valve train components begin to fail, including lifters, rocker arms, and valve springs, the vehicle can lose power while being driven, hesitate, and the engine can misfire, stall, shudder, stutter, or surge.  One common symptom of the valve train system failure is a ticking noise emanating from the engine compartment, as well as other abnormal noises, including knocking, chirps, squeals, and squeaks.

12.     The Valve Train Defect can leave drivers and passengers in dangerous situations.  For example, the risk of a traffic collision is increased by the vehicles' stalling, losing power while driving, shaking and hesitation, especially when trying to merge or enter intersections. Similarly, if the Defect is unremedied for too long, the entire engine can be damaged, necessitating an expensive full engine replacement.

13.     When the Valve Train Defect manifests during the warranty period, GM authorizes its dealerships to merely replace the failed defective parts with the same, albeit new, defective components.  Further, these repairs are often incomplete

as many warranty repairs: 1) fail to replace all of the lifters and other affected supporting components of the AFM/DFM valve train system; and/or 2) fail to replace any other engine components damaged by the lifter's failure. As a result, either the Valve Train Defect manifests again, often outside the warranty period, or the engine damage caused by the Defect is left unrepaired leading to eventual engine failure. Class Members are then forced to personally suffer the costs to replace the lifters, rocker arms, valve springs, and other damaged components, including bearing the cost(s) of any repeat failures. Further, this ongoing damage to the engine eventually and inevitably leads to Class Vehicles requiring full engine replacements, well before the expected lifespan of the engine has elapsed.

14.     The Valve Train Defect is inherent in each Class Vehicle and was present at the time of sale.  The Engines in the Class Vehicles were designed to last at least 200,000 miles with proper maintenance, but the Valve Train Defect begins to damage the engines immediately.  As a result, expensive repairs or full engine replacements occur before 100,000 miles have elapsed.

15.     GM was well aware of the Valve Train Defect from pre-production testing, design failure mode analysis, calls to its customer service hotline, aggregate part sales, dealer audits, aggregate warranty information, complaints made to the National Highway Transportation Safety Administration ("NHTSA") which GM monitors, and customer complaints made to both GM and its authorized dealers. Further, GM has issued many bulletins to its dealerships (but not consumers)

regarding the problems with the rocker arms, lifters, and valve springs in Class Vehicles. These sources of knowledge and information were exclusively in the possession of GM and its network of authorized dealers and, therefore, unavailable to consumers.

16.     Despite access to aggregate internal data, GM has actively concealed the existence of the Valve Train Defect by claiming that consumers are responsible for the lifter failures - despite the assurances of dealership technicians that there is no way to prevent the failure - and failing to authorize permanent or complete repairs under warranty.  In this way, GM has effectively and knowingly transferred the costs of repair to consumers, despite the promises of its express warranties.

17.     GM sells the Class Vehicles with a 3-year, 36,000-mile bumper-to-bumper warranty.[1] However, when class members bring their vehicles to GM's authorized dealerships, many are denied repairs because they are told that the sounds they are hearing from the engine – ticking, knocking, squealing, squeaking, and/or chirping – are "normal," only for GM authorized dealerships to declare repairs are needed as soon as they are out of warranty.  Others may receive a repair only after the engine has failed or a check engine light has gone on but are denied coverage for subsequent failures even though the Defect was clearly not remedied by the previous attempted repair. As a result, Class Members are personally exposed to thousands of

---

[1] As explained in more detail, *infra*, certain Class Vehicles have bumper-to-bumper warranties with longer durational limits.

dollars of out-of-pocket to repair costs, including money that flows to GM when consumers purchase replacement parts through authorized GM dealerships.

18.     The Valve Train Defect is material because it poses a serious safety concern. Losing power while driving, especially at highway speeds or while trying to merge or change lanes, hesitation, surging, shaking and stalling all significantly increase the risk of vehicle collision. No reasonable consumer would have purchased a vehicle that puts their safety at risk.

19.     The Valve Train Defect is also material because consumers incur significant and unexpected repair costs. GM's failure to disclose the Valve Train Defect at the time of purchase is material because no reasonable consumer expects to spend thousands of dollars to repair or replace damaged vehicle components that the manufacturer knows will fail well before the expected useful life of the component and knows will also damage other components or destroy the engine entirely and.

20.     Had GM disclosed the Valve Train Defect, Plaintiffs and Class Members would not have purchased the Class Vehicles or would have paid less for them.

**THE PARTIES**

**Plaintiff Danny Harrison**

21.     Plaintiff Danny Harrison is a citizen of Alabama, domiciled in Spanish Fort, Alabama.

22.    On or about February 9, 2021, Plaintiff Harrison purchased a new 2021 GMC Sierra 1500 equipped with a 5.3L V8 engine from McConnell Automotive, an authorized GM dealership located in Mobile, Alabama.

23.    Plaintiff Harrison purchased his vehicle primarily for personal, family, or household use.

24.    Passenger safety and reliability were important factors in Plaintiff Harrison's decision to purchase his vehicle.  Before purchasing the vehicle, Plaintiff Harrison visited the dealership's website, reviewed the vehicle's window stickers, which included GM's Monroney sticker which listed the 5.3L engine as a component, and spoke to the authorized salesperson at the dealership who assured him of the quality, safety, and reliability of the vehicle.  Plaintiff Harrison also took the vehicle for a test ride.  Plaintiff Harrison selected and ultimately purchased his Class Vehicle because the vehicle was represented to be, and was marketed as, a high-quality vehicle capable of providing safe, reliable transportation.  The purchase was made in part on the advertised safety, reliability, and quality of the vehicle and its components, including its engine.

25.    None of the information provided to Plaintiff Harrison disclosed any defects in the vehicle or its engine.  GM's omissions were material to Plaintiff Harrison.

26.    Had GM disclosed its knowledge of the Valve Train Defect before he purchased his vehicle, Plaintiff Harrison would have seen and been aware of the

disclosures. Indeed, GM's misstatements and omissions were material to Plaintiff Harrison.   Like all members of the Class, Plaintiff Harrison would not have purchased his Class Vehicle, or would have paid less for the vehicle, had he known of the Valve Train Defect.

27.    In addition, at the time of Plaintiff Harrison's vehicle purchase, and in purchasing his vehicle, he relied upon GM and its authorized dealerships' representations, which Plaintiff Harrison viewed during his online research, including on GM's website, heard from the salesperson, and reviewed the vehicle's window stickers, including the Monroney sticker, that the vehicle was fully functional, safe, durable, reliable, and that the engine operated correctly and effectively.   Plaintiff Harrison relied on those representations and the omission of, or failure to disclose, the Valve Train Defect, in purchasing the vehicle, and absent those representations and omissions, would not have purchased the vehicle, or would have paid less for it.

28.    At the time of his purchase, GM issued to Plaintiff Harrison for his vehicle: (1) a bumper-to-bumper warranty lasting for three years or 36,000 miles, whichever occurred first; (2) a powertrain warranty lasting for five years or 60,000 miles, whichever occurred first; and (3) an emissions control warranty of eight years or 80,000 miles, whichever occurred first.

29.    Unbeknownst to Plaintiff Harrison, at the time of his purchase, GM had already issued two communications to its authorized dealerships describing

10

problems with the valve train system in the 2021 GMC Sierra 1500. Moreover, GM issued the first TSB describing problems the valve train system in the L84 engine, the engine in Plaintiff Harrison's vehicle, in November 2018.

30.     At all times during his possession of the vehicle, Plaintiff Harrison has properly maintained and serviced his Class Vehicle according to GM's recommended maintenance guidelines.

31.     On or about July 23, 2021, Plaintiff Harrison was driving his vehicle on a 20-mile-long bridge located approximately 250 miles from his home when the vehicle began to sputter, spit, vibrate, misfire, and lose power.  In addition, multiple lights on the dashboard illuminated.   Plaintiff Harrison was only narrowly able to get the vehicle off the bridge, where he called his local GM authorized dealership, Tameron Buick GMC, for assistance.  They directed him to a local GM authorized dealership, Courtesy GMC Truck Center, located in Lafayette, Louisiana.

32.     Plaintiff Harrison's vehicle was towed to Courtesy GMC Truck Center. At the time, it had approximately 8,250 miles on the odometer.  The dealership inspected the vehicle and found Diagnostic Trouble Code ("DTC") P0300 and DTC P0303 recorded by the vehicle's ECM, indicating misfires in the cylinders.  The lifter for the #3 cylinder had collapsed, causing a bent pushrod and a resulting tapping noise.  The dealership replaced all the lifters on the left side of the engine, the pushrod, and the gaskets, per TSB 19-NA-218, which was issued by GM in June

2020. Per the repair order, the dealership installed eight lifters with part number 12680871.

33.     Plaintiff Harrison requested that all the lifters in his vehicle's engine be replaced, reasoning that the failed lifter would have come from the same batch as the others in his vehicle.  The dealership agreed and communicated with GM directly, trying to get authorization under the warranty applicable to Plaintiff Harrison's vehicle to replace the lifters on the ride side of the engine as well.  GM refused to cover a warranty replacement of the right-side lifters.

34.     Plaintiff Harrison was without his vehicle for 43 days, including the 25 days it took for the dealership to receive replacement parts from GM.  He also had to secure alternative transportation to get back home while his vehicle was sitting at Courtesy GMC Truck Center.

35.     Ultimately, GM arranged for Plaintiff Harrison's partially repaired vehicle to be returned to him at his home.

36.     On or about January 8, 2022, Plaintiff Harrison was driving his vehicle when the check engine light on the dashboard illuminated, and he heard a sound resembling a backfire.  He managed to take his vehicle to Tameron Buick GMC, an authorized GM dealership located in Daphne, Alabama.  The dealership found DTC P0302, indicating a misfire in cylinder #2, as well as a tapping noise coming from the engine.  The dealership's inspection revealed the #2 pushrod was bent and that the intake lifter for cylinder #2 had come apart.  The dealership replaced all the lifters

on the right side of Plaintiff Harrison's vehicle and the pushrod.  Per the repair order, the dealership installed eight  lifters with part number 12698946 on the right side of the engine.

37.    To date, Plaintiff Harrison's vehicle remains subject to the Valve Train Defect.

38.    As a result of the Valve Train Defect, Plaintiff Harrison has reasonably lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes.  Specifically, he cannot drive his vehicle more than 25 miles from his home for fear of it breaking down again. Further, Plaintiff Harrison will be unable to rely on GM's advertising or labeling in the future, and so will not purchase or lease another vehicle from GM in the future, though he would like to do so.

39.    At all times, Plaintiff Harrison, like other class members, has driven his vehicle in a foreseeable manner in the sense that Plaintiff Harrison has not abused their vehicle or used it for purposes unintended by GM such as drag racing, for example. However, despite this normal and foreseeable driving, the Valve Train Defect has rendered his vehicle unsafe and unfit to be used as intended.

**Plaintiff Jeremiah Johnson**

40.    Plaintiff Jeremiah Johnson is an Alaska citizen who is domiciled in Kodiak, Alaska.

41.    In or around July 2021, Plaintiff Johnson purchased a used 2017 Yukon Denali equipped with a 6.2L V8 engine from Payless Car Sales located in Anchorage, Alaska.

42.    Plaintiff Johnson purchased his vehicle primarily for personal, family, or household use.

43.    Passenger safety and reliability were important factors in Plaintiff Johnson's decision to purchase his vehicle. Before making his purchase, Plaintiff Johnson conducted internet research, saw many commercials for the Yukon Denali, and reviewed the sales documentation and CarFax, which listed the 6.2L engine as a component.  Plaintiff Johnson selected and ultimately purchased his Class Vehicle because the vehicle was represented to be and was marketed as a high-quality vehicle capable of providing safe, reliable transportation.  The purchase was made in part on the advertised safety, reliability, and quality of the vehicle and its components, including its engine.

44.    None of the information provided to Plaintiff Johnson disclosed any defects in the vehicle or its engine.  GM's omissions were material to Plaintiff Johnson.

45.    Had GM disclosed its knowledge of the Valve Train Defect before he purchased his vehicle, Plaintiff Johnson would have seen and been aware of the disclosures. Indeed, GM's misstatements and omissions were material to Plaintiff Johnson.  Like all members of the Class, Plaintiff Johnson would not have purchased

his Class Vehicle, or would have paid less for the vehicle, had he known of the Valve Train Defect.

46.     In addition, at the time Plaintiff Johnson purchased his vehicle, and in purchasing his vehicle, he relied upon representations from GM that he saw in commercials that the vehicle was "professional grade", fully functional, safe, durable, reliable, and that the engine operated correctly and effectively.  Plaintiff Johnson relied on those representations and the omission of the disclosure of the Valve Train Defect, in leasing the vehicle, and absent those representations and omissions, would not have leased the vehicle or would have paid less for it.

47.     At the time of his purchase, GM transferred to Plaintiff Johnson for his vehicle: (1) a bumper-to-bumper warranty lasting for three years or 36,000 miles, whichever occurred first; (2) a powertrain warranty lasting for five years or 60,000 miles, whichever occurred first; and (3) an emissions control warranty of eight years or 80,000 miles, whichever occurred first.

48.     Unbeknownst to Plaintiff Johnson, at the time of his purchase, GM had already issued six communications to its authorized dealerships describing problems with the valve train system in 2016 Chevrolet Silverados. Moreover, in January 2015, GM issued the first TSB describing problems the valve train system in the L86 engine, the engine in Plaintiff Johnson's vehicle.

49.     At all times during his ownership of the vehicle, Plaintiff Johnson has properly maintained and serviced his Class Vehicle according to GM's recommended maintenance guidelines.

50.     On or around December 16, 2021, with approximately 72,000 miles on the odometer, Plaintiff Johnson experienced his vehicle running roughly, emanating ticking noises from the engine compartment, and flashing error codes. Plaintiff Johnson's vehicle was towed to Midtown Auto Repair Services where the "technician pulled codes P0300 – multiple cylinder misfire, and code P0304 – cylinder #4 misfire." The technician "inspected further and found lifter failure on multiple cylinders. Cylinder #4 has complete lifter failure w push rod/rocker damage (bent)." The technician replaced eight lifters with part number 12698946, eight lifters with part number 12648846, the VLOM, the pushrod, the rocker, related gaskets, pipes, and bolts.  Plaintiff Johnson paid $1213.20 out of pocket for the repairs, with the remainder being covered by a third party extended warranty contract with United Car Care, and loss of use of vehicle for 56 days.

51.     To date, Plaintiff Johnson's vehicle remains subject to the Valve Train Defect.

52.     As a result of the Valve Train Defect, Plaintiff Johnson has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes.  Further, Plaintiff Johnson will be unable to rely on GM's advertising or labeling in the future, and so will not

purchase or lease another vehicle from GM in the future, though he would like to do so.

53.     At all times, Plaintiff Johnson, like other class members, has driven his vehicle in a foreseeable manner in the sense that Plaintiff Johnson has not abused his vehicle or used it for purposes unintended by GM such as drag racing, for example. However, despite this normal and foreseeable driving, the Valve Train Defect has rendered his vehicle unsafe and unfit to be used as intended.

**Plaintiffs Robin and Tony Reidhar**

54.     Plaintiffs Robin and Tony Reidhar ("Reidhar") are citizens of Arkansas, domiciled in Lonoke, Arkansas.

55.     On or about January 28, 2014, Plaintiffs Reidhars purchased a new 2014 Chevrolet Silverado equipped with a 6.2L V8 engine from Russell Chevrolet, an authorized Chevrolet dealership located in North Little Rock, Arkansas.

56.     Plaintiffs Reidhars purchased their vehicle primarily for personal, family, or household use.

57.     Passenger safety and reliability were important factors in Plaintiffs Reidhars' decision to purchase their vehicle.  Before purchasing the vehicle, Plaintiffs Reidhars viewed commercials regarding the vehicle highlighting its durability; visited GM's website and the dealership's website; performed online research regarding the vehicle; reviewed sales documentation, brochures, and the vehicle's window stickers, which included GM's Monroney sticker  which listed the

17

6.2L engine as a component; and spoke to the authorized salesperson at the dealership about the vehicle. Plaintiffs Reidhars also took the vehicle for a test drive. Plaintiffs Reidhars selected and ultimately purchased their Class Vehicle because the vehicle was represented to be, and was marketed as, a high-quality vehicle capable of providing safe, reliable transportation. The purchase was made in part on the advertised safety, reliability, and quality of the vehicle and its components, including its engine.

58.     None of the information provided to Plaintiffs Reidhars disclosed any defects in the vehicle or its engine. GM's omissions were material to Plaintiffs Reidhars.

59.     GM did not disclose its knowledge of the Valve Train Defect before they purchased their vehicle, Indeed, GM's misstatements and omissions were material to Plaintiffs Reidhars. Like all members of the Class, Plaintiffs Reidhars would not have purchased their Class Vehicle, or would have paid less for the vehicle, had they known of the Valve Train Defect.

60.     In addition, at the time Plaintiffs Reidhars purchased their vehicle, and in purchasing their vehicle, they relied upon representations from GM and its authorized dealership that they saw during their online research, including GM's website, heard from the salesperson, and reviewed the vehicle's window stickers, including the vehicle's Monroney sticker that the vehicle was fully functional, safe, durable, reliable, and that the engine operated correctly and effectively. Plaintiffs

Reidhars relied on those representations and the omission of the disclosure of the Valve Train Defect, in purchasing the vehicle, and absent those representations and omissions, would not have purchased the vehicle or would have paid less for it.

61.     At the time of their purchase, GM issued to Plaintiffs Reidhars for their vehicle: (1) a bumper-to-bumper warranty lasting for three years or 36,000 miles, whichever occurred first; (2) a powertrain warranty lasting for 5 years or 100,000 miles, whichever occurred first; and (3) an emissions control warranty of eight years or 80,000 miles, whichever occurred first.

62.     Unbeknownst to Plaintiffs Reidhars, GM issued the first TSB describing problems the valve train system in the L86 engine, the engine in Plaintiffs Reidhars' vehicle, in January 2015.

63.     At all times during their possession of the vehicle, Plaintiffs Reidhars have properly maintained and serviced their Class Vehicle according to GM's recommended maintenance guidelines.

64.     On or around January 28, 2014, the Reidhars also purchased a GM Major Guard vehicle service contract.  On or around February 19, 2022, when the vehicle has approximately 66,000 miles on the odometer, the Reidhars observed that the vehicle was emanating tapping and knocking noises from the engine compartment. The Reidhars took their vehicle to Gwatney Chevrolet, an authorized Chevrolet dealership in Jacksonville, Arkansas, which "performed [a] diagnosis and found lifter stuck in #4 cylinder." The dealership "removed all components to

remove head and replace AFM lifter on bank 2." However, the lifter was not listed as a line item on Plaintiffs' repair order. The dealership also replaced related gaskets, the manifold, and bolts.  Plaintiffs paid approximately $3,471.50  for the repairs.

65.    To date, Plaintiffs Reidhars's vehicle remains subject to the Valve Train Defect.

66.    As a result of the Valve Train Defect, Plaintiffs Reidhars have lost confidence in the ability of their Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes.  Further, Plaintiffs Reidhars will be unable to rely on GM's advertising or labeling in the future, and so will not purchase or lease another vehicle from GM in the future, though they would like to do so.

67.    At all times, Plaintiffs Reidhars, like other class members, have driven their vehicle in a foreseeable manner in the sense that Plaintiff Reidhars have not abused their vehicle or used it for purposes unintended by GM such as drag racing, for example. However, despite this normal and foreseeable driving, the Valve Train Defect has rendered their vehicle unsafe and unfit to be used as intended.

**Plaintiff Ruben Solis**

68.    Plaintiff Ruben Solis is a citizen of California, domiciled in Selma, California.

20

69.     On or about December 15, 2020, Plaintiff Solis purchased a new 2021 GMC Sierra equipped with a 5.3L V8 engine from Fahrney Automotive d/b/a Selma Buick GMC, an authorized GM dealership located in Selma, California.

70.     Plaintiff Solis purchased his vehicle primarily for personal, family, or household use.

71.     Passenger safety and reliability were important factors in Plaintiff Solis's decision to purchase his vehicle.  Before purchasing the vehicle, Plaintiff Solis viewed several Facebook advertisements for the vehicle, visited GM's website, dealership advertisements, reviewed the vehicle's window stickers, including the Monroney sticker which listed the 5.3L engine as a component, reviewed the sales documentation, and spoke to the authorized salesperson at the dealership.  Plaintiff Solis also took the vehicle for a test ride.  Plaintiff Solis selected and ultimately purchased his Class Vehicle because the vehicle was represented to be, and was marketed as, a high-quality vehicle capable of providing safe, reliable transportation. The purchase was made in part on the advertised safety, reliability, and quality of the vehicle and its components, including its engine.

72.     None of the information provided to Plaintiff Solis disclosed any defects in the vehicle or its engine.  GM's omissions were material to Plaintiff Solis.

73.     Had GM disclosed its knowledge of the Valve Train Defect before they purchased his vehicle, Plaintiff Solis would have seen and been aware of the disclosures. Indeed, GM's misstatements and omissions were material to Plaintiff

Solis. Like all members of the Class, Plaintiff Solis would not have purchased his Class Vehicle, or would have paid less for the vehicle, had he known of the Valve Train Defect.

74.     In addition, at the time of Plaintiff Solis's vehicle purchase, and in purchasing his vehicle, he relied upon GM and its authorized dealerships' representations which he heard from the salesperson, on GM's website, on the window stickers, and in advertisements, that the vehicle was fully functional, safe, durable, reliable, and that the engine operated correctly and effectively.  Plaintiff Solis relied on those representations and the omission of, or failure to disclose, the Valve Train Defect, in purchasing the vehicle, and absent those representations and omissions, would not have purchased the vehicle, or would have paid less for it.

75.     At the time of his purchase, Plaintiff Solis's vehicle had the remainder of GM issued: (1) bumper-to-bumper warranty lasting for three years or 36,000 miles, whichever occurred first; (2) powertrain warranty lasting for five years or 60,000 miles, whichever occurred first; and (3) emissions control warranty of eight years or 80,000 miles, whichever occurred first.

76.     Unbeknownst to Plaintiff Solis, at the time of his purchase, GM had already issued three communications to its authorized dealerships describing problems with the valve train system in the 2021 GMC Sierra.  Moreover, GM issued the first TSB describing problems the valve train system in the L84 engine, the engine in Plaintiff Solis' vehicle, in November 2018.

77.     At all times during his possession of the vehicle, Plaintiff Solis has properly maintained and serviced his Class Vehicle according to GM's recommended maintenance guidelines.

78.     Specifically, on or about November 28, 2021, when the vehicle had approximately 9,600 miles on the odometer, Plaintiff Solis was driving his vehicle onto a street when he heard a loud noise from the engine. The check engine light on the dashboard illuminated, the engine began to make ticking noises, and the vehicle slowed as it lost power. He managed to drive the vehicle to the dealership, which told him to come back in a day.

79.     On November 29, 2021, Plaintiff Solis returned his vehicle to the dealership.  The technician verified the "ticking/knocking" sound and found the DTC P0305 in the ECM.  Ultimately, the technician discovered a bent pushrod on cylinder #5, caused by a lifter which came apart.  The repair order states that the technician followed TSB 19-NA-218, which was issued in June 2020.  It took nearly two weeks for the dealership to replace the lifters on the left bank of the engine and the pushrod. When he picked up his vehicle on December 9, 2021, Plaintiff Solis asked if the problem could reoccur. He was told by the technician at the dealership that it was possible for his vehicle to fail again in the future and that the technician had heard similar complaints from other customers. Mr. Solis believes that his vehicle could fail at any moment.  According to the repair order, 8 lifters with part number 12680871 were installed in his vehicle.

80.   To date, Plaintiff Solis's vehicle remains subject to the Valve Train Defect.

81.   As a result of the Valve Train Defect, Plaintiff Solis has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes.  Further, Plaintiff Solis will be unable to rely on GM's advertising or labeling in the future, and so will not purchase or lease another vehicle from GM in the future, though they would like to do so.

82.   At all times, Plaintiff Solis, like other class members, has driven his vehicle in a foreseeable manner in the sense that Plaintiff Solis has not abused his vehicle or used it for purposes unintended by GM such as drag racing, for example. However, despite this normal and foreseeable driving, the Valve Train Defect has rendered his vehicle unsafe and unfit to be used as intended.

**Plaintiff Bobby Cheshire**

83.    Plaintiff Bobby Cheshire is a citizen of Florida, domiciled in Lake City, Florida.

84.    On or about June 9, 2015, Plaintiff Cheshire purchased a new 2015 Chevrolet Silverado 1500 equipped with a 5.3L V8 engine from Roundtree Moore Chevrolet, an authorized GM dealership located in Lake City, Florida.

85.   Plaintiff Cheshire purchased his vehicle primarily for personal, family, or household use.

86.     Passenger safety and reliability were important factors in Plaintiff Cheshire's decision to purchase his vehicle.  Before purchasing the vehicle, Plaintiff Cheshire reviewed the vehicle's window stickers, including the Monroney sticker which listed the 5.3L engine as a component, reviewed the sales documentation, and spoke to the authorized salesperson at the dealership.  Plaintiff Cheshire also took the vehicle for a test ride.  Plaintiff Cheshire selected and ultimately purchased his Class Vehicle because the vehicle was represented to be, and was marketed as, a high-quality vehicle capable of providing safe, reliable transportation.  The purchase was made in part on the advertised safety, reliability, and quality of the vehicle and its components, including its engine.

87.     None of the information provided to Plaintiff Cheshire disclosed any defects in the vehicle or its engine.  GM's omissions were material to Plaintiff Cheshire.

88.     Had GM disclosed its knowledge of the Valve Train Defect before they purchased his vehicle, Plaintiff Cheshire would have seen and been aware of the disclosures. Indeed, GM's misstatements and omissions were material to Plaintiff Cheshire. Like all members of the Class, Plaintiff Cheshire would not have purchased his Class Vehicle, or would have paid less for the vehicle, had he known of the Valve Train Defect.

89.     In addition, at the time of Plaintiff Cheshire's vehicle purchase, and in purchasing his vehicle, he relied upon GM and its authorized dealerships'

representations which he heard from the salesperson and reviewed on the vehicle's window stickers, that the vehicle was fully functional, safe, durable, reliable, and that the engine operated correctly and effectively.  Plaintiff Cheshire relied on those representations and the omission of, or failure to disclose, the Valve Train Defect, in purchasing the vehicle, and absent those representations and omissions, would not have purchased the vehicle, or would have paid less for it.

90.     At the time of his purchase, Plaintiff Cheshire's vehicle had the remainder of GM issued: (1) bumper-to-bumper warranty lasting for three years or 36,000 miles, whichever occurred first; (2) powertrain warranty lasting for five years or 60,000 miles, whichever occurred first; and (3) emissions control warranty of eight years or 80,000 miles, whichever occurred first.

91.     Unbeknownst to Plaintiff Cheshire, at the time of his purchase, GM had already issued four communications to its authorized dealerships describing problems with the valve train system in the 2015 Chevrolet Silverado 1500. Moreover, GM issued the first TSB describing problems the valve train system in the L83 engine, the engine in Plaintiff Cheshire's vehicle, in January 2015.

92.     At all times during his possession of the vehicle, Plaintiff Cheshire has properly maintained and serviced his Class Vehicle according to GM's recommended maintenance guidelines.

93.     On or around October 19, 2021, Plaintiff Cheshire was driving his vehicle when the vehicle's engine began to misfire.  He also heard a loud ticking

noise coming from the engine compartment.  He believed he would be stranded and carefully made his way home.  On or around October 22, 2021, when the vehicle had approximately 53,243 miles on the odometer, Plaintiff Cheshire delivered his vehicle to the dealership for diagnosis and repair.  By that time, the check engine light had illuminated as well.  The dealership found several DTCs in the ECM, including P0300, P219A, and P0324, indicating engine misfires, an imbalance in the air to fuel ratio, and excessive engine vibration due to the air to fuel imbalance. Inspection revealed a collapsed #7 lifter, a bent pushrod, and damaged rocker arm. The repairs noted on the repair order indicate that the rocker arm, two pushrods, all right side lifters, and the VLOM would be replaced.  However, the repair order also indicates that only four regular lifters with part number 12648846 were sold, and not an additional four AFM Lifters.   Further, the technician noted that "CUSTOMER ADVISED BEFORE WORK STARTED THAT RTMC CAN NOT (sic) GUARANTEE WHEN CAMSHAFT OR OTHER SIDE LIFTERS COULD FAILED (sic). AND THAT REPLACING LIFTERS ON DRIVER SIDE WAS THE MOST COST EFFECTIVE REPAIR AT THIS TIME." Plaintiff Cheshire was charged $5,022.33 for the partial repair and was without his vehicle for a week.

94.     During that week, while his vehicle was being repaired at the dealership, Plaintiff Cheshire called GM customer service to complain.  He was initially told that GM would cover part of the cost of the repair.  However, GM

customer service called Plaintiff Cheshire again after speaking with the dealership and refused to help because the dealership had offered a $500 discount on the repair.

95.    When Plaintiff Cheshire picked up his vehicle, the service representative informed him that he received a 24-month, unlimited mile component coverage warranty for the parts replaced in his engine.  When he asked for paperwork documenting this warranty, he was denied and instead told it was "in the system." During a later conversation with the manager of the automotive dealership group to which the dealership belonged, he was told that the component warranty coverage was for 24-months, or 24,000 miles, whichever occurred first.

96.    To date, Plaintiff Cheshire's vehicle remains subject to the Valve Train Defect.

97.    As a result of the Valve Train Defect, Plaintiff Cheshire has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes.  Further, Plaintiff Cheshire will be unable to rely on GM's advertising or labeling in the future, and so will not purchase or lease another vehicle from GM in the future, though they would like to do so.

98.    At all times, Plaintiff Cheshire, like other class members, has driven his vehicle in a foreseeable manner in the sense that Plaintiff Cheshire has not abused his vehicle or used it for purposes unintended by GM such as drag racing, for

example. However, despite this normal and foreseeable driving, the Valve Train Defect has rendered his vehicle unsafe and unfit to be used as intended.

**Plaintiff Melissa Luster**

99.    Plaintiff Melissa Luster is a citizen of Florida, domiciled in Melbourne, Florida.

100.    On or about March 14, 2017, Plaintiff Luster purchased a new 2017 Cadillac Escalade equipped with a 6.2L V8 engine from Murphy Cadillac, an authorized GM dealership located in Melbourne, Florida.

101.    Plaintiff Luster purchased her vehicle primarily for personal, family, or household use.

102.    Passenger safety and reliability were important factors in Plaintiff Luster's decision to purchase her vehicle. Before making her purchase, Plaintiff Luster "Googled" the vehicle, review the manufacturer and dealer websites, created and reviewed a specification sheet with the salespersons which listed the 6.2L engine as a component to order the vehicle directly from GM, and spoke to the authorized salesperson at the dealership who assured her of the quality, safety, and reliability of the vehicle.  Plaintiff Luster selected and ultimately purchased her Class Vehicle because the vehicle was represented to be, and was marketed as, a high-quality vehicle capable of providing safe, reliable transportation.  The purchase was made in part on the advertised safety, reliability, and quality of the vehicle and its components, including its engine.

103.   None of the information provided to Plaintiff Luster disclosed any defects in the vehicle or its engine.  GM's omissions were material to Plaintiff Luster.

104.   Had GM disclosed its knowledge of the Valve Train Defect before she purchased her vehicle, Plaintiff Luster would have seen and been aware of the disclosures. Indeed, GM's misstatements and omissions were material to Plaintiff Luster.  Like all members of the Class, Plaintiff Luster would not have purchased her Class Vehicle, or would have paid less for the vehicle, had she known of the Valve Train Defect.

105.   In addition, at the time Plaintiff Luster purchased her vehicle, and in purchasing her vehicle, she relied upon representations from GM and its authorized dealership that she saw during her research, heard from the salesperson, and reviewed on the specification sheet that the vehicle was fully functional, safe, durable, reliable, and that the engine operated correctly and effectively.  Plaintiff Luster relied on those representations and the omission of the disclosure of the Valve Train Defect, in purchasing the vehicle, and absent those representations and omissions, would not have purchased the vehicle or would have paid less for it.

106.   At the time of her purchase, GM issued to Plaintiff Luster for her vehicle: (1) a bumper-to-bumper warranty lasting for four years or 50,000 miles, whichever occurred first; (2) a powertrain warranty lasting for six years or 70,000

miles, whichever occurred first; and (3) an emissions control warranty of eight years or 80,000 miles, whichever occurred first.

107.   Unbeknownst to Plaintiff Luster, at the time of her purchase, GM had already issued two communications to its authorized dealerships describing problems with the valve train system in 2017 Cadillac Escalades. Moreover, GM issued the first TSB describing problems the valve train system in the L86 engine, the engine in Plaintiff Luster's vehicle, in January 2015.

108.   At all times during her ownership of the vehicle, Plaintiff Luster has properly maintained and serviced her Class Vehicle according to GM's recommended maintenance guidelines.

109.   Soon after purchasing her vehicle, Plaintiff Luster experienced the vehicle losing power while driving, shifting hard, and occasional stalling.  She repeatedly took her vehicle to the dealership to complain about these issues and request repairs.  Specifically, Luster took her vehicle to the dealership and requested repairs on August 10, 2017, January 4, 2018, October 10, 2018, February 15, 2019, June 27, 2019, February 28, 2020, and March 10, 2020.  Each time, no repairs were attempted, and she was told that there was nothing wrong with her vehicle.  Plaintiff Luster's vehicle had 62,079 miles on the odometer as of February 5, 2021.

110.   On or about November 5, 2021, Plaintiff Luster heard a ticking and knocking noise from the engine compartment while she was driving the vehicle. She took the vehicle to the dealership, which performed a diagnostic and found a bad

lifter and bent pushrod.  In addition, the problem had been ongoing for so long, the camshaft in her vehicle was damaged and had to be replaced.

111.   The dealership informed her that her vehicle was out of warranty and she was responsible for the total cost of the repairs, including a replacement camshaft, all the lifters, and a replacement pushrod.  As a result, Plaintiff Luster paid over $6,000 for repairs, which took two weeks to complete.  At the time, her vehicle had 78,000 miles on the odometer.  Despite the fact that the repair order indicates that all the lifters were replaced in her vehicle, the repair order only notes 8 regular lifters, part number 12648846, being sold to Plaintiff Luster.  As a result, Plaintiff Luster is unsure whether all the lifters have been replaced in her vehicle and, if they have, with what parts.

112.   To date, Plaintiff Luster's vehicle remains subject to the Valve Train Defect.

113.   As a result of the Valve Train Defect, Plaintiff Luster has lost confidence in the ability of her Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes.  Further, Plaintiff Luster will be unable to rely on GM's advertising or labeling in the future, and so will not purchase or lease another vehicle from GM in the future, though she would like to do so.

114.   At all times, Plaintiff Luster, has driven her vehicle in a foreseeable manner in the sense that Plaintiff Luster has not abused her vehicle or used it for purposes unintended by GM such as drag racing, for example. However, despite this

normal and foreseeable driving, the Valve Train Defect has rendered her vehicle unsafe and unfit to be used as intended.

**Plaintiff Stephanie Speno**

115.   Plaintiff Stephanie Speno is a citizen of Florida, domiciled in Orange City, Florida.

116.   On or about December 12, 2020, Plaintiff Speno purchased a new 2021 Chevrolet Silverado equipped with a 5.3L V8 engine from Starling Chevrolet of Deland, an authorized GM dealership located in Deland, Florida.

117.   Plaintiff Speno purchased her vehicle primarily for personal, family, or household use.

118.   Passenger safety and reliability were important factors in Plaintiff Speno's decision to purchase her vehicle. Before making her purchase, Plaintiff Speno viewed many GM commercials featuring the Silverado, reviewed sales documentation and the Monroney sticker which listed the 5.3L engine as a component. Plaintiff Speno also spoke to the authorized salesperson at the dealership, explaining that she had had very unreliable vehicles in the past and emphasizing the importance of quality, safety, and reliability in this next vehicle purchase.  The salesperson assured her that the 2021 Chevrolet Silverado was very reliable, durable, high-quality, and safe; would retain a high resale value; and would be suitable for long trips in inclement whether that she explained she intended to take. Plaintiff Speno also test drove the vehicle. Plaintiff Speno selected and

ultimately purchased her Class Vehicle because the vehicle was represented to be, and was marketed as, a high-quality vehicle capable of providing safe, reliable transportation.  The purchase was made in part on the advertised safety, reliability, and quality of the vehicle and its components, including its engine.

119.   None of the information provided to Plaintiff Speno disclosed any defects in the vehicle or its engine.  GM's omissions were material to Plaintiff Speno.

120.   Had GM disclosed its knowledge of the Valve Train Defect before she purchased her vehicle, Plaintiff Speno would have seen and been aware of the disclosures. Indeed, GM's misstatements and omissions were material to Plaintiff Speno.  Like all members of the Class, Plaintiff Speno would not have purchased her Class Vehicle, or would have paid less for the vehicle, had she known of the Valve Train Defect.

121.   In addition, at the time Plaintiff Speno purchased her vehicle, and in purchasing her vehicle, she relied upon representations from GM and its authorized dealership that she saw in commercials and the Monroney sticker and heard from the salesperson that the vehicle was fully functional, safe, durable, reliable, and that the engine operated correctly and effectively.  Plaintiff Speno relied on those representations and the omission of the disclosure of the Valve Train Defect, in purchasing the vehicle, and absent those representations and omissions, would not have purchased the vehicle or would have paid less for it.

122.   At the time of her purchase, GM issued to Plaintiff Speno for her vehicle: (1) a bumper-to-bumper basic warranty lasting for three years or 36,000 miles, whichever occurred first; (2) a powertrain warranty lasting for five years or 60,000 miles, whichever occurred first; and (3) an emissions control warranty of eight years or 80,000 miles, whichever occurred first.

123.   Unbeknownst to Plaintiff Speno, at the time of her purchase, GM had already issued two communications to its authorized dealerships describing problems with the valve train system in the 2021 Chevrolet Silverado.  Moreover, GM issued the first TSB describing problems the valve train system in the L84 engine, the engine Plaintiff Speno's vehicle, in November 2018.

124.   At all times during her ownership of the vehicle, Plaintiff Speno has properly maintained and serviced her Class Vehicle according to GM's recommended maintenance guidelines.

125.   In or around October 2021, Plaintiff Speno experienced the vehicle losing power while driving, idling and driving roughly, shuttering, and emanating ticking noises from the engine.  On or around October 26, 2021, with approximately 26,963 miles on the odometer, Plaintiff Speno took her vehicle to Starling Chevrolet to complain of the engine issues and request repairs. On the repair order, the dealership noted an "engine concern" but omitted details of Plaintiff Speno's description of the rough driving, shuttering, and ticking noises, instead reducing her complaint to an "a loud whining noise under the hood." The dealership inspected her

vehicle, finding "internal failure in idler pulley, causing whine noise when engine running[,]" and accordingly, replaced the idler pulley and the serpentine belt. The dealership also performed a multipoint inspection (erroneously noting that Plaintiff Speno declined a recall, unrelated to the Defect) and routine oil maintenance, but failed to address or repair Plaintiff's engine issues in any other respect.

126. In or around December 2021, Plaintiff Speno noticed that her vehicle began to exhibit the Defect again, including gear slippage, shuttering, and noises from the engine, which gradually became worse. On or around January 31, 2022, Plaintiff took her vehicle to Starling Chevrolet for a routine oil change and reported that loud noises were emanating from the left front side of her vehicle. However, the dealership again erroneously noted her concerns as a tire issue, incorrectly stating on the repair order "customer states there is a loud sound coming from the front left tire while driving" and "a customer request to check tires for dry rot." The dealership failed to otherwise address or acknowledge Plaintiff's complaint.

127. Two weeks later, in the evening on February 13, 2022, Plaintiff's boyfriend was driving her vehicle while Plaintiff was riding in the passenger seat. The vehicle emanated a loud pop from the engine. The vehicle began to lose power while driving, jerking, and lurching violently when accelerating after a stop. However, the vehicle's check engine light or other warning did not appear. Upon reaching her home, Plaintiff called GM to report the incident because the dealership was already closed. Plaintiff told GM that she did not feel safe driving the vehicle to

the dealership for repairs. The GM representative gave Plaintiff contact information for a towing company, which towed her vehicle to Starling Chevrolet. The vehicle had approximately 38,111 miles on the odometer.

128. On or around February 14, 2022, Starling Chevrolet inspected her vehicle regarding her engine-related complaints and also performed multipoint inspection. According to the repair order, Plaintiff reported that "engine [was]making loud noise and vehicle jerks on accell [*sic*] no SES light present[.]" The repair order noted the following diagnostic steps and findings: "check codes in vehicle, P0300 set in ECM, U0401 set in TCCM. Check for misfires, cylinder 2 has a 1414 history misfires and is a dead misfire when running. . . . found cyl[inder] 2 exhaust push rod bent. . . found cylinder #2 intake lifter came apart/separated [*sic*]. Found Bulletin 19-NA-218 applies. Corrected by 4062390: Valve Lifter Replacement Right Side." The technician replaced eight "right bank lifters [part number 12698946], 1 pushrod, and all associated seals, gaskets and 1 time use components per TSB 19-NA-218." Following these repairs, the repair order stated that the vehicle was test driven and "now operates as designed." The dealership stated to Plaintiff that GM had directed replacement of only one set of lifters, not both. Plaintiff picked up her vehicle on or around February 23, 2022.

129. However, Plaintiff Speno continued to experience the vehicle losing power while driving, idling and driving roughly, shuttering, and emanating even louder ticking noises from the engine. Less than three weeks after her engine was

inspected and the right bank lifters replaced, on or about March 14, 2022, Plaintiff Speno was driving on I-95 when the vehicle began flashing its check engine light, emanating a ticking and knocking noise from the engine, and driving roughly. She pulled over to the side of the road, turned off the engine, and waited a short period of time before driving the vehicle back to her home. The next day, on March 15, 2022, she took the vehicle back to Starling Chevrolet, which again inspected her vehicle regarding her engine-related complaints and performed another multipoint inspection. According to the repair order, Plaintiff reported that "SES light was blinking and engine running very rough[.]" The repair order noted the following diagnostic steps and findings: "run vehicle, heard pop/tick noise intermittently. Check codes in vehicle, P0300 set in ECM. Check for misfires, cylinder #5 has 100 history misfires, 7 and 8 had 1 all others 0 misfires in history. Found Bulletin 19-NA-218 applies. Corrected by Valve Lifter Replacement Left Side." The technician removed the left side rockers and inspected for bent pushrods and noted that none were bent. The repair order further noted "NEC to replace affected bank of lifters per TSB 19-NA-218" and replaced eight "left bank lifters [part number 12698946], and all associated components/seal/gaskets to perform repair." Following these repairs, the repair order stated that the vehicle was test driven and "now operating as designed."

130.   To date, Plaintiff Speno's vehicle remains subject to the Valve Train Defect.

131.   As a result of the Valve Train Defect, Plaintiff Speno has lost confidence in the ability of her Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes.  Further, Plaintiff Speno will be unable to rely on GM's advertising or labeling in the future, and so will not purchase or lease another vehicle from GM in the future, though she would like to do so.

132.   At all times, Plaintiff Speno, like other class members, has driven her vehicle in a foreseeable manner in the sense that Plaintiff Speno has not abused her vehicle or used it for purposes unintended by GM such as drag racing, for example. However, despite this normal and foreseeable driving, the Valve Train Defect has rendered her vehicle unsafe and unfit to be used as intended.

### Plaintiff Nancy Velasquez

133.   Plaintiff Nancy Velasquez is a citizen of Florida, domiciled in Miami, Florida.

134.   On or about October 22, 2017, Plaintiff Velasquez purchased a new 2017 Chevrolet Tahoe equipped with a 5.3L V8 engine from Bomnin Chevrolet Dadeland, an authorized GM dealership located in Miami, Florida.

135.   Plaintiff Velasquez purchased her vehicle primarily for personal, family, or household use.

136.   Passenger safety and reliability were important factors in Plaintiff Velasquez's decision to purchase her vehicle.  Before purchasing the vehicle, Plaintiff Velasquez reviewed the vehicle's window stickers, including the Monroney

sticker which listed the 5.3L engine as a component, saw many commercials, including specific focus group commercials revealing that her vehicle was the safest, did general research using search engines, and spoke to the authorized salesperson at the dealership.  Plaintiff Velasquez also took the vehicle for a test ride.  Plaintiff Velasquez selected and ultimately purchased her Class Vehicle because the vehicle was represented to be, and was marketed as, a high-quality vehicle capable of providing safe, reliable transportation.  The purchase was made in part on the advertised safety, reliability, and quality of the vehicle and its components, including its engine.

137.   None of the information provided to Plaintiff Velasquez disclosed any defects in the vehicle or its engine.  GM's omissions were material to Plaintiff Velasquez.

138.   Had GM disclosed its knowledge of the Valve Train Defect before they purchased her vehicle, Plaintiff Velasquez would have seen and been aware of the disclosures. Indeed, GM's misstatements and omissions were material to Plaintiff Velasquez. Like all members of the Class, Plaintiff Velasquez would not have purchased her Class Vehicle, or would have paid less for the vehicle, had he known of the Valve Train Defect.

139.   In addition, at the time of Plaintiff Velasquez' vehicle purchase, and in purchasing her vehicle, she relied upon GM and its authorized dealerships' representations, which Plaintiff Velasquez viewed during her online research,

statements in commercials, reviewed on the window stickers, and heard from the salesperson, that the vehicle was fully functional, safe, durable, reliable, and that the engine operated correctly and effectively.  Plaintiff Velasquez relied on those representations and the omission of, or failure to disclose, the Valve Train Defect, in purchasing the vehicle, and absent those representations and omissions, would not have purchased the vehicle, or would have paid less for it.

140.   At the time of her purchase, Plaintiff Velasquez's vehicle had the remainder of GM issued: (1) bumper-to-bumper warranty lasting for three years or 36,000 miles, whichever occurred first; (2) powertrain warranty lasting for five years or 60,000 miles, whichever occurred first; and (3) emissions control warranty of eight years or 80,000 miles, whichever occurred first.

141.   Unbeknownst to Plaintiff Velasquez, at the time of her purchase, GM had already issued two communications to its authorized dealerships describing problems with the valve train system in the 2017 GMC Yukon. Moreover, GM issued the first TSB describing problems the valve train system in the L83 engine, the engine in Plaintiff Velasquez's vehicle, in January 2015.

142.   At all times during her possession of the vehicle, Plaintiff Velasquez has properly maintained and serviced her Class Vehicle according to GM's recommended maintenance guidelines.

143.   On or about February 8, 2022, when her vehicle had 67,000 miles on the odometer, Plaintiff Velasquez was driving when she heard a clunking sound from

the engine, the vehicle failed to accelerate properly, and the check engine light illuminated. She took her vehicle to Bomnin Chevrolet Dadeland for diagnosis and repair. The dealership informed her that the #5 lifter was worn out, causing damage to the camshaft.  The dealership also found DTC P0300 and found misfires in cylinder #5.  The dealership replaced all of the lifters in her vehicle, including all AFM and regular lifters, as well as the camshaft.  Plaintiff Velasquez paid $2,845 to have the engine in her vehicle repaired.  She was without her vehicle for a week.

144.   To date, Plaintiff Velasquez's vehicle remains subject to the Valve Train Defect.

145.   As a result of the Valve Train Defect, Plaintiff Velasquez has lost confidence in the ability of her Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes.  Further, Plaintiff Velasquez will be unable to rely on GM's advertising or labeling in the future, and so will not purchase or lease another vehicle from GM in the future, though they would like to do so.

146.   At all times, Plaintiff Velasquez, like other class members, has driven her vehicle in a foreseeable manner in the sense that Plaintiff Velazquez has not abused her vehicle or used it for purposes unintended by GM such as drag racing, for example. However, despite this normal and foreseeable driving, the Valve Train Defect has rendered her vehicle unsafe and unfit to be used as intended.

**Plaintiff Joey Brown**

147.   Plaintiff Joey Brown is a Georgia citizen who is domiciled in Clarkesville, Georgia.

148.   In or around August 2019, Plaintiff Joey Brown purchased a used 2017 Chevrolet Silverado 1500 equipped with a 5.3L V8 engine with approximately 44,000 miles on the odometer from World Toyota in Chamblee, Georgia.

149.   Plaintiff Brown purchased his vehicle primarily for personal, family, or household use.

150.   Passenger safety and reliability were important factors in Plaintiff Brown's decision to purchase his vehicle. Before making his purchase, Plaintiff Brown conducted internet research including at Kelley Blue Book and Edmunds.com, saw commercials for the Chevrolet Silverado, reviewed GM's website and the dealer website, reviewed the window sticker including the Monroney sticker which listed the 5.3L engine as a component, and test drove the vehicle.   Plaintiff Brown selected and ultimately purchased his Class Vehicle because the vehicle was represented to be and was marketed as a high-quality vehicle capable of providing safe, reliable transportation.   The purchase was made in part on the advertised safety, reliability, and quality of the vehicle and its components, including its engine.

151.   None of the information provided to Plaintiff Brown disclosed any defects in the vehicle or its engine.   GM's omissions were material to Plaintiff Brown.

152.   Had GM disclosed its knowledge of the Valve Train Defect before he purchased his vehicle, Plaintiff Brown would have seen and been aware of the disclosures. Indeed, GM's misstatements and omissions were material to Plaintiff Brown.  Like all members of the Class, Plaintiff Brown would not have purchased his Class Vehicle, or would have paid less for the vehicle, had he known of the Valve Train Defect.

153.   In addition, at the time Plaintiff Brown purchased his vehicle, and in purchasing his vehicle, he relied upon representations from GM that he saw in commercials, on the GM website, and on the window sticker that the vehicle was fully functional, safe, durable, reliable, and that the engine operated correctly and effectively.  Plaintiff Brown relied on those representations and the omission of the disclosure of the Valve Train Defect, in leasing the vehicle, and absent those representations and omissions, would not have leased the vehicle or would have paid less for it.

154.   At the time of his purchase, GM transferred to Plaintiff Brown for his vehicle: (1) a bumper-to-bumper warranty lasting for three years or 36,000 miles, whichever occurred first; (2) a powertrain warranty lasting for five years or 60,000

miles, whichever occurred first; and (3) an emissions control warranty of eight years or 80,000 miles, whichever occurred first.

155.   Unbeknownst to Plaintiff Brown, GM had already issued at least eleven (1) technical service bulletins alerting dealerships to lifter problems in the 2017 Chevrolet Silverado 1500 but had not issued a recall. Moreover, GM issued the first TSB describing problems the valve train system in the L83 engine, the engine in Plaintiff Brown's vehicle, in January 2015.

156.   At all times during his ownership of the vehicle, Plaintiff Brown has properly maintained and serviced his Class Vehicle according to GM's recommended maintenance guidelines.

157.   On or about October 19, 2021, when the vehicle has approximately 74,000 miles on the odometer, Plaintiff Brown observed that the vehicle was hesitating, had a lack of power, ran roughly, and was emitting noises sounding like "rocks in a blender" from the engine compartment, while his son Connor Brown also experienced loss of power while driving the vehicle on highways. Plaintiff Brown immediately took his vehicle to his local authorized Chevrolet dealership, which performed a diagnostic check and advised that the vehicle suffered from bent pushrods due to bent pushrods and that the valve spring was broken. The dealership recommended a total engine replacement. The dealership replaced the engine and related belts, gaskets, seals, and hardware, for which Plaintiff Brown paid out-of-

pocket in the amount of $5,155.14. Plaintiff Brown was without his vehicle for 30 days.

158.   To date, Plaintiff Brown's vehicle remains subject to the Valve Train Defect.

159.   As a result of the Valve Train Defect, Plaintiff Brown has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes.  Further, Plaintiff Brown will be unable to rely on GM's advertising or labeling in the future, and so will not purchase or lease another vehicle from GM in the future, though he would like to do so.

160.   At all times, Plaintiff Brown, like other class members, has driven his vehicle in a foreseeable manner in the sense that Plaintiff Brown has not abused his vehicle or used it for purposes unintended by GM such as drag racing, for example. However, despite this normal and foreseeable driving, the Valve Train Defect has rendered his vehicle unsafe and unfit to be used as intended. .

**Plaintiff Leon Jordan**

161.   Plaintiff Leon Jordan is a citizen of Georgia, domiciled in Stockbridge, Georgia.

162.   On or about December 31, 2015, Plaintiff Jordan purchased a used 2015 Cadillac Escalade equipped with a 6.2L V8 engine with approximately 7,780 miles

on the odometer from Heritage Cadillac, an authorized GM dealership located in Morrow, Georgia.

163.    Plaintiff Jordan purchased his vehicle primarily for personal, family, or household use.

164.    Passenger safety and reliability were important factors in Plaintiff Jordan's decision to purchase his vehicle. Before making his purchase, Plaintiff Jordan reviewed the vehicle's window stickers, including the Monroney sticker which listed the 6.2L engine as a component and spoke to the authorized salesperson at the dealership who assured him of the quality, safety, and reliability of the vehicle. Plaintiff Jordan also took the vehicle for a test drive. Plaintiff Jordan selected and ultimately purchased his Class Vehicle because the vehicle was represented to be and was marketed as a high-quality vehicle capable of providing safe, reliable transportation. The purchased was made in part on the advertised safety, reliability, and quality of the vehicle and its components, including its engine.

165.    None of the information provided to Plaintiff Jordan disclosed any defects in the vehicle or its engine. GM's omissions were material to Plaintiff Jordan.

166.    Had GM disclosed its knowledge of the Valve Train Defect before he purchased his vehicle, Plaintiff Jordan would have seen and been aware of the disclosures. Indeed, GM's misstatements and omissions were material to Plaintiff Jordan. Like all members of the Class, Plaintiff Jordan would not have purchased

his Class Vehicle, or would have paid less for the vehicle, had he known of the Valve Train Defect.

167.   In addition, at the time Plaintiff Jordan purchased his vehicle, and in purchasing his vehicle, he relied upon representations from GM and its authorized dealership that he heard from the salesperson and reviewed the vehicle's window stickers, including the Monroney sticker that the vehicle was fully functional, safe, durable, reliable, and that the engine operated correctly and effectively.  Plaintiff Jordan relied on those representations and the omission of the disclosure of the Valve Train Defect, in purchasing the vehicle, and absent those representations and omissions, would not have purchased the vehicle or would have paid less for it.

168.   At the time of his purchase, GM transferred to Plaintiff Jordan for his vehicle: (1) a bumper-to-bumper warranty lasting for four years or 50,000 miles, whichever occurred first; (2) a powertrain warranty lasting for six years or 70,000 miles, whichever occurred first; and (3) an emissions control warranty of eight years or 80,000 miles, whichever occurred first.

169.   Unbeknownst to Plaintiff Jordan, at the time of his purchase, GM had already issued five communications to its authorized dealerships describing problems with the valve train system in 2015 Cadillac Escalade. Moreover, GM issued the first TSB describing problems the valve train system in the L86 engine, the engine in Plaintiff Jordan's vehicle, in January 2015.

170.   At all times during his ownership of the vehicle, Plaintiff Jordan has properly maintained and serviced his Class Vehicle according to GM's recommended maintenance guidelines.

171.   In around early June 2021, Plaintiff Jordan observed that the vehicle was hesitating while being driven, had a lack of power, ran roughly, produced smoke from the tailpipe, and was making a clacking noise in the engine compartment.  On or about June 14, 2021, he had the vehicle towed to Heritage Cadillac.  At the time, his vehicle had approximately 46,800 miles on the odometer.   The dealership performed a diagnostic check and discovered that there was a "misfire condition due to issue with lifter failure and bent pushrods."  Plaintiff Jordan was charged and paid $1,650 for the diagnostic and the dealership recommended that he replace the engine.

172.   Heritage Cadillac contacted EasyCare, Plaintiff Jordan's third-party warranty provider to submit a claim on his behalf in order to pay for a new engine. EasyCare sent an adjustor to Heritage Cadillac, who inspected the vehicle and ultimately denied the claim due to coolant mixing with the engine oil.  Heritage Cadillac informed Plaintiff Jordan that the coolant mixing with the oil was the result of the lifter failure and subsequent damage to the engine it caused and explained that to EasyCare.  However, EasyCase denied the claim three times.

173.   After nearly four months had passed without a resolution, and because Plaintiff Jordan had not been provided with a loaner vehicle in the interim, forcing him to pay for Lyft rides, inter alia, to get to his doctors' appointments, he began to

search for an alternative.  No dealership, other than Heritage Cadillac, would accept his vehicle as a trade-in, significantly limiting his options at securing new transportation.  Because he is a disabled veteran and has trouble getting into and driving smaller vehicles, Plaintiff Jordan once again considered a Cadillac Escalade.

174.   While his 2015 Cadillac Escalade was sitting in the service area of the dealership, Plaintiff Jordan observed that a 2020 Cadillac Escalade had come in for the same issue—failed lifters.  As a result, he specifically looked at only 2021 Cadillac Escalades and specifically asked if the 2021 Cadillac Escalade had the same issue(s).  He was told that the dealership "had not had that kind of problem" with the 2021 Cadillac Escalade.

175.   On September 30, 2021, Plaintiff Jordan purchased a new 2021 Cadillac Escalade equipped with a 6.2L V8 engine from Heritage Cadillac.  He purchased this vehicle primarily for personal, family, or household use.

176.   Passenger safety and reliability were important factors in Plaintiff Jordan's decision to purchase the 2021 Cadillac Escalade vehicle. Before making his purchase, Plaintiff Jordan reviewed GM's website, reviewed the vehicle's window stickers, including the Monroney sticker which listed the 6.2L engine as a component, and spoke to the authorized salesperson at the dealership who assured him of the quality, safety, and reliability of the vehicle, particularly in comparison to his issues with the 2015 Cadillac Escalade.  Plaintiff Jordan also took the vehicle for a test ride.  Plaintiff Jordan selected and ultimately purchased the 2021 Cadillac

Escalade because the vehicle was represented to be and was marketed as a high-quality vehicle capable of providing safe, reliable transportation.  The purchased was made in part on the advertised safety, reliability, and quality of the vehicle and its components, including its engine.

177.  None of the information provided to Plaintiff Jordan disclosed any defects in the vehicle or its engine.  GM's omissions were material to Plaintiff Jordan.

178.  Had GM disclosed its knowledge of the Valve Train Defect before he purchased his vehicle, Plaintiff Jordan would have seen and been aware of the disclosures. Indeed, GM's misstatements and omissions were material to Plaintiff Jordan.  Like all members of the Class, Plaintiff Jordan would not have purchased his Class Vehicle, or would have paid less for the vehicle, had he known of the Valve Train Defect.

179.  In addition, at the time Plaintiff Jordan purchased the 2021 Cadillac Escalade, and in purchasing the vehicle, he relied upon representations from GM and its authorized dealership that he saw during his research, heard from the salesperson, and reviewed the vehicle's window stickers, including the Monroney sticker that the vehicle was fully functional, safe, durable, reliable, and that the engine operated correctly and effectively.   Plaintiff Jordan relied on those representations and the omission of the disclosure of the Valve Train Defect, in

purchasing the vehicle, and absent those representations and omissions, would not have purchased the vehicle or would have paid less for it.

180.   At the time of his purchase, GM provided to Plaintiff Jordan for his vehicle: (1) a bumper-to-bumper warranty lasting for four years or 50,000 miles, whichever occurred first; (2) a powertrain warranty lasting for six years or 70,000 miles, whichever occurred first; and (3) an emissions control warranty of eight years or 80,000 miles, whichever occurred first.

181.   Unbeknownst to Plaintiff Jordan, at the time of his purchase of the 2021 Cadillac Escalade, GM had already issued seven communications to its authorized dealerships describing valve train problems in 2021 Cadillac Escalades.  Moreover, GM issued the first TSB describing problems the valve train system in the L87 engine, the engine in Plaintiff Jordan's vehicle, in November 2018.

182.   To date, Plaintiff Jordan's vehicle remains subject to the Valve Train Defect.

183.   As a result of the Valve Train Defect, Plaintiff Jordan has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes.  Further, Plaintiff Jordan will be unable to rely on GM's advertising or labeling in the future, and so will not purchase or lease another vehicle from GM in the future, though he would like to do so.

184.   At all times, Plaintiff Jordan, like other class members, has driven his vehicles in a foreseeable manner in the sense that Plaintiff Jordan has not abused his vehicles or used them for purposes unintended by GM such as drag racing, for example. However, despite this normal and foreseeable driving, the Valve Train Defect has rendered his vehicles unsafe and unfit to be used as intended.

**Plaintiff Michael Scott**

185.   Plaintiff Michael Scott is a citizen of Georgia and is domiciled in Commerce, Georgia.

186.   On or about May 28, 2020, Plaintiff Scott purchased a new 2020 Chevrolet Silverado 1500 equipped with a 5.3L V8 engine, an L82, from Auto Gallery Chevrolet, an authorized GM dealership located in Commerce, Georgia.

187.   Plaintiff Scott purchased his vehicle primarily for personal, family, or household use.

188.   Passenger safety and reliability were important factors in Plaintiff Scott's decision to purchase his vehicle.  Before purchasing the vehicle, Plaintiff Scott visited the manufacturer's and dealership's website, reviewed the vehicle's window stickers, including the Monroney sticker which listed the 5.3L engine as a component, saw several commercials and adds, including on Facebook, did general research using search engines, and spoke to the authorized salesperson at the dealership.  Plaintiff Scott also took the vehicle for a test ride.  Plaintiff Scott selected and ultimately purchased his Class Vehicle because the vehicle was represented to

be, and was marketed as, a high-quality vehicle capable of providing safe, reliable transportation.  The purchase was made in part on the advertised safety, reliability, and quality of the vehicle and its components, including its engine.

189.   None of the information provided to Plaintiff Scott disclosed any defects in the vehicle or its engine.  GM's omissions were material to Plaintiff Scott.

190.   Had GM disclosed its knowledge of the Valve Train Defect before they purchased his vehicle, Plaintiff Scott would have seen and been aware of the disclosures. Indeed, GM's misstatements and omissions were material to Plaintiff Scott. Like all members of the Class, Plaintiff Scott would not have purchased his Class Vehicle, or would have paid less for the vehicle, had he known of the Valve Train Defect.

191.   In addition, at the time of Plaintiff Scott's vehicle purchase, and in purchasing his vehicle, he relied upon GM and its authorized dealerships' representations, which Plaintiff Scott viewed during his online research, including on the manufacturer's dealerships' website, on the window stickers, statements in commercials, and heard from the salesperson, that the vehicle was fully functional, safe, durable, reliable, and that the engine operated correctly and effectively. Plaintiff Scott relied on those representations and the omission of, or failure to disclose, the Valve Train Defect, in purchasing the vehicle, and absent those representations and omissions, would not have purchased the vehicle, or would have paid less for it.

192.   At the time of his purchase, Plaintiff Scott's vehicle had the remainder of GM issued: (1) bumper-to-bumper warranty lasting for three years or 36,000 miles, whichever occurred first; (2) powertrain warranty lasting for five years or 60,000 miles, whichever occurred first; and (3) emissions control warranty of eight years or 80,000 miles, whichever occurred first.

193.   Unbeknownst to Plaintiff Scott, within a month of his purchase of his vehicle, GM issued a TSB to its authorized dealerships describing problems with the valve train system in the 2020 Chevrolet Silverado by adding that model to a previously issued TSB.

194.   At all times during his possession of the vehicle, Plaintiff Scott has properly maintained and serviced his Class Vehicle according to GM's recommended maintenance guidelines.

195.   On or about November 17, 2020, Plaintiff Scott heard a ticking noise coming from the engine compartment and experienced a loss of power while driving. At the time, his vehicle had approximately miles on the odometer.  Plaintiff Scott delivered his vehicle to Auto Gallery Chevrolet, which noted his complaint about hearing a ticking noise coming from the engine.  The technician inspected the vehicle and "found upper engine noise" and found that the lifters in the vehicle were scorn. The dealership replaced all the lifters in the vehicle, as well as gaskets and seals. The vehicle was returned to Plaintiff Scott on November 24, 2020.  According to the repair order, the new AFM lifters had part number 12680871.

196.   On December 29, 2021, Plaintiff Scott was driving his vehicle when he again heard ticking noises from the engine compartment.  In addition, the engine misfired and the vehicle shuttered.  Nevertheless, Plaintiff Scott again delivered his vehicle to Auto Gallery Chevrolet, when his vehicle had 47,063 miles odometer, and requested diagnosis and repair.  The technician found that the issue was caused by the lifters.  In addition, the technician reported during the repair that the "right bank had a head bolt to break off about 2 inches deep in the block. unable (sp) to remove broken piece." The vehicle was returned to Plaintiff Scott on January 7, 2022. According to the repair order, the new AFM lifters had part number 12680871.

197.   The engine in Plaintiff Scott's vehicle is currently being damaged by the loose piece of the head bolt.

198.   To date, Plaintiff Scott's vehicle remains subject to the Valve Train Defect.

199.   As a result of the Valve Train Defect, Plaintiff Scott has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes.  Further, Plaintiff Scott will be unable to rely on GM's advertising or labeling in the future, and so will not purchase or lease another vehicle from GM in the future, though he would like to do so.

200.   At all times, Plaintiff Scott, like other class members, has driven his vehicle in a foreseeable manner in the sense that Plaintiff Scott has not abused his vehicle or used it for purposes unintended by GM such as drag racing, for example.

However, despite this normal and foreseeable driving, the Valve Train Defect has rendered his vehicle unsafe and unfit to be used as intended.

**Plaintiff Trenton Acree**

201.   Plaintiff Trenton Acree is a citizen of Idaho, domiciled in Kuna, Idaho.

202.   On or about December 27, 2018, Plaintiff Acree purchased a new 2018 GMC Sierra 1500 equipped with a 5.3L V8 engine from Kendall Chevrolet Buick GMC of Nampa, an authorized GM dealership located in Nampa, Idaho.

203.   Plaintiff Acree purchased his vehicle primarily for personal, family, or household use.

204.   Passenger safety and reliability were important factors in Plaintiff Acree's decision to purchase his vehicle.  Before purchasing the vehicle, Plaintiff Acree visited the dealership's website, reviewed the vehicle's window stickers, including the Monroney sticker which listed the 5.3L engine as a component, did general research using search engines, and spoke to the authorized salesperson at the dealership.  Plaintiff Acree also took the vehicle for a test ride.  Plaintiff Acree selected and ultimately purchased his Class Vehicle because the vehicle was represented to be, and was marketed as, a high-quality vehicle capable of providing safe, reliable transportation.  The purchase was made in part on the advertised safety, reliability, and quality of the vehicle and its components, including its engine.

205.   None of the information provided to Plaintiff Acree disclosed any defects in the vehicle or its engine.  GM's omissions were material to Plaintiff Acree.

206.   Had GM disclosed its knowledge of the Valve Train Defect before they purchased his vehicle, Plaintiff Acree would have seen and been aware of the disclosures. Indeed, GM's misstatements and omissions were material to Plaintiff Acree. Like all members of the Class, Plaintiff Acree would not have purchased his Class Vehicle, or would have paid less for the vehicle, had he known of the Valve Train Defect.

207.   In addition, at the time of Plaintiff Acree's vehicle purchase, and in purchasing his vehicle, he relied upon GM and its authorized dealerships' representations, which Plaintiff Acree viewed during his online research, including on the dealerships' website, statements in commercials, viewed on the window stickers, and heard from the salesperson, that the vehicle was fully functional, safe, durable, reliable, and that the engine operated correctly and effectively.  Plaintiff Acree relied on those representations and the omission of, or failure to disclose, the Valve Train Defect, in purchasing the vehicle, and absent those representations and omissions, would not have purchased the vehicle, or would have paid less for it.

208.   At the time of his purchase, Plaintiff Acree's vehicle had the remainder of GM issued: (1) bumper-to-bumper warranty lasting for three years or 36,000 miles, whichever occurred first; (2) powertrain warranty lasting for five years or 60,000 miles, whichever occurred first; and (3) emissions control warranty of eight years or 80,000 miles, whichever occurred first.

209.   Unbeknownst to Plaintiff Acree, at the time of his purchase, GM had already issued three communications to its authorized dealerships describing problems with the valve train system in the 2018 GMC. Moreover, GM issued the first TSB describing problems the valve train system in the L83 engine, the engine in Plaintiff Acree's vehicle, in January 2015.

210.   At all times during his possession of the vehicle, Plaintiff Acree has properly maintained and serviced his Class Vehicle according to GM's recommended maintenance guidelines.

211.   On or around January 10, 2022, when the vehicle had less than 83,000 miles on the odometer, Plaintiff Acree took his vehicle to the dealership for diagnosis and repair of an illuminated check engine light which turned itself off and a leaking water pump. The dealership found in addition to needing a new water pump, there was a DTC of Active Fuel Management Fault. The dealership further found an "internal fault to Active Fuel Management lifters." As a result, all of the lifters in his vehicle had to be replaced, along with the guides, VLOM plate, and related gaskets and seals. Mr. Acree had to pay $4,445.17 to repair the engine and was without his vehicle for over a month.  According to the repair order, 8 AFM Lifters with part number 12698946 and 8 regular lifters with part number 12698945 were installed in his vehicle.

212.   To date, Plaintiff Acree's vehicle remains subject to the Valve Train Defect.

213.   As a result of the Valve Train Defect, Plaintiff Acree has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes.  Further, Plaintiff Acree will be unable to rely on GM's advertising or labeling in the future, and so will not purchase or lease another vehicle from GM in the future, though he would like to do so.

214.   At all times, Plaintiff Acree, like other class members, has driven his vehicle in a foreseeable manner in the sense that Plaintiff Acree has not abused his vehicle or used it for purposes unintended by GM such as drag racing, for example. However, despite this normal and foreseeable driving, the Valve Train Defect has rendered his vehicle unsafe and unfit to be used as intended.

**Plaintiff Richard Zembol**

215.   Plaintiff Richard Zembol is a citizen of Illinois, domiciled in Mokena, Illinois.

216.   On or about April 7, 2021, Plaintiff Zembol purchased a new 2021 GMC Yukon AT4 equipped with a 5.3L V8 engine from D'Arcy Buick GMC, an authorized GM dealership located in Joliet, Illinois.

217.   Plaintiff Zembol purchased his vehicle primarily for personal, family, or household use.

218.   Passenger safety and reliability were important factors in Plaintiff Zembol's decision to purchase his vehicle.  Before purchasing the vehicle, Plaintiff Zembol visited the manufacturer's and dealership's website, reviewed the vehicle's

window stickers, including the Monroney sticker which listed the 5.3L engine as a component, viewed television commercials, did general research using search engines, and spoke to the authorized salesperson at the dealership. Plaintiff Zembol also took the vehicle for a test ride. Plaintiff Zembol selected and ultimately purchased his Class Vehicle because the vehicle was represented to be, and was marketed as, a high-quality vehicle capable of providing safe, reliable transportation. The purchase was made in part on the advertised safety, reliability, and quality of the vehicle and its components, including its engine.

219. None of the information provided to Plaintiff Zembol disclosed any defects in the vehicle or its engine. GM's omissions were material to Plaintiff Zembol.

220. Had GM disclosed its knowledge of the Valve Train Defect before they purchased his vehicle, Plaintiff Zembol would have seen and been aware of the disclosures. Indeed, GM's misstatements and omissions were material to Plaintiff Zembol. Like all members of the Class, Plaintiff Zembol would not have purchased his Class Vehicle, or would have paid less for the vehicle, had he known of the Valve Train Defect.

221. In addition, at the time of Plaintiff Zembol' vehicle purchase, and in purchasing his vehicle, he relied upon GM and its authorized dealerships' representations, which Plaintiff Zembol viewed during his online research, including on the dealerships' website, heard from the salesperson, and reviewed the vehicle's

window stickers, including the Monroney sticker, that the vehicle was fully functional, safe, durable, reliable, and that the engine operated correctly and effectively.  Plaintiff Zembol relied on those representations and the omission of, or failure to disclose, the Valve Train Defect, in purchasing the vehicle, and absent those representations and omissions, would not have purchased the vehicle, or would have paid less for it.

222.   At the time of his purchase, GM issued to Plaintiff Zembol for his vehicle: (1) a bumper-to-bumper warranty lasting for three years or 36,000 miles, whichever occurred first; (2) a powertrain warranty lasting for five years or 60,000 miles, whichever occurred first; and (3) an emissions control warranty of eight years or 80,000 miles, whichever occurred first.

223.   Unbeknownst to Plaintiff Zembol, within two weeks of his purchase, GM issued three communications to its authorized dealerships describing problems with the valve train system in the 2021 GMC Yukon. By December 2021, GM had issued an additional three communications describing problems with the valve train system in his vehicle. Moreover, GM issued the first TSB describing problems the valve train system in the L84 engine, the engine in Plaintiff Zembol's vehicle, in November 2018.

224.   At all times during his possession of the vehicle, Plaintiff Zembol has properly maintained and serviced his Class Vehicle according to GM's recommended maintenance guidelines.

225.   On or about January 10, 2021 and at approximately 8,000 miles, Plaintiff Zembol was driving his vehicle when the engine began to knocking, stalling, misfiring, and stuttering. Plaintiff Zembol continued driving his vehicle after it first began experiencing these issues for about 50 miles until he reached a safe place to stop. Thereafter he had his vehicle towed to D'Arcy Buick GMC where the dealership informed him that his vehicle needed new lifters. The dealership replaced both banks of lifters.  Plaintiff Zembol requested a complete engine replacement due to potential damage to internal parts after it began experiencing issues but was denied and there is no indication the dealership checked the engine for internal damage.

226.   To date, Plaintiff Zembol's vehicle remains subject to the Valve Train Defect.

227.   As a result of the Valve Train Defect, Plaintiff Zembol has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes.  Further, Plaintiff Zembol will be unable to rely on GM's advertising or labeling in the future, and so will not purchase or lease another vehicle from GM in the future, though they would like to do so.

228.   At all times, Plaintiff Zembol, like other class members, has driven his vehicle in a foreseeable manner in the sense that Plaintiff Zembol has not abused his vehicle or used it for purposes unintended by GM such as drag racing, for example.

63

However, despite this normal and foreseeable driving, the Valve Train Defect has rendered his vehicle unsafe and unfit to be used as intended.

**Plaintiff Joseph Attia**

229.   Plaintiff Joseph Attia is a citizen of Massachusetts, domiciled in Natick, Massachusetts.

230.   On or about February 14, 2020, Plaintiff Attia purchased a used 2018 GMC Yukon equipped with a 6.2L V8 engine from a dealership located in Norwood, Massachusetts.  At the time of his purchase, the vehicle had approximately 50,813 miles on the odometer.

231.   Plaintiff Attia purchased his vehicle primarily for personal, family, or household use.

232.   Passenger safety and reliability were important factors in Plaintiff Attia's decision to purchase his vehicle.  Before purchasing the vehicle, Plaintiff Attia visited the manufacturer and dealership websites, reviewed the vehicle's window stickers, including the Monroney sticker which listed the 6.2L engine as a component, did general research using search engines, researched Kelly Blue Book and Edmunds, and spoke to the authorized salesperson at the dealership.  Plaintiff Attia also took the vehicle for a test ride.  Plaintiff Attia selected and ultimately purchased his Class Vehicle because the vehicle was represented to be, and was marketed as, a high-quality vehicle capable of providing safe, reliable transportation.

The purchase was made in part on the advertised safety, reliability, and quality of the vehicle and its components, including its engine.

233.   None of the information provided to Plaintiff Attia disclosed any defects in the vehicle or its engine.  GM's omissions were material to Plaintiff Attia.

234.   Had GM disclosed its knowledge of the Valve Train Defect before they purchased his vehicle, Plaintiff Attia would have seen and been aware of the disclosures. Indeed, GM's misstatements and omissions were material to Plaintiff Attia. Like all members of the Class, Plaintiff Attia would not have purchased his Class Vehicle, or would have paid less for the vehicle, had he known of the Valve Train Defect.

235.   In addition, at the time of Plaintiff Attia' vehicle purchase, and in purchasing his vehicle, he relied upon GM and its authorized dealerships' representations, which Plaintiff Attia viewed during his online research, including on the manufacturer and dealership websites, reviewed on the window stickers, and heard from the salesperson, that the vehicle was fully functional, safe, durable, reliable, and that the engine operated correctly and effectively.  Plaintiff Attia relied on those representations and the omission of, or failure to disclose, the Valve Train Defect, in purchasing the vehicle, and absent those representations and omissions, would not have purchased the vehicle, or would have paid less for it.

236.   At the time of his purchase, Plaintiff Attia received the remainder of the GM-issued warranties including: (1) powertrain warranty lasting for five years or

65

60,000 miles, whichever occurred first; and (2) emissions control warranty of eight years or 80,000 miles, whichever occurred first.

237.   Unbeknownst to Plaintiff Attia, at the time of his purchase, GM had already issued six communications to its authorized dealerships describing problems with the valve train system in the 2018 GMC Yukon.  Furthermore, GM had already issued one communication to its authorized dealership describing problems with the valve trains system in the 2018 GMC Yukon prior to the vehicle original purchase by a consumer on January 1, 2018. Moreover, GM issued the first TSB describing problems the valve train system in the L86 engine, the engine in Plaintiff Attia's vehicle, in January 2015.

238.   At all times during his possession of the vehicle, Plaintiff Attia has properly maintained and serviced his Class Vehicle according to GM's recommended maintenance guidelines.

239.   On or about November 24, 2021 and at 78,483 miles, Plaintiff Attia was driving his vehicle when he experienced a knocking coming from the engine, the check engine light began flashing, and the vehicle became unstable, shaking uncontrollably.  He and his passengers were left stranded.

240.   Plaintiff Attia initially had the vehicle checked out by a local auto shop, before it was taken to Commonwealth Chevrolet, an authorized GM dealership located in Lawrence, Massachusetts. The technician confirmed the noises from the engine compartment and discovered DTC P0300 indicated engine misfires in the

ECM.  The dealership found a failed lifter in bank 1 of the engine and recommended replacing all of the lifters in the vehicles, as well as guides, and related equipment. Plaintiff Attia paid $2,033.47 for the repair, while GM agreed to pay approximately $871. Per the repair order, the dealership installed 8 AFM Lifters with part number 12698946 as well as 8 regular lifters.

241.    Upset that GM refused to pay for the full repair even though the TSB it published showed that GM was well-aware of the problems in its vehicles, on December 18, 2021, Plaintiff Attia emailed Mary Berra, the chief executive officer of GM to complain.  A member of Ms. Berra's team contacted Plaintiff Attia and ultimately offered him $4,000 credit on a new GM vehicle.  Plaintiff Attia refused, but shortly thereafter received a letter from GM indicating that they would give him extended component coverage warranty on the new lifters installed in his vehicle.

242.    To date, Plaintiff Attia's vehicle remains subject to the Valve Train Defect.

243.    As a result of the Valve Train Defect, Plaintiff Attia has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes.  Further, Plaintiff Attia will be unable to rely on GM's advertising or labeling in the future, and so will not purchase or lease another vehicle from GM in the future, though he would like to do so.

244.    At all times, Plaintiff Attia, like other class members, has driven his vehicle in a foreseeable manner in the sense that Plaintiff Attia has not abused his

vehicle or used it for purposes unintended by GM such as drag racing, for example. However, despite this normal and foreseeable driving, the Valve Train Defect has rendered his vehicle unsafe and unfit to be used as intended.

### Plaintiffs Alexander and Nataliya Purshaga

245.   Plaintiffs Alexander Purshaga and Nataliya Purshaga ("Purshagas") are citizens of Massachusetts, domiciled in Westfield, Massachusetts.

246.   On or about June 10, 2021, Plaintiffs Purshaga purchased a preowned 2018 GMC Yukon equipped with a 6.2L V8 engine from Balise Chevrolet Buick GMC, an authorized GM dealership located in Springfield, Massachusetts.  At the time of purchase, their vehicle had approximately 69,000 miles on the odometer.

247.   Plaintiffs Purshaga purchased their vehicle primarily for personal, family, or household use.

248.   Passenger safety and reliability were important factors in Plaintiffs Purshagas' decision to purchase their vehicle.  Before purchasing the vehicle, Plaintiffs Purshaga visited the dealership's website, reviewed the vehicle's window stickers, including the Monroney sticker which listed the 6.2L engine as a component, viewed television commercials, researched on third-party websites such as Edumuds.com, and spoke to the authorized salesperson at the dealership. Plaintiffs Purshagas also took the vehicle for a test ride.  Plaintiffs Purshagas selected and ultimately purchased their Class Vehicle because the vehicle was represented to be, and was marketed as, a high-quality vehicle capable of providing safe, reliable

transportation.  The purchase was made in part on the advertised safety, reliability, and quality of the vehicle and its components, including its engine.

249.   None of the information provided to Plaintiffs Purshagas disclosed any defects in the vehicle or its engine.  GM's omissions were material to Plaintiffs Purshagas.

250.   Had GM disclosed its knowledge of the Valve Train Defect before they purchased their vehicle, Plaintiffs Purshagas would have seen and been aware of the disclosures. Indeed, GM's misstatements and omissions were material to Plaintiffs Purshagas.  Like all members of the Class, Plaintiffs Purshagas would not have purchased their Class Vehicle, or would have paid less for the vehicle, had they known of the Valve Train Defect.

251.   In addition, at the time of Plaintiffs Purshagas' vehicle purchase, and in purchasing their vehicle, they relied upon GM and its authorized dealerships' representations, which Plaintiffs Purshagas viewed during their online research, including on the dealerships' website, heard from the salesperson, and reviewed the vehicle's  window stickers, including the Monroney sticker, that the vehicle was fully functional, safe, durable, reliable, and that the engine operated correctly and effectively.  Plaintiffs Purshagas relied on those representations and the omission of, or failure to disclose, the Valve Train Defect, in purchasing the vehicle, and absent those representations and omissions, would not have purchased the vehicle, or would have paid less for it.

252.   At the time of its original sale purchase, GM issued for their vehicle: (1) a bumper-to-bumper warranty lasting for three years or 36,000 miles, whichever occurred first; (2) a powertrain warranty lasting for five years or 60,000 miles, whichever occurred first; and (3) an emissions control warranty of eight years or 80,000 miles, whichever occurred first.   At the time of their purchase, GM transferred the emissions control warranty to the Purshagas.

253.   Unbeknownst to Plaintiffs Purshagas, at the time of their purchase, GM had already issued twelve (12) communications to its authorized dealerships describing problems with the valve train system in the 2018 GMC Yukon. Moreover, GM issued the first TSB describing problems the valve train system in the L86 engine, the engine in Plaintiffs Purshagas' vehicle, in January 2015.

254.   At all times during their possession of the vehicle, Plaintiffs Purshagas has properly maintained and serviced their Class Vehicle according to GM's recommended maintenance guidelines.

255.   On or around February 2, 2022, Plaintiffs Purshagas' vehicle began to shake and the engine misfired while it was being driven. Mr. Purshaga took his vehicle to Central Chevrolet, an authorized GM dealership located in West Springfield, Massachusetts, for diagnosis and repair on February 7, 2022. The dealership found the check engine light illuminated and DTC P0306 in the ECM, indicating misfires on cylinder #6.  A further inspection revealed the #6 cylinder's rocker arms to "have play," and bent pushrods, as a result of failed lifters.  In

particular, the cylinder #6 "active lifter damaged the camshaft. The roller on the lifter seized and worn the camshaft lobe." The dealership recommended that the VLOM, camshaft, and all the lifters be replaced, because replacing the lifters on only one bank would put "additional strain" on the other components. Plaintiffs Purshagas authorized the repairs. All sixteen lifters were replaced, eight with part number 12698945 and eight with part number 12698946. Plaintiffs Purshaga ultimately paid $7,108.84 for the repair, which included a new timing belt and tensioner, and retrieved their vehicle on February 16, 2022.

256. Several weeks later, while driving the vehicle, Plaintiffs Purshagas witnessed the check engine light illuminate again. When it turned itself off, they believed it was a transient issue, but several days later, it illuminated again. In addition, the engine's revolutions per minute began to fluctuate widely, the vehicle began to shake noticeably, and stalled twice. Plaintiffs Purshaga ceased driving their vehicle and called Central Chevrolet. They were told that the dealership was too busy and would not be able to receive and diagnose the vehicle until March 30, 2022. On March 30, 2022, Plaintiffs Purshaga delivered their vehicle to Central Chevrolet for diagnosis and repair. They are currently awaiting a diagnosis.

257. To date, Plaintiffs Purshagas' vehicle remains subject to the Valve Train Defect.

258. As a result of the Valve Train Defect, Plaintiffs Purshagas have lost confidence in the ability of their Class Vehicle to provide safe and reliable

transportation for ordinary and advertised purposes.  Further, Plaintiffs Purshagas will be unable to rely on GM's advertising or labeling in the future, and so will not purchase or lease another vehicle from GM in the future, though they would like to do so.

259.   At all times, Plaintiffs Purshaga, like other class members, have driven their vehicle in a foreseeable manner in the sense that Plaintiffs Purshaga have not abused their vehicle or used it for purposes unintended by GM such as drag racing, for example. However, despite this normal and foreseeable driving, the Valve Train Defect has rendered their vehicle unsafe and unfit to be used as intended.

**Plaintiff Lisa Saffell**

260.   Plaintiff Lisa Saffell is a citizen of Missouri, domiciled in Overland, Missouri.

261.   On or about April 12, 2019, Plaintiff Saffell purchased a new 2018 GMC Sierra 1500 equipped with a 6.2L V8 engine from Suntrup Buick-Pontiac-GMC, an authorized GM dealership located in St. Peters, Missouri.

262.   Plaintiff Saffell purchased her vehicle primarily for personal, family, or household purposes.

263.   Passenger safety and reliability were important factors in Plaintiff Saffell's decision to purchase her vehicle. Before purchasing the vehicle, Plaintiff Saffell visited the manufacturer's website, reviewed the vehicle's window stickers, including the Monroney sticker which listed the 6.2L engine as a component, viewed

television commercials, did general research online, and spoke to the authorized salesperson at the dealership, who informed her that the vehicle was safe and reliable. Plaintiff Saffell also test drove the vehicle twice. She selected and ultimately purchased her Class Vehicle because the vehicle was represented to be, and was marketed as, a high-quality vehicle capable of providing safe, reliable transportation. The purchase was made in part on the advertised safety, reliability, and quality of the vehicle and its components, including its engine.

264.   None of the information provided to Plaintiff Saffell disclosed any defects in the vehicle or its engine.   GM's omissions were material to Plaintiff Saffell.

265.   Had GM disclosed its knowledge of the Valve Train Defect before they purchased her vehicle, Plaintiff Saffell would have seen and been aware of the disclosures. Indeed, GM's misstatements and omissions were material to Plaintiff Saffell. Like all members of the Class, Plaintiff Saffell would not have purchased her Class Vehicle, or would have paid less for the vehicle, had she known of the Valve Train Defect.

266.   In addition, at the time of Plaintiff Saffell's vehicle purchase, and in purchasing her vehicle, she relied upon GM and its authorized dealerships' representations, which Plaintiff Saffell saw in commercials, reviewed on the windows stickers, and heard from the salesperson, that the vehicle was fully functional, safe, durable, reliable, and that the engine operated correctly and

effectively. Plaintiff Saffell relied on those representations and the omission of, or failure to disclose, the Valve Train Defect, in purchasing the vehicle, and absent those representations and omissions, would not have purchased the vehicle, or would have paid less for it.

267.   At the time of her purchase, Plaintiff Saffell's vehicle had the remainder of GM issued: (1) bumper-to-bumper warranty lasting for three years or 36,000 miles, whichever occurred first; (2) powertrain warranty lasting for five years or 60,000 miles, whichever occurred first; and (3) emissions control warranty of eight years or 80,000 miles, whichever occurred first.

268.   Unbeknownst to Plaintiff Saffell, at the time of her purchase, GM had already issued five communications to its authorized dealerships describing problems with the valve train system in the 2018 GMC Sierra. Moreover, GM issued the first TSB describing problems the valve train system in the L86 engine, the engine in Plaintiff Saffell's vehicle, in January 2015.

269.   At all times during her possession of the vehicle, Plaintiff Saffell has properly maintained and serviced her Class Vehicle according to GM's recommended maintenance guidelines.

270.   On or about February 10, 2022, with less than 49,000 miles on her vehicle, Plaintiff Saffell was driving when she heard a knocking noise coming from the engine. On the same day, Plaintiff Saffell's vehicle stalled when she accelerated. In the following days, Plaintiff Saffell continued to inspect her vehicle and the

knocking noise persisted. She delivered her vehicle to the Lou Fusz Buick GMC dealership in St. Louis, Missouri, complaining of the knocking noise and her vehicle stalling out. The dealership informed her that all of the right bank lifters would need to be replaced and push rod #6 was bent. As a result, the dealership replaced the eight lifters in the right bank and push rod #6. Plaintiff Saffell asked the dealership if the left bank lifters could be replaced since they would likely fail in the future. The dealership refused to replace the left bank lifters, but the service advisor informed Plaintiff Saffell that she was aware of customers having certain lifters replaced and then having to return to replace others.

271.   To date, Plaintiff Saffell's vehicle remains subject to the Valve Train Defect.

272.   As a result of the Valve Train Defect, Plaintiff Saffell has lost confidence in the ability of her Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes.  Further, Plaintiff Saffell will be unable to rely on GM's advertising or labeling in the future, and so will not purchase or lease another vehicle from GM in the future, though she would like to do so.

273.   At all times, Plaintiff Saffell, like other class members, has driven her vehicle in a foreseeable manner in the sense that Plaintiff Saffell has not abused her vehicle or used it for purposes unintended by GM such as drag racing, for example.

However, despite this normal and foreseeable driving, the Valve Train Defect has rendered her vehicle unsafe and unfit to be used as intended.

**Plaintiff Daniel Demarest**

274.   Plaintiff Daniel Demarest is a citizen of New Jersey and is domiciled in Montvale, New Jersey.

275.   In or around May 13, 2019, Plaintiff Demarest leased a new 2019 Chevrolet Silverado 1500 equipped with a 5.3L V8 engine from Hawthorne Chevrolet, an authorized GM dealership located in Hawthorne, New Jersey.

276.   Plaintiff Demarest purchased his vehicle primarily for personal, family, or household use.

277.   Passenger safety and reliability were important factors in Plaintiff Demarest's decision to lease his vehicle. Before making his purchase, Plaintiff Demarest reviewed the manufacturer and dealer websites, test drove a 2019 Silverado with the same engine, and spoke to the authorized salesperson at the dealership who assured him of the quality, safety, and reliability of the vehicle. Plaintiff Demarest selected and ultimately leased his Class Vehicle because the vehicle was represented to be and was marketed as a high-quality vehicle capable of providing safe, reliable transportation.  The lease was made in part on the advertised safety, reliability, and quality of the vehicle and its components, including its engine.

278.   None of the information provided to Plaintiff Demarest disclosed any defects in the vehicle or its engine.   GM's omissions were material to Plaintiff Demarest.

279.   Had GM disclosed its knowledge of the Valve Train Defect before he purchased his vehicle, Plaintiff Demarest would have seen and been aware of the disclosures. Indeed, GM's misstatements and omissions were material to Plaintiff Demarest.  Like all members of the Class, Plaintiff Demarest would not have leased his Class Vehicle, or would have paid less for the vehicle, had he known of the Valve Train Defect.

280.   In addition, at the time Plaintiff Demarest leased his vehicle, and in leasing his vehicle, he relied upon representations from GM and its authorized dealership that he viewed on the website and heard from the salesperson that the vehicle was fully functional, safe, durable, reliable, and that the engine operated correctly and effectively.  Plaintiff Demarest relied on those representations and the omission of the disclosure of the Valve Train Defect, in leasing the vehicle, and absent those representations and omissions, would not have leased the vehicle or would have paid less for it.

281.   At the time of his lease, GM provided to Plaintiff Demarest for his vehicle: (1) a bumper-to-bumper warranty lasting for three years or 36,000 miles, whichever occurred first; (2) a powertrain warranty lasting for five years or 60,000

miles, whichever occurred first; and (3) an emissions control warranty of eight years or 80,000 miles, whichever occurred first.

282.    Unbeknownst to Plaintiff Demarest, at the time of his lease, GM had already issued three communications to its authorized dealerships describing problems with the valve train system in 2019 Chevrolet Silverados. Moreover, GM issued the first TSB describing problems the valve train system in the L84 engine, the engine in Plaintiff Demarest's vehicle, in November 2018.

283.    At all times during his ownership of the vehicle, Plaintiff Demarest has properly maintained and serviced his Class Vehicle according to GM's recommended maintenance guidelines.

284.    On or about May 7, 2021, Plaintiff Demarest was driving his vehicle on the highway from New Jersey to Florida when the vehicle began to stutter and shake. The check engine light began to flash, and he heard noises coming from the engine. The vehicle became hard to control, but he managed to get to the closest GM authorized dealership, Lumberton GMC, located in Lumberton, North Carolina. At the time of the malfunction, his vehicle had approximately 14,700 miles on the odometer.

285.    The dealership confirmed that the check engine light was on and found DTC P0300 in the vehicle's computer. The dealership inspected the vehicle, confirming a misfire in cylinder number 1, on which the rocker arms were not moving. The dealership identified the cause as failed lifters and cited TSB

PIP5776C.  Ultimately, the dealership confirmed that all eight lifters on the left side of the engine would have to be replaced. Per the repair order, the dealership installed 8 lifters with part number 12680871.

286.   Plaintiff Demarest waited five hours at the dealership before he was given a loaner vehicle to continue on his trip, because GM's policies do not allow dealerships to provide loaner vehicles that are not GM-branded vehicles, and such a vehicle could not be located.  Later, he had to extend his trip by one day because his vehicle would not be ready in time.  This delay cost him at least $240.00.

287.   To date, Plaintiff Demarest's vehicle remains subject to the Valve Train Defect.

288.   As a result of the Valve Train Defect, Plaintiff Demarest has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes.  Further, Plaintiff Demarest will be unable to rely on GM's advertising or labeling in the future, and so will not purchase or lease another vehicle from GM with a gasoline-powered V8 engine in the future, though he would like to do so.

289.   At all times, Plaintiff Demarest, like other class members, has driven his vehicle in a foreseeable manner in the sense that Plaintiff Demarest has not abused his vehicle or used it for purposes unintended by GM such as drag racing, for example. However, despite this normal and foreseeable driving, the Valve Train Defect has rendered his vehicle unsafe and unfit to be used as intended.

**Plaintiff Paul Mouradjian**

290.   Plaintiff Paul Mouradjian is a citizen of New Jersey, domiciled in Blackwood, New Jersey.

291.   On or around October 25, 2017, Plaintiff Mouradjian purchased a used 2015 Chevrolet Silverado 1500 equipped with a 5.3L V8 engine with approximately 8,293 miles on the odometer from Mall Chevrolet, an authorized Chevrolet dealership located in Cherry Hill, New Jersey.

292.   Plaintiff Mouradjian purchased his vehicle primarily for personal, family, or household use.

293.   Passenger safety and reliability were important factors in Plaintiff Mouradjian's decision to purchase his vehicle.  Before purchasing the vehicle, Plaintiff Mouradjian viewed many commercials for the vehicle, researched the vehicle online including viewing the vehicle's product page on the dealership's website, reviewed the sales documentation, and spoke to the authorized salesperson at the dealership.  Plaintiff Mouradjian also took the vehicle for a test ride.  Plaintiff Mouradjian selected and ultimately purchased his Class Vehicle because the vehicle was represented to be, and was marketed as, a high-quality vehicle capable of providing safe, reliable transportation.  The purchase was made in part on the advertised safety, reliability, and quality of the vehicle and its components, including its engine.

294.   None of the information provided to Plaintiff Mouradjian disclosed any defects in the vehicle or its engine.   GM's omissions were material to Plaintiff Mouradjian.

295.   Had GM disclosed its knowledge of the Valve Train Defect before they purchased his vehicle, Plaintiff Mouradjian would have seen and been aware of the disclosures. Indeed, GM's misstatements and omissions were material to Plaintiff Mouradjian. Like all members of the Class, Plaintiff Mouradjian would not have purchased his Class Vehicle, or would have paid less for the vehicle, had he known of the Valve Train Defect.

296.   In addition, at the time of Plaintiff Mouradjian's vehicle purchase, and in purchasing his vehicle, he relied upon GM and its authorized dealerships' representations which he heard from the salesperson, that the vehicle was fully functional, safe, durable, reliable, and that the engine operated correctly and effectively.   Plaintiff Mouradjian relied on those representations and the omission of, or failure to disclose, the Valve Train Defect, in purchasing the vehicle, and absent those representations and omissions, would not have purchased the vehicle, or would have paid less for it.

297.   At the time of his purchase, Plaintiff Mouradjian's vehicle had the remainder of GM issued: (1) bumper-to-bumper warranty lasting for three years or 36,000 miles, whichever occurred first; (2) powertrain warranty lasting for five years

or 60,000 miles, whichever occurred first; and (3) emissions control warranty of eight years or 80,000 miles, whichever occurred first.

298.   Unbeknownst to Plaintiff Mouradjian, at the time of his purchase, GM had already issued at least ten communications to its authorized dealerships describing problems with the valve train system in the 2015 Chevrolet Silverado 1500. Moreover, GM issued the first TSB describing problems the valve train system in the L83 engine, the engine in Plaintiff Mouradjian's vehicle, in January 2015.

299.   At all times during his possession of the vehicle, Plaintiff Mouradjian has properly maintained and serviced his Class Vehicle according to GM's recommended maintenance guidelines.

300.   In the end of November 2021, when the vehicle has approximately 53,000 miles on the odometer, Plaintiff Mouradjian observed that the vehicle was hesitating, was emanating noises from the engine compartment, and would not accelerate or reach speeds above 45 miles per hour. He promptly took his vehicle to Tire Corral in Clementon, New Jersey, which recommended that his Class Vehicle's engine be repaired. Thereafter, in late December 2021, Plaintiff took his vehicle to Integrity Automotive, which performed an inspection and determined that the "engine noise [was] coming from collapsed and failed lifters, and suggested[ed] engine replacement." The technician also noted that there were "[o]ther options available, but not recommended." The technician also "[f]ound cam damage." Integrity Automotive replaced the entire engine assembly including belts, water

pump, intake manifold sets, and related gaskets, seals, and hardware.  Plaintiff paid approximately $11,000 for the repairs.

301.   To date, Plaintiff Mouradjian's vehicle remains subject to the Valve Train Defect.

302.   As a result of the Valve Train Defect, Plaintiff Mouradjian has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes.  Further, Plaintiff Mouradjian will be unable to rely on GM's advertising or labeling in the future, and so will not purchase or lease another vehicle from GM in the future, though he would like to do so.

303.   At all times, Plaintiff Mouradjian, like other class members, has driven his vehicle in a foreseeable manner in the sense that Plaintiff Mouradjian has not abused his vehicle or used it for purposes unintended by GM such as drag racing, for example. However, despite this normal and foreseeable driving, the Valve Train Defect has rendered his vehicle unsafe and unfit to be used as intended.

### Plaintiffs Randall Thorson and Salomé Rodriguez-Thorson

304.   Plaintiffs Randall Thorson and Salomé Rodriguez-Thorson ("Thorsons") are citizens of New Mexico, domiciled in Placitas, New Mexico.

305.   On or about November 14, 2020, Plaintiffs Thorsons purchased a new 2021 Chevrolet Silverado equipped with a 5.3L V8 engine from Reliable Chevrolet, an authorized GM dealership located in Albuquerque, New Mexico.

306.   Plaintiffs Thorsons purchased their vehicle primarily for personal, family, or household use.

307.   Passenger safety and reliability were important factors in Plaintiffs Thorsons' decision to purchase their vehicle.   Before purchasing the vehicle, Plaintiffs Thorsons visited the dealership's website, reviewed the vehicle's window stickers, including the Monroney sticker which listed the 5.3L engine as a component, viewed television commercials, did research on google, Kelley Blue Book, and consumer reports, and spoke to the authorized salesperson at the dealership.   Plaintiffs Thorsons also took the vehicle for a test ride.   Plaintiffs Thorsons selected and ultimately purchased their Class Vehicle because the vehicle was represented to be, and was marketed as, a high-quality vehicle capable of providing safe, reliable transportation.   The purchase was made in part on the advertised safety, reliability, and quality of the vehicle and its components, including its engine.

308.   None of the information provided to Plaintiffs Thorsons disclosed any defects in the vehicle or its engine.   GM's omissions were material to Plaintiffs Thorsons.

309.   Had GM disclosed its knowledge of the Valve Train Defect before they purchased their vehicle, Plaintiffs Thorsons would have seen and been aware of the disclosures. Indeed, GM's misstatements and omissions were material to Plaintiffs Thorsons.   Like all members of the Class, Plaintiffs Thorsons would not have

purchased their Class Vehicle, or would have paid less for the vehicle, had they known of the Valve Train Defect.

310.   In addition, at the time of Plaintiffs Thorsons' vehicle purchase, and in purchasing their vehicle, they relied upon GM and its authorized dealerships' representations, which Plaintiffs Thorsons viewed during their online research, including on the dealerships' website, heard from the salesperson, and reviewed the vehicle's window stickers, including the Monroney sticker, that the vehicle was fully functional, safe, durable, reliable, and that the engine operated correctly and effectively.  Plaintiffs Thorsons relied on those representations and the omission of, or failure to disclose, the Valve Train Defect, in purchasing the vehicle, and absent those representations and omissions, would not have purchased the vehicle, or would have paid less for it.

311.   At the time of their purchase, GM issued to Plaintiffs Thorsons for their vehicle: (1) a bumper-to-bumper warranty lasting for three years or 36,000 miles, whichever occurred first; (2) a powertrain warranty lasting for five years or 60,000 miles, whichever occurred first; and (3) an emissions control warranty of eight years or 80,000 miles, whichever occurred first.

312.   Unbeknownst to Plaintiffs Thorsons, at the time of their purchase, GM had already issued two communications to its authorized dealerships describing problems with the valve train system in the 2021 Chevrolet Silverado.  Moreover,

GM issued the first TSB describing problems the valve train system in the L84 engine, the engine Plaintiffs Thorsons' vehicle, in November 2018.

313. At all times during their possession of the vehicle, Plaintiffs Thorsons has properly maintained and serviced their Class Vehicle according to GM's recommended maintenance guidelines.

314. On or about August 28, 2021, when the vehicle had approximately 10,365 miles odometer, Plaintiff Randall Thorson was driving on the highway at about 75 mph when the vehicle lost power, the engine misfired and ran roughly, a ticking noise came from the engine, and various lights illuminated on his dashboard. Plaintiffs Thorsons called GM roadside assistance, which towed the vehicle to Reliable Chevrolet for repair and diagnosis. The technician at the dealership could also hear the engine noise and found DTCs P0300 and P0306 indicating misfires on cylinder #6. The dealership found two bent pushrods on cylinder #6 due to a collapsed lifter. When service associate at the dealership called Plaintiff Randall Thorson to give him the diagnosis, the associate said he had seen this before.

315. Ultimately, the lifters on one side of the engine were replaced, along with the two pushrods. According to the repair order, 8 new lifters were installed in the vehicle, part number 12680871.

316. After performing the partial repair to only one of the banks of lifters and pushrods, the vehicle was returned to Plaintiffs Thorsons thirty-eight (38) days

later on October 5, 2021.   When Plaintiffs Thorsons picked up the vehicle, the service association reiterated that they had seen this problem before.

317.   To date, Plaintiffs Thorsons' vehicle remains subject to the Valve Train Defect.

318.   As a result of the Valve Train Defect, Plaintiffs Thorsons have lost confidence in the ability of their Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes.   Further, Plaintiffs Thorsons will be unable to rely on GM's advertising or labeling in the future, and so will not purchase or lease another vehicle from GM in the future, though they would like to do so.

319.   At all times, Plaintiffs Thorsons, like other class members, have driven their vehicle in a foreseeable manner in the sense that Plaintiffs Thorsons have not abused their vehicle or used it for purposes unintended by GM such as drag racing, for example. However, despite this normal and foreseeable driving, the Valve Train Defect has rendered their vehicle unsafe and unfit to be used as intended.

**Plaintiff Dave Cecchini**

320.   Plaintiff Dave Cecchini is a citizen of New York, domiciled in Beaver Dams, New York.

321.   On or about March 22, 2021, Plaintiff Cecchini purchased a new 2021 GMC Sierra AT4 equipped with a 5.3L V8 engine from Simmons Rockwell GMC Buick, an authorized GM dealership located in Elmira, New York.

322.   Plaintiff Cecchini purchased his vehicle primarily for personal, family, or household use.

323.   Passenger safety and reliability were important factors in Plaintiff Cecchini's decision to purchase his vehicle.  Before purchasing the vehicle, Plaintiff Cecchini viewed several commercials for the vehicle, reviewed the vehicle's window stickers, including the Monroney sticker which listed the 5.3L engine as a component, reviewed the sales documentation, and spoke to the authorized salesperson at the dealership.  Plaintiff Cecchini also took the vehicle for a test ride. Plaintiff Cecchini selected and ultimately purchased his Class Vehicle because the vehicle was represented to be, and was marketed as, a high-quality vehicle capable of providing safe, reliable transportation.  The purchase was made in part on the advertised safety, reliability, and quality of the vehicle and its components, including its engine.

324.   None of the information provided to Plaintiff Cecchini disclosed any defects in the vehicle or its engine.  GM's omissions were material to Plaintiff Cecchini.

325.   Had GM disclosed its knowledge of the Valve Train Defect before they purchased his vehicle, Plaintiff Cecchini would have seen and been aware of the disclosures. Indeed, GM's misstatements and omissions were material to Plaintiff Cecchini. Like all members of the Class, Plaintiff Cecchini would not have

purchased his Class Vehicle, or would have paid less for the vehicle, had he known of the Valve Train Defect.

326.   In addition, at the time of Plaintiff Cecchini's vehicle purchase, and in purchasing his vehicle, he relied upon GM and its authorized dealerships' representations which he heard from the salesperson and in commercials, that the vehicle was fully functional, safe, durable, reliable, and that the engine operated correctly and effectively.  Plaintiff Cecchini relied on those representations and the omission of, or failure to disclose, the Valve Train Defect, in purchasing the vehicle, and absent those representations and omissions, would not have purchased the vehicle, or would have paid less for it.

327.   At the time of his purchase, Plaintiff Cecchini's vehicle had the remainder of GM issued: (1) bumper-to-bumper warranty lasting for three years or 36,000 miles, whichever occurred first; (2) powertrain warranty lasting for five years or 60,000 miles, whichever occurred first; and (3) emissions control warranty of eight years or 80,000 miles, whichever occurred first.

328.   Unbeknownst to Plaintiff Cecchini, at the time of his purchase, GM had already issued at least one communication to its authorized dealerships describing problems with the valve train system in the 2021 GMC Sierra AT4. Moreover, GM issued the first TSB describing problems the valve train system in the L84 engine, the engine Plaintiff Cecchini's vehicle, in November 2018.

329.   At all times during his possession of the vehicle, Plaintiff Cecchini has properly maintained and serviced his Class Vehicle according to GM's recommended maintenance guidelines.

330.   On or about December 22, 2021, with approximately 19,700 miles on the odometer, Plaintiff Cecchini was driving his vehicle when the engine began knocking, causing the vehicle to sputter, shake, and stall.  Plaintiff Cecchini brought it to Simmons-Rockwell GMC Buick where it was diagnosed as lifter failure.  His vehicle remains in the shop while awaiting repairs.  Plaintiff Cecchini has lost the use of his vehicle and incurred expenses related to obtaining alternative transportation.

331.   To date, Plaintiff Cecchini's vehicle remains subject to the Valve Train Defect.

332.   As a result of the Valve Train Defect, Plaintiff Cecchini has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes.  Further, Plaintiff Cecchini will be unable to rely on GM's advertising or labeling in the future, and so will not purchase or lease another vehicle from GM in the future, though he would like to do so.

333.   At all times, Plaintiff Cecchini, like other class members, has driven his vehicle in a foreseeable manner in the sense that Plaintiff Cecchini has not abused his vehicle or used it for purposes unintended by GM such as drag racing, for

example. However, despite this normal and foreseeable driving, the Valve Train Defect has rendered his vehicle unsafe and unfit to be used as intended.

### Brian Hess and Jessica Martin-Wasser

334.   Plaintiffs Brian Hess and Jessica Martin-Wasser are citizens of Nevada, domiciled in Henderson, Nevada.

335.   On or about April 7, 2021, Plaintiffs Hess and Martin-Wasser purchased a new 2021 Chevrolet Silverado 1500 equipped with a 5.3L V8 from Fairway Chevrolet, an authorized GM dealership located in Las Vegas, Nevada.

336.   Plaintiffs Hess and Martin-Wasser purchased their vehicle primarily for personal, family, or household use.

337.   Passenger safety and reliability were important factors in Plaintiffs Hess and Martin-Wasser's decision to purchase their vehicle.  Before purchasing the vehicle, Plaintiffs Hess and Martin-Wasser viewed many commercials for the vehicle, researched the vehicle online including viewing the vehicle's product page on the dealership's website, reviewed the vehicle's window stickers, including the Monroney sticker which listed the 5.3L engine as a component, reviewed the sales documentation, and spoke to the authorized salesperson at the dealership.  Plaintiffs Hess and Martin-Wasser also took the vehicle for a test ride.  Plaintiffs Hess and Martin-Wasser selected and ultimately purchased their Class Vehicle because the vehicle was represented to be, and was marketed as, a high-quality vehicle capable of providing safe, reliable transportation.  The purchase was made in part on the

advertised safety, reliability, and quality of the vehicle and its components, including its engine.

338. None of the information provided to Plaintiffs Hess and Martin-Wasser disclosed any defects in the vehicle or its engine. GM's omissions were material to Plaintiff Hess.

339. Had GM disclosed its knowledge of the Valve Train Defect before they purchased their vehicle, Plaintiffs Hess and Martin-Wasser would have seen and been aware of the disclosures. Indeed, GM's misstatements and omissions were material to Plaintiffs Hess and Martin-Wasser. Like all members of the Class, Plaintiffs Hess and Martin-Wasser would not have purchased their Class Vehicle, or would have paid less for the vehicle, had he known of the Valve Train Defect.

340. In addition, at the time of Plaintiffs Hess and Martin-Wasser's vehicle purchase, and in purchasing their vehicle, they relied upon GM and its authorized dealerships' representations which they heard from the salesperson and in commercials, that the vehicle was fully functional, safe, durable, reliable, and that the engine operated correctly and effectively. Plaintiffs Hess and Martin-Wasser relied on those representations and the omission of, or failure to disclose, the Valve Train Defect, in purchasing the vehicle, and absent those representations and omissions, would not have purchased the vehicle, or would have paid less for it.

341. At the time of their purchase, Plaintiffs Hess and Martin-Wasser's vehicle had the remainder of GM issued: (1) bumper-to-bumper warranty lasting for

three years or 36,000 miles, whichever occurred first; (2) powertrain warranty lasting for five years or 60,000 miles, whichever occurred first; and (3) emissions control warranty of eight years or 80,000 miles, whichever occurred first.

342.   Unbeknownst to Plaintiffs Hess and Martin-Wasser, at the time of their purchase, GM had already issued at least one communication to its authorized dealerships describing problems with the valve train system in the 2020 Chevrolet Silverado 1500, and was preparing to issue another communication describing problems with the valve train system in the 2021 Chevrolet Silverado 1500, which was released to GM's authorized dealerships two weeks after Plaintiffs' purchase. Moreover, GM issued the first TSB describing problems the valve train system in the L84 engine, the engine in their vehicle, in November 2018.

343.   At all times during their possession of the vehicle, Plaintiffs Hess and Martin-Wasser have properly maintained and serviced their Class Vehicle according to GM's recommended maintenance guidelines.

344.   In or around October 2021, when the vehicle had approximately 7,000 miles on the odometer, the vehicle began to backfire, sputter, lose power, make a clicking noise from the engine, and could not accelerate properly.  Mr. Hess took their vehicle to the dealership for diagnosis and repair.  The dealership found DTCs P0300, P050D, and P0305, indicating misfires.  Upon inspection, the dealership found that the intake valve lifter on cylinder #5 had separated and damaged the pushrod.  The dealership cleared the DTCs, replaced all the lifters on the engine's

left bank (part number 12680871 on the repair order), and replaced the single pushrod.  In addition, he was without their vehicle for a week.

345.   To date, Plaintiffs Hess and Martin-Wasser's vehicle remains subject to the Valve Train Defect.

346.   As a result of the Valve Train Defect, Plaintiffs Hess and Martin-Wasser have lost confidence in the ability of their Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes.  Further, Plaintiff Hess will be unable to rely on GM's advertising or labeling in the future, and so will not purchase or lease another vehicle from GM in the future, though they would like to do so.

347.   At all times, Plaintiffs Hess and Martin-Wasser, like other class members, have driven their vehicle in a foreseeable manner in the sense that Plaintiffs Hess and Martin-Wasser have not abused their vehicle or used it for purposes unintended by GM such as drag racing, for example. However, despite this normal and foreseeable driving, the Valve Train Defect has rendered their vehicle unsafe and unfit to be used as intended.

**Plaintiffs Chad and Adria Nicole Lacy**

348.   Plaintiffs Chad Lacy and Adria Nicole Lacy ("Lacys") are citizens of North Carolina, domiciled in Huntersville, North Carolina.

349.   On or about October 15, 2014, Plaintiffs Lacys purchased a new 2015 GMC Yukon equipped with a 6.2L V8 engine from Randy Marion Buick/GMC, an authorized GM dealership located in Huntersville, North Carolina.

350.   Plaintiffs Lacys purchased their vehicle primarily for personal, family, or household use.

351.   Passenger safety and reliability were important factors in Plaintiffs Lacys' decision to purchase their vehicle.  Before purchasing the vehicle, Plaintiffs Lacys visited the manufacturer and dealership websites, reviewed the vehicle's window stickers, including the Monroney sticker listed the 6.2L engine as a component, viewed television commercials, and spoke to the authorized salesperson at the dealership.  Plaintiffs Lacys also took the vehicle for a test ride.  Plaintiffs Lacys selected and ultimately purchased their Class Vehicle because the vehicle was represented to be, and was marketed as, a high-quality vehicle capable of providing safe, reliable transportation.  The purchase was made in part on the advertised safety, reliability, and quality of the vehicle and its components, including its engine.

352.   None of the information provided to Plaintiffs Lacys disclosed any defects in the vehicle or its engine.  GM's omissions were material to Plaintiffs Lacys.

353.   Had GM disclosed its knowledge of the Valve Train Defect before they purchased their vehicle, Plaintiffs Lacys would have seen and been aware of the disclosures. Indeed, GM's misstatements and omissions were material to Plaintiffs

Lacys. Like all members of the Class, Plaintiffs Lacys would not have purchased their Class Vehicle, or would have paid less for the vehicle, had they known of the Valve Train Defect.

354. In addition, at the time of Plaintiffs Lacys' vehicle purchase, and in purchasing their vehicle, they relied upon GM and its authorized dealerships' representations and omissions, which Plaintiffs Lacys viewed during their online research, including on the manufacturer and dealerships websites, heard from the salesperson, and reviewed on the Monroney sticker, that the vehicle was fully functional, safe, durable, reliable, and that the engine operated correctly and effectively and where GM failed to disclose the Valve Train Defect. Plaintiffs Lacys relied on those representations and the omission of, or failure to disclose, the Valve Train Defect, in purchasing the vehicle, and absent those representations and omissions, would not have purchased the vehicle, or would have paid less for it.

355. At the time of their purchase, GM issued to Plaintiffs Lacys for their vehicle: (1) a bumper-to-bumper warranty lasting for three years or 36,000 miles, whichever occurred first; (2) a powertrain warranty lasting for five years or 60,000 miles, whichever occurred first; and (3) an emissions control warranty of eight years or 80,000 miles, whichever occurred first.

356. Unbeknownst to Plaintiffs Lacys, at the time of their purchase, GM had already issued one communication to its authorized dealerships describing problems with the valve train system in the 2015 GMC Yukon. Moreover, GM issued the first

TSB describing problems the valve train system in the L86 engine, the engine in their vehicle, in January 2015.

357. At all times during their possession of the vehicle, Plaintiffs Lacys has properly maintained and serviced their Class Vehicle according to GM's recommended maintenance guidelines.

358. In August 2021, the Lacys' vehicle began to run roughly, sputter, and nearly stalled. On or about August 23, 2021, when the vehicle had approximately 97,893 miles on the odometer, Plaintiffs Lacys delivered their vehicle to Randy Marion for diagnosis and repair. The dealership found a broken valve spring on the intake valve for cylinder #2 and replaced that valve spring, two pushrods, and the intake manifold. Plaintiffs Lacy were charged $1,405.76.

359. Within months, the Lacys heard a ticking and knocking noise coming from the engine compartment and the check engine light illuminated. On December 2, 2021, when the vehicle had 101,078 miles on the odometer, the Plaintiffs Lacys returned to Randy Marion for diagnosis and repair of the vehicle. The technician found the check engine light illuminated and the DTC P0300 in the ECM indicating misfires. Further investigation revealed that the misfires were on cylinders #1 and #6 as a result of lifter failure, a bent pushrod, and the VLOM was leaking. The dealership replaced all of the lifters, the VLOM, and the pushrod. Plaintiffs Lacys were charged $2,016.00 for the repair after GM agreed to partially cover the repair under warranty. The vehicle was returned to Plaintiffs Lacys almost two months later

later on January 25, 2022. Per the repair order, the dealership installed 8 AFM Lifters with part number 12698946 and 8 regular lifters.

360.   To date, Plaintiffs Lacys' vehicle remains subject to the Valve Train Defect.

361.   As a result of the Valve Train Defect, Plaintiffs Lacys have lost confidence in the ability of their Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes.  Further, Plaintiffs Lacys will be unable to rely on GM's advertising or labeling in the future, and so will not purchase or lease another vehicle from GM in the future, though they would like to do so.

362.   At all times, Plaintiffs Lacys, like other class members, have driven their vehicle in a foreseeable manner in the sense that Plaintiffs Lacys has not abused their vehicle or used it for purposes unintended by GM such as drag racing, for example. However, despite this normal and foreseeable driving, the Valve Train Defect has rendered their vehicle unsafe and unfit to be used as intended.

### **Plaintiff Mark Hayford**

363.   Plaintiff Mark Hayford is an Ohio citizen who is domiciled in Delphos, Ohio.

364.   On or about February 3, 2018, Plaintiff Hayford purchased a 2016 Chevrolet Silverado 1500 equipped with a 6.2L V8 engine with approximately 48,000 miles on the odometer from a dealership located in Defiance, Ohio.

365.   Plaintiff Hayford purchased his vehicle primarily for personal, family, or household use.

366.   Passenger safety and reliability were important factors in Plaintiff Hayford's decision to purchase his vehicle. Before making his purchase, Plaintiff Hayford conducted internet research including at Kelley Blue Book, saw commercials for the Chevrolet Silverado, reviewed the manufacturer and dealer websites, reviewed the vehicle's window stickers, including the Monroney sticker which listed the 6.2L engine as a component, and test drove the vehicle. Plaintiff Hayford selected and ultimately purchased his Class Vehicle because the vehicle was represented to be and was marketed as a high-quality vehicle capable of providing safe, reliable transportation. The purchase was made in part on the advertised safety, reliability, and quality of the vehicle and its components, including its engine.

367.   None of the information provided to Plaintiff Hayford disclosed any defects in the vehicle or its engine. GM's omissions were material to Plaintiff Hayford.

368.   Had GM disclosed its knowledge of the Valve Train Defect before he purchased his vehicle, Plaintiff Hayford would have seen and been aware of the disclosures. Indeed, GM's misstatements and omissions were material to Plaintiff Hayford. Like all members of the Class, Plaintiff Hayford would not have purchased

his Class Vehicle, or would have paid less for the vehicle, had he known of the Valve Train Defect.

369.   In addition, at the time Plaintiff Hayford purchased his vehicle, and in purchasing his vehicle, he relied upon representations and omissions from GM that he viewed on the website and saw on the Monroney sticker that the vehicle was fully functional, safe, durable, reliable, and that the engine operated correctly and effectively and where GM failed to disclose the Valve Train Defect.   Plaintiff Hayford relied on those representations and the omission of the disclosure of the Valve Train Defect, in leasing the vehicle, and absent those representations and omissions, would not have leased the vehicle or would have paid less for it.

370.   At the time of his purchase, GM transferred to Plaintiff Hayford for his vehicle: (1) a bumper-to-bumper warranty lasting for three years or 36,000 miles, whichever occurred first; (2) a powertrain warranty lasting for five years or 60,000 miles, whichever occurred first; and (3) an emissions control warranty of eight years or 80,000 miles, whichever occurred first.

371.   Unbeknownst to Plaintiff Hayford, at the time of his purchase, GM had already issued six communications to its authorized dealerships describing problems with the valve train system in 2016 Chevrolet Silverados. Moreover, GM issued the first TSB describing problems the valve train system in the L86 engine, the engine in Plaintiff Hayford's vehicle, in January 2015.

372.   At all times during his ownership of the vehicle, Plaintiff Hayford has properly maintained and serviced his Class Vehicle according to GM's recommended maintenance guidelines.

373.   In September 2021, Plaintiff Hayford had taken the vehicle to Lima Auto Mall, an authorized GM dealership located in Lima, Ohio.   There, he complained about problems with the vehicle's 8-speed transmission, including lurching and jerking.   The dealership charged him approximate $1,500 for repairs to the transmission, which he paid out-of-pocket.   At the time, his vehicle had approximately 81,300 miles on the odometer.

374.   On or about September 21, 2021, Lima Auto Mall told Plaintiff Hayford that his vehicle was fixed and to pick it up.   When he turned the vehicle on, he immediately heard a loud ticking sound coming from the engine compartment. Concerned that the engine would seize up as he drove away, Plaintiff Hayford insisted that the dealership diagnose his vehicle again.   The dealership inspected the engine and found a collapsed lifter on cylinder #4 and a bent push rod.   The dealership diagnosed the cause of the collapsed lifter to be an internal failure of the VLOM.   Ultimately, eight lifters were replaced, four of the AFM Lifters and four of the regular lifters, as well as the VLOM.   Plaintiff Hayford was charged approximately $3,300 to repair the engine, which he paid out-of-pocket.   The dealership warned him that the same lifter, or other lifters, could also fail again, and

that this was not a permanent repair.  Per the repair order, the dealership installed 4 lifters with part number 12680871.

375.   To date, Plaintiff Hayford's vehicle remains subject to the Valve Train Defect.

376.   As a result of the Valve Train Defect, Plaintiff Hayford has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes.  Further, Plaintiff Hayford will be unable to rely on GM's advertising or labeling in the future, and so will not purchase or lease another vehicle from GM in the future, though he would like to do so.

377.   At all times, Plaintiff Hayford, like other class members, has driven his vehicle in a foreseeable manner in the sense that Plaintiff Hayford has not abused his vehicle or used it for purposes unintended by GM such as drag racing, for example. However, despite this normal and foreseeable driving, the Valve Train Defect has rendered his vehicle unsafe and unfit to be used as intended.

**Plaintiff Daniel Podojil**

378.   Plaintiff Daniel Podojil is an Ohio citizen who is domiciled in Hudson, Ohio.

379.   In or around April 2020, Plaintiff Podojil purchased a new 2020 GMC Sierra 1500 equipped with a 5.3L V8 engine from Axelrod Buick GMC, an authorized Chevrolet dealership located in Parma, Ohio.

380.   Plaintiff Podojil purchased his vehicle primarily for personal, family, or household use.

381.   Passenger safety and reliability were important factors in Plaintiff Podojil's decision to purchase his vehicle. Before making his purchase, Plaintiff Podojil saw commercials for the GMC Sierra, reviewed the manufacturer and dealer websites, reviewed the sales documentation which listed the 5.3L engine as a component, and test drove the vehicle.  Plaintiff Podojil selected and ultimately purchased his Class Vehicle because the vehicle was represented to be and was marketed as a high-quality vehicle capable of providing safe, reliable transportation. The purchase was made in part on the advertised safety, reliability, and quality of the vehicle and its components, including its engine.

382.   None of the information provided to Plaintiff Podojil disclosed any defects in the vehicle or its engine.  GM's omissions were material to Plaintiff Podojil.

383.   Had GM disclosed its knowledge of the Valve Train Defect before he purchased his vehicle, Plaintiff Podojil would have seen and been aware of the disclosures. Indeed, GM's misstatements and omissions were material to Plaintiff Podojil.  Like all members of the Class, Plaintiff Podojil would not have purchased his Class Vehicle, or would have paid less for the vehicle, had he known of the Valve Train Defect.

384.   In addition, at the time Plaintiff Podojil purchased his vehicle, and in purchasing his vehicle, he relied upon representations from GM that he viewed on the website and saw on the sales documentation and commercials that the vehicle was fully functional, safe, durable, reliable, and that the engine operated correctly and effectively.  Plaintiff Podojil relied on those representations and the omission of the disclosure of the Valve Train Defect, in leasing the vehicle, and absent those representations and omissions, would not have leased the vehicle or would have paid less for it.

385.   At the time of his purchase, GM transferred to Plaintiff Podojil for his vehicle: (1) a bumper-to-bumper warranty lasting for three years or 36,000 miles, whichever occurred first; (2) a powertrain warranty lasting for five years or 60,000 miles, whichever occurred first; and (3) an emissions control warranty of eight years or 80,000 miles, whichever occurred first.

386.   Unbeknownst to Plaintiff Podojil, at the time of his purchase, GM had already issued at least one communication to its authorized dealerships describing problems with the valve train system in the 2019 GMC Sierra 1500 and was preparing to issue another communication describing problems with the valve train system in the 2020 GMC Sierra 1500, which was released to GM's authorized dealerships two months after Plaintiff's purchase.  Moreover, GM issued the first TSB describing problems the valve train system in the L84 engine, the engine in Plaintiff Podojil's vehicle, in November 2018.

387.   At all times during his ownership of the vehicle, Plaintiff Podojil has properly maintained and serviced his Class Vehicle according to GM's recommended maintenance guidelines.

388.   Within the first few months of purchase, Plaintiff Podojil experienced his vehicle fluctuating in speed, sputtering, and shuttering. On one occasion, Plaintiff's vehicle shut down completely on the highway while driving at highway speeds and towing a boat. Plaintiff was forced to pull over and restart the vehicle to drive home. Following this incident and on several other occasions, Plaintiff took his vehicle to Axelrod GMC, an authorized GMC dealership, to complain about these issues and request repairs. On one service visit, the dealership implemented a software update, but no other repairs, diagnoses, or other fixes were suggested or implemented. The software update did not fix the Defect. On or about March 9, 2022, with approximately 29,000 miles on the odometer, Plaintiff Podojil was driving his vehicle when it began to fluctuate in speed, sputter, stall, emanate ticking noises from the engine compartment, and illuminate the check engine lights. Plaintiff Podojil brought it to Lambert Buick GMC where the issues were diagnosed as lifter failure and expected to be repaired by March 18, 2022. However, the dealership diagnosed additional engine damage and damage to the cam, requiring replacement of the lifters and more time to complete repairs. The vehicle is currently at the dealership undergoing repairs, and the dealership informed Plaintiff that his engine is being replaced with a refurbished engine.

389. To date, Plaintiff Podojil's vehicle remains subject to the Valve Train Defect.

390. As a result of the Valve Train Defect, Plaintiff Podojil has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes. Further, Plaintiff Podojil will be unable to rely on GM's advertising or labeling in the future, and so will not purchase or lease another vehicle from GM in the future, though he would like to do so.

391. At all times, Plaintiff Podojil, like other class members, has driven his vehicle in a foreseeable manner in the sense that Plaintiff Podojil has not abused his vehicle or used it for purposes unintended by GM such as drag racing, for example. However, despite this normal and foreseeable driving, the Valve Train Defect has rendered his vehicle unsafe and unfit to be used as intended.

### Plaintiffs Adam Ibrahim and Tyler Elizabeth Lamberts

392. Plaintiffs Adam Ibrahim and Tyler Elizabeth Lamberts ("Ibrahim and Lamberts") are citizens of Washington, domiciled in Bellevue, Washington.

393. On or about February 10, 2021, Plaintiffs Ibrahim and Lamberts purchased a new 2021 Chevrolet Tahoe equipped with a 5.3L V8 engine from Chevrolet Cadillac of Bend Oregon, an authorized GM dealership located in Bend, Oregon.

394.  Plaintiffs Ibrahim and Lamberts purchased their vehicle primarily for personal, family, or household use.

395.  Passenger safety and reliability were important factors in Plaintiffs Ibrahim and Lamberts' decision to purchase their vehicle.  Before purchasing the vehicle, Plaintiffs Ibrahim and Lamberts visited the manufacturer and dealership websites, reviewed the vehicle's window stickers, including the Monroney sticker which listed the 5.3L engine as a component, viewed television commercials, did general research online, and spoke to the authorized salesperson at the dealership. Plaintiffs Ibrahim and Lamberts also took the vehicle for a test ride.  Plaintiffs Ibrahim and Lamberts selected and ultimately purchased their Class Vehicle because the vehicle was represented to be, and was marketed as, a high-quality vehicle capable of providing safe, reliable transportation.  The purchase was made in part on the advertised safety, reliability, and quality of the vehicle and its components, including its engine.

396.  None of the information provided to Plaintiffs Ibrahim and Lamberts disclosed any defects in the vehicle or its engine.  GM's omissions were material to Plaintiffs Ibrahim and Lamberts.

397.  Had GM disclosed its knowledge of the Valve Train Defect before they purchased their vehicle, Plaintiffs Ibrahim and Lamberts would have seen and been aware of the disclosures. Indeed, GM's misstatements and omissions were material to Plaintiffs Ibrahim and Lamberts.  Like all members of the Class, Plaintiffs Ibrahim

and Lamberts would not have purchased their Class Vehicle, or would have paid less for the vehicle, had they known of the Valve Train Defect.

398. In addition, at the time of Plaintiffs Ibrahim and Lamberts' vehicle purchase, and in purchasing their vehicle, they relied upon GM and its authorized dealerships' representations and omissions, which Plaintiffs Ibrahim and Lamberts viewed during their online research, including on the manufacturer's and dealerships' website, heard from the salesperson, and reviewed on the Monroney sticker, that the vehicle was fully functional, safe, durable, reliable, and that the engine operated correctly and effectively, and where GM failed to disclose the Valve Train Defect Plaintiffs Ibrahim and Lamberts relied on those representations and the omission of, or failure to disclose, the Valve Train Defect, in purchasing the vehicle, and absent those representations and omissions, would not have purchased the vehicle, or would have paid less for it.

399. At the time of their purchase, GM issued to Plaintiffs Ibrahim and Lamberts for their vehicle: (1) a bumper-to-bumper warranty lasting for three years or 36,000 miles, whichever occurred first; (2) a powertrain warranty lasting for five years or 60,000 miles, whichever occurred first; and (3) an emissions control warranty of eight years or 80,000 miles, whichever occurred first.

400. Unbeknownst to Plaintiffs Ibrahim and Lamberts, at the time of their purchase, GM had already issued two communications to its authorized dealerships describing problems with the valve train system in the 2021 Chevrolet Tahoe.

Moreover, GM issued the first TSB describing problems the valve train system in the L84 engine, the engine in their vehicle, in November 2018.

401.   At all times during their possession of the vehicle, Plaintiffs Ibrahim and Lamberts have properly maintained and serviced their Class Vehicle according to GM's recommended maintenance guidelines.

402.   During a service visit to the dealership in November 2021, Plaintiff Ibrahim complained of strange noises coming from the engine compartment and that the engine seemed to be consuming oil.  The dealership told him that there was nothing wrong with his vehicle.

403.   On December 16, 2021, Plaintiff Ibrahim was driving their vehicle in a snowstorm in icy conditions when the engine lost power, the check engine light illuminated and began to flash, stability control turned off, and a knocking noise came from the engine compartment. Plaintiff Ibrahim barely managed to make it home safely.   The next day, on December 17, 2021, when the vehicle had approximately 14,784 miles on the odometer, Plaintiffs Ibrahim and Lamberts delivered their vehicle to Chevrolet Cadillac of Bend, Oregon for diagnosis and repair.   The dealership verified the problems Plaintiffs Ibrahim and Lamberts reported and found DTC P0306 stored in the vehicle's ECM, indicating a misfire on cylinder #6.   Further examination revealed the #6 exhaust lifter had "collapsed/failed." The dealership replaced all the lifters and guide on one of side of the engine.   The vehicle was then returned to Plaintiffs Ibrahim and Lamberts 12

days later.  Per the repair order, the dealership installed 8 lifters with part number 12698946.  On December 19, 2021, Plaintiffs Ibrahim Lambert were informed that the vehicle was repaired and ready to be picked up.  However, they were already back at their residence several states away.  When they inquired, they were told GM customer service associate that GM Trip Interruption Service would not be able to return their vehicle until New Years' Eve.

404.  On December 19, 2021, Plaintiff Ibrahim began a chat on GM's customer application to request reimbursement of rental expenses, the return of your vehicle more promptly, and getting all the of the lifters replaced in the vehicle as opposed to only half.  These requests were escalated several times to various manages and seniors managers. Ultimately, Plaintiffs were told that a GM  Regional Service Director who has the authority to make the call on whether the engine should be fully fixed will make the final decision on a full repair.  By mid-February 2022, they were informed that the GM Regional Service Director had denied their request. Their request for rental reimbursement was approved and funded at the end of March 2022.  Their vehicle was actually returned on January 5, 2022.

405.  To date, Plaintiffs Ibrahim and Lamberts's vehicle remains subject to the Valve Train Defect.

406.  As a result of the Valve Train Defect, Plaintiffs Ibrahim and Lamberts have lost confidence in the ability of their Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes, they avoid using the vehicle as

much as possible, no longer plan to use it for long-distance trips, and are planning on buying a new vehicle. Further, Plaintiffs Ibrahim and Lamberts will be unable to rely on GM's advertising or labeling in the future for the Subject Engines, and so will not purchase or lease another vehicle from GM in the future with one of the Subject Engines, though they would like to do so.

407. At all times, Plaintiffs Ibrahim and Lamberts, have driven their vehicle in a foreseeable manner in the sense that Plaintiffs Ibrahim and Lamberts have not abused their vehicle or used it for purposes unintended by GM such as drag racing, for example. However, despite this normal and foreseeable driving, the Valve Train Defect has rendered their vehicle unsafe and unfit to be used as intended.

### Plaintiff Jennifer Deery

408. Plaintiff Jennifer Deery is a citizen of Rhode Island, domiciled in Hope Valley, Rhode Island.

409. On or about October 27, 2018, Plaintiff Deery purchased a new 2017 GMC Yukon equipped with a 5.3L V8 engine from Hurd Auto Mall, an authorized GM dealership located in Johnson, Rhode Island.

410. Plaintiff Deery purchased her vehicle primarily for personal, family, or household use.

411. Passenger safety and reliability were important factors in Plaintiff Deery's decision to purchase her vehicle. Before purchasing the vehicle, Plaintiff Deery viewed multiple commercials for the vehicle, reviewed the vehicle's window

stickers, including the Monroney sticker which listed the 5.3L engine as a component, reviewed the sales documentation, and spoke to the authorized salesperson at the dealership.  Plaintiff Deery also took the vehicle for a test ride. Plaintiff Deery selected and ultimately purchased her Class Vehicle because the vehicle was represented to be, and was marketed as, a high-quality vehicle capable of providing safe, reliable transportation.  The purchase was made in part on the advertised safety, reliability, and quality of the vehicle and its components, including its engine.

412.   None of the information provided to Plaintiff Deery disclosed any defects in the vehicle or its engine.  GM's omissions were material to Plaintiff Deery.

413.   Had GM disclosed its knowledge of the Valve Train Defect before they purchased her vehicle, Plaintiff Deery would have seen and been aware of the disclosures. Indeed, GM's misstatements and omissions were material to Plaintiff Deery. Like all members of the Class, Plaintiff Deery would not have purchased her Class Vehicle, or would have paid less for the vehicle, had she known of the Valve Train Defect.

414.   In addition, at the time of Plaintiff Deery's vehicle purchase, and in purchasing her vehicle, she relied upon GM and its authorized dealerships' representations which she heard from the salesperson, and commercial disseminated by GM, that the vehicle was fully functional, safe, durable, reliable, and that the engine operated correctly and effectively. Plaintiff Deery relied on those

representations and the omission of, or failure to disclose, the Valve Train Defect, in purchasing the vehicle, and absent those representations and omissions, would not have purchased the vehicle, or would have paid less for it.

415.   At the time of her purchase, GM issued to Plaintiff Deery: (1) bumper-to-bumper warranty lasting for three years or 36,000 miles, whichever occurred first; (2) powertrain warranty lasting for five years or 60,000 miles, whichever occurred first; and (3) emissions control warranty of eight years or 80,000 miles, whichever occurred first.

416.   Unbeknownst to Plaintiff Deery, at the time of her purchase, GM had already issued five communications to its authorized dealerships describing problems with the valve train system in the 2017 GMC Yukon.  In fact, GM had been issuing TSB warning dealerships of valve train problems in the engine in her vehicle, the L83, since January 2015.

417.   At all times during her possession of the vehicle, Plaintiff Deery has properly maintained and serviced her Class Vehicle according to GM's recommended maintenance guidelines.

418.   On or about December 7, 2021, when the vehicle had approximately 99,470 miles on the odometer, Plaintiff was driving on the highway when her vehicle's engine began misfiring and stalled. On or about December 9, 2021, Plaintiff Deery delivered her vehicle to Hurd Auto Mall for diagnosis and repair. The dealership diagnosed her vehicle as having a failed lifter corresponding to

cylinder #6 which subsequently damaged the cam shaft and recommended a complete engine replacement.   Her vehicle was not ready until January 22, 2022. The engine replacement ultimately cost Plaintiff Deery $8,825.45.

419.   To date, Plaintiff Deery's vehicle remains subject to the Valve Train Defect.

420.   As a result of the Valve Train Defect, Plaintiff Deery has lost confidence in the ability of her Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes.  Further, Plaintiff Deery will be unable to rely on GM's advertising or labeling in the future, and so will not purchase or lease another vehicle from GM in the future, though she would like to do so.

421.   At all times, Plaintiff Deery, like other class members, has driven her vehicle in a foreseeable manner in the sense that Plaintiff Deery has not abused her vehicle or used it for purposes unintended by GM such as drag racing, for example. However, despite this normal and foreseeable driving, the Valve Train Defect has rendered her vehicle unsafe and unfit to be used as intended.

**Plaintiffs Brian and Tammy Burton**

422.   Plaintiffs Brian Burton and Tammy Burton ("Burtons") are citizens of Tennessee, domiciled in Oliver Springs, Tennessee.

423.   On or about or about November 1, 2021, Plaintiffs Burtons purchased a preowned 2021 GMC Sierra AT4 equipped with a 5.3L V8 engine from a

dealership located in Oak Ridge, Tennessee.  At the time of purchase, the vehicle had 16,576 miles on the odometer.

424.   Plaintiffs Burtons purchased their vehicle primarily for personal, family, or household use.

425.   Passenger safety and reliability were important factors in Plaintiffs Burtons' decision to purchase their vehicle.  Before purchasing the vehicle, Plaintiffs Burtons visited authorized GM dealerships multiple times to research the vehicle, reviewed the vehicle's window stickers, including the Monroney sticker which listed the 5.3L engine as a component, and spoke to the authorized salesperson at the dealership.  Plaintiffs Burtons also took the vehicle for a test ride.  Plaintiffs Burtons selected and ultimately purchased their Class Vehicle because the vehicle was represented to be, and was marketed as, a high-quality vehicle capable of providing safe, reliable transportation.  The purchase was made in part on the advertised safety, reliability, and quality of the vehicle and its components, including its engine.

426.   None of the information provided to Plaintiffs Burtons disclosed any defects in the vehicle or its engine.  GM's omissions were material to Plaintiffs Burtons.

427.   Had GM disclosed its knowledge of the Valve Train Defect before they purchased their vehicle, Plaintiffs Burtons would have seen and been aware of the disclosures. Indeed, GM's misstatements and omissions were material to Plaintiffs Burtons.  Like all members of the Class, Plaintiffs Burtons would not have purchased

their Class Vehicle, or would have paid less for the vehicle, had they known of the Valve Train Defect.

428.   In addition, at the time of Plaintiffs Burtons' vehicle purchase, and in purchasing their vehicle, they relied upon GM and its authorized dealerships' representations and omissions, heard from the salesperson, and reviewed on the Monroney sticker, that the vehicle was fully functional, safe, durable, reliable, and that the engine operated correctly and effectively and where GM failed to disclose the Valve Train Defect.  Plaintiffs Burtons relied on those representations and the omission of, or failure to disclose, the Valve Train Defect, in purchasing the vehicle, and absent those representations and omissions, would not have purchased the vehicle, or would have paid less for it.

429.   At the time of their purchase, GM transferred to Plaintiffs Burtons for their vehicle: (1) a bumper-to-bumper warranty lasting for three years or 36,000 miles, whichever occurred first; (2) a powertrain warranty lasting for five years or 60,000 miles, whichever occurred first; and (3) an emissions control warranty of eight years or 80,000 miles, whichever occurred first.

430.   Unbeknownst to Plaintiffs Burtons, at the time of their purchase, GM had already issued three communications to its authorized dealerships describing problems with the valve train system in the 2021 GMC Sierra. Moreover, GM issued the first TSB describing problems the valve train system in the L84 engine, the engine in their vehicle, in November 2018.

116

431.   At all times during their possession of the vehicle, Plaintiffs Burtons has properly maintained and serviced their Class Vehicle according to GM's recommended maintenance guidelines.

432.   On or about January 30, 2022, Plaintiff Brian Burton was driving his vehicle and stopped at a stop sign.  When he tried to accelerate from the stop, the vehicle's engine began to misfire.  The vehicle steadily lost power as he drove and was barely able to move forward by the time he got to his home.  By that time, Plaintiff Brian Burton could hear a loud ticking or knocking noise coming from the engine compartment.  He called the GMC roadside assistance line, which arranged for the vehicle to be towed to Duncan Family Automotive Group, an authorized GM dealership and repair facility for diagnosis and repair.  At the time, their vehicle had 20,721 miles on the odometer. The dealership found a collapsed lifter and replaced all eight lifters on the right bank, as well as a pushrod and "all sparkplugs." However, the repair order only lists the sale of one spark plug.

433.   After performing this partial repair, the vehicle was returned to Plaintiffs Burtons on February 7, 2022.

434.   Plaintiff Brian Burton had a conversation with "Casey" from Duncan service desk, who informed him that vehicles with these engines have had valve train problems even when they are straight off the delivery truck.  In particular, Casey noted that he has seen the problem in vehicles with less than 500 miles on the odometer.

435.   To date, Plaintiffs Burtons's vehicle remains subject to the Valve Train Defect.

436.   As a result of the Valve Train Defect, Plaintiffs Burtons have lost confidence in the ability of their Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes.  Further, Plaintiffs Burtons will be unable to rely on GM's advertising or labeling in the future, and so will not purchase or lease another vehicle from GM in the future, though they would like to do so.

437.   At all times, Plaintiffs Burtons, like other class members, have driven his vehicle in a foreseeable manner in the sense that Plaintiff Burtons has not abused them vehicle or used it for purposes unintended by GM such as drag racing, for example. However, despite this normal and foreseeable driving, the Valve Train Defect has rendered them vehicle unsafe and unfit to be used as intended.

**Plaintiff Chris Dittman**

438.   Plaintiff Chris Dittman is a citizen of Mississippi, domiciled in Olive Branch, Mississippi.

439.   On or about April 3, 2021, Plaintiff Dittman purchased a new 2021 GMC Yukon equipped with a 5.3L V8 from Sunrise Buick GMC from Wolfchase, LLC, an authorized GM dealership located in Bartlett, Tennessee.

440.   Plaintiff Dittman purchased his vehicle primarily for personal, family, or household use.

441.    Passenger safety and reliability were important factors in Plaintiff Dittman's decision to purchase his vehicle.  Before purchasing the vehicle, Plaintiff Dittman visited the dealership's website, reviewed the vehicle's window stickers, including the Monroney sticker, which listed the 5.3L engine as a component, and spoke to the authorized salesperson at the dealership about the vehicle.  Plaintiff Dittman also took the vehicle for a test drive.  Plaintiff Dittman selected and ultimately purchased his Class Vehicle because the vehicle was represented to be, and was marketed as, a high-quality vehicle capable of providing safe, reliable transportation.  The purchase was made in part on the advertised safety, reliability, and quality of the vehicle and its components, including its engine.

442.    None of the information provided to Plaintiff Dittman disclosed any defects in the vehicle or its engine.  GM's omissions were material to Plaintiff Dittman.

443.    Had GM disclosed its knowledge of the Valve Train Defect before he purchased his vehicle, Plaintiff Dittman would have seen and been aware of the disclosures. Indeed, GM's misstatements and omissions were material to Plaintiff Dittman.  Like all members of the Class, Plaintiff Dittman would not have purchased his Class Vehicle, or would have paid less for the vehicle, had he known of the Valve Train Defect.

444.    In addition, at the time Plaintiff Dittman purchased his vehicle, and in purchasing his vehicle, he relied upon representations and omissions from GM and

its authorized dealership that he saw during his online research, including GM's website, heard from the salesperson, and reviewed on the Monroney sticker that the vehicle was fully functional, safe, durable, reliable, and that the engine operated correctly and effectively and where GM failed to disclose the Valve Train Defect. Plaintiff Dittman relied on those representations and the omission of the disclosure of the Valve Train Defect, in purchasing the vehicle, and absent those representations and omissions, would not have purchased the vehicle or would have paid less for it.

445.   At the time of his purchase, GM issued to Plaintiff Dittman for his vehicle: (1) a bumper-to-bumper warranty lasting for three years or 36,000 miles, whichever occurred first; (2) a powertrain warranty lasting for 5 years or 60,000 miles, whichever occurred first; and (3) an emissions control warranty of eight years or 80,000 miles, whichever occurred first.

446.   Unbeknownst to Plaintiff Dittman, at the time of his purchase, GM had already issued at least four communications to its authorized dealerships describing problems with the valve train system in the 2021 GMC Yukon.  Moreover, GM issued the first TSB describing problems the valve train system in the L84 engine, the engine in Plaintiff Dittman's vehicle, in November 2018.

447.   At all times during his possession of the vehicle, Plaintiff Dittman have properly maintained and serviced his Class Vehicle according to GM's recommended maintenance guidelines.

448.   On or about September 17, 2021, when the vehicle had less than 10,000 miles on the odometer, while Mr. Dittman was driving the vehicle, the traction control and ESC lights illuminated on the dashboard, the engine began to run roughly, and clicking noises were audible from the engine compartment.   That evening, Mr. Dittman took the vehicle to Landers GMC, an authorized GM dealership located in South Haven, Mississippi.   That dealership found the code P0300 in the engine's computer and diagnosed the vehicle as having a separated lifter related to the number 7 cylinder and bent pushrod.   The dealership replaced the broken lifters on the left side (eight lifters, part number 12680871 on the repair order), the bent pushrod (part number 12619828 on the repair order), associated gaskets, and performed an oil change.   On September 23, 2021, Mr. Dittman retrieved his vehicle.

449.   On or about November 12, 2021, Mr. Dittman was again driving his vehicle when it began to run roughly.   Again, he heard a ticking noises from the engine compartment and the check engine light began to flash.   Again, he returned the vehicle to Lander GMC, which diagnosed the vehicle, "found cylinder 8 lifter was collapsed."   The pushrod was also bent.   The dealership replaced eight right bank lifters (part number 12698946 on the repair order) and the pushrod (part number 12619828 on the repair order).   Mr. Dittman requested that all the lifters be replaced, but the dealership refused and told him that GM would not authorize such a repair.

450.    To date, Plaintiff Dittman's vehicle remains subject to the Valve Train Defect.

451.    As a result of the Valve Train Defect, Plaintiff Dittman has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes.  Further, Plaintiff Dittman will be unable to rely on GM's advertising or labeling in the future, and so will not purchase or lease another vehicle from GM in the future, though he would like to do so.

452.    At all times, Plaintiff Dittman, like other class members, has driven his vehicle in a foreseeable manner in the sense that Plaintiff Dittman has not abused his vehicle or used it for purposes unintended by GM such as drag racing, for example. However, despite this normal and foreseeable driving, the Valve Train Defect has rendered his vehicle unsafe and unfit to be used as intended.

**Plaintiff Forrest Hudson**

453.    Plaintiff Forrest Hudson is a citizen of Texas, domiciled in Hemphill, Texas.

454.    On or about June 14, 2016, Plaintiff Hudson purchased a new 2016 Chevrolet Silverado 1500 equipped with a 5.3L V8 engine from Classic Chevrolet, an authorized GM dealership located in Beaumont, Texas.

455.    Plaintiff Hudson purchased his vehicle primarily for personal, family, or household use.

456.   Passenger safety and reliability were important factors in Plaintiff Hudson's decision to purchase his vehicle.  Before purchasing the vehicle, Plaintiff Hudson visited the manufacturer's website, reviewed the vehicle's window stickers, including the Monroney sticker which listed the 5.3L engine as a component, and spoke to the authorized salesperson at the dealership.  Plaintiff Hudson also took the vehicle for a test ride.  Plaintiff Hudson selected and ultimately purchased his Class Vehicle because the vehicle was represented to be, and was marketed as, a high-quality vehicle capable of providing safe, reliable transportation.  The purchase was made in part on the advertised safety, reliability, and quality of the vehicle and its components, including its engine.

457.   None of the information provided to Plaintiff Hudson disclosed any defects in the vehicle or its engine.  GM's omissions were material to Plaintiff Hudson.

458.   Had GM disclosed its knowledge of the Valve Train Defect before they purchased his vehicle, Plaintiff Hudson would have seen and been aware of the disclosures. Indeed, GM's misstatements and omissions were material to Plaintiff Hudson. Like all members of the Class, Plaintiff Hudson would not have purchased his Class Vehicle, or would have paid less for the vehicle, had he known of the Valve Train Defect.

459.   In addition, at the time of Plaintiff Hudson' vehicle purchase, and in purchasing his vehicle, he relied upon GM and its authorized dealerships'

representations, which Plaintiff Hudson viewed during his online research, including on the manufacturer's dealerships' website, and heard from the salesperson, that the vehicle was fully functional, safe, durable, reliable, and that the engine operated correctly and effectively. Plaintiff Hudson relied on those representations and the omission of, or failure to disclose, the Valve Train Defect, in purchasing the vehicle, and absent those representations and omissions, would not have purchased the vehicle, or would have paid less for it.

460. At the time of his purchase, Plaintiff Hudson's vehicle had the remainder of GM issued: (1) bumper-to-bumper warranty lasting for three years or 36,000 miles, whichever occurred first; (2) powertrain warranty lasting for five years or 60,000 miles, whichever occurred first; and (3) emissions control warranty of eight years or 80,000 miles, whichever occurred first.

461. Unbeknownst to Plaintiff Hudson, at the time of his purchase, GM had already issued one communication to its authorized dealerships describing problems with the valve train system in the 2016 Chevrolet Silverado. Moreover, GM issued the first TSB describing problems the valve train system in the L83 engine, the engine in Plaintiff Hudson's vehicle, in January 2015.

462. At all times during his possession of the vehicle, Plaintiff Hudson has properly maintained and serviced his Class Vehicle according to GM's recommended maintenance guidelines.

463. After hearing an engine ticking sound for several months, in or around September 2021, the check engine light illuminated in Plaintiff Hudson's vehicle. He called OnStar Services, which ran a diagnosis and informed Plaintiff Hudson that his vehicle had a "linkage issue" and to take it to a dealership.

464. On or about September 20, 2021, when his vehicle had approximately 74,000 miles on the odometer, Plaintiff Hudson brought his vehicle to Lake Country Chevrolet, an authorized GM dealership located in Jasper, Texas, for diagnosis and repair. The dealership diagnosed his vehicle as having lifter failure on the right side of the vehicle's engine and that all the lifters there had to be replaced. Plaintiff Hudson was informed that the lifter failure was likely caused by the AFM. This repair cost Plaintiff Hudson $2,449.77. Per the repair orders, the dealership installed four lifters with part number 12698946 and four regular lifters.

465. In October 2021, Plaintiff Hudson contacted GM customer service directly to complain about the AFM system in his vehicle and the fact that he had to pay for a repair.

466. In February 2022, Plaintiff Hudson began the hearing the ticking noise coming from his engine once more. However, he had previously been told by employees of the dealership that unless the vehicle had a check engine light illuminated or otherwise "threw a code," there would be nothing that the dealership would be allowed to do, per GM's instructions.

467.   To date, Plaintiff Hudson's vehicle remains subject to the Valve Train Defect.

468.   As a result of the Valve Train Defect, Plaintiff Hudson has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes.  Further, Plaintiff Hudson will be unable to rely on GM's advertising or labeling in the future, and so will not purchase or lease another vehicle from GM in the future, though he would like to do so.

469.   At all times, Plaintiff Hudson, like other class members, has driven his vehicle in a foreseeable manner in the sense that Plaintiff Hudson has not abused his vehicle or used it for purposes unintended by GM such as drag racing, for example. However, despite this normal and foreseeable driving, the Valve Train Defect has rendered his vehicle unsafe and unfit to be used as intended.

### **Plaintiffs Ronald and Marilyn Jett**

470.   Plaintiffs Ronald and Marilyn Jett are Texas citizens who are domiciled in San Antonio, Texas.

471.   On or about July 17, 2017, Plaintiffs Ronald and Marilyn Jett purchased a new 2017 GMC Sierra equipped with a 5.3L V8 engine from John Roley's AutoCenter, an authorized GM dealership located in Levelland, Texas.

472.   Plaintiffs Ronald and Marilyn Jett purchased their vehicle primarily for personal, family, or household use.

473. Passenger safety and reliability were important factors in the Jetts' decision to purchase their vehicle. Before making their purchase, the Jetts' reviewed Kelley Blue Book, saw commercials for the GMC Sierra, reviewed the vehicle's window stickers, including the Monroney sticker which listed the 5.3L engine as a component, and spoke to the authorized salesperson at the dealership who assured them of the quality, safety, and reliability of the vehicle.  The Jetts also took the vehicle for a test drive.  Plaintiffs Ronald and Marilyn Jett selected and ultimately purchased their Class Vehicle because the vehicle was represented to be and was marketed as a high-quality vehicle capable of providing safe, reliable transportation. The purchase was made in part on the advertised safety, reliability, and quality of the vehicle and its components, including its engine.

474. None of the information provided to Plaintiffs Ronald and Marilyn Jett disclosed any defects in the vehicle or its engine.  GM's omissions were material to Plaintiffs Ronald and Marilyn Jett.

475. Had GM disclosed its knowledge of the Valve Train Defect before they purchased their vehicle, Plaintiffs Ronald and Marilyn Jett would have seen and been aware of the disclosures. Indeed, GM's misstatements and omissions were material to Plaintiffs Ronald and Marilyn Jett.  Like all members of the Class, Plaintiffs Ronald and Marilyn Jett would not have purchased their Class Vehicle, or would have paid less for the vehicle, had they known of the Valve Train Defect.

476.   In addition, at the time Plaintiffs Ronald and Marilyn Jett purchased their vehicle, and in purchasing their vehicle, they relied upon representations and omissions from GM and its authorized dealership's salesperson and reviewed on the Monroney sticker that the vehicle was fully functional, safe, durable, reliable, and that the engine operated correctly and effectively and where GM failed to disclose the Valve Train Defect.   Plaintiffs Ronald and Marilyn Jett relied on those representations and the omission of the disclosure of the Valve Train Defect, in purchasing the vehicle, and absent those representations and omissions, would not have purchased the vehicle or would have paid less for it.

477.   At the time of their purchase, GM provided to Plaintiffs Ronald and Marilyn Jett for their vehicle: (1) a bumper-to-bumper warranty lasting for three years or 36,000 miles, whichever occurred first; (2) a powertrain warranty lasting for five years or 60,000 miles, whichever occurred first; and (3) an emissions control warranty of eight years or 80,000 miles, whichever occurred first.

478.   Unbeknownst to Plaintiffs Ronald and Marilyn Jett, at the time of their purchase, GM had already issued two communications to its authorized dealerships describing problems with the valve trains system in 2017 GMC Sierras. Moreover, GM issued the first TSB describing problems the valve train system in the L83 engine, the engine in their vehicle, in January 2015.

479. At all times during their ownership of the vehicle, Plaintiffs Ronald and Marilyn Jett have properly maintained and serviced their Class Vehicle according to GM's recommended maintenance guidelines.

480. In early October 2021, while on a trip, Plaintiff Ronald Jett began to hear the engine ticking. The vehicle would also misfire, shutter, lose power, and occasionally stall. At the time, his vehicle had approximately 73,000 miles on the odometer.

481. Plaintiff Ronald Jett took his vehicle to an O'Reilly AutoParts store, which found the DTC code for a misfire in cylinder # 4. On or about October 11, 2021, he took the vehicle to All American Chevrolet, an authorized GM dealership located in San Angelo, Texas for diagnosis. All American Chevrolet found DTCs P0300 and P0304 in the ECM. Inspection revealed failed lifter in cylinder #4. The dealership recommended a total engine replacement costing approximately $9,600. Plaintiff Ronald Jett paid $180 for this diagnosis but refused the repair.

482. Plaintiff Ronald Jett took his vehicle to another authorized GM dealership, North Park Chevrolet, located in Castorville, Texas, which also recommended a full engine replacement and provided a quote of approximately $9,700. He also confirmed the diagnosis with two independent auto mechanics, who quoted total engine replacements costing $7,800 and $11,000.

483. Ultimately, Plaintiffs Ronald and Marilyn Jett's vehicle is being repaired by Premier Auto Repair in San Antonio, Texas for approximately

$6,453.00.  Plaintiffs Ronald and Marilyn Jett decided to repair their engine because, due to part and engine shortages, they have been unable to find a replacement engine to purchase.  They were without their vehicle for a month.

484.   To date, Plaintiffs Ronald and Marilyn Jett's vehicle remains subject to the Valve Train Defect.

485.   As a result of the Valve Train Defect, Plaintiffs Ronald and Marilyn Jett have lost confidence in the ability of their Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes.  Further, Plaintiffs Ronald and Marilyn Jett will be unable to rely on GM's advertising or labeling in the future, and so will not purchase or lease another vehicle from GM in the future, though they would like to do so.

486.   At all times, Plaintiffs Ronald and Marilyn Jett, like other class members, have driven the vehicle in a foreseeable manner in the sense that Plaintiff Ronald and Marilyn Jeff have not abused their vehicle or used it for purposes unintended by GM such as drag racing, for example. However, despite this normal and foreseeable driving, the Valve Train Defect has rendered their vehicle unsafe and unfit to be used as intended.

**Plaintiff Ryan Fancher**

487.   Plaintiff Ryan Fancher is a citizen of Washington, domiciled in Orondo, Washington.

488.   In or around Spring 2017, Plaintiff Fancher purchased a used 2016 GMC Sierra Denali 1500 equipped with a 6.2L V8 engine from Sangster Motors, an authorized GMC dealership in Wenatchee, Washington.

489.   Plaintiff Fancher purchased his vehicle primarily for personal, family, or household use.

490.   Passenger safety and reliability were important factors in Plaintiff Fancher's decision to purchase his vehicle.  Before purchasing the vehicle, Plaintiff Fancher visited the dealership's website, the manufacturer's website, reviewed the window stickers including the Monroney sticker which listed the 6.2L engine as a component, did general research using search engines and Kelley Blue Book, and spoke to the salesperson at the dealership.  Plaintiff Fancher also took the vehicle for a test ride.  Plaintiff Fancher selected and ultimately purchased his Class Vehicle because the vehicle was represented to be, and was marketed as, a high-quality vehicle capable of providing safe, reliable transportation.  The purchase was made in part on the advertised safety, reliability, and quality of the vehicle and its components, including its engine.

491.   None of the information provided to Plaintiff Fancher disclosed any defects in the vehicle or its engine.  GM's omissions were material to Plaintiff Fancher.

492.   Had GM disclosed its knowledge of the Valve Train Defect before they purchased his vehicle, Plaintiff Fancher would have seen and been aware of the

disclosures. Indeed, GM's misstatements and omissions were material to Plaintiff Fancher. Like all members of the Class, Plaintiff Fancher would not have purchased his Class Vehicle, or would have paid less for the vehicle, had he known of the Valve Train Defect.

493.   In addition, at the time of Plaintiff Fancher's vehicle purchase, and in purchasing his vehicle, he relied upon GM and its authorized dealerships' representations, which Plaintiff Fancher viewed during his online research, including on the dealerships' website, statements in commercials, and heard from the salesperson, that the vehicle was fully functional, safe, durable, reliable, and that the engine operated correctly and effectively.   Plaintiff Fancher relied on those representations and the omission of, or failure to disclose, the Valve Train Defect, in purchasing the vehicle, and absent those representations and omissions, would not have purchased the vehicle, or would have paid less for it.

494.   At the time of his purchase, Plaintiff Fancher's vehicle had the remainder of GM issued: (1) bumper-to-bumper warranty lasting for three years or 36,000 miles, whichever occurred first; (2) powertrain warranty lasting for five years or 60,000 miles, whichever occurred first; and (3) emissions control warranty of eight years or 80,000 miles, whichever occurred first.

495.   Unbeknownst to Plaintiff Fancher, at the time of his purchase, GM had already issued three communications to its authorized dealerships describing problems with the valve train system in the 2016 GMC Sierra Denali. Moreover,

GM issued the first TSB describing problems the valve train system in the L86 engine, the engine in their vehicle, in January 2015.

496. At all times during his possession of the vehicle, Plaintiff Fancher has properly maintained and serviced his Class Vehicle according to GM's recommended maintenance guidelines.

497. On or around August 5, 2021, when the vehicle had approximately 57,000 miles on the odometer, Plaintiff Fancher experienced a loud knocking noise emanating from the engine, and the vehicle manifested shaking and shuttering, in addition to an illuminated check engine light. Plaintiff Fancher took his vehicle to the dealership for diagnosis and repair, where the dealership found that the egine light diagnosis, knocking, and shaking were "caused by Verified concern, heard knocking noise and misfire on #6 cylinder. Tested and found no compression on cylinder 6 . Removed valve cover and found failed lifter and bent push rod . Due to fault in valve lifter manifold . Rec new vlom , all lifters on right bank and 2 new pushrods." Although the repair order stated that the dealership "[r]emoved right cylinder head . all lifters on right bank 2 push  rods on cylinder 6 and the VLM. Reinstalled and reseal all removed parts[,]" the repair order lists that only 4 lifters, part number 12648846, were replaced. Mr. Fancher had to pay $1,457.36  to repair the engine and was without his vehicle for approximately six to eight weeks.

498. To date, Plaintiff Fancher's vehicle remains subject to the Valve Train Defect.

499.   As a result of the Valve Train Defect, Plaintiff Fancher has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes.  Further, Plaintiff Fancher will be unable to rely on GM's advertising or labeling in the future, and so will not purchase or lease another vehicle from GM in the future, though he would like to do so.

500.   At all times, Plaintiff Fancher, like other class members, has driven his vehicle in a foreseeable manner in the sense that Plaintiff Fancher has not abused his vehicle or used it for purposes unintended by GM such as drag racing, for example.  However, despite this normal and foreseeable driving, the Valve Train Defect has rendered his vehicle unsafe and unfit to be used as intended.

**Plaintiff Rebecca Prosser**

501.   Plaintiff Rebecca Prosser is a citizen of Washington, domiciled in Seattle, Washington.

502.   On or about January 2, 2021, Plaintiff Prosser purchased a new 2021 GMC Yukon equipped with a 6.2L V8 engine from Kirkland Buick GMC, an authorized GM dealership located in Kirkland, Washington.  Kirkland Buick GMC has since become Buick GMC of Bellevue.

503.   Plaintiff Prosser purchased her vehicle primarily for personal, family, or household use.

504.   Passenger safety and reliability were important factors in Plaintiff Prosser's decision to purchase her vehicle. Before making her purchase, Plaintiff Prosser "Googled" the vehicle, reviewed the manufacturer and dealer's websites, reviewed a Monroney sticker for a 2021 GMC Yukon which listed the 6.2L engine as a component, test drove a 2021 GMC Yukon, created and reviewed with a salesperson a specification sheet for her 2021 GMC Yukon which was a custom order directly from GM, and spoke to the authorized salesperson at the dealership who assured her of the quality, safety, and reliability of the vehicle.  Plaintiff Prosser selected and ultimately purchased her Class Vehicle because the vehicle was represented to be and was marketed as a high-quality vehicle capable of providing safe, reliable transportation.  The purchase was made in part on the advertised safety, reliability, and quality of the vehicle and its components, including its engine.

505.   None of the information provided to Plaintiff Prosser disclosed any defects in the vehicle or its engine.  GM's omissions were material to Plaintiff Prosser.

506.   Had GM disclosed its knowledge of the Valve Train Defect before she purchased her vehicle, Plaintiff Prosser would have seen and been aware of the disclosures. Indeed, GM's misstatements and omissions were material to Plaintiff Prosser.  Like all members of the Class, Plaintiff Prosser would not have purchased her Class Vehicle, or would have paid less for the vehicle, had she known of the Valve Train Defect.

507.   In addition, at the time Plaintiff Prosser purchased her vehicle, and in purchasing her vehicle, she relied upon representations and omissions from GM and its authorized dealership that she saw during her research, heard from the salesperson, reviewed on the Monroney sticker, and reviewed on the specification sheet that the vehicle was fully functional, safe, durable, reliable, and that the engine operated correctly and effectively and where GM failed to disclose the Valve Train Defect.  Plaintiff Prosser relied on those representations and the omission of the disclosure of the Valve Train Defect, in purchasing the vehicle, and absent those representations and omissions, would not have purchased the vehicle or would have paid less for it.

508.   At the time of her purchase, GM issued to Plaintiff Prosser for her vehicle: (1) a bumper-to-bumper warranty lasting for three years or 36,000 miles, whichever occurred first; (2) a powertrain warranty lasting for 5 years or 60,000 miles, whichever occurred first; and (3) an emissions control warranty of eight years or 80,000 miles, whichever occurred first.

509.   Unbeknownst to Plaintiff Prosser, at the time of her purchase, GM had already issued at least two communications to its authorized dealerships describing problems with the valve train system in 2021 GMC Yukon. Moreover, GM issued the first TSB describing problems the valve train system in the L87 engine, the engine in Plaintiff Prosser's vehicle, in November 2018.

510.    At all times during her ownership of the vehicle, Plaintiff Prosser has properly maintained and serviced her Class Vehicle according to GM's recommended maintenance guidelines.

511.    In early October 2021, while driving her vehicle, Plaintiff Prosser began to hear a thumping or clunking noise coming from the engine compartment. In addition, several lights illuminated on the dashboard.  Plaintiff Prosser took her vehicle immediately to the dealership for diagnosis.  At the time, her vehicle had approximately 3,600 miles on the odometer.

512.    The dealership inspected her vehicle and confirmed hearing the noise. A run of the diagnosis found that the "fourth lifter" was collapsing and that the associated pushrod was bent.  The dealership replaced all of the lifters in her vehicle, the bent pushrod, as well as related seals and gaskets.  This repair was provided under warranty.

513.    To date, Plaintiff Prosser's vehicle remains subject to the Valve Train Defect.

514.    As a result of the Valve Train Defect, Plaintiff Prosser has lost confidence in the ability of her Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes.  Further, Plaintiff Prosser will be unable to rely on GM's advertising or labeling in the future, and so will not purchase or lease another vehicle from GM in the future, though she would like to do so.

515.   At all times, Plaintiff Prosser, like other class members, has driven her vehicle in a foreseeable manner in the sense that Plaintiff Mouradjian has not abused her vehicle or used it for purposes unintended by GM such as drag racing, for example. However, despite this normal and foreseeable driving, the Valve Train Defect has rendered her vehicle unsafe and unfit to be used as intended.

**Defendant**

516.  Defendant General Motors LLC is a Delaware limited liability company with its principal place of business located at 300 Renaissance Center, Detroit, Michigan. General Motors LLC is registered to do business in the State of Delaware. The sole member and owner of General Motors LLC is General Motors Holdings LLC.

517.   General Motors Holdings LLC is a Delaware limited liability company with its principal place of business in the State of Michigan.  General Motors Holdings LLC's only member is General Motor Company, a Delaware corporation with its principal place of business in the State of Michigan.  General Motors Company has 100% ownership interest in General Motors Holdings LLC.  General Motor Company also owns ACDelco, a company which makes parts for GM vehicles to be used when the vehicles are manufactured and also to be sold to the public when those parts require repair.

518.  General Motors LLC, through its various entities, designs, manufactures, markets, distributes, services, repairs, sells, and leases passenger

vehicles, including the Class Vehicles, nationwide and in Delaware. General Motors LLC is the warrantor and distributor of the Class Vehicles in the United States.

519. At all relevant times, Defendant was and is engaged in the business of designing, manufacturing, constructing, assembling, marketing, distributing, and selling automobiles and motor vehicle components in Delaware and throughout the United States of America.

520. In order to sell vehicles to the general public, GM enters into agreements with dealerships who are then authorized to sell GM-branded vehicles such as the Class Vehicles to consumers such as Plaintiffs. These agreements also designate the authorized dealerships to conduct warranty and recall repairs on GM's behalf. All service and repairs performed at an authorized dealership are also completed according to GM's explicit instructions, issued through service manuals, technical service bulletins ("TSBs"), preliminary information bulletins ("PIs"), information service bulletins, and other documents, often only referred to by a "Document ID." Per the agreements between GM and the authorized dealers, consumers such as Plaintiffs can receive services under GM's issued warranties at dealer locations that are convenient to them. Furthermore, GM's authorized dealerships are only able to sell new vehicles purchased directly from GM, as well as ACDelco parts for those vehicles to be used in service and repairs. As such, GM directly profits from all sales of new vehicles at authorized GM dealerships and directly profits from all sales of ACDelco parts at those dealerships.

521.  GM also develops and disseminates the owners' manual, warranty booklets, maintenance schedules, advertisements, and other promotional materials relating to the Class Vehicles.  GM is also responsible for the production and content of the information on the Monroney Stickers, as well as other window stickers.

522.  GM is the drafter of the warranties it provides to consumers nationwide, the terms of which unreasonably favor GM.  Consumers are not given a meaningful choice in the terms of the warranties provided by GM, and those warranties are offered on a "take it or leave it" basis.

## JURISDICTION AND VENUE

523.  This action is properly before this Court and this Court has subject matter jurisdiction over this action under the Class Action Fairness Act. At least one member of the proposed class is a citizen of a different state than GM, the number of proposed class members exceeds 100, and the amount in controversy exceeds the sum or value of $5,000,000.00 exclusive of interests and costs. 28 U.S.C. § 1332(d)(2)(A).

524.  In addition, under 28 U.S.C. § 1367, this Court may exercise supplemental jurisdiction over the state law claims as well as the Magnuson-Moss Warranty Act claims, because all of the claims are derived from a common nucleus of operative facts and are such that Plaintiffs would ordinarily expect to try them in one judicial proceeding.

525.    This Court has personal jurisdiction over Defendant because its principal place of business is in the State of Michigan; it has consented to jurisdiction by registering to conduct business in the state; maintains sufficient minimum contacts in Michigan; and otherwise intentionally avails itself of the markets within Michigan through promotion, sale, marketing and distribution of its vehicles, which renders the exercise of jurisdiction by this Court proper and necessary as GM is "at home" in Michigan.

526.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)-(c). A substantial part of the events or omissions giving rise to the claims occurred in this District. Plaintiffs may properly sue GM in this District, the state of GM's principal place of business.

## FACTUAL ALLEGATIONS

527.    Since 2013, GM has designed, manufactured, distributed, sold, and leased the Class Vehicles. GM has sold and leased, directly or indirectly, through dealers and other retail outlets, thousands of Class Vehicles in Michigan and nationwide. In 2019, GM sold 2,547,000 vehicles in the United States alone and estimated that it was "the market share leader in North America[.]"[2]

---

[2] *See* Exhibit A, General Motors Company 2020 Annual Report (Form 10-K), at 2 (Feb. 5, 2020), available at: https://investor.gm.com/static-files/78f06039-f442-41a0-8929-81021e9ccb17 (last visited December 10, 2021).

528.   GM has thousands of authorized dealerships across the United States. GM authorizes these dealerships to sell GM vehicles, parts, and accessories and to service and repair GM vehicles using GM parts.[3] Its net automotive sales through those dealerships, for its North American region, totaled $96.733 billion in 2020.[4] GM sells its vehicles to its authorized dealerships, which in turn sell those vehicles to consumers. After these dealerships sell cars to consumers, including the Plaintiffs and Class Members, they purchase additional vehicle inventory from GM to replace the vehicles sold, increasing GM's revenues. Thus, Plaintiffs' and Class Members' purchase of Class Vehicles accrues to the benefit of GM by increasing its revenues. In addition, GM underscores the importance of its dealerships as follows: "The quality of GM dealerships and our relationship with our dealers and distributors are critical to our success given that dealers maintain the primary sales and service interface with the end consumer of our products."[5]

529.   GM provided all purchasers or lessees of the Class Vehicles with a New Vehicle Limited Warranty ("NVLW").   The terms of these warranties are non-negotiable and GM exercises sole authority in determining whether and to what extent a particular repair is covered under the warranties it offers.

---

[3] *Id.* at 3.
[4] *Id.* at 30.
[5] *Id*. at 3.

530.   Moreover, although GM offers a single type of extended warranty, which merely extends the durational limits for a fee of thousands of dollars, no other terms are changed, leaving GM the sole arbiter of whether it will honor the warranty. In particular, GM may decide that a defect is a "design defect" not covered under the warranties it provides, extended or otherwise, and thus not provide warranty coverage.

531.   Further, GM's authorized dealerships also sell extended warranties from third-party suppliers.   However, those warranties exclude manufacturer's defects, including those like the Valve Train Defect.

532.   The NVLW for the Class Vehicles included a "Bumper-to-Bumper" warranty, a Powertrain warranty, and an Emission Control Systems Warranty, stated in relevant part:[6]

**What is Covered**

**Warranty Applies**

This warranty is for [GM] vehicles registered in the United States and normally operated in the United States or Canada, and is provided to the original and any subsequent owners of the vehicle during the warranty period.

**Repairs Covered**

---

[6] This sample warranty displays certain durational limits.  Discovery will show that that the warranties issued with the sale or lease of Class Vehicles are identical with the exception of the durational limits.   The durational limits of each named plaintiff's warranty are outlined *supra*.

The warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period. Needed repairs will be performed using new, remanufactured, or refurbished parts.

**No Charge**

Warranty repairs, including towing, parts, and labor, will be made at no charge.

**Obtaining Repairs**

To obtain warranty repairs, take the vehicle to a [GM] dealer facility within the warranty period and request the needed repairs. Reasonable time must be allowed for the dealer to perform necessary repairs.

**Warranty Period**

The warranty period for all coverages begins on the date the vehicle is first delivered or put in use and ends at the expiration of the coverage period.

**Bumper-to-Bumper Coverage**

The complete vehicle is covered for 3 years or 36,000 miles, whichever comes first, except for other coverages listed here under "What is Covered" and those items listed under "What is Not Covered" later in this section.

**Powertrain Component Warranty Coverage**

Coverage is for the first 5 years or 60,000 miles whichever comes first. []

****

*Exclusions:* Excluded from the powertrain coverage are sensors, wiring, connectors, engine radiator, coolant hoses, coolant, and heater core. Coverage on the engine cooling system begins at the inlet to the water pump and ends with the thermostat housing and/or outlet that attaches to the return hose. Also excluded is the starter motor, entire pressurized fuel system (in-tank fuel pump, pressure lines, fuel rail(s), regulator, injectors, and return line) as well as the Engine/Powertrain Control Module and/or module programming.

\*\*\*\*

**Other Terms:** This warranty gives you specific legal rights and you may also have other rights which vary from state to state.

GM does not authorize any person to create for it any other obligation or liability in connection with these vehicles. **Any implied warranty of merchantability or fitness for a particular purpose applicable to this vehicle is limited in duration to the duration of this written warranty. Performance of repairs and needed adjustments is the exclusive remedy under this written warranty or any implied warranty. GM shall not be liable for incidental or consequential damages, such as, but not limited to, lost wages or vehicle rental expenses, resulting from breach of this written warranty or any implied warranty.\***

\* Some states do not allow limitations on how long an implied warranty will last or the exclusion or limitation of incidental or consequential damages, so the above limitations or exclusions may not apply to you.

\*\*\*\*

The emission warranty on your vehicle is issued in accordance with the U.S. Federal Clean Air Act. Defects in material or workmanship in GM emission parts may also be covered under the New Vehicle Limited Warranty Bumper-to-Bumper coverage. In any case, the warranty with the broadest coverage applies.

**What Is Covered**

The Emissions related parts covered under Federal and California Warranty are listed under the Emission Warranty Parts List 0 21. How to Determine the Applicable Emissions Warranty State and Federal agencies may require a different emission warranty coverage depending on:

- Whether the vehicle conforms to regulations applicable to light duty or heavy duty emission control systems.

- Whether the vehicle conforms to or is certified for California regulations in addition to U.S. EPA Federal regulations.

All vehicles are eligible for Federal Emissions Control Warranty Coverage. If the emissions control label contains language stating the vehicle conforms to

146

California regulations, the vehicle is also eligible for California Emissions Warranty Coverage.

**Federal Emission Control System Warranty**

**Federal Emissions Warranty Coverage**

- For Passenger Car or Light Duty Truck with a Gross Vehicle Weight Rating (GVWR) of 8,500 lbs. or less

    - 2 years or 24,000 miles, whichever comes first for Emissions related parts

    - 8 years or 80,000 miles, whichever comes first for Emissions select components; catalytic converters, engine control module, transmission control module and other diagnostic emissions critical-electronic control units

\*\*\*\*

**Federal Emission Defect Warranty**

GM warrants to the owner the following:

- The vehicle was designed, equipped and built to conform at the time of sale with applicable regulations of the U.S. Federal Environmental Protection Agency (EPA).

- The vehicle is free from emissions-defects in materials and workmanship which cause the vehicle to fail to conform to those regulations during the emission warranty period.

- Emission-related defects in the genuine GM parts listed under the Emission Warranty Parts List, including related diagnostic costs, parts, and labor are covered by this warranty.

****

## Owner's Warranty Responsibilities

As the vehicle owner, you are responsible for the performance of the scheduled maintenance listed in your owner manual. GM recommends that you retain all maintenance receipts for your vehicle, but GM cannot deny warranty coverage solely for the lack of receipts or for your failure to ensure the performance of all scheduled maintenance. You are responsible for presenting your vehicle to a Chevrolet dealer selling your vehicle line as soon as a problem exists. The warranted repairs should be completed in a reasonable amount of time, not to exceed 30 days. As the vehicle owner, you should also be aware that Chevrolet may deny warranty coverage if your vehicle or a part has failed due to abuse, neglect, improper or insufficient maintenance, modifications not approved by Chevrolet, or if the defect is not emissions-related.

If you have any questions regarding your rights and responsibilities under these warranties, you should contact the Customer Assistance Center at 1-800-222-1020 or, in California, write to:

State of California Air Resources Board
Mobile Source Operations
Division P.O. Box 8001
El Monte, CA 91731-2990

## The Valve Train Defect

533.   Every internal combustion engine, including the 5.3L, 6.0L, and 6.2L V8 engines produced by GM and installed in 2014 to present model year vehicles (the "Subject Engines"), has a valve train system, the mechanical system that controls when the intake valves and exhaust valves of the internal combustion chamber open and close.  Intake valves introduce gasoline and air (or simply air in direct injection vehicles), while exhaust valves allow exhaust to escape the chamber. A typical sequence has the intake valve opening to allow gas and/or air into the chamber, the intake valve then closing, the combustion happening in the chamber, the exhaust valve opening to allow exhaust out, and finally the exhaust valve closing.

534.   In the Subject Engines, the rotational movement of the camshaft leads to the opening and closing of the intake and exhaust valves.  The camshaft itself has lobes, precision designed and crafted egg-shaped pieces that turn as the shaft turns that determine the timing and lift of valve openings.  As a camshaft rotates, its egg-shaped lobes push up on lifters, which are filled with oil to maintain zero valve lash

149

(i.e., to make sure there is no clearance between parts that should be constantly riding on one another, preventing noise and wear, and allowing for quicker valve opening and closing for improved performance). These are known as hydraulic lifters and sometimes are referred to as tappets.

535. The lifters then apply this force to the pushrods, metal rods that push into the rocker arm, which turns or pivots on internal bearings, and then opens the valve.

536. The figure below shows how the valve train system fits together, though this is not a representation of the Subject Engines.



**Figure 1**

537.   The valves themselves are opened by the action of the rocker arm and closed by force of a coiled spring called a valve spring.

538.   Each of these mechanical pieces must be working properly in order for the valve timing of the engine to run as specified in the engine design.

539.   The Subject Engines also have another system involved with the valve train system, known as Active Fuel Management (AFM) or Dynamic Fuel Management (DFM).  While most of the Subject Engines have AFM, some have DFM.  Both use the valve train system to effectively shut off some of the cylinders at certain time during the vehicle's operation, in order to save fuel.  AFM and DFM are trademarked names for this technology in GM vehicles, although AFM was originally called Displacement on Demand ("DoD").  In AFM, four of the cylinders can be deactivated. In DFM, any of the eight cylinders can be deactivated.

540.   Originally introduced in 2005, the GM global chief engineer for small block engines, Jordan Lee, stated, "Rather than adding turbochargers or multi-valve cylinders heads to increase the power of smaller engines, we chose to keep the proven capability of our larger V-8 truck engines, and save fuel by switching off half of the cylinders when they aren't needed."

541.   As described by Lee, "With recent increases in computing power, we can combine sophisticated digital design, powerful control strategies, and simple, robust mechanical systems to bring real benefits with no added cost to our customers."

542. With AFM, when the Engine Control Module ("ECM") decides that the engine is producing more power than is needed, for example when cruising on highway speeds or other "light load" conditions, the ECM will "deactivate" half of the cylinders of the engine – cylinders 1, 4, 6, and 7. The ECM accomplishes this by the use of specialized lifters and a valve lifter oil manifold ("VLOM") which delivers pressurized engine oil to the lifters.

543. The VLOM delivers the pressurized oil to four solenoids, which are normally closed. When the VLOM provides this oil, the solenoids open and deliver the oil to the AFM lifters, which forces the locking pins into the lifter body. This is demonstrated by Figure 2, below. This allows the outer cylinder of the lifter to continue to follow the motion of the cam lobe, while the inner portion of the lifter does not. As a result, the lifter does not transfer the motion of the cam lobe to the pushrod, which does not move the rocker arm, which does not actuate the valve.



**Figure 2**

544.   To activate the lifter, the VLOM turns the solenoid off.  This stops flow of oil to the AFM lifter, and spring pressure forces the locking pin out, which locks the inner body of the lifter to the outer body.  Now the lifter engages the pushrod, transferring the force of the cam lobe to the pushrod.

545.   AFM lifter failure, such as collapsed lifters, can be the result of a mistimed switch event, when the lifter is locked or unlocked at the wrong time of the cycle.  If the locking pin is not fully engaged at the proper time, it can damage the lifter latching shelf.  The left most lifter in Figure 3 below is a collapsed lifter.



**Figure 3**

546.   Mistimed switch events can be caused by errors in the ECM, low engine oil pressure including from oil aeration (when too much air gets mixed into the engine oil, causing foaming), and/or leaks in the VLOM.

547. Stuck lifters can cause the roller on the lifter which rides on the cam lobe to freeze into position, creating a furrow on the cam lobe and sending pieces of metal circulating through the engine. Collapsed lifters can also cause the pushrods to become bent.

548. AFM lifters are easily distinguishable from regular lifters, as shown below in Figure 4. The AFM lifters are on the left, regular lifters are on the right and the plastic lifter guides are on the top.



**Figure 4**

549. Dynamic Fuel Management is another form of AFM. Like AFM, it uses AFM Lifters to deactivate certain cylinders at the direction of the ECM. DFM differs from AFM by having more than 17-cylinder patterns of deactivation, instead of two patterns in AFM engines (8 cylinders in use or 4 cylinders in use). GM executive Jordan Lee explained in 2018, "DFM is powered by a sophisticated

controller that continuously monitors every movement of the accelerator pedal and runs a complex sequence of calculations to determine how many cylinders are required to meet the driver's requested torque. It can make this determination 80 times per second."[7]

550. As described by GM, "An electromechanical system deactivates and reactivates all 16 of the engine's hydraulic valve lifters, controlling valve actuation. The system uses solenoids to deliver oil pressure to control ports in the lifters, which activate and deactivate the lifters' latching mechanisms. When a cylinder is deactivated, the two-piece lifters effectively collapse on themselves to prevent them from opening the valves. When the cylinder is reactivated, solenoids send an oil pressure signal to the control ports on the lifters and the latching mechanism restores normal function, allowing the valves to open and close."[8] As such, DFM operates as AFM does, via the same mechanisms, and AFM and DFM engines share the same components, including AFM lifters, rocker arms, and valve springs. DFM does not use any non-AFM lifters.

551. Each of the Subject Engines are nearly identical with respect to their valve train systems, using the same component pieces and using the same or similar programming. GM has been producing engines with this system since 2006. Below

---

[7] *See* "2019 Silverado Leads Industry with Dynamic Fuel Management," GM Press Release (May 5, 2018).
[8] *Id*.

is a table which outlines the engine codes (known internally to GM as RPO codes)

of the Subject Engines, as well as their generation, whether they use AFM or DFM,

and the year the engine was placed into production.  As the table indicates and further

shown via the manufacturer communications described further *infra*, the Valve Train

Defect is inherent to all these engines, even those that are not currently included in

the Class Vehicles.

| Engine Code | Engine Description | Introduced |
|---|---|---|
| L76 | 6.0L Gen 4 engine with AFM | MY 2007 |
| L77 | 6.0L Gen 4 engine with AFM | MY 2011 |
| L94 | 6.2L Gen 4 engine with AFM | MY 2010 |
| L99 | 6.2L Gen 4 engine with AFM | MY 2009 |
| LC9 | 5.3L Gen 4 engine with AFM | MY 2007 |
| LFA | 6.0L Gen 4 engine with AFM | MY 2008 |
| LH6 | 5.3L Gen 4 engine with AFM | MY 2005 |
| LMG | 5.3L Gen 4 engine with AFM | MY 2007 |
| LS4 | 5.3L Gen 4 engine with AFM | MY 2005 |
| LY5 | 5.3L Gen 4 engine with AFM | MY 2007 |
| LZI | 6.0L Gen 4 engine with AFM | MY 2010 |
| L83 | 5.3L Gen 5 engine with AFM | MY 2014 |

| L86 | 6.2L Gen 5 engine with AFM | MY 2014 |
| L8B (L83) | 5.3L Gen 5 engine with AFM | MY 2016 |
| LT1 | 6.2L Gen 5 engine with AFM | MY 2014 |
| LT4 | 6.2L Gen 5 engine with AFM | MY 2015 |
| L82 | 5.3L Gen 5 engine with AFM | MY 2019 |
| L84 | 5.3L Gen 5 engine with DFM | MY 2019 |
| L87 | 6.2L Gen 5 engine with DFM | MY 2019 |
| L96 | 6.0L Gen 4 engine with AFM | MY 2010 |
| LC8 | 6.0L Gen 4 engine with AFM | MY 2011 |

552. Significantly, the valve train system components, including the AFM Lifters, are identical in Generation 4 and Generation 5 engines. GM's business depends on parts such as AFM Lifters, valve springs, and rocker arms, being identical so that they can be used in many different engines at the same time. Indeed, the design of the AFM/DFM systems are identical in each of the Class Vehicles.

553. Notably, while AFM lifters are subject to some unique issues, the valve train systems in the Subject Engines are also subject to problems in more traditional valve trains, i.e., problems with other components, like the rocker arms and the valve springs. In the Subject Engines, the rocker arms shed needle bearings, causing the rocker arm to no longer move in time with the rest of the valve train.

554. Further, the Subject Engines also have valve springs which breakdown and fail prematurely. In particular, the valve springs can literally break into multiple

pieces, or simply shed pieces of themselves.  When this happens, the valve spring can no longer hold the opening to the combustion chamber closed.

555.   All of these issues with the valve trains systems, including the problems with the lifters, the rocker arms, and the valve springs, can lead to component debris circulation throughout the engine and damage other key engine components, including the camshaft and the cylinders.

556.   The original components of the valve train system in the Subject Engines are made by ACDelco, GM's parts subsidiary.  However, some aftermarket manufacturers also make these parts according to GM's specifications. Dealerships use ACDelco parts when repairing the Engines. Critically, symptoms of the Valve Train Defect begin with noises, typically chirping, squeaking, and/or ticking when the vehicle is not idling.  Eventually, if unremedied, they progress to engine misfires, as the valves fail to open and close at appropriate times.  Various Diagnostic Trouble Codes ("DTCs") are associated with the Defect, including those related to engine misfires (DTCs P0300 through P0308), erratic sensor readings (i.e. P0106), idle RPMs too low (i.e. P0506), trapped high pressure exhaust charge (i.e. P3189, P318A, P318B, P318C, P318D, P318E, P318F, P3190), or those related to the cylinder deactivation system itself (i.e. P3400, P3401, etc.).  At this point, not only are the valve train components likely damaged, but other parts of the engine may become damaged as well, as pieces of the damaged or broken valve train's components begin to circulate through the engine oil.

557.   The Valve Train Defect alleged is inherent in and the same for all Class Vehicles.   Despite knowing of the Valve Train Defect, GM has continued to manufacture the Subject Engines and the defective valve train components, install them in Class Vehicles, and has failed to remedy the Valve Train Defect.

### The Valve Train Defect Poses a Serious Safety Concern Not Discussed in GM's Advertising

558.   The Valve Train Defect is material to consumers because it presents a serious safety concern.   Losing power while driving, especially at highway speeds or while trying to merge or change lanes, hesitation, surging, stalling, as well as full engine failure, all significantly increase the risk of vehicle collision.   Stalled vehicles or those with engine failure can also leave their occupants stranded in dangerous situations, including on the side of busy highways or roads.

559.   Despite having knowledge since at least 2010 of the existence and extent of the Valve Train Defect in Class Vehicles, as discussed further infra, and the that no permanent repair exists, GM continued to use AFM and/or DFM in its vehicles, including the defective valve train system needed to make that fuel management system functional.   In fact, GM heavily advertised the reliability, durability, and efficiency of the Class Vehicles, particularly of the utility of the AFM or DFM systems, while at the same time knowing that the reliability, durability, and ability of the Class Vehicles to even provide basic transportation was undermined by the Valve Train Defect.

560.   For example, in the brochure for the 2019 Chevrolet Silverado, GM boasts that it was "[t]he strongest, most advanced Silverado ever," offered with one of "six engines designed with Chevy truck power and reliability."  The brochures also promises that the DFM in the vehicles "all happens with seamless precision, so you'll never even notice."



Dynamic Fuel Management (DFM)
System. 6.2L V8 engine shown.

FUEL INJECTOR

COLLAPSIBLE LIFTERS

CONTINUOUSLY VARIABLE
VALVE TIMING

**DYNAMIC FUEL MANAGEMENT (DFM).**
This new technology is included on the 5.3L EcoTec3 V8 engine with 8-speed transmission as well as the available 6.2L EcoTec3 V8. A sophisticated control system continuously monitors every movement of the accelerator pedal and calculates exactly how much torque is needed to handle the current driving

condition, from highway cruising to city traffic to hauling a heavy load. Nearly instantaneously, the engine control system will activate or deactivate cylinders in an industry-first 17 different patterns to maximize fuel economy[1] and create the power needed. And it all happens with seamless precision, so you'll never even notice.

**ACTIVE FUEL MANAGEMENT (AFM).**
The 2.7L Turbo, the 4.3L EcoTec3 V6 and the 5.3L EcoTec3 V8 engine with 6-speed transmission offer this system. Sensing load and demand, AFM improves efficiency by deactivating cylinders when power demands are light and reactivating cylinders when more power is required.

561.   In the brochure for the 2017 GMC Sierra, GM promotes the use of AFM in the engines without ever mentioning the Valve Train Defect.  "By sensing load and demand, AFM improves efficiency by activating or deactivating cylinders. Under demanding conditions, such as high speeds or heavy loads, the valves' switching mechanisms is depressurized, re-engaging the cylinder and restoring full power."

562.    The brochures of the 2016 Chevrolet Silverado promise that the engines "deliver power and efficiency" while the brochures for the 2017 Cadillac Escalade also promise that "[e]ngine technologies like Continuous Variable Valve timing, multi-port Direct Injection and Active Fuel Management also ensure this power-plant's 460 lb-ft of torque are harness efficiently."

563.    Notably, the AFM and DFM systems are listed as components of the Class Vehicles on the Monroney stickers affixed to each new or used car sold by any automobile dealer in the United States. Monroney stickers are mandated by Automobile Information Disclosure Act of 1958 and must include information about the specific vehicle being sold including, powertrain information about the engine and transmission, safety ratings, crash test scores, fuel economy and environmental impact.  Despite being listed on the Monroney stickers, purportedly because AFM and DFM impact the fuel efficiency of the vehicle, there is no mention of the Defect and its associated safety risk.

564.    Indeed, GM has acknowledged that window stickers are an appropriate place for disclosing safety information.  GM will affix "certified window stickers" on vehicles that contain information about a battery recall repair on Chevrolet Bolt vehicles.[9]

---

[9] *See* Exhibit B, Jonathon Ramsey, "Chevy Bolts will get window sticker attesting to battery fix," Autoblog (Jan. 4, 2022), available at https://www.autoblog.com/2022/01/04/chevy-bolt-window-sticker-battery-fire-recall-fix/ (last visited March 3, 2022).

565.   At no time did GM reveal the existence or extent of the Valve Train Defect in any of its advertising, in the Monroney stickers affixed to each new vehicle it produced, or in the specification sheets for custom ordered vehicles.  Instead, it repeatedly called vehicles with the Subject Engines "reliable," "dependable," and "long-lasting."

### GM Had Superior and Exclusive Knowledge of the Valve Train Defect

566.   GM is aware of the Valve Train Defect and denies the defect exists. GM is also refusing to extend the warranty for the valve train, or Subject Engines, or fix the conditions which cause the Valve Train Defect to occur.

567.   As a result, GM's customers have had or will have to pay thousands in out-of-pocket costs.  Moreover, they and other motorists are subjected to the ongoing safety risk that these vehicles present.

568.   GM fraudulently, intentionally, negligently, and/or recklessly omitted and concealed from Plaintiffs and members of the Classes the existence and extent of the Valve Train Defect in Class Vehicles even though GM knew or should have known of the design, material, manufacturing, or workmanship defects in Class Vehicles.

569.   Knowledge and information regarding the Valve Train Defect were in the exclusive and superior possession of GM, and its dealers, and that information was not provided to Plaintiffs and the members of the Classes.  Based on pre-production testing, pre-production design failure mode analysis, production design

failure analysis, knowledge of alternative designs for lifters, quality control audits of lifters and other valve train components, early consumer complaints made to GM's network of exclusive dealers, aggregate warranty data compiled from those dealers, repair orders and parts data received from the dealers, auto parts stores, and/or consumers, consumer complaints to dealers and NHTSA and testing performed in response to those consumer complaints, inter alia, GM was aware of and should have been aware of the Valve Train Defect in the Class Vehicles and fraudulent concealed the Valve Train Defect and associated safety risk from Plaintiffs and members of the Classes.

570. GM knew or should have known that the Valve Train Defect and the associated safety risk was material to owners and lessees of Class Vehicles and was not known or reasonably discoverable by Plaintiffs and members of the Classes before they purchased or leased Class Vehicles or within the applicable warranty periods.

571. Notwithstanding GM's exclusive and superior knowledge of the Valve Train Defect, GM failed to disclose the defect to consumer at the time of purchased or lease of the Class Vehicles, or any time thereafter, and continues to sell Class Vehicles containing the Defect. GM intentionally concealed that the Valve Train Defect presents a safety risk to consumers, including Plaintiffs and members of the Classes, and the public.

### GM's Pre-Production Testing Revealed the Valve Train Defect

572.   GM is experienced in the design and manufacture of consumer vehicles. As an experienced manufacturer, GM conducts tests, including substantial pre-sale durability testing, on incoming components, including lifters, rocker arms, and valve springs, to verify the parts are free from defect and align with GM's specifications.[10]

573.   GM also performs durability testing on each model year of vehicles via pre-production testing.  For GM, this work is completed by its Pre-Preproduction Operations ("PPO") unit.  One significant testing facility is located in Warren, Michigan, where team members integrate and test the latest innovations in GM's products, as well as leading validation and quality control efforts.

574.   As described by Betty J. Romsek, executive director for General Motors' global pre-production operations ["PPO"] in an editorial in The Detroit News,  "PPO is responsible for building the first, fully functioning version of new and new-generation vehicles. PPO employees…troubleshoot the product build and production processes before any vehicles are built for our customers."[11]   She

---

[10]   *See* Exhibit C, Akweli Parker, *How Car Testing Works*, HOWSTUFFWORKS.COM, available at http://auto.howstuffworks.com/car-driving-safety/safety-regulatory-devices/car-testing.htm ("The idea behind car testing is that it allows manufactures to work out all the kinks and potential problems of a model before it goes into full production.") (last visited December 10, 2021).

[11] *See* Exhibit D, Betty J. Romsek, "GM invests in pre-production, Metro Detroit," *The Detroit News*, available at https://www.detroitnews.com/story/opinion/2015/05/07/romsek-gm-invests-pre-production/70899386/ (May 7, 2015) (last visited December 10, 2021).

estimated that GM produces 2,500 pre-production models a year and also describes how testing includes real-world driving.

575.   GM has robust durability testing for pre-production vehicles.   As described by GM, "[i]n 18 months, the durability team at General Motors' Milford Proving Group can put a vehicle through an entire lifecycle.   Durability tests are long, repetitive and physically demanding."[12]

576.   As described by GM itself, GM sets "benchmarks a vehicle must endure before the Milford durability team will release it for production," including "100,000 miles of customer use," and placing vehicle in special chambers for hours where the vehicles are exposed to high temperatures and humidity.[13]

577.   As a result of this testing, which takes place both before new innovations, such as AFM, are introduced into vehicles, and prior to any model year being mass-produced, GM would have learned of the Valve Train Defect not only prior to the sale of the first vehicle with AFM, but also each year before new model year vehicles were produced.   In particular, testing that placed 100,000 miles on the engines prior to production in GM's standard durability testing would have revealed the significantly high rate of valve train component failure.

---

[12] *See* Exhibit E, "Repetitive and Physical: 90 Years of Durability Testing," https://media.gm.com/media/us/en/gm/news.detail.html/content/Pages/news/us/en/2014/Oct/1024-milford.html (last visited December 10, 2021).
[13] *Id*.

**Communications Issued to Authorized GM Dealerships Demonstrate GM's Knowledge of the Defect**

578.   GM's knowledge of the Valve Train Defect can also be shown via its communications to its authorized dealerships regarding symptoms of the Valve Train Defect and describing the exact steps dealership technicians should take in response to consumer complaints.  These communications, known as Technical Service Bulletins ("TSBs") and Preliminary Information Bulletins ("PIs") are issued exclusively to its dealerships and are not disseminated to consumers, even if their vehicles receive services as outlined in the bulletins.

579.   Starting in 2012, NHTSA began to require that manufacturers such as GM provide copies of these bulletins to be posted on the NHTSA website.  However, the bulletins provided usually post-date 2011 and since GM issues bulletins for everything from minor, cosmetic issues to major issues such as the Valve Train Defect, any given model year of vehicle might have over 1,000 bulletins applicable to it.  In fact, some of the model years included in the Class Vehicles have over 2,000 bulletins applicable to them.  Further, NHTSA does not provide a way to search through the bulletins so that consumers can sort major issues from minor issues.

580.   Indeed, GM also includes the following disclaimer on its bulletins:

> GM bulletins are intended for use by professional technicians, NOT a "do-it-yourselfer". They are written to inform these technicians of conditions that may occur on some vehicles, or to provide information that could assist in the proper service of a vehicle.  Properly trained technicians have the equipment, tools, safety instructions,

and know-how to do a job properly and safely. If a condition is described, DO NOT assume that the bulletin applies to your vehicle, or that your vehicle will have that condition. See your GM dealer for information on whether your vehicle may benefit from the information. (emphasis in original)

581. The information contained in the bulletins reflects months, and sometimes years, of prior knowledge, from GM's collection of information and analysis, including information used to devise a response, and then draft the bulletin and/or address the design and manufacture of parts or software that is needed as part of the response.

582. Similarly, GM also issues "Service Updates" directly to its authorized dealerships. Service updates often involve new vehicles currently in dealership inventory, or on the way to dealership, which require dealership repair before they can be sold. Service updates "should be performed on vehicles in dealer inventory only." Vehicles which are not in dealership inventory, *i.e.*, already sold to consumers, do not receive the noted repair, nor are they recalled. Instead, consumers must wait until a failure before seeking a warranty repair. Service updates, unlike bulletins, are not published on the NHTSA website. Often, service updates list parts or components that need be replaced with newly designed and released components.

583. On January 17, 2011, GM issued Preliminary Information Bulletin PIP4568K, regarding "Tick Noise And/Or Misfires on AFM Cylinders 1 4 6 And/Or 7." This bulletin was applicable to 2008-2009 Buick LaCrosse and Allure, 2007

Buick Rainer, 2007-2011 Cadillac Escalade, 2010-2011 Chevrolet Camaro SS, 2007-2011 Chevrolet Avalanche, Silverado, Suburban, and Tahoe, 2006-2009 Chevrolet Trailblazer, 2006-2009 Chevrolet Impala SS, 2006-2007 Chevrolet Monte Carlo SS, 2006-2009 GMC Envoy, 2007-2011 GMC Sierra and Yukon, 2008-2009 Pontiac G8, 2005-2008 Pontiac Grand Prix GXP, and 2006-2009 Saab 97x vehicles with a V8 Engine and Active Fuel Management.  The engines involved included RPO Codes L76, L77, L94, L99, LC9, LFA, LH6, LMG, LS4, LY5, and LZ1, a collection of 5.3L and 6.0L V8 engines.  The bulletin stated that customers may "comment on a SES light, engine misfire on cylinder 1, 4, 6, or 7 and/or tick noise." As noted by GM, "[t]his may be the result of an AFM lifter that unlocks as soon as the engine is started or one that is mechanically collapsed/stuck all of the time." AFM lifters which unlock immediately after the vehicle starts would cause an SES light, DTC P0300, and engine misfires.  AFM lifters which were collapsed or stuck would additionally cause "a consistent valve train tick noise."  Diagnostic procedures were outlined, and the dealerships were directed to replace the Valve Lifter Oil Manifold ("VLOM"), all the AFM lifters and the plastic lifter guides.[14] This bulletin superseded PIP4568J[15], a previous version of the PI, adding that the

_____

[14] Certain vehicles also needed their AFM pressure relief valve shield inspected and possibly replaced.  Technicians were directed to refer to TSB 10-06-01-008. The lead number on TSBs indicates the first year in which they were issued, in this case, 2010.

[15] PIs which are subsequently revised have letters appended to the end of their

plastic lifter guides in the engines should also be replaced, and that Police Tahoes additionally needed their Engine Control Modules ("ECMs") reprogramed.

584.   In December 2012, GM issued Preliminary Information Bulletin PIP4138M, regarding "SES Light, DTC P0300, and/or a Chirp, Squeak, Squeal, or Tick Noise – Potential Valvetrain Concern."  This bulletin was applicable to 2004-2007 Buick Rainier, 2008-2009 Buick LaCrosse and Allure, 2006-2013 CTS-V, 2002-2013 Cadillac Escalade, 2010-2013 Chevrolet Camaro, 2011-2013 Chevrolet Caprice, 2002-2013 Chevrolet Avalanche, 1999-2013 Chevrolet Express, Silverado, Suburban, and Tahoe, 2009-2013 Chevrolet Colorado, 2003-2009 Chevrolet Trailblazer, 2006-2009 Chevrolet Impala SS, 2006-2007 Chevrolet Monte Carlo SS, 2003-2006 Chevrolet SSR, 2005-2013 Chevrolet Corvette, 2009-2013 GMC Canyon, 2003-2009 GMC Envoy, 1999-2013 GMC Savana, Sierra, and Yukon, 2003-2010 Hummer H2, 2008-2010 Hummer H3, 2008-2010 Pontiac G8, 2005-2006 Pontiac GTO, 2005-2008 Pontiac Grand Prix GXP, and 2005-2009 Saab 97x vehicles with a V8 engine.  No engine codes were noted.   The bulletin stated that customers "may complain of an SES light, engine misfire, and/or engine noise" and that "[t]he noise may be described as a chirp, squeak, squeal, or tick noise and may

---

designation to indicate the version of the bulletin.  Despite Plaintiffs' best efforts, they have been unable to located PIP4568J or any previous version of the PI. However, it is clear such versions exist and pre-date the issuance of this PI by months, if not years.

increase off idle."  If the cause of the concern was not isolated after SI diagnosis[16], GM's regular diagnostic review, GM noted that this concern may be the result of several conditions, including a "worn camshaft lobe and/or lifter roller," "a broken valve spring," and "a collapsed AFM lifter."  Worn camshaft lobe and/or lifter rollers were to be replaced, as well as the plastic lifter guides and the VLOM. Broken valve springs were to be replaced. If a collapsed AFM Lifter was found, technicians were to "refer to the latest version of PIP4568 for additional information."  That PI directed technicians to replace the lifters, guides, and the VLOM.  The previous version of the PI, PIP4138K, was to be discarded.

585.  In January 2013, GM issued Preliminary Information Bulletin PIP4138M, regarding "SES Light, DTC P0300, and/or a Chirp, Squeak, Squeal, or Tick Noise – Potential Valvetrain Concern."  This bulletin was applicable to 2004-2007 Buick Rainier, 2008-2009 Buick LaCrosse and Allure, 2006-2013 CTS-V, 2002-2013 Cadillac Escalade, 2010-2013 Chevrolet Camaro, 2011-2013 Chevrolet Caprice, 2002-2013 Chevrolet Avalanche, 1999-2013 Chevrolet Express, Silverado, Suburban, and Tahoe, 2009-2013 Chevrolet Colorado, 2003-2009 Chevrolet Trailblazer, 2006-2009 Chevrolet Impala SS, 2006-2007 Chevrolet Monte Carlo SS, 2003-2006 Chevrolet SSR, 2005-2013 Chevrolet Corvette, 2009-2013 GMC Canyon, 2003-2009 GMC Envoy, 1999-2013 GMC Savana, Sierra, and Yukon,

---

[16] SI diagnosis is GM-proprietary software which aids GM-authorized dealerships in diagnosis of vehicles.

2003-2010 Hummer H2, 2008-2010 Hummer H3, 2008-2010 Pontiac G8, 2005-2006 Pontiac GTO, 2005-2008 Pontiac Grand Prix GXP, and 2005-2009 Saab 97x vehicles with a V8 engine.  No engine codes were noted.   The bulletin stated that customers "may complaint of an SES light, engine misfire, and/or engine noise" and that "[t]he noise may be described as a chirp, squeak, squeal, or tick noise and may increase off idle."  If the cause of the concern was not isolated after SI diagnosis, GM's regular diagnostic review, GM noted that this concern may be the result of several conditions, including a "worn camshaft lobe and/or lifter roller," "a broken valve spring," and "a collapsed AFM lifter."  Worn camshaft lobe and/or lifter rollers were to be replaced, as well as the plastic lifter guides and the VLOM.  Broken valve springs were to be replaced.  If a collapsed AFM Lifter was found, technicians were to "refer to the latest version of PIP4568 for additional information."  That PI directed technicians to replace the lifters, guides, and the VLOM.  The previous version of the PI, PIP4138L, was to be discarded because this version updated the warranty information.

586.   In July 2013, GM issued an updated Preliminary Information Bulletin, PIP4568M.  Dealerships were directed to discard PIP4568L, which was issued sometime after PIP4568K in January 2011.  This PI updated the model years of the vehicles to which the PI was applicable, including 2008-2009 Buick LaCrosse and Allure, 2007 Buick Rainier, 2007-2013 Cadillac Escalade, 2010-2013 Chevrolet Camaro SS, 2007-2013 Chevrolet Avalanche, Silverado, Suburban, and Tahoe,

2006-2009 Chevrolet Trailblazer, 2006-2009 Chevrolet Impala SS, 2006-2007 Chevrolet Monte Carlo SS, 2006-2009 GMC Envoy, 2007-2013 GMC Sierra and Yukon, 2008-2009 Pontiac G8, 2005-2008 Pontiac Grand Prix GXP, and 2006-2009 Saab 97x vehicles with a V8 Engine and Active Fuel Management.  The engines involved included RPO Codes L76, L77, L94, L99, LC9, LFA, LH6, LMG, LS4, LY5, and LZ1, a collection of 5.3L and 6.0L V8 engines.  Again, the PI stated that customers may report a SES lift, engine misfire on cylinder 1, 4, 6, and 7 and/or tick noise, which "may be the result of the AFM lifter that unlocks as soon the engine is started or one that is mechanically collapsed/stuck all of the time."  The PI continued, "[t]hese lifter concerns may be the result of internal locking pin damage, which may occur if the response time of an AFM lifter unlocking event is decreased due to low oil pressure, oil aeration, internal engine sludge, or an internal concern with an AFM lifter, VLOM, plastic lifter guide, lifter bore, and/or cam lobe wear."  The PI directed dealerships to replace the VLOM, all the AFM lifters, and all plastic lifter guides.  Further, 2008-2009 Full Size Trucks and SUVs, and the 2007-2009 Chevrolet Tahoe with the Police Package also required an ECM update.  Certain vehicles also needed their AFM pressure relief valve shield inspected and possibly replaced.  Technicians were directed to refer to TSB 10-06-01-008 in that case.  Technicians were also to carefully inspect the camshaft lobes through the lifter bores to ensure they were not obviously worn, and to clean out the lifter control oil passages with brake cleaner if

172

debris was noted.  The PI indicates that low oil pressure to the VLOM can cause AFM lifter damage.

587.  In August 2013, GM issued Preliminary Information Bulletin PIP4138N, regarding "SES Light, DTC P0300, and/or a Chirp, Squeak, Squeal, or Tick Noise – Potential Valvetrain Concern."  This bulletin was applicable to 2004-2007 Buick Rainier, 2008-2009 Buick LaCrosse and Allure, 2006-2013 CTS-V, 2002-2013 Cadillac Escalade, 2010-2013 Chevrolet Camaro, 2011-2013 Chevrolet Caprice PPV, 2002-2013 Chevrolet Avalanche, 1999-2013 Chevrolet Express, Silverado, Suburban, and Tahoe, 2009-2013 Chevrolet Colorado, 2003-2009 Chevrolet Trailblazer, 2006-2009 Chevrolet Impala SS, 2006-2007 Chevrolet Monte Carlo SS, 2003-2006 Chevrolet SSR, 2005-2013 Chevrolet Corvette, 2009-2013 GMC Canyon, 2003-2009 GMC Envoy, 1999-2013 GMC Savana, Sierra, and Yukon, 2003-2010 Hummer H2, 2008-2010 Hummer H3, 2008-2010 Pontiac G8, 2005-2006 Pontiac GTO, 2005-2008 Pontiac Grand Prix GXP, and 2005-2009 Saab 97x vehicles with a V8 engine.  No engine codes were noted.   The bulletin stated that customers "may complaint of an SES light, engine misfire, and/or engine noise" and that "[t]he noise may be described as a chirp, squeak, squeal, or tick noise and may increase off idle."  If the cause of the concern was not isolated after SI diagnosis, GM's regular diagnostic review, GM noted that this concern may be the result of several conditions, including a "worn camshaft lobe and/or lifter roller," "a broken valve spring," and "a collapsed AFM lifter."  Worn camshaft lobe and/or lifter rollers

were to be replaced, as well as the plastic lifter guides and the VLOM. Broken valve springs were to be replaced. If a collapsed AFM Lifter was found, technicians were directed to "refer to the latest version of PIP4568 for additional information." That PI directed technicians to replace the lifters, guides, and the VLOM. The previous version of the PI, PIP4138M, was to be discarded.

588. In or around September 2014, GM issued Preliminary Information Bulletin PIP5226 regarding "Needle Bearings Found in the oil pan During an Oil Change." The PI was applicable to all 2015 and Prior GM Passenger Cars and Trucks with a V6 or V8 push rod engines with Equipped with roller Rocker Arms. The PI described "[i]f a dealer finds roller rocker arm needle bearings during an oil change [in the oil pan], inspect all of the roller rocker arms. If a damaged rocker arm is found, only replace the broken roller rocker arm." The PI repeatedly told technicians, "replacement of the remaining roller rocker arms is not necessary."

589. In January 2015, GM issued Preliminary Information Bulletin PIP5259, regarding "Engine Misfire Lamp P03000 AFM Cylinders." The PI was applicable to 2014-2015 Chevrolet Silverado, Suburban, and Tahoe, and 2014-2015 GMC Sierra, Yukon, and Yukon XL vehicles, equipped with 5.3L V8 or 6.2L V8 engines with RPO codes L83 and L86, respectively. The PI described that "[s]ome customers may comment on an SES light P0300, engine misfire on cylinder 4, 6, and/or tick noise. This may be the result of an AFM lifter that is mechanically collapsed and or stuck all of the time. These lifter concerns may be the result of

internal locking pin damage in the lifter, due to oil aeration." Technicians were directed to use the SI diagnosis to find the cause of the concern, and if that failed to inspect for valve operation. If the valve or valves were not moving, the AFM lifters and guides on the back with the concern were to be replaced, along with the oil pump and oil pan assembly.

590. In March 2015, GM issued Preliminary Information Bulletin PIP5259C, regarding "Engine Misfire Lamp P03000 AFM Cylinders." The PI was applicable to 2014-2015 Chevrolet Silverado, Suburban, and Tahoe, 2014-2015 GMC Sierra, Yukon, and Yukon XL vehicles, and 2015 Cadillac Escalades, equipped with 5.3L V8 or 6.2L V8 engines with RPO codes L83 and L86, respectively. This PI superseded PIP5259B, which had been issued between January and March 2015. Technicians were directed to discard PIP5259B. The PI described that "[s]ome customers may comment on an SES lift P0300, engine misfire on cylinder 4, 6, and/or tick noise. This may be the result of an AFM lifter that is mechanically collapsed and or stuck all of the time. These lifter concerns may be the result of internal locking pin damage in the lifter, due to oil aeration." Technicians were directed to use the SI diagnosis to find the cause of the concern, and if that failed, to inspect for valve operation. If the valve or valves were not moving, the AFM lifters and guides on the back with the concern were to be replaced, along with the Valve Lifter Oil Assembly.

591. In March 2015, GM issued Preliminary Information Bulletin PIP5259D, regarding "Engine Misfire Lamp P03000 AFM Cylinders." The PI was applicable to 2014-2015 Chevrolet Silverado, Suburban, and Tahoe, 2014-2015 GMC Sierra, Yukon, and Yukon XL vehicles, and 2015 Cadillac Escalades, equipped with 5.3L V8 or 6.2L V8 engines with RPO codes L83 and L86, respectively. This PI superseded PIP5259C, which had been issued just a few weeks prior in the same month. Technicians were directed to discard PIP5259C. The PI described that "[s]ome customers may comment on an SES lift P0300, engine misfire on cylinder 4, 6, and/or tick noise. This may be the result of an AFM lifter that is mechanically collapsed and or stuck all of the time. These lifter concerns may be the result of internal locking pin damage in the lifter, due to oil aeration." Technicians were directed to use the SI diagnosis to find the cause of the concern, and if that failed, to inspect for valve operation. If the valve or valves were not moving, the AFM lifters and guides on the back with the concern were to be replaced, as well as the oil pump pick up seal.

592. In June 2015, GM issued TSB 15-06-01-002, regarding "Engine Misfire/Tick Noise, Malfunction Indicator Lap (MIL) on, DTC P0300 Set." The TSB was applicable to 2015 Cadillac Escalades, 2014 Chevrolet Silverado 1500, 2014-2015 Chevrolet Corvette, 2014 Chevrolet Silverado, Suburban, and Tahoe, 2014 GMC Sierra 1500, and 2014-2015 GMC Sierra, Yukon, and Yukon XL vehicles, equipped with 5.3L V8 or 6.2L V8 engines with RPO codes L83 and L86

or LT1, respectively.  The TSB described "[s]ome customers may comment on a malfunction indicator lamp (MIL) on and/or an engine misfire/tick noise. Technicians may find DTC P0300 set or in history."  Again, the TSB noted that "[t]his may be the result of an active fuel management (AFM) lifter that is mechanically collapsed and/or stuck all of them.  This may be result of internal locking pin damage in the lifter. Due to oil aeration." Technicians were directed to use the SI diagnosis to find the cause of the concern, and if that failed to inspect for valve operation.  If the valve or valves were not moving, the technicians were to replace the valve lifter oil manifold and the affected bank of lifters.  Further, "[i]f the lifter has spun the bore, the guides should be replaced also."

593.   In July 2015, GM issued Technical Service Bulletin 15-06-01-002A, regarding "Engine Misfire/Tick Noise, Malfunction Indicator Lap (MIL) on, DTC P0300 Set."  This changed the previous version of the TSB in adding a second part number for the AFM, number 12619820, or the previously noted 12645725.

594.   In January 2016, GM issued Preliminary Information Bulletin PIP5316, regarding "Information On How to Remove Most Stuck Lifters when Completing 15-06-01-002A."  This PI was applicable to 2015 Cadillac Escalade, 2014-2015 Chevrolet Corvette, 2014-2015 Chevrolet Silverado 1500, 2015 Chevrolet Suburban and Tahoe, 2014-2015 GMC Sierra 1500 and 2015 Yukon and Yukon XL vehicles, equipped with RPO 5.3L 6.2L V8 with codes L83, L86, LT1, LT4, and LV3 (as noted above, this engine code seems to be for a 4.3L V6 engine).

Technicians were directed to use vice grips with a slide hammer or with a small pry bar to get the stuck lifter out of the lifter bore. If these processes failed to remove the lifter, the engine would have to be replaced.

595. In March 2016, GM issued Preliminary Information Bulletin PIP4568S, regarding "Tick Noise And/or Misfires on AFM Cylinders 1 4 6 And/or 7." The PI was applicable to 2008-2009 Buick LaCrosse and Allure, 2007 Buick Rainier, 2007-2014 Cadillac Escalade, 2011-2015 Chevrolet Caprice PPV, 2010-2015 Chevrolet Camaro SS, 2007-2013 Chevrolet Silverado, 2007-2014 Chevrolet Avalanche, Suburban, and Tahoe, 2006-2009 Chevrolet Trailblazer, 2006-2009 Chevrolet Impala SS, 2006-2007 Chevrolet Monte Carlo SS, 2006-2009 GMC Envoy, 2007-2013 GMC Sierra, 2007-2014 GMC Yukon, 2008-2009 Pontiac G8, 2005-2008 Pontiac Grand Prix GXP, and 2006-2009 Saab 97x vehicles with a V8 Engine and Active Fuel Management. The engines involved included RPO Codes L76, L77, L94, L99, LC9, LFA, LH6, LMG, LS4, LY5, and LZ1, a collection of 5.3L and 6.0L V8 engines. The PI was issued to update the applicable model years and technicians were directed to disregard the previous version, PIP4568R, one of five updated versions of PIP4568M issued sometime after July 2013. Again, the PI stated that customers may report a SES lift, engine misfire on cylinder 1, 4, 6, and 7 and/or tick noise, which "may be the result of the AFM lifter that unlocks as soon the engine is started or one that is mechanically collapsed/stuck all of the time." The PI continued, "[t]hese lifter concerns may be the result of internal locking pin damage, which may

occur if the response time of an AFM lifter unlocking event is decreased due to low oil pressure, oil aeration, internal engine sludge, or an internal concern with an AFM lifter, VLOM, plastic lifter guide, lifter bore, and/or cam lobe wear." The PI directed dealerships to replace the VLOM, all the AFM lifters, and all plastic lifter guides. Further, 2008-2009 Full Size Trucks and SUVs, and the 2007-2009 Chevrolet Tahoe with the Police Package also required an ECM update. Certain vehicles also needed their AFM pressure relief valve shield inspected and possibly replaced. Technicians were directed to refer to TSB 10-06-01-008 in that case. Technicians were also to carefully inspect the camshaft lobes through the lifter bores to ensure they were not obviously worn, and to clean out the lifter control oil passages with brake cleaner if debris was noted. The PI indicates that low oil pressure to the VLOM can cause AFM lifter damage.

596.    In May 2016, GM issued Technical Service Bulletin 15-06-01-002C, regarding "Engine Misfire/Tick Noise, Malfunction Indicator Lap (MIL) on, DTC P0300 Set." This TSB replaced 15-06-01-002B, which technicians were to discard, and specifically added models to the applicable vehicles as well as updated parts information. The TSB was applicable to 2015-2016 Cadillac Escalades, 2016 Cadillac CTS-V, 2014 Chevrolet Silverado 1500, 2014-2016 Chevrolet Corvette, 2015-2016 Chevrolet Silverado, Suburban, and Tahoe, 2016 Chevrolet Camaro, 2014 GMC Sierra 1500, and 2014-2015 GMC Sierra, Yukon, and Yukon XL vehicles, equipped with 5.3L V8 or 6.2L V8 engines with RPO codes L83 and L86,

LT1, or LT4 respectively.  The TSB described "[s]ome customers may comment on a malfunction indicator lamp (MIL) on and/or an engine misfire/tick noise. Technicians may find DTC P0300 set or in history."  Again, the TSB noted that "[t]his may be the result of an active fuel management (AFM) lifter that is mechanically collapsed and/or stuck all of them.  This may be result of internal locking pin damage in the lifter. Due to oil aeration." Technicians were directed to use the SI diagnosis to find the cause of the concern, and if that failed to inspect for valve operation.  If the valve or valves were not moving, the technicians were to replace the valve lifter oil manifold and the affected bank of lifters.  Further, "[i]f the lifter has spun the bore, the guides should be replaced also."

597.  In August 2016, GM issued Preliminary Information Bulletin PIP4786C, regarding "Low Oil Pressure Message/Lift – Inspect Valve Lifter Oil Lifter."  It is unknown when PIP4786, a predecessor PI, was issued, but this PI superseded PIP4786B and updated the models to which the PI was applicable.  This PI was applicable to 2007 Cadillac Escalades built before April 1, 2006 with the 6.2L L92 Engine, a vehicle which had AFM hardware but in the AFM system was not enabled.  This PI was also applicable to 2007 Buick Lacrosse Super and Allure Super, 2005-2007 Buick Rainer, 2007-2016 Cadillac Escalade, 2010-2016 Chevrolet Camaro SS, 2014-2016 Chevrolet Corvette, 2007-2016 Chevrolet Avalanche, Silverado, Suburban, and Tahoe, 2007-2009 Chevrolet Impala, 2005-2009 Chevrolet Trailblazer, 2007 Chevrolet Monte Carlo, 2007-2016 GMC Sierra

and Yukon, 2005-2009 GMC Envoy, 2007-2008 Pontiac Grand Prix, 2008-2009 Pontiac G8, and 2005-2009 Saab 97x vehicles, equipped with AFM V8 engines. However, the PI specifies that it is applicable to vehicles who RPO engine codes are L76, L77, L83, L86, L94, L99, LC9, LFA, LH6, LMG, LS4, LT1, LTA, LY5, and LV3, which includes 5.3L, 6.0L and 6.2L V8 engines and a 4.3L V6 engine. Both fourth generation and fifth generation engines are on this list. The PI described "[s]ome customer may complain of a low oil pressure message/light on the dash and a technician may find a P0521 DTC in the ECM." Technicians were to "inspect the Valve Lifter Oil Filter for debris/sludge that could be restricting oil flow to the oil pressure sensor before replacing any parts." The filter was to be cleaned, and if cleaning was not possible, replaced.

598.   In October 2016, GM issued Technical Service Bulletin 15-06-01-002E regarding "Engine Misfire/Tick Noise, Malfunction Indicator Lamp (MIL) Illuminated, DTC P0300 Set." This TSB replaced 15-06-01-002D, which was issued sometime after May 2016, adding the 2017 model year, and also replaced PIP5316, which was issued in January 2016. The TSB was applicable to 2015-2017 Cadillac Escalade, 2016-2017 Cadillac CTS-V, 2014 Chevrolet Silverado 1500, 2014-2017 Chevrolet Corvette, 2015-2017 Chevrolet Silverado, Suburban, and Tahoe, 2016-2017 Chevrolet Camaro, 2014 GMC Sierra 1500, and 2014-2017 GMC Sierra, Yukon, and Yukon XL vehicles, equipped with 5.3L V8 or 6.2L V8 engines with RPO codes L83 and L86,  LT1, or LT4 respectively.  The TSB also identifies LV3

as an applicable engine code, though it is a 4.3L V6 engine. The TSB described "[s]ome customers may comment on a malfunction indicator lamp (MIL) on and/or an engine misfire/tick noise. Technicians may find DTC P0300 set or in history." Again, the TSB noted that "[t]his may be the result of an active fuel management (AFM) lifter that is mechanically collapsed and/or stuck all of them. This may be result of internal locking pin damage in the lifter, due to oil aeration." Technicians were directed to use the SI diagnosis to find the cause of the concern, and if that failed to inspect for valve operation. If the valve or valves were not moving, the technicians were to replace the valve lifter oil manifold and the affected bank of lifters. Further, "[i]f the lifter has spun the bore, the guides should be replaced also." If the lifters could not be removed with vice grips, either with a slide hammer or small pry bar, the engine would have to be replaced.

599. In December 2016, GM issued Preliminary Information Bulletin PIP4138P, regarding "SES Light, DTC P0300, and/or a Chirp, Squeak, Squeal, or Tick Noise – Potential Valvetrain Concern." This bulletin was applicable to 2004-2007 Buick Rainier, 2008-2009 Buick LaCrosse and Allure, 2006-2017 CTS-V, 2002-2017 Cadillac Escalade, 2010-2017 Chevrolet Camaro, 2010-2017 Chevrolet Corvette, 2011-2017 Chevrolet Caprice PPV, 2002-2013 Chevrolet Avalanche, 1999-2017 Chevrolet Express, Silverado, Suburban, and Tahoe, 2009-2013 Chevrolet Colorado, 2003-2009 Chevrolet Trailblazer, 2006-2009 Chevrolet Impala SS, 2006-2007 Chevrolet Monte Carlo SS, 2003-2006 Chevrolet SSR, 2009-2013

GMC Canyon, 2003-2009 GMC Envoy, 1999-2017 GMC Savana, Sierra, and Yukon, 2003-2010 Hummer H2, 2008-2010 Hummer H3, 2008-2010 Pontiac G8, 2005-2006 Pontiac GTO, 2005-2008 Pontiac Grand Prix GXP, and 2005-2009 Saab 97x vehicles with a V8 engine.  No engine codes were noted.   The bulletin stated that customers "may complain of an SES light, engine misfire, and/or engine noise" and that "[t]he noise may be described as a chirp, squeak, squeal, or tick noise and may increase off idle."  If the cause of the concern was not isolated after SI diagnosis, GM's regular diagnostic review, GM noted that this concern may be the result of several conditions, including a "worn camshaft lobe and/or lifter roller," "a broken valve spring," and "a collapsed AFM lifter."  Worn camshaft lobe and/or lifter rollers were to be replaced, as well as the plastic lifter guides and the VLOM. Broken valve springs were to be replaced.  If a collapsed AFM Lifter was found, technicians were to "refer to the latest version of PIP4568 for additional information."   That PI directed technicians to replace the lifters, guides, and the VLOM.  For engine codes L83, L86, LT1 and LT4, technicians were also directed to follow TSB 15-06-01-002E.  The previous version of the PI, PIP4138N, was to be discarded, because this PI added model years.

600.   In December 2017, GM issued Technical Service Bulletin 15-06-01-002F, regarding "Engine Misfire/Tick Noise, Malfunction Indicator Lamp (MIL) Illuminated, DTC P0300 Set."  This bulletin updated 15-06-01-002E, adding the 2018 Model Year, updating the cause and changing a picture.  The TSB was

applicable to 2015-2018 Cadillac Escalade, 2016-2018 Cadillac CTS-V, 2014 Chevrolet Silverado 1500, 2014-2018 Chevrolet Corvette, 2015-2018 Chevrolet Silverado, Suburban, and Tahoe, 2016-2018 Chevrolet Camaro, 2014 GMC Sierra 1500, and 2014-2018 GMC Sierra, Yukon, and Yukon XL vehicles, equipped with 5.3L V8 or 6.2L V8 engines with RPO codes L83 and L86, LT1, or LT4 respectively. The TSB described that "[s]ome customers may comment on a malfunction indicator lamp (MIL) on and/or an engine misfire/tick noise. Technicians may find DTC P0300 set or in history." The possible causes included an AFM lifter that is mechanically collapsed and/or stuck all of the time, internal locking pin damage in the lifter, due to oil aeration, lifter that has collapsed and is stuck in the lifter bore, and a bent push rod. Technicians were instructed to inspect the camshaft for damage after the lifters were removed and replace if found to be damaged. Then technicians were to perform the SI diagnosis, inspect the engine for valve operation, and if found to be not moving, replace the valve lifter oil manifold and affected bank of AFM lifters. If the lifter has spun the bore, the guides should also be replaced.

601. On January 24, 2018, GM issued Preliminary Information Bulletin PIP4138Q, regarding "SES Light, DTC P0300, and/or a Chirp, Squeak, Squeal, or Tick Noise – Potential." This bulletin was applicable to 2008-2009 Buick LaCrosse, 2008-2009 Buick Allure, 2004-2007 Buick Rainier, 2006-2018 CTS-V, 2002-2018 Cadillac Escalade, 2002-2013 Chevrolet Avalanche, 2011-2018 Chevrolet Caprice PPV, 2009-2012 Chevrolet Colorado, 2010-2018 Chevrolet Camaro, 2005-2018

Chevrolet Corvette, 2002-2018 Chevrolet Express, 2006-2009 Chevrolet Impala SS, 2016-2018 Chevrolet LCF Models, 2006-2007 Chevrolet Monte Carlo SS, 2003-2006 Chevrolet SSR, 2002-2018 Chevrolet Silverado, 2002-2018 Chevrolet Silverado HD, 2002-2018 Chevrolet Suburban, 2002-2018 Chevrolet Tahoe, 2003-2009 Chevrolet Trailblazer, 2009-2013 GMC Canyon, 2003-2009 GMC Envoy, 2002-2018 GMC Savana, 2002-2018 Sierra, 2002-2018  Sierra HD, 2002-2018 Yukon, 2003-2010 Hummer H Models, 2008-2010 Pontiac G8, 2005-2006 Pontiac GTO, 2005-2008 Pontiac Grand Prix GXP, and 2005-2009 Saab 9-7x vehicles with a V8 engine.  No engine codes were noted.  The bulletin stated that customers "may complain of an SES light, engine misfire, and/or engine noise" and that "[t]he noise may be described as a chirp, squeak, squeal, or tick noise and may increase off idle." If the cause of the concern was not isolated after SI diagnosis, GM's regular diagnostic review, GM noted that this concern may be the result of several conditions, including a "worn camshaft lobe and/or lifter roller," "a broken valve spring," and "a collapsed AFM lifter."  Worn camshaft lobe and/or lifter rollers were to be replaced, as well as the plastic lifter guides and the VLOM. Broken valve springs were to be replaced.  If a collapsed AFM Lifter was found, technicians were to "refer to the latest version of PIP4568 for additional information."  That PI directed technicians to replace the lifters, guides, and the VLOM.  For engine codes L83, L86, LT1 and LT4, technicians were also directed to follow TSB 15-06-01-

002E.  The previous version of the PI, PIP4138P, was to be discarded, because this PI added model years.

602.   On February 2, 2018, GM issued Preliminary Information Bulletin PIP5628.  This provided a diagnostic tree for technicians to determine why a vehicle would have a misfire.  The bulletin was applicable to all GM vehicles model years 2000-2019.  The PI described that "[a] vehicle may come in with a misfire and DTCs P0300-P0308 and/or P050D set" due to an engine misfire.   The PI instructed technicians that before calling TAC for these concerns, the template had to filled out to allow TAC to assist.  The diagnostic list put spark, fuel injector balance testing, and fuel contamination first as possible causes.  Some of the last issues to check were abnormal engine noises, misfires on AFM cylinders, and verifying rocker arm movement.

603.   On March 1, 2018, Melling Engine Parts ("Melling"), a leading aftermarket parts manufacturer, also issued its own technical service bulletin to GM dealerships, in addition to other auto parts suppliers.  This bulletin stated that most of their lifters returned for failure are good and that "[w]e have found that most lifter faults are caused by oil pressure issues, or control issues."  The bulletin goes on to state:

The AFM lifter bores in these engines have a spec of .843-.844, and the deactivation lifters require 22 PSI of pressure to release the locking pins.   Taking these two things into consideration a lifter bore that is even slightly worn could bleed off enough oil pressure to prevent the lifter from unlocking.  In addition it has been reported that it is common to find the VLOM oil filter plugged and needing replacement on high mileage engines with miss-fire fault codes.

Melling has received AFM DEAC lifters back for warranty claims where the lifter has been stuck compressed, this condition can be caused by the VLOM commanding activation or deactivation at the wrong point in the cam's rotation, either in the ramp, or at the lobe peak.

Any time an engine has failed AFM lifters the lifter guides must be replaced, the lifter bores must be measured, and the VLOM must also be tested for proper operation, or replaced.  In addition the VLOM oil filter must be replaced as well.

604.    Notably, Melling's instructions call for technicians to measure the lifter bore, a step that the bulletins from GM do not address.

605.    On October 16, 2018, GM issued Preliminary Information Bulletin PIP4138R, regarding "SES Light, DTC P0300, and/or a Chirp, Squeak, Squeal, or Tick Noise – Potential."  This bulletin was applicable to 2008-2009 Buick LaCrosse, 2008-2009 Buick Allure, 2004-2007 Buick Rainier, 2006-2018 CTS-V, 2002-2018 Cadillac Escalade, 2002-2013 Chevrolet Avalanche, 2011-2018 Chevrolet Caprice PPV, 2009-2012 Chevrolet Colorado, 2010-2018 Chevrolet Camaro, 2005-2018 Chevrolet Corvette, 2002-2018 Chevrolet Express, 2006-2009 Chevrolet Impala SS, 2016-2018 Chevrolet LCF Models, 2006-2007 Chevrolet Monte Carlo SS, 2014-2017 Chevrolet SS, 2003-2006 Chevrolet SSR, 2002-2018 Chevrolet Silverado, 2002-2018 Chevrolet Silverado HD, 2002-2018 Chevrolet Suburban, 2002-2018 Chevrolet Tahoe, 2003-2009 Chevrolet Trailblazer, 2003-2009 GMC Canyon, 2003-2009 GMC Envoy, 2002-2018 GMC Savana, 2002-2018 Sierra, 2002-2018  Sierra

HD, 2002-2018 Yukon, 2003-2010 Hummer H Models, 2008-2010 Pontiac G8, 2005-2006 Pontiac GTO, 2005-2008 Pontiac Grand Prix GXP, and 2005-2009 Saab 9-7x vehicles with a V8 engine. No engine codes were noted. The bulletin stated that customers "may complain of an SES light, engine misfire, and/or engine noise" and that "[t]he noise may be described as a chirp, squeak, squeal, or tick noise and may increase off idle." If the cause of the concern was not isolated after SI diagnosis, GM's regular diagnostic review, GM noted that this concern may be the result of several conditions, including a "worn camshaft lobe and/or lifter roller," "a broken valve spring," and "a collapsed AFM lifter." Worn camshaft lobe and/or lifter rollers were to be replaced, as well as the plastic lifter guides and the VLOM. Broken valve springs were to be replaced. If a collapsed AFM Lifter was found, technicians were to "refer to the latest version of PIP4568 for additional information." That PI directed technicians to replace the lifters, guides, and the VLOM. For engine codes L83, L86, LT1 and LT4, technicians were also directed to follow TSB 15-06-01-002E. The previous version of the PI, PIP4138Q, was to be discarded, because this PI updated model years.

606. On November 14, 2018, GM issued Preliminary Information Bulletin PIP5606B, regarding "Ticking Noise From The Engine." This PI was applicable to 2019 Cadillac CTS and Escalade, 2019 Chevrolet Camaro, Corvette, Silverado LD, Silverado 1500, Suburban, and Tahoe, and GMC Sierra 1500 Limited, Sierra 1500, and Yukon vehicles, equipped with 4.3L V6, or 5.3L or 6.2L V8 engines with RPO

codes LT4, L86, LT1, LT4, LTI, LT5, L83, LV3, L84, or L87.  The PI stated that vehicles "may have a tick noise from the engine cold, initial start in the morning" and stated that the cause was that "[a] lifter may not have sufficient amount of oil during cold start operation (not pumped up)".  Technicians were instructed to allow the engine to sit overnight and attempt to duplicate.  If they could not hear the noise, the vehicle was to be returned to the customer.  If DTCs were found, technicians were to go through SI diagnosis, and if the noise persists, they were to inspect to "isolate the cylinder with the concern" and further inspect for a bent pushrod and/or collapsed lifter.  The faulty piece was to be replaced.  The PI also noted, "[e]ngineering is working to understand the cause for this concern."

607.  On February 18, 2019, GM re-issued Preliminary Information Bulletin PIP5628.  This provided a diagnostic tree for technicians to determine why a vehicle would have a misfire.  The bulletin was applicable to all GM vehicle model years 2000-2019.  The PI described that "[a] vehicle may come in with a misfire and DTCs P0300-P0308 and/or P050D set" due to an engine misfire.  The PI instructed technicians that, before calling TAC for these concerns, the template had to be filled out to allow TAC to assist.  The diagnostic list put spark, fuel injector balance testing, and fuel contamination first as possible causes.  Some of the last issues to check were abnormal engine noises, misfires on AFM cylinders, and verifying rocker arm movement.

608.   In March 2019, GM issued Technical Service Bulletin 15-06-01-002H, regarding "Engine Misfire/Tick Noise, Malfunction Indicator Lamp (MIL) Illuminated, DTC P0300 Set."  This bulletin updated 15-06-01-002G, adding the 2018 Model Year, additional part numbers.  The TSB was applicable to 2015-2019 Cadillac Escalade, 2016-2019 Cadillac CTS-V, 2014 Chevrolet Silverado 1500, 2014-2019 Chevrolet Corvette, 2015-2018 Chevrolet Silverado, 2015-2019 Chevrolet Suburban and Tahoe, 2016-2019 Chevrolet Camaro, 2019 Chevrolet Silverado LD, 2014 GMC Sierra 1500, 2014-2018 GMC Sierra, 2014-2019 GMC Yukon and Yukon XL, and 2019 GMC Sierra Limited vehicles, equipped with 5.3L V8 or 6.2L V8 engines with RPO codes L83 and L86,  LT1, or LT4 respectively. The TSB described that "[s]ome customers may comment on a malfunction indicator lamp (MIL) on and/or an engine misfire/tick noise.  Technicians may find DTC P0300 set or in history."   The possible causes included AFM lifter that is mechanically collapsed and/or stuck all of the time, internal locking pin damage in the lifter, due to oil aeration, lifter that has collapsed and is stuck in the lifter bore, and a bent push rod. Technicians were instructed to inspect the camshaft for damage after the lifters are removed and replace if found to be damaged.  Then technicians were to perform the SI diagnosis, inspect the engine for valve operation, and if found to be not moving, replace the valve lifter oil manifold and affected bank of AFM lifters.  If the lifter has spun the bore, the guides should also be replaced.

609.   On September 20, 2019, GM issued Service Bulletin Information 19-NA-219, regarding "Diagnostic Tip for Misfire, Chirp, Squeak, Squeal or Tick Noise, Malfunction Indicator Lamp (MIL) Illuminated – DTC P0300, P0301, P0302, P0303, P0304, P0305, P0306, P0307, and/or P0308 Set."  This bulletin replaced PIP4138R, issued in October 2018.  This bulletin was applicable to all Buick, Cadillac, Chevrolet, GMC, Hummer, Pontiac, and Saab passenger cars and trucks including model years 2002 through 2018 with a V8 engine.  The bulletin stated that customers might comment on misfire, chirp, squeak, squeal, tick, and MIL illuminated.  Technicians might also find certain DTCs in the ECM, indicating engine misfires.   If the cause of the concern was not isolated after SI diagnosis, GM's regular diagnostic review, GM noted that this concern may be the result of several conditions, including a "worn camshaft lobe and/or lifter roller," "a broken valve spring," and "a collapsed AFM lifter."  Worn camshaft lobe and/or lifter rollers were to be replaced, as well as the plastic lifter guides and the VLOM. Broken valve springs were to be replaced.  If a collapsed AFM Lifter was found, technicians were to "refer to the latest version of PIP4568 for additional information."   That PI directed technicians to replace the lifters, guides, and the VLOM.  For engine codes L83, L86, LT1 and LT4, technicians were also directed to follow the latest version of TSB 15-06-01-002.

610.   In March 2020, GM re-issued Service Information Bulletin 19-NA-219, regarding "Diagnostic Tip for Misfire, Chirp, Squeak, Squeal or Tick Noise,

Malfunction Indicator Lamp (MIL) Illuminated – DTC P0300, P0301, P0302, P0303, P0304, P0305, P0306, P0307, and/or P0308 Set." This bulletin replaced PIP4138R, issued in October 2018. This bulletin was applicable to all Buick, Cadillac, Chevrolet, GMC, Hummer, Pontiac, and Saab passenger cars and trucks including model years 2002 through 2018 with a V8 engine. The bulletin stated that customers might comment on misfire, chirp, squeak, squeal, tick, and MIL illuminated. Technicians might also find certain DTCs in the ECM, indicating engine misfires. If the cause of the concern was not isolated after SI diagnosis, GM's regular diagnostic review, GM noted that this concern may be the result of several conditions, including a "worn camshaft lobe and/or lifter roller," "a broken valve spring," and "a collapsed AFM lifter." Worn camshaft lobe and/or lifter rollers were to be replaced, as well as the plastic lifter guides and the VLOM. Broken valve springs were to be replaced. If a collapsed AFM Lifter was found, technicians were to "refer to the latest version of PIP4568 for additional information." That PI directed technicians to replace the lifters, guides, and the VLOM. For engine codes L83, L86, LT1 and LT4, technicians were also directed to follow the latest version of TSB 15-06-01-002.

611. In March 2020, GM issued Technical Service Bulletin 15-06-01-002I, regarding "Engine Misfire/Tick Noise, Malfunction Indicator Lamp (MIL) Illuminated, DTC P0300 Set." This bulletin updated 15-06-01-002H, adding the L8B engine code. The TSB was applicable to 2015-2019 Cadillac Escalade, 2016-

2019 Cadillac CTS-V, 2014 Chevrolet Silverado 1500, 2014-2019 Chevrolet
Corvette, 2015-2018 Chevrolet Silverado, 2015-2019 Chevrolet Suburban and
Tahoe, 2016-2019 Chevrolet Camaro, 2019 Chevrolet Silverado LD, 2014 GMC
Sierra 1500, 2014-2018 GMC Sierra, 2014-2019 GMC Yukon and Yukon XL, and
2019 GMC Sierra Limited vehicles, equipped with 5.3L V8 or 6.2L V8 engines with
RPO codes L83 or L8B, and L86, LT1, or LT4 respectively.  The TSB described
that "[s]ome customers may comment on a malfunction indicator lamp (MIL) on
and/or an engine misfire/tick noise.  Technicians may find DTC P0300 set or in
history."  The possible causes included AFM lifter that is mechanically collapsed
and/or stuck all of the time, internal locking pin damage in the lifter, due to oil
aeration, lifter that has collapsed and is stuck in the lifter bore, and a bent push rod.
Technicians were instructed to inspect the camshaft for damage after the lifters are
removed and replace if found to be damaged.  Then technicians were to perform the
SI diagnosis, inspect the engine for valve operation, and if found to be not moving,
replace the valve lifter oil manifold and affected bank of AFM lifters.  If the lifter
has spun the bore, the guides should also be replaced.

612.  In May 2020, GM issued Technical Service Bulletin 15-06-01-002J,
regarding "Engine Misfire/Tick Noise, Malfunction Indicator Lamp (MIL)
Illuminated, DTC P0300 Set."  This bulletin updated 15-06-01-002I, changing a part
number and a warranty coverage statement to include both Powertrain and
Emissions.  The TSB was applicable to 2015-2019 Cadillac Escalade, 2016-2019

Cadillac CTS-V, 2014 Chevrolet Silverado 1500, 2014-2019 Chevrolet Corvette, 2015-2018 Chevrolet Silverado, 2015-2019 Chevrolet Suburban and Tahoe, 2016-2019 Chevrolet Camaro, 2019 Chevrolet Silverado LD, 2014 GMC Sierra 1500, 2014-2018 GMC Sierra, 2014-2019 GMC Yukon and Yukon XL, and 2019 GMC Sierra Limited vehicles, equipped with 5.3L V8 or 6.2L V8 engines with RPO codes L83 or L8B, and L86, LT1, or LT4 respectively. The TSB described that "[s]ome customers may comment on a malfunction indicator lamp (MIL) on and/or an engine misfire/tick noise. Technicians may find DTC P0300 set or in history." The possible causes included AFM lifter that is mechanically collapsed and/or stuck all of the time, internal locking pin damage in the lifter, due to oil aeration, lifter that has collapsed and is stuck in the lifter bore, and a bent push rod. Technicians were instructed to inspect the camshaft for damage after the lifters were removed and replace if found to be damaged. Then technicians were to perform the SI diagnosis, inspect the engine for valve operation, and if found to be not moving, replace the valve lifter oil manifold and affected bank of AFM lifters. If the lifter has spun the bore, the guides should also be replaced.

613. In June 2020, GM issued Technical Service Bulletin 19-NA-218, regarding "Ticking Noise from the Engine." The TSB replaced PIP5606E, which was to be discarded. The TSB was applicable to 2019 Cadillac CTS, 2019-2020 Cadillac Escalade, 2019-2020 Chevrolet Camaro, 2020 Chevrolet Corvette, 2019 Chevrolet Silverado, 2019-2020 Chevrolet Silverado 1500, 2019-2020 Chevrolet

Suburban, 2019-2020 Chevrolet Tahoe, 2019 GMC Sierra Limited, 2019-2020 GMC Sierra 1500, and 2019-2020 GMC Yukon vehicles with equipped with 4.3L V6 or 5.3L, 6.0L, or 6.2L V8 engines with RPO codes LV3, L83, L84, L86, L96, LT1, LT4, or LT5. The TSB stated that customers may comment that they hear a ticking noise from the engine, which the TSB described will mainly occur during the first initial start in the morning. "This condition may be cause by a lifter not having a sufficient amount of oil during cold start operation (not pumped up)." Technicians were directed to allow vehicles to sit overnight and return the vehicle to the customer if no ticking noise is heard on start-up. However, if a noise was found and isolated via cylinder deactivation test, the engine was to be inspected for a bent pushrod and/or a collapsed lifter.

614. On July 27, 2020, GM issued Preliminary Information Bulletin PIP5226D, regarding "Needle Bearings Found in The Oil Pan During An Oil Change." The PI superseded PIP522C, updating the information to add model years. The PI was applicable to all GM models from all brands, including all model years from 2000 to 2021, on vehicles equipped with V6 or V8 push rod engines with roller rockers. The PI described that the "[t]echnician may find needle bearing in the oil pan during an oil change." Technicians were to inspect the roller rocker arms and replaced only broken roller rocker arms. All oil drains were to be cleaned as well.

615. On October 8, 2020, GM issued Preliminary Information PIP5628C, regarding "Misfire Template." This provided a diagnostic tree for technicians to

determine why a vehicle would have a misfire.  The bulletin was applicable to all GM vehicles model years 2000-2021.  The PI described that "[a] vehicle may come in with a misfire and DTCs P0300-P0308 and/or P050D set" due to an engine misfire.  The PI instructed technicians that before calling TAC for these concerns, the template had to be filled out to allow TAC to assist.  The diagnostic list put spark, fuel injector balance testing, and fuel contamination first as possible causes.  Some of the last issues to check with abnormal engine noises, misfires on AFM cylinders, and verifying rocker arm movement.

616.   On October 13, 2020, GM issued Preliminary Information PIP5752B, regarding "Service Engine Light misfire engine noise with DTC P0300 P0106 P0506."  This PI superseded PIP5752, originally issued in September 2020, and updated the model years applicable to the bulletin.  The PI was applicable to 2021 Cadillac Escalade, 2020 to 2021 Chevrolet Camaro, 2020 Chevrolet Corvette, 2020 Chevrolet Silverado, 2021 Chevrolet Suburban, 2021 Chevrolet Tahoe, 2020 GMC Sierra, and 2021 GMC Yukon vehicles with equipped with 5.3L V8 or 6.2L V8 engines with RPO codes L82 and L84, and L87, LT1, LT2, and LT4 respectively. The PI was also applicable to 6.6L V8 engines with RPO code L8T.  The PI dealt with a "concern of service engine light, misfire and engine noise with possible [] DTC P0300 P0106 P0506."  The cause was listed as a possible broken valve spring. Dealerships were directed to inspect the engines for broken valve springs.  If none were observed, no repairs were done.  If a broken valve spring was observed, a

cylinder leakage test would need to be performed.  Without any leakage, the dealership was directed to replace all the valve springs on both banks of the engine if the vehicle was built between June 1, 2020, and September 15, 2020, if the vehicle had a 6.2L engine.  For the 5.3L and 6.6L, just the broken valve spring was to be replaced.  However, if cylinder leakage occurred, the engine would need to be fully inspected to determine the correct repair.

617.  On November 20, 2020, GM issued Preliminary Information PIP5752G, regarding "Service Engine Light Misfire Engine Noise with DTC P0300 P0106 P0506." This PI superseded PIP5752F, originally issued in September 2020, and updated seven times, including to adding a "Valve Spring Part Restriction" and adding vehicles.  The PI was applicable to 2021 Cadillac Escalade, 2020 to 2021 Chevrolet Camaro, 2020 Chevrolet Corvette, 2020 to 2021 Chevrolet Silverado, 2021 Chevrolet Suburban, 2021 Chevrolet Tahoe, 2020 to 2021 GMC Sierra, and 2021 GMC Yukon vehicles with equipped with 5.3L V8 or 6.2L V8 engines with RPO codes L82 and L84, and L87, LT1, LT2, and LT4 respectively.  The PI was also applicable to 6.6L V8 engines with RPO code L8T.  The PI dealt with a "concern of service engine light, misfire and engine noise with possible [] DTC P0300 P0106 P0506 P3189, P318A, P318B, P318C, P318D, P318E, P318F, P3190." The cause was listed as a possible broken valve spring.  Dealerships were directed to contact GM's Technical Assistance for suspected valve spring concerns for issue verification and expediting parts for repair. Dealerships were to inspect the engines

for broken valve springs.  If none were observed, no repairs were done.  If a broken valve spring was observed, a cylinder leakage test would need to be performed. Without any leakage, the dealership was directed to replace all the valve springs on both banks of the engine if the vehicle was built between June 1, 2020, and October 7, 2020, if the vehicle had a 6.2L engine.  For the 5.3L and 6.6L, just the broken valve spring was to be replaced.  Part number 12691120 for the 6.2L L87, LT1, LT2, and LT4 was on restriction for the Technical Assistance Center.  Dealerships were also to check for damaged intake manifolds and follow TSB 00-06-01-026M for replacing the intake manifold after severe internal engine damage.  However, if cylinder leakage occurred, the engine would need to be fully inspected to determine the correct repair.  For the 6.2L engines with engine damage, dealerships were directed to PIP5759, which dealt with part restrictions for full engine replacements.

618.   In December 2020, GM issued Technical Service Bulletin 15-06-01-002K, regarding "Engine Misfire/Tick Noise, Malfunction Indicator Lamp (MIL) Illuminated, DTC P0300 Set."  This bulletin updated 15-06-01-002J, updating the parts information section. The TSB was applicable to 2015-2019 Cadillac Escalade, 2016-2019 Cadillac CTS-V, 2014 Chevrolet Silverado 1500, 2014-2019 Chevrolet Corvette, 2015-2018 Chevrolet Silverado, 2015-2019 Chevrolet Suburban and Tahoe, 2016-2019 Chevrolet Camaro, 2019 Chevrolet Silverado LD, 2014 GMC Sierra 1500, 2014-2018 GMC Sierra, 2014-2019 GMC Yukon and Yukon XL, and 2019 GMC Sierra Limited vehicles, equipped with 5.3L V8 or 6.2L V8 engines with

RPO codes L83 or L8B, and L86,  LT1, or LT4 respectively.  The TSB described that "[s]ome customers may comment on a malfunction indicator lamp (MIL) on and/or an engine misfire/tick noise.  Technicians may find DTC P0300 set or in history."  The possible causes included AFM lifter that is mechanically collapsed and/or stuck all of the time, internal locking pin damage in the lifter, due to oil aeration, lifter that has collapsed and is stuck in the lifter bore, and a bent push rod. Technicians were instructed to inspect the camshaft for damage after the lifters are removed and replace if found to be damaged.  Then technicians were to perform the SI diagnosis, inspect the engine for valve operation, and if found to be not moving, replace the valve lifter oil manifold and affected bank of AFM lifters.  If the lifter has spun the bore, the guides should also be replaced.

619.  On April 19, 2021, GM issued Preliminary Information Bulletin PIP5752L, regarding "Service Engine Light Misfire Engine Noise with DTC P0300 P0106 P0506."  This PI was applicable to 2021 Cadillac Escalade, 2020-2021 Chevrolet Camaro, 2020 Chevrolet Corvette, 2020-2021 Chevrolet Silverado, 2021 Chevrolet Suburban, 2021 Chevrolet Tahoe, 2020-2021 GMC Sierra, and 2021 GMC Yukon, equipped with 5.3L, 6.2L, or 6.6L V8 engines with RPO codes L82, L84, L87, LT1, LT2, LT4, and L8T.  The PI described that a possible broken valve spring could cause the service engine light to come on, engine misfires, engine noises, and DTCs P0300, P0106, P0506 P318A, P318B, P318C, P318D, P318E, P318F, P3190.  Technicians were instructed to perform a cylinder leakage test, and

if none was observed, to replace the affected valve spring and check to see if the intake manifold was damaged.  If cylinder leakage was found, the extent of damage to the engine would have to be determined and appropriate repairs given, up to and including full engine replacement.  The original version of this PI was issued on September 8, 2020.

620.  On April 23, 2021, GM issued Preliminary Information PIP5776C, regarding "Misfire Due To Collapsed Lifter."  This PI had originally been issued on January 20, 2021 and updated on March 4, 2021 to clarify the applicable models. This PI was applicable to 2021 Cadillac Escalade, 2019 Chevrolet 1500, 2020-2021 Chevrolet Silverado 1500, 2021 Chevrolet Suburban, 2021 Chevrolet Tahoe, 2019 GMC Sierra 1500, 2020-2021 GMC Sierra 1500, and 2021 GMC Yukon vehicles, equipped with 5.3L or 6.2L V8 engines with RPO codes L84 or L87.  The PI stated that vehicles "may come in with a P0300 – P0308 set with a bent push rod that leads to a collapsed lifter or a lifter that come apart" due to an "[i]nternal lifter concern." Technicians were directed to replace all lifters and lifter guides on the affected bank, but not the lifters on the opposite bank or the oil control solenoid.

621.  On May 17, 2021, GM issued Preliminary Information PIP5776D, regarding "Misfire Due To Collapsed Lifter."  This PI was applicable to 2021 Cadillac Escalade, 2020-2021 Chevrolet Silverado 1500, 2021 Chevrolet Suburban, 2021 Chevrolet Tahoe, 2020-2021 GMC Sierra 1500, and 2021 GMC Yukon vehicles, equipped with 5.3L or 6.2L V8 engines with RPO codes L84 or L87 and

produced between September 1, 2020, and March 31, 2021.  The PI stated that vehicles  "may come in with a P0300 – P0308 set with a bent push rod that leads to a collapsed lifter or a lifter that come apart" due to an "[i]nternal lifter concern." Technicians were directed to replace all lifters and lifter guides on the affected bank, but not the lifters on the opposite bank or the oil control solenoid.

622.   On July 19, 2021, GM issued Preliminary Information PIP5776F, regarding "Misfire Due To Collapsed Lifter."  This PI was applicable to 2021 Cadillac Escalade, 2020-2021 Chevrolet Silverado 1500, 2021 Chevrolet Suburban, 2021 Chevrolet Tahoe, 2020-2021 GMC Sierra 1500, 2021 GMC Yukon vehicles, and Holden/GMSV Silverado 1500 4WD, equipped with 5.3L or 6.2L V8 engines with RPO codes L84 or L87 and produced between September 1, 2020, and March 31, 2021.  The PI stated that vehicles "may come in with a P0300 – P0308 set with a bent push rod that leads to a collapsed lifter or a lifter that come apart" due to an "[i]nternal lifter concern."  For vehicles with under 8,000 miles, all lifters and guides on both banks were to be replaced.  For vehicles with over 8,000, the lifters and guides were to be replaced on only the affected bank.  The oil control solenoid was not to be replaced, regardless.

623.   In November 2021, GM issued Service Update N212353840, regarding "Valve Lifter Repair."  This service update was applicable to 2021 Cadillac Escalade and Escalade ESV, Chevrolet Silverado LD, Suburban, and Tahoe, and GMC Sierra LD, Yukon, and Yukon XL vehicles equipped with 5.3L V8 or 6.2L V8 engines with

RPO codes L84 or L87, respectively.  The service update stated that these vehicles "may have valve lifters with a broken lock pin spring."  Dealerships were directed to replace all the valve lifters on both sides of the engine.  Notably, these engines are all DFM engines and all lifters were to be replaced with a new AFM lifter, part number 12698946.

624.   As explained, these are some of the bulletins issued by GM and others regarding the Defect.  However, these documents make clear that GM was well-aware of the valve train issues with the previous generation engines when it designed, manufactured, tested, and produced the Generation 5 engines, and yet those engines still were sold to Plaintiffs and members of the Classes with the Defect.

## Redesigned Parts of the Valve Train System

625.   Over the course of the production of the Class Vehicles and the Engines, GM has attempted to partially address some of causes of the Valve Train Defect with redesigned engine valve train components.

626.   For example, GM used AFM lifters with part number 12645725 in vehicles from 2008 through 2018.  In 2018, GM introduced new AFM lifters, installing them in new vehicles beginning with model year 2019, with part number 12680871.  However, these AFM Lifters were also defective, particularly with regarding to the locking pin spring mechanism.  As a result, in late 2021, GM introduced yet another redesigned AFM Lifter, part number 12698946.

627.   As a result, vehicles produced in late 2021 or repaired beginning in November 2021 will have part number 12698946 AFM Lifters installed in their vehicles.   However, older vehicles, including those previously repaired by GM dealerships, will have AFM Lifters with part numbers 12645725 and 12680871.   For example, Plaintiff Harrison's vehicle received new AFM lifters with part number 12680871 as a part of the first repair in August 2021.   For the second repair in January 2022, Plaintiff Harrison's vehicle received new AFM lifters with part number 12698946.   Currently, Plaintiff Harrison's vehicle has an engine equipped with eight each of these AFM lifters.

628.   Similarly, GM has redesigned the valve springs which are used in the Class Vehicle's engines.   Previously, GM has produced and installed valve springs with part numbers 12629515, 12678635, and 12661339.   Each of these parts has been replaced with the valve spring, part number 1261120.   However, even these new valve springs are subject to premature failure.   Indeed, as indicated by the fall 2020 Preliminary Information bulletins released by GM, there were substantial problems with this valve train component.   Although GM did not disclose the issue, discover will show that GM suspected and eventually confirmed that many of these parts suffered from metallurgical problems, *i.e.,* they were not made correctly by the supplier and GM had failed to prevent the installation of these out-of-specification components in its Engines and Class Vehicles.

629.    GM has refused to issue a recall for vehicles with these older parts and instead waits for their inevitable failure before replacing them, both in the hopes that Plaintiffs and consumers will have to bear the costs of the failures themselves, as well as the associated safety risk, and because the great expense of recalling so many vehicles and producing so many replacement parts.

## Customer Complaints to NHTSA

630.    GM monitors customers' complaints made to the National Highway Traffic Safety Administration ("NHTSA.") Federal law requires automakers like GM to be in close contact with NHTSA regarding potential auto defects, including imposing a legal requirement (backed by criminal penalties) compelling the confidential disclosure of defects and related data by automakers to NHTSA, including field reports, customer complaints, and warranty data. See TREAD Act, Pub. L. No. 106-414, 114 Stat.1800 (2000).

631.    Automakers also have a legal obligation to identify and report emerging safety-related defects to NHTSA under the Early Warning Reporting Requirements. *Id.* Similarly, automakers, including GM, monitor NHTSA databases for consumer complaints regarding their automobiles as part of their ongoing obligation to identify potential defects in their vehicles, including safety-related defects. *Id.* Thus, GM knew or should have known of the many complaints about the Valve Train Defect logged by NHTSA ODI, and the content, consistency, and large number of those complaints alerted, or should have alerted, GM to the Valve Train Defect.

632.   Exhibit F, attached to this Complaint, is a representative sampling of the hundreds of complaints concerning the Valve Train Defect available through NHTSA's website, www.safercar.gov, which reveal that GM, through its network of dealers and repair technicians, was made aware of many failures of valve springs, rocker arms, and lifters in the Subject Engines.

**Other Internal Sources of GM's Knowledge of the Valve Train Defect**

633.   GM communicates technical information to its network of authorized dealerships in several ways, including issuing TSBs and other documents on its proprietary network which reference problems with GM vehicles and instructions on their repair.  Some of these documents are merely identified by "Document ID" and a specific number.  Often, they are accessed through GM's proprietary software system, on which the SI Diagnosis resides.

634.   Unlike TSBs, which regulations require manufacturers to disclose to NHTSA, the documents on GM's network which are merely identified by a Document ID number are not disclosed or disseminated to the public in any way.

635.   GM also has extensive warranty data and replacement part order data which show the high rate of warranty repair and/or replacement requests for valve train components in the Subject Engines, as well as the high number of replacement parts sold to dealerships and consumers.  These high volumes are recorded in GM's propriety systems its uses to communicate part orders and inventories from its network of authorized dealerships, including Service Parts Assistance Center

(SPAC), Parts Workbench Electronic Parts Information Center (EPIC), and an automated module in the Telephone Response and Communication System (TRACS). As such, discovery will show that GM has sold significantly more replacement parts and engines that would be expected, well in excess of industry and GM standard calculations for replacement parts. GM is also aware of the ongoing shortages of replacement parts for the Class Vehicles, leading to Plaintiffs and consumers waiting weeks for their repairs, or longer.

636. Additionally, GM would have additionally learned of this widespread defect from the many reports received from dealerships and from customer complaints directly to GM. GM's customer relations department collects and analyzes field data including, but not limited to, repair requests made at dealerships, technical reports prepared by engineers who have reviewed vehicles for which warranty coverage is being requested, parts sales reports, and warranty claims data. The volume of complaints received from these sources, in combination with others such as NHSTA complaints, is significantly higher than the average amount of complaints about failures that GM would expect to receive for vehicle components. Indeed, Plaintiffs' Counsel has received over 600 complaints from Class Members about the Valve Train Defect and valve train component failures between October 2021 through March 2022.

637. Defendant's warranty department similarly analyzes and collects data submitted by its dealerships in order to identify trends in its vehicles. It is

Defendant's policy that when a repair is made under warranty the dealership must provide GM with detailed documentation of the problem and the fix employed to correct it. Dealerships have an incentive to provide detailed information to GM, because they will not be reimbursed for any repairs unless the justification is sufficiently detailed.

638.   Furthermore, regardless of whether part and engine replacements as a result of the Defect are covered by GM under warranty, GM has ordered its authorized dealerships to return the removed components to GM for research and inspection.   When Class Members attempt to secure the removed parts or engines from their vehicles, they are denied access.   Discovery will show that GM has received tens of thousands of these parts for inspection and, as a result, has received confirmation of the existence, extent, and associated safety risk of the Valve Train Defect.

### Customer Complaints on Third-Party Websites

639.   Consumers similarly complained about the Valve Train Defect on various online forums, often describing buying new from GM and discussing various remedies, including more frequently changing the oil or turning off AFM to avoid straining the valve train system.   However, when consumers take their vehicles to GM dealerships for repairs, they are often told that the Defect is a design defect or that there is nothing that can be done to prevent the damage.

640.   While GM itself denies there is a defect and instead claims the noises the vehicles make are the normal operation of the fuel injectors or the AFM/DFM system, as discussed more supra and infra, GM monitors such third-party websites as a regular practice and would have been aware of such postings regarding issues being complained about relevant to its vehicles.  The three largest American car manufacturers in particular, GM, Ford, and Chrysler, have made the monitoring of consumer complaints as posted on third-party websites a part of their brand and reputational management for at least a decade.[17] Below are some examples of complaints regarding the Valve Train Defect on consumer boards (errors in original).

a.  **March 3, 2017, Ndestounis posted "Collapsed lifter AFM issue"[18]:**

My Silverado 5.3 cre cab was at dealer again for air conditioner issue. I picked it up drove 1/4 mile and all hell broke loose every light light up and it went into safe mode very loud knock started. Drove back and the service manager thought a bad wire or plug.turns out its a colapsed lifter. They are only replacing that lifter nothing else. I would think they would at least do the whole side. Any thoughts or suggestions would be great. Thank you

b.  **November 25, 2019, The Great Oz posted "GM lifter issue!"[19]:**

---

[17] *See* Exhibit G, Read, Richard, "Taking your car complaint online? Chrysler, GM, and Ford will see it.", *Christian Science Monitor*, Aug. 21, 2012 (available at https://www.csmonitor.com/Business/In-Gear/2012/0827/Taking-your-car-complaint-online-Chrysler-GM-and-Ford-will-see-it.) (last visited December 10, 2021).

[18]  See Exhibit H, page 1.  Original available at https://www.gm-trucks.com/forums/topic/198537-collapsed-lifter-afm-issue/  (last visited December 10, 2021).

[19]  See Exhibit H, page 2.  Original available at https://mikeysboard.com/threads/gm-lifter-issue.293878/ (last visited December 10, 2021)

After buying lots of GM vans over the years and having very few problems, it seems they changed something. The dealer won't talk about it, but it appears that the lifters can collapse across the whole GM range of V-8 engines. The engine will run badly and generate a P0300 code (random misfire), then the collapsed lifter will eat the camshaft, followed by metal fragments destroying the main bearings. We've had two 2017s with less than 30k get a new engine at GM's expense, but my concern is that all of the 2017s are going to need engine replacements, and the replacement engines will use the same bad parts.

If you hear ticking sounds or the engine runs/idles/stumbles it needs to be checked right away. Unless GM gets sued, at this point if you're outside of warranty you will have to pay.

This is supposed to be limited to engines that shut down cylinders to save fuel. Ours don't have that feature but still have the problem. GM issued a service bulletin about it, but the dealership won't talk.



c. **July 15, 2011, kruser79, posted "Latest AFM Victim"[20]:**

Well, I am the latest victim of GM's horrendous engineering debacle known as AFM. I bought my 2010 ESV mid May and within weeks was experiencing a chronic, yet random misfire (localized cyl #4). I took it to my local indie shop and they said I had a "sticking valve" and gave me a bottle of Lucas fuel system cleaner. Wonder of wonders, it

---

[20] See Exhibit H, page 3. Original available at https://www.cadillacforums.com/threads/latest-afm-victim.984178/ (last visited December 10, 2021)

stopped. Except maybe once a day, or every other day, I would get a quick MAF value failure or misfire failure. I would clear them and they would stay off. I just thought I was cleaning up a carboned up or sticking valvetrain and it was still in progress.

So fast forward to a week and a half ago and I am 200 miles from Boise, ID having driven from Central Texas. At the bottom of a long coasting leg, getting back on the throttle brings up a tick, sounds JUST like a collapsed lifter.

I baby it in to Boise, finding the throttle settings that bring the least amount of noise, hoping that that means the least amount of damage being done. The shop digging into it find a collapsed lifter (of course), and it is #4 (of course).

So these guys are loathe to do anything but a full repair, replacing everything involved, Cam and lifters, solenoid pack, everything from the block up. I can understand it. If they cut any corners with this crap, they got me on my way, only to be back on the side of the road a few miles down the road. I was wanting to get them to install an AFM delete kit, but he described the problems I would have with going into another shop, while on the road, with a simple MIL. A lesser shop wouldn't be able to do anything with the custom programming done. So he talked me into letting them rebuild everything, but disabling the AFM through a programmer. I don't want this system running AT ALL. In fact, future plans include a cam swap and an attempt at hitting a minimum of 450 HP.    I    will    take    it    all    out    then    for    sure. Just looking at this system and how it runs pisses me off. Brilliant idea, half-assed engineering, piss poor execution.

d. **October 26, 2017, Brendon444, posted "6.2 engine destroyed. 25,000km"[21]:**

2016 6.2 Denali top end of motor done with only 25,000km. Roller on lifter ruined and pitted. Needs all lifters replaced and cam is also worn. Anyone else hear of this? Not really impressed at this point. Concerned of future reliability.

---

[21] *See* Exhibit H, page 4. Original available at https://www.tahoeyukonforum.com/threads/6-2-engine-destroyed-25-000km.97926/ (last visited December 10, 2021)

…
Looks              to            be            known              problem.

Condition

Some customers may comment on a malfunction indicator lamp (MIL) on        and/or        an        engine        misfire/tick        noise.

Technicians    may    find    DTC    P0300    set    or    in    history.

Cause
This may be the result of an active fuel management (AFM) lifter that is    mechanically    collapsed    and/or    stuck    all    of    the    time.

This may be the result of internal locking pin damage in the lifter, due to                              oil                              aeration.

This may be the result of a lifter that has collapsed and is stuck in the lifter                                                              bore.

Correction
Note: Inspect the camshaft for damage while the lifters are removed from the engine. If damage is found, replace the camshaft per SI.

If SI diagnosis does not isolate the cause of this concern, technicians should            inspect            for            valve            operation.

If the valve(s) are not moving, replace the valve lifter oil manifold and affected bank of AFM lifters. Refer to *Valve Lifter Oil Manifold Replacement* and *Valve        Lifter        Replacement* in        SI.

If the lifter has spun the bore, the guides should also be replaced.

e. **December 20, 2017, Hunthearin, posted "Reliability after Lifter failure – 2016 5.3L"[22]:**

Engine was misfiring last week, so I brought it to the dealer.  They

---

[22] *See* Exhibit H, page 5.  Original available at https://www.gm-trucks.com/forums/topic/208090-reliability-after-lifter-failure-2016-53l/ (last visited December 10, 2021).

211

confirmed that I had a collapsed lifter, and that it had to be replaced under warranty. When going over the repairs with the service writer, they informed me that they only replaced the failed lifter. Out of curiosity, I asked him what such a repair would cost outside of the powertrain warranty. He told me it would cost anywhere between $3500-4000 if it happened again, and that all of the lifters would need to be replaced should I be paying out of pocket. He added that I would be "silly not to replace them all" due to the type and magnitude of service, and because of the likelihood that another fouled or damaged lifter could fail shortly after the first. GM only authorized the dealer to replace the single failed lifter in my engine.

I drive for work, and already have 45,000 miles on my 2016 Sierra. I am happy to let GM replace as many lifters as need be on their dime. That said, as the end of my 60k mile powertrain warranty nears, I am worrying about long term reliability on this truck. I have maintained it meticulously.

What are your thoughts? Since I've had a lifter failure at such low mileage, are there high odds that another will fail on me soon, or at all? Should I dump the Sierra and get another 5.3L? Would a Denali with the 6.2L be more reliable? The styling and interior of this truck have made it my favorite vehicle ever, so I'd hate to see it go.

f. **June 1, 2017, Jeppen, posted "Collapsed Lifter"[23]:**

hello - Driving to work the other day, I heard a noise and then tick tick tick tick. Checked some things out. I have narrowed it down. I removed valve cover on the drivers side and cylinder 1 has a collapsed lifter on the intake. I know that this is an AFM cylinder. Truck ran very smooth up until this point, i did not notice any valve noise on start up or anything.                    125,000                    miles.

I am guessing its a bad lifter, however, could it be the solenoid that controls the AFM part of it? When I put pressure on the rocker while the engine is running, I can feel the up and down motion, so I am assuming the came lob is fine, just no oil in the lifter to "pump" it up. Of course, the cam could be damaged by a bad lifter. Anything else I

---

[23] See Exhibit H, page 6. Original available at https://www.silveradosierra.com/threads/collapsed-lifter.624874/ (last visited December 10, 2021).

can try before tearing down and replacing the lifter?

Thoughts?

Thanks much

g. **May 6, 2020, JPoland1228, posted "600 mile 2020 6.2 collapsed lifters"[24]:**

About 2 weeks ago I purchased a 2020 Sierra 1500 AT4 and just recently upon coming up to 600 miles on the dash I quickly noticed loud ticking noise coming from the engine area. Brought it in for service.

next day I received a call in the morning stating that multiple lifters Have collapsed. Was told they will swap them out on the entire side and was told they'll get it taken care of.

picked up my truck after hours and the noise was the same. Maybe even possibly worse. Needless to say I put the keys back in the box and went back home.

I see people on the forums have ran into similar issues but I don't see how it was rectified in the end. Should I be getting or requesting a new motor? Is my motor just a lemon? Or is there a simple fix? I'm waiting to hear back from the dealer now.

https://youtu.be/sNbxbzToWPI

https://youtu.be/IC5XqTUlEI4

h. **February 2, 2017, Fleet_Manager, posted "Another cam & lifter failure due to AFM"[25]:**

2015 Escalade 94K miles catastrophic engine failure due to AFM

---

[24] *See* Exhibit H, page 7. Original available at https://www.gm-trucks.com/forums/topic/238603-600-mile-2020-62-collapsed-lifters/ (last visited December 10, 2021).

[25] *See* Exhibit H, page 8. Original available at https://www.cadillacforums.com/threads/another-cam-lifter-failure-due-to-afm.937418/ (last visited December 10, 2021)

components. This is our second Escalade in our fleet to suffer this same failure. We have had two Denalis suffer the same fate as well.This newest failure solidifies my belief that Active Fuel Management is the Achilles heal of modern GM V8's. Now, we have 150K warranty, so this is covered. But, we still lose a ton of money while the vehicle is down for the typical 3 weeks it takes for a dealership to complete this repair. Not happy right now.

i. **January 4, 2020, Medicarnp, posted "2017 AFM lifter failure issues"[26]:**

Hope this is the right place to ask a question, I was a bit blindsided a 2017 suburban suddenly developing a severe engine stutter diagnosed as lifter failure after an oil change at the dealership.

Car has 90,000 miles on it has been running fine without any problems whatsoever until we bring it to the dealership for a warranty brake repair and while there we have a simple oil change. Shortly after the oil change my wife who drives the car notices asleep taking which progresses to a more severe stutter and the engine light starts coming on while we're driving.

Of course we go back to the dealer thinking they've done something wrong of course they deny that the oil change anything to do with my lifter failure and quote me $7000 to replace the entire engine??? It's a 2017 car... 90k just outa warranty and The seemingly coincidental timing of it Occurring right after it's been with the dealer.

A little searching online apparently shows that lifter collapse is a known issue with suburbans, such that the part is actually even on back order...

Anyone have any advice on what to do, any workaround address this problem or put a Band-Aid on it for a little while or am I literally stuck getting a new motor or trying to trade this thing in

---

[26] *See* Exhibit H, page 9. Original available at https://www.reddit.com/r/Chevy/comments/ejvoht/2017_chevy_afm_lifter_failure_issues/ (last visited December 10, 2021)

641.   Plaintiffs allege that before Plaintiffs purchased or leased their Class Vehicles, and since 2010, GM knew about the Valve Train Defect through sources not available to consumers, including pre-release testing data, early consumer complaints to GM and its dealers, testing conducted in response to those complaints, high failure rates and replacement part sales data, and other aggregate data from GM dealers about the problem.

642.   GM had superior and exclusive knowledge of the Valve Train Defect and knew or should have known that the defect was not known or reasonably discoverable by Plaintiffs and Class Members before they purchased or leased the Class Vehicles.  Only GM had access to its research and development data, its pre-production testing analyses, aggregate warranty data, its issuance of technical service bulletins and other internal communications provided to authorized dealerships, including those through its proprietary diagnostic systems, and other internal sources of data which corroborate and prove the existence and extent of the Valve Train Defect, as well as consumer complaints made to Defendant, its dealerships, third party forums, and NHTSA.

643.   The existence of the Valve Train Defect is a material fact that a reasonable consumer would consider when deciding whether to purchase or lease a Class Vehicle.  Had Plaintiffs and other Class Members known of the Valve Lifter Defect, they would have paid less for the Class Vehicles or would not have purchased or leased them.

644.   The Valve Train Defect has been so prevalent, and GM and its authorized dealers so unwilling to help, that owners of Class Vehicles have tried numerous repairs on their own, including but not limited to replacing components with non-OEM parts, including Melling produced lifters, and disabling the AFM or DFM in their vehicles to avoid putting unnecessary strain on the valve train system.

645.   Reasonable consumers, like Plaintiffs, reasonably expect that a vehicle's valve train system will last more than 100,000 miles, given that the engines were designed to last 200,000 miles.  Moreover, they also reasonably expect that the vehicles are safe, will function in a manner that will not pose a safety risk, and are free of dangerous safety defects. Plaintiffs and Class Members further reasonably expect that GM will not sell or lease vehicles with known safety defects, such as the Valve Train Defect, and will disclose any such defects to its consumers when it learns of them. They did not expect GM to fail to disclose the Valve Train Defect to them and to continually deny it.

## GM Has Actively Concealed the Valve Train Defect

646.   Despite its knowledge of the Valve Train Defect in the Class Vehicles, GM actively concealed the existence and nature of the defect from Plaintiffs and Class Members.  Specifically, GM failed to disclose or actively concealed at and after the time of purchase, lease, or repair:

a.  any and all known material defects or material nonconformities of the Class Vehicles, including the defects pertaining to the valve springs, rocker arms, and lifters;

b.  that the Class Vehicles, including the valve train system within their engines, were not in good working order, were defective, and were not fit for their intended purposes; and

c.  that the Class Vehicles and their engines were defective, despite the fact that GM learned of such defects as early as 2010.

647.  GM actively concealed the defect by denying the existence of a defect, claiming that ticking noises and vibrations were a normal condition for the Subject Engines, and blaming the Class Members for the problems.

648.  When consumers present their Class Vehicles to an authorized GM dealer for diagnosis and repair, GM refused to honor the bumper-to-bumper 3-year, 36,000-mile, powertrain, or emissions warranties, telling the customers that the condition is normal or else providing ineffective and incomplete repairs.  In fact, service managers, who are not mechanics or technicians, are empowered to deny Plaintiffs and Class Members even a diagnosis if the manager decides there is no problem with the vehicle.

649.  Accordingly, despite GM's knowledge of the Valve Train Defect, GM has caused Class Members to expend money at its dealerships to diagnose, repair or

replace the Class Vehicles' lifters, and other damaged components, once the time limitations have run on the bumper-to-bumper warranty.

650. GM has also concealed the Valve Train Defect by failing to issue any TSBs, recalls, campaigns or any other technical documents that publicly acknowledges the existence of the defect in Class Vehicles or replacing valve train components with the newly designed parts as described above. Instead, in addition to bulletins to its authorized dealers discussing how to diagnose and partially repair the symptoms of the Valve Train Defect, GM has also issued bulletins which direct dealerships and their technicians to tell Plaintiffs and consumers that the noises they are hearing are "normal."

651. For example, in April 2014, GM issued Service Bulletin Information 14-06-04-004A, regarding "Various Engine Noises During Cold Start and Warm Engine Operation." This bulletin superseded 14-06-04-004A and was applicable to 2014 Chevrolet Corvette, 2014-2015 Chevrolet Silverado 1500, 2015 Chevrolet Suburban and Tahoe, 2014-2015 GMC Sierra 1500 and Denali models, and 2015 GMC Yukon and Yukon XL vehicles equipped with 4.3L V6 (RPO LV3), 5.3L V8 (RPO L83), or 6.2L V8 (RPO L86 or LT1) engines. The bulletin purported to describe that these new engines "generate noises…that owners of the previous generation multiport fuel injection (MFI) vehicles may not be familiar," including "a subtle ticking noise" at idle or a "higher pitched clicking sound." The bulletin

stresses that the "[t]hese sounds are [] normal characteristics of the DI high pressure fuel system." No repairs were to be attempted for these noise complaints.

652. In May 2015, GM issued Preliminary Information PIP5504, regarding "Buffeting Vibration Drone Type Noise Exhaust Tone Change Body Pressuring Booming (AFM Exhaust)." The PI was applicable to 2015 Cadillac Escalade, Chevrolet Suburban and Tahoe, and GMC Yukon Models with 5.3L or 6.2L V8 engines. The PI described that "while some slight changes in exhaust tone and/or vibration/drone type noises can be normal when AFM is in 4 cylinder mode, there have been some complaints of them being excessive." GM instructed technicians to compare to other vehicles and see if the noise is "normal." If so, no further repairs were to be made.

653. On June 19, 2017, GM issued Preliminary Information Bulletin PIP5504, regarding "Diagnosing Fishbite Chuggle Misfire Feeling Or Shudder Vibration, with a Light Tip In." This PI was applicable to 2016-2017 Chevrolet Silverado, Suburban, and Tahoe, as well as GMC Sierra and Yukon models, equipped with the 5.3L V8 engine (RPO L83). The PI stated that customers may complain about "[a] shake and/or shudder during light throttle acceleration between …30 and 65 mph…steady state driving when transmission is not actively shifting gears." This PI noted "AFM Disturbances can be mislabeled as any of the [conditions] above as well as shudder below, but in fact as to do with the imbalance caused by less cylinders firing." If AFM Disturbances were suspected, technicians

were directed to review PIT5404, noted above.  If not related to that bulletin, technicians were told, "this may be a normal characteristic of active fuel management mode."  This PI was reissued multiple times to update model years and to add applicable engine types.  The latest version appears to be PIP5504E, issued sometime after June 2020.  The applicable vehicles include 2016-2020 Chevrolet Express, 2016-2018 Chevrolet Silverado, 2019 Chevrolet Silverado, 2020 Chevrolet Silverado 1500, 2016-2020 Chevrolet Silverado 2500/3500, 2016-2020 Chevrolet Suburban, 2016-2020 Chevrolet Tahoe, 2016-2020 GMC Savana, 2016-2018 GMC Sierra, 2019 GMC Sierra, 2020 GMC Sierra 1500, 2016-2020 GMC Sierra 2500/3500, and 2016-2020 GMC Yukon models, equipped with various engines including the 5.3L, 6.0L, and 6.2L V8 engines with RPO codes of L96, LC8, L82, 83, and L84.

654.   In March 2019, GM issued Information Service Bulletin 06-06-05-001H.  This bulletin was a revision of 06-06-05-001G, adding the 2017 to 2019 model years.  The number of the bulletin suggests it was originally issued in 2006.  The bulletin notes "[s]ome customer may comment on changes in the exhaust tone when an Active Fuel Management (AFM) equipped 6 cylinder or 8 cylinder engine changes to 3 cylinder or 4 cylinder mode.  Some drivers may also notice a very slight vibration in either the accelerator pedal, floor pan and/or the steering wheel.  This is a normal condition for AFM equipped vehicles and no repairs should be attempted."

**Technicians were actually directed to provide a copy of this bulletin to customers.**

655. In March 2020, GM issued Service Bulletin Information 14-06-04-004F, regarding "Various Engine Noises During Cold Start and Warm Engine Operation." This bulletin superseded 14-06-04-004E, adding the 2020 model year, and was applicable to 2015-2020 Cadillac Escalade and Escalade ESV, 2016-2019 Cadillac CTS, 2016-2020 Chevrolet Camaro, 2014-2019 Chevrolet Corvette, 2014-2018 Chevrolet Silverado 1500, 2019 Chevrolet Silverado, 2020 Chevrolet Silverado 1500, 2019-2020 Chevrolet Silverado 2500/3500, 2019 Chevrolet Silverado 1500 LD, 2015-2020 Chevrolet Suburban and Tahoe, 2014-2018 GMC Sierra 1500 and Denali models, 2019-2020 GMC Sierra, 2019-2020 GMC Sierra 2500 and 3500, 2019 GMC Sierra 1500 Limited,  and 2015-2020 GMC Yukon and Yukon XL vehicles equipped with 4.3L V6 (RPO LV1, LV3), 5.3L V8 (RPO L82, L83, L84), or 6.2L V8 (RPO L86, L87, LT1, LT4, LT5) engines. The bulletin purported to describe that these new engines "generate noises…that owners of the previous generation multiport fuel injection (MFI) vehicles may not be familiar," including "a subtle ticking noise" at idle or a "higher pitched clicking sound." The bulletin stresses that the "[t]hese sounds are [] normal characteristics of the DI high pressure fuel system." No repairs were to be attempted for these noise complaints.

656.   These bulletins, often issued at the same time as other bulletins proposing actual, if ineffectual, repairs, gave dealerships and technicians reasons to deny repairs when customers came in complaining of ticking and other noises.

657.   Further, some dealership technicians have told customers that the issues they are experiencing with their cars, including unexpected lifter failures, are well-known to GM.  But while some criticize the design of the engines, or AFM/DFM, others have blamed suppliers for producing "bad batches" of sub-standard parts.  As such, customers may believe that a repair with new parts will permanently remedy the symptoms of the Valve Train Defect in their vehicles, when in fact, there is no permanent repair available.  However, if a "bad batch" of sub-standard parts is, in fact, to blame, GM has been concealing the Valve Train Defect by failing to issue a recall.

658.   Additionally, GM also has a policy in place to provide extended warranties, called Component Coverage, when Class Members have had two or more repairs of the Valve Train Defect at an authorized GM dealer.  Component Coverage covers Powertrain components, including all internally lubricated parts, electrical components, control modules, blocks, heads, shafts, and torque converters, among other items for defects related to materials and workmanship.  For example, when Plaintiff Harrison complained to GM directly via the customer service hotline, he was told by a GM Senior Consultant that he would not receive such an extended warranty because he had only one repair.  The dealership which performed this repair

intervened on his behalf and got GM to issue this Component Coverage for him, lasting six years or 100,000 miles, whichever comes first.

659.   Similarly, Plaintiff Prosser also received Component Coverage, again after the intercession of the dealership which performed the repair on her vehicle. However, her Component Coverage is only for five years or 100,000 miles, whichever comes first.  Further, this extended coverage does not help Plaintiffs Harrison, Prosser, or any other Class Member avoid the safety risk associated with the Valve Train Defect, including the sudden loss of motive power while driving.

## TOLLING OF THE STATUE OF LIMITATIONS AND ESTOPPEL

660.   Any applicable statute of limitations has been tolled by Defendant's knowing and active concealment of the Valve Train Defect and misrepresentations and omissions alleged herein.  Through no fault of their own or lack of diligence, Plaintiffs and members of the Class were deceived regarding the Class Vehicles and could not reasonably discover the Defect or Defendant's deception with respect to the Defect.  Defendant and its agents continue to deny the existence and extent of the Defect, even when questioned by Plaintiffs and members of the Class.

661.   Plaintiffs and members of the Class did not discover and did not know of any facts that would have caused a reasonable person to suspect that the Defendant was concealing a defect and/or the Class Vehicles contained the Valve Train Defect and the corresponding safety risk.  As alleged herein, the existence of the Valve Train Defect was material to Plaintiffs and members of the Class at all relevant times.

Within the time period of any applicable statutes of limitations, Plaintiffs and members of the Class could not have discovered through the exercise of reasonable diligence the existence of the Defect or that the Defendant was concealing the Defect.

662.   At all times, Defendant is and was under a continuous duty to disclose to Plaintiffs and members of the Class the true standard, quality and grade of the Class Vehicles and to disclose the Valve Train Defect and corresponding safety risk due to their exclusive and superior knowledge of the existence and extent of the Valve Train Defect in Class Vehicles.

663.   Defendant knowingly, actively and affirmatively concealed the facts alleged herein.  Plaintiffs and members of the Class reasonably relied on Defendant's knowing, active, and affirmative concealment.

664.   For these reasons, all applicable statutes of limitation have been tolled based on the discovery rule and Defendant's fraudulent concealment, and Defendant is estopped from relying on any statutes of limitations in defense of this action.

### The Agency Relationship Between GM and its Network of Authorized Dealerships

665.   Defendant enters into agreements with its nationwide network of authorized dealerships to fulfill Defendant's obligations under the warranties it provides directly to consumers as well as to provide repairs under recalls. These agreements require a dealership to follow the rules and policies of GM in all aspects

of diagnosing, repairing, maintaining, and servicing GM vehicles, as well as selling only GM-approved parts for the vehicles, for reimbursement by GM.

666. Because Plaintiffs and members of the Class are third-party beneficiaries of the manufacturer-dealership agreements which create the implied warranty, they may avail themselves of the implied warranty and allow consumers to seek warranty and recall services locally. This is true because third-party beneficiaries to contracts between other parties that create an implied warranty of merchantability may avail themselves of the implied warranty. *See In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prod. Liab. Litig.*, 754 F. Supp. 2d 1145, 1185 (C.D. Cal. 2010).

667. Further, Plaintiffs and each of the members of the Class are the intended beneficiaries of Defendant's express and implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles, and they have no rights under the warranty agreements provided by Defendant. Defendant's warranties were designed for and intended to benefit the consumers only. The consumers are the true intended beneficiaries of Defendant's express and implied warranties, and the consumers may therefore avail themselves of those warranties.

668. Defendant issued the express warranties to the Plaintiffs and the Class members. Defendant also developed and disseminated the owner's manual and warranty booklets, advertisements, and other promotional materials relating to the

Class Vehicles. Defendant also is responsible for the content of the Moroney Stickers on Defendant-branded vehicles.

669.   In repairing GM-branded vehicles, Defendant acts through numerous authorized dealers who act, and represent themselves to the public, as exclusive Defendant representatives and agents. That the dealers act as Defendant's agents is demonstrated by the following facts:

a.   The authorized GM dealerships complete all service and repair according to Defendant's instructions, which Defendant issues to its authorized dealerships through service manuals, technical service bulletins ("TSBs"), and other documents, often only accessible via Defendant's proprietary computer systems, including the SI Diagnosis referenced in many of the TSBs;

b.   Consumers are able to receive services under Defendant's issued New Vehicle Limited Warranty only at Defendant's authorized dealerships, and they are able to receive these services because of the agreements between Defendant and the authorized dealers. These agreements provide Defendant with a significant amount of control over the actions of the authorized dealerships;

c.   The warranties provided by Defendant for the defective vehicles direct consumers to take their vehicles to authorized dealerships for repairs or services;

d.   Defendant controls the way in which its authorized dealers can respond to complaints and inquiries concerning defective vehicles, and the dealerships are able to perform repairs under warranty only with Defendant's authorization;

e.   Defendant has entered into agreements and understandings with its authorized dealers pursuant to which it authorizes and exercises substantial control over the operations of its dealers and the dealers' interaction with the public;

f.   Defendant implemented its express and implied warranties as they relate to the defects alleged herein by instructing authorized Defendant dealerships to address complaints of the Defect by prescribing and implementing the relevant TSBs cited herein; and

g.   GM's authorized dealerships are able to bind GM into the terms of the express warranties by selling vehicles to the public, by reviewing the quality of used GM vehicles and certifying their worthiness to receive GM's Certified Pre-Owned Warranties, and by interceding on consumers' behalf to get GM to issue Component Coverage, as described *supra*.

670.   Indeed, GM's warranty booklets make it abundantly clear that GM's authorized dealerships are GM's agents so that consumers may receive repairs from

GM under the warranties it provides directly to consumers such as Plaintiffs. The booklets, which are plainly written for the consumers, not the dealerships, tell the consumers repeatedly to seek repairs and assistance at its "your selling dealer." For example, the booklets state, that GM "will provide repairs to the vehicle during the warranty period" and also that "[t]o obtain warranty repairs, take the vehicle to a [Buick, Cadillac, Chevrolet, or GMC] dealer facility within the warranty period and request the needed repairs."

671.   The booklets direct Plaintiffs and class members, should they have warranty problems, to first "contact the owners of the dealer facility or the general manager."  Next, Plaintiffs and class members are directed to contact GM directly as a Customer Assistance Center.  However, the booklet states, "[w]hen contacting [GM], remember that your concern will likely be resolved at a dealer's facility."

## CLASS ACTION ALLEGATIONS

672.   Plaintiffs bring this lawsuit as a class action on behalf of themselves and all others similarly situated as members of the proposed Class pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), 23(b)(3), and 23(c)(4). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

673.   The Classes are defined as:

> **Nationwide Class or Class:** All persons in the United States who purchased or leased a model year 2014 to present GM vehicle with a 5.3L, 6.0L, or 6.2L V8 engine.

**Alabama Sub-Class:** All persons who purchased or leased a model year 2014 to present GM vehicle with a 5.3L, 6.0L, or 6.2L V8 engine in the State of Alabama.

**Alaska Sub-Class:** All persons who purchased or leased a model year 2014 to present GM vehicle with a 5.3L, 6.0L, or 6.2L V8 engine in the State of Alaska.

**Arkansas Sub-Class:** All persons who purchased or leased a model year 2014 to present GM vehicle with a 5.3L, 6.0L, or 6.2L V8 engine in the State of Arkansas.

**California Sub-Class:** All persons who purchased or leased a model year 2014 to present GM vehicle with a 5.3L, 6.0L, or 6.2L V8 engine in the State of California.

**CLRA Sub-Class:** All members of the California Sub-Class who are "consumers" within the meaning of California Civil Code § 1761 (d).

**Connecticut Sub-Class:** All persons who purchased or leased a model year 2014 to present GM vehicle with a 5.3L, 6.0L, or 6.2L V8 engine in the State of Connecticut.

**Florida Sub-Class:** All persons who purchased or leased a model year 2014 to present GM vehicle with a 5.3L, 6.0L, or 6.2L V8 engine in the State of Florida.

**Georgia Sub-Class:** All persons who purchased or leased a model year 2014 to present GM vehicle with a 5.3L, 6.0L, or 6.2L V8 engine in the State of Georgia.

**Idaho Sub-Class:** All persons who purchased or leased a model year 2014 to present GM vehicle with a 5.3L, 6.0L, or 6.2L V8 engine in the State of Idaho.

**Illinois Sub-Class:** All persons who purchased or leased a model year 2014 to present GM vehicle with a 5.3L, 6.0L, or 6.2L V8 engine in the State of Illinois.

**Maryland Sub-Class Class:** All persons who purchased or leased a model year 2014 to present GM vehicle with a 5.3L, 6.0L, or 6.2L V8 engine in the State of Maryland.

**Massachusetts Sub-Class:** All persons who purchased or leased a model year 2014 to present GM vehicle with a 5.3L, 6.0L, or 6.2L V8 engine in the State of Massachusetts.

**Missouri Sub-Class Class:** All persons who purchased or leased a model year 2014 to present GM vehicle with a 5.3L, 6.0L, or 6.2L V8 engine in the State of Missouri.

**North Carolina Sub-Class:** All persons who purchased or leased a model year 2014 to present GM vehicle with

a 5.3L, 6.0L, or 6.2L V8 engine in the State of North Carolina.

**New Jersey Sub-Class:** All persons who purchased or leased a model year 2014 to present GM vehicle with a 5.3L, 6.0L, or 6.2L V8 engine in the State of New Jersey.

**New Mexico Sub-Class:** All persons who purchased or leased a model year 2014 to present GM vehicle with a 5.3L, 6.0L, or 6.2L V8 engine in the State of New Mexico.

**Nevada Sub-Class Class:** All persons who purchased or leased a model year 2014 to present GM vehicle with a 5.3L, 6.0L, or 6.2L V8 engine in the State of Nevada.

**New York Sub-Class:** All persons who purchased or leased a model year 2014 to present GM vehicle with a 5.3L, 6.0L, or 6.2L V8 engine in the State of New York.

**Ohio Sub-Class:** All persons who purchased or leased a model year 2014 to present GM vehicle with a 5.3L, 6.0L, or 6.2L V8 engine in the State of Ohio.

**Oregon Sub-Class:** All persons who purchased or leased a model year 2014 to present GM vehicle with a 5.3L, 6.0L, or 6.2L V8 engine in the State of Oregon.

**Rhode Island Sub-Class:** All persons who purchased or leased a model year 2014 to present GM vehicle with a 5.3L, 6.0L, or 6.2L V8 engine in the State of Rhode Island.

**Tennessee Sub-Class:** All persons who purchased or leased a model year 2014 to present GM vehicle with a 5.3L, 6.0L, or 6.2L V8 engine in the State of Tennessee.

**Texas Sub-Class:** All persons who purchased or leased a model year 2014 to present GM vehicle with a 5.3L, 6.0L, or 6.2L V8 engine in the State of Texas.

**Washington Sub-Class**: All persons who purchased or leased a model year 2014 to present GM vehicle with a 5.3L, 6.0L, or 6.2L V8 engine in the State of Washington.

674. Excluded from the Class are: (1) Defendant, any entity or division in which Defendant has a controlling interest, and their legal representatives, officers, directors, assigns, and successors; (2) the Judge to whom this case is assigned and the Judge's staff; (3) any Judge sitting in the presiding state and/or federal court

system who may hear an appeal of any judgment entered; and (4) those persons who have suffered personal injuries as a result of the facts alleged herein. Plaintiffs reserve the right to amend the Class definitions if discovery and further investigation reveal that the Class should be expanded or otherwise modified.

675. Numerosity: Although the exact number of Class Members is uncertain and can only be ascertained through appropriate discovery, the number is great enough such that joinder is impracticable. The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and to the Court. The Class Members are readily identifiable from information and records in Defendant's possession, custody, or control, as well as from records kept by the Department of Motor Vehicles of each state.

676. Typicality: Plaintiffs' claims are typical of the claims of the Class in that Plaintiffs, like all Class Members, purchased or leased a Class Vehicle designed, manufactured, and distributed by GM. The representative Plaintiffs, like all Class Members, has been damaged by Defendant's misconduct in that they have incurred or will incur the cost of repairing or replacing the defective starter and/or other damaged components. Furthermore, the factual bases of GM's misconduct are common to all Class Members and represent a common thread resulting in injury to the Class.

677. Commonality: There are numerous questions of law and fact common to Plaintiffs and the Class that predominate over any question affecting Class

Members individually. These common legal and factual issues include the following:

    a.    Whether Class Vehicles suffer from defects relating to the valve train system;

    b.    Whether the defects relating to the valve train system constitute an unreasonable safety risk;

    c.    Whether Defendant knows about the defects pertaining to the starter and, if so, how long Defendant has known of the defect;

    d.    Whether the defective nature of the valve train system constitutes a material fact;

    e.    Whether Defendant has a duty to disclose the defective nature of the valve train system to Plaintiffs and Class Members;

    f.    Whether Plaintiffs and the other Class Members are entitled to equitable relief, including a preliminary and/or permanent injunction;

    g.    Whether Defendant knew or reasonably should have known of the defects pertaining to the valve train system before it sold and leased Class Vehicles to Class Members;

    h.    Whether Defendant should be declared financially responsible for notifying the Class Members of problems with the Class

Vehicles and for the costs and expenses of repairing and replacing the defective valve train system and/or its components;

i.   Whether Defendant is obligated to inform Class Members of their right to seek reimbursement for having paid to diagnose, repair, or replace their defective valve train system;

j.   Whether Defendant breached the implied warranty of merchantability pursuant to the Magnuson-Moss Warranty Act;

k.   Whether Defendant breached written warranties pursuant to the Magnuson-Moss Warranty Act;

l.   Whether Defendant breached express warranties pursuant to the laws governing each of the state Class jurisdictions;

m.   Whether Defendant breached the implied warranty of merchantability pursuant to the laws governing each of the state Class jurisdictions;

n.   Whether Defendant breached the consumer protection laws of the states of Alabama, Connecticut, Florida, Georgia, New Jersey, Ohio, Texas, and Washington;

o.   Whether Defendant committed fraud by omission;

p.   Whether Defendant fraudulently concealed the defective nature of the valve train system; and

q.  Whether Defendant has been unjustly enriched by its actions as complained of herein.

678.  <u>Adequate Representation</u>: Plaintiffs will fairly and adequately protect the interests of the Class Members. Plaintiffs have retained attorneys experienced in the prosecution of class actions, including consumer and product defect class actions, and they intend to prosecute this action vigorously.

679.  <u>Predominance and Superiority</u>: Plaintiffs and Class Members have all suffered and will continue to suffer harm and damages as a result of Defendant's unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy. Because of the relatively small size of the individual Class Members' claims, it is likely that only a few Class Members could afford to seek legal redress for Defendant's misconduct. Absent a class action, Class Members will continue to incur damages, and Defendant's misconduct will continue without remedy or relief.  Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that it will conserve the resources of the courts and the litigants and promote consistency and efficiency of adjudication.

## CAUSES OF ACTION

## COUNT I
### Fraud by Omission or Fraudulent Concealment
### (On behalf of the Nationwide Class, or in the Alternative,
### on Behalf of all Sub-Classes against Defendant)

680.   Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 671 above as if fully set forth herein.

681.   Plaintiffs bring this cause of action on behalf of themselves and the Nationwide Class, or in the alternative, on behalf of each of the State Sub-Classes, against Defendant.

682.   GM knew that the Class Vehicles suffered from an inherent Valve Train Defect, were defectively designed and/or manufactured and were not suitable for their intended use.

683.   Defendant concealed from and failed to disclose to Plaintiffs and Class Members the defective nature of the Class Vehicles.

684.   Defendant was under a duty to Plaintiffs and Class Members to disclose the defective nature of the Class Vehicles because:

  a.  Defendant was in a superior position to know the true state of facts about the safety defect contained in the Class Vehicles;

  b.  The omitted facts were material because they directly impact the safety of the Class Vehicles;

  c.  Defendant knew the omitted facts regarding the Valve Train Defect

were not known to or reasonably discoverable by Plaintiffs and Class Members;

d.  Defendant made partial disclosures about the quality of the Class Vehicles without revealing their true defective nature; and,

e.  Defendant actively concealed the defective nature of the Class Vehicles from Plaintiffs and Class Members.

685.  The facts concealed or not disclosed by Defendant to Plaintiffs and the other Class Members are material in that a reasonable person would have considered them to be important in deciding whether to purchase or lease Defendant's Class Vehicles or pay a lesser price for them. Whether a vehicle's lifter, rocker arm, and/or valve spring is defective, which can cause stalling, losing power while driving, and hesitation, is a material safety concern. Had Plaintiffs and Class Members known about the defective nature of the Class Vehicles, they would not have purchased or leased the Class Vehicles or would have paid less for them.

686.  Defendant concealed or failed to disclose the true nature of the design and/or manufacturing defects contained in the Class Vehicles to induce Plaintiffs and Class Members to act thereon. Plaintiffs and the other Class Members justifiably relied on Defendant's omissions to their detriment. This detriment is evident from Plaintiffs' and Class Members' purchase or lease of Defendant's defective Class Vehicles.

687.    Defendant continued to conceal the defective nature of the Class Vehicles even after Class Members began to report the problems. Indeed, Defendant continues to cover up and conceal the true nature of the problem today.

688.    As a direct and proximate result of Defendant's misconduct, Plaintiffs and Class Members have suffered and will continue to suffer actual damages. Plaintiffs and the Class reserve their right to elect either to (a) rescind their purchase or lease of the Valve Train Defective Vehicles and obtain restitution or (b) affirm their purchase or lease of the Valve Train Defective Vehicles and recover damages.

689.    Defendant's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class' rights and well-being to enrich Defendant. Defendant's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**COUNT II**
**Unjust Enrichment**
**(On Behalf of the Class, or, in the Alternative, on Behalf of all Sub-Classes against Defendant)**

690.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 671 above as if fully set forth herein.

691.    Plaintiffs bring this count on behalf of themselves and the Class or, alternatively, on behalf of all Sub-Classes against Defendant.

692.   GM has received and retained a benefit from Plaintiffs and all Class Members and inequity has resulted.

693.   GM has benefitted from selling and leasing defective cars whose value was artificially inflated by GM's concealment of the Valve Train Defect, and Plaintiffs and Class Members have overpaid for the cars and have been forced to pay other costs.

694.   As a result of its wrongful acts, concealments, and omissions of the defect in its Class Vehicles, as set forth above, GM charged higher prices for their vehicles than the vehicles' true value. Plaintiffs and Class Members paid than higher price for their vehicles to GM's authorized distributors and dealers, which are in GM's control.

695.   All Class members conferred a benefit on GM.

696.   It is inequitable for GM to retain these benefits.

697.   Plaintiffs and all Class members were not aware of the true facts about the Class Vehicles and did not benefit from GM's conduct.

698.   GM knowingly accepted the benefits of its unjust conduct.

699.   As a result of the Defendant's unjust enrichment, Plaintiffs and Class Members have suffered damages.

700.   Plaintiffs do not seek restitution under their Unjust Enrichment claim. Rather, Plaintiffs and Class Members seek non-restitutionary disgorgement of the financial profits that Defendant obtained as a result of its unjust conduct.

701.   Additionally, Plaintiffs seek injunctive relief to compel Defendant to offer, under warranty, remediation solutions that Defendant identifies. Plaintiffs also seek injunctive relief enjoining Defendant from further deceptive distribution, sales, and lease practices with respect to Class Vehicles, enjoining Defendant from selling the Class Vehicles with the misleading information; compelling Defendant to provide Class members with a replacement components that do not contain the defects alleged herein; and/or compelling Defendant to reform its warranty, in a manner deemed to be appropriate by the Court, to cover the injury alleged and to notify all Class Members that such warranty has been reformed. Money damages are not an adequate remedy for the above requested non-monetary injunctive relief.

<u>**COUNT III**</u>
**Violation of the Magnuson-Moss Warranty Act**
**15 U.S.C. § 2301**
**(On behalf of the Class, or in the Alternative,**
**on Behalf of all Sub-Classes or Plaintiffs Individually against Defendant)**

702.   Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 671 above as if fully set forth herein.

703.   This claim is brought on behalf of Plaintiffs and the Class, or alternatively, on behalf of all Sub-Classes, or on behalf of Plaintiffs individually against Defendant.

704.   Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

705. GM is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

706. The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

707. 15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

708. Defendant's implied warranty is an "implied warranty" within the meaning of 15 U.S.C. § 2301(7).

709. Defendant's express warranty is a "written warranty" within the meaning of 15 U.S.C. §2301(6).

710. Defendant breached the implied warranty and the express warranty by virtue of the above-described acts.

711. Plaintiffs and the other Class Members notified Defendant of the breach within a reasonable time and/or were not required to do so. GM was also on notice of the Valve Train Defect from, among other sources, the complaints and service requests it received from Class Members and its dealers.

712. Defendant's breach of the implied warranty and express warranty deprived Plaintiff and Class Members of the benefits of their bargains.

713. Privity is not required here because Plaintiffs and each of the other Class Members are intended third-party beneficiaries of contracts between GM and

its dealers, and specifically, of GM's implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

714.   GM breached these warranties, as described in more detail above. Without limitation, the Class Vehicles contain a Valve Train Defect that puts vehicle occupants' safety in jeopardy. The Class Vehicles share a common defect in that they are manufactured with defective materials and/or with poor workmanship. Contrary to GM's representations about its vehicles, the Class Vehicles are defective in manufacture, materials and/or workmanship and are unsafe. The Class Vehicles share a common defect.

715.   Affording GM a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here. Indeed, GM has long been on notice of the claims of Plaintiffs and Class members and has refused to provide a remedy, instead placing the blame on customers or refusing to acknowledge the existence of the defect.

716.   At the time of sale or lease of each Class Vehicle, GM knew, should have known, or was reckless in not knowing of its misrepresentations and omissions concerning the Class Vehicles' Valve Train Defect and inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the Valve Train Defect. Under the circumstances, the remedies available under any informal

settlement procedure would be inadequate and any requirement that Plaintiffs resort to an informal dispute resolution procedure and/or afford GM a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

717.   Plaintiffs and the other Class members would suffer economic hardship if they returned their Class Vehicles but did not receive the return of all payments made by them. Because GM is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the other Class members have not re-accepted their Class Vehicles by retaining them.

718.   Plaintiffs provided notice to GM of their intent to pursue class claims under the MMWA via letters dated October 20, 2021, November 8, 2021, November 19, 2021, and November 23, 2021.

719.   The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

720.   Plaintiffs, individually and on behalf of all members of the Class, seek all damages permitted by law, in an amount to be proven at trial.

**Claims on Behalf of the Alabama Sub-Class**

## COUNT IV
### Breach of Express Warranty
### Ala. Code §§ 7-2-313 AND 7-2A-210
### (On Behalf of the Alabama Sub-Class against Defendant)

721.   Plaintiffs repeat and re-allege each and every allegation contained above in paragraphs 1 through 671 above as if fully set forth herein.

722.   Plaintiff Daniel Harrison ("Alabama Plaintiff") brings this count on behalf of himself and the Alabama Sub-Class against Defendant.

723.   GM is and was at all relevant times a "merchant" with respect to motor vehicles under Ala. Code §§ 7-2-104(1) and 7-2A-103(3), and a "seller" of motor vehicles under § 7-2-103(1)(d).

724.   With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Ala. Code § 7-2A-103(1)(p).

725.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Ala. Code §§ 7-2-105(1) and 7-2A-103(1)(h).

726.   The valve train systems were manufactured and/or installed in the Class Vehicles by Defendant and are covered by the express warranty.

727.   Defendant provided all purchasers and lessees of the Class Vehicles with an express warranty described herein, which became a material part of the bargain. Accordingly, GM's express warranty is an express warranty under Alabama state law.

728.   In a section entitled "What is Covered," Defendant's express warranty (or New Vehicle Limited Warranty ("NVLW")) provides in relevant part that "[t]he warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." The warranty further provides that "[w]arranty repairs, including, including towing, parts, and labor, will be made at no charge" and "[t]o obtain warranty repairs, take the vehicle to a Chevrolet dealer facility within the warranty period and request the needed repairs."

729.   According to GM, the "Bumper-to-Bumper Coverage is for the first 3 years or 36,000 miles, whichever comes first," if not longer.

730.   Defendant's NVLW and other warranties regarding the Class Vehicles formed a basis of the bargain that was breached when Alabama Plaintiff and members of the Alabama Sub-Class purchased or leased the Class Vehicles with the defective lifter and/or related components.

731.   Alabama Plaintiff and members of the Alabama Sub-Class experienced defects within the warranty period. Despite the existence of the NVLW, Defendant failed to inform Alabama Plaintiff and members of the Alabama Sub-Class that the Class Vehicles were equipped with defective lifters and related components. When providing repairs under the express warranty, these repairs were ineffective and incomplete and did not provide a permanent repair for the Valve Train Defect.

732.   GM breached the express warranty through the acts and omissions described above, including by promising to repair or adjust defects in materials or workmanship of any part supplied by Defendant and then failing to do so. Defendant has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles materials and workmanship defects.

733.   Privity is not required here because Alabama Plaintiff and members of the Alabama Sub-Class are intended third-party beneficiaries of contracts between GM and its distributors and dealers, and specifically, of GM's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles.  The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

734.   Any attempt by GM to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here.  Specifically, the warranty limitation is unenforceable because GM knowingly sold or leased defective products without informing consumers about the Valve Train Defect.  The time limits are unconscionable and inadequate to protect Alabama Plaintiff and the members of the Alabama Sub-Class.  Among other things, Alabama Plaintiff and members of the Alabama Sub-Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the

terms of which were drafted by GM and unreasonable favored GM. A gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Valve Train Defect existed between GM and members of the Alabama Sub-Class.

735.   Further, the limited warranty promising to repair and/or correct a manufacturing or workmanship defect fails of its essential purpose because the contractual remedy is insufficient to make Alabama Plaintiff and the members of the Alabama Sub-Class whole, because GM has failed and/or has refused to adequately provide the promised remedies, i.e., a permanent repair, within a reasonable time.

736.   Alabama Plaintiff was not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Valve Train Defect from the complaints and service requests it received from Class Members, including those formal complaints submitted to NHTSA, and through other internal sources.

737.   Nonetheless, Alabama Plaintiff and members of the Alabama Sub-Class provided notice to GM of the breach of express warranties when they took their vehicles to GM-authorized providers of warranty repairs.  Alabama Plaintiff also provided notice to GM of its breach of express warranty by calling their customer service line and by letter dated November 23, 2021.

738.   As a result of GM's breach of the applicable express warranties, owners and/or lessees of the Class Vehicles suffered, and continue to suffer, an ascertainable loss of money, property, and/or value of their Class Vehicles.

739.   As a direct and proximate result of Defendant's breach of express warranties, Alabama Plaintiff and members of the Alabama Sub-Class have been damaged in an amount to be determined at trial.

740.   As a result of GM's breach of the express warranty, Alabama Plaintiff and Alabama Sub-Class Members are entitled to legal and equitable relief against GM, including actual damages, specific performance, attorney's fees, costs of suit, and other relief as appropriate.

## COUNT V
### Breach of the Implied Warranty of Merchantability
### Ala. Code §§ 7-2-314 and 7-2A-212
### (On Behalf of the Alabama Sub-Class against Defendant)

741.   Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 671 as if fully set forth herein.

742.   Alabama Plaintiff brings this count on behalf of himself and the Alabama Sub-Class against Defendant.

743.   GM is and was at all relevant times a "merchant" with respect to motor vehicles under Ala. Code §§ 7-2-104(1) and 7-2A-103(3), and a "seller" of motor vehicles under § 7-2-103(1)(d).

744.   With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Ala. Code § 7-2A-103(1)(p).

745.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Ala. Code §§ 7-2-105(1) and 7-2A-103(1)(h).

746.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Ala. Code §§ 7-2-314 and 7-2A-212.

747.    GM knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. GM directly sold and marketed Class Vehicles to customers through authorized dealers, like those from whom Alabama Plaintiff and members of the Alabama Sub-Class bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. GM knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Alabama Plaintiff and members of the Alabama Sub-Class, with no modification to the defective Class Vehicles.

748.    GM provided Alabama Plaintiff and members of the Alabama Sub-Class with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold. However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, inter alia, the Class Vehicles and their lifter suffered from an inherent defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

749.    This implied warranty included, among other things: (i) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold by GM were safe and reliable for providing transportation; and (ii) a warranty that the Class

Vehicles would be fit for their intended use while the Class Vehicles were being operated.

750.   Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles were and are defective at the time of sale or lease and thereafter as more fully described above. GM knew of this defect at the time these sale or lease transactions occurred.

751.   As a result of GM's breach of the applicable implied warranties, Alabama Plaintiff and members of the Alabama Sub-Class suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Valve Train Defect, Alabama Plaintiff and members of the Alabama Sub-Class were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

752.   GM's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

753.   Alabama Plaintiff and members of the Alabama Sub-Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

754.   Privity is not required here because Alabama Plaintiff and members of the Alabama Sub-Class are intended third-party beneficiaries of contracts between GM and its distributors and dealers, and specifically, of GM's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles.  The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

755.   Alabama Plaintiff and members of the Alabama Sub-Class were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of warranty would have been futile. GM was also on notice of the Valve Train Defect from the complaints and service requests it received from Alabama Plaintiff and the Class Members and through other internal sources.

756.   Nonetheless, Alabama Plaintiff and members of the Alabama Sub-Class provided notice to GM of the breach of express warranties when they took their vehicles to GM-authorized provider of warranty repairs.  Alabama Plaintiff also provided notice to GM of its breach of express warranty by letter dated November 23, 2021.

757.   As a direct and proximate cause of GM's breach, Alabama Plaintiff and members of the Alabama Sub-Class suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution

of value of their Class Vehicles. Additionally, Alabama Plaintiff and members of the Alabama Sub-Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

758.  As a direct and proximate result of GM's breach of the implied warranty of merchantability, Alabama Plaintiff and members of the Alabama Sub-Class have been damaged in an amount to be proven at trial.

**Claims on Behalf of the Alaska Sub-Class**

**COUNT VI**
**Breach of the Implied Warranty of Merchantability**
**Alaska Stat. §§ 45.02.314 and 45.12.212**
**(On Behalf of the Alaska Sub-Class against Defendant)**

759.  Plaintiffs repeat and re-allege each and every allegation contained above in paragraphs 1 through 671 above as if fully set forth herein.

760.  Plaintiff Jeremiah Johnson ("Alaska Plaintiff") brings this count on behalf of himself and the Alaska Sub-Class against Defendant.

761.  GM is and was at all relevant times a "merchant" with respect to motor vehicles under Alaska Stat. §§ 45.02.104(a) and 45.12.103(c)11, and a "seller" of motor vehicles under Alaska Stat. § 45.02.103(a)(4).

762.  With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Alaska Stat. § 45.02.103(a)(16).

763.  The Class Vehicles are and were at all relevant times "goods" within the meaning of Alaska Stat. §§ 45.02.105(a) and 45.12.103(a)(8).

764.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Alaska Stat. § § 45.02.314 and 45.12.212.

765.   GM knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. GM directly sold and marketed Class Vehicles to customers through authorized dealers, like those from whom Alaska Plaintiff and members of the Alaska Sub-Class bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. GM knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Alaska Plaintiff and members of the Alaska Sub-Class, with no modification to the defective Class Vehicles.

766.   GM provided Alaska Plaintiff and members of the Alaska Sub-Class with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.  However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, inter alia, the Class Vehicles and their lifter suffered from an inherent defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

767.   This implied warranty included, among other things: (i) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold by GM were safe and reliable for providing transportation; and (ii) a warranty that the Class

Vehicles would be fit for their intended use while the Class Vehicles were being operated.

768.   Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles were and are defective at the time of sale or lease and thereafter as more fully described above. GM knew of this defect at the time these sale or lease transactions occurred.

769.   As a result of GM's breach of the applicable implied warranties, Alaska Plaintiff and members of the Alaska Sub-Class suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Valve Train Defect, Alaska Plaintiff and members of the Alaska Sub-Class were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

770.   GM's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

771.   Alaska Plaintiff and members of the Alaska Sub-Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

772. Privity is not required here because Alaska Plaintiff and members of the Alaska Sub-Class are intended third-party beneficiaries of contracts between GM and its distributors and dealers, and specifically, of GM's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

773. Alaska Plaintiff and members of the Alaska Sub-Class were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of warranty would have been futile. GM was also on notice of the Valve Train Defect from the complaints and service requests it received from Alaska Plaintiff and the Class Members and through other internal sources.

774. Nonetheless, Alaska Plaintiff and members of the Alaska Sub-Class provided notice to GM of the breach of express warranties when they took their vehicles to GM-authorized provider of warranty repairs. Alaska Plaintiff also provided notice to GM of its breach of express warranty by letter dated March 23, 2022.

775. As a direct and proximate cause of GM's breach, Alaska Plaintiff and members of the Alaska Sub-Class suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of

their Class Vehicles. Additionally, Alaska Plaintiff and members of the Alaska Sub-Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

776. As a direct and proximate result of GM's breach of the implied warranty of merchantability, Alaska Plaintiff and members of the Alaska Sub-Class have been damaged in an amount to be proven at trial.

**Claims on Behalf of the Arkansas Sub-Class**

<u>COUNT VII</u>
**Breach of Express Warranty**
**Ark. Code Ann. §§ 4-2-313 and 4-2A-210**
**(On Behalf of the Arkansas Sub-Class against Defendant)**

777. Plaintiffs repeat and re-allege each and every allegation contained above in paragraphs 1 through 671 above as if fully set forth herein.

778. Plaintiffs Robin and Tony Reidhar ("Arkansas Plaintiffs") bring this count on behalf of themselves and the Arkansas Sub-Class against Defendant.

779. GM is and was at all relevant times a "merchant" with respect to motor vehicles under Ark. Code Ann. §§ 4-2-104(1) and 4-2A-103(3), and a "seller" of motor vehicles under § 4-2-103(1)(d).

780. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Ark. Code Ann. § 4-2A-103(1)(p).

781. The Class Vehicles are and were at all relevant times "goods" within the meaning of Ark. Code Ann. §§ 4-2-105(1) and 4-2A-103(1)(h).

782. The valve train systems were manufactured and/or installed in the Class Vehicles by Defendant and are covered by the express warranty.

783. Defendant provided all purchasers and lessees of the Class Vehicles with an express warranty described herein, which became a material part of the bargain. Accordingly, GM's express warranty is an express warranty under Arkansas state law.

784. In a section entitled "What is Covered," Defendant's express warranty (or New Vehicle Limited Warranty ("NVLW")) provides in relevant part that "[t]he warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." The warranty further provides that "[w]arranty repairs, including, including towing, parts, and labor, will be made at no charge" and "[t]o obtain warranty repairs, take the vehicle to a Chevrolet dealer facility within the warranty period and request the needed repairs."

785. According to GM, the "Bumper-to-Bumper Coverage is for the first 3 years or 36,000 miles, whichever comes first," if not longer.

786. Defendant's NVLW and other warranties regarding the Class Vehicles formed a basis of the bargain that was breached when Arkansas Plaintiffs and members of the Arkansas Sub-Class purchased or leased the Class Vehicles with the defective lifter and/or related components.

787. Arkansas Plaintiffs and members of the Arkansas Sub-Class experienced defects within the warranty period. Despite the existence of the NVLW, Defendant failed to inform Arkansas Plaintiffs and members of the Arkansas Sub-Class that the Class Vehicles were equipped with defective lifters and related components. When providing repairs under the express warranty, these repairs were ineffective and incomplete and did not provide a permanent repair for the Valve Train Defect.

788. GM breached the express warranty through the acts and omissions described above, including by promising to repair or adjust defects in materials or workmanship of any part supplied by Defendant and then failing to do so. Defendant has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles materials and workmanship defects.

789. Privity is not required here because Arkansas Plaintiffs and members of the Arkansas Sub-Class are intended third-party beneficiaries of contracts between GM and its distributors and dealers, and specifically, of GM's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

790.   Any attempt by GM to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here.   Specifically, the warranty limitation is unenforceable because GM knowingly sold or leased defective products without informing consumers about the Valve Train Defect.   The time limits are unconscionable and inadequate to protect Arkansas Plaintiffs and the members of the Arkansas Sub-Class.   Among other things, Arkansas Plaintiffs and members of the Arkansas Sub-Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by GM and unreasonable favored GM. A gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Valve Train Defect existed between GM and members of the Arkansas Sub-Class.

791.   Further, the limited warranty promising to repair and/or correct a manufacturing or workmanship defect fails of its essential purpose because the contractual remedy is insufficient to make Arkansas Plaintiffs and the members of the Arkansas Sub-Class whole, because GM has failed and/or has refused to adequately provide the promised remedies, i.e., a permanent repair, within a reasonable time.

792.   Arkansas Plaintiffs were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Valve Train Defect

from the complaints and service requests it received from Class Members, including those formal complaints submitted to NHTSA, and through other internal sources.

793.   Nonetheless, Arkansas Plaintiffs and members of the Arkansas Sub-Class provided notice to GM of the breach of express warranties when they took their vehicles to GM-authorized providers of warranty repairs.  Arkansas Plaintiffs also provided notice to GM of its breach of express warranty by letter dated March 23, 2022.

794.   As a result of GM's breach of the applicable express warranties, owners and/or lessees of the Class Vehicles suffered, and continue to suffer, an ascertainable loss of money, property, and/or value of their Class Vehicles.

795.   As a direct and proximate result of Defendant's breach of express warranties, Arkansas Plaintiffs and members of the Arkansas Sub-Class have been damaged in an amount to be determined at trial.

796.   As a result of GM's breach of the express warranty, Arkansas Plaintiffs and Arkansas Sub-Class Members are entitled to legal and equitable relief against GM, including actual damages, specific performance, attorney's fees, costs of suit, and other relief as appropriate.

## COUNT VIII
### Breach of the Implied Warranty of Merchantability
### Ark. Code Ann. §§ 4-2-313 and 4-2A-212
### (On Behalf of the Arkansas Sub-Class against Defendant)

797.   Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 671 above as if fully set forth herein.

798.   Arkansas Plaintiffs bring this count on behalf of themselves and the Arkansas Sub-Class against Defendant.

799.   GM is and was at all relevant times a "merchant" with respect to motor vehicles under Ark. Code Ann. §§ 4-2-104(1) and 4-2A-103(3), and a "seller" of motor vehicles under § 4-2-103(1)(d).

800.   With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Ark. Code Ann. § 4-2A-103(1)(p).

801.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Ark. Code Ann. §§ 4-2-105(1) and 4-2A-103(1)(h).

802.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Ark. Code Ann. §§ 4-2-313 and 4-2A-212.

803.   GM knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. GM directly sold and marketed Class Vehicles to customers through authorized dealers, like those from whom Arkansas Plaintiffs and members of the Arkansas Sub-Class bought or leased their vehicles, for the

intended purpose of consumers purchasing the vehicles. GM knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Arkansas Plaintiffs and members of the Arkansas Sub-Class, with no modification to the defective Class Vehicles.

804.   GM provided Arkansas Plaintiffs and members of the Arkansas Sub-Class with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold. However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, inter alia, the Class Vehicles and their lifter suffered from an inherent defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

805.   This implied warranty included, among other things: (i) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold by GM were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

806.   Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles were and are defective at the time of sale

or lease and thereafter as more fully described above. GM knew of this defect at the time these sale or lease transactions occurred.

807.   As a result of GM's breach of the applicable implied warranties, Arkansas Plaintiffs and members of the Arkansas Sub-Class suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Valve Train Defect, Arkansas Plaintiffs and members of the Arkansas Sub-Class were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

808.   GM's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

809.   Arkansas Plaintiffs and members of the Arkansas Sub-Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

810.   Privity is not required here because Arkansas Plaintiffs and members of the Arkansas Sub-Class are intended third-party beneficiaries of contracts between GM and its distributors and dealers, and specifically, of GM's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles.  The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty

agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

811.   Arkansas Plaintiffs and members of the Arkansas Sub-Class were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of warranty would have been futile. GM was also on notice of the Valve Train Defect from the complaints and service requests it received from Arkansas Plaintiffs and the Class Members and through other internal sources.

812.   Nonetheless, Arkansas Plaintiffs and members of the Arkansas Sub-Class provided notice to GM of the breach of express warranties when they took their vehicles to GM-authorized providers of warranty repairs. Arkansas Plaintiffs also provided notice to GM of its breach of implied warranty by letter dated March 23, 2022.

813.   As a direct and proximate cause of GM's breach, Arkansas Plaintiffs and members of the Arkansas Sub-Class suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Arkansas Plaintiffs and members of the Arkansas Sub-Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

814.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Arkansas Plaintiffs and members of the Arkansas Sub-Class have been damaged in an amount to be proven at trial.

263

**COUNT IX**
**Violations of the Arkansas Deceptive Trade Practices Act**
**Ark. Code Ann. §§ 4-88-101, *et seq*.**
**(On Behalf of the Arkansas Sub-Class against Defendant)**

815.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 671 above as if fully set forth herein.

816.    Arkansas Plaintiffs bring this cause of action on behalf of themselves and on behalf of the members of the Arkansas Sub-Class.

817.    GM is a "person" within the meaning of Ark. Code Ann. § 4-88-102(5).

818.    The Arkansas Deceptive Trade Practices Act ("DTPA") prohibits a person from engaging in a "deceptive trade practice," including, inter alia, "knowingly making a false representation as to the characteristics, ingredients, uses, benefits, alterations, source, sponsorship, approval, or certification of goods or services or as to whether goods are original or new or of a particular standard, quality, grade, style, or model;" and "advertising the goods or services with the intent not to sell them as advertised." Ark. Code Ann. § 4-88-102(a)(1) and (a)(3).  GM engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated the Arkansas DTPA.

819.    GM participated in unfair or deceptive trade practices that violated the Arkansas DTPA.  As described below and alleged throughout the Complaint, by failing to disclose the Valve Train Defect, by concealing the Valve Train Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by

presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, GM knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. GM systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Valve Train Defect in the course of its business.

820. GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

821. GM's unfair and deceptive acts or practices occurred repeatedly in GM's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

822. GM knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

823. GM knew or should have known that its conduct violated the Arkansas DTPA.

824. Defendant was under a duty to Arkansas Plaintiffs and the Arkansas Sub-Class Members to disclose the defective nature of the Class Vehicles because:

    a. Defendant was in a superior position to know the true state of

facts about the safety defect in the Class Vehicles;

b.   Defendant made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

c.   Defendant actively concealed the defective nature of the Class Vehicles from Arkansas Plaintiffs and the Arkansas Sub-Class Members at the time of sale and thereafter.

825.   By failing to disclose the Valve Train Defect, Defendant knowingly and intentionally concealed material facts and breached its duty not to do so.

826.   The facts concealed or not disclosed by Defendant to Arkansas Plaintiffs and the Arkansas Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendant's Class Vehicles, or to pay less for them. Whether a vehicle's lifter, rocker arm, and/or valve spring is defective, which can cause stalling, losing power while driving, and hesitation, is a material safety concern. Had Arkansas Plaintiffs and the Arkansas Sub-Class Members known that the Class Vehicles suffered from the Valve Train Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

827.   Arkansas Plaintiffs and the Arkansas Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the

Valve Train Defect. That is the reasonable and objective consumer expectation for vehicles.

828.   As a result of Defendant's misconduct, Arkansas Plaintiffs and the Arkansas Sub-Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

829.   As a direct and proximate result of Defendant's unfair or deceptive acts or practices, Arkansas Plaintiffs and the Arkansas Sub-Class Members have suffered and will continue to suffer actual damages.

830.   GM's violations present a continuing risk to Arkansas Plaintiffs and the Arkansas Sub-Class Members as well as to the general public.  GM's unlawful acts and practices complained of herein affect the public interest.

831.   Arkansas Plaintiff provided notice of his claims, including a written demand for relief, by letter dated March 23, 2022.

832.   Arkansas Plaintiffs and the Arkansas Sub-Class Members seek, inter alia, actual damages in an amount to be determined at trial, reasonable attorneys' fees; and any other just and proper relief available under the Arkansas DTPA.

**Claims on Behalf of the CLRA Sub-Class**

**COUNT X**
**Violation of California's Consumers Legal Remedies Act**
**California Civil Code § 1750, *et seq*.**
**(On Behalf of the CLRA Sub-Class against Defendant)**

833.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 671 above as if fully set forth herein.

834.    Plaintiff Ruben Solis ("California Plaintiff") brings this count on behalf of himself and the CLRA Sub-Class against Defendant.

835.    GM is a "person" as defined by California Civil Code § 1761(c).

836.    California Plaintiff and Class Members are "consumers" within the meaning of Cal. Civ. Code § 1761(d).

837.    The purchase and leases of Class Vehicles by California Plaintiff and the CLRA Sub-Class Members constitute "transactions" as defined by the Cal. Civ. Code § 1761(e).

838.    The Class Vehicles constitute "goods" or "services" as defined by Cal. Civ. Code § 1761(a) and (b).

839.    California Plaintiff and the CLRA Sub-Class members are "consumers" within the meaning of California Civil Code § 1761(d) because they purchased their Class Vehicles primarily for personal, family, or household use.

840.   GM's representations, active concealments, omissions, and failures to disclose regarding the Class Vehicles violated the California's Consumers Legal Remedies Act ("CLRA") in the following ways:

    a.   GM misrepresented the Class Vehicles had characteristics, uses, or benefits Class Vehicles did not in fact have (Cal. Civ. Code § 1770(a)(5));

    b.   GM misrepresented that the Class Vehicles were of a particular standard, quality, or grade when they were of another (Cal. Civ. Code § 1770(a)(7));

    c.   GM advertised the Class Vehicles with the intent not to sell/lease them as advertised (Cal. Civ. Code § 1770(a)(9));

    d.   GM misrepresented that the Class Vehicles and the warranties conferred or involved rights, remedies, or obligations that they did not (Cal. Civ. Code§ 1770(a)(14)); and

    e.   GM misrepresented that the Class Vehicles were supplied in accordance with previous representations when they were not (Cal. Civ. Code § 1770(a)(16)).

841.    GM repeatedly engaged in these unfair and deceptive acts or practices and in the course of its business.  The acts or practices were material, capable of deceiving a substantial portion of the purchasing public and caused economic hard to the purchasers and lessees of the Class Vehicles, including the California Plaintiff.

842.   GM participated in unfair or deceptive trade practices that violated the CLRA.  As described below and alleged throughout the Complaint, by failing to disclose the Valve Train Defect, by concealing the Valve Train Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, GM knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. GM systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Valve Train Defect in the course of its business.

843.   GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

844.   GM's unfair and deceptive acts or practices occurred repeatedly in GM's trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

845.   GM knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

846.   GM knew or should have known that its conduct violated the CLRA.

270

847.    Defendant was under a duty to California Plaintiff and the California Sub-Class Members to disclose the defective nature of the Class Vehicles because:

      a.    Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

      b.    Defendant made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

      c.    Defendant actively concealed the defective nature of the Class Vehicles from California Plaintiff and the California Sub-Class Members at the time of sale and thereafter.

848.    By failing to disclose the Valve Train Defect, Defendant knowingly and intentionally concealed material facts and breached its duty not to do so.

849.    The facts concealed or not disclosed by Defendant to California Plaintiff and the California Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendant's Class Vehicles, or to pay less for them. Whether a vehicle's lifter, rocker arm, and/or valve spring is defective, which can cause stalling, losing power while driving, and hesitation, is a material safety concern. Had California Plaintiff and the California Sub-Class Members known that the Class Vehicles suffered from the Valve Train Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

850. California Plaintiff and the California Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Valve Train Defect. That is the reasonable and objective consumer expectation for vehicles.

851. As a result of Defendant's misconduct, California Plaintiff and the California Sub-Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

852. As a direct and proximate result of Defendant's unfair or deceptive acts or practices, California Plaintiff and the California Sub-Class Members have suffered and will continue to suffer actual damages.

853. GM's violations present a continuing risk to California Plaintiff and the California Sub-Class Members as well as to the general public. GM's unlawful acts and practices complained of herein affect the public interest.

854. California Plaintiff provided notice of his claims, by letter dated December 17, 2021.

855. California Plaintiff and members of the California Sub-Class seek to recover actual damages, an order enjoining GM's unfair or deceptive acts or practices and equitable relief under Cal. Civ. Code § 1780(e), and any other just and proper relief available under the CLRA.

856. In accordance with section 1782(a) of the CLRA, Plaintiffs' counsel has served GM with notice of its alleged violations of Cal. Civ. Code § 1770(a)

relating to the Class Vehicles purchased by Plaintiffs and Class Members, and demanded that GM, within thirty (30) days of such notice, correct or agree to correct the actions described therein and agree to reimburse associated out-of-pocket costs. GM did not respond or otherwise to correct the actions described therein, to reimburse associated out-of-pocket costs, or otherwise to remedy the harm alleged.

**Claims on Behalf of the California Sub-Class**

**COUNT XI**
**Violation of California's Unfair Competition Law**
**Cal. Bus. & Prof. Code § 17200,** *et seq.*
**(On Behalf of the California Sub-Class against Defendant)**

857.   Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 671 above as if fully set forth herein.

858.   California Plaintiff brings this count on behalf of himself and the California Sub-Class against Defendant.

859.   California Business & Professions Code § 17200 prohibits "unfair competition" including any "unlawful, unfair, or fraudulent business practice" and "unfair, deceptive, untrue or misleading advertising." GM engaged in conduct that violated each of this statute's three prongs.

860.   GM committed an unlawful business act or practice in violation of Cal. Bus. & Prof. Code § 17200, et seq., by systematically breaching its warranty obligations and by violating the CLRA and the Song-Beverly Consumer Warranty Act as alleged above and below.

861.   GM committed unfair business acts and practices in violation of Cal. Bus. & Prof. Code § 17200, et seq., because the acts and practices described herein, including but not limited to GM's failure to provide a permanent remedy to fix the Valve Train Defect, where immoral, unethical, oppressive, unscrupulous, unconscionable, and/or substantially injurious to California Plaintiff and California Sub-Class Members. GM's acts and practices were additionally unfair because the harm to California Plaintiff and California Sub-Class Members is substantial and is not outweighed by any countervailing benefits to consumers or competition. Further, GM's acts and practices were unfair in that they were contrary to legislatively declared or public policy.

862.   GM committed fraudulent business acts and practices in violation of Cal. Bus. & Prof. Code § 17200, et seq., when it concealed the existence and nature of the Valve Train Defect, while representing in its marketing, advertising, and other broadly disseminated representations that the Class Vehicles were safe when, in fact, the Valve Defect creates a significant and material safety hazard and inhibits the quality and functionality of the Class Vehicles. GM's representations, omissions, and active concealments about the Valve Train Defect are likely to mislead the public with regard to the true defective nature of Class Vehicles.

863.   GM's unfair or deceptive acts or practices occurred repeatedly in the course of GM's trade or business and were likely to mislead a substantial portion of the purchasing public.

864.   California Plaintiff relied on GM's material representations and nondisclosures and would not have purchased/leased, or would have paid less for, the Class Vehicles had they known the truth.

865.   As a direct and proximate result of GM's unfair, unlawful, and deceptive practices, California Plaintiff has lost money.

866.   Plaintiffs would consider purchasing or leasing similar GM vehicles in the future if Plaintiffs could rely on GM's representations regarding the vehicles.

867.   California Plaintiff and California Sub-class Members seek an order enjoining GM from committing such unlawful, unfair, and fraudulent business practices, and seek restitution pursuant to Cal. Bus. & Prof. Code § 17203.

<u>COUNT XII</u>
**Breach of Express Warranty**
**CAL. COM. CODE §§ 2313 and 10210**
**(On Behalf of the California Sub-Class against Defendant)**

868.   Plaintiffs repeat and re-allege each and every allegation contained above in paragraphs 1 through 671 above as if fully set forth herein.

869.   California Plaintiff brings this count on behalf of himself and the California Sub-Class against Defendant.

870.   GM is and was at all relevant times a "merchant" with respect to motor vehicles under Cal. Com. Code §§ 2104(1) and 10103(c), and a "seller" of motor vehicles under § 2103(1)(d).

871.   With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Cal. Com. Code § 10103(a)(16).

872.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Cal. Com. Code §§ 2105(1) and 10103(a)(8).

873.   The valve train systems were manufactured and/or installed in the Class Vehicles by Defendant and are covered by the express warranty.

874.   Defendant provided all purchasers and lessees of the Class Vehicles with an express warranty described herein, which became a material part of the bargain. Accordingly, GM's express warranty is an express warranty under California state law.

875.   In a section entitled "What is Covered," Defendant's express warranty (or New Vehicle Limited Warranty ("NVLW")) provides in relevant part that "[t]he warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." The warranty further provides that "[w]arranty repairs, including, including towing, parts, and labor, will be made at no charge" and "[t]o obtain warranty repairs, take the vehicle to a Chevrolet dealer facility within the warranty period and request the needed repairs."

876.   According to GM, the "Bumper-to-Bumper Coverage is for the first 3 years or 36,000 miles, whichever comes first," if not longer.

877. Defendant's NVLW and other warranties regarding the Class Vehicles formed a basis of the bargain that was breached when California Plaintiff and members of the California Sub-Class purchased or leased the Class Vehicles with the defective lifter and/or related components.

878. California Plaintiff and members of the California Sub-Class experienced defects within the warranty period. Despite the existence of the NVLW, Defendant failed to inform California Plaintiff and members of the California Sub-Class that the Class Vehicles were equipped with defective lifters and related components. When providing repairs under the express warranty, these repairs were ineffective and incomplete and did not provide a permanent repair for the Valve Train Defect.

879. GM breached the express warranty through the acts and omissions described above, including by promising to repair or adjust defects in materials or workmanship of any part supplied by Defendant and then failing to do so. Defendant has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles materials and workmanship defects.

880. Privity is not required here because California Plaintiff and members of the California Sub-Class are intended third-party beneficiaries of contracts between GM and its distributors and dealers, and specifically, of GM's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles. The dealers were not intended to be the ultimate

consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

881.   Any attempt by GM to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here.   Specifically, the warranty limitation is unenforceable because GM knowingly sold or leased defective products without informing consumers about the Valve Train Defect.   The time limits are unconscionable and inadequate to protect California Plaintiff and the members of the California Sub-Class.   Among other things, California Plaintiff and members of the California Sub-Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by GM and unreasonable favored GM. A gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Valve Train Defect existed between GM and members of the California Sub-Class.

882.   Further, the limited warranty promising to repair and/or correct a manufacturing or workmanship defect fails of its essential purpose because the contractual remedy is insufficient to make California Plaintiff and the members of the California Sub-Class whole, because GM has failed and/or has refused to adequately provide the promised remedies, i.e., a permanent repair, within a reasonable time.

883.    California Plaintiff was not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Valve Train Defect from the complaints and service requests it received from Class Members, including those formal complaints submitted to NHTSA, and through other internal sources.

884.    Nonetheless, California Plaintiff and members of the California Sub-Class provided notice to GM of the breach of express warranties when they took their vehicles to GM-authorized providers of warranty repairs.  California Plaintiff also provided notice to GM of its breach of express warranty by letter dated December 17, 2021.

885.    As a result of GM's breach of the applicable express warranties, owners and/or lessees of the Class Vehicles suffered, and continue to suffer, an ascertainable loss of money, property, and/or value of their Class Vehicles.

886.    As a direct and proximate result of Defendant's breach of express warranties, California Plaintiff and members of the California Sub-Class have been damaged in an amount to be determined at trial.

887.    As a result of GM's breach of the express warranty, California Plaintiff and California Sub-Class Members are entitled to legal and equitable relief against GM, including actual damages, specific performance, attorney's fees, costs of suit, and other relief as appropriate.

## COUNT XIII
### Breach of the Implied Warranty of Merchantability
### Cal. Com. Code §§ 2314 and 10212
### (On Behalf of the California Sub-Class against Defendant)

888.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 671 as if fully set forth herein.

889.    California Plaintiff brings this count on behalf of himself and the California Sub-Class against Defendant.

890.    GM is and was at all relevant times a "merchant" with respect to motor vehicles under Cal. Com. Code §§ 2104(1) and 10103(c), and a "seller" of motor vehicles under § 2103(1)(d).

891.    With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Cal. Com. Code § 10103(a)(16).

892.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Cal. Com. Code §§ 2105(1) and 10103(a)(8).

893.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Cal. Com. Code §§ 2314 and 10212.

894.    GM knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. GM directly sold and marketed Class Vehicles to customers through authorized dealers, like those from whom California Plaintiff and members of the California Sub-Class bought or leased their vehicles, for the

intended purpose of consumers purchasing the vehicles. GM knew that the Class Vehicles would and did pass unchanged from the authorized dealers to California Plaintiff and members of the California Sub-Class, with no modification to the defective Class Vehicles.

895.   GM provided California Plaintiff and members of the California Sub-Class with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold. However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, inter alia, the Class Vehicles and their lifter suffered from an inherent defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

896.   This implied warranty included, among other things: (i) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold by GM were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

897.   Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles were and are defective at the time of sale

or lease and thereafter as more fully described above. GM knew of this defect at the time these sale or lease transactions occurred.

898.   As a result of GM's breach of the applicable implied warranties, California Plaintiff and members of the California Sub-Class suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Valve Train Defect, California Plaintiff and members of the California Sub-Class were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

899.   GM's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

900.   California Plaintiff and members of the California Sub-Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

901.   Privity is not required here because California Plaintiff and members of the California Sub-Class are intended third-party beneficiaries of contracts between GM and its distributors and dealers, and specifically, of GM's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles.   The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements

provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

902. California Plaintiff and members of the California Sub-Class were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of warranty would have been futile. GM was also on notice of the Valve Train Defect from the complaints and service requests it received from California Plaintiff and the Class Members and through other internal sources.

903. Nonetheless, California Plaintiff and members of the California Sub-Class provided notice to GM of the breach of express warranties when they took their vehicles to GM-authorized provider of warranty repairs. California Plaintiff also provided notice to GM of its breach of express warranty by letter dated December 17, 2021.

904. As a direct and proximate cause of GM's breach, California Plaintiff and members of the California Sub-Class suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, California Plaintiff and members of the California Sub-Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

905. As a direct and proximate result of GM's breach of the implied warranty of merchantability, California Plaintiff and members of the California Sub-Class have been damaged in an amount to be proven at trial.

**COUNT XIV**
**Breach of the Implied Warranty**
**Pursuant to Song-Beverly Consumer Warranty Act**
**California Civil Code §§ 1792 and 1791.1, *et seq*.**
**(On Behalf of the California Sub-Class against Defendant)**

906.   Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 671 as if fully set forth herein.

907.   California Plaintiff brings this count on behalf of himself and the California Sub-Class against Defendant.

908.   GM was and is at all relevant times the manufacturer, distributor, warrantor, and/or seller of the Class Vehicles. GM knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased.

909.   GM provided California Plaintiff and the California Sub-Class members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold. However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, inter alia, the Class Vehicles suffered from an inherent defect in the valve train system at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

910.   GM impliedly warranted that the Class Vehicles were of merchantable quality and fit for their intended use. This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their valve train system, which

were manufactured, supplied, distributed, and/or sold by GM, would provide safe and reliable transportation; and (ii) a warranty that the Class Vehicles and their valve train system would be fit for their intended use.

911. Contrary to the applicable implied warranties, the Class Vehicles and their valve train system at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing California Plaintiff and the California Sub-Class members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including the defective valve train system.

912. The Valve Train Defect is inherent and was present in each Class Vehicle at the time of sale.

913. As a result of GM's breach of the applicable implied warranties, owners and/or lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Valve Train Defect, California Plaintiff and the California Sub-Class members were harmed and suffered actual damages in that the Class Vehicles' valve train system and/or its components are substantially certain to fail before their expected useful life has run.

914. GM's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of California Civil Code §§ 1792 and 1791.1.

**Claims on Behalf of the Florida Sub-Class**

**COUNT XV**
**Breach of Express Warranty**
**F.S.A. §§ 672.313 AND 680.21**
**(On Behalf of the Florida Sub-Class against Defendant)**

915.   Plaintiffs repeat and re-allege each and every allegation contained above in paragraphs 1 through 671 above as if fully set forth herein.

916.   Plaintiffs Bobby Cheshire, Melissa Luster, Stephanie Speno, and Nancy Velasquez ("Florida Plaintiffs") bring this count on behalf of themselves and the Florida Sub-Class against Defendant.

917.   GM is and was at all relevant times a "merchant" with respect to motor vehicles under F.S.A. §§ 672.104(1) and 680.1031(3)(k), and a "seller" of motor vehicles under § 672.103(1)(d).

918.   With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under F.S.A. § 680.1031(1)(p).

919.   The Class Vehicles are and were at all relevant times "goods" within the meaning of F.S.A. §§ 672.105(1) and 680.1031(1)(h).

920.   The valve train systems and/or installed in the Class Vehicles by Defendant and are covered by the express warranty.

921.   Defendant provided all purchasers and lessees of the Class Vehicles with an express warranty described herein, which became a material part of the

bargain. Accordingly, GM's express warranty is an express warranty under Florida state law.

922.   In a section entitled "What is Covered," Defendant's express warranty (or New Vehicle Limited Warranty ("NVLW")) provides in relevant part that "[t]he warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." The warranty further provides that "[w]arranty repairs, including, including towing, parts, and labor, will be made at no charge" and "[t]o obtain warranty repairs, take the vehicle to a Chevrolet dealer facility within the warranty period and request the needed repairs."

923.   According to GM, the "Bumper-to-Bumper Coverage is for the first 3 years or 36,000 miles, whichever comes first," if not longer.

924.   Defendant's NVLW and other warranties regarding the Class Vehicles formed a basis of the bargain that was breached when Florida Plaintiffs and members of the Florida Sub-Class purchased or leased the Class Vehicles with the defective lifter and/or related components.

925.   Florida Plaintiffs and members of the Florida Sub-Class experienced defects within the warranty period. Despite the existence of the NVLW, Defendant failed to inform Florida Plaintiffs and members of the Florida Sub-Class that the Class Vehicles were equipped with defective lifters and related components.  When

providing repairs under the express warranty, these repairs were ineffective and incomplete and did not provide a permanent repair for the Valve Train Defect.

926.   GM breached the express warranty through the acts and omissions described above, including by promising to repair or adjust defects in materials or workmanship of any part supplied by Defendant and then failing to do so. Defendant has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles materials and workmanship defects.

927.   Privity is not required here because Florida Plaintiffs and members of the Florida Sub-Class are intended third-party beneficiaries of contracts between GM and its distributors and dealers, and specifically, of GM's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles.  The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

928.   Any attempt by GM to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here.  Specifically, the warranty limitation is unenforceable because GM knowingly sold or leased defective products without informing consumers about the Valve Train Defect.  The time limits are unconscionable and inadequate to protect Florida Plaintiffs and the members of the Florida Sub-Class.  Among other things, Florida Plaintiffs and

members of the Florida Sub-Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by GM and unreasonable favored GM. A gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Valve Train Defect existed between GM and members of the Florida Sub-Class.

929. Further, the limited warranty promising to repair and/or correct a manufacturing or workmanship defect fails of its essential purpose because the contractual remedy is insufficient to make Florida Plaintiffs and the members of the Florida Sub-Class whole, because GM has failed and/or has refused to adequately provide the promised remedies, i.e. a permanent repair, within a reasonable time.

930. Florida Plaintiffs were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Valve Train Defect from the complaints and service requests it received from Class Members, including those formal complaints submitted to NHTSA, and through other internal sources.

931. Nonetheless, Florida Plaintiffs and members of the Florida Sub-Class provided notice to GM of the breach of express warranties when they took their vehicles to a GM-authorized provider of warranty repairs.

932. As a result of GM's breach of the applicable express warranties, owners and/or lessees of the Class Vehicles suffered, and continue to suffer, an ascertainable loss of money, property, and/or value of their Class Vehicles.

933.  As a direct and proximate result of Defendant's breach of express warranties, Florida Plaintiffs and members of the Florida Sub-Class have been damaged in an amount to be determined at trial.

934.  As a result of GM's breach of the express warranty, Florida Plaintiffs and Florida Sub-Class Members are entitled to legal and equitable relief against GM, including actual damages, specific performance, attorney's fees, costs of suit, and other relief as appropriate.

## COUNT XVI
### Breach of the Implied Warranty of Merchantability
### F.S.A. §§ 672.314 AND 680.212
### (On Behalf of the Florida Sub-Class against Defendant)

935.  Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 671 above as if fully set forth herein.

936.  Florida Plaintiffs bring this count on behalf of themselves and the Florida Sub-Class against Defendant.

937.  GM is and was at all relevant times a "merchant" with respect to motor vehicles under F.S.A. §§ 672.104(1) and 680.1031(3)(k), and a "seller" of motor vehicles under § 672.103(1)(d).

938.  With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under F.S.A. § 680.1031(1)(p).

939.  The Class Vehicles are and were at all relevant times "goods" within the meaning of F.S.A. §§ 672.105(1) and 680.1031(1)(h).

940.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under F.S.A. §§ 672.314 and 680.212.

941.   GM knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. GM directly sold and marketed Class Vehicles to customers through authorized dealers, like those from whom Florida Plaintiffs and members of the Florida Sub-Class bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. GM knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Florida Plaintiffs and members of the Florida Sub-Class, with no modification to the defective Class Vehicles.

942.   GM provided Florida Plaintiffs and members of the Florida Sub-Class with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.  However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, inter alia, the Class Vehicles and their lifter suffered from an inherent defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

943.   This implied warranty included, among other things: (i) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold by GM were safe and reliable for providing transportation; and (ii) a warranty that the Class

Vehicles would be fit for their intended use while the Class Vehicles were being operated.

944.   Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles were and are defective at the time of sale or lease and thereafter as more fully described above. GM knew of this defect at the time these sale or lease transactions occurred.

945.   As a result of GM's breach of the applicable implied warranties, Florida Plaintiffs and members of the Florida Sub-Class suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Valve Train Defect, Florida Plaintiffs and members of the Florida Sub-Class were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

946.   GM's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

947.   Florida Plaintiffs and members of the Florida Sub-Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

948.   Privity is not required here because Florida Plaintiffs and members of the Florida Sub-Class are intended third-party beneficiaries of contracts between GM and its distributors and dealers, and specifically, of GM's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles.   The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

949.   Florida Plaintiffs and members of the Florida Sub-Class were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of warranty would have been futile. GM was also on notice of the Valve Train Defect from the complaints and service requests it received from Florida Plaintiffs and the Class Members and through other internal sources.

950.   Nonetheless, Florida Plaintiffs and members of the Florida Sub-Class provided notice to GM of the breach of express warranties when they took their vehicles to a GM-authorized provider of warranty repairs.

951.   As a direct and proximate cause of GM's breach, Florida Plaintiffs and members of the Florida Sub-Class suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Florida Plaintiffs and members of the Florida

Sub-Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

952. As a direct and proximate result of GM's breach of the implied warranty of merchantability, Florida Plaintiffs and members of the Florida Sub-Class have been damaged in an amount to be proven at trial.

## COUNT XVII
### Violations of the Florida Deceptive and Unfair Trade Practices Act
### F.S.A. §§ 501.201-.213
### (On Behalf of the Florida Sub-Class against Defendant)

953. Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 671 above as if fully set forth herein.

954. Florida Plaintiffs bring this cause of action on behalf of themselves and on behalf of the members of the Florida Sub-Class.

955. GM's business acts and practices alleged herein constitute unfair, unconscionable and/or deceptive methods, acts or practices under the Florida Deceptive and Unfair Trade Practices Act, § 501.201, et seq., Florida Statutes ("FDUTPA").

956. At all relevant times, Florida Plaintiffs and members of the Florida Sub-Class were "consumers" within the meaning of the FDUTPA. F.S.A. § 501.203(7).

957. GM's conduct, as set forth herein, occurred in the conduct of "trade or commerce" within the meaning of the FDUTPA. F.S.A. § 501.203(8).

958.   FDUPTA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce" at set forth in the statute. Fla. Stat. § 501.204(1).  Breach of express and implied warranties constitutes an unfair or deceptive act or practice under FDUTPA.  GM engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated the FDUTPA.

959.   GM participated in unfair or deceptive trade practices that violated the FDUTPA.  As described below and alleged throughout the Complaint, by failing to disclose the Valve Train Defect, by concealing the Valve Train Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, GM knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. GM systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Valve Train Defect in the course of its business.

960.   GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

961. GM's unfair and deceptive acts or practices occurred repeatedly in GM's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

962. GM knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

963. GM knew or should have known that its conduct violated the FDUTPA.

964. Defendant was under a duty to Florida Plaintiffs and the Florida Sub-Class Members to disclose the defective nature of the Class Vehicles because:

    a.   Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

    b.   Defendant made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

    c.   Defendant actively concealed the defective nature of the Class Vehicles from Florida Plaintiffs and the Florida Sub-Class Members at the time of sale and thereafter.

965. By failing to disclose the Valve Train Defect, Defendant knowingly and intentionally concealed material facts and breached its duty not to do so.

966. The facts concealed or not disclosed by Defendant to Florida Plaintiffs and the Florida Sub-Class Members are material because a reasonable person would

have considered them to be important in deciding whether or not to purchase or lease Defendant's Class Vehicles, or to pay less for them. Whether a vehicle's lifter, rocker arm, and/or valve spring is defective, which can cause stalling, losing power while driving, and hesitation, is a material safety concern. Had Florida Plaintiffs and the Florida Sub-Class Members known that the Class Vehicles suffered from the Valve Train Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

967.   Florida Plaintiffs and the Florida Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Valve Train Defect. That is the reasonable and objective consumer expectation for vehicles.

968.   As a result of Defendant's misconduct, Florida Plaintiffs and the Florida Sub-Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

969.   As a direct and proximate result of Defendant's unfair or deceptive acts or practices, Florida Plaintiffs and the Florida Sub-Class Members have suffered and will continue to suffer actual damages.

970.   GM's violations present a continuing risk to Florida Plaintiffs and the Florida Sub-Class Members as well as to the general public.  GM's unlawful acts and practices complained of herein affect the public interest.

971.   Florida Plaintiffs and the Florida Sub-Class Members seek, inter alia, actual damages in an amount to be determined at trial, reasonable attorneys' fees;

and any other just and proper relief available under the FDUTPA. Because GM acted with willful and conscious disregard of the rights and safety of others, GM's conduct constitutes malice, oppression, and fraud warranting punitive damages.

**Claims on Behalf of the Georgia Sub-Class**

<u>COUNT XVIII</u>
**Breach of Express Warranty**
**Ga. Code Ann. §§ 11-2-313 and 11-2A-210**
**(On Behalf of the Georgia Sub-Class against Defendant)**

972.   Plaintiffs repeat and re-allege each and every allegation contained above in paragraphs 1 through 671 above as if fully set forth herein.

973.   Plaintiffs Joey Brown, Leon Jordan, and Michael Scott ("Georgia Plaintiffs") bring this count on behalf of themselves and the Georgia Sub-Class against Defendant.

974.   GM is and was at all relevant times a "merchant" with respect to motor vehicles under Ga. Code Ann. §§ 11-2-104(1) and 11-2A-103(3), and a "seller" of motor vehicles under § 11-2-103(1)(d).

975.   With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Ga. Code Ann. § 11-2A-103(1)(p).

976.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Ga. Code Ann. §§ 11-2-105(1) and 11-2A-103(1)(h).

977.   The valve train systems were manufactured and/or installed in the Class Vehicles by Defendant and are covered by the express warranty.

978.   Defendant provided all purchasers and lessees of the Class Vehicles with an express warranty described herein, which became a material part of the bargain. Accordingly, GM's express warranty is an express warranty under Georgia state law.

979.   In a section entitled "What is Covered," Defendant's express warranty (or New Vehicle Limited Warranty ("NVLW")) provides in relevant part that "[t]he warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." The warranty further provides that "[w]arranty repairs, including, including towing, parts, and labor, will be made at no charge" and "[t]o obtain warranty repairs, take the vehicle to a Chevrolet dealer facility within the warranty period and request the needed repairs."

980.   According to GM, the "Bumper-to-Bumper Coverage is for the first 3 years or 36,000 miles, whichever comes first," if not longer.

981.   Defendant's NVLW and other warranties regarding the Class Vehicles formed a basis of the bargain that was breached when Georgia Plaintiffs and members of the Georgia Sub-Class purchased or leased the Class Vehicles with the defective lifter and/or related components.

982.   Georgia Plaintiffs and members of the Georgia Sub-Class experienced defects within the warranty period. Despite the existence of the NVLW, Defendant failed to inform Georgia Plaintiffs and members of the Georgia Sub-Class that the

Class Vehicles were equipped with defective lifters and related components.  When providing repairs under the express warranty, these repairs were ineffective and incomplete and did not provide a permanent repair for the Valve Train Defect.

983.   GM breached the express warranty through the acts and omissions described above, including by promising to repair or adjust defects in materials or workmanship of any part supplied by Defendant and then failing to do so. Defendant has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles materials and workmanship defects.

984.   Privity is not required here because Georgia Plaintiffs and members of the Georgia Sub-Class are intended third-party beneficiaries of contracts between GM and its distributors and dealers, and specifically, of GM's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles.  The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

985.   Any attempt by GM to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here.  Specifically, the warranty limitation is unenforceable because GM knowingly sold or leased defective products without informing consumers about the Valve Train Defect.  The time limits are unconscionable and inadequate to protect Georgia Plaintiffs and the

members of the Georgia Sub-Class.  Among other things, Georgia Plaintiffs and members of the Georgia Sub-Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by GM and unreasonable favored GM. A gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Valve Train Defect existed between GM and members of the Georgia Sub-Class.

986.   Further, the limited warranty promising to repair and/or correct a manufacturing or workmanship defect fails of its essential purpose because the contractual remedy is insufficient to make Georgia Plaintiffs and the members of the Georgia Sub-Class whole, because GM has failed and/or has refused to adequately provide the promised remedies, i.e., a permanent repair, within a reasonable time.

987.   Georgia Plaintiffs were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Valve Train Defect from the complaints and service requests it received from Class Members, including those formal complaints submitted to NHTSA, and through other internal sources.

988.   Nonetheless, Georgia Plaintiffs and members of the Georgia Sub-Class provided notice to GM of the breach of express warranties when they took their vehicles to GM-authorized provider of warranty repairs.  Georgia Plaintiffs also provided notice to GM of its breach of express warranty by letter dated October 20, 2021, November 19, 2021, and February 14, 2022.

989.   As a result of GM's breach of the applicable express warranties, owners and/or lessees of the Class Vehicles suffered, and continue to suffer, an ascertainable loss of money, property, and/or value of their Class Vehicles.

990.   As a direct and proximate result of Defendant's breach of express warranties, Georgia Plaintiffs and members of the Georgia Sub-Class have been damaged in an amount to be determined at trial.

991.   As a result of GM's breach of the express warranty, Georgia Plaintiffs and Georgia Sub-Class Members are entitled to legal and equitable relief against GM, including actual damages, specific performance, attorney's fees, costs of suit, and other relief as appropriate.

## COUNT XIX
**Breach of the Implied Warranty of Merchantability**
**Ga. Code Ann. § 11-2-314 and 11-2A-212**
**(On Behalf of the Georgia Sub-Class against Defendant)**

992.   Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 671 above as if fully set forth herein.

993.   Georgia Plaintiffs bring this count on behalf of themselves and the Georgia Sub-Class against Defendant.

994.   GM is and was at all relevant times a "merchant" with respect to motor vehicles under Ga. Code Ann. §§ 11-2-104(1) and 11-2A-103(3), and a "seller" of motor vehicles under § 11-2-103(1)(d).

995.   With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Ga. Code Ann. § 11-2A-103(1)(p).

996.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Ga. Code Ann. §§ 11-2-105(1) and 11-2A-103(1)(h).

997.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Ga. Code Ann. §§ 11-2-314 and 11-2A-212.

998.   GM knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. GM directly sold and marketed Class Vehicles to customers through authorized dealers, like those from whom Georgia Plaintiffs and members of the Georgia Sub-Class bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. GM knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Georgia Plaintiffs and members of the Georgia Sub-Class, with no modification to the defective Class Vehicles.

999.   GM provided Georgia Plaintiffs and members of the Georgia Sub-Class with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.  However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, inter alia, the Class Vehicles and their lifter

suffered from an inherent defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

1000. This implied warranty included, among other things: (i) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold by GM were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

1001. Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles were and are defective at the time of sale or lease and thereafter as more fully described above. GM knew of this defect at the time these sale or lease transactions occurred.

1002. As a result of GM's breach of the applicable implied warranties, Georgia Plaintiffs and members of the Georgia Sub-Class suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Valve Train Defect, Georgia Plaintiffs and members of the Georgia Sub-Class were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

1003. GM's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

1004. Georgia Plaintiffs and members of the Georgia Sub-Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

1005. Privity is not required here because Georgia Plaintiffs and members of the Georgia Sub-Class are intended third-party beneficiaries of contracts between GM and its distributors and dealers, and specifically, of GM's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

1006. Georgia Plaintiffs and members of the Georgia Sub-Class were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of warranty would have been futile. GM was also on notice of the Valve Train Defect from the complaints and service requests it received from Georgia Plaintiffs and the Class Members and through other internal sources.

1007. Nonetheless, Georgia Plaintiffs and members of the Georgia Sub-Class provided notice to GM of the breach of express warranties when they took their

vehicles to GM-authorized providers of warranty repairs.  Georgia Plaintiffs also provided notice to GM of its breach of express warranty by letter dated October 20, 2021, November 19, 2021, and February 14, 2022.

1008.  As a direct and proximate cause of GM's breach, Georgia Plaintiffs and members of the Georgia Sub-Class suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Georgia Plaintiffs and members of the Georgia Sub-Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

1009. As a direct and proximate result of GM's breach of the implied warranty of merchantability, Georgia Plaintiffs and members of the Georgia Sub-Class have been damaged in an amount to be proven at trial.

## COUNT XX
### Violation of Georgia's Fair Business Practices Act,
### Ga. Code Ann. § 10-1-390, *et seq*.
### (On Behalf of the Georgia Sub-Class against Defendant)

1010. Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 671 above as if fully set forth herein.

1011. Georgia Plaintiffs bring this cause of action on behalf of themselves and on behalf of the members of the Georgia Sub-Class.

1012. Georgia's Fair Business Practices Act ("GFBPA") declares "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer

acts or practices in trade or commerce" to be unlawful. Ga. Code Ann. § 10-1-393(a).

1013. Unfair or deceptive acts or practices are defined to include, "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have," "[r]epresenting that goods or services are of a particular standard, quality, or grade … if they are of another," and [a]dvertising goods or services with intent not to sell them as advertised." Ga. Code Ann. § 10-1-393(b). GM engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated the GFBPA.

1014. GM participated in unfair or deceptive trade practices that violated the GFBPA. As described below and alleged throughout the Complaint, by failing to disclose the Valve Train Defect, by concealing the Valve Train Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, GM knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. GM systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Valve Train Defect in the course of its business.

1015. GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression,

or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

1016. GM's unfair and deceptive acts or practices occurred repeatedly in GM's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

1017. GM knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

1018. GM knew or should have known that its conduct violated the GFBPA.

1019. Defendant was under a duty to Georgia Plaintiffs and the Georgia Sub-Class Members to disclose the defective nature of the Class Vehicles because:

     a.    Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

     b.    Defendant made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

     c.    Defendant actively concealed the defective nature of the Class Vehicles from Georgia Plaintiffs and the Georgia Sub-Class Members at the time of sale and thereafter.

1020. By failing to disclose the Valve Train Defect, Defendant knowingly and intentionally concealed material facts and breached its duty not to do so.

1021. The facts concealed or not disclosed by Defendant to Georgia Plaintiffs and the Georgia Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendant's Class Vehicles, or to pay less for them. Whether a vehicle's lifter, rocker arm and/or valve spring is defective, which can cause stalling, losing power while driving, and hesitation, is a material safety concern. Had Georgia Plaintiffs and the Georgia Sub-Class Members known that the Class Vehicles suffered from the Valve Train Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

1022. Georgia Plaintiffs and the Georgia Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Valve Train Defect. That is the reasonable and objective consumer expectation for vehicles.

1023. As a result of Defendant's misconduct, Georgia Plaintiffs and the Georgia Sub-Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

1024. As a direct and proximate result of Defendant's unfair or deceptive acts or practices, Georgia Plaintiffs and the Georgia Sub-Class Members have suffered and will continue to suffer actual damages.

1025. GM's violations present a continuing risk to Georgia Plaintiffs and the Georgia Sub-Class Members as well as to the general public.  GM's unlawful acts and practices complained of herein affect the public interest.

1026. Pursuant to statute, Georgia Plaintiffs provided notice of their claim by letter dated October 20, 2021, November 19, 2021, and February 14, 2022.  Georgia Plaintiffs and members of the Georgia Sub-Class seek all damages and relief to which they are entitled to because GM failed to remedy its unlawful conduct within the requisite time period.

1027. Georgia Plaintiffs and members of the Georgia Sub-Class seek monetary relief against Defendant in the amount of damages, exemplary damages for intentional violations, injunctive relief, attorneys' fees, and any other just and proper relief available under Ga. Code Ann. § 10-1-399(a).

### COUNT XXI
**Violation of the Georgia Uniform Deceptive Trade Practices Act,**
**Ga. Code Ann. § 10-1-370, *et seq*.**
**(On Behalf of the Georgia Sub-Class against Defendant)**

1028. Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 671 above as if fully set forth herein.

1029. Georgia Plaintiffs bring this cause of action on behalf of themselves and on behalf of the members of the Georgia Sub-Class.

1030. The Georgia Uniform Deceptive Trade Practices Act ("GUDTPA") prohibits "deceptive trade practices,' which include the "misrepresentation of standard or quality of goods or services," and "engaging in any other conduct which similarly creates a likelihood of confusion or of misunderstanding." Ga. Code Ann.

§ 10-1-372(a). GM engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated the GUDTPA.

1031. Defendant, Georgia Plaintiff, and the members of the Georgia Sub-Class are "persons" within the meaning of the GUDTPA, GA. Code Ann. § 10-1-471(5).

1032. GM participated in unfair or deceptive trade practices that violated the GUDTPA. As described below and alleged throughout the Complaint, by failing to disclose the Valve Train Defect, by concealing the Valve Train Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, GM knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. GM systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Valve Train Defect in the course of its business.

1033. GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

1034. GM's unfair and deceptive acts or practices occurred repeatedly in GM's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

1035. GM knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

1036. GM knew or should have known that its conduct violated the GUDTPA.

1037. Defendant was under a duty to Georgia Plaintiffs and the Georgia Sub-Class Members to disclose the defective nature of the Class Vehicles because:

   a.   Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

   b.   Defendant made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

   c.   Defendant actively concealed the defective nature of the Class Vehicles from Georgia Plaintiffs and the Georgia Sub-Class Members at the time of sale and thereafter.

1038. By failing to disclose the Valve Train Defect, Defendant knowingly and intentionally concealed material facts and breached its duty not to do so.

1039. The facts concealed or not disclosed by Defendant to Georgia Plaintiffs and the Georgia Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendant's Class Vehicles, or to pay less for them. Whether a vehicle's lifter, rocker arm, and/or valve spring is defective, which can cause stalling, losing power while driving, and hesitation, is a material safety concern. Had Georgia Plaintiffs and the Georgia Sub-Class Members known that the Class Vehicles suffered from the Valve Train Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

1040. Georgia Plaintiffs and the Georgia Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Valve Train Defect. That is the reasonable and objective consumer expectation for vehicles.

1041. As a result of Defendant's misconduct, Georgia Plaintiffs and the Georgia Sub-Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

1042. As a direct and proximate result of Defendant's unfair or deceptive acts or practices, Georgia Plaintiffs and the Georgia Sub-Class Members have suffered and will continue to suffer actual damages.

1043. GM's violations present a continuing risk to Georgia Plaintiffs and the Georgia Sub-Class Members as well as to the general public.  GM's unlawful acts and practices complained of herein affect the public interest.

1044.  Pursuant to statute, Georgia Plaintiffs provided notice of their claim by letter dated October 20, 2021, November 19, 2021, and February 14, 2022.  Georgia Plaintiffs and members of the Georgia Sub-Class seek all damages and relief to which they are entitled to because GM failed to remedy its unlawful conduct within the requisite time period.

1045.  Georgia Plaintiffs and members of the Georgia Sub-Class seek monetary relief against Defendant in the amount of damages, exemplary damages for intentional violations, injunctive relief, attorneys' fees, and any other just and proper relief available under Ga. Code Ann. § 10-1-373.

**Claims on Behalf of the Idaho Sub-Class**

**COUNT XXII**
**Breach of Express Warranty**
**IDAHO CODE §§ 28-2-313 AND 28-12-210**
**(On Behalf of the Idaho Sub-Class against Defendant)**

1046.  Plaintiffs repeat and re-allege each and every allegation contained above in paragraphs 1 through 671 above as if fully set forth herein.

1047.  Plaintiff Trenton Acree("Idaho Plaintiff") brings this count on behalf of himself and the Idaho Sub-Class against Defendant.

1048.  GM is and was at all relevant times a "merchant" with respect to motor vehicles under Idaho Code §§ 28-2-104(1) and 28-12-103(3), and a "seller" of motor vehicles under § 28-2-103(1)(d).

1049. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Idaho Code § 28-12-103(1)(p).

1050. The Class Vehicles are and were at all relevant times "goods" within the meaning of Idaho Code §§ 28-2-105(1) and 28-12-103(1)(h).

1051. The valve train systems were manufactured and/or installed in the Class Vehicles by Defendant and are covered by the express warranty.

1052. Defendant provided all purchasers and lessees of the Class Vehicles with an express warranty described herein, which became a material part of the bargain. Accordingly, GM's express warranty is an express warranty under Idaho state law.

1053. In a section entitled "What is Covered," Defendant's express warranty (or New Vehicle Limited Warranty ("NVLW")) provides in relevant part that "[t]he warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." The warranty further provides that "[w]arranty repairs, including, including towing, parts, and labor, will be made at no charge" and "[t]o obtain warranty repairs, take the vehicle to a Chevrolet dealer facility within the warranty period and request the needed repairs."

1054. According to GM, the "Bumper-to-Bumper Coverage is for the first 3 years or 36,000 miles, whichever comes first," if not longer.

1055. Defendant's NVLW and other warranties regarding the Class Vehicles formed a basis of the bargain that was breached when Idaho Plaintiff and members of the Idaho Sub-Class purchased or leased the Class Vehicles with the defective lifter and/or related components.

1056. Idaho Plaintiff and members of the Idaho Sub-Class experienced defects within the warranty period. Despite the existence of the NVLW, Defendant failed to inform Idaho Plaintiff and members of the Idaho Sub-Class that the Class Vehicles were equipped with defective lifters and related components.  When providing repairs under the express warranty, these repairs were ineffective and incomplete and did not provide a permanent repair for the Valve Train Defect.

1057. GM breached the express warranty through the acts and omissions described above, including by promising to repair or adjust defects in materials or workmanship of any part supplied by Defendant and then failing to do so. Defendant has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles materials and workmanship defects.

1058. Privity is not required here because Idaho Plaintiff and members of the Idaho Sub-Class are intended third-party beneficiaries of contracts between GM and its distributors and dealers, and specifically, of GM's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles.  The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the

Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

1059. Any attempt by GM to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here. Specifically, the warranty limitation is unenforceable because GM knowingly sold or leased defective products without informing consumers about the Valve Train Defect. The time limits are unconscionable and inadequate to protect Idaho Plaintiff and the members of the Idaho Sub-Class. Among other things, Idaho Plaintiff and members of the Idaho Sub-Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by GM and unreasonable favored GM. A gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Valve Train Defect existed between GM and members of the Idaho Sub-Class.

1060. Further, the limited warranty promising to repair and/or correct a manufacturing or workmanship defect fails of its essential purpose because the contractual remedy is insufficient to make Idaho Plaintiff and the members of the Idaho Sub-Class whole, because GM has failed and/or has refused to adequately provide the promised remedies, i.e., a permanent repair, within a reasonable time.

1061. Idaho Plaintiff was not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Valve Train Defect from the

complaints and service requests it received from Class Members, including those formal complaints submitted to NHTSA, and through other internal sources.

1062. Nonetheless, Idaho Plaintiff and members of the Idaho Sub-Class provided notice to GM of the breach of express warranties when they took their vehicles to GM-authorized providers of warranty repairs.  Idaho Plaintiff also provided notice to GM of its breach of express warranty by letter dated March 7, 2022.

1063.  As a result of GM's breach of the applicable express warranties, owners and/or lessees of the Class Vehicles suffered, and continue to suffer, an ascertainable loss of money, property, and/or value of their Class Vehicles.

1064.  As a direct and proximate result of Defendant's breach of express warranties, Idaho Plaintiff and members of the Idaho Sub-Class have been damaged in an amount to be determined at trial.

1065.  As a result of GM's breach of the express warranty, Idaho Plaintiff and Idaho Sub-Class Members are entitled to legal and equitable relief against GM, including actual damages, specific performance, attorney's fees, costs of suit, and other relief as appropriate.

<u>**COUNT XXIII**</u>
**Breach of the Implied Warranty of Merchantability**
**IDAHO CODE §§ 28-2-314 AND 28-12-212**
**(On Behalf of the Idaho Sub-Class against Defendant)**

1066. Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 671 as if fully set forth herein.

1067. Idaho Plaintiff brings this count on behalf of himself and the Idaho Sub-Class against Defendant.

1068. GM is and was at all relevant times a "merchant" with respect to motor vehicles under Idaho Code §§ 28-2-104(1) and 28-12-103(3), and a "seller" of motor vehicles under § 28-2-103(1)(d).

1069. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Idaho Code § 28-12-103(1)(p).

1070. The Class Vehicles are and were at all relevant times "goods" within the meaning of Idaho Code §§ 28-2-105(1) and 28-12-103(1)(h).

1071. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Idaho Code §§ 28-2-314 and 28-12-212.

1072. GM knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. GM directly sold and marketed Class Vehicles to customers through authorized dealers, like those from whom Idaho Plaintiff and members of the Idaho Sub-Class bought or leased their vehicles, for the intended

purpose of consumers purchasing the vehicles. GM knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Idaho Plaintiff and members of the Idaho Sub-Class, with no modification to the defective Class Vehicles.

1073. GM provided Idaho Plaintiff and members of the Idaho Sub-Class with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold. However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, inter alia, the Class Vehicles and their lifter suffered from an inherent defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

1074. This implied warranty included, among other things: (i) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold by GM were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

1075. Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles were and are defective at the time of sale

or lease and thereafter as more fully described above. GM knew of this defect at the time these sale or lease transactions occurred.

1076. As a result of GM's breach of the applicable implied warranties, Idaho Plaintiff and members of the Idaho Sub-Class suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Valve Train Defect, Idaho Plaintiff and members of the Idaho Sub-Class were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

1077. GM's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

1078. Idaho Plaintiff and members of the Idaho Sub-Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

1079. Privity is not required here because Idaho Plaintiff and members of the Idaho Sub-Class are intended third-party beneficiaries of contracts between GM and its distributors and dealers, and specifically, of GM's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the

Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

1080. Idaho Plaintiff and members of the Idaho Sub-Class were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of warranty would have been futile. GM was also on notice of the Valve Train Defect from the complaints and service requests it received from Idaho Plaintiff and the Class Members and through other internal sources.

1081. Nonetheless, Idaho Plaintiff and members of the Idaho Sub-Class provided notice to GM of the breach of express warranties when they took their vehicles to GM-authorized provider of warranty repairs.  Idaho Plaintiff also provided notice to GM of its breach of express warranty by letter dated March 7, 2022.

1082. As a direct and proximate cause of GM's breach, Idaho Plaintiff and members of the Idaho Sub-Class suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Idaho Plaintiff and members of the Idaho Sub-Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

1083. As a direct and proximate result of GM's breach of the implied warranty of merchantability, Idaho Plaintiff and members of the Idaho Sub-Class have been damaged in an amount to be proven at trial.

## COUNT XXIV
### Violations of the Idaho Consumer Protection Act
### IDAHO CODE § 48-601, *et seq*.
### (On Behalf of the Idaho Sub-Class against Defendant)

1084. Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 671 above as if fully set forth herein.

1085. Idaho Plaintiff brings this cause of action on behalf of himself and on behalf of the members of the Idaho Sub-Class.

1086. GM, Idaho Plaintiff, and the Idaho Sub-Class Members are "persons" within the meaning of Idaho Code § 48-602(1).

1087. Defendant was and is engaged in "trade" or "commerce" within the meaning of Idaho Code § 48-602(2).

1088. Idaho Consumer Credit and Protection Act ("CPA") makes unlawful misleading, false, or deceptive acts, including, but not limited to the following specific actions: "(5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, connection, qualifications or license that he does not have;" "(7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;" and "(17) Engaging in any act or practice that is otherwise misleading, false, or deceptive to the consumer[.]"  Idaho Code Ann. §

48-603.  GM engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated the Idaho CPA.

1089. GM participated in unfair or deceptive trade practices that violated the Idaho CPA.  As described below and alleged throughout the Complaint, by failing to disclose the Valve Train Defect, by concealing the Valve Train Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, GM knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. GM systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Valve Train Defect in the course of its business.

1090. GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

1091. GM's unfair and deceptive acts or practices occurred repeatedly in GM's trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

1092. GM knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

1093. GM knew or should have known that its conduct violated the Idaho CPA.

1094. Defendant was under a duty to Idaho Plaintiff and the Idaho Sub-Class Members to disclose the defective nature of the Class Vehicles because:

    a.  Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

    b.    Defendant made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

    c.    Defendant actively concealed the defective nature of the Class Vehicles from Idaho Plaintiff and the Idaho Sub-Class Members at the time of sale and thereafter.

1095. By failing to disclose the Valve Train Defect, Defendant knowingly and intentionally concealed material facts and breached its duty not to do so.

1096. The facts concealed or not disclosed by Defendant to Idaho Plaintiff and the Idaho Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendant's Class Vehicles, or to pay less for them. Whether a vehicle's lifter,

rocker arm, and/or valve spring is defective, which can cause stalling, losing power while driving, and hesitation, is a material safety concern. Had Idaho Plaintiff and the Idaho Sub-Class Members known that the Class Vehicles suffered from the Valve Train Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

1097. Idaho Plaintiff and the Idaho Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Valve Train Defect. That is the reasonable and objective consumer expectation for vehicles.

1098. As a result of Defendant's misconduct, Idaho Plaintiff and the Idaho Sub-Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

1099. As a direct and proximate result of Defendant's unfair or deceptive acts or practices, Idaho Plaintiff and the Idaho Sub-Class Members have suffered and will continue to suffer actual damages.

1100. GM's violations present a continuing risk to Idaho Plaintiff and the Idaho Sub-Class Members as well as to the general public. GM's unlawful acts and practices complained of herein affect the public interest.

1101. Idaho Plaintiff provided notice of his claims by letter dated March 7, 2022.

1102. Pursuant to Idaho Code § 48-608, Idaho Plaintiff and members of the Idaho Sub-Class seek to recover actual damages in an amount to be determined at

trial; an order enjoining GM's unfair, unlawful, and/or deceptive practices; declaratory relief; restitution; punitive dames; attorneys' fees and costs; and any other relief available under the Idaho CPA that the Court deems just and proper.

**Claims on Behalf of the Illinois Sub-Class**

<u>**COUNT XXV**</u>
**Breach of Express Warranty**
**810 ILL. COMP. STAT. §§ 5/2-313 AND 5/2A-210**
**(On Behalf of the Illinois Sub-Class against Defendant)**

1103. Plaintiffs repeat and re-allege each and every allegation contained above in paragraphs 1 through 671 above as if fully set forth herein.

1104. Plaintiff Richard Zembol ("Illinois Plaintiff") brings this count on behalf of himself and the Illinois Sub-Class against Defendant.

1105. GM is and was at all relevant times a "merchant" with respect to motor vehicles under 810 Ill. Comp. Stat. §§ 5/2-104(1) and 5/2A-103(3), and a "seller" of motor vehicles under § 5/2-103(1)(d).

1106. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under 810 Ill. Comp. Stat. § 5/2A-103(1)(p).

1107. The Class Vehicles are and were at all relevant times "goods" within the meaning of 810 Ill. Comp. Stat. §§ 5/2-105(1) and 5/2A-103(1)(h).

1108. The valve train systems were manufactured and/or installed in the Class Vehicles by Defendant and are covered by the express warranty.

1109. Defendant provided all purchasers and lessees of the Class Vehicles with an express warranty described herein, which became a material part of the bargain. Accordingly, GM's express warranty is an express warranty under Illinois state law.

1110. In a section entitled "What is Covered," Defendant's express warranty (or New Vehicle Limited Warranty ("NVLW")) provides in relevant part that "[t]he warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." The warranty further provides that "[w]arranty repairs, including, including towing, parts, and labor, will be made at no charge" and "[t]o obtain warranty repairs, take the vehicle to a Chevrolet dealer facility within the warranty period and request the needed repairs."

1111. According to GM, the "Bumper-to-Bumper Coverage is for the first 3 years or 36,000 miles, whichever comes first," if not longer.

1112. Defendant's NVLW and other warranties regarding the Class Vehicles formed a basis of the bargain that was breached when Illinois Plaintiff and members of the Illinois Sub-Class purchased or leased the Class Vehicles with the defective lifter and/or related components.

1113. Illinois Plaintiff and members of the Illinois Sub-Class experienced defects within the warranty period. Despite the existence of the NVLW, Defendant failed to inform Illinois Plaintiff and members of the Illinois Sub-Class that the Class

Vehicles were equipped with defective lifters and related components. When providing repairs under the express warranty, these repairs were ineffective and incomplete and did not provide a permanent repair for the Valve Train Defect.

1114. GM breached the express warranty through the acts and omissions described above, including by promising to repair or adjust defects in materials or workmanship of any part supplied by Defendant and then failing to do so. Defendant has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles materials and workmanship defects.

1115. Privity is not required here because Illinois Plaintiff and members of the Illinois Sub-Class are intended third-party beneficiaries of contracts between GM and its distributors and dealers, and specifically, of GM's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

1116. Any attempt by GM to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here. Specifically, the warranty limitation is unenforceable because GM knowingly sold or leased defective products without informing consumers about the Valve Train Defect. The time limits are unconscionable and inadequate to protect Illinois Plaintiff and the

members of the Illinois Sub-Class. Among other things, Illinois Plaintiff and members of the Illinois Sub-Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by GM and unreasonable favored GM. A gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Valve Train Defect existed between GM and members of the Illinois Sub-Class.

1117. Further, the limited warranty promising to repair and/or correct a manufacturing or workmanship defect fails of its essential purpose because the contractual remedy is insufficient to make Illinois Plaintiff and the members of the Illinois Sub-Class whole, because GM has failed and/or has refused to adequately provide the promised remedies, i.e., a permanent repair, within a reasonable time.

1118. Illinois Plaintiff was not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Valve Train Defect from the complaints and service requests it received from Class Members, including those formal complaints submitted to NHTSA, and through other internal sources.

1119. Nonetheless, Illinois Plaintiff and members of the Illinois Sub-Class provided notice to GM of the breach of express warranties when they took their vehicles to GM-authorized providers of warranty repairs. Illinois Plaintiff also provided notice to GM of its breach of express warranty by letter dated January 25, 2022.

1120. As a result of GM's breach of the applicable express warranties, owners and/or lessees of the Class Vehicles suffered, and continue to suffer, an ascertainable loss of money, property, and/or value of their Class Vehicles.

1121. As a direct and proximate result of Defendant's breach of express warranties, Illinois Plaintiff and members of the Illinois Sub-Class have been damaged in an amount to be determined at trial.

1122. As a result of GM's breach of the express warranty, Illinois Plaintiff and Illinois Sub-Class Members are entitled to legal and equitable relief against GM, including actual damages, specific performance, attorney's fees, costs of suit, and other relief as appropriate.

## COUNT XXVI
### Breach of the Implied Warranty of Merchantability
### 810 ILL. COMP. STAT. §§ 5/2-314 and 5/2A-212
### (On Behalf of the Illinois Sub-Class against Defendant)

1123. Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 671 as if fully set forth herein.

1124. Illinois Plaintiff brings this count on behalf of himself and the Illinois Sub-Class against Defendant.

1125. GM is and was at all relevant times a "merchant" with respect to motor vehicles under 810 Ill. Comp. Stat. §§ 5/2-104(1) and 5/2A-103(3), and a "seller" of motor vehicles under § 5/2-103(1)(d).

1126.  With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under 810 Ill. Comp. Stat. § 5/2A-103(1)(p).

1127.  The Class Vehicles are and were at all relevant times "goods" within the meaning of 810 Ill. Comp. Stat. §§ 5/2-105(1) and 5/2A-103(1)(h).

1128.  A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under 810 Ill. Comp. Stat. §§ 5/2-314 and 5/2A-212.

1129.  GM knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. GM directly sold and marketed Class Vehicles to customers through authorized dealers, like those from whom Illinois Plaintiff and members of the Illinois Sub-Class bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. GM knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Illinois Plaintiff and members of the Illinois Sub-Class, with no modification to the defective Class Vehicles.

1130.  GM provided Illinois Plaintiff and members of the Illinois Sub-Class with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.  However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, inter alia, the Class Vehicles and their lifter

suffered from an inherent defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

1131. This implied warranty included, among other things: (i) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold by GM were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

1132. Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles were and are defective at the time of sale or lease and thereafter as more fully described above. GM knew of this defect at the time these sale or lease transactions occurred.

1133. As a result of GM's breach of the applicable implied warranties, Illinois Plaintiff and members of the Illinois Sub-Class suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Valve Train Defect, Illinois Plaintiff and members of the Illinois Sub-Class were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

1134. GM's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

1135. Illinois Plaintiff and members of the Illinois Sub-Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

1136. Privity is not required here because Illinois Plaintiff and members of the Illinois Sub-Class are intended third-party beneficiaries of contracts between GM and its distributors and dealers, and specifically, of GM's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

1137. Illinois Plaintiff and members of the Illinois Sub-Class were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of warranty would have been futile. GM was also on notice of the Valve Train Defect from the complaints and service requests it received from Illinois Plaintiff and the Class Members and through other internal sources.

1138. Nonetheless, Illinois Plaintiff and members of the Illinois Sub-Class provided notice to GM of the breach of express warranties when they took their

vehicles to GM-authorized provider of warranty repairs.   Illinois Plaintiff also provided notice to GM of its breach of express warranty by letter dated January 25, 2022.

1139. As a direct and proximate cause of GM's breach, Illinois Plaintiff and members of the Illinois Sub-Class suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Illinois Plaintiff and members of the Illinois Sub-Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

1140. As a direct and proximate result of GM's breach of the implied warranty of merchantability, Illinois Plaintiff and members of the Illinois Sub-Class have been damaged in an amount to be proven at trial.

## COUNT XXVII
### Violations of the Illinois Consumer Fraud and Deceptive Business Practices Act
### 815 ILCS 505/1, *et seq*.
### (On Behalf of the Illinois Sub-Class against Defendant)

1141. Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 671 above as if fully set forth herein.

1142. Illinois Plaintiff brings this cause of action on behalf of himself and on behalf of the members of the Illinois Sub-Class.

1143. GM is a "person" as that term is defined in 815 ILCS 505/1(c).

1144. Illinois Plaintiff and the Illinois Sub-Class members are "consumers" as that term is defined in 815 ILCS 505/1(e).

1145. The Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois CFA") prohibits "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression, or omission of any material fact, with intent that others rely upon the concealment, suppression, or omission of such material fact … in the conduct of trade or commerce … whether any person has in fact been misled, deceived or damaged thereby." 815 ILCS 505/2. GM engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated the Illinois CFA.

1146. GM participated in unfair or deceptive trade practices that violated the Illinois CFA.  As described below and alleged throughout the Complaint, by failing to disclose the Valve Train Defect, by concealing the Valve Train Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, GM knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. GM systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Valve Train Defect in the course of its business.

1147. GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

1148. GM's unfair and deceptive acts or practices occurred repeatedly in GM's trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

1149. GM knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

1150. GM knew or should have known that its conduct violated the Illinois CFA.

1151. Defendant was under a duty to Illinois Plaintiff and the Illinois Sub-Class Members to disclose the defective nature of the Class Vehicles because:

   a.    Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

   b.    Defendant made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

   c.    Defendant actively concealed the defective nature of the Class Vehicles from Illinois Plaintiff and the Illinois Sub-Class

Members at the time of sale and thereafter.

1152.  By failing to disclose the Valve Train Defect, Defendant knowingly and intentionally concealed material facts and breached its duty not to do so.

1153. The facts concealed or not disclosed by Defendant to Illinois Plaintiff and the Illinois Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendant's Class Vehicles, or to pay less for them. Whether a vehicle's lifter, rocker arm, and/or valve spring is defective, which can cause stalling, losing power while driving, and hesitation, is a material safety concern. Had Illinois Plaintiff and the Illinois Sub-Class Members known that the Class Vehicles suffered from the Valve Train Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

1154. Illinois Plaintiff and the Illinois Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Valve Train Defect. That is the reasonable and objective consumer expectation for vehicles.

1155.  As a result of Defendant's misconduct, Illinois Plaintiff and the Illinois Sub-Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

1156.  As a direct and proximate result of Defendant's unfair or deceptive acts or practices, Illinois Plaintiff and the Illinois Sub-Class Members have suffered and will continue to suffer actual damages.

1157. GM's violations present a continuing risk to Illinois Plaintiff and the Illinois Sub-Class Members as well as to the general public. GM's unlawful acts and practices complained of herein affect the public interest.

1158. Illinois Plaintiff provided notice of his claims, by letter dated January 25, 2022.

1159. Pursuant to 815 ILCS 505/10a(a), Illinois Plaintiff and the Illinois Sub-Class Members seek monetary relief against GM in the amount of actual damages, as well as punitive damages because GM acted with fraud and/or malice and/or was grossly negligent.

1160. Illinois Plaintiff and the Illinois Sub-Class Members also seeks attorneys' fees, and any other just and proper relief available under 815 Ill. Comp. Stat. § 505/1, *et seq*.

**Claims on Behalf of the Maryland Sub-Class**

**COUNT XXVIII**
**Breach of Express Warranty**
**Md. Com. Law §§ 2-313 and 2A-210**
**(On Behalf of the Maryland Sub-Class against Defendant)**

1161. Plaintiffs repeat and re-allege each and every allegation contained above in paragraphs 1 through 671 above as if fully set forth herein.

1162. Plaintiff Scott Roller ("Maryland Plaintiff") brings this count on behalf of himself and the Maryland Sub-Class against Defendant.

1163.  GM is and was at all relevant times a "merchant" with respect to motor vehicles under Md. Com. Law §§ 2-104(1) and 2A-103(3), and a "seller" of motor vehicles under § 2-103(1)(d).

1164.  With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Md. Com. Law § 2A-103(1)(p).

1165.  The Class Vehicles are and were at all relevant times "goods" within the meaning of Md. Com. Law §§ 2-105(1) and 2A-103(1)(h).

1166.  The valve train systems were manufactured and/or installed in the Class Vehicles by Defendant and are covered by the express warranty.

1167.  Defendant provided all purchasers and lessees of the Class Vehicles with an express warranty described herein, which became a material part of the bargain.  Accordingly, GM's express warranty is an express warranty under Maryland state law.

1168.  In a section entitled "What is Covered," Defendant's express warranty (or New Vehicle Limited Warranty ("NVLW")) provides in relevant part that "[t]he warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." The warranty further provides that "[w]arranty repairs, including, including towing, parts, and labor, will be made at no charge" and "[t]o obtain warranty repairs, take the vehicle to a Chevrolet dealer facility within the warranty period and request the needed repairs."

1169. According to GM, the "Bumper-to-Bumper Coverage is for the first 3 years or 36,000 miles, whichever comes first," if not longer.

1170. Defendant's NVLW and other warranties regarding the Class Vehicles formed a basis of the bargain that was breached when Maryland Plaintiff and members of the Maryland Sub-Class purchased or leased the Class Vehicles with the defective lifter and/or related components.

1171. Maryland Plaintiff and members of the Maryland Sub-Class experienced defects within the warranty period. Despite the existence of the NVLW, Defendant failed to inform Maryland Plaintiff and members of the Maryland Sub-Class that the Class Vehicles were equipped with defective lifters and related components.  When providing repairs under the express warranty, these repairs were ineffective and incomplete and did not provide a permanent repair for the Valve Train Defect.

1172. GM breached the express warranty through the acts and omissions described above, including by promising to repair or adjust defects in materials or workmanship of any part supplied by Defendant and then failing to do so. Defendant has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles materials and workmanship defects.

1173. Privity is not required here because Maryland Plaintiff and members of the Maryland Sub-Class are intended third-party beneficiaries of contracts between GM and its distributors and dealers, and specifically, of GM's express warranties,

including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

1174. Any attempt by GM to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here. Specifically, the warranty limitation is unenforceable because GM knowingly sold or leased defective products without informing consumers about the Valve Train Defect. The time limits are unconscionable and inadequate to protect Maryland Plaintiff and the members of the Maryland Sub-Class. Among other things, Maryland Plaintiff and members of the Maryland Sub-Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by GM and unreasonable favored GM. A gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Valve Train Defect existed between GM and members of the Maryland Sub-Class.

1175. Further, the limited warranty promising to repair and/or correct a manufacturing or workmanship defect fails of its essential purpose because the contractual remedy is insufficient to make Maryland Plaintiff and the members of the Maryland Sub-Class whole, because GM has failed and/or has refused to

adequately provide the promised remedies, i.e., a permanent repair, within a reasonable time.

1176. Maryland Plaintiff was not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Valve Train Defect from the complaints and service requests it received from Class Members, including those formal complaints submitted to NHTSA, and through other internal sources.

1177. Nonetheless, Maryland Plaintiff and members of the Maryland Sub-Class provided notice to GM of the breach of express warranties when they took their vehicles to GM-authorized providers of warranty repairs. Maryland Plaintiff also provided notice to GM of its breach of express warranty by letter dated February 4, 2022.

1178. As a result of GM's breach of the applicable express warranties, owners and/or lessees of the Class Vehicles suffered, and continue to suffer, an ascertainable loss of money, property, and/or value of their Class Vehicles.

1179. As a direct and proximate result of Defendant's breach of express warranties, Maryland Plaintiff and members of the Maryland Sub-Class have been damaged in an amount to be determined at trial.

1180. As a result of GM's breach of the express warranty, Maryland Plaintiff and Maryland Sub-Class Members are entitled to legal and equitable relief against

GM, including actual damages, specific performance, attorney's fees, costs of suit, and other relief as appropriate.

## COUNT XXIX
### Breach of the Implied Warranty of Merchantability
### Md. Com. Law §§ 2-314 and 2A-212
### (On Behalf of the Maryland Sub-Class against Defendant)

1181. Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 671 as if fully set forth herein.

1182. Maryland Plaintiff brings this count on behalf of himself and the Maryland Sub-Class against Defendant.

1183. GM is and was at all relevant times a "merchant" with respect to motor vehicles under Md. Com. Law §§ 2-104(1) and 2A-103(3), and a "seller" of motor vehicles under § 2-103(1)(d).

1184. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Md. Com. Law § 2A-103(1)(p).

1185. The Class Vehicles are and were at all relevant times "goods" within the meaning of Md. Com. Law §§ 2-105(1) and 2A-103(1)(h).

1186. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Md. Com. Law §§ 2-314 and 2A-212.

1187. GM knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. GM directly sold and marketed Class Vehicles

to customers through authorized dealers, like those from whom Maryland Plaintiff and members of the Maryland Sub-Class bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. GM knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Maryland Plaintiff and members of the Maryland Sub-Class, with no modification to the defective Class Vehicles.

1188. GM provided Maryland Plaintiff and members of the Maryland Sub-Class with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold. However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, inter alia, the Class Vehicles and their lifter suffered from an inherent defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

1189. This implied warranty included, among other things: (i) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold by GM were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

1190. Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe

transportation. Instead, the Class Vehicles were and are defective at the time of sale or lease and thereafter as more fully described above. GM knew of this defect at the time these sale or lease transactions occurred.

1191. As a result of GM's breach of the applicable implied warranties, Maryland Plaintiff and members of the Maryland Sub-Class suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Valve Train Defect, Maryland Plaintiff and members of the Maryland Sub-Class were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

1192. GM's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

1193. Maryland Plaintiff and members of the Maryland Sub-Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

1194. Privity is not required here because Maryland Plaintiff and members of the Maryland Sub-Class are intended third-party beneficiaries of contracts between GM and its distributors and dealers, and specifically, of GM's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles. The dealers were not intended to be the ultimate

consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

1195. Maryland Plaintiff and members of the Maryland Sub-Class were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of warranty would have been futile. GM was also on notice of the Valve Train Defect from the complaints and service requests it received from Maryland Plaintiff and the Class Members and through other internal sources.

1196. Nonetheless, Maryland Plaintiff and members of the Maryland Sub-Class provided notice to GM of the breach of express warranties when they took their vehicles to GM-authorized provider of warranty repairs.  Maryland Plaintiff also provided notice to GM of its breach of express warranty by letter dated February 4, 2022.

1197. As a direct and proximate cause of GM's breach, Maryland Plaintiff and members of the Maryland Sub-Class suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Maryland Plaintiff and members of the Maryland Sub-Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

1198. As a direct and proximate result of GM's breach of the implied warranty of merchantability, Maryland Plaintiff and members of the Maryland Sub-Class have been damaged in an amount to be proven at trial.

**COUNT XXX**
**Violations of the Maryland Consumer Protection Act,**
**Md. Code Ann., Com. Law § 13-101, *et seq.***
**(On Behalf of the Maryland Sub-Class against Defendant)**

1199. Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 671 above as if fully set forth herein.

1200. Maryland Plaintiff brings this cause of action on behalf of himself and on behalf of the members of the Maryland Sub-Class.

1201. GM, Maryland Plaintiff, and the Maryland Sub-Class Members are "persons" within the meaning of Md. Code Ann., Com. Law § 13-101(h).

1202. The Maryland Consumer Protection Act ("Maryland CPA") provides that a person may not engage in any unfair and deceptive trade practice in the sale or lease of any consumer good, including representing that goods are of a particular standard, quality, or grade if they are not, advertising goods without intent to sell or lease them as advertised, selling goods knowing that a service, replacement or repair was needed, "failure to state a material fact if the failure deceives or tends to deceive," and "[d]eception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same," Md. Code Ann., Com. Law § 13-301,

regardless of whether the consumer is actually deceived or damaged, Md. Code Ann., Com. Law § 13-302.  GM engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated the Maryland CPA.

1203. GM participated in unfair or deceptive trade practices that violated the Maryland CPA.  As described below and alleged throughout the Complaint, by failing to disclose the Valve Train Defect, by concealing the Valve Train Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, GM knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. GM systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Valve Train Defect in the course of its business.

1204. GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

1205. GM's unfair and deceptive acts or practices occurred repeatedly in GM's trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

1206. GM knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

1207. GM knew or should have known that its conduct violated the Maryland CPA.

1208. Defendant was under a duty to Maryland Plaintiff and the Maryland Sub-Class Members to disclose the defective nature of the Class Vehicles because:

    a. Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

    b. Defendant made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

    c. Defendant actively concealed the defective nature of the Class Vehicles from Maryland Plaintiff and the Maryland Sub-Class Members at the time of sale and thereafter.

1209. By failing to disclose the Valve Train Defect, Defendant knowingly and intentionally concealed material facts and breached its duty not to do so.

1210. The facts concealed or not disclosed by Defendant to Maryland Plaintiff and the Maryland Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendant's Class Vehicles, or to pay less for them. Whether a vehicle's

lifter, rocker arm, and/or valve spring is defective, which can cause stalling, losing power while driving, and hesitation, is a material safety concern. Had Maryland Plaintiff and the Maryland Sub-Class Members known that the Class Vehicles suffered from the Valve Train Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

1211. Maryland Plaintiff and the Maryland Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Valve Train Defect. That is the reasonable and objective consumer expectation for vehicles.

1212. As a result of Defendant's misconduct, Maryland Plaintiff and the Maryland Sub-Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

1213. As a direct and proximate result of Defendant's unfair or deceptive acts or practices, Maryland Plaintiff and the Maryland Sub-Class Members have suffered and will continue to suffer actual damages.

1214. GM's violations present a continuing risk to Maryland Plaintiff and the Maryland Sub-Class Members as well as to the general public. GM's unlawful acts and practices complained of herein affect the public interest.

1215. Maryland Plaintiff provided notice of his claims by letter dated February 4, 2022.

1216. Pursuant to Md. Code Ann., Com. Law § 13-408, Maryland Plaintiff and members of the Maryland Sub-Class seek monetary relief against Ford in the amount of actual damages, attorneys' fees, and any other just and proper relief available under the Maryland CPA.

**Claims on Behalf of the Massachusetts Sub-Class**

<u>**COUNT XXXI**</u>
**Breach of Express Warranty**
**Mass. Gen. Laws ch. 106 §§ 2-313 and 2A-210**
**(On Behalf of the Massachusetts Sub-Class against Defendant)**

1217. Plaintiffs repeat and re-allege each and every allegation contained above in paragraphs 1 through 671 above as if fully set forth herein.

1218. Plaintiffs Joseph Attia and Alexander Purshaga ("Massachusetts Plaintiffs") bring this count on behalf of themselves and the Massachusetts Sub-Class against Defendant.

1219. GM is and was at all relevant times a "merchant" with respect to motor vehicles under Mass. Gen. Laws ch. 106 §§ 2-104(1) and 2A-103(3), and a "seller" of motor vehicles under § 2-103(1)(d).

1220. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Mass. Gen. Laws ch. 106 § 2A-103(1)(p).

1221. The Class Vehicles are and were at all relevant times "goods" within the meaning of Mass. Gen. Laws ch. 106 §§ 2-105(1) and 2A-103(1)(h).

1222. The valve train systems were manufactured and/or installed in the Class Vehicles by Defendant and are covered by the express warranty.

1223. Defendant provided all purchasers and lessees of the Class Vehicles with an express warranty described herein, which became a material part of the bargain. Accordingly, GM's express warranty is an express warranty under Massachusetts state law.

1224. In a section entitled "What is Covered," Defendant's express warranty (or New Vehicle Limited Warranty ("NVLW")) provides in relevant part that "[t]he warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." The warranty further provides that "[w]arranty repairs, including, including towing, parts, and labor, will be made at no charge" and "[t]o obtain warranty repairs, take the vehicle to a Chevrolet dealer facility within the warranty period and request the needed repairs."

1225. According to GM, the "Bumper-to-Bumper Coverage is for the first 3 years or 36,000 miles, whichever comes first," if not longer.

1226. Defendant's NVLW and other warranties regarding the Class Vehicles formed a basis of the bargain that was breached when Massachusetts Plaintiffs and members of the Massachusetts Sub-Class purchased or leased the Class Vehicles with the defective lifter and/or related components.

1227. Massachusetts Plaintiffs and members of the Massachusetts Sub-Class experienced defects within the warranty period. Despite the existence of the NVLW, Defendant failed to inform Massachusetts Plaintiffs and members of the Massachusetts Sub-Class that the Class Vehicles were equipped with defective lifters and related components. When providing repairs under the express warranty, these repairs were ineffective and incomplete and did not provide a permanent repair for the Valve Train Defect.

1228. GM breached the express warranty through the acts and omissions described above, including by promising to repair or adjust defects in materials or workmanship of any part supplied by Defendant and then failing to do so. Defendant has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles materials and workmanship defects.

1229. Privity is not required here because Massachusetts Plaintiffs and members of the Massachusetts Sub-Class are intended third-party beneficiaries of contracts between GM and its distributors and dealers, and specifically, of GM's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

1230. Any attempt by GM to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here. Specifically, the warranty limitation is unenforceable because GM knowingly sold or leased defective products without informing consumers about the Valve Train Defect. The time limits are unconscionable and inadequate to protect Massachusetts Plaintiffs and the members of the Massachusetts Sub-Class. Among other things, Massachusetts Plaintiffs and members of the Massachusetts Sub-Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by GM and unreasonable favored GM. A gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Valve Train Defect existed between GM and members of the Massachusetts Sub-Class.

1231. Further, the limited warranty promising to repair and/or correct a manufacturing or workmanship defect fails of its essential purpose because the contractual remedy is insufficient to make Massachusetts Plaintiffs and the members of the Massachusetts Sub-Class whole, because GM has failed and/or has refused to adequately provide the promised remedies, i.e., a permanent repair, within a reasonable time.

1232. Massachusetts Plaintiffs were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Valve Train Defect

from the complaints and service requests it received from Class Members, including those formal complaints submitted to NHTSA, and through other internal sources.

1233. Nonetheless, Massachusetts Plaintiffs and members of the Massachusetts Sub-Class provided notice to GM of the breach of express warranties when they took their vehicles to GM-authorized providers of warranty repairs. Massachusetts Plaintiffs also provided notice to GM of its breach of express warranty by letter dated February 10, 2022 and March 7, 2022.

1234. As a result of GM's breach of the applicable express warranties, owners and/or lessees of the Class Vehicles suffered, and continue to suffer, an ascertainable loss of money, property, and/or value of their Class Vehicles.

1235. As a direct and proximate result of Defendant's breach of express warranties, Massachusetts Plaintiffs and members of the Massachusetts Sub-Class have been damaged in an amount to be determined at trial.

1236. As a result of GM's breach of the express warranty, Massachusetts Plaintiffs and Massachusetts Sub-Class Members are entitled to legal and equitable relief against GM, including actual damages, specific performance, attorney's fees, costs of suit, and other relief as appropriate.

## COUNT XXXII
### Breach of the Implied Warranty of Merchantability
### Mass. Gen. Laws ch. 106 §§ 2-314 and 2A-212
### (On Behalf of the Massachusetts Sub-Class against Defendant)

1237. Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 671 as if fully set forth herein.

1238. Massachusetts Plaintiffs bring this count on behalf of themselves and the Massachusetts Sub-Class against Defendant.

1239. GM is and was at all relevant times a "merchant" with respect to motor vehicles under Mass. Gen. Laws ch. 106 §§ 2-104(1) and 2A-103(3), and a "seller" of motor vehicles under § 2-103(1)(d).

1240. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Mass. Gen. Laws ch. 106 § 2A-103(1)(p).

1241. The Class Vehicles are and were at all relevant times "goods" within the meaning of Mass. Gen. Laws ch. 106 §§ 2-105(1) and 2A-103(1)(h).

1242. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Mass. Gen. Laws ch. 106 §§ 2-314 and 2A-212.

1243. GM knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. GM directly sold and marketed Class Vehicles to customers through authorized dealers, like those from whom Massachusetts Plaintiffs and members of the Massachusetts Sub-Class bought or leased their

vehicles, for the intended purpose of consumers purchasing the vehicles. GM knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Massachusetts Plaintiffs and members of the Massachusetts Sub-Class, with no modification to the defective Class Vehicles.

1244. GM provided Massachusetts Plaintiffs and members of the Massachusetts Sub-Class with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.  However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, inter alia, the Class Vehicles and their lifter suffered from an inherent defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

1245. This implied warranty included, among other things: (i) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold by GM were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

1246. Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles were and are defective at the time of sale

or lease and thereafter as more fully described above. GM knew of this defect at the time these sale or lease transactions occurred.

1247. As a result of GM's breach of the applicable implied warranties, Massachusetts Plaintiffs and members of the Massachusetts Sub-Class suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Valve Train Defect, Massachusetts Plaintiffs and members of the Massachusetts Sub-Class were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

1248. GM's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

1249. Massachusetts Plaintiffs and members of the Massachusetts Sub-Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

1250. Privity is not required here because Massachusetts Plaintiffs and members of the Massachusetts Sub-Class are intended third-party beneficiaries of contracts between GM and its distributors and dealers, and specifically, of GM's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles. The dealers were not

intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

1251. Massachusetts Plaintiffs and members of the Massachusetts Sub-Class were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of warranty would have been futile. GM was also on notice of the Valve Train Defect from the complaints and service requests it received from Massachusetts Plaintiffs and the Class Members and through other internal sources.

1252. Nonetheless, Massachusetts Plaintiffs and members of the Massachusetts Sub-Class provided notice to GM of the breach of express warranties when they took their vehicles to GM-authorized provider of warranty repairs. Massachusetts Plaintiffs also provided notice to GM of its breach of express warranty by letter dated February 10, 2022 and March 7, 2022.

1253. As a direct and proximate cause of GM's breach, Massachusetts Plaintiffs and members of the Massachusetts Sub-Class suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Massachusetts Plaintiffs and members of the Massachusetts Sub-Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

1254. As a direct and proximate result of GM's breach of the implied warranty of merchantability, Massachusetts Plaintiffs and members of the Massachusetts Sub-Class have been damaged in an amount to be proven at trial.

## COUNT XXXIII
**Violations of the Massachusetts Consumer Protection Act,
Mass. Gen. Laws 93A, § 1, *et seq.*
(On Behalf of the Massachusetts Sub-Class against Defendant)**

1255. Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 671 above as if fully set forth herein.

1256. Massachusetts Plaintiffs bring this cause of action on behalf of themselves and on behalf of the members of the Massachusetts Sub-Class.

1257. GM, Massachusetts Plaintiffs, and the Massachusetts Sub-Class Members are "persons" within the meaning of "persons" within the meaning of Mass. Gen. Laws 93A, § 1(a).

1258. The Massachusetts Consumer Protection Act ("MCPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws 93A, § 2(a).GM engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated the MCPA.

1259. GM participated in unfair or deceptive trade practices that violated the MCPA. As described below and alleged throughout the Complaint, by failing to disclose the Valve Train Defect, by concealing the Valve Train Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting

itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, GM knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. GM systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Valve Train Defect in the course of its business.

1260. GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

1261. GM's unfair and deceptive acts or practices occurred repeatedly in GM's trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

1262. GM knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

1263. GM knew or should have known that its conduct violated the MCPA.

1264. Defendant was under a duty to Massachusetts Plaintiffs and the Massachusetts Sub-Class Members to disclose the defective nature of the Class Vehicles because:

      a.      Defendant was in a superior position to know the true state of

facts about the safety defect in the Class Vehicles;

b.   Defendant made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

c.   Defendant actively concealed the defective nature of the Class Vehicles from Massachusetts Plaintiffs and the Massachusetts Sub-Class Members at the time of sale and thereafter.

1265.  By failing to disclose the Valve Train Defect, Defendant knowingly and intentionally concealed material facts and breached its duty not to do so.

1266. The facts concealed or not disclosed by Defendant to Massachusetts Plaintiffs and the Massachusetts Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendant's Class Vehicles, or to pay less for them. Whether a vehicle's lifter, rocker arm, and/or valve spring is defective, which can cause stalling, losing power while driving, and hesitation, is a material safety concern. Had Massachusetts Plaintiffs and the Massachusetts Sub-Class Members known that the Class Vehicles suffered from the Valve Train Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

1267. Massachusetts Plaintiffs and the Massachusetts Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the

Valve Train Defect. That is the reasonable and objective consumer expectation for vehicles.

1268. As a result of Defendant's misconduct, Massachusetts Plaintiffs and the Massachusetts Sub-Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

1269. As a direct and proximate result of Defendant's unfair or deceptive acts or practices, Massachusetts Plaintiffs and the Massachusetts Sub-Class Members have suffered and will continue to suffer actual damages.

1270. GM's violations present a continuing risk to Massachusetts Plaintiffs and the Massachusetts Sub-Class Members as well as to the general public. GM's unlawful acts and practices complained of herein affect the public interest.

1271. Massachusetts Plaintiffs provided notice of his claims by letter dated February 22, 2022 and March 7, 2022.

1272. Pursuant to Mass. Gen. Laws 93A, § 9, Massachusetts Plaintiffs and members of the Massachusetts Sub-Class seek monetary relief against Defendants measures as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $25 for each Massachusetts Plaintiff and each member of the Massachusetts Sub-Class. Because Defendants' conduct was committed willfully and knowingly, Massachusetts Plaintiffs and members of the Massachusetts Sub-Class are entitled to recover, for Massachusetts Plaintiffs and

each member of the Massachusetts Sub-Class, up to three times actual damages, but no less than two times actual damages.

**Claims on Behalf of the Missouri Sub-Class**

**COUNT XXXIV**
**Breach of Express Warranty,**
**Mo. Rev. Stat. § 400.2-313 AND § 400.2A-210)**
**(On Behalf of the Missouri Sub-Class against Defendant)**

1273. Plaintiffs repeat and re-allege each and every allegation contained above in paragraphs 1 through 671 above as if fully set forth herein.

1274. Plaintiff Lisa Saffell ("Missouri Plaintiff") brings this count on behalf of herself and the Missouri Sub-Class against Defendant.

1275. Plaintiff Lisa Saffell ("Missouri Plaintiff") brings this count on behalf of herself and the Missouri Sub-Class against Defendant.

1276. GM is and was at all relevant times a "merchant" with respect to motor vehicles under Mo. Rev. Stat. § 400.2-104(1) and a "seller" of motor vehicles under § 400.2-314.

1277. With respect to leases, GM is and was at all relevant times a "lessor" with respect to motor vehicles under Mo. Rev. Stat. § 400.2A-103(1)(p) and § 400.2A-212.

1278. The Class Vehicles are and were at all relevant times "goods" within the meaning of Mo. Rev. Stat. § 400.2-105(1) and Mo. Stat. § 400.2A-103(1)(h).

1279. The valve train systems were manufactured and/or installed in the Class Vehicles by Defendant and are covered by the express warranty.

1280. Defendant provided all purchasers and lessees of the Class Vehicles with an express warranty described herein, which became a material part of the bargain. Accordingly, GM's express warranty is an express warranty under Missouri state law.

1281. In a section entitled "What is Covered," Defendant's express warranty (or New Vehicle Limited Warranty ("NVLW")) provides in relevant part that "[t]he warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." The warranty further provides that "[w]arranty repairs, including towing, parts, and labor, will be made at no charge" and "[t]o obtain warranty repairs, take the vehicle to a Chevrolet dealer facility within the warranty period and request the needed repairs."

1282. According to GM, the "Bumper-to-Bumper Coverage is for the first 3 years or 36,000 miles, whichever comes first," if not longer.

1283. Defendant's NVLW and other warranties regarding the Class Vehicles formed a basis of the bargain that was breached when Missouri Plaintiff and members of the Missouri Sub-Class purchased or leased the Class Vehicles with the defective lifter and/or related components.

1284. Missouri Plaintiff and members of the Missouri Sub-Class experienced defects within the warranty period. Despite the existence of the NVLW, Defendant failed to inform Missouri Plaintiff and members of the Missouri Sub-Class that the Class Vehicles were equipped with defective lifters and related components. When providing repairs under the express warranty, these repairs were ineffective and incomplete and did not provide a permanent repair for the Valve Train Defect.

1285. GM breached the express warranty through the acts and omissions described above, including by promising to repair or adjust defects in materials or workmanship of any part supplied by Defendant and then failing to do so. Defendant has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles materials and workmanship defects.

1286. Privity is not required here because Missouri Plaintiff and members of the Missouri Sub-Class are intended third-party beneficiaries of contracts between GM and its distributors and dealers, and specifically, of GM's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

1287. Any attempt by GM to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here. Specifically, the

warranty limitation is unenforceable because GM knowingly sold or leased defective products without informing consumers about the Valve Train Defect. The time limits are unconscionable and inadequate to protect Missouri Plaintiff and the members of the Missouri Sub-Class. Among other things, Missouri Plaintiff and members of the Missouri Sub-Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by GM and unreasonably favored GM. A gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Valve Train Defect existed between GM and members of the Missouri Sub-Class.

1288. Further, the limited warranty promising to repair and/or correct a manufacturing or workmanship defect fails of its essential purpose because the contractual remedy is insufficient to make Missouri Plaintiff and the members of the Missouri Sub-Class whole, because GM has failed and/or has refused to adequately provide the promised remedies, i.e., a permanent repair, within a reasonable time.

1289. Missouri Plaintiff and members of the Missouri Sub-Class were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Valve Train Defect from the complaints and service requests it received from Class Members, including those formal complaints submitted to NHTSA, and through other internal sources.

1290. Nonetheless, Missouri Plaintiff and members of the Missouri Sub-Class provided notice to GM of the breach of express warranties when they took their vehicles to GM-authorized providers of warranty repairs. Missouri Plaintiff also provided notice to GM of its breach of express warranty by calling their customer service line and by letter dated March 14, 2022.

1291. As a result of GM's breach of the applicable express warranties, owners and/or lessees of the Class Vehicles suffered, and continue to suffer, an ascertainable loss of money, property, and/or value of their Class Vehicles.

1292. As a direct and proximate result of Defendant's breach of express warranties, Missouri Plaintiff and members of the Missouri Sub-Class have been damaged in an amount to be determined at trial.

1293. As a result of GM's breach of the express warranty, Missouri Plaintiff and Missouri Sub-Class Members are entitled to legal and equitable relief against GM, including actual damages, specific performance, attorney's fees, costs of suit, and other relief as appropriate.

## COUNT XXXV
**Breach of the Implied Warranty of Merchantability,**
**Mo. Rev. Stat. § 400.2-314 and § 400.2A-212**
**(On Behalf of the Missouri Sub-Class against Defendant)**

1294. Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 671 above as if fully set forth herein.

369

1295. Missouri Plaintiff brings this count on behalf of herself and the Missouri Sub-Class against Defendant.

1296. GM is and was at all relevant times a "merchant" with respect to motor vehicles under Mo. Rev. Stat. § 400.2-104(1) and a "seller" of motor vehicles under § 400.2-314.

1297. With respect to leases, GM is and was at all relevant times a "lessor" with respect to motor vehicles under Mo. Rev. Stat. § 400.2A-103(1)(p) and § 400.2A-212.

1298. The Class Vehicles are and were at all relevant times "goods" within the meaning of Mo. Rev. Stat. § 400.2-105(1) and Mo. Stat. § 400.2A-103(1)(h).

1299. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Mo. Rev. Stat. § 400.2-314 and § 400.2A-212.

1300. GM knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. GM directly sold and marketed Class Vehicles to customers through authorized dealers, like those from whom Missouri Plaintiff and members of the Missouri Sub-Class bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. GM knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Missouri Plaintiff and members of the Missouri Sub-Class, with no modification to the defective Class Vehicles.

1301. GM provided Missouri Plaintiff and members of the Missouri Sub-Class with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold. However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, inter alia, the Class Vehicles and their lifter suffered from an inherent defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

1302. This implied warranty included, among other things: (i) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold by GM were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

1303. Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles were and are defective at the time of sale or lease and thereafter as more fully described above. GM knew of this defect at the time these sale or lease transactions occurred.

1304. As a result of GM's breach of the applicable implied warranties, Missouri Plaintiff and members of the Missouri Sub-Class suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a

result of the Valve Train Defect, Missouri Plaintiff and members of the Missouri Sub-Class were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

1305. GM's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

1306. Missouri Plaintiff and members of the Missouri Sub-Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

1307. Privity is not required here because Missouri Plaintiff and members of the Missouri Sub-Class are intended third-party beneficiaries of contracts between GM and its distributors and dealers, and specifically, of GM's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

1308. Missouri Plaintiff and members of the Missouri Sub-Class were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of warranty would have been futile. GM was also on notice of the

Valve Train Defect from the complaints and service requests it received from Missouri Plaintiff and the Class Members and through other internal sources.

1309. Nonetheless, Missouri Plaintiff and members of the Missouri Sub-Class provided notice to GM of the breach of express warranties when they took their vehicles to GM-authorized provider of warranty repairs. Missouri Plaintiff also provided notice to GM of its breach of express warranty by letter dated March 14, 2022.

1310. As a direct and proximate cause of GM's breach, Missouri Plaintiff and members of the Missouri Sub-Class suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Missouri Plaintiff and members of the Missouri Sub-Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

1311. As a direct and proximate result of GM's breach of the implied warranty of merchantability, Missouri Plaintiff and members of the Missouri Sub-Class have been damaged in an amount to be proven at trial.

**COUNT XXXVI**
**Violations of the Missouri Merchandising Practices Act,**
**Mo. Rev. Stat. § 407.010, *et seq*.**
**(On Behalf of the Missouri Sub-Class against Defendant)**

1312. Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 671 above as if fully set forth herein.

1313. Missouri Plaintiff brings this cause of action on behalf of herself and on behalf of the members of the Missouri Sub-Class.

1314. GM, Missouri Plaintiff and members of the Missouri Sub-Class are "persons" within the meaning of the Missouri Merchandising Practices Act ("Missouri MPA"), Mo. Rev. Stat. § 407.010(5).

1315. GM engaged in "trade" or "commerce" in the State of Missouri within the meaning of Mo. Rev. Stat. § 407.010(7).

1316. The Missouri MPA makes unlawful the "act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise." Mo. Rev. Stat. § 407.020. GM engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated the Missouri MPA.

1317. GM participated in unfair or deceptive trade practices that violated the Missouri MPA. As described below and alleged throughout the Complaint, by failing to disclose the Valve Train Defect, by concealing the Valve Train Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, GM knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. GM systematically misrepresented, concealed,

suppressed, or omitted material facts relating to the Class Vehicles and the Valve Train Defect in the course of its business.

1318. GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

1319. GM's unfair and deceptive acts or practices occurred repeatedly in GM's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

1320. GM knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

1321. GM knew or should have known that its conduct violated the Missouri MPA.

1322. Defendant was under a duty to Missouri Plaintiff and the Missouri Sub-Class Members to disclose the defective nature of the Class Vehicles because:

      a.    Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

      b.    Defendant made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

c.     Defendant actively concealed the defective nature of the Class Vehicles from Missouri Plaintiff and the Missouri Sub-Class Members at the time of sale and thereafter.

1323.  By failing to disclose the Valve Train Defect, Defendant knowingly and intentionally concealed material facts and breached its duty not to do so.

1324.  The facts concealed or not disclosed by Defendant to Missouri Plaintiff and the Missouri Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendant's Class Vehicles, or to pay less for them. Whether a vehicle's lifter, rocker arm, and/or valve spring is defective, which can cause stalling, losing power while driving, and hesitation, is a material safety concern. Had Missouri Plaintiff and the Missouri Sub-Class Members known that the Class Vehicles suffered from the Valve Train Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

1325.  Missouri Plaintiff and the Missouri Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Valve Train Defect. That is the reasonable and objective consumer expectation for vehicles.

1326. As a result of Defendant's misconduct, Missouri Plaintiff and the Missouri Sub-Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

1327.  As a direct and proximate result of Defendant's unfair or deceptive acts or practices, Missouri Plaintiff and the Missouri Sub-Class Members have suffered and will continue to suffer actual damages.

1328.  GM's violations present a continuing risk to Missouri Plaintiff and the Missouri Sub-Class Members as well as to the general public. GM's unlawful acts and practices complained of herein affect the public interest.

1329.  Missouri Plaintiff provided notice of her claims, including a written demand for relief, by letter dated March 14, 2022.

1330.  GM is liable to Missouri Plaintiff and Missouri Sub-Class Members for damages in amounts to be proven at trial, including actual damages, attorneys' fees, costs, and punitive damages, as well as injunctive relief enjoining GM's unfair and deceptive practices, and any other just and proper relief available under Mo. Rev. Stat. § 407.025.

**Claims on Behalf of the Nevada Sub-Class**

<u>**COUNT XXXVII**</u>
**Breach of Express Warranty,**
**Nev. Rev. Stat. §§ 104.2313 AND 104A.2210**
**(On Behalf of the Nevada Sub-Class against Defendant)**

1331.  Plaintiffs repeat and re-allege each and every allegation contained above in paragraphs 1 through 671 above as if fully set forth herein.

1332. Plaintiffs Brian Hess and Jessica Martin-Wasser ("Nevada Plaintiffs") bring this count on behalf of themselves and the Nevada Sub-Class against Defendant.

1333. GM is and was at all relevant times a "merchant" with respect to motor vehicles under Nev. Rev. Stat. §§ 104.2104(1) and 104A.2103(3), and "sellers" of motor vehicles under § 104.2103(1)(c).

1334. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Nev. Rev. Stat. § 104A.2103(1)(p).

1335. The Class Vehicles are and were at all relevant times "goods" within the meaning of Nev. Rev. Stat. §§ 104.2105(1) and 104A.2103(1)(h).

1336. The valve train systems were manufactured and/or installed in the Class Vehicles by Defendant and are covered by the express warranty.

1337. Defendant provided all purchasers and lessees of the Class Vehicles with an express warranty described herein, which became a material part of the bargain. Accordingly, GM's express warranty is an express warranty under Nevada state law.

1338. In a section entitled "What is Covered," Defendant's express warranty (or New Vehicle Limited Warranty ("NVLW")) provides in relevant part that "[t]he warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." The warranty further provides that

"[w]arranty repairs, including, including towing, parts, and labor, will be made at no charge" and "[t]o obtain warranty repairs, take the vehicle to a Chevrolet dealer facility within the warranty period and request the needed repairs."

1339. According to GM, the "Bumper-to-Bumper Coverage is for the first 3 years or 36,000 miles, whichever comes first," if not longer.

1340. Defendant's NVLW and other warranties regarding the Class Vehicles formed a basis of the bargain that was breached when Nevada Plaintiffs and members of the Nevada Sub-Class purchased or leased the Class Vehicles with the defective lifter and/or related components.

1341. Nevada Plaintiffs and members of the Nevada Sub-Class experienced defects within the warranty period. Despite the existence of the NVLW, Defendant failed to inform Nevada Plaintiffs and members of the Nevada Sub-Class that the Class Vehicles were equipped with defective lifters and related components.  When providing repairs under the express warranty, these repairs were ineffective and incomplete and did not provide a permanent repair for the Valve Train Defect.

1342. GM breached the express warranty through the acts and omissions described above, including by promising to repair or adjust defects in materials or workmanship of any part supplied by Defendant and then failing to do so. Defendant has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles materials and workmanship defects.

1343. Privity is not required here because Nevada Plaintiffs and members of the Nevada Sub-Class are intended third-party beneficiaries of contracts between GM and its distributors and dealers, and specifically, of GM's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

1344. Any attempt by GM to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here. Specifically, the warranty limitation is unenforceable because GM knowingly sold or leased defective products without informing consumers about the Valve Train Defect. The time limits are unconscionable and inadequate to protect Nevada Plaintiffs and the members of the Nevada Sub-Class. Among other things, Nevada Plaintiffs and members of the Nevada Sub-Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by GM and unreasonable favored GM. A gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Valve Train Defect existed between GM and members of the Nevada Sub-Class.

1345. Further, the limited warranty promising to repair and/or correct a manufacturing or workmanship defect fails of its essential purpose because the

contractual remedy is insufficient to make Nevada Plaintiffs and the members of the Nevada Sub-Class whole, because GM has failed and/or has refused to adequately provide the promised remedies, i.e., a permanent repair, within a reasonable time.

1346. Nevada Plaintiffs were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Valve Train Defect from the complaints and service requests it received from Class Members, including those formal complaints submitted to NHTSA, and through other internal sources.

1347. Nonetheless, Nevada Plaintiffs and members of the Nevada Sub-Class provided notice to GM of the breach of express warranties when they took their vehicles to GM-authorized providers of warranty repairs.  Nevada Plaintiffs also provided notice to GM of its breach of express warranty by letter dated March 11, 2022.

1348.  As a result of GM's breach of the applicable express warranties, owners and/or lessees of the Class Vehicles suffered, and continue to suffer, an ascertainable loss of money, property, and/or value of their Class Vehicles.

1349. As a direct and proximate result of Defendant's breach of express warranties, Nevada Plaintiffs and members of the Nevada Sub-Class have been damaged in an amount to be determined at trial.

1350. As a result of GM's breach of the express warranty, Nevada Plaintiffs and Nevada Sub-Class Members are entitled to legal and equitable relief against

GM, including actual damages, specific performance, attorney's fees, costs of suit, and other relief as appropriate.

## COUNT XXXVIII
### Breach of the Implied Warranty of Merchantability,
### Nev. Rev. Stat. §§ 104.2314 AND 104A.2212
### (On Behalf of the Nevada Sub-Class against Defendant)

1351. Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 671 above as if fully set forth herein.

1352. Nevada Plaintiffs bring this count on behalf of themselves and the Nevada Sub-Class against Defendant.

1353. GM is and was at all relevant times a "merchant" with respect to motor vehicles under Nev. Rev. Stat. §§ 104.2104(1) and 104A.2103(3), and "sellers" of motor vehicles under § 104.2103(1)(c).

1354. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Nev. Rev. Stat. § 104A.2103(1)(p).

1355. The Class Vehicles are and were at all relevant times "goods" within the meaning of Nev. Rev. Stat. §§ 104.2105(1) and 104A.2103(1)(h).

1356. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Nev. Rev. Stat. §§ 104.2314 and 104A.2212.

1357. GM knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. GM directly sold and marketed Class Vehicles

to customers through authorized dealers, like those from whom Nevada Plaintiffs and members of the Nevada Sub-Class bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. GM knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Nevada Plaintiffs and members of the Nevada Sub-Class, with no modification to the defective Class Vehicles.

1358. GM provided Nevada Plaintiffs and members of the Nevada Sub-Class with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold. However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, inter alia, the Class Vehicles and their lifter suffered from an inherent defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

1359. This implied warranty included, among other things: (i) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold by GM were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

1360. Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe

transportation. Instead, the Class Vehicles were and are defective at the time of sale or lease and thereafter as more fully described above. GM knew of this defect at the time these sale or lease transactions occurred.

1361. As a result of GM's breach of the applicable implied warranties, Nevada Plaintiffs and members of the Nevada Sub-Class suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Valve Train Defect, Nevada Plaintiffs and members of the Nevada Sub-Class were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

1362. GM's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

1363. Nevada Plaintiffs and members of the Nevada Sub-Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

1364. Privity is not required here because Nevada Plaintiffs and members of the Nevada Sub-Class are intended third-party beneficiaries of contracts between GM and its distributors and dealers, and specifically, of GM's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles.  The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements

provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

1365. Nevada Plaintiffs and members of the Nevada Sub-Class were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of warranty would have been futile. GM was also on notice of the Valve Train Defect from the complaints and service requests it received from Nevada Plaintiffs and the Class Members and through other internal sources.

1366. Nonetheless, Nevada Plaintiffs and members of the Nevada Sub-Class provided notice to GM of the breach of express warranties when they took their vehicles to GM-authorized providers of warranty repairs.  Nevada Plaintiffs also provided notice to GM of its breach of express warranty by letter dated March 11, 2022.

1367.  As a direct and proximate cause of GM's breach, Nevada Plaintiffs and members of the Nevada Sub-Class suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Nevada Plaintiffs and members of the Nevada Sub-Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

1368. As a direct and proximate result of GM's breach of the implied warranty of merchantability, Nevada Plaintiffs and members of the Nevada Sub-Class have been damaged in an amount to be proven at trial.

**COUNT XXXIX**
**Violations of the Nevada Deceptive Trade Practices Act,**
**Nev. Rev. Stat. § 598.0903, *et seq*.**
**(On Behalf of the Nevada Sub-Class against Defendant)**

1369. Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 671 above as if fully set forth herein.

1370. Nevada Plaintiffs bring this cause of action on behalf of themselves and on behalf of the members of the Nevada Sub-Class.

1371. The Nevada Consumer Protection Act ("Nevada DTPA") broadly prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Wash. Rev. Code § 19.86.020. The Nevada Deceptive Trade Practices Act ("Nevada DTPA"), Nev. Rev. Stat. § 598.0903, et. seq., prohibits the use of deceptive trade practices in the course of business and occupation. Under Nevada law, deceptive trade practices include, but are not limited to, "[k]nowingly mak[ing] a false representation as to the characteristics, ingredients, uses, benefits, alterations or quantities of goods or services for sale or lease" or "[r]epresenting that goods or services for sale or lease are of a particular standard, quality or grade, or that such goods are of a particular style or model, if he or she knows or should know that they are of another standard, quality, grade, style or model." Nev. Rev. Stat. Ann. § 598.0915(5), (7). See also Nev. Rev. Stat. Ann. § 598.0915(9), (15), Nev. Rev. Stat. Ann. § 598.0925. GM

engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated the Nevada DTPA.

1372. GM participated in unfair or deceptive trade practices that violated the Nevada DTPA. As described below and alleged throughout the Complaint, by failing to disclose the Valve Train Defect, by concealing the Valve Train Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, GM knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. GM systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Valve Train Defect in the course of its business.

1373. GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

1374. GM's unfair and deceptive acts or practices occurred repeatedly in GM's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

1375. GM knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

1376. GM knew or should have known that its conduct violated the Nevada DTPA.

1377. Defendant was under a duty to Nevada Plaintiffs and the Nevada Sub-Class Members to disclose the defective nature of the Class Vehicles because:

a. Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

a. Defendant made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

b. Defendant actively concealed the defective nature of the Class Vehicles from Nevada Plaintiffs and the Nevada Sub-Class Members at the time of sale and thereafter.

1378. By failing to disclose the Valve Train Defect, Defendant knowingly and intentionally concealed material facts and breached its duty not to do so.

1379. The facts concealed or not disclosed by Defendant to Nevada Plaintiffs and the Nevada Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendant's Class Vehicles, or to pay less for them. Whether a vehicle's lifter,

rocker arm, and/or valve spring is defective, which can cause stalling, losing power while driving, and hesitation, is a material safety concern. Had Nevada Plaintiffs and the Nevada Sub-Class Members known that the Class Vehicles suffered from the Valve Train Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

1380. Nevada Plaintiffs and the Nevada Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Valve Train Defect. That is the reasonable and objective consumer expectation for vehicles.

1381. As a result of Defendant's misconduct, Nevada Plaintiffs and the Nevada Sub-Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

1382. As a direct and proximate result of Defendant's unfair or deceptive acts or practices, Nevada Plaintiffs and the Nevada Sub-Class Members have suffered and will continue to suffer actual damages.

1383. GM's violations present a continuing risk to Nevada Plaintiffs and the Nevada Sub-Class Members as well as to the general public.  GM's unlawful acts and practices complained of herein affect the public interest.

1384. Pursuant to Nev. Rev. Stat. § 41.600, the Nevada Plaintiffs and Nevada Sub-Class Members seek an order enjoining Defendants' unfair or deceptive acts or practices and awarding damages and any other just and proper relief available under the Nevada DTPA.

**Claims on Behalf of the New Jersey Sub-Class**

<u>COUNT XL</u>
**Breach of Express Warranty,**
**N.J. Stat. Ann. §§ 12A:2-313 and 2A-210**
**(On Behalf of the New Jersey Sub-Class against Defendant)**

1385. Plaintiffs repeat and re-allege each and every allegation contained above in paragraphs 1 through 671 above as if fully set forth herein.

1386. Plaintiffs Daniel Demarest and Paul Mouradjian ("New Jersey Plaintiffs") brings this count on behalf of themselves and the New Jersey Sub-Class against Defendant.

1387. GM is and was at all relevant times a "merchant" with respect to motor vehicles under N.J. Stat. Ann. § 12A:2-104(1) and a "seller" of motor vehicles under § 2-103(1)(d).

1388. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under N.J. Stat. Ann.§ 12A:2A-103(1)(p).

1389. The Class Vehicles are and were at all relevant times "goods" within the meaning of N.J. Stat. Ann.§§ 12A:2-105(1) and 2A-103(1)(h).

1390. The valve train systems were manufactured and/or installed in the Class Vehicles by Defendant and are covered by the express warranty.

1391. Defendant provided all purchasers and lessees of the Class Vehicles with an express warranty described herein, which became a material part of the

bargain. Accordingly, GM's express warranty is an express warranty under New Jersey state law.

1392. In a section entitled "What is Covered," Defendant's express warranty (or New Vehicle Limited Warranty ("NVLW")) provides in relevant part that "[t]he warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." The warranty further provides that "[w]arranty repairs, including, including towing, parts, and labor, will be made at no charge" and "[t]o obtain warranty repairs, take the vehicle to a Chevrolet dealer facility within the warranty period and request the needed repairs."

1393. According to GM, the "Bumper-to-Bumper Coverage is for the first 3 years or 36,000 miles, whichever comes first," if not longer.

1394. Defendant's NVLW and other warranties regarding the Class Vehicles formed a basis of the bargain that was breached when New Jersey Plaintiffs and members of the New Jersey Sub-Class purchased or leased the Class Vehicles with the defective lifter and/or related components.

1395. New Jersey Plaintiffs and members of the New Jersey Sub-Class experienced defects within the warranty period. Despite the existence of the NVLW, Defendant failed to inform New Jersey Plaintiffs and members of the New Jersey Sub-Class that the Class Vehicles were equipped with defective lifters and related components. When providing repairs under the express warranty, these repairs were

ineffective and incomplete and did not provide a permanent repair for the Valve Train Defect.

1396. GM breached the express warranty through the acts and omissions described above, including by promising to repair or adjust defects in materials or workmanship of any part supplied by Defendant and then failing to do so. Defendant has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles materials and workmanship defects.

1397. Privity is not required here because New Jersey Plaintiffs and members of the New Jersey Sub-Class are intended third-party beneficiaries of contracts between GM and its distributors and dealers, and specifically, of GM's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

1398. Any attempt by GM to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here. Specifically, the warranty limitation is unenforceable because GM knowingly sold or leased defective products without informing consumers about the Valve Train Defect. The time limits are unconscionable and inadequate to protect New Jersey Plaintiffs and the members of the New Jersey Sub-Class. Among other things, New Jersey Plaintiffs

and members of the New Jersey Sub-Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by GM and unreasonable favored GM. A gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Valve Train Defect existed between GM and members of the New Jersey Sub-Class.

1399. Further, the limited warranty promising to repair and/or correct a manufacturing or workmanship defect fails of its essential purpose because the contractual remedy is insufficient to make New Jersey Plaintiffs and the members of the New Jersey Sub-Class whole, because GM has failed and/or has refused to adequately provide the promised remedies, i.e., a permanent repair, within a reasonable time.

1400. New Jersey Plaintiffs were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Valve Train Defect from the complaints and service requests it received from Class Members, including those formal complaints submitted to NHTSA, and through other internal sources.

1401. Nonetheless, New Jersey Plaintiffs and members of the New Jersey Sub-Class provided notice to GM of the breach of express warranties when they took their vehicles to GM-authorized providers of warranty repairs. New Jersey Plaintiffs

also provided notice to GM of its breach of express warranty by letters dated November 8, 2021 and March 18, 2022.

1402. As a result of GM's breach of the applicable express warranties, owners and/or lessees of the Class Vehicles suffered, and continue to suffer, an ascertainable loss of money, property, and/or value of their Class Vehicles.

1403. As a direct and proximate result of Defendant's breach of express warranties, New Jersey Plaintiffs and members of the New Jersey Sub-Class have been damaged in an amount to be determined at trial.

1404. As a result of GM's breach of the express warranty, New Jersey Plaintiffs and New Jersey Sub-Class Members are entitled to legal and equitable relief against GM, including actual damages, specific performance, attorney's fees, costs of suit, and other relief as appropriate.

## COUNT XLI
### Breach of the Implied Warranty of Merchantability,
### N.J. Stat. Ann. §§ 12A:2-314 and 2A-212
### (On Behalf of the New Jersey Sub-Class against Defendant)

1405. Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 671 above as if fully set forth herein.

1406. New Jersey Plaintiffs bring this count on behalf of themselves and the New Jersey Sub-Class against Defendant.

1407. GM is and was at all relevant times a "merchant" with respect to motor vehicles under N.J. Stat. Ann. § 12A:2-104(1) and a "seller" of motor vehicles under § 2-103(1)(d).

1408. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under N.J. Stat. Ann.§ 12A:2A-103(1)(p).

1409. The Class Vehicles are and were at all relevant times "goods" within the meaning of N.J. Stat. Ann.§§ 12A:2-105(1) and 2A-103(1)(h).

1410. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under N.J. Stat. Ann. §§ 12A:2-314 and 2A-212.

1411. GM knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. GM directly sold and marketed Class Vehicles to customers through authorized dealers, like those from whom New Jersey Plaintiffs and members of the New Jersey Sub-Class bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. GM knew that the Class Vehicles would and did pass unchanged from the authorized dealers to New Jersey Plaintiffs and members of the New Jersey Sub-Class, with no modification to the defective Class Vehicles.

1412. GM provided New Jersey Plaintiffs and members of the New Jersey Sub-Class with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were

sold.  However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, inter alia, the Class Vehicles and their lifter suffered from an inherent defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

1413. This implied warranty included, among other things: (i) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold by GM were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

1414. Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles were and are defective at the time of sale or lease and thereafter as more fully described above. GM knew of this defect at the time these sale or lease transactions occurred.

1415. As a result of GM's breach of the applicable implied warranties, New Jersey Plaintiffs and members of the New Jersey Sub-Class suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Valve Train Defect, New Jersey Plaintiffs and members of the New Jersey Sub-Class were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

1416. GM's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

1417. New Jersey Plaintiffs and members of the New Jersey Sub-Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

1418. Privity is not required here because New Jersey Plaintiffs and members of the New Jersey Sub-Class are intended third-party beneficiaries of contracts between GM and its distributors and dealers, and specifically, of GM's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles.  The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

1419. New Jersey Plaintiffs and members of the New Jersey Sub-Class were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of warranty would have been futile. GM was also on notice of the Valve Train Defect from the complaints and service requests it received from New Jersey Plaintiffs and the Class Members and through other internal sources.

1420. Nonetheless, New Jersey Plaintiffs and members of the New Jersey Sub-Class provided notice to GM of the breach of express warranties when they took their vehicles to GM-authorized provider of warranty repairs. New Jersey Plaintiffs also provided notice to GM of its breach of express warranty by letters dated November 8, 2021 and March 18, 2022.

1421. As a direct and proximate cause of GM's breach, New Jersey Plaintiffs and members of the New Jersey Sub-Class suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, New Jersey Plaintiffs and members of the New Jersey Sub-Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

1422. As a direct and proximate result of GM's breach of the implied warranty of merchantability, New Jersey Plaintiffs and members of the New Jersey Sub-Class have been damaged in an amount to be proven at trial.

<u>COUNT XLII</u>
**Violation of the New Jersey Consumer Fraud Act,**
**N.J. Stat. Ann. §§ 56:8-1, *et seq.***
**(On Behalf of the New Jersey Sub-Class against Defendant)**

1423. Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 671 above as if fully set forth herein.

1424. New Jersey Plaintiffs bring this cause of action on behalf of themselves and on behalf of the members of the New Jersey Sub-Class.

1425. GM, New Jersey Plaintiffs, and the New Jersey Sub-Class Members "persons" within the meaning of the New Jersey Consumer Fraud Act ("New Jersey CFA"), N.J. Stat. Ann. § 56:8-1(d).

1426. GM engaged in "sales" of "merchandise" within the meaning of N.J. Stat. Ann. § 56:8-1(c), (d).

1427. The New Jersey CFA makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentations, or the knowing concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby…" N.J. Stat. Ann. § 56:8-2. GM engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated the New Jersey CFA.

1428. GM participated in unfair or deceptive trade practices that violated the New Jersey CFA. As described below and alleged throughout the Complaint, by failing to disclose the Valve Train Defect, by concealing the Valve Train Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, GM knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. GM systematically misrepresented, concealed,

suppressed, or omitted material facts relating to the Class Vehicles and the Valve Train Defect in the course of its business.

1429. GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

1430. GM's unfair and deceptive acts or practices occurred repeatedly in GM's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

1431. GM knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

1432. GM knew or should have known that its conduct violated the New Jersey CFA.

1433. Defendant was under a duty to New Jersey Plaintiffs and the New Jersey Sub-Class Members to disclose the defective nature of the Class Vehicles because:

    a.    Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

    b.    Defendant made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class

Vehicles; and

c.   Defendant actively concealed the defective nature of the Class Vehicles from New Jersey Plaintiffs and the New Jersey Sub-Class Members at the time of sale and thereafter.

1434.  By failing to disclose the Valve Train Defect, Defendant knowingly and intentionally concealed material facts and breached its duty not to do so.

1435. The facts concealed or not disclosed by Defendant to New Jersey Plaintiffs and the New Jersey Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendant's Class Vehicles, or to pay less for them. Whether a vehicle's lifter, rocker arm, and/or valve spring is defective, which can cause stalling, losing power while driving, and hesitation, is a material safety concern. Had New Jersey Plaintiffs and the New Jersey Sub-Class Members known that the Class Vehicles suffered from the Valve Train Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

1436. New Jersey Plaintiffs and the New Jersey Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Valve Train Defect. That is the reasonable and objective consumer expectation for vehicles.

1437. As a result of Defendant's misconduct, New Jersey Plaintiffs and the New Jersey Sub-Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

1438. As a direct and proximate result of Defendant's unfair or deceptive acts or practices, New Jersey Plaintiffs and the New Jersey Sub-Class Members have suffered and will continue to suffer actual damages.

1439. GM's violations present a continuing risk to New Jersey Plaintiffs and the New Jersey Sub-Class Members as well as to the general public.  GM's unlawful acts and practices complained of herein affect the public interest.

1440. Pursuant to N.J. Stat. Ann. § 56:8-19, New Jersey Plaintiffs and the New Jersey Sub- Class Members seek an order enjoining Ford's unlawful conduct, actual damages, treble damages, attorneys' fees, costs, and any other just and proper relief available under the New Jersey CFA.

**Claims on Behalf of the New Mexico Sub-Class**

**COUNT XLIII**
**Breach of Express Warranty,**
**N.M. Stat. Ann. § 55-2-313AND 55-2A-210**
**(On Behalf of the New Mexico Sub-Class against Defendant)**

1441. Plaintiffs repeat and re-allege each and every allegation contained above in paragraphs 1 through 671 above as if fully set forth herein.

1442. Plaintiffs Randall Thorson and Salomé Rodriguez-Thorson ("New Mexico Plaintiffs") brings this count on behalf of themselves and the New Mexico Sub-Class against Defendant.

1443. GM is and was at all relevant times a "merchant" with respect to motor vehicles under N.M. Stat. Ann. § 55-2-104(1) and 55-2A-103(3), and a "seller" of motor vehicles under § 55-2-103(1)(d).

1444. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under N.M. Stat. Ann. § 55-2A-103(1)(p).

1445. The Class Vehicles are and were at all relevant times "goods" within the meaning of N.M. Stat. Ann. §§ 7-2-105(1) and 55-2A-103(1)(h).

1446. The valve train systems were manufactured and/or installed in the Class Vehicles by Defendant and are covered by the express warranty.

1447. Defendant provided all purchasers and lessees of the Class Vehicles with an express warranty described herein, which became a material part of the bargain. Accordingly, GM's express warranty is an express warranty under New Mexico state law.

1448. In a section entitled "What is Covered," Defendant's express warranty (or New Vehicle Limited Warranty ("NVLW")) provides in relevant part that "[t]he warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." The warranty further provides that

"[w]arranty repairs, including, including towing, parts, and labor, will be made at no charge" and "[t]o obtain warranty repairs, take the vehicle to a Chevrolet dealer facility within the warranty period and request the needed repairs."

1449. According to GM, the "Bumper-to-Bumper Coverage is for the first 3 years or 36,000 miles, whichever comes first," if not longer.

1450. Defendant's NVLW and other warranties regarding the Class Vehicles formed a basis of the bargain that was breached when New Mexico Plaintiffs and members of the New Mexico Sub-Class purchased or leased the Class Vehicles with the defective lifter and/or related components.

1451. New Mexico Plaintiffs and members of the New Mexico Sub-Class experienced defects within the warranty period. Despite the existence of the NVLW, Defendant failed to inform New Mexico Plaintiffs and members of the New Mexico Sub-Class that the Class Vehicles were equipped with defective lifters and related components. When providing repairs under the express warranty, these repairs were ineffective and incomplete and did not provide a permanent repair for the Valve Train Defect.

1452. GM breached the express warranty through the acts and omissions described above, including by promising to repair or adjust defects in materials or workmanship of any part supplied by Defendant and then failing to do so. Defendant has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles materials and workmanship defects.

1453. Privity is not required here because New Mexico Plaintiffs and members of the New Mexico Sub-Class are intended third-party beneficiaries of contracts between GM and its distributors and dealers, and specifically, of GM's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

1454. Any attempt by GM to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here. Specifically, the warranty limitation is unenforceable because GM knowingly sold or leased defective products without informing consumers about the Valve Train Defect. The time limits are unconscionable and inadequate to protect New Mexico Plaintiffs and the members of the New Mexico Sub-Class. Among other things, New Mexico Plaintiffs and members of the New Mexico Sub-Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by GM and unreasonable favored GM. A gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Valve Train Defect existed between GM and members of the New Mexico Sub-Class.

1455. Further, the limited warranty promising to repair and/or correct a manufacturing or workmanship defect fails of its essential purpose because the contractual remedy is insufficient to make New Mexico Plaintiffs and the members of the New Mexico Sub-Class whole, because GM has failed and/or has refused to adequately provide the promised remedies, i.e., a permanent repair, within a reasonable time.

1456. New Mexico Plaintiffs were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Valve Train Defect from the complaints and service requests it received from Class Members, including those formal complaints submitted to NHTSA, and through other internal sources.

1457. Nonetheless, New Mexico Plaintiffs and members of the New Mexico Sub-Class provided notice to GM of the breach of express warranties when they took their vehicles to GM-authorized providers of warranty repairs. New Mexico Plaintiffs also provided notice to GM of its breach of express warranty by letter dated January 20, 2022.

1458. As a result of GM's breach of the applicable express warranties, owners and/or lessees of the Class Vehicles suffered, and continue to suffer, an ascertainable loss of money, property, and/or value of their Class Vehicles.

1459. As a direct and proximate result of Defendant's breach of express warranties, New Mexico Plaintiffs and members of the New Mexico Sub-Class have been damaged in an amount to be determined at trial.

1460. As a result of GM's breach of the express warranty, New Mexico Plaintiffs and New Mexico Sub-Class Members are entitled to legal and equitable relief against GM, including actual damages, specific performance, attorney's fees, costs of suit, and other relief as appropriate.

### COUNT XLIV
**Breach of the Implied Warranty of Merchantability,**
**N.M. Stat. Ann. §§ 55-2-314 and 55-2A-212**
**(On Behalf of the New Mexico Sub-Class against Defendant)**

1461. Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 671 as if fully set forth herein.

1462. New Mexico Plaintiffs brings this count on behalf of himself and the New Mexico Sub-Class against Defendant.

1463. GM is and was at all relevant times a "merchant" with respect to motor vehicles under N.M. Stat. Ann. § 55-2-104(1) and 55-2A-103(3), and a "seller" of motor vehicles under § 55-2-103(1)(d).

1464. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under N.M. Stat. Ann. § 55-2A-103(1)(p).

1465. The Class Vehicles are and were at all relevant times "goods" within the meaning of N.M. Stat. Ann. §§ 7-2-105(1) and 55-2A-103(1)(h).

1466. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under N.M. Stat. Ann. §§ 55-2-314 and 55-2A-212.

1467. GM knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. GM directly sold and marketed Class Vehicles to customers through authorized dealers, like those from whom New Mexico Plaintiffs and members of the New Mexico Sub-Class bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. GM knew that the Class Vehicles would and did pass unchanged from the authorized dealers to New Mexico Plaintiffs and members of the New Mexico Sub-Class, with no modification to the defective Class Vehicles.

1468. GM provided New Mexico Plaintiffs and members of the New Mexico Sub-Class with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold. However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, inter alia, the Class Vehicles and their lifter suffered from an inherent defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

1469. This implied warranty included, among other things: (i) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold by GM were safe and reliable for providing transportation; and (ii) a warranty that the Class

Vehicles would be fit for their intended use while the Class Vehicles were being operated.

1470. Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles were and are defective at the time of sale or lease and thereafter as more fully described above. GM knew of this defect at the time these sale or lease transactions occurred.

1471. As a result of GM's breach of the applicable implied warranties, New Mexico Plaintiffs and members of the New Mexico Sub-Class suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Valve Train Defect, New Mexico Plaintiffs and members of the New Mexico Sub-Class were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

1472. GM's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

1473. New Mexico Plaintiffs and members of the New Mexico Sub-Class have complied with all obligations under the warranty, or otherwise have been

excused from performance of said obligations as a result of GM's conduct described herein.

1474. Privity is not required here because New Mexico Plaintiffs and members of the New Mexico Sub-Class are intended third-party beneficiaries of contracts between GM and its distributors and dealers, and specifically, of GM's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

1475. New Mexico Plaintiffs and members of the New Mexico Sub-Class were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of warranty would have been futile. GM was also on notice of the Valve Train Defect from the complaints and service requests it received from New Mexico Plaintiffs and the Class Members and through other internal sources.

1476. Nonetheless, New Mexico Plaintiffs and members of the New Mexico Sub-Class provided notice to GM of the breach of express warranties when they took their vehicles to GM-authorized provider of warranty repairs. New Mexico Plaintiffs also provided notice to GM of its breach of express warranty by letter dated January 20, 2022.

1477. As a direct and proximate cause of GM's breach, New Mexico Plaintiffs and members of the New Mexico Sub-Class suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, New Mexico Plaintiffs and members of the New Mexico Sub-Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

1478. As a direct and proximate result of GM's breach of the implied warranty of merchantability, New Mexico Plaintiffs and members of the New Mexico Sub-Class have been damaged in an amount to be proven at trial.

## COUNT XLV
### Violations of the New Mexico Unfair Practices Act,
### New Mexico Stat. Ann. § 57-12-1, *et seq.*
### (On Behalf of the New Mexico Sub-Class against Defendant)

1479. Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 671 above as if fully set forth herein.

1480. New Mexico Plaintiffs brings this cause of action on behalf of himself and on behalf of the members of the New Mexico Sub-Class.

1481. GM, New Mexico Plaintiffs, and the New Mexico Sub-Class Members are "persons" within the meaning of N.M. Stat. Ann. § 57-12-2(A).

1482. Defendant was and is engaged in "trade" or "commerce" within the meaning of N.M. Stat. Ann. § 57-12-2(C).

1483. The New Mexico Unfair Practices Act ("UPA") makes unlawful "[u]nfair or deceptive trade practices and unconscionable trade practices in the conduct of any trade or commerce." N.M. Stat. Ann. § 57-12-3. Specifically, this includes "representing that goods or services are of a particular standard, quality or grade or that goods are of a particular style or model if they are of another"; "using exaggeration, innuendo or ambiguity as to a material fact or failing to state a material fact if doing so deceives or tends to deceive"; or "failing to deliver the quality or quantity of goods or services contracted for". N.M. Stat. Ann. § 57-12-2(D). GM engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated the New Mexico UPA.

1484. GM participated in unfair or deceptive trade practices that violated the New Mexico UPA. As described below and alleged throughout the Complaint, by failing to disclose the Valve Train Defect, by concealing the Valve Train Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, GM knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. GM systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Valve Train Defect in the course of its business.

1485. GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

1486. GM's unfair and deceptive acts or practices occurred repeatedly in GM's trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

1487. GM knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

1488. GM knew or should have known that its conduct violated the New Mexico UPA.

1489. Defendant was under a duty to New Mexico Plaintiffs and the New Mexico Sub-Class Members to disclose the defective nature of the Class Vehicles because:

a.   Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

b.   Defendant made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

c.   Defendant actively concealed the defective nature of the Class

Vehicles from New Mexico Plaintiffs and the New Mexico Sub-Class Members at the time of sale and thereafter.

1490.  By failing to disclose the Valve Train Defect, Defendant knowingly and intentionally concealed material facts and breached its duty not to do so.

1491.  The facts concealed or not disclosed by Defendant to New Mexico Plaintiffs and the New Mexico Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendant's Class Vehicles, or to pay less for them. Whether a vehicle's lifter, rocker arm, and/or valve spring is defective, which can cause stalling, losing power while driving, and hesitation, is a material safety concern. Had New Mexico Plaintiffs and the New Mexico Sub-Class Members known that the Class Vehicles suffered from the Valve Train Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

1492. New Mexico Plaintiffs and the New Mexico Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Valve Train Defect. That is the reasonable and objective consumer expectation for vehicles.

1493. As a result of Defendant's misconduct, New Mexico Plaintiffs and the New Mexico Sub-Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

1494. As a direct and proximate result of Defendant's unfair or deceptive acts or practices, New Mexico Plaintiffs and the New Mexico Sub-Class Members have suffered and will continue to suffer actual damages.

1495. GM's violations present a continuing risk to New Mexico Plaintiffs and the New Mexico Sub-Class Members as well as to the general public. GM's unlawful acts and practices complained of herein affect the public interest.

1496. New Mexico Plaintiffs provided notice of his claims by letter dated January 20, 2022.

1497. New Mexico Plaintiffs and members of the New Mexico Sub-Class seek actual damages, or the sum of $100, whichever is greater, treble damages, or the sum of $300 for GM's willful violation of the New Mexico UPA, an order enjoining GM's deceptive and unfair conduct, court costs and attorneys' fees as a result of Defendant's violations of the New Mexico PA as provided in N.M. Stat. Ann. § 57-12-10.

**Claims on Behalf of the New York Sub-Class**

**COUNT XLVI**
**Breach of Express Warranty,**
**N.Y. U.C.C. §§ 2-314 AND 2A-210**
**(On Behalf of the New York Sub-Class against Defendant)**

1498. Plaintiffs repeat and re-allege each and every allegation contained above in paragraphs 1 through 671 above as if fully set forth herein.

415

1499. Plaintiff Dave Cecchini ("New York Plaintiff") brings this count on behalf of himself and the New York Sub-Class against Defendant.

1500. GM is and was at all relevant times a "merchant" with respect to motor vehicles under N.Y. UCC Law §§ 11-2-104(1), and a "seller" of motor vehicles under § 2-103(1)(d).

1501. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under N.Y. UCC Law § 2A-103(1)(p).

1502. The Class Vehicles are and were at all relevant times "goods" within the meaning of N.Y. UCC Law §§ 2-105(1) and 2A-103(1)(h).

1503. The valve train systems were manufactured and/or installed in the Class Vehicles by Defendant and are covered by the express warranty.

1504. Defendant provided all purchasers and lessees of the Class Vehicles with an express warranty described herein, which became a material part of the bargain. Accordingly, GM's express warranty is an express warranty under New York state law.

1505. In a section entitled "What is Covered," Defendant's express warranty (or New Vehicle Limited Warranty ("NVLW")) provides in relevant part that "[t]he warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." The warranty further provides that "[w]arranty repairs, including, including towing, parts, and labor, will be made at no

charge" and "[t]o obtain warranty repairs, take the vehicle to a Chevrolet dealer facility within the warranty period and request the needed repairs."

1506. According to GM, the "Bumper-to-Bumper Coverage is for the first 3 years or 36,000 miles, whichever comes first," if not longer.

1507. Defendant's NVLW and other warranties regarding the Class Vehicles formed a basis of the bargain that was breached when New York Plaintiff and members of the New York Sub-Class purchased or leased the Class Vehicles with the defective lifter and/or related components.

1508. New York Plaintiff and members of the New York Sub-Class experienced defects within the warranty period. Despite the existence of the NVLW, Defendant failed to inform New York Plaintiff and members of the New York Sub-Class that the Class Vehicles were equipped with defective lifters and related components. When providing repairs under the express warranty, these repairs were ineffective and incomplete and did not provide a permanent repair for the Valve Train Defect.

1509. GM breached the express warranty through the acts and omissions described above, including by promising to repair or adjust defects in materials or workmanship of any part supplied by Defendant and then failing to do so. Defendant has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles materials and workmanship defects.

1510. Privity is not required here because New York Plaintiff and members of the New York Sub-Class are intended third-party beneficiaries of contracts between GM and its distributors and dealers, and specifically, of GM's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

1511. Any attempt by GM to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here. Specifically, the warranty limitation is unenforceable because GM knowingly sold or leased defective products without informing consumers about the Valve Train Defect. The time limits are unconscionable and inadequate to protect New York Plaintiff and the members of the New York Sub-Class. Among other things, New York Plaintiff and members of the New York Sub-Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by GM and unreasonable favored GM. A gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Valve Train Defect existed between GM and members of the New York Sub-Class.

1512. Further, the limited warranty promising to repair and/or correct a manufacturing or workmanship defect fails of its essential purpose because the

contractual remedy is insufficient to make New York Plaintiff and the members of the New York Sub-Class whole, because GM has failed and/or has refused to adequately provide the promised remedies, i.e., a permanent repair, within a reasonable time.

1513. New York Plaintiff was not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Valve Train Defect from the complaints and service requests it received from Class Members, including those formal complaints submitted to NHTSA, and through other internal sources.

1514. Nonetheless, New York Plaintiff and members of the New York Sub-Class provided notice to GM of the breach of express warranties when they took their vehicles to GM-authorized providers of warranty repairs. New York Plaintiff also provided notice to GM of its breach of express warranty by letter dated January 25, 2022.

1515. As a result of GM's breach of the applicable express warranties, owners and/or lessees of the Class Vehicles suffered, and continue to suffer, an ascertainable loss of money, property, and/or value of their Class Vehicles.

1516. As a direct and proximate result of Defendant's breach of express warranties, New York Plaintiff and members of the New York Sub-Class have been damaged in an amount to be determined at trial.

1517.  As a result of GM's breach of the express warranty, New York Plaintiff and New York Sub-Class Members are entitled to legal and equitable relief against GM, including actual damages, specific performance, attorney's fees, costs of suit, and other relief as appropriate.

## COUNT XLVII
### Breach of the Implied Warranty of Merchantability,
### N.Y. U.C.C. §§ 2-314 AND 2A-212
### (On Behalf of the New York Sub-Class against Defendant)

1518.  Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 671 as if fully set forth herein.

1519.  New York Plaintiff brings this count on behalf of himself and the New York Sub-Class against Defendant.

1520.  GM is and was at all relevant times a "merchant" with respect to motor vehicles under N.Y. UCC Law §§ 11-2-104(1), and a "seller" of motor vehicles under § 2-103(1)(d).

1521.  With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under N.Y. UCC Law § 2A-103(1)(p).

1522.  The Class Vehicles are and were at all relevant times "goods" within the meaning of N.Y. UCC Law §§ 2-105(1) and 2A-103(1)(h).

1523.  A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under N.Y. UCC Law §§ 2-314 and 2A-212.

1524. GM knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. GM directly sold and marketed Class Vehicles to customers through authorized dealers, like those from whom New York Plaintiff and members of the New York Sub-Class bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. GM knew that the Class Vehicles would and did pass unchanged from the authorized dealers to New York Plaintiff and members of the New York Sub-Class, with no modification to the defective Class Vehicles.

1525. GM provided New York Plaintiff and members of the New York Sub-Class with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold. However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, inter alia, the Class Vehicles and their lifter suffered from an inherent defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

1526. This implied warranty included, among other things: (i) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold by GM were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

1527. Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiff and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles were and are defective at the time of sale or lease and thereafter as more fully described above. GM knew of this defect at the time these sale or lease transactions occurred.

1528. As a result of GM's breach of the applicable implied warranties, New York Plaintiff and members of the New York Sub-Class suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Valve Train Defect, New York Plaintiff and members of the New York Sub-Class were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

1529. GM's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

1530. New York Plaintiff and members of the New York Sub-Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

1531. Privity is not required here because New York Plaintiff and members of the New York Sub-Class are intended third-party beneficiaries of contracts between GM and its distributors and dealers, and specifically, of GM's express

warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

1532. New York Plaintiff and members of the New York Sub-Class were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of warranty would have been futile. GM was also on notice of the Valve Train Defect from the complaints and service requests it received from New York Plaintiff and the Class Members and through other internal sources.

1533. Nonetheless, New York Plaintiff and members of the New York Sub-Class provided notice to GM of the breach of express warranties when they took their vehicles to GM-authorized provider of warranty repairs. New York Plaintiff also provided notice to GM of its breach of express warranty by letter dated January 25, 2022.

1534. As a direct and proximate cause of GM's breach, New York Plaintiff and members of the New York Sub-Class suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, New York Plaintiff and members of the New York Sub-Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

1535. As a direct and proximate result of GM's breach of the implied warranty of merchantability, New York Plaintiff and members of the New York Sub-Class have been damaged in an amount to be proven at trial.

## COUNT XLVIII
### Violations of the New York General Business Law § 349,
### N.Y. GEN. BUS. LAW § 349
### (On Behalf of the New York Sub-Class against Defendant)

1536. Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 671 above as if fully set forth herein.

1537. New York Plaintiff brings this cause of action on behalf of himself and on behalf of the members of the New York Sub-Class.

1538. New York Plaintiff and members of the New York Sub-Class are "persons" as defined by the New York General Business Law ("New York GBL"). N.Y. Gen. Bus. Law § 349(h).

1539. GM is a "person," "firm," "corporation," or "association" within the meaning of N.Y. Gen. Bus. Law § 349.New York's General Business Law § 349 makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 349. GM engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated the New York GBL.

1540. GM participated in unfair or deceptive trade practices that violated the New York GBL.  As described below and alleged throughout the Complaint, by failing to disclose the Valve Train Defect, by concealing the Valve Train Defect, by

marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, GM knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. GM systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Valve Train Defect in the course of its business.

1541. GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

1542. GM's unfair and deceptive acts or practices occurred repeatedly in GM's trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

1543. GM knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

1544. GM knew or should have known that its conduct violated the New York GBL.

1545. Defendant was under a duty to New York Plaintiff and the New York Sub-Class Members to disclose the defective nature of the Class Vehicles because:

425

a.   Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

b.   Defendant made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

c.   Defendant actively concealed the defective nature of the Class Vehicles from New York Plaintiff and the New York Sub-Class Members at the time of sale and thereafter.

1546.  By failing to disclose the Valve Train Defect, Defendant knowingly and intentionally concealed material facts and breached its duty not to do so.

1547.  The facts concealed or not disclosed by Defendant to New York Plaintiff and the New York Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendant's Class Vehicles, or to pay less for them. Whether a vehicle's lifter, rocker arm, and/or valve spring is defective, which can cause stalling, losing power while driving, and hesitation, is a material safety concern. Had New York Plaintiff and the New York Sub-Class Members known that the Class Vehicles suffered from the Valve Train Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

1548.  New York Plaintiff and the New York Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the

Valve Train Defect. That is the reasonable and objective consumer expectation for vehicles.

1549. As a result of Defendant's misconduct, New York Plaintiff and the New York Sub-Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

1550. As a direct and proximate result of Defendant's unfair or deceptive acts or practices, New York Plaintiff and the New York Sub-Class Members have suffered and will continue to suffer actual damages.

1551. GM's violations present a continuing risk to New York Plaintiff and the New York Sub-Class Members as well as to the general public. GM's unlawful acts and practices complained of herein affect the public interest.

1552. New York Plaintiff provided notice of his claims by letter dated January 25, 2022.

1553. Pursuant to N.Y. Gen. Bus. Law § 349(h), New York Plaintiff and each New York Sub-Class Member seek actual damages or $50, whichever is greater, in addition to discretionary three times actual damages up to $1,000 for Defendant's willful and knowing violation of N.Y. Gen. Bus. Law § 349. Plaintiffs and New York Class members also seek attorneys' fees, an order enjoining GM's deceptive conduct, and any other just and proper relief available under the New York GBL.

## COUNT XLIX
### Violations of the New York General Business Law § 350,
### N.Y. GEN. BUS. LAW § 350
### (On Behalf of the New York Sub-Class against Defendant)

1554. Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 671 above as if fully set forth herein.

1555. New York Plaintiff brings this cause of action on behalf of himself and on behalf of the members of the New York Sub-Class.

1556. New York's General Business Law § 350, the New York False Advertising Act ("NY FAA"), makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce[.]" False advertising includes "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in the light of . . . representations [made] with respect to the commodity." N.Y. Gen. Bus. Law § 350-a.

1557. GM caused to be made or disseminated throughout New York, through advertising, marketing, and other publications, representations that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to GM, to be untrue and misleading to consumers, including New York Plaintiff and the New York Sub-Class Members.

1558. GM violated the NY FAA because of the misrepresentations and omissions alleged herein, including, but not limited to, GM's failure to disclose the

Valve Train Defect, by concealing the Valve Train Defect, by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, cleanliness, performance and efficiency, and stood behind its vehicles after they were sold, GM knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. GM systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Valve Train Defect in the course of its business.

1559. In purchasing or leasing the Class Vehicles, New York Plaintiff and the New York Sub-Class Members were deceived by GM's failure to the Valve Train Defect.

1560. New York Plaintiff and the New York Sub-Class Members had no way of knowing that GM's representations and omissions were false and misleading, that an internal component part of the Class Vehicles is defective and causes a safety hazard, that the valve train system will fail under normal and intended use of the Class Vehicles, or that GM would refuse to repair, replace, or compensate New York Plaintiff and the New York Sub-Class Members for the failure of the defective valve train systems and the known consequences of that failure to the Class Vehicles.

1561. GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression,

or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

1562. GM's unfair and deceptive acts or practices occurred repeatedly in GM's trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

1563. GM knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

1564. GM knew or should have known that its conduct violated the New YorkFAA.

1565. GM's unfair or deceptive acts or practices, fraud, misrepresentations, suppression or omission of material facts were likely to and did in fact deceive reasonable consumers.

1566. GM intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead New York Plaintiff and the New York Sub-Class Members.

1567. New York Plaintiff and the New York Sub-Class Members reasonably relied on GM's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

1568. Defendant was under a duty to New York Plaintiff and the New York Sub-Class Members to disclose the defective nature of the Class Vehicles because:

a.   Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

b.   Defendant made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

c.   Defendant actively concealed the defective nature of the Class Vehicles from New York Plaintiff and the New York Sub-Class Members at the time of sale and thereafter.

1569.  By failing to disclose the Valve Train Defect, Defendant knowingly and intentionally concealed material facts and breached its duty not to do so.

1570. The facts concealed or not disclosed by Defendant to New York Plaintiff and the New York Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendant's Class Vehicles, or to pay less for them. Whether a vehicle's lifter, rocker arm, and/or valve spring is defective, which can cause stalling, losing power while driving, and hesitation, is a material safety concern. Had New York Plaintiff and the New York Sub-Class Members known that the Class Vehicles suffered from the Valve Train Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

1571. New York Plaintiff and the New York Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the

Valve Train Defect. That is the reasonable and objective consumer expectation for vehicles.

1572. As a result of Defendant's misconduct, New York Plaintiff and the New York Sub-Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

1573. As a direct and proximate result of Defendant's unfair or deceptive acts or practices, New York Plaintiff and the New York Sub-Class Members have suffered and will continue to suffer actual damages.

1574. GM's violations present a continuing risk to New York Plaintiff and the New York Sub-Class Members as well as to the general public. GM's unlawful acts and practices complained of herein affect the public interest.

1575. New York Plaintiff provided notice of his claims by letter dated January 25, 2022.

1576. New York Plaintiff and the New York Sub-Class Members are entitled to recover their actual damages or $500, whichever is greater. Because GM acted willfully or knowingly, New York Plaintiff and the New York Sub-Class Members are entitled to recover three times actual damages, up to $10,000.

**Claims on Behalf of the North Carolina Sub-Class**

## COUNT L
### Breach of Express Warranty,
### N.C. GEN. STAT. §§ 25-2-313 AND 252A-210
### (On Behalf of the North Carolina Sub-Class against Defendant)

1577. Plaintiffs repeat and re-allege each and every allegation contained above in paragraphs 1 through 671 above as if fully set forth herein.

1578. Plaintiffs Chad and Adria Nicole Lacy ("North Carolina Plaintiffs") bring this count on behalf of themselves and the North Carolina Sub-Class against Defendant.

1579. GM is and was at all relevant times a "merchant" with respect to motor vehicles under N.C. Gen. Stat. § 25-2-104(1) and a "seller" of motor vehicles under § 25-2-103(1)(d).

1580. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under N.C. Gen. Stat.§ 25-2A-103(1)(p).

1581. The Class Vehicles are and were at all relevant times "goods" within the meaning of N.C. Gen. Stat. § 25-2-105(1) and N.C.G.S.A. § 25-2A-103(1)(h).

1582. The valve train systems were manufactured and/or installed in the Class Vehicles by Defendant and are covered by the express warranty.

1583. Defendant provided all purchasers and lessees of the Class Vehicles with an express warranty described herein, which became a material part of the

bargain. Accordingly, GM's express warranty is an express warranty under North Carolina state law.

1584. In a section entitled "What is Covered," Defendant's express warranty (or New Vehicle Limited Warranty ("NVLW")) provides in relevant part that "[t]he warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." The warranty further provides that "[w]arranty repairs, including, including towing, parts, and labor, will be made at no charge" and "[t]o obtain warranty repairs, take the vehicle to a Chevrolet dealer facility within the warranty period and request the needed repairs."

1585. According to GM, the "Bumper-to-Bumper Coverage is for the first 3 years or 36,000 miles, whichever comes first," if not longer.

1586. Defendant's NVLW and other warranties regarding the Class Vehicles formed a basis of the bargain that was breached when North Carolina Plaintiffs and members of the North Carolina Sub-Class purchased or leased the Class Vehicles with the defective lifter and/or related components.

1587. North Carolina Plaintiffs and members of the North Carolina Sub-Class experienced defects within the warranty period. Despite the existence of the NVLW, Defendant failed to inform North Carolina Plaintiffs and members of the North Carolina Sub-Class that the Class Vehicles were equipped with defective lifters and related components. When providing repairs under the express warranty, these

repairs were ineffective and incomplete and did not provide a permanent repair for the Valve Train Defect.

1588. GM breached the express warranty through the acts and omissions described above, including by promising to repair or adjust defects in materials or workmanship of any part supplied by Defendant and then failing to do so. Defendant has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles materials and workmanship defects.

1589. Privity is not required here because North Carolina Plaintiffs and members of the North Carolina Sub-Class are intended third-party beneficiaries of contracts between GM and its distributors and dealers, and specifically, of GM's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

1590. Any attempt by GM to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here. Specifically, the warranty limitation is unenforceable because GM knowingly sold or leased defective products without informing consumers about the Valve Train Defect. The time limits are unconscionable and inadequate to protect North Carolina Plaintiffs and the members of the North Carolina Sub-Class. Among other things, North Carolina

Plaintiffs and members of the North Carolina Sub-Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by GM and unreasonable favored GM. A gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Valve Train Defect existed between GM and members of the North Carolina Sub-Class.

1591. Further, the limited warranty promising to repair and/or correct a manufacturing or workmanship defect fails of its essential purpose because the contractual remedy is insufficient to make North Carolina Plaintiffs and the members of the North Carolina Sub-Class whole, because GM has failed and/or has refused to adequately provide the promised remedies, i.e., a permanent repair, within a reasonable time.

1592. North Carolina Plaintiffs were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Valve Train Defect from the complaints and service requests it received from Class Members, including those formal complaints submitted to NHTSA, and through other internal sources.

1593. Nonetheless, North Carolina Plaintiffs and members of the North Carolina Sub-Class provided notice to GM of the breach of express warranties when they took their vehicles to GM-authorized providers of warranty repairs.   North

Carolina Plaintiffs also provided notice to GM of its breach of express warranty by letter dated February 4, 2022.

1594. As a result of GM's breach of the applicable express warranties, owners and/or lessees of the Class Vehicles suffered, and continue to suffer, an ascertainable loss of money, property, and/or value of their Class Vehicles.

1595. As a direct and proximate result of Defendant's breach of express warranties, North Carolina Plaintiffs and members of the North Carolina Sub-Class have been damaged in an amount to be determined at trial.

1596. As a result of GM's breach of the express warranty, North Carolina Plaintiffs and North Carolina Sub-Class Members are entitled to legal and equitable relief against GM, including actual damages, specific performance, attorney's fees, costs of suit, and other relief as appropriate.

## COUNT LI
### Breach of the Implied Warranty of Merchantability,
### N.C. GEN. STAT. §§ 25-2-314 and 252A-212
### (On Behalf of the North Carolina Sub-Class against Defendant)

1597. Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 671 as if fully set forth herein.

1598. North Carolina Plaintiffs bring this count on behalf of themselves and the North Carolina Sub-Class against Defendant.

1599. GM is and was at all relevant times a "merchant" with respect to motor vehicles under N.C. Gen. Stat. § 25-2-104(1) and a "seller" of motor vehicles under § 25-2-103(1)(d).

1600. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under N.C. Gen. Stat. § 25-2A-103(1)(p).

1601. The Class Vehicles are and were at all relevant times "goods" within the meaning of N.C. Gen. Stat. § 25-2-105(1) and § 25-2A-103(1)(h).

1602. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under N.C. Gen. Stat. §§ 25-2-314 and 252A-212.

1603. GM knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. GM directly sold and marketed Class Vehicles to customers through authorized dealers, like those from whom North Carolina Plaintiffs and members of the North Carolina Sub-Class bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. GM knew that the Class Vehicles would and did pass unchanged from the authorized dealers to North Carolina Plaintiffs and members of the North Carolina Sub-Class, with no modification to the defective Class Vehicles.

1604. GM provided North Carolina Plaintiffs and members of the North Carolina Sub-Class with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which

they were sold. However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, inter alia, the Class Vehicles and their lifter suffered from an inherent defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

1605. This implied warranty included, among other things: (i) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold by GM were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

1606. Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles were and are defective at the time of sale or lease and thereafter as more fully described above. GM knew of this defect at the time these sale or lease transactions occurred.

1607. As a result of GM's breach of the applicable implied warranties, North Carolina Plaintiffs and members of the North Carolina Sub-Class suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Valve Train Defect, North Carolina Plaintiffs and members of the North Carolina Sub-Class were harmed and suffered actual damages

in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

1608. GM's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

1609. North Carolina Plaintiffs and members of the North Carolina Sub-Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

1610. Privity is not required here because North Carolina Plaintiffs and members of the North Carolina Sub-Class are intended third-party beneficiaries of contracts between GM and its distributors and dealers, and specifically, of GM's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

1611. North Carolina Plaintiffs and members of the North Carolina Sub-Class were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of warranty would have been futile. GM was also on notice of the Valve Train Defect from the complaints and service requests it received

from North Carolina Plaintiffs and the Class Members and through other internal sources.

1612. Nonetheless, North Carolina Plaintiffs and members of the North Carolina Sub-Class provided notice to GM of the breach of express warranties when they took their vehicles to GM-authorized provider of warranty repairs.  North Carolina Plaintiffs also provided notice to GM of its breach of express by letter dated February 4, 2022.

1613. As a direct and proximate cause of GM's breach, North Carolina Plaintiffs and members of the North Carolina Sub-Class suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, North Carolina Plaintiffs and members of the North Carolina Sub-Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

1614. As a direct and proximate result of GM's breach of the implied warranty of merchantability, North Carolina Plaintiffs and members of the North Carolina Sub-Class have been damaged in an amount to be proven at trial.

## COUNT LII
**Violations of the North Carolina Unfair and Deceptive Acts and Practices Act,
N.C. Gen. Stat. § 75-1.1, *et seq*.
(On Behalf of the North Carolina Sub-Class against Defendant)**

1615. Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 671 above as if fully set forth herein.

1616. North Carolina Plaintiffs bring this cause of action on behalf of themselves and on behalf of the members of the North Carolina Sub-Class.

1617. Defendant was and is engaged in "commerce" within the meaning of N.C. Gen. Stat. § 75-1.1(b).

1618. North Carolina Unfair and Deceptive Acts and Practices Act ("North Carolina UDTPA"), broadly prohibits "unfair or deceptive acts or practices in or affecting commerce." N.C. Gen. Stat. § 75-1.1(a). GM engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated the North Carolina UDTPA.

1619. GM participated in unfair or deceptive trade practices that violated the North Carolina UDTPA.  As described below and alleged throughout the Complaint, by failing to disclose the Valve Train Defect, by concealing the Valve Train Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, GM knowingly and intentionally misrepresented and omitted material facts in connection with the sale

or lease of the Class Vehicles. GM systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Valve Train Defect in the course of its business.

1620. GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

1621. GM's unfair and deceptive acts or practices occurred repeatedly in GM's trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

1622. GM knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

1623. GM knew or should have known that its conduct violated the North Carolina UDTPA.

1624. Defendant was under a duty to North Carolina Plaintiffs and the North Carolina Sub-Class Members to disclose the defective nature of the Class Vehicles because:

   a.   Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

   b.   Defendant made partial disclosures about the quality of the Class

443

Vehicles without revealing the defective nature of the Class Vehicles; and

c.     Defendant actively concealed the defective nature of the Class Vehicles from North Carolina Plaintiffs and the North Carolina Sub-Class Members at the time of sale and thereafter.

1625.  By failing to disclose the Valve Train Defect, Defendant knowingly and intentionally concealed material facts and breached its duty not to do so.

1626. The facts concealed or not disclosed by Defendant to North Carolina Plaintiffs and the North Carolina Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendant's Class Vehicles, or to pay less for them. Whether a vehicle's lifter, rocker arm, and/or valve spring is defective, which can cause stalling, losing power while driving, and hesitation, is a material safety concern. Had North Carolina Plaintiffs and the North Carolina Sub-Class Members known that the Class Vehicles suffered from the Valve Train Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

1627. North Carolina Plaintiffs and the North Carolina Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Valve Train Defect. That is the reasonable and objective consumer expectation for vehicles.

1628. As a result of Defendant's misconduct, North Carolina Plaintiffs and the North Carolina Sub-Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

1629. As a direct and proximate result of Defendant's unfair or deceptive acts or practices, North Carolina Plaintiffs and the North Carolina Sub-Class Members have suffered and will continue to suffer actual damages.

1630. GM's violations present a continuing risk to North Carolina Plaintiffs and the North Carolina Sub-Class Members as well as to the general public.  GM's unlawful acts and practices complained of herein affect the public interest.

1631. North Carolina Plaintiffs provided notice of his claims by letter dated February 4, 2022.

1632. Because GM's actions and conduct were willful, North Carolina Plaintiffs and members of the North Carolina Sub-Class seek an order for treble their actual damages, an order enjoining GM's unlawful acts, court costs, attorneys' fees, and any other just and proper relief available under the North Carolina UDTPA, N.C. Gen. Stat.§ 75-16.

**Claims on Behalf of the Ohio Sub-Class**

<u>COUNT LIII</u>
**Breach of Express Warranty,**
**Ohio Rev. Code Ann. § 1302.26, *et seq.***
**(On Behalf of the Ohio Sub-Class against Defendant)**

1633. Plaintiffs repeat and re-allege each and every allegation contained above in paragraphs 1 through 671 above as if fully set forth herein.

1634. Plaintiff Mark Hayford and Dan Podojil ("Ohio Plaintiffs") bring this count on behalf of themselves and the Ohio Sub-Class against Defendant.

1635. GM is and was at all relevant times a "merchant" with respect to motor vehicles under Ohio Rev. Code Ann. §§ 1302.01(5) and 1310.01(A)(20), and a "seller" of motor vehicles under § 1302.01(4).

1636. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Ohio Rev. Code Ann. § 1310.01(A)(20).

1637. The Class Vehicles are and were at all relevant times "goods" within the meaning of Ohio Rev. Code Ann. §§ 1302.01(8) and 1310.01(A)(8).

1638. The valve train systems were manufactured and/or installed in the Class Vehicles by Defendant and are covered by the express warranty.

1639. Defendant provided all purchasers and lessees of the Class Vehicles with an express warranty described herein, which became a material part of the bargain. Accordingly, GM's express warranty is an express warranty under Ohio state law.

1640. In a section entitled "What is Covered," Defendant's express warranty (or New Vehicle Limited Warranty ("NVLW")) provides in relevant part that "[t]he warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." The warranty further provides that "[w]arranty repairs, including, including towing, parts, and labor, will be made at no charge" and "[t]o obtain warranty repairs, take the vehicle to a Chevrolet dealer facility within the warranty period and request the needed repairs."

1641. According to GM, the "Bumper-to-Bumper Coverage is for the first 3 years or 36,000 miles, whichever comes first," if not longer.

1642. Defendant's NVLW and other warranties regarding the Class Vehicles formed a basis of the bargain that was breached when Ohio Plaintiffs and members of the Ohio Sub-Class purchased or leased the Class Vehicles with the defective lifter and/or related components.

1643. Ohio Plaintiffs and members of the Ohio Sub-Class experienced defects within the warranty period. Despite the existence of the NVLW, Defendant failed to inform Ohio Plaintiffs and members of the Ohio Sub-Class that the Class Vehicles were equipped with defective lifters and related components. When providing repairs under the express warranty, these repairs were ineffective and incomplete and did not provide a permanent repair for the Valve Train Defect.

1644. GM breached the express warranty through the acts and omissions described above, including by promising to repair or adjust defects in materials or workmanship of any part supplied by Defendant and then failing to do so. Defendant has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles materials and workmanship defects.

1645. Privity is not required here because Ohio Plaintiffs and members of the Ohio Sub-Class are intended third-party beneficiaries of contracts between GM and its distributors and dealers, and specifically, of GM's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles.  The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

1646. Any attempt by GM to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here.  Specifically, the warranty limitation is unenforceable because GM knowingly sold or leased defective products without informing consumers about the Valve Train Defect.  The time limits are unconscionable and inadequate to protect Ohio Plaintiffs and the members of the Ohio Sub-Class.  Among other things, Ohio Plaintiffs and members of the Ohio Sub-Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were

drafted by GM and unreasonable favored GM. A gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Valve Train Defect existed between GM and members of the Ohio Sub-Class.

1647. Further, the limited warranty promising to repair and/or correct a manufacturing or workmanship defect fails of its essential purpose because the contractual remedy is insufficient to make Ohio Plaintiffs and the members of the Ohio Sub-Class whole, because GM has failed and/or has refused to adequately provide the promised remedies, i.e. a permanent repair, within a reasonable time.

1648. Ohio Plaintiffs was not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Valve Train Defect from the complaints and service requests it received from Class Members, including those formal complaints submitted to NHTSA, and through other internal sources.

1649. Nonetheless, Ohio Plaintiffs and members of the Ohio Sub-Class provided notice to GM of the breach of express warranties when they took their vehicles to GM-authorized providers of warranty repairs.  Ohio Plaintiffs also provided notice to GM of its breach of express warranty by letter dated November 19, 2021 and March 23, 2022.

1650. As a result of GM's breach of the applicable express warranties, owners and/or lessees of the Class Vehicles suffered, and continue to suffer, an ascertainable loss of money, property, and/or value of their Class Vehicles.

1651. As a direct and proximate result of Defendant's breach of express warranties, Ohio Plaintiffs and members of the Ohio Sub-Class have been damaged in an amount to be determined at trial.

1652. As a result of GM's breach of the express warranty, Ohio Plaintiffs and Ohio Sub-Class Members are entitled to legal and equitable relief against GM, including actual damages, specific performance, attorney's fees, costs of suit, and other relief as appropriate.

## COUNT LIV
### Breach of the Implied Warranty of Merchantability, Ohio Rev. Code Ann. §§ 1302.27 AND 1310.19 (On Behalf of the Ohio Sub-Class against Defendant)

1653. Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 671 above as if fully set forth herein.

1654. Ohio Plaintiffs bring this count on behalf of themselves and the Ohio Sub-Class against Defendant.

1655. GM is and was at all relevant times a "merchant" with respect to motor vehicles under Ohio Rev. Code Ann. §§ 1302.01(5) and 1310.01(A)(20), and a "seller" of motor vehicles under § 1302.01(4).

1656. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Ohio Rev. Code Ann. § 1310.01(A)(20).

1657. The Class Vehicles are and were at all relevant times "goods" within the meaning of Ohio Rev. Code Ann. §§ 1302.01(8) and 1310.01(A)(8).

1658.  A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Ohio Rev. Code Ann. §§ 1302.27 and 1310.19.

1659.  GM knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. GM directly sold and marketed Class Vehicles to customers through authorized dealers, like those from whom Ohio Plaintiffs and members of the Ohio Sub-Class bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. GM knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Ohio Plaintiffs and members of the Ohio Sub-Class, with no modification to the defective Class Vehicles.

1660. GM provided Ohio Plaintiffs and members of the Ohio Sub-Class with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.  However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, inter alia, the Class Vehicles and their lifter suffered from an inherent defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

1661.  This implied warranty included, among other things: (i) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold by GM were safe and reliable for providing transportation; and (ii) a warranty that the Class

Vehicles would be fit for their intended use while the Class Vehicles were being operated.

1662. Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles were and are defective at the time of sale or lease and thereafter as more fully described above. GM knew of this defect at the time these sale or lease transactions occurred.

1663. As a result of GM's breach of the applicable implied warranties, Ohio Plaintiffs and members of the Ohio Sub-Class suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Valve Train Defect, Ohio Plaintiffs and members of the Ohio Sub-Class were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

1664. GM's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

1665. Ohio Plaintiffs and members of the Ohio Sub-Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

1666. Privity is not required here because Ohio Plaintiffs and members of the Ohio Sub-Class are intended third-party beneficiaries of contracts between GM and its distributors and dealers, and specifically, of GM's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles.  The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

1667. Ohio Plaintiffs and members of the Ohio Sub-Class were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of warranty would have been futile. GM was also on notice of the Valve Train Defect from the complaints and service requests it received from Ohio Plaintiffs and the Class Members and through other internal sources.

1668. Nonetheless, Ohio Plaintiffs and members of the Ohio Sub-Class provided notice to GM of the breach of express warranties when they took their vehicles to GM-authorized providers of warranty repairs.  Ohio Plaintiffs also provided notice to GM of its breach of express warranty by letter dated November 19, 2021 and March 23, 2022.

1669. As a direct and proximate cause of GM's breach, Ohio Plaintiffs and members of the Ohio Sub-Class suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of

their Class Vehicles. Additionally, Ohio Plaintiffs and members of the Ohio Sub-Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

1670. As a direct and proximate result of GM's breach of the implied warranty of merchantability, Ohio Plaintiffs and members of the Ohio Sub-Class have been damaged in an amount to be proven at trial.

## COUNT LV
### Violations of the Ohio Consumer Sales Practices Act, Ohio Rev. Code Ann. § 1345.01, *et seq*. (On Behalf of the Ohio Sub-Class against Defendant)

1671. Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 671 above as if fully set forth herein.

1672. Ohio Plaintiffs bring this cause of action on behalf of themselves and on behalf of the members of the Ohio Sub-Class.

1673. Ohio Plaintiffs and members of the Ohio Sub-Class are "consumers" as defined by the Ohio Consumer Sales Practices Act, Ohio Rev. Code Ann. § 1345.01 ("Ohio CSPA").

1674. GM is a "supplier" as defined by the Ohio CSPA.

1675. Ohio Plaintiff's and the Ohio Sub-Class Members' purchases or leases of Class Vehicles were "consumer transactions" as defined by the Ohio CSPA.

1676. The Ohio CSPA, Ohio Rev. Code Ann. § 1345.02, broadly prohibits "an unconscionable act or practice in connection with a consumer transaction."

Specifically, and without limitation of the broad prohibition, the Act prohibits suppliers from representing "(1) That the subject of a consumer transaction has sponsorship, approval, performance characteristics, accessories, uses, or benefits that it does not have; [and] (2) That the subject of a consumer transaction is of a particular standard, quality, grade, style, prescription, or model, if it is not." Ohio Rev. Code Ann. § 1345.02. GM engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated the Ohio CSPA.

1677. GM participated in unfair or deceptive trade practices that violated the Ohio CSPA. As described below and alleged throughout the Complaint, by failing to disclose the Valve Train Defect, by concealing the Valve Train Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, GM knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. GM systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Valve Train Defect in the course of its business.

1678. GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

1679. GM's unfair and deceptive acts or practices occurred repeatedly in GM's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

1680. GM knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

1681. GM knew or should have known that its conduct violated the Ohio CSPA.

1682. Defendant was under a duty to Ohio Plaintiffs and the Ohio Sub-Class Members to disclose the defective nature of the Class Vehicles because:

    a.    Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

    b.    Defendant made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

    c.    Defendant actively concealed the defective nature of the Class Vehicles from Ohio Plaintiffs and the Ohio Sub-Class Members at the time of sale and thereafter.

1683. By failing to disclose the Valve Train Defect, Defendant knowingly and intentionally concealed material facts and breached its duty not to do so.

1684. The facts concealed or not disclosed by Defendant to Ohio Plaintiffs and the Ohio Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendant's Class Vehicles, or to pay less for them. Whether a vehicle's lifter, rocker arm, and/or valve spring is defective, which can cause stalling, losing power while driving, and hesitation, is a material safety concern. Had Ohio Plaintiffs and the Ohio Sub-Class Members known that the Class Vehicles suffered from the Valve Train Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

1685. Ohio Plaintiffs and the Ohio Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Valve Train Defect. That is the reasonable and objective consumer expectation for vehicles.

1686. As a result of Defendant's misconduct, Ohio Plaintiffs and the Ohio Sub-Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

1687. As a direct and proximate result of Defendant's unfair or deceptive acts or practices, Ohio Plaintiffs and the Ohio Sub-Class Members have suffered and will continue to suffer actual damages.

1688. GM's violations present a continuing risk to Ohio Plaintiffs and the Ohio Sub-Class Members as well as to the general public. GM's unlawful acts and practices complained of herein affect the public interest.

1689. Ohio Plaintiffs provided notice of their claims by letter dated November 19, 2021 and March 23, 2022.

1690. Ohio Plaintiffs and members of the Ohio Sub-Class seek actual damages, plus an amount not exceeding $5,000 in noneconomic damages, an order enjoining GM's deceptive and unfair conduct, court costs and attorneys' fees as a result of Defendant's violations of the Ohio CSPA as provided in Ohio Rev. Code Ann. § 1345.09.

**Claims on Behalf of the Oregon Sub-Class**

<u>COUNT LVI</u>
**Breach of Express Warranty,**
**OR. REV. STAT. §§ 72.3130 AND 72A.2100**
**(On Behalf of the Oregon Sub-Class against Defendant)**

1691. Plaintiffs repeat and re-allege each and every allegation contained above in paragraphs 1 through 671 above as if fully set forth herein.

1692. Plaintiffs Adam Ibrahim and Tyler Elizabeth Lamberts ("Oregon Plaintiffs") bring this count on behalf of themselves and the Oregon Sub-Class against Defendant.

1693. GM is and was at all relevant times a "merchant" with respect to motor vehicles under Or. Rev. Stat. §§ 72.1040(1) and 72A.1030(1)(t), and a "seller" of motor vehicles under Or. Rev. Stat. § 72.1030(1)(d).

1694. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Or. Rev. Stat. § 72A.1030(1)(p).

1695. The Class Vehicles are and were at all relevant times "goods" within the meaning of Or. Rev. Stat. §§ 72.1050(1) and 72A.1030(1)(h).

1696. The valve train systems were manufactured and/or installed in the Class Vehicles by Defendant and are covered by the express warranty.

1697. Defendant provided all purchasers and lessees of the Class Vehicles with an express warranty described herein, which became a material part of the bargain. Accordingly, GM's express warranty is an express warranty under Oregon state law.

1698. In a section entitled "What is Covered," Defendant's express warranty (or New Vehicle Limited Warranty ("NVLW")) provides in relevant part that "[t]he warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." The warranty further provides that "[w]arranty repairs, including, including towing, parts, and labor, will be made at no charge" and "[t]o obtain warranty repairs, take the vehicle to a Chevrolet dealer facility within the warranty period and request the needed repairs."

1699. According to GM, the "Bumper-to-Bumper Coverage is for the first 3 years or 36,000 miles, whichever comes first," if not longer.

1700. Defendant's NVLW and other warranties regarding the Class Vehicles formed a basis of the bargain that was breached when Oregon Plaintiffs and members

of the Oregon Sub-Class purchased or leased the Class Vehicles with the defective lifter and/or related components.

1701. Oregon Plaintiffs and members of the Oregon Sub-Class experienced defects within the warranty period. Despite the existence of the NVLW, Defendant failed to inform Oregon Plaintiffs and members of the Oregon Sub-Class that the Class Vehicles were equipped with defective lifters and related components.  When providing repairs under the express warranty, these repairs were ineffective and incomplete and did not provide a permanent repair for the Valve Train Defect.

1702. GM breached the express warranty through the acts and omissions described above, including by promising to repair or adjust defects in materials or workmanship of any part supplied by Defendant and then failing to do so. Defendant has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles materials and workmanship defects.

1703. Privity is not required here because Oregon Plaintiffs and members of the Oregon Sub-Class are intended third-party beneficiaries of contracts between GM and its distributors and dealers, and specifically, of GM's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles.  The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

1704. Any attempt by GM to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here. Specifically, the warranty limitation is unenforceable because GM knowingly sold or leased defective products without informing consumers about the Valve Train Defect. The time limits are unconscionable and inadequate to protect Oregon Plaintiffs and the members of the Oregon Sub-Class. Among other things, Oregon Plaintiffs and members of the Oregon Sub-Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by GM and unreasonable favored GM. A gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Valve Train Defect existed between GM and members of the Oregon Sub-Class.

1705. Further, the limited warranty promising to repair and/or correct a manufacturing or workmanship defect fails of its essential purpose because the contractual remedy is insufficient to make Oregon Plaintiffs and the members of the Oregon Sub-Class whole, because GM has failed and/or has refused to adequately provide the promised remedies, i.e., a permanent repair, within a reasonable time.

1706. Oregon Plaintiffs were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Valve Train Defect from the complaints and service requests it received from Class Members, including those formal complaints submitted to NHTSA, and through other internal sources.

1707. Nonetheless, Oregon Plaintiffs and members of the Oregon Sub-Class provided notice to GM of the breach of express warranties when they took their vehicles to GM-authorized providers of warranty repairs.  Oregon Plaintiff also provided notice to GM of its breach of express warranty by letter dated February 10, 2022.

1708. As a result of GM's breach of the applicable express warranties, owners and/or lessees of the Class Vehicles suffered, and continue to suffer, an ascertainable loss of money, property, and/or value of their Class Vehicles.

1709. As a direct and proximate result of Defendant's breach of express warranties, Oregon Plaintiffs and members of the Oregon Sub-Class have been damaged in an amount to be determined at trial.

1710. As a result of GM's breach of the express warranty, Oregon Plaintiffs and Oregon Sub-Class Members are entitled to legal and equitable relief against GM, including actual damages, specific performance, attorney's fees, costs of suit, and other relief as appropriate.

## <u>COUNT LVII</u>
**Breach of the Implied Warranty of Merchantability,**
**OR. REV. STAT. §§ 72.3140 AND 72A.2120**
**(On Behalf of the Oregon Sub-Class against Defendant)**

1711. Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 671 as if fully set forth herein.

1712. Oregon Plaintiffs bring this count on behalf of themselves and the Oregon Sub-Class against Defendant.

1713. GM is and was at all relevant times a "merchant" with respect to motor vehicles under Or. Rev. Stat. §§ 72.1040(1) and 72A.1030(1)(t), and a "seller" of motor vehicles under Or. Rev. Stat. § 72.1030(1)(d).

1714. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Or. Rev. Stat. § 72A.1030(1)(p).

1715. The Class Vehicles are and were at all relevant times "goods" within the meaning of Or. Rev. Stat. §§ 72.1050(1) and 72A.1030(1)(h).

1716. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Or. Rev. Stat. §§ 72.3140 and 72A-2120.

1717. GM knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. GM directly sold and marketed Class Vehicles to customers through authorized dealers, like those from whom Oregon Plaintiffs and members of the Oregon Sub-Class bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. GM knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Oregon Plaintiffs and members of the Oregon Sub-Class, with no modification to the defective Class Vehicles.

1718. GM provided Oregon Plaintiffs and members of the Oregon Sub-Class with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold. However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, inter alia, the Class Vehicles and their lifter suffered from an inherent defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

1719. This implied warranty included, among other things: (i) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold by GM were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

1720. Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles were and are defective at the time of sale or lease and thereafter as more fully described above. GM knew of this defect at the time these sale or lease transactions occurred.

1721. As a result of GM's breach of the applicable implied warranties, Oregon Plaintiffs and members of the Oregon Sub-Class suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a

result of the Valve Train Defect, Oregon Plaintiffs and members of the Oregon Sub-Class were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

1722. GM's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

1723. Oregon Plaintiffs and members of the Oregon Sub-Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

1724. Privity is not required here because Oregon Plaintiffs and members of the Oregon Sub-Class are intended third-party beneficiaries of contracts between GM and its distributors and dealers, and specifically, of GM's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles.  The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

1725. Oregon Plaintiffs and members of the Oregon Sub-Class were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of warranty would have been futile. GM was also on notice of the

Valve Train Defect from the complaints and service requests it received from Oregon Plaintiffs and the Class Members and through other internal sources.

1726. Nonetheless, Oregon Plaintiffs and members of the Oregon Sub-Class provided notice to GM of the breach of express warranties when they took their vehicles to GM-authorized provider of warranty repairs.  Oregon Plaintiffs also provided notice to GM of its breach of express warranty by letter dated February 10, 2022.

1727. As a direct and proximate cause of GM's breach, Oregon Plaintiffs and members of the Oregon Sub-Class suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Oregon Plaintiffs and members of the Oregon Sub-Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

1728. As a direct and proximate result of GM's breach of the implied warranty of merchantability, Oregon Plaintiffs and members of the Oregon Sub-Class have been damaged in an amount to be proven at trial.

## COUNT LVIII
### Violations of the Oregon Consumer Protection Act,
### OR. REV. STAT. § 646.605, *et seq*.
### (On Behalf of the Oregon Sub-Class against Defendant)

1729. Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 671 above as if fully set forth herein.

1730. Oregon Plaintiffs bring this cause of action on behalf of themselves and on behalf of the members of the Oregon Sub-Class.

1731. GM, Oregon Plaintiffs, and the Oregon Sub-Class Members are "persons" within the meaning of Or. Rev. Stat. § 646.605(4).

1732. Defendant was and is engaged in "trade" or "commerce" within the meaning of Or. Rev. Stat. § 646.605(8).

1733. The Oregon Unfair Trade Practices Act ("Oregon UTPA") prohibits "unlawful practice . . . in the course of . . . business." Or. Rev. Stat. § Ann. 646.608(1).GM engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated the Oregon UTPA.

1734. GM participated in unfair or deceptive trade practices that violated the Oregon UTPA.  As described below and alleged throughout the Complaint, by failing to disclose the Valve Train Defect, by concealing the Valve Train Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, GM knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. GM systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Valve Train Defect in the course of its business.

1735. GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

1736. GM's unfair and deceptive acts or practices occurred repeatedly in GM's trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

1737. GM knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

1738. GM knew or should have known that its conduct violated the Oregon UTPA.

1739. Defendant was under a duty to Oregon Plaintiffs and the Oregon Sub-Class Members to disclose the defective nature of the Class Vehicles because:

      a.    Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

      b.    Defendant made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

      c.    Defendant actively concealed the defective nature of the Class Vehicles from Oregon Plaintiffs and the Oregon Sub-Class

Members at the time of sale and thereafter.

1740.  By failing to disclose the Valve Train Defect, Defendant knowingly and intentionally concealed material facts and breached its duty not to do so.

1741. The facts concealed or not disclosed by Defendant to Oregon Plaintiffs and the Oregon Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendant's Class Vehicles, or to pay less for them. Whether a vehicle's lifter, rocker arm, and/or valve spring is defective, which can cause stalling, losing power while driving, and hesitation, is a material safety concern. Had Oregon Plaintiffs and the Oregon Sub-Class Members known that the Class Vehicles suffered from the Valve Train Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

1742. Oregon Plaintiffs and the Oregon Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Valve Train Defect. That is the reasonable and objective consumer expectation for vehicles.

1743. As a result of Defendant's misconduct, Oregon Plaintiffs and the Oregon Sub-Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

1744. As a direct and proximate result of Defendant's unfair or deceptive acts or practices, Oregon Plaintiffs and the Oregon Sub-Class Members have suffered and will continue to suffer actual damages.

469

1745. GM's violations present a continuing risk to Oregon Plaintiffs and the Oregon Sub-Class Members as well as to the general public.  GM's unlawful acts and practices complained of herein affect the public interest.

1746. Oregon Plaintiffs provided notice of their claims by letter dated February 10, 2022.

1747. Pursuant to Or. Rev. Stat. § 646.638, Oregon Plaintiffs and members of the Oregon Sub-Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding actual damages or statutory damages in the amount of $200 for each class member, whichever is greater, punitive damages, attorneys' fees and costs, and any other just and proper relief available under the Oregon UTPA.

**Claims on Behalf of the Rhode Island Sub-Class**

<u>**COUNT LIX**</u>
**Breach of Express Warranty,**
**6A R.I. Gen. Laws Ann. §§ 6A-2-313 AND 7-2.1-210**
**(On Behalf of the Rhode Island Sub-Class against Defendant)**

1748. Plaintiffs repeat and re-allege each and every allegation contained above in paragraphs 1 through 671 above as if fully set forth herein.

1749. Plaintiff Jennifer Deery ("Rhode Island Plaintiff") brings this count on behalf of herself and the Rhode Island Sub-Class against Defendant.

1750. GM is and was at all relevant times a "merchant" with respect to motor vehicles under 6A R.I. Gen. Laws Ann. §§ 6A-2-104(1) and 6A-2.1-103(3), and a "seller" of motor vehicles under § 6A-2-103(1)(a).

1751. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under 6A R.I. Gen. Laws Ann. § 6A-2.1-103(1)(p).

1752. The Class Vehicles are and were at all relevant times "goods" within the meaning of 6A R.I. Gen. Laws Ann. § 6A-2-105(1) and 6A-2.1-103(1)(h).

1753. The valve train systems were manufactured and/or installed in the Class Vehicles by Defendant and are covered by the express warranty.

1754. Defendant provided all purchasers and lessees of the Class Vehicles with an express warranty described herein, which became a material part of the bargain. Accordingly, GM's express warranty is an express warranty under Rhode Island state law.

1755. In a section entitled "What is Covered," Defendant's express warranty (or New Vehicle Limited Warranty ("NVLW")) provides in relevant part that "[t]he warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." The warranty further provides that "[w]arranty repairs, including, including towing, parts, and labor, will be made at no charge" and "[t]o obtain warranty repairs, take the vehicle to a Chevrolet dealer facility within the warranty period and request the needed repairs."

1756. According to GM, the "Bumper-to-Bumper Coverage is for the first 3 years or 36,000 miles, whichever comes first," if not longer.

1757. Defendant's NVLW and other warranties regarding the Class Vehicles formed a basis of the bargain that was breached when Rhode Island Plaintiff and members of the Rhode Island Sub-Class purchased or leased the Class Vehicles with the defective lifter and/or related components.

1758. Rhode Island Plaintiff and members of the Rhode Island Sub-Class experienced defects within the warranty period. Despite the existence of the NVLW, Defendant failed to inform Rhode Island Plaintiff and members of the Rhode Island Sub-Class that the Class Vehicles were equipped with defective lifters and related components.  When providing repairs under the express warranty, these repairs were ineffective and incomplete and did not provide a permanent repair for the Valve Train Defect.

1759. GM breached the express warranty through the acts and omissions described above, including by promising to repair or adjust defects in materials or workmanship of any part supplied by Defendant and then failing to do so. Defendant has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles materials and workmanship defects.

1760. Privity is not required here because Rhode Island Plaintiff and members of the Rhode Island Sub-Class are intended third-party beneficiaries of contracts between GM and its distributors and dealers, and specifically, of GM's express

warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

1761. Any attempt by GM to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here. Specifically, the warranty limitation is unenforceable because GM knowingly sold or leased defective products without informing consumers about the Valve Train Defect. The time limits are unconscionable and inadequate to protect Rhode Island Plaintiff and the members of the Rhode Island Sub-Class. Among other things, Rhode Island Plaintiff and members of the Rhode Island Sub-Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by GM and unreasonable favored GM. A gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Valve Train Defect existed between GM and members of the Rhode Island Sub-Class.

1762. Further, the limited warranty promising to repair and/or correct a manufacturing or workmanship defect fails of its essential purpose because the contractual remedy is insufficient to make Rhode Island Plaintiff and the members of the Rhode Island Sub-Class whole, because GM has failed and/or has refused to

adequately provide the promised remedies, i.e., a permanent repair, within a reasonable time.

1763. Rhode Island Plaintiff was not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Valve Train Defect from the complaints and service requests it received from Class Members, including those formal complaints submitted to NHTSA, and through other internal sources.

1764. Nonetheless, Rhode Island Plaintiff and members of the Rhode Island Sub-Class provided notice to GM of the breach of express warranties when they took their vehicles to GM-authorized providers of warranty repairs. Rhode Island Plaintiff also provided notice to GM of its breach of express warranty by letter dated February 4, 2022.

1765. As a result of GM's breach of the applicable express warranties, owners and/or lessees of the Class Vehicles suffered, and continue to suffer, an ascertainable loss of money, property, and/or value of their Class Vehicles.

1766. As a direct and proximate result of Defendant's breach of express warranties, Rhode Island Plaintiff and members of the Rhode Island Sub-Class have been damaged in an amount to be determined at trial.

1767. As a result of GM's breach of the express warranty, Rhode Island Plaintiff and Rhode Island Sub-Class Members are entitled to legal and equitable

relief against GM, including actual damages, specific performance, attorney's fees, costs of suit, and other relief as appropriate.

## COUNT LX
### Breach of the Implied Warranty of Merchantability,
### 6A R.I. Gen. Laws Ann. §§ 6A-2-314 and 6A-2.1-212
### (On Behalf of the Rhode Island Sub-Class against Defendant)

1768. Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 671 as if fully set forth herein.

1769. Rhode Island Plaintiff brings this count on behalf of herself and the Rhode Island Sub-Class against Defendant.

1770. GM is and was at all relevant times a "merchant" with respect to motor vehicles under 6A R.I. Gen. Laws Ann. §§ 6A-2-104(1) and 6A-2.1-103(3), and a "seller" of motor vehicles under § 6A-2-103(1)(a).

1771. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under 6A R.I. Gen. Laws Ann. § 6A-2.1-103(1)(p).

1772. The Class Vehicles are and were at all relevant times "goods" within the meaning of 6A R.I. Gen. Laws Ann. § 6A-2-105(1) and 6A-2.1-103(1)(h).

1773. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under 6A R.I. Gen. Laws Ann. §§ 6A-2-314 and 6A-2.1-212.

1774. GM knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. GM directly sold and marketed Class Vehicles

to customers through authorized dealers, like those from whom Rhode Island Plaintiff and members of the Rhode Island Sub-Class bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. GM knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Rhode Island Plaintiff and members of the Rhode Island Sub-Class, with no modification to the defective Class Vehicles.

1775. GM provided Rhode Island Plaintiff and members of the Rhode Island Sub-Class with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.  However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, inter alia, the Class Vehicles and their lifter suffered from an inherent defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

1776. This implied warranty included, among other things: (i) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold by GM were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

1777. Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe

transportation. Instead, the Class Vehicles were and are defective at the time of sale or lease and thereafter as more fully described above. GM knew of this defect at the time these sale or lease transactions occurred.

1778. As a result of GM's breach of the applicable implied warranties, Rhode Island Plaintiff and members of the Rhode Island Sub-Class suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Valve Train Defect, Rhode Island Plaintiff and members of the Rhode Island Sub-Class were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

1779. GM's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

1780. Rhode Island Plaintiff and members of the Rhode Island Sub-Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

1781. Privity is not required here because Rhode Island Plaintiff and members of the Rhode Island Sub-Class are intended third-party beneficiaries of contracts between GM and its distributors and dealers, and specifically, of GM's express warranties, including the NVLW, the Powertrain Warranties, and any warranties

provided with certified pre-owned vehicles.  The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

1782. Rhode Island Plaintiff and members of the Rhode Island Sub-Class were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of warranty would have been futile. GM was also on notice of the Valve Train Defect from the complaints and service requests it received from Rhode Island Plaintiff and the Class Members and through other internal sources.

1783. Nonetheless, Rhode Island Plaintiff and members of the Rhode Island Sub-Class provided notice to GM of the breach of express warranties when they took their vehicles to GM-authorized provider of warranty repairs.  Rhode Island Plaintiff also provided notice to GM of its breach of express warranty by letter dated February 4, 2022.

1784. As a direct and proximate cause of GM's breach, Rhode Island Plaintiff and members of the Rhode Island Sub-Class suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Rhode Island Plaintiff and members of the Rhode Island Sub-Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

1785. As a direct and proximate result of GM's breach of the implied warranty of merchantability, Rhode Island Plaintiff and members of the Rhode Island Sub-Class have been damaged in an amount to be proven at trial.

## COUNT LXI
### Violations of the Rhode Island Unfair Trade Practice and Consumer Protection Act, 6 R.I. Gen. Laws §§ 6-13.1-1, *et seq.* (On Behalf of the Rhode Island Sub-Class against Defendant)

1786. Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 671 above as if fully set forth herein.

1787. Rhode Island Plaintiff brings this cause of action on behalf of herself and on behalf of the members of the Rhode Island Sub-Class.

1788. GM, Rhode Island Plaintiff, and the Rhode Island Sub-Class Members are "persons" within the meaning of 6 R.I. Gen. Laws Ann. § 6-13.1-1(3).

1789. Defendant was and is engaged in "trade" or "commerce" within the meaning of 6 R.I. Gen. Laws Ann. § 6-13.1-1(5)

1790. The Rhode Island Unfair Trade Practices and Consumer Protections Act ("CPA") declares that unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce are unlawful. 6 R.I. Gen. Laws § 6-13.1-2. Specifically, the Rhode Island CPA prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce" including: "(v) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have;" "(vii) Representing

that goods or services are of a particular standard, quality, or grade, ... if they are of another;" "(ix) Advertising goods or services with intent not to sell them as advertised;" "(xii) Engaging in any other conduct that similarly creates a likelihood of confusion or of misunderstanding;" "(xiii) Engaging in any act or practice that is unfair or deceptive to the consumer;" and "(xiv) Using other methods, acts or practices which mislead or deceive Members of the public in a material respect." 6 R.I. Gen. Law § 6-13.1-1(6). GM engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated the Rhode Island CPA.

1791. GM participated in unfair or deceptive trade practices that violated the Rhode Island CPA.  As described below and alleged throughout the Complaint, by failing to disclose the Valve Train Defect, by concealing the Valve Train Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, GM knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. GM systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Valve Train Defect in the course of its business.

1792. GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression,

or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

1793. GM's unfair and deceptive acts or practices occurred repeatedly in GM's trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

1794. GM knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

1795. GM knew or should have known that its conduct violated the Rhode Island CPA.

1796. Defendant was under a duty to Rhode Island Plaintiff and the Rhode Island Sub-Class Members to disclose the defective nature of the Class Vehicles because:

     a.    Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

     b.    Defendant made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

     c.    Defendant actively concealed the defective nature of the Class Vehicles from Rhode Island Plaintiff and the Rhode Island Sub-Class Members at the time of sale and thereafter.

481

1797.  By failing to disclose the Valve Train Defect, Defendant knowingly and intentionally concealed material facts and breached its duty not to do so.

1798. The facts concealed or not disclosed by Defendant to Rhode Island Plaintiff and the Rhode Island Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendant's Class Vehicles, or to pay less for them. Whether a vehicle's lifter, rocker arm, and/or valve spring is defective, which can cause stalling, losing power while driving, and hesitation, is a material safety concern. Had Rhode Island Plaintiff and the Rhode Island Sub-Class Members known that the Class Vehicles suffered from the Valve Train Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

1799. Rhode Island Plaintiff and the Rhode Island Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Valve Train Defect. That is the reasonable and objective consumer expectation for vehicles.

1800. As a result of Defendant's misconduct, Rhode Island Plaintiff and the Rhode Island Sub-Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

1801.  As a direct and proximate result of Defendant's unfair or deceptive acts or practices, Rhode Island Plaintiff and the Rhode Island Sub-Class Members have suffered and will continue to suffer actual damages.

1802. GM's violations present a continuing risk to Rhode Island Plaintiff and the Rhode Island Sub-Class Members as well as to the general public. GM's unlawful acts and practices complained of herein affect the public interest.

1803. Rhode Island Plaintiff provided notice of his claims, by letter dated February 4, 2022.

1804. Rhode Island Plaintiff and members of the Rhode Island Sub-Class seek actual damages, or the sum of $500, whichever is greater, treble damages in the Court's discretion, an order enjoining GM's deceptive and unfair conduct, court costs and attorneys' fees as a result of Defendant's violations of the Rhode Island CPA as provided in 6 R.I. Gen. Laws Ann. § 6-13.1-5.2.

## COUNT LXII
**Violations of the Rhode Island Regulation of Business Practices Among Motor Vehicle Manufacturers, Distributors, and Dealers,**
**31 R.I. Gen. Laws Ann. § 31-5.1-1,** *et seq.*
**(On Behalf of the Rhode Island Sub-Class against Defendant)**

1805. Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 671 above as if fully set forth herein.

1806. Rhode Island Plaintiff brings this cause of action on behalf of herself and on behalf of the members of the Rhode Island Sub-Class.

1807. GM, Rhode Island Plaintiff, and the Rhode Island Sub-Class Members are "persons" within the meaning of 31 R.I. Gen. Laws Ann. § 31-5.1-1(12).

1808. Defendant was and is at all relevant times a "distributor" with respect to motor vehicles under 31 R.I. Gen. Laws Ann. § 31-5.1-1(2) and a manufacturer of motor vehicles under § 31-5.1-1(8).

1809. The Rhode Island Regulation of Business Practices Among Motor Vehicle Manufacturers, Distributors, and Dealers ("Dealers Act") declares that unfair methods of competition, and unfair deceptive acts or practices are unlawful. 31 R.I. Gen. Laws Ann. § 31-5.1-3(a). GM engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated the Rhode Island Dealers Act.

1810. GM participated in unfair or deceptive trade practices that violated the Rhode Island Dealers Act. As described below and alleged throughout the Complaint, by failing to disclose the Valve Train Defect, by concealing the Valve Train Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, GM knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. GM systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Valve Train Defect in the course of its business.

1811. GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression,

or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

1812. GM's unfair and deceptive acts or practices occurred repeatedly in GM's trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

1813. GM knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

1814. GM knew or should have known that its conduct violated the Rhode Island Dealers Act.

1815. Defendant was under a duty to Rhode Island Plaintiff and the Rhode Island Sub-Class Members to disclose the defective nature of the Class Vehicles because:

     a.    Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

     b.    Defendant made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

     c.    Defendant actively concealed the defective nature of the Class Vehicles from Rhode Island Plaintiff and the Rhode Island Sub-Class Members at the time of sale and thereafter.

1816.  By failing to disclose the Valve Train Defect, Defendant knowingly and intentionally concealed material facts and breached its duty not to do so.

1817.  The facts concealed or not disclosed by Defendant to Rhode Island Plaintiff and the Rhode Island Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendant's Class Vehicles, or to pay less for them. Whether a vehicle's lifter, rocker arm, and/or valve spring is defective, which can cause stalling, losing power while driving, and hesitation, is a material safety concern. Had Rhode Island Plaintiff and the Rhode Island Sub-Class Members known that the Class Vehicles suffered from the Valve Train Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

1818.  Rhode Island Plaintiff and the Rhode Island Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Valve Train Defect. That is the reasonable and objective consumer expectation for vehicles.

1819.  As a result of Defendant's misconduct, Rhode Island Plaintiff and the Rhode Island Sub-Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

1820.  As a direct and proximate result of Defendant's unfair or deceptive acts or practices, Rhode Island Plaintiff and the Rhode Island Sub-Class Members have suffered and will continue to suffer actual damages.

486

1821. GM's violations present a continuing risk to Rhode Island Plaintiff and the Rhode Island Sub-Class Members as well as to the general public. GM's unlawful acts and practices complained of herein affect the public interest.

1822. Rhode Island Plaintiff provided notice of his claims, by letter dated February 4, 2022.

1823. Rhode Island Plaintiff and members of the Rhode Island Sub-Class seek actual damages, an order enjoining GM's deceptive and unfair conduct, court costs and attorneys' fees as a result of Defendant's violations of the Rhode Island Dealers Act as provided in 31 R.I. Gen. Laws Ann. § 31-5.1-13.

**Claims on Behalf of the Tennessee Sub-Class**

**COUNT LXIII**
**Breach of Express Warranty,**
**TENN. CODE §§ 47-2-313 AND 47-2A-210**
**(On Behalf of the Tennessee Sub-Class against Defendant)**

1824. Plaintiffs repeat and re-allege each and every allegation contained above in paragraphs 1 through 671 above as if fully set forth herein.

1825. Plaintiffs Christopher and Julie Dittman and Brian and Tammy Burton ("Tennessee Plaintiffs") bring this count on behalf of themselves and the Tennessee Sub-Class against Defendant.

1826. GM is and was at all relevant times a "merchant" with respect to motor vehicles under Tenn. Code §§ 47-2-104(1) and 47-2A-103(1)(t), and "seller" of motor vehicles under § 47-2-103(1)(d).

1827.  With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Tenn. Code § 47-2A-103(1)(p).

1828.  The Class Vehicles are and were at all relevant times "goods" within the meaning of Tenn. Code §§ 47-2-105(1) and 47-2A-103(1)(h).

1829.  The valve train systems were manufactured and/or installed in the Class Vehicles by Defendant and are covered by the express warranty.

1830.  Defendant provided all purchasers and lessees of the Class Vehicles with an express warranty described herein, which became a material part of the bargain.  Accordingly, GM's express warranty is an express warranty under Tennessee state law.

1831.  In a section entitled "What is Covered," Defendant's express warranty (or New Vehicle Limited Warranty ("NVLW")) provides in relevant part that "[t]he warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." The warranty further provides that "[w]arranty repairs, including, including towing, parts, and labor, will be made at no charge" and "[t]o obtain warranty repairs, take the vehicle to a Chevrolet dealer facility within the warranty period and request the needed repairs."

1832.  According to GM, the "Bumper-to-Bumper Coverage is for the first 3 years or 36,000 miles, whichever comes first," if not longer.

1833. Defendant's NVLW and other warranties regarding the Class Vehicles formed a basis of the bargain that was breached when Tennessee Plaintiffs and members of the Tennessee Sub-Class purchased or leased the Class Vehicles with the defective lifter and/or related components.

1834. Tennessee Plaintiffs and members of the Tennessee Sub-Class experienced defects within the warranty period. Despite the existence of the NVLW, Defendant failed to inform Tennessee Plaintiffs and members of the Tennessee Sub-Class that the Class Vehicles were equipped with defective lifters and related components.  When providing repairs under the express warranty, these repairs were ineffective and incomplete and did not provide a permanent repair for the Valve Train Defect.

1835. GM breached the express warranty through the acts and omissions described above, including by promising to repair or adjust defects in materials or workmanship of any part supplied by Defendant and then failing to do so. Defendant has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles materials and workmanship defects.

1836. Privity is not required here because Tennessee Plaintiffs and members of the Tennessee Sub-Class are intended third-party beneficiaries of contracts between GM and its distributors and dealers, and specifically, of GM's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles.  The dealers were not intended to be the

ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

1837. Any attempt by GM to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here.  Specifically, the warranty limitation is unenforceable because GM knowingly sold or leased defective products without informing consumers about the Valve Train Defect.  The time limits are unconscionable and inadequate to protect Tennessee Plaintiffs and the members of the Tennessee Sub-Class.  Among other things, Tennessee Plaintiffs and members of the Tennessee Sub-Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by GM and unreasonable favored GM. A gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Valve Train Defect existed between GM and members of the Tennessee Sub-Class.

1838. Further, the limited warranty promising to repair and/or correct a manufacturing or workmanship defect fails of its essential purpose because the contractual remedy is insufficient to make Tennessee Plaintiffs and the members of the Tennessee Sub-Class whole, because GM has failed and/or has refused to adequately provide the promised remedies, i.e., a permanent repair, within a reasonable time.

1839. Tennessee Plaintiffs were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Valve Train Defect from the complaints and service requests it received from Class Members, including those formal complaints submitted to NHTSA, and through other internal sources.

1840. Nonetheless, Tennessee Plaintiffs and members of the Tennessee Sub-Class provided notice to GM of the breach of express warranties when they took their vehicles to GM-authorized providers of warranty repairs. Tennessee Plaintiffs also provided notice to GM of its breach of express warranty by letter dated December 17, 2021 and March 9, 2022.

1841. As a result of GM's breach of the applicable express warranties, owners and/or lessees of the Class Vehicles suffered, and continue to suffer, an ascertainable loss of money, property, and/or value of their Class Vehicles.

1842. As a direct and proximate result of Defendant's breach of express warranties, Tennessee Plaintiffs and members of the Tennessee Sub-Class have been damaged in an amount to be determined at trial.

1843. As a result of GM's breach of the express warranty, Tennessee Plaintiffs and Tennessee Sub-Class Members are entitled to legal and equitable relief against GM, including actual damages, specific performance, attorney's fees, costs of suit, and other relief as appropriate.

**COUNT LXIV**
**Breach of the Implied Warranty of Merchantability,**
**TENN. CODE §§ 47-2-314 AND 47-2A-212**
**(On Behalf of the Tennessee Sub-Class against Defendant)**

1844. Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 671 as if fully set forth herein.

1845. Tennessee Plaintiffs bring this count on behalf of themselves and Tennessee Sub-Class against Defendant.

1846. GM is and was at all relevant times a "merchant" with respect to motor vehicles under Tenn. Code §§ 47-2-104(1) and 47-2A-103(1)(t), and "seller" of motor vehicles under § 47-2-103(1)(d).

1847. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Tenn. Code § 47-2A-103(1)(p).

1848. The Class Vehicles are and were at all relevant times "goods" within the meaning of Tenn. Code §§ 47-2-105(1) AND 47-2A-103(1)(h).

1849. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Tenn. Code §§ 47-2-314 and 47-2A-212.

1850. GM knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. GM directly sold and marketed Class Vehicles to customers through authorized dealers, like those from whom Tennessee Plaintiffs and members of the Tennessee Sub-Class bought or leased their vehicles, for the

intended purpose of consumers purchasing the vehicles. GM knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Tennessee Plaintiffs and members of the Tennessee Sub-Class, with no modification to the defective Class Vehicles.

1851. GM provided Tennessee Plaintiffs and members of the Tennessee Sub-Class with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold. However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, inter alia, the Class Vehicles and their lifter suffered from an inherent defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

1852. This implied warranty included, among other things: (i) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold by GM were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

1853. Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles were and are defective at the time of sale

or lease and thereafter as more fully described above. GM knew of this defect at the time these sale or lease transactions occurred.

1854. As a result of GM's breach of the applicable implied warranties, Tennessee Plaintiffs and members of the Tennessee Sub-Class suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Valve Train Defect, Tennessee Plaintiffs and members of the Tennessee Sub-Class were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

1855. GM's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

1856. Tennessee Plaintiffs and members of the Tennessee Sub-Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

1857. Privity is not required here because Tennessee Plaintiffs and members of the Tennessee Sub-Class are intended third-party beneficiaries of contracts between GM and its distributors and dealers, and specifically, of GM's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty

494

agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

1858. Tennessee Plaintiffs and members of the Tennessee Sub-Class were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of warranty would have been futile. GM was also on notice of the Valve Train Defect from the complaints and service requests it received from Tennessee Plaintiffs and the Class Members and through other internal sources.

1859. Nonetheless, Tennessee Plaintiffs and members of the Tennessee Sub-Class provided notice to GM of the breach of express warranties when they took their vehicles to GM-authorized provider of warranty repairs. Tennessee Plaintiffs also provided notice to GM of its breach of express warranty by letter dated December 17, 2021 and March 9, 2022.

1860. As a direct and proximate cause of GM's breach, Tennessee Plaintiffs and members of the Tennessee Sub-Class suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Tennessee Plaintiffs and members of the Tennessee Sub-Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

1861. As a direct and proximate result of GM's breach of the implied warranty of merchantability, Tennessee Plaintiffs and members of the Tennessee Sub-Class have been damaged in an amount to be proven at trial.

**COUNT LXV**
**Violations of the Tennessee Consumer Protection Act,**
**TENN. CODE ANN. § 47-18-101, *et seq*.**
**(On Behalf of the Tennessee Sub-Class against Defendant)**

1862. Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 671 above as if fully set forth herein.

1863. Tennessee Plaintiffs bring this cause of action on behalf of themselves and on behalf of the members of the Tennessee Sub-Class.

1864. Tennessee Plaintiffs and members of the Tennessee Sub-Class are "consumers" as defined by the Tenn. Code Ann. § 47-18-103(2).

1865. GM, Tennessee Plaintiff, and the Tennessee Sub-Class Members are "persons" within the meaning of Tenn. Code Ann. § 47-18-103(9).

1866.  The Class Vehicles are "goods" within the meaning Tenn. Code Ann. § 47-18-103(5).

1867. Defendant was and is engaged in "trade," "commerce," and/or "consumer transaction[s]" within the meaning of Tenn. Code Ann. § 47-18-103(11).

1868. The Tennessee Consumer Protection Act ("CPA") provides that, "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce constitute unlawful acts or practices", including but not limited to, "(2) causing likelihood of confusion or misunderstanding as to the certification of goods . . . ;" "(5) representing that goods . . . have . . . characteristics . . . uses, benefits . . . that they do not have;" "(7) representing that goods . . . are of a particular standard,

quality or grade, or that goods are of a particular style or model, if they are of another;" "(9) advertising goods or services with intent not to sell them as advertised;" "(22) using any advertisement containing an offer to sell goods . . . when the offer is not a bona fide effort to sell the advertised goods . . . ;" "(27) engaging in any other act or practice which is deceptive to the consumer or any other person…" Tenn. Code Ann. § 47-18-104(a), (b).GM engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated the Tennessee CPA.

1869. GM participated in unfair or deceptive trade practices that violated the Tennessee CPA. As described below and alleged throughout the Complaint, by failing to disclose the Valve Train Defect, by concealing the Valve Train Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, GM knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. GM systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Valve Train Defect in the course of its business.

1870. GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

1871. GM's unfair and deceptive acts or practices occurred repeatedly in GM's trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

1872. GM knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

1873. GM knew or should have known that its conduct violated the Tennessee CPA.

1874. Defendant was under a duty to Tennessee Plaintiffs and the Tennessee Sub-Class Members to disclose the defective nature of the Class Vehicles because:

    a.    Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

    b.    Defendant made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

    c.    Defendant actively concealed the defective nature of the Class Vehicles from Tennessee Plaintiffs and the Tennessee Sub-Class Members at the time of sale and thereafter.

1875.  By failing to disclose the Valve Train Defect, Defendant knowingly and intentionally concealed material facts and breached its duty not to do so.

1876. The facts concealed or not disclosed by Defendant to Tennessee Plaintiffs and the Tennessee Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendant's Class Vehicles, or to pay less for them. Whether a vehicle's lifter, rocker arm, and/or valve spring is defective, which can cause stalling, losing power while driving, and hesitation, is a material safety concern. Had Tennessee Plaintiffs and the Tennessee Sub-Class Members known that the Class Vehicles suffered from the Valve Train Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

1877. Tennessee Plaintiffs and the Tennessee Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Valve Train Defect. That is the reasonable and objective consumer expectation for vehicles.

1878. As a result of Defendant's misconduct, Tennessee Plaintiffs and the Tennessee Sub-Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

1879. As a direct and proximate result of Defendant's unfair or deceptive acts or practices, Tennessee Plaintiffs and the Tennessee Sub-Class Members have suffered and will continue to suffer actual damages.

1880. GM's violations present a continuing risk to Tennessee Plaintiffs and the Tennessee Sub-Class Members as well as to the general public.  GM's unlawful acts and practices complained of herein affect the public interest.

1881. Tennessee Plaintiffs provided notice of their claims, by letter dated December 17, 2021 and March 9, 2022.

1882. Pursuant to Tenn. Code Ann. § 47-18-109, Tennessee Plaintiffs and members of the Tennessee Sub-Class seek order enjoining GM's unfair and/or deceptive acts or practices, damages, treble damages for willful and knowing violations, pursuant to § 47-18-109(a)(3), punitive damages, attorneys' fees, costs, and any relief available under the Tennessee CPA that the Court deems just and proper.

**Claims on Behalf of the Texas Sub-Class**

**COUNT LXVI**
**Breach of Express Warranty,**
**Tex. Bus. & Com. Code §§ 2.313 AND 2A.210**
**(On Behalf of the Texas Sub-Class against Defendant)**

1883. Plaintiffs repeat and re-allege each and every allegation contained above in paragraphs 1 through 671 above as if fully set forth herein.

1884. Plaintiffs Ronald and Marilyn Jett, and Forrest Hudson ("Texas Plaintiffs") bring this count on behalf of themselves and the Texas Sub-Class against Defendant.

1885. GM is and was at all relevant times a "merchant" with respect to motor vehicles under Texas Bus. & Com. Code §§ 2.104(1) and 2A.103(a)(20), and a "seller" of motor vehicles under § 2.103(a)(4).

1886. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Texas Bus. & Com. Code § 2A.103(a)(16).

1887. The Class Vehicles are and were at all relevant times "goods" within the meaning of Texas Bus. & Com. Code §§ 2.105(a) and 2A.103(a)(8).

1888. The valve train systems were manufactured and/or installed in the Class Vehicles by Defendant and are covered by the express warranty.

1889. Defendant provided all purchasers and lessees of the Class Vehicles with an express warranty described herein, which became a material part of the bargain. Accordingly, GM's express warranty is an express warranty under Texas state law.

1890. In a section entitled "What is Covered," Defendant's express warranty (or New Vehicle Limited Warranty ("NVLW")) provides in relevant part that "[t]he warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." The warranty further provides that "[w]arranty repairs, including, including towing, parts, and labor, will be made at no charge" and "[t]o obtain warranty repairs, take the vehicle to a Chevrolet dealer facility within the warranty period and request the needed repairs."

501

1891. According to GM, the "Bumper-to-Bumper Coverage is for the first 3 years or 36,000 miles, whichever comes first."

1892. Defendant's NVLW and other warranties regarding the Class Vehicles formed a basis of the bargain that was breached when Texas Plaintiffs and members of the Texas Sub-Class purchased or leased the Class Vehicles with the defective lifter and/or related components.

1893. Texas Plaintiffs and members of the Texas Sub-Class experienced defects within the warranty period. Despite the existence of the NVLW, Defendant failed to inform Texas Plaintiffs and members of the Texas Sub-Class that the Class Vehicles were equipped with defective lifters and related components. When providing repairs under the express warranty, these repairs were ineffective and incomplete and did not provide a permanent repair for the Valve Train Defect.

1894. GM breached the express warranty through the acts and omissions described above, including by promising to repair or adjust defects in materials or workmanship of any part supplied by Defendant and then failing to do so. Defendant has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles materials and workmanship defects.

1895. Privity is not required here because Texas Plaintiffs and members of the Texas Sub-Class are intended third-party beneficiaries of contracts between GM and its distributors and dealers, and specifically, of GM's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with

certified pre-owned vehicles. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

1896. Any attempt by GM to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here. Specifically, the warranty limitation is unenforceable because GM knowingly sold or leased defective products without informing consumers about the Valve Train Defect. The time limits are unconscionable and inadequate to protect Texas Plaintiffs and the members of the Texas Sub-Class. Among other things, Texas Plaintiffs and members of the Texas Sub-Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by GM and unreasonable favored GM. A gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Valve Train Defect existed between GM and members of the Texas Sub-Class.

1897. Further, the limited warranty promising to repair and/or correct a manufacturing or workmanship defect fails of its essential purpose because the contractual remedy is insufficient to make Texas Plaintiffs and the members of the Texas Sub-Class whole, because GM has failed and/or has refused to adequately provide the promised remedies, i.e. a permanent repair, within a reasonable time.

1898. Texas Plaintiffs were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Valve Train Defect from the complaints and service requests it received from Class Members, including those formal complaints submitted to NHTSA, and through other internal sources.

1899. Nonetheless, Texas Plaintiffs and members of the Texas Sub-Class provided notice to GM of the breach of express warranties when they took their vehicles to GM-authorized providers of warranty repairs.  Texas Plaintiffs also provided notice to GM of its breach of express warranty by letter dated November 8, 2021, January 20, 2022, and February 10, 2022.

1900.  As a result of GM's breach of the applicable express warranties, owners and/or lessees of the Class Vehicles suffered, and continue to suffer, an ascertainable loss of money, property, and/or value of their Class Vehicles.

1901. As a direct and proximate result of Defendant's breach of express warranties, Texas Plaintiffs and members of the Texas Sub-Class have been damaged in an amount to be determined at trial.

1902. As a result of GM's breach of the express warranty, Texas Plaintiffs and Texas Sub-Class Members are entitled to legal and equitable relief against GM, including actual damages, specific performance, attorney's fees, costs of suit, and other relief as appropriate.

## COUNT LXVII
### Breach of the Implied Warranty of Merchantability,
### Tex. Bus. & Com. Code §§ 2.314 AND 2A.212
### (On Behalf of the Texas Sub-Class against Defendant)

1903. Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 671 above as if fully set forth herein.

1904. Texas Plaintiffs brings this count on behalf of themselves and the Texas Sub-Class against Defendant.

1905. GM is and was at all relevant times a "merchant" with respect to motor vehicles under Texas Bus. & Com. Code §§ 2.104(1) and 2A.103(a)(20), and a "seller" of motor vehicles under § 2.103(a)(4).

1906. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Texas Bus. & Com. Code § 2A.103(a)(16).

1907. The Class Vehicles are and were at all relevant times "goods" within the meaning of Texas Bus. & Com. Code §§ 2.105(a) and 2A.103(a)(8).

1908. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Texas Bus. & Com. Code §§ 2.314 and 2A.212.

1909. GM knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. GM directly sold and marketed Class Vehicles to customers through authorized dealers, like those from whom Texas Plaintiffs and members of the Texas Sub-Class bought or leased their vehicles, for the intended

purpose of consumers purchasing the vehicles. GM knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Texas Plaintiffs and members of the Texas Sub-Class, with no modification to the defective Class Vehicles.

1910. GM provided Texas Plaintiffs and members of the Texas Sub-Class with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold. However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, inter alia, the Class Vehicles and their lifter suffered from an inherent defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

1911. This implied warranty included, among other things: (i) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold by GM were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

1912. Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles were and are defective at the time of sale

or lease and thereafter as more fully described above. GM knew of this defect at the time these sale or lease transactions occurred.

1913. As a result of GM's breach of the applicable implied warranties, Texas Plaintiffs and members of the Texas Sub-Class suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Valve Train Defect, Texas Plaintiffs and members of the Texas Sub-Class were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

1914. GM's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

1915. Texas Plaintiffs and members of the Texas Sub-Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

1916. Privity is not required here because Texas Plaintiffs and members of the Texas Sub-Class are intended third-party beneficiaries of contracts between GM and its distributors and dealers, and specifically, of GM's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements

provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

1917. Texas Plaintiffs and members of the Texas Sub-Class were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of warranty would have been futile. GM was also on notice of the Valve Train Defect from the complaints and service requests it received from Texas Plaintiffs and the Class Members and through other internal sources.

1918. Nonetheless, Texas Plaintiffs and members of the Texas Sub-Class provided notice to GM of the breach of express warranties when they took their vehicles to GM-authorized providers of warranty repairs.  Texas Plaintiffs also provided notice to GM of its breach of express warranty by letter dated November 8, 2021, January 20, 2022, and February 10, 2022.

1919. As a direct and proximate cause of GM's breach, Texas Plaintiffs and members of the Texas Sub-Class suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Texas Plaintiffs and members of the Texas Sub-Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

1920. As a direct and proximate result of GM's breach of the implied warranty of merchantability, Texas Plaintiffs and members of the Texas Sub-Class have been damaged in an amount to be proven at trial.

## COUNT LXVIII
### Violations of the Texas Deceptive Trade Practices Act –
### Consumer Protection Act,
### Texas Bus. & Com. Code § 17.41, *et seq.*
### (On Behalf of the Texas Sub-Class against Defendant)

1921. Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 671 above as if fully set forth herein.

1922. Texas Plaintiffs bring this cause of action on behalf of themselves and on behalf of the members of the Texas Sub-Class.

1923. GM is a "person" as that term is defined in Tex. Bus. & Com. Code § 17.45(3).

1924. Texas Plaintiffs and the members of the Texas Sub-Class are individuals, partnerships, or corporations with assets of less than $25 million (or are controlled by corporations or entities with less than $25 million in assets), see Tex. Bus. & Com. Code § 17.41, and are therefore "consumers" pursuant to Tex. Bus. & Com. Code § 17.45(4).

1925. GM is engaged in "trade" or "commerce" or "consumer transactions" within the meaning Tex. Bus. & Com. Code § 17.46(a).

1926. The Texas Deceptive Trade Practices – Consumer Protection Act ("Texas DTPA") prohibits "false, misleading, or deceptive acts or practices in the conduct of any trade or commerce," Tex. Bus. & Com. Code § 17.46(a), and an "unconscionable action or course of action," which means "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability,

experience, or capacity of the consumer to a grossly unfair degree." Tex. Bus. & Com. Code §§ 17.45(5) and 17.50(a)(3). GM engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated the Texas DTPA.

1927. GM participated in unfair or deceptive trade practices that violated the Texas DTPA.  As described below and alleged throughout the Complaint, by failing to disclose the Valve Train Defect, by concealing the Valve Train Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, GM knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. GM systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Valve Train Defect in the course of its business.

1928. GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

1929. GM's unfair and deceptive acts or practices occurred repeatedly in GM's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

1930. GM knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

1931. GM knew or should have known that its conduct violated the Texas DTPA.

1932. Defendant was under a duty to Texas Plaintiffs and the Texas Sub-Class Members to disclose the defective nature of the Class Vehicles because:

      a.     Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

      b.     Defendant made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

      c.     Defendant actively concealed the defective nature of the Class Vehicles from Texas Plaintiffs and the Texas Sub-Class Members at the time of sale and thereafter.

1933. By failing to disclose the Valve Train Defect, Defendant knowingly and intentionally concealed material facts and breached its duty not to do so.

1934. The facts concealed or not disclosed by Defendant to Texas Plaintiffs and the Texas Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendant's Class Vehicles, or to pay less for them. Whether a vehicle's lifter,

rocker arm, and/or valve spring is defective, which can cause stalling, losing power while driving, and hesitation, is a material safety concern. Had Texas Plaintiffs and the Texas Sub-Class Members known that the Class Vehicles suffered from the Valve Train Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

1935. Texas Plaintiffs and the Texas Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Valve Train Defect. That is the reasonable and objective consumer expectation for vehicles.

1936. As a result of Defendant's misconduct, Texas Plaintiffs and the Texas Sub-Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

1937. As a direct and proximate result of Defendant's unfair or deceptive acts or practices, Texas Plaintiffs and the Texas Sub-Class Members have suffered and will continue to suffer actual damages.

1938. GM's violations present a continuing risk to Texas Plaintiffs and the Texas Sub-Class Members as well as to the general public.  GM's unlawful acts and practices complained of herein affect the public interest.

1939. Texas Plaintiffs provided notice of their claims by letter dated November 8, 2021, January 20, 2022, and February 10, 2022.

1940. Pursuant to Tex. Bus. & Com. Code § 17.50, Texas Plaintiffs and members of the Texas Sub-Class seek an order enjoining VW from engaging in

unfair and/or deceptive acts or practices, damages, multiple damages for knowing and intentional violations, pursuant to § 17.50(b)(1), punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Texas DTPA.

**Claims on Behalf of the Washington Sub-Class**

<u>**COUNT LXIX**</u>
**Breach of Express Warranty,**
**Wash. Rev. Code §§ 62A.2-313 AND 62A.2A-210**
**(On Behalf of the Washington Sub-Class against Defendant)**

1941. Plaintiffs repeat and re-allege each and every allegation contained above in paragraphs 1 through 671 above as if fully set forth herein.

1942. Plaintiffs Ryan Fancher and Rebecca Prosser ("Washington Plaintiffs") bring this count on behalf of themselves and the Washington Sub-Class against Defendant.

1943. GM is and was at all relevant times a "merchant" with respect to motor vehicles under Wash. Rev. Code §§ 62A.2-104(1) and 62A.2A-103(1)(t), and a "seller" of motor vehicles under § 2.103(a)(4).

1944. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Wash. Rev. Code § 62A.2A-103(1)(p).

1945. The Class Vehicles are and were at all relevant times "goods" within the meaning of Wash. Rev. Code §§ 62A.2-105(1) and 62A.2A-103(1)(h).

1946. The valve train systems were manufactured and/or installed in the Class Vehicles by Defendant and are covered by the express warranty.

1947. Defendant provided all purchasers and lessees of the Class Vehicles with an express warranty described herein, which became a material part of the bargain. Accordingly, GM's express warranty is an express warranty under Washington state law.

1948. In a section entitled "What is Covered," Defendant's express warranty (or New Vehicle Limited Warranty ("NVLW")) provides in relevant part that "[t]he warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." The warranty further provides that "[w]arranty repairs, including, including towing, parts, and labor, will be made at no charge" and "[t]o obtain warranty repairs, take the vehicle to a Chevrolet dealer facility within the warranty period and request the needed repairs."

1949. According to GM, the "Bumper-to-Bumper Coverage is for the first 3 years or 36,000 miles, whichever comes first," if not longer.

1950. Defendant's NVLW and other warranties regarding the Class Vehicles formed a basis of the bargain that was breached when Washington Plaintiffs and members of the Washington Sub-Class purchased or leased the Class Vehicles with the defective lifter and/or related components.

1951. Washington Plaintiffs and members of the Washington Sub-Class experienced defects within the warranty period. Despite the existence of the NVLW, Defendant failed to inform Washington Plaintiffs and members of the Washington Sub-Class that the Class Vehicles were equipped with defective lifters and related components.  When providing repairs under the express warranty, these repairs were ineffective and incomplete and did not provide a permanent repair for the Valve Train Defect.

1952. GM breached the express warranty through the acts and omissions described above, including by promising to repair or adjust defects in materials or workmanship of any part supplied by Defendant and then failing to do so. Defendant has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles materials and workmanship defects.

1953. Privity is not required here because Washington Plaintiffs and members of the Washington Sub-Class are intended third-party beneficiaries of contracts between GM and its distributors and dealers, and specifically, of GM's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles.  The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

1954. Any attempt by GM to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here. Specifically, the warranty limitation is unenforceable because GM knowingly sold or leased defective products without informing consumers about the Valve Train Defect. The time limits are unconscionable and inadequate to protect Washington Plaintiffs and the members of the Washington Sub-Class. Among other things, Washington Plaintiffs and members of the Washington Sub-Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by GM and unreasonable favored GM. A gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Valve Train Defect existed between GM and members of the Washington Sub-Class.

1955. Further, the limited warranty promising to repair and/or correct a manufacturing or workmanship defect fails of its essential purpose because the contractual remedy is insufficient to make Washington Plaintiffs and the members of the Washington Sub-Class whole, because GM has failed and/or has refused to adequately provide the promised remedies, i.e., a permanent repair, within a reasonable time.

1956. Washington Plaintiffs were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Valve Train Defect

from the complaints and service requests it received from Class Members, including those formal complaints submitted to NHTSA, and through other internal sources.

1957. Nonetheless, Washington Plaintiffs and members of the Washington Sub-Class provided notice to GM of the breach of express warranties when they took their vehicles to GM-authorized providers of warranty repairs.

1958.  As a result of GM's breach of the applicable express warranties, owners and/or lessees of the Class Vehicles suffered, and continue to suffer, an ascertainable loss of money, property, and/or value of their Class Vehicles.

1959. As a direct and proximate result of Defendant's breach of express warranties, Washington Plaintiffs and members of the Washington Sub-Class have been damaged in an amount to be determined at trial.

1960. As a result of GM's breach of the express warranty, Washington Plaintiffs and Washington Sub-Class Members are entitled to legal and equitable relief against GM, including actual damages, specific performance, attorney's fees, costs of suit, and other relief as appropriate.

## COUNT LXX
### Breach of the Implied Warranty of Merchantability,
### Wash. Rev. Code §§ 62A.2-314 AND 62A.2A-212
### (On Behalf of the Washington Sub-Class against Defendant)

1961. Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 671 above as if fully set forth herein.

1962. Washington Plaintiffs bring this count on behalf of themselves and the Washington Sub-Class against Defendant.

1963. GM is and was at all relevant times a "merchant" with respect to motor vehicles under Wash. Rev. Code §§ 62A.2-104(1) and 62A.2A-103(1)(t), and a "seller" of motor vehicles under § 2.103(a)(4).

1964. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Wash. Rev. Code § 62A.2A-103(1)(p).

1965. The Class Vehicles are and were at all relevant times "goods" within the meaning of Wash. Rev. Code §§ 62A.2-105(1) and 62A.2A-103(1)(h).

1966. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Wash. Rev. Code §§ 62A.2-314 and 62A.2A-212.

1967. GM knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. GM directly sold and marketed Class Vehicles to customers through authorized dealers, like those from whom Washington Plaintiffs and members of the Washington Sub-Class bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. GM knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Washington Plaintiffs and members of the Washington Sub-Class, with no modification to the defective Class Vehicles.

1968. GM provided Washington Plaintiffs and members of the Washington Sub-Class with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold. However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, inter alia, the Class Vehicles and their lifter suffered from an inherent defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

1969. This implied warranty included, among other things: (i) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold by GM were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

1970. Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles were and are defective at the time of sale or lease and thereafter as more fully described above. GM knew of this defect at the time these sale or lease transactions occurred.

1971. As a result of GM's breach of the applicable implied warranties, Washington Plaintiffs and members of the Washington Sub-Class suffered an ascertainable loss of money, property, and/or value of their Class Vehicles.

Additionally, as a result of the Valve Train Defect, Washington Plaintiffs and members of the Washington Sub-Class were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

1972. GM's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

1973. Washington Plaintiffs and members of the Washington Sub-Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

1974. Privity is not required here because Washington Plaintiffs and members of the Washington Sub-Class are intended third-party beneficiaries of contracts between GM and its distributors and dealers, and specifically, of GM's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

1975. Washington Plaintiffs and members of the Washington Sub-Class were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of warranty would have been futile. GM was also on

notice of the Valve Train Defect from the complaints and service requests it received from Washington Plaintiffs and the Class Members and through other internal sources.

1976. Nonetheless, Washington Plaintiffs and members of the Washington Sub-Class provided notice to GM of the breach of express warranties when they took their vehicles to GM-authorized providers of warranty repairs.

1977. As a direct and proximate cause of GM's breach, Washington Plaintiffs and members of the Washington Sub-Class suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Washington Plaintiffs and members of the Washington Sub-Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

1978. As a direct and proximate result of GM's breach of the implied warranty of merchantability, Washington Plaintiffs and members of the Washington Sub-Class have been damaged in an amount to be proven at trial.

**COUNT LXXI**
**Violations of the Washington Consumer Protection Act,**
**Wash Rev. Code § 19.86.010, *et seq*.**
**(On Behalf of the Washington Sub-Class against Defendant)**

1979. Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 671 above as if fully set forth herein.

521

1980.  Washington Plaintiffs bring this cause of action on behalf of themselves and on behalf of the members of the Washington Sub-Class.

1981.  Washington Plaintiff, members of the Washington Sub-Class, and GM are "persons" within the meaning of Wash. Rev. Code § 19.86.010(2).

1982.  The Washington Consumer Protection Act ("Washington CPA") broadly prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Wash. Rev. Code § 19.86.020. GM engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated the Washington CPA.

1983.  GM participated in unfair or deceptive trade practices that violated the Washington CPA.  As described below and alleged throughout the Complaint, by failing to disclose the Valve Train Defect, by concealing the Valve Train Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, GM knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. GM systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Valve Train Defect in the course of its business.

1984.  GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression

522

or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

1985. GM's unfair and deceptive acts or practices occurred repeatedly in GM's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

1986. GM knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

1987. GM knew or should have known that its conduct violated the Washington CPA.

1988. Defendant was under a duty to Washington Plaintiffs and the Washington Sub-Class Members to disclose the defective nature of the Class Vehicles because:

    a.    Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

    b.    Defendant made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

    c.    Defendant actively concealed the defective nature of the Class Vehicles from Washington Plaintiffs and the Washington Sub-Class Members at the time of sale and thereafter.

1989. By failing to disclose the Valve Train Defect, Defendant knowingly and intentionally concealed material facts and breached its duty not to do so.

1990. The facts concealed or not disclosed by Defendant to Washington Plaintiffs and the Washington Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendant's Class Vehicles, or to pay less for them. Whether a vehicle's lifter, rocker arm, and/or valve spring is defective, which can cause stalling, losing power while driving, and hesitation, is a material safety concern. Had Washington Plaintiffs and the Washington Sub-Class Members known that the Class Vehicles suffered from the Valve Train Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

1991. Washington Plaintiffs and the Washington Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Valve Train Defect. That is the reasonable and objective consumer expectation for vehicles.

1992. As a result of Defendant's misconduct, Washington Plaintiffs and the Washington Sub-Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

1993. As a direct and proximate result of Defendant's unfair or deceptive acts or practices, Washington Plaintiffs and the Washington Sub-Class Members have suffered and will continue to suffer actual damages.

1994. GM's violations present a continuing risk to Washington Plaintiffs and the Washington Sub-Class Members as well as to the general public. GM's unlawful acts and practices complained of herein affect the public interest.

1995. GM is liable to Washington Plaintiffs and the Washington Sub-Class for damages in amounts to be proven at trial, including punitive damages, attorneys' fees, costs, and any other remedies the Court may deem appropriate under Wash. Rev. Code § 19.86.090. Because GM's actions were willful and knowing, Plaintiffs' damages should be trebled.

## **PRAYER FOR RELIEF**

1996. Plaintiffs, individually and on behalf of all others similarly situated, request the Court enter judgment against Defendant, as follows:

a. An order certifying the proposed Class, designating Plaintiffs as named representative of the Classes, and designating the undersigned as Class Counsel;

b. A declaration that Defendant is financially responsible for notifying all Class Members about the defective nature of the valve train system, including the need for periodic maintenance;

c. An order enjoining Defendant from further deceptive distribution, sales, and lease practices with respect to Class Vehicles; compelling Defendant to issue a voluntary recall for the Class Vehicles pursuant to 49 U.S.C. § 30118(a); compelling

Defendant to remove, repair, and/or replace the Class Vehicles' defective starter with suitable alternative product(s) that do not contain the defects alleged herein; enjoining Defendant from selling the Class Vehicles with the misleading information; and/or compelling Defendant to reform its warranty, in a manner deemed to be appropriate by the Court, to cover the injury alleged and to notify all Class Members that such warranty has been reformed;

d.   An award to Plaintiffs and the Class for compensatory, exemplary, and statutory damages, including interest, in an amount to be proven at trial;

e.   Any and all remedies provided pursuant to the Magnuson-Moss Warranty Act;

f.   Any and all remedies provided pursuant to the causes of action and statutes alleged herein;

g.   A declaration that Defendant must disgorge, for the benefit of the Class, all or part of the ill-gotten profits it received from the sale or lease of its Class Vehicles or make full restitution to Plaintiffs and Class Members;

h.   An award of attorneys' fees and costs, as allowed by law;

i.    An award of pre-judgment and post-judgment interest, as provided by law;

j.    Leave to amend the Complaint to conform to the evidence produced at trial; and

k.    Such other relief as may be appropriate under the circumstances.

## DEMAND FOR JURY TRIAL

1997. Plaintiffs hereby demand a trial by jury of all issues in this action so triable.

Dated: March 31, 2022           Respectfully submitted,

By:*/s/ E. Powell Miller*
E. Powell Miller (P39487)
Sharon S. Almonrode (P33938)
Dennis A. Lienhardt (P81118)
**THE MILLER LAW FIRM, P.C.**
950 West University Drive, Suite 300
Rochester, MI 48307
Tel: (248) 841-2200
Fax: (248) 652-2852
epm@millerlawpc.com
ssa@millerlawpc.com
dal@millerlawpc.com

**BERGER MONTAGUE PC**
Russell D. Paul
Abigail Gertner
Amey J. Park
Natalie Lesser
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel.: (215) 875-3000
Fax: (215) 875-4604
rpaul@bm.net

527

agertner@bm.net
apark@bm.net
nlesser@bm.net

**CAPSTONE LAW APC**
Tarek H. Zohdy
Cody R. Padgett
Laura E. Goolsby
1875 Century Park East, Suite 1000
Los Angeles, California 90067
Telephone:   (310) 556-4811
Facsimile:    (310) 943-0396
Tarek.Zohdy@capstonelawyers.com
Cody.Padgett@capstonelawyers.com
Laura.Goolsby@capstonelaywers.com

**GORDON & PARTNERS, P.A.**
Steven Calamusa
Geoffrey Stahl
4114 Northlake Blvd.,
Palm Beach Gardens, FL 33410
Telephone: (561) 799-5070
Facsimile: (561) 799-4050
scalamusa@fortheinjured.com
gstahl@fortheinjured.com

## CERTIFICATE OF SERVICE

I hereby certify that on March 31, 2022, I electronically filed the foregoing papers using the ECF system which will send electronic notices of same to all counsel of record.

Respectfully submitted,

By: */s/ E. Powell Miller*
E. Powell Miller (P39487)
THE MILLER LAW FIRM, P.C.
950 W. University Drive, Suite 300
Rochester, MI  48307
Telephone: (248) 841-2200
E-mail:  epm@millerlawpc.com