UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DANNY HARRISON, et al.,

            Plaintiffs,                    Case No. 21-12927
                                           Honorable Laurie J. Michelson
v.

GENERAL MOTORS, LLC,

            Defendant.

---

## OPINION AND ORDER GRANTING IN PART
## GM'S MOTION TO DISMISS [38]

---

Danny Harrison, along with 41 other plaintiffs, bought new or pre-owned General Motors vehicles that they believe are defective. Specifically, Plaintiffs allege that each of their vehicles (which encompass a variety of GM models and range from model years 2014 to 2021) has a valve-train system that malfunctions in a few ways.

As a result of this defect, Plaintiffs say that they hear noises from the engine, such as a "chirping, squeaking, and/or ticking when the vehicle is not idling." Eventually, the defect leads to the engine misfiring as valves fail to open and close at the appropriate times. This, say Plaintiffs, causes them to stall, surge, or lose power while driving.

So Plaintiffs sued GM over what they call the Valve-Train Defect. In what is a borderline unwieldy single lawsuit, they bring a host of claims, all on behalf of nationwide or statewide classes, which include fraudulent omission or concealment, unjust enrichment, breach of express warranty, breach of implied warranty, violation

of the Magnuson-Moss Warranty Act, and violations of consumer-protection statutes in 22 states.

GM simultaneously moved to dismiss the complaint and to compel certain plaintiffs to arbitrate their claims. The Court has issued an opinion on the motion to compel arbitration, and as a result, stayed 17 plaintiffs' claims. So it will only consider the claims of the following Plaintiffs in its opinion on the motion to dismiss: Danny Harrison, Melissa Luster, Leon Jordan, Mark Hayford, Ronald and Marilyn Jett, Nataliya and Alexander Purshaga, Daniel Podojil, Jennifer Deery, Christopher Dittman, Michael Scott, Bobby Cheshire, Brian and Tammy Burton, Tony and Robin Reidhar, Paul Mouradjian, Brian Hess, Lisa Saffell, Joseph Attia, Stephanie Speno, and Scott Roller.[1]

## I.

The Court provides a broad overview of the factual background of this case here, but given the scope of the case, it will reiterate the relevant facts as to each individual plaintiff in its analysis of their claims.

The 23 plaintiffs who are relevant to this opinion hail from 13 states and have purchased various models of vehicles from GM dealerships from 2014 to 2021. They bring largely the same type of claims, but they do so under the different laws of the states they purchased their car in. They all have one thing in common, however—they all allege that their GM vehicles have a defective valve-train system.

---

[1] Christopher McClave is listed in the caption of the amended complaint, but no factual allegations are made about him. So the Court will dismiss him from the complaint.

Some background on the valve-train system is helpful. "Every internal combustion engine . . . has a valve train system," which is "the mechanical system that controls when the intake valves and exhaust valves of the internal combustion chamber open and close." (ECF No. 27, PageID.2653.) As their names suggest, the intake valves introduce gasoline and air (or just air) into the chamber, and the exhaust valves allow the exhaust to escape. (*Id.*)

The valve train consists of many smaller parts working together to accomplish the opening and closing of the valves. The figure below helps show how these smaller parts fit together.



(ECF No. 27, PageID.2654.) The rotation of the camshaft opens and closes the valves. (*Id.* at PageID.2653.) "As a camshaft rotates, its egg-shaped lobes push up on lifters . . . . The lifters then apply this force to the pushrods, [which are] metal rods that push into the rocker arm, which turns or pivots on its internal bearings, and then opens the valve." (*Id.* at PageID.2653–2654.)

There is also a coiled spring, called the valve spring, which closes the valves. (*Id.* at PageID.2655.)

Plaintiffs say that the engines at issue in this litigation also use either Active Fuel Management (AFM) or Dynamic Fuel Management (DFM). (*Id.* at PageID.2655.) These management systems "effectively shut off some of the cylinders at certain time[s] during the vehicle's operation in order to save fuel." (*Id.*) AFM and DFM are specific to GM vehicles. (*Id.*) The deactivation of the cylinders is accomplished "by the use of specialized lifters" that lock and unlock so that "the lifter does not transfer the motion of the cam lobe to the pushrod," which in turn does not move the rocker arm, so the valve remains closed. (*Id.* at PageID.2656.)

According to Plaintiffs, there are a few issues with how this system operates in their GM vehicles. For one, the lifters collapse "when the lifter is locked or unlocked at the wrong time of the cycle." (*Id.* at PageID.2657.) Lifters also become stuck, causing "the roller . . . to freeze into position, creating a furrow on the cam[shaft] lobe and sending pieces of metal circulating through the engine. Collapsed lifters can also cause the pushrods to become bent." (*Id.* at PageID.2658.) Plaintiffs also note that while the specialized AFM lifters have some "unique issues, the valve train systems in the Subject Engines are also subject to problems in more traditional valve trains[.]" (*Id.* at PageID.2661.) These issues include the rocker arms no longer moving in time with the rest of the valve train and the valve springs breaking down and failing prematurely. (*Id.* at PageID.2661–2662.)

4

Plaintiffs experience a few different symptoms as a result of the valve train not working. These include "noises, typically chirping, squeaking, and/or ticking" and "[e]ventually, if unremedied, they progress to engine misfire, as the valves fail to open and close at appropriate times." (*Id.* at PageID.2662.) Some plaintiffs have also experienced a loss of power while driving, and the vehicle stalling and surging. (*Id.* at PageID.2663.) But Plaintiffs have not alleged that they were involved in a crash because of the defect or suffered any physical injuries.

As far as GM's culpability, Plaintiffs say GM knew about the Valve-Train Defect and failed to disclose it to consumers when they purchased their vehicles. (ECF No. 27, PageID.2666.) In support of this assertion, Plaintiffs provide numerous bulletins issued by GM to its dealers describing issues with the valve train in various vehicle models and instructing the dealership on how to repair the defect. (*Id.* at PageID.2670–2706.) They also allege that pre-production testing, complaints to online forums and the National Highway Traffic Safety Commission, and GM's redesign of the valve-train system tend to show that GM knew about the defect. (*See, e.g.*, *id.* at PageID.2668, 2706–2709, 2711.)

In December 2021, Plaintiffs sued GM over the Valve-Train Defect. (ECF No. 1.) After GM moved to dismiss and to compel certain plaintiffs to arbitrate their claims, Plaintiffs amended their complaint, bringing 71 claims in total, both individually and on behalf of either national or state-specific classes. (ECF No. 27.) GM responded as it did before, and the parties engaged in a lengthy round of briefing

for both the motion to dismiss and the motion to compel arbitration. The motion to dismiss is now before the Court.

Given the extensive briefing, the Court considers the motion to dismiss without further argument. *See* E.D. Mich. LR 7.1(f).

## II.

In deciding a motion to dismiss under Rule 12(b)(6), the Court "construes the complaint in the light most favorable" to Plaintiffs and determines whether their "complaint 'contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *See Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 403 (6th Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Detailed factual allegations are not required to survive a motion to dismiss, *HDC, LLC v. City of Ann Arbor*, 675 F.3d 608, 614 (6th Cir. 2012), but they must "raise a right to relief above the speculative level," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). What is plausible is "a context-specific task" requiring this Court "to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

## III.

### A. Standing

The Court begins with GM's argument on Plaintiffs' standing for their nationwide class allegations. *See Langfan v. Goodyear Tire & Rubber Co.*, 529 F. App'x 460, 462 (6th Cir. 2013).

There is no federal law of torts or contract. When a plaintiff, like Plaintiffs here, brings a tort claim on behalf of a nationwide class, in reality she does so on

behalf of 50 classes alleging the same type of claim under the relevant laws of each state.

GM argues that Plaintiffs lack standing to bring claims under state laws that do not apply to them. For example, Harrison, who is from Alabama, does not have standing to bring an unjust-enrichment claim on behalf of consumers in Indiana. Yet, Harrison does exactly that when he brings a nationwide class claim for unjust enrichment, which results in him bringing claims under Indiana (and every other state's) law. Applying that to Plaintiffs' claims as a whole, GM argues that they do not have standing to pursue nationwide class claims because they do not reside in every state. Each plaintiff only has standing to bring claims under the laws of the state in which she is from.

Courts have not uniformly addressed this issue. Some courts have deferred this question to the class-certification stage, finding that the issue is best suited to the commonality or typicality analysis under Federal Rule of Civil Procedure 23. *See Johnson v. FCA US LLC*, 555 F. Supp. 3d 488, 499 (E.D. Mich. 2021); *Gamboa v. Ford Motor Co.*, 381 F. Supp. 3d 853, 884 (E.D. Mich. 2019).

This Court has previously declined to follow this line of cases. *See Withrow v. FCA US LLC*, No. 19-13214, 2021 WL 2529847, at *6–9 (E.D. Mich. June 21, 2021). There, the Court provided three main reasons why it would not defer this question to class certification—one, the case law used in support of deferring did not involve plaintiffs seeking to bring claims under the laws of all 50 states; two, standing must be determined claim-by-claim and relief-by-relief; and three, Rule 23 and standing

present distinct inquiries with distinct purposes. *Id.* at *6–8. So, the Court concluded, plaintiffs only have standing to bring claims, including class claims, under the laws of the states where they bought their vehicles because their injury is only "fairly traceable" to the defendant's unlawful conduct under that state's laws. *Id.* at *9.

Plaintiffs have not provided the Court with any reason to rethink its decision in *Withrow*. Plaintiffs merely cite to cases in this District and others that have deferred the question to the class-certification stage. (ECF No. 40, PageID.5236–5237.) But the Court is well aware of these decisions. In fact, it addressed many of these decisions in *Withrow* and provided reasons why it was not persuaded to follow them. *See* 2021 WL 2529847, at *6 ("But on the facts of this case, the Court does not believe *Amchem*, *Ortiz*, and *Fallick* are instructive."). In fact, many of the decisions Plaintiffs cite predate this Court's decision in *Withrow*. And since the Court issued its opinion in *Withrow*, other courts have joined it in dismissing nationwide class claims that seek to invoke state laws that the named plaintiffs have no connection to. *See, e.g.*, *Heater v. Gen. Motors, LLC*, 568 F. Supp. 3d 626, 644 (N.D. W. Va. 2021); *Vitiosus v. Alani Nutrition, LLC*, No. 21-cv-2048, 2022 WL 2441303, at *10 (S.D. Cal. July 5, 2022); *Pistorio v. FCA US LLC*, No. 20-cv-11838, 2022 WL 141524, at *6 (E.D. Mich. Jan. 14, 2022).

So given that Plaintiffs have not provided the Court with any reason to change its decision, the Court will dismiss Plaintiffs' nationwide claims for unjust enrichment, fraud by omission, and violations of the Magnuson-Moss Warranty Act for the same reasons it gave in *Withrow*. 2021 WL 2529847, at *6–9. Plaintiffs may

8

only pursue those claims, individually and on behalf of a class, under the laws of the states they share a connection with, and not under the laws of all fifty states.

## B. Fraud by Omission or Fraudulent Concealment

Turning to the substance of the claims, Plaintiffs complain about GM's failure to inform them of the Valve-Train Defect. GM raises two grounds for dismissing Plaintiffs' fraud-by-omission claims: that Plaintiffs have not plausibly pled that GM knew about the defect and that, even if they had, Plaintiffs have not alleged that GM had a duty to disclose the defect.[2]

### 1. Knowledge

The Court starts with addressing Plaintiffs' allegations about GM's knowledge of the defect, as knowledge is a relevant issue to claims other than just the fraud-by-omission claims. It is undisputed that knowledge is an element of fraud by omission in all relevant states. *See Gregorio v. Ford Motor Co.*, 522 F. Supp. 3d 264, 277–78 (E.D. Mich. 2021). And because neither party makes arguments specific to any one state's law, the Court will address this argument in a general manner.

Plaintiffs allege four sources of GM's knowledge of the Valve-Train Defect: pre-production testing, customer complaints to online forums and to the National Highway Traffic Safety Administration, redesigning parts of the valve-train system, and Technical Service Bulletins and Service Updates.

---

[2] GM also argues that, to the extent Plaintiffs bring any claims based on misrepresentations, those should be dismissed for failing to plead specific statements or pleading statements that are puffery. As the fraud-by-omission claim does not necessarily implicate any misrepresentations, the Court will address this argument when discussing Plaintiffs' state-consumer-protection-act claims.

Two of these categories—customer complaints and pre-production testing—are disfavored as ways of showing a manufacturer's knowledge.

"Without supporting facts that GM engaged with or received complaints about the [defect] and its safety risk, the consumer complaints are insufficient to allege that GM knew about the [defect] under the 12(b)(6) pleading standard." *Smith v. Gen. Motors LLC*, 988 F.3d 873, 885 (6th Cir. 2021). To show such engagement, Plaintiffs rely on an article titled, "Taking your car complaint online? Chrysler, GM, and Ford will see it." (*See* ECF No. 27-8.) But the article fails to support Plaintiffs' conclusion that GM took note of the complaints. For starters, the article discusses a more general trend of GM, Ford, and Chrysler focusing on brand and reputation management, as opposed to corporate identity as a whole, by using search engines to scan for terms involving their bestselling cars. (ECF No. 27-8, PageID.3207.) That hardly leads to the inference that GM specifically knew about customer complaints regarding the Valve-Train Defect in several different models of cars over several years. In fact, the article says little about GM specifically and mostly discusses Chrysler's strategy. (*See id.* at PageID.3208 ("While Ford and GM don't seem to devote quite as much staff time to such activities, it's become part of their corporate game plan, too.").) Further, the article does not discuss its sources for coming to these conclusions—the author did not interview anyone from GM and does not share his own credentials for making these assertions. So the article on consumer complaints does little to show that GM plausibly "engaged with or received complaints" about the Valve-Train Defect. *See*

10

*Smith*, 988 F.3d at 885. And without such allegations, the complaints cannot be used to show knowledge.

Similarly, Plaintiffs allege that as a result of "testing that place[s] 100,000 miles on the engines prior to production in GM's standard durability testing," GM "would have learned of the Valve Train Defect not only prior to the sale of the first vehicle with AFM, but also each year before new model year vehicles were produced." (ECF No. 27, PageID.2669.) Similar allegations have been found to be insufficient to plead knowledge because Plaintiffs have made "no specific allegations about the results of the tests, such as data obtained by GM or documents confirming or suggesting whether the defect became known." *See Smith*, 988 F.3d at 884. In other words, Plaintiffs have not alleged "how or why testing revealed" the defect other than an assumption that by placing 100,000 miles on the vehicles and conducting durability testing, GM must have learned of the defect. *See id.* And none of the articles Plaintiffs attach to their complaint changes that conclusion as they do not contain specific discussions about the Valve-Train Defect. (*See* ECF Nos. 27-4, 27-5, 27-6.) So the pre-production allegations also do not plausibly show GM's knowledge of the defect.

And while the Court perhaps understands the logic behind Plaintiffs' allegations that GM redesigning certain valve-train parts means it knew of the defect, that argument only goes so far. There are many other reasons for GM to redesign a part—availability of materials, cost of materials or assembly, to improve efficiency of the vehicle, and to improve reliability and safety (apart from the need to do so because

of a defect). Plus, Plaintiffs allege that the redesigned valve-train system was also defective. (ECF No. 27, PageID.2707.) So it seems even less likely that GM redesigned these parts because of the Valve-Train Defect if the parts continued to be defective in largely the same way. Thus, Plaintiffs' allegations that GM redesigned certain components of the valve-train system do not plausibly show that GM knew about the Valve-Train Defect.

With that, Plaintiffs' knowledge allegations boil down to the Technical Service Bulletins and the Service Updates. The Court finds that these two sources are sufficient to plausibly allege that GM had knowledge of the defect.

GM provides Technical Service Bulletins, which describe issues that customers may experience with their vehicles, to professional technicians at its dealerships. (ECF No. 27, PageID.2670.) The bulletins include, among other things, a description of the issue and how customers may describe the issue, what model and model year of vehicle the bulletin applies to, and possible solutions the dealership technicians should apply to fix the defect. (*See, e.g.*, *id.* at PageID.2683–2684.)

While these bulletins are not admissions that a particular vehicle has a defect, this Court and others have found that they provide a sufficient basis to allege that the manufacturer had knowledge about certain issues. *See Gregorio v. Ford Motor Co.*, 522 F. Supp. 3d 264, 282 (E.D. Mich. 2021) ("As explained by another court in this District, 'TSBs advising of specific transmission issues support[ ] a fair inference that [the manufacturer] relied on an 'accretion of knowledge' collated from its own internal testing and engineering reports and complaints and data received

exclusively by it through its dealer channels, which prompted it to issue those repair bulletins.'" (quoting *Francis v. Gen. Motors, LLC*, 504 F. Supp. 3d 659, 685 (E.D. Mich. 2020))); *see also In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d 936, 958 (N.D. Cal. 2014); *MacDonald v. Ford Motor Co.*, 37 F. Supp. 3d 1087, 1093 (N.D. Cal. 2014). Thus, when GM "issues a service bulletin about the precise issue in the precise vehicle that a plaintiff complains of, it is common sense to infer that [GM] had knowledge of that issue at the time of, and prior to, the service bulletin." *See Gregorio*, 522 F. Supp. 3d at 282.

Plaintiffs' allegations warrant such an inference here.

Start with the allegations describing the defect. The Court surmises that the Valve-Train Defect, which generally refers to the valves not opening and closing at the correct times, is actually the failure of three parts: the rockers arms, the valve springs, and the lifters. The rocker-arm issue refers to the rocker arms shedding "needle bearings, causing the rocker arm to no longer move in time with the rest of the valve train." (ECF No. 27, PageID.2661.) The valve springs "breakdown and fail prematurely" by either breaking into multiple pieces or shedding pieces, which causes the valve spring to no longer hold the opening to the combustion chamber closed. (*Id.* at PageID.2662.) And the lifter defect includes "collapsed lifters, which can be the result of a mistimed switch event when the lifter is locked or unlocked at the wrong time of the cycle." (*Id.* at PageID.2657.) In turn, collapsed lifters can cause the pushrods to become bent, apparently causing them to not properly push into the rocker arm, which is what controls the opening of the valve. (*Id.* at PageID.2658.)

Issues with all three components—the rocker arm, the valve springs, and the lifters—can cause debris to circulate through the engine and create the issues Plaintiffs complain of.

In terms of what customers may experience as a result of the defect, Plaintiffs say that "symptoms of the Valve Train Defect begin with noises, typically chirping, squeaking, and/or ticking when the vehicle is not idling. Eventually, if unremedied, they progress to engine misfires, as the valves fail to open and close at appropriate times." (ECF No. 27, PageID.2662.)

Now compare those allegations to the Technical Service Bulletins. Plaintiffs describe over 30 different bulletins in their complaint, but the point can be made with a few. The bulletins refer to issues that Plaintiffs connect to the defect. (*See* ECF No. 27, PageID.2672 (pleading that a 2011 TSB stated, "[t]his may be the result of an AFM lifter that unlocks as soon as the engine is started or one that is mechanically collapsed/stuck all of the time. . . . AFM lifters which were collapsed or stuck would additionally cause "a consistent valve train tick noise."); *id.* at PageID.2674 (pleading that a 2012 TSB stated, "GM noted that this concern may be the result of several conditions, including a 'worn camshaft lobe and/or lifter roller,' 'a broken valve spring,' and 'a collapsed AFM lifter.'"); *id.* at PageID.2678 (pleading that a 2014 TSB stated, "if a dealer finds roller rocker arm needle bearings during an oil change [in the oil pan], inspect all of the roller rocker arms. If a damaged rocker arm is found, only replace the broken roller rocker arm."); *id.* at PageID.2680 (pleading that a 2015 TSB stated, "[s]ome customers may comment on . . . engine misfire on cylinder 4, 6,

14

and/or tick noise. This may be the result of an AFM lifter that is mechanically collapsed and or stuck all of the time. These lifter concerns may be the result of internal locking pin damage in the lifter, due to oil aeration."); *id.* at PageID.2692 (pleading that a 2018 TSB stated, "GM noted that this concern may be the result of several conditions, including a worn camshaft lobe and/or lifter roller, a broken valve spring, and a collapsed AFM lifter."); *id.* at PageID.2695 (pleading that a 2019 TSB stated, "The bulletin stated that customers might comment on misfire, chirp, squeak, squeal, tick . . . GM noted that this concern may be the result of several conditions, including a worn camshaft lobe and/or lifter roller, a broken valve spring, and a collapsed AFM lifter."); *id.* at PageID.2697, 2698 (pleading that a 2020 TSB "described that '[s]ome customers may comment on a malfunction indicator lamp (MIL) on and/or an engine misfire/tick noise. . . . The possible causes included AFM lifter that is mechanically collapsed and/or stuck all of the time, internal locking pin damage in the lifter, due to oil aeration, lifter that has collapsed and is stuck in the lifter bore, and a bent push rod.'").) Given the similarities between the defect description and these bulletins, the Court finds that "it is common sense to" infer that GM had knowledge of these issues before and at the time it issued the bulletins.

The Court notes, however, that Plaintiffs have alleged one uniform defect—the Valve Train Defect. Yet the sum of their TSB allegations actually indicate that there are three separate part failures at issue in this case. The Court would thus describe the "Valve Train Defect" as actually three separate defects that affect three different parts, all of which perhaps lead to the same symptoms. But Plaintiffs' allegations do

not plausibly show that each plaintiff suffered from all three parts failing at once such that the Court can find GM plausibly had knowledge of a "Valve Train Defect." But it does find that GM plausibly knew of 1) issues with the rocker arms; 2) issues with the valve springs, and; 3) issues with the lifters.

GM also argues that some of these bulletins "apply only to a limited subset of the vehicles included in Plaintiffs' broad putative class." (ECF No. 38, PageID.2602.) While that is true, it does not change this Court's conclusion for two reasons. One, though a particular bulletin only applies to the vehicles listed, Plaintiffs have provided numerous bulletins issued by GM, some of which apply to a broad range of classes. (*See, e.g.*, ECF No. 27, PageID.2700 ("The bulletin was applicable to all GM vehicles model years 2000-2021.").) And two, despite raising this argument, GM does not specify which of Plaintiffs' vehicles are not covered by the bulletins. Without this information, the Court is unwilling to exclude any fraud-by-omission claim.

Finally, GM argues that the bulletins are "not a basis for imposing liability[.]" (ECF No. 28, PageID.3602.) But as another district court explained, "[a]t this juncture, the Court is not determining liability or considering the TSB as an 'admission' of any kind. Rather, the various TSB helps render plausible Plaintiffs' allegations that Defendants knew of the alleged defect." *Ponzio v. Mercedes-Benz USA, LLC*, 447 F. Supp. 3d 194, 229 (D.N.J. 2020).

Thus, Plaintiffs have plausibly alleged GM's knowledge, and their fraud-by-omission claims will not be dismissed on that ground.

## 2. Duty to Disclose

GM also argues that, under relevant state law, Plaintiffs must plead that GM had a duty to disclose information about the defect to state a claim for fraud by omission. For their part, Plaintiffs argue that not all states require a duty to disclose, but for the ones that do, Plaintiffs have adequately pled such a duty by pleading that GM had superior knowledge of the defect.

Both parties agree that a duty to disclose can be established based on GM's superior knowledge of the defect in all relevant states except Florida and New Jersey. (*See* ECF No. 38, PageID.3607, n.33.) So, for all other states, the Court will assume without deciding that Plaintiffs are required to plead a duty to disclose because it finds that Plaintiffs have done so by pleading that GM had superior knowledge of the defect.

Much like the Court's analysis on GM's knowledge of the defect, the analysis here also focuses on the bulletins Plaintiffs cite in their complaint. This Court and others in this District have found that Technical Service Bulletins in particular support an inference that a manufacturer "was collecting evidence of a [defect] from internal sources long before the TSBs were issued." *Gregorio*, 522 F. Supp. 3d at 282–83 (finding three TSBs issued by Ford sufficient to establish superior knowledge); *see also Francis*, 504 F. Supp. 3d at 685 ("[T]he evidence of the many TSBs advising of specific transmission issues supports a fair inference that GM relied on an accretion of knowledge collated from its own internal testing and engineering reports and complaints and data received exclusively by it through its dealer channels, which

17

prompted it to issue those repair bulletins."). And though some TSBs are available on public websites, like the NHTSA website, that does not defeat Plaintiffs' allegation that GM had superior knowledge of the defect compared to them. For one, even if the TSBs were available online for consumers who conducted Internet research, the information that led to the issuance of the bulletins was likely in the exclusive control of GM. *See Gregorio*, 522 F. Supp. 3d at 282–83. And Plaintiffs' complaint suggests that the full content of the TSBs was not publicly available. *See MyFord Touch*, 46 F. Supp. 3d at 960. Indeed, Plaintiffs plead that the bulletins "are issued exclusively to [GM] dealerships and are not disseminated to consumers, even if their vehicles receive services as outlined in the bulletins" unless directed to do so by GM. (ECF No. 27, PageID.2670.) Plaintiffs continue, "since GM issues bulletins for everything from minor, cosmetic issues to major issues such as the Valve Train Defect, any given model year of vehicle might have over 1,000 bulletins applicable to it . . . . Further, NHTSA does not provide a way to search through the bulletins so that consumers can sort major issues from minor issues." (*Id.*) And the bulletins include a disclaimer stating, "DO NOT assume that the bulletin applies to your vehicle, or that your vehicle will have that condition. See your GM dealer for information on whether your vehicle may benefit from the information." (*Id.* at PageID.2670–2671.) In all, given the intended purpose of the TSBs, the process by which they are issued, and the difficulty consumers may have discerning between material and non-material TSBs, the Court finds that the dozens of TSBs issued by GM about valve-train issues make plausible the allegation that GM had superior knowledge of the alleged defect.

18

That leaves whether Plaintiffs have plausibly pled a duty to disclose under Florida and New Jersey law.

New Jersey law does not allow a plaintiff to establish a duty to disclose via superior knowledge. *See O'Connor v. Ford Motor Co.*, 567 F. Supp. 3d 915, 965 (N.D. Ill. 2021) ("[A] party's 'superior knowledge' is insufficient to impose a duty to disclose in New Jersey." (quoting *Schechter v. Hyundai Motor America*, No. 18-13634, 2019 WL 3416902, at *9 (D.N.J. July 29, 2019))); *see also Roe v. Ford Motor Co.*, No. 18-12528, 2021 WL 2529825, at *9 (E.D. Mich. June 21, 2021). There must be something more, like a fiduciary relationship or a partial disclosure. *Chapman v. Gen. Motors LLC*, 531 F. Supp. 3d 1257, 1291 (E.D. Mich. 2021). "In fact, New Jersey Courts have found no special relationship between individual consumers and automobile manufacturers that would impose a duty to disclose on the manufacturers" within the context of omissions-based fraud claims. *Ponzio*, 447 F. Supp. 3d at 234; *Coba v. Ford Motor Co.*, No. 12-1622, 2013 WL 244687, at *12 (D.N.J. Jan. 22, 2013) (internal citations omitted); *Argabright v. Rheem Mfg. Co.*, 201 F. Supp. 3d 578, 604 (D.N.J. 2016). And Mouradjian (the only New Jersey plaintiff the Court is considering in this opinion) does not allege any sort of partial disclosure that would impose on GM the duty to also disclose the defect. (*See* ECF No. 27, PageID.2584–2587). So the Court will dismiss Mouradjian's fraud-by-omission claim under New Jersey law.

As for Florida, courts in this District have found that superior knowledge is an exception to the duty to disclose under Florida law. *See Chapman v. Gen. Motors, LLC*, 531 F.Supp.3d 1257, 1291 (E.D. Mich. 2021) (denying motion to dismiss because

superior knowledge is an exception to the duty to disclose under Florida law); *In re Gen. Motors Air Conditioning Mktg. & Sales Practices Litig.*, 406 F. Supp. 3d 618, 638 (E.D. Mich. 2019) (same (citing *Majdipour v. Jaguar Land Rover N. Am., LLC*, No. 12-07849, 2015 WL 1270958, at *13 (D.N.J. Mar. 18, 2015))); *see also Majdipour*, 2015 WL 1270958, at *13 (holding that plaintiff plausibly alleged that auto manufacturer "had superior knowledge of the alleged defect" which could "establish a duty to disclose" under Florida law); *Estate of Pilgrim v. Gen. Motors LLC*, — F. Supp. 3d —, 2021 WL 989322, at *9 (E.D. Mich. 2022) (same). And Florida law provides a basis for this conclusion. *See Nessim v. DeLoache*, 384 So. 2d 1341, 1344 (Fla. Dist. Ct. App. 1980) ("The classic illustration of fraud is where one party having superior knowledge intentionally fails to disclose a material fact, which is not discoverable by ordinary observation[.]" (internal citations omitted)). So, for the reasons given above, the Court will allow the fraud-by-omission claims to survive under Florida law.

In sum, the only fraud-by-omission claim that will be dismissed is Mouradjian's claim under New Jersey law. The other plaintiffs who are at issue in this motion plausibly pled a duty to disclose based on GM's superior knowledge.

### C. Express Warranty

Plaintiffs also bring breach-of-express-warranty claims based on GM's failure to repair the valve-train issues at no cost. Plaintiffs fall into two groups when examining their express warranty claims—those who sought repairs within the warranty period and those who did not. The Court addresses each group in turn.

### 1. No repairs within warranty

Start with Plaintiffs who did not seek repairs within the warranty period. This Court has previously held that a plaintiff who did not bring their vehicle in for repair within the time and mileage limits set by the warranty may not pursue a breach-of-express-warranty claim. *See Roe v. Ford Motor Co.*, No. 2:18-CV-12528-LJM-APP, 2019 WL 3564589, at *9 (E.D. Mich. Aug. 6, 2019) ("As it is not plausible that any plaintiff brought his or her vehicle to a Ford dealer for a water-pump repair within the lesser of five years and 60,000 miles, Ford's express-warranty obligation to repair or replace the water pump was never triggered. So even if, as Plaintiffs[] plead, Ford did not repair their vehicles cost-free, Ford did not breach the express warranty by failing to do so.").

A similar conclusion is warranted here. GM's warranty states, "[t]o obtain warranty repairs, take the vehicles to a GMC [or Chevrolet] dealer facility within the warranty period and request the needed repairs." (ECF No. 38-4 (the Jetts and Deery); ECF No. 38-6 (Hayford); ECF No. 38-8 (Cheshire and Mouradjian); ECF No. 38-15, PageID.4271 (Reidhars); ECF No. 38-16, PageID.4321 (Attia and the Purshagas).) The warranty thus directs consumers to take the vehicles to a dealer facility within the warranty period as a precondition to receiving repairs. *See id.*

That precondition is fatal to some of plaintiffs' express-warranty claims. *See Roe*, 2019 WL 3564589, at *9; *see also Wozniak v. Ford Motor Co.*, No. 2:17-CV-12794, 2019 WL 108845, at *2 (E.D. Mich. Jan. 4, 2019); *Gregorio v. Ford Motor Co.*, 522 F. Supp. 3d 264, 290 (E.D. Mich. 2021). GM issued Plaintiffs an express warranty with

time and mileage limits. (ECF No. 38-4 (the Jetts and Deery had a 5-year or 60,000-miles Powertrain warranty); ECF No. 38-6 (same for Hayford); ECF No. 38-8 (Cheshire and Mouradjian had a 5-year or 100,000 miles Powertrain warranty); ECF No. 38-15, PageID.4271 (same for Reidhars); ECF No. 38-16, PageID.4321 (Attia and the Purshagas had a 5-year or 60,000-miles Powertrain warranty).) Yet these plaintiffs all alleged that they sought repairs after the expiration of their warranties or failed to take their vehicles in for repair at a dealer facility. (*See* ECF No. 27, PageID.2632–2633 (Jetts took vehicle in for repair after 73,000 miles); *id.* at PageID.2617 (Deery took her vehicle in to a non-dealer repair shop at 99,470 miles); *id.* at PageID.2605 (Hayford took in his vehicle at 81,300 miles); *id.* at PageID.2524, 2527 (Cheshire bought his vehicle in 2015 and took it for repairs in 2021); *id.* at PageID.2586 (no allegations that Mouradjian took car to a certified dealer); *id.* at PageID.2519 (Reidhars purchased vehicle in 2014 and took it into dealership in 2022); *id.* at PageID.2570 (Attia took his car in after 78,483 miles); *id.* at PageID.2572 (Purshagas purchased vehicle used at 69,000 miles).) Thus, the Jetts, Deery, Cheshire, Mouradjian, the Reidhars, Attia, the Purshagas, and Hayford did not satisfy the precondition to their warranties and have failed to plausibly plead a breach-of-express-warranty claim.

Plaintiffs argue that they should not be barred from pursuing an express-warranty claim because they have alleged that the defect "existed when they purchased their vehicles and GM's express warranty covers any vehicle defect occurring during the warranty period." (ECF No. 40, PageID.5241.) That may be true,

but it does not explain why Plaintiffs should be excused from the separate precondition of seeking a repair within the time-and-mileage limits. To establish a breach, Plaintiffs must show that GM did not comply with the terms of that warranty. And nothing in the warranty guarantees a defect-free vehicle upon purchase— instead, it guarantees free repairs if a defective vehicle is presented to the dealership within certain time and mile limits. *See Roe*, 2019 WL 3564589, at *11 ("Factually, Ford did not promise that Plaintiffs' powertrains were defect-free; Ford merely promised that (if certain conditions were met) it would repair, replace, or adjust powertrain parts . . . free of charge" (internal quotations omitted)). So these plaintiffs' express-warranty claims are untenable to the extent they seek to hold GM accountable for breaching a warranty that guarantees repairs within a certain period when they never asked for such repairs during the relevant period.

Plaintiffs also present a similar argument in a different flavor—that they should not be held to the durational and mileage limits set out in the express warranty because the limits are unconscionable due to GM's knowledge of the defect at the time of sale.

Plaintiffs have not expressly argued that any particular state does not require a showing of procedural unconscionability. And GM asserts that to successfully plead a breach-of-warranty claim based on a theory of unconscionability, they must allege both substantive and procedural unconscionability. *See Ambrose v. Gen. Motors LLC*, No. 19-13449, 2022 WL 3701946, at *9 (E.D. Mich. Aug. 26, 2022) (citing *Rivera v. Ford Motor Co.*, No. 16-cv-13786, 2017 WL 3485815, at *3 (E.D. Mich. Aug. 15, 2017)).

The Sixth Circuit has held that a contract is procedurally unconscionable where the "relative bargaining power and alternative sources of supply strongly favors one party." *See Andersons, Inc. v. Horton Farms, Inc.*, 166 F.3d 308, 322 (6th Cir. 1998).

Plaintiffs have barely pled any allegations about unconscionability. For each subclass, Plaintiffs state that the warranty limitations are unconscionable because GM "knowingly" sold or leased vehicles without disclosing the Valve-Train Defect and that Plaintiffs did not determine or know about the warranty limitations, even though the limitations are stated in the warranty. (*See, e.g.*, ECF No. 27, PageID.2749–2750.) Plaintiffs conclude, "[a] gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Valve-Train Defect existed between GM" and the class members for each state. (*See, e.g.*, *id.* at PageID.2750.)

GM's alleged knowledge of the defect does not amount to a gross disparity of bargaining power between Plaintiffs and GM. The Court agrees with the court's analysis in *In re General Motors Air Conditioning Marketing & Sales Practices Litigation* that a difference in knowledge should not be conflated with a difference in bargaining power. 406 F. Supp. 3d 618, 629–30 (E.D. Mich. 2019). As the court explained, "Bargaining power comes primarily from having viable alternatives in the marketplace, and a vehicle consumer with many options – like the Plaintiffs here – has real and substantial bargaining power even where a seller like GM knowingly fails to disclose a defect." *Id.*

To that point, the Court notes that given the nature of the car industry, it is difficult to show procedural unconscionability in a case like this one. Many courts

have recognized, and this Court agrees, that the car industry is one of the most competitive markets that exists. With that competition comes a meaningful choice between a range of manufacturers and models. In other words, the "alternative sources of supply" does not favor GM in the bargaining process at all. As one court put it, "[a]n individual seeking to purchase one of the Class Vehicles has many other options – sometimes within walking distance of his local GM dealership – if he is unhappy with the warranty that GM provides." *In re Gen. Motors Air Conditioning Mktg. & Sales Pracs. Litig.*, 406 F. Supp. 3d at 629–30.

Without more than its allegations that GM knew about the Valve-Train Defect and Plaintiffs did not, Plaintiffs have failed to plausibly plead that the limits on the warranty were procedurally unconscionable. So the terms of the express warranty will still apply. The Jetts, Deery, Hayford, Cheshire, Mouradjian, the Reidhars, Attia, and the Purshagas may not proceed with their express-warranty claims.

### 2. Repairs Within Warranty Period

As for the remaining plaintiffs, they all plausibly alleged that they sought repairs within the warranty period. GM mostly does not dispute this, with the exception of two plaintiffs—Luster and Jordan.

Luster alleged that she bought her car in 2017, and just a few months after, she took her vehicle to the dealership and requested repairs for issues related to the valve train, but "was told there was nothing wrong with her vehicle." (ECF No. 27, PageID.2531.) She also alleges that as of 2021, her car had 62,079 miles. (*Id.*) As her

Powertrain warranty covers the first 6 years or 70,000 miles (ECF No. 38-5), Luster has plausibly alleged that she sought repairs within the warranty period.

As for Jordan, the facts are less clear. Jordan alleges he bought a used GM vehicle on December 31, 2015, and on June 14, 2021, with 46,800 miles on his car, he sought valve-train repairs from a dealer. His Powertrain warranty is for the first 6 years or 70,000 miles, so he seemingly sought repairs within the warranty limitations. (*See* ECF No. 38-7.) But there is a wrinkle: the warranty also states that the "period for all coverages begins on the date the vehicle is first delivered or put in use," and Jordan bought a used vehicle. (*See* ECF No. 38-7.) However, Jordan purchased a 2015 model, so it may have been first put into use after June 14, 2015, making the June 14, 2021 requested repair within six years. Given that Jordan may have sought repairs within the time limit set in the warranty, the Court finds that he plausibly pled an express-warranty claim at this stage.

Having determined who sought repairs within the warranty period, the Court now addresses GM's argument that those plaintiffs have no express-warranty claim because they received "the precise benefit the warranty provides"—a free repair.

Courts in similar cases have found that an express-warranty claim may be brought when the manufacturer is either unwilling or unable to repair the vehicle, despite attempting to repair the vehicle for free. *See Benkle v. Ford Motor Co.*, No. 161569, 2017 WL 9486154, at *12 (C.D. Cal. Dec. 22, 2017) ("Plaintiffs have plausibly alleged a breach of express warranty on the theory that Defendant failed to provide adequate repairs under the terms of its Limited Warranty."); *Gregorio v. Ford Motor*

26

*Co.*, 522 F. Supp. 3d 264, 290 (E.D. Mich. 2021) (holding that it is plausible that Ford's express warranty failed its essential purpose where plaintiffs pled that Ford was either unwilling or unable to fix the defect); *Reynolds v. FCA US LLC*, 546 F. Supp. 3d 635, 649–50 (E.D. Mich. 2021).

Plaintiffs here have adequately pled that even if GM provided them with repairs, the repairs failed to fix the defect. All Plaintiffs, including those whose valve-trains were repaired under warranty, state that the Valve-Train Defect continues to affect their cars at the time of the complaint. (*See, e.g.*, ECF No. 27, PageID.2513.) Some Plaintiffs even allege that they sought repairs multiple times during the warranty period and still experienced the defect, which suggests that the repair was ineffective. (*See* ECF No. 27, PageID.2511–2512 (Harrison); *id.* at PageID.2535–2536 (Speno); *id.* at PageID.2566–2567 (Roller); *id.* at PageID.2555–2556 (Scott); *id.* at PageID.2609 (Podojil); *id.* at PageID.2625 (Dittman).) And Luster stated she was denied repairs for the defect when she sought them. (*Id.* at PageID.2531.)

So the Court will not dismiss the express-warranty claims of Plaintiffs who presented their vehicle for repair during the warranty period but received an ineffective repair.

### D. Implied Warranty

GM raises four issues with Plaintiffs' implied-warranty-of-merchantability claims: that their implied-warranty claims are limited by their express-warranty claims, that they are still able to drive their vehicles after the repairs, that Plaintiffs failed to allege privity, and that the statute of limitations bar some of their claims.

### 1. Express-Warranty Limitation

The Court agrees with GM that plaintiffs who did not comply with the durational limits set out in the express warranties also do not have a plausible implied-warranty claim because their express warranties limit the duration of any implied warranties. *See Hall v. Gen. Motors, LLC*, No. 19-cv-10186, 2020 WL 1285636, at *11 (E.D. Mich. Mar. 18, 2020) ("Because Plaintiffs' implied warranties expired before they sought service for their vehicles, they cannot state a viable breach of implied warranty claim against GM.").

The Jetts, Deery, Hayford, Cheshire, Mouradjian, the Reidhars, Attia, and the Purshagas alleged that the defect manifested outside of the warranty period. (ECF No. 27, PageID.2633 (Jetts); *id.* at PageID.2617 (Deery); *id.* at PageID.2605 (Hayford); *id.* at PageID.2526–2526 (Cheshire); *id.* at PageID.2586 (Mouradjian); *id.* at PageID.2519 (Reidhars); *id.* at PageID.2570 (Attia); *id.* at PageID.2574 (Purshagas).) And all of their express warranties contained a clause that set durational limits for any implied warranties. (ECF No. 38-4 (Jetts' and Deery's express warranty stating, "Any implied warranty of merchantability or fitness for a particular purpose applicable to this vehicle is limited in duration to the duration of this written warranty."); ECF No. 38-6 (Hayford); ECF No. 38-8 (Cheshire and Mouradjian); ECF No. 38-15, PageID.4281–4282 (the Reidhars); ECF No. 38-16, PageID.4331 (Attia and the Purshagas).) So the Court will also dismiss the implied-warranty claims brought by the Jetts, Deery, Hayford, Cheshire, Mouradjian, the Reidhars, Attia, and the Purshagas.

## 2. Merchantability

The U.C.C. provides an implied warranty of merchantability. U.C.C. § 2-314. To be merchantable, goods must be "fit for the ordinary purposes for which such goods are used." U.C.C. § 2-314(2)(c).

GM argues that "no Plaintiff alleges that they have not been able to drive their vehicle after repairs were performed," so none of Plaintiffs' vehicles are truly unmerchantable. (ECF No. 38, PageID.3590.) GM does not argue that any particular jurisdiction's rule of decision warrants dismissal of the claims—it merely argues that each plaintiff's implied-warranty claim should be dismissed for failing to allege that they are unable "to drive their cars despite the alleged defects." (*Id.* (quoting *Brown v. Hyundai Motor Am.*, No. CV1811249, 2019 WL 4126710, at *5 (D.N.J. Aug. 30, 2019).)

Courts have not taken the narrow view of merchantability that GM desires. Rather, "for an automobile to be merchantable in the usual sense, the law requires more than it simply move from point to point under its own power. Ordinary car buyers reasonably expect, and the law allows that they should expect, cars not only to provide transportation, but also do so in a reasonably safe and reliable manner." *Francis v. Gen. Motors, LLC*, 504 F. Supp. 3d 659, 675 (E.D Mich. 2020); *see also Gregorio*, 522 F. Supp. 3d at 290 ("Courts routinely hold that to be fit for its ordinary purpose, a standard road vehicle must be able to provide safe and reliable transportation and be substantially free of defects."); *In re FCA US LLC Monostable Elec. Gearshift Litig.*, 334 F.R.D. 96, 112 (E.D. Mich. 2019).

With one exception discussed below, Plaintiffs have satisfied this definition of merchantability. As a general matter, Plaintiffs allege that the Valve-Train Defect causes them to lose power while driving and also causes the car to stall, shake, and surge. (ECF No. 27, PageID.2508.) In particular, Plaintiffs have described their car engines losing power as they drove, which affects their ability to use their car for transportation purposes, and their vehicles emanating a loud ticking or knocking noise. (*See, e.g.*, ECF No. 27, PageID.2621 (Burton's vehicle "was barely able to move forward by the time he got to his home" and had a loud ticking or knocking noise); *id.* at PageID.2597 (Hess and Martin-Wasser experienced a loss of power, sputtering, and noises from the engine, and could not accelerate); *id.* at PageID.2511–2512 (Harrison was on a 20-mile bridge when he lost power and the vehicle began to sputter and misfire and says he was "only narrowly able to get the vehicle off the bridge[.]"); *id.* at PageID.2566 ("Roller was driving his vehicle on the highway when the vehicle began to [shutter] . . . He was barely able to exit the highway safely [and] . . . the vehicle would not start.").) These allegations, if true, would show that the vehicles are not fulfilling their transportation purposes, and are also causing issues of reliability. If these vehicles are losing power and breaking down on bridges and highways, they are not functioning in the way consumers would expect.

The one exception the Court has found is Jordan's allegations about his 2021 vehicle. Jordan says that his 2015 GM vehicle "had a lack of power, ran roughly, produced smoke from the tailpipe, and was making a clacking noise in the engine compartment" (ECF No. 27, PageID.2549), but all Jordan says about his 2021 vehicle

30

is that it "remains subject to the Valve Train Defect" (ECF No. 27, PageID.2552). Jordan does not allege any facts about the 2021 vehicle's failure to function at any specific time. Thus, the Court will not allow Jordan to pursue an implied-warranty claim for his 2021 GM vehicle.

So all Plaintiffs, with the exception of Jordan and his 2021 vehicle, have plausibly pled that their vehicles were not merchantable.

### 3. Privity

Of the Plaintiffs whose implied-warranty claims are not subject to dismissal for the time-and-mileage limitations, GM asserts that seven of them—the Burtons, Dittman, Speno, Luster, Harrison, and Podojil—failed to allege privity.

The Burtons and Dittman bring their implied-warranty claims under Tennessee law. Privity is a requirement in Tennessee for an implied-warranty claim. *Chapman v. Gen. Motors LLC*, 531 F. Supp. 3d 1257, 1277 (E.D. Mich. 2021) (dismissing Tennessee implied warranty of merchantability claim because Tennessee has a privity requirement with no exceptions); *Travis v. Ferguson*, No. M201600833COAR3CV, 2017 WL 1736708, at *2 (Tenn. Ct. App. May 3, 2017) ("Importantly, Tennessee Code Annotated Section 47–2–314 requires privity of contract between the buyer and the seller. As discussed in the annotations to the statute: The rule requiring privity of contract between the parties is still an essential element of implied warranty in Tennessee except in cases where the product involved is in a defective condition unreasonably dangerous to the user or to the property."

(citing Tenn. Code Ann. § 47–2–314, n. 9; *Leach v. Wiles*, 429 S.W.2d 823 (Tenn. Ct. App. 1968))).

The Burtons and Dittman argue that issuance of an express warranty is evidence that there is privity sufficient for an implied-warranty claim, but they cite no Tennessee law in support.

The Burtons and Dittman do cite to *Commercial Truck & Trailer Sales, Inc. v. McCampbell*, 580 S.W.2d 765 (Tenn. 1979). That decision relies on Tenn. Ann. Code § 29-34-104, which states, "In all causes of action for . . . breach of warranty, including actions brought under the Uniform Commercial Code, privity shall not be a requirement to maintain such action." But this provision is inapplicable in this case where the Burtons are only alleging economic damages and not personal injury or property damage. *See Siqueiros v. General Motors LLC*, No. 16-CV-07244-EMC, 2021 WL 2115400, at *12 (N.D. Cal. May 25, 2021) ("Tennessee law requires plaintiff to be in privity with the defendant to assert warranty claims unless they are raising a cause of action for personal injury or property damage. Put differently, the privity requirement is loosened where there has been personal injury or property damage, not, as here, where there is only a risk of such injury."). Indeed, *McCampbell* was about a fatal injury. *Comm. Truck & Trailer Sales, Inc.*, 580 S.W.2d at 767. So the Burtons and Dittman's implied-warranty claims are dismissed for lack of privity under Tennessee law.

Luster and Speno's claims will similarly be dismissed under Florida law. This Court has previously found that Florida law provides no exceptions to the privity

requirement. *Gregorio*, 522 F. Supp. 3d at 292 ("Florida, on the other hand, has a strict privity requirement. The Florida plaintiffs cannot maintain implied warranty claims against Ford because they bought their cars from a dealer rather than Ford itself."); *see also Chapman*, 531 F. Supp. 3d. at 1278 ("The claims under the . . . Florida statutes, where no exceptions are recognized, are dismissed for failure to sufficiently allege privity.").

Luster and Speno nonetheless contend that there is a third-party beneficiary exception to Florida's privity requirement and that their claims fall under it. The Court recognizes that there is a split among Florida courts as to whether such an exception exists. *Compare Padilla v. Porsche Cars N. Am., Inc.*, 391 F. Supp. 3d 11081117 (S.D. Fla. 2019) ("Consistent with Florida law, and this Court's application thereof, because Plaintiffs did not purchase their used vehicles directly from Porsche, they lack contractual privity with Porsche and their implied warranty claim necessarily fails as a matter of law."), *with Weiss v. Gen. Motors LLC*, 418 F. Supp. 3d 1173, 1183 (S.D. Fla. 2019) ("The Court finds more persuasive the decisions finding the third-party beneficiary exception viable in Florida . . . .Otherwise, a manufacturer would always be able to shield itself from implied warranty claims even though it knows that its intended consumer is not the dealership."). But a split in authority is not enough of a reason for this Court to stray from its prior decision. The Court will thus follow the line of cases finding that Florida law has a strict privity requirement with no exceptions. So Speno and Luster's implied-warranty claims are dismissed.

The same dispute occurs between Harrison and GM under Alabama law. While Harrison does raise the third-party beneficiary exception to privity, he does so in a conclusory manner by merely citing to the portion of the complaint where he asserts he is a third-party beneficiary of "contracts between GM and its distributors and dealers[.]" (ECF No. 27, PageID.2749.)

Despite Harrison's undeveloped argument, it appears that Alabama courts do allow for a third-party beneficiary exception to the privity requirement. *See Hurry v. Gen. Motors LLC*, — F. Supp. 3d —, No. 3:21-CV-673-ECM, 2022 WL 3587349, at *7 (M.D. Ala. Aug. 22, 2022) ("GM argues that Alabama law does not allow a third-party beneficiary to maintain an implied warranty of merchantability claim. That is incorrect." (citing *Morris Concrete, Inc. v. Warrick*, 868 So.2d 429, 435 (Ala. Ct. App. 2003))). And similar to what the court found in *Hurry*, Harrison's allegations here support "a reasonable inference that the parties to the contract for the Class Vehicles—GM and the independent authorized dealers—intended to bestow the benefit of the implied warranty of merchantability upon the Plaintiffs. It is reasonable to infer that GM and the independent dealers intended for the eventual users of the Class Vehicles—the Plaintiffs—to benefit from the implied warranty of merchantability because of the foreseeability of harm to those users from vehicles which are defective, unmerchantable, or both." *Hurry*, 2022 WL 3587349, at *7. So Harrison's implied-warranty claim will survive.

Podojil brings his implied-warranty claim under Ohio law. Ohio law has a privity requirement, but "federal courts applying Ohio law readily have found the

privity requirement to be satisfied where the manufacturer issued a written warranty covering the vehicle in question and the claims are based on warranty-covered defects." *In re FCA US LLC Monostable Elec. Gearshift Litig.*, 355 F. Supp. 3d 582, 596 (E.D. Mich. 2018) (citing *Roxy Home Improvement, LLC v. Mercedes-Benz USA, LLC*, No. 17-01817, 2018 WL 1705800, at *5 (N.D. Ohio Apr. 9, 2018)); *see also Roxy Home Improvement*, 2018 WL 1705800, at *5 ("For purposes of this 12(c) motion and accepting well-pleaded factual allegations as true, the court finds that plaintiffs were in privity of contract with [Mercedes-Benz USA] with respect to the standard 4-year/50,000-mile limited warranties on the 2015 and 2016 vans."). So Podojil's implied-warranty claim will also survive.

In sum, the Burtons, Dittman, Luster, and Speno's implied-warranty claims will be dismissed for lack of privity under Tennessee and Florida law, respectively.

### 4. Statute of Limitations

The Court needs to address GM's statute-of-limitations argument only as to Jordan, who brings his implied-warranty claim under Georgia law. Recall that Jordan pled that he purchased two vehicles—one in 2015 and one in 2021—but the Court found that he did not plead sufficient facts to support his implied-warranty claim for the 2021 vehicle.

So that leaves the 2015 vehicle. Jordan purchased that car in December 2015, but did not sue until almost six years later, in December 2021. Plaintiffs do not dispute that Georgia has a four-year statute of limitations for implied-warranty claims. *See* Ga. Stat. § 11-2-725(1); *see also McCabe v. Daimler AG*, 948 F. Supp. 2d

1347, 1361 (N.D. Ga. 2013). And breach-of-implied-warranty claims "accrue on the date of delivery, irrespective of an attempt to repair." *Moyer v. RV World, LLC*, No. 1:20-cv-754, 2020 WL 13468969, at\*5 (N.D. Ga. Oct. 27, 2020) (citing *Everhart v. Rich's Inc.*, 196 S.E.2d 475, 476 (Ga. Ct. App. 1973)); *see also* Ga. Stat. § 11-2-725(2) ("A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach."). Since Jordan purchased his vehicle in 2015 and did not bring suit until 2021, his claim is time-barred by the four-year statute of limitations in Georgia's UCC.

Though Plaintiffs assert that the statute of limitations is tolled because of fraudulent concealment, they did not cite a Georgia case in support of this exception. And Georgia law requires a plaintiff to show concealment "by positive affirmative act and not by mere silence. There must be some trick or artifice employed to mislead the party who has the cause of action." *See Moore v. Meeks*, 483 S.E.2d 383, 385 (Ga. Ct. App. 1997). Since there is no indication that GM employed such tactics against Jordan, the Court will not toll the statute of limitations.

Thus, since it is clear from the face of the complaint that Jordan's implied-warranty claim for his 2015 vehicle is time-barred by Georgia's four-year statute of limitations, *see Dabish v. McMahon*, 818 F. App'x 423, 428 (6th Cir. 2020) (affirming dismissal on statute of limitations in part because plaintiffs did not sufficiently plead fraudulent concealment tolling), the Court will dismiss Jordan's implied-warranty claim.

\*      \*      \*

To summarize, the Court dismisses the following Plaintiffs' implied-warranty claims: the Jetts, Deery, Hayford, Cheshire, Mouradjian, the Reidhars, Attia, and the Purshagas because of the limitation in their express warranties; the Burtons, Dittman, Luster, and Speno because of privity; and Jordan for failure to plead unmerchantability (2021) and for being untimely (2015).

### E. Magnuson-Moss Warranty Act

"The MMWA provides a federal cause of action for consumers damaged by a defendant who fails to comply with an obligation under a written or implied warranty." *Gregorio v. Ford Motor Co.*, 522 F. Supp. 3d 264, 293 (E.D. Mich. 2021). The parties agree that, if a plaintiff's express- and implied-warranty claims are subject to dismissal, plaintiff's Magnuson-Moss claim must be dismissed as well. (ECF No. 38, PageID.3594; ECF No. 40, PageID.5247.) So the Court will dismiss the following plaintiffs' Magnuson-Moss claims: the Purshagas, Cheshire, Deery, Attia, the Jetts, Hayford, Mouradjian, the Reidhars, and Luster.

GM also raises a basis for dismissing the other plaintiffs' Magnuson-Moss class action claims. GM says that all plaintiffs have failed to meet the Act's 100-named-plaintiff requirement, and so their class action claims must be dismissed. *See Kuns v. Ford Motor Co.*, 543 F. App'x 572, 574 (6th Cir. 2013) ("To bring a class action pursuant to the MMWA, a complaint must list at least one hundred named plaintiffs." (citing 15 U.S.C. § 2310(d)(3))).

The Court recognizes that there is a split in authority as to whether a plaintiff may use the Class Action Fairness Act to bring a class action under the Magnuson-

Moss Warranty Act, thereby evading Magnuson-Moss' requirement that they name 100 plaintiffs. *See, e.g.*, *Floyd v. Am. Honda Motor Co.*, 966 F.3d 1027, 1035 (9th Cir. 2020) ("Although CAFA was enacted thirty years after MMWA, CAFA does not demonstrate any intent by Congress to repeal or alter parts of the MMWA's jurisdictional requirements. Therefore, CAFA may not be used to evade or override the MMWA's specific numerosity requirement[.]" (internal citations omitted)). But the Sixth Circuit has stated that "district courts have, as a general rule, held that the CAFA effectively supersedes the MMWA's more stringent jurisdictional requirements. We agree that the district court had jurisdiction notwithstanding the MMWA's jurisdictional limitations." *Kuns*, 543 F. App'x at 574. Thus, the Court will follow the Sixth Circuit's guidance and allow the other plaintiffs to pursue their Magnuson-Moss class claims without naming 100 named plaintiffs.

GM urges the Court to part ways with the Sixth Circuit's opinion in *Kuns*, but the Court declines this invitation. Though *Kuns* is an unpublished case, it is indicative of the Sixth Circuit's opinion and considered this issue head-on. And this Court routinely relies on unpublished Sixth Circuit case law to guide its decisions.

Thus, the Magnuson-Moss claims brought by the Purshagas, Cheshire, Deery, Attia, the Jetts, Hayford, Mouradjian, the Reidhars, and Luster are dismissed, but the remaining Magnuson-Moss claims will remain.

### F. Unjust Enrichment

Plaintiffs assert unjust-enrichment claims on behalf of all plaintiffs en masse without specifying the state laws such claims fall under. Many states, however, bar

a plaintiff from bring an unjust-enrichment claim where an agreement exists between the parties that defines their relevant rights. If there is disagreement concerning the validity of the contract though, then an unjust-enrichment claim may be pled in the alternative. *See Gregorio*, 522 F. Supp. 3d at 294; *Solo v. United Parcel Serv. Co.*, 819 F.3d 788, 797 (6th Cir. 2016); *Johnston v. PhD Fitness, LLC*, No. 16-cv-14152, 2018 WL 646683, at *6 (E.D. Mich. Jan. 31, 2018) (holding that where the defendant "disputed the existence of an express agreement, at this stage there is nothing infirm about [the plaintiff] pleading unjust enrichment in the alternative"). And that is where the parties here disagree—GM believes that Plaintiffs' express-warranty claims bar their unjust-enrichment claims, and Plaintiffs believe that they should be able to plead both in the alternative. GM has the better argument.

Here, GM does not dispute the existence of an express warranty between it and Plaintiffs. To this point, GM has not really even argued that repairs of the valve train would not be covered under the warranty. Instead, it has argued that some plaintiffs did not present their vehicle for repair within the warranty period, and the ones that did received the benefit of their bargain, i.e. a free repair. So rather than disputing the existence of a valid contract, *see Solo*, 819 F.3d at 797, GM is instead recognizing the existence of such a contract and purportedly enforcing its terms. "Where the parties have an enforceable contract and merely dispute its terms, scope, or effect, one party cannot recover for promissory estoppel and unjust enrichment." *Terry Barr Sales Agency, Inc. v. All-Lock Co.*, 96 F.3d 174, 181 (6th Cir. 1996).

39

Further, "[c]ourts have regularly dismissed unjust enrichment claims filed against automobile manufacturers where a valid, enforceable express warranty covers the same subject matter as plaintiffs' unjust enrichment claims." *In re Gen. Motors Air Conditioning Mktg. & Sales Practices Litig.*, 406 F. Supp. 3d 618, 634 (E.D. Mich. 2019); *see also McKee v. Gen. Motors LLC*, 376 F. Supp. 3d 751, 762 (E.D. Mich. 2019); *Hall v. Gen. Motors, LLC*, No. 19-CV-10186, 2020 WL 1285636, at *9 (E.D. Mich. Mar. 18, 2020), appeal dismissed, No. 20-1321, 2020 WL 6140402 (6th Cir. Sept. 28, 2020); *Gant v. Ford Motor Co.*, 517 F.Supp.3d 707, 723 (E.D. Mich. 2021). So the Court finds that because the express warranty governs GM's obligations to remedy the alleged defect, Plaintiffs may not bring an unjust-enrichment claim in the alternative.

Resisting this conclusion, Plaintiffs cite to *Francis v. General Motors, LLC*, 504 F. Supp.3d 659, 694 (E.D. Mich. 2020), in support of their argument that they are able to plead unjust enrichment in the alternative. But *Francis* was a case where GM denied that its express warranty covered the alleged defect. In contrast, here, GM agrees the express warranty applies—by limiting claims from plaintiffs who did not seek repairs within the warranty period or by fulfilling its purpose and giving plaintiffs repairs within the warranty period. Either way, GM recognizes that an express-warranty governs its obligations. So the Court finds that *Gregorio*, and the cases it relies on, presents a better comparison to the current case than *Francis*. Thus, the Court will dismiss the unjust-enrichment claims.

### G. State Consumer Protection Laws

GM raises a number of issues with Plaintiffs' claims under various state consumer protection laws. Before the Court looks at the relevant state law more closely, it notes that GM seeks to dismiss many of these claims on the basis that Plaintiffs have not adequately pled its knowledge of the defect. As the Court explained above, Plaintiffs have plausibly pled GM's knowledge of the alleged defect. So to the extent GM raises the same argument for the state-consumer-protection-act claims, it does not warrant dismissal of those claims.

The Court will also address misrepresentation-based claims under all relevant state statutes together. Plaintiffs purport to bring misrepresentation-based claims, but their allegations in support are either conclusory or vague. (*See, e.g.*, ECF No. 27, PageID.2510 ("Indeed, GM's misstatements and omissions were material to Plaintiff Harrison.").) Plaintiffs allege that they relied on representations from either GM or its dealerships, but do not specify what the statements were: "[Plaintiffs] relied upon GM and its authorized dealerships' representations, which [Plaintiffs] viewed during [their] online research, including on GM's website, heard from the salesperson, and reviewed the vehicle's window stickers, including the Monroney sticker,[3] that the vehicle was fully functional, safe, durable, reliable, and that the engine operated

---

[3] "Monroney stickers are mandated by [the] Automobile Information Disclosure Act of 1958 and must include information about the specific vehicle being sold including, powertrain information about the engine and transmission, safety ratings, crash test scores, fuel economy and environmental impact." (ECF No. 27, PageID.2665.)

correctly and effectively." (ECF No. 27, PageID.2510.) Though Plaintiffs varied in what they viewed, this allegation is similar for all plaintiffs.

Plaintiffs also quote some brochures for GM vehicles, claiming they state things like "'the strongest, most advanced Silverado ever,' offered with one of 'six engines designed with Chevy truck power and reliability'" (*id.* at PageID.2664); "DFM in the vehicles 'all happens with seamless precision, so you'll never even notice'" (*id.*); "'[b]y sensing load and demand, AFM improves efficiency by activating or deactivating cylinders[;] [u]nder demanding conditions, such as high speeds or heavy loads, the valves switching mechanisms is depressurized, re-engaging the cylinder and restoring full power'" (*id.*); and "'delivery power and efficiency'" (*id.* at PageID.2665).

None of these statements are specific enough to establish a representation-based claim, and many are "non-actionable puffery." *See Elliott v. Gen. Motors LLC*, No. 21-12561, 2022 WL 1815494, at *6 (E.D. Mich. June 2, 2022) ("Courts in this district have repeatedly held that the kind of broad, non-quantifiable statements about a vehicle's safety or reliability that Plaintiffs identify here are non-actionable puffery[.]"); *see also Wysong Corp. v. APN, Inc.*, 889 F.3d 267, 271 (6th Cir. 2018) (explaining that "puffery is a fact of life" and that "reasonable consumers know that marketing involves some level of exaggeration—what the law calls 'puffery'"); *Raymo v. FCA US LLC*, 475 F. Supp. 3d 680, 705–06 (E.D. Mich. 2020) (finding "claims that a vehicle is 'efficient' or 'reliable'" to be puffery (internal citations omitted)); *Ram Int'l Inc. v. ADT Sec. Servs., Inc.*, No. 11-10259, 2011 WL 5244936, at

*6 (E.D. Mich. Nov. 3, 2011) ("Defendant's statements that its products were efficient, reliable, and would protect Plaintiffs' property are examples of opinion and puffery."). GM's statements about efficiency, reliability, durability, and precision have little meaning without providing a specific measure of these attributes. *See Raymo*, 474 F. Supp. 3d at 706 (finding statements that are "general and nonquantifiable" to be puffery); *Chapman v. Gen. Motors LLC*, 531 F. Supp. 3d 1257, 1287 (E.D. Mich. 2021) ("While '11 percent more fuel efficient' might seem closer to the types of statements the Court found to be actionable . . . the allegations fail to indicate what benchmark the 11% figure is being compared to (i.e., the trucks are 11% more fuel efficient than what?), and therefore the Court does not consider the use of this figure to be a quantifiable promise that could constitute affirmative misrepresentation.").

And some of the statements Plaintiffs point to seem to be facts, or at least align with Plaintiffs' explanation of the defect. For example, the statement, "By sensing load and demand, AFM improves efficiency by activating or deactivating cylinders. Under demanding conditions, such as high speeds or heavy loads, the valves switching mechanisms is depressurized, re-engaging the cylinder and restoring full power," tracks Plaintiffs' own description of how AFM operates. (*See* ECF No. 27, PageID.2656.) And though Plaintiffs would not agree that AFM "improves efficiency" or "restor[es] full power," those parts of the statement are too general to support a misrepresentation claim.

So in all, the statements Plaintiffs allege GM falsely made are all generalized and vague, and thus are non-actionable puffery at best. So to the extent any plaintiff made a misrepresentation-based claim, that claim is dismissed.

Now the Court will turn to its state-specific analysis for the remaining omissions-based claims.

### 1. Arkansas

The Court will dismiss the Reidhars' Arkansas Deceptive Trade Practices Act claim as time-barred.

The Reidhars do not dispute that the Arkansas DTPA has a five-year statute of limitations, Ark. Stat. § 4-88-115, that they bought their vehicle in 2014, and that they did not raise these claims until the filing of the amended complaint in 2022 (or, at the absolute earliest, the filing of the original complaint in December 2021). (ECF No. 27, PageID.2517.)

The Reidhars argue, however, that they are entitled to tolling due to fraudulent concealment. "In order to toll a limitation period on the basis of fraudulent concealment, there must be: "(1) a positive act of fraud (2) that is actively concealed, and (3) is not discoverable by reasonable diligence." *Summerhill v. Terminix, Inc.*, 637 F.3d 877, 880 (8th Cir. 2011); *see also Bomar v. Moser*, 251 S.W.3d 234, 242 (2007). "[T]o toll the statute of limitations, we said that plaintiffs were required to show something more than a continuation of a prior nondisclosure." *Shelton v. Fisher*, 8 S.W.3d 557, 562 (Ark. 2000) (quoting *Martin v. Arthur*, 3 S.W.3d 684, 687 (Ark. 1999)).

44

The Reidhars have not plausibly pled something "so furtively planned and secretly executed" that kept their cause of action concealed. *See Shelton*, 8 S.W.3d at 562. All the Reidhars allege is that GM did not disclose the alleged defect at the time of sale nor at any point after. The Reidhars do not allege active concealment in the form of denying repairs, telling them that their valve-train issues were normal, or pretending the defect is something else. Rather, the Reidhars state that when they presented their vehicle for repair, the dealership told them that they "found lifter stuck in #4 cylinder" and that the dealership was replacing the AFM lifter. (ECF No. 27, PageID.2520.) That hardly amounts to a "furtive" plan to conceal the cause of action. Nor do the Plaintiffs' allegations about the TSBs suggest such a furtive plan.

So the Court finds that the Reidhars did not plausibly plead active concealment such that the statute of limitations should be tolled. Their claim is thus time-barred and will be dismissed.

### 2. Florida

GM challenges Cheshire, Luster, and Speno's claims under the Florida Deceptive and Unfair Trade Practices Act for failing to "allege any specific facts about the contents" of the materials they allegedly relied on that contained representations from GM and its dealers. (ECF No. 38, PageID.3612.)

As discussed, any representation-based claims are dismissed. The Florida plaintiffs may, however, proceed with an omissions-based claim under the FDUTPA for GM's failure to disclose an alleged known defect, including by failing to list the defect on Monroney stickers Plaintiffs say they relied upon. *See Badawi v. Brunswick*

*Corp.*, No. 8:21-CV-1825-TPB-AAS, 2022 WL 613807, at *3 (M.D. Fla. Mar. 2, 2022) ("Specifically, Plaintiff's FDUTPA claim alleges that the limited written warranty provided by Sea Ray in connection with Plaintiff's purchase of the boat in November 2020 was misleading and constituted an unfair and deceptive trade practice in light of Sea Ray's alleged knowledge that the boat it supplied suffered from substantial defects that Sea Ray failed to disclose, and that Plaintiff was thereby induced to purchase the boat. The complaint is sufficiently particularized."); *Cho v. Hyundai Motor Co., Ltd.*, No. 822CV00448SPGKES, 2022 WL 16966537, at *7 (C.D. Cal. Oct. 21, 2022) (finding reliance on Hyundai materials, including Monroney stickers, sufficient to survive a motion to dismiss under Florida law). But Plaintiffs did not allege any specific misrepresentations on the Monroney stickers, so only an omissions-based claim as to the stickers survives.

Thus, the omissions-based claims under Florida's Deceptive and Unfair Trade Practices Act will survive.

### 3. Georgia

Jordan and Scott bring claims under two Georgia statutes—the Georgia Fair Business Practices Act and the Georgia Uniform Deceptive Trade Practices Act.

Their claims under the Georgia Uniform Deceptive Trade Practices Act will be dismissed. "Under [the] GUDTPA, '[a] person likely to be damaged by a deceptive trade practice of another may be granted an injunction against it under the principles of equity and on terms that the court considers reasonable.'" *Amin v. Mercedes-Benz USA, LLC*, 301 F.Supp.3d 1277, 1292 (N.D. Ga. 2018) (quoting O.C.G. § 10-1-373(a)).

46

To plead a claim under the GUDTPA, Jordan and Scott must plead "a likelihood of future harm by a deceptive trade practice." *Id.*

Though Jordan and Scott plead that they would "like to" purchase GM vehicles in the future, they also state that they are "unable to rely on GM's advertising or labeling in the future, and so will not purchase or lease another vehicle from GM in the future[.]" (ECF No. 27, PageID.2552, 2556.) Such an allegation does not amount to the inference that Jordan and Scott are likely to buy another class vehicle in the future, and it certainly does not show that they are likely to be misled by any alleged deceptive practices. In short, Jordan and Scott have not "sufficiently alleged that they are 'likely to be damaged' again by [GM's] advertising or marketing." *Amin*, 301 F. Supp. 3d at 1294 (quoting O.C.G.A. § 10-1-373(a)); *see also Cunningham*, 2022 WL 17069563, at *13 (E.D. Mich. Nov. 17, 2022) ("Simply put, Cunningham fails to plausibly allege that the omissions will mislead him on a going-forward basis."). So the GUDTPA claims will be dismissed.

As for the Georgia Fair Business Practices Act, GM argues that Jordan and Scott's class claims should be dismissed because the statute prohibits bringing an action in a representative capacity. O.C.G. § 10-9-399. Jordan and Scott respond that Federal Rule of Civil Procedure 23 governs whether a class action can proceed in federal court.

This dispute of whether the Georgia statute barring class actions or Federal Rule 23 controls presents an issue best decided under the Supreme Court's decision in *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393 (2010). "This

Court, like 'the majority of district and circuit courts' that have considered the issue, finds that Justice Stevens' concurrence is the controlling opinion in *Shady Grove*." *Cunningham*, 2022 WL 17069563, at *10–13 (citing *Greene v. Gerber Prod. Co.*, 262 F. Supp. 3d 38, 60 (E.D.N.Y. 2017) (collecting cases)). The Court also notes that this issue has divided federal district courts, and thus, does not have an easy answer. *See, e.g.*, *Reynolds v. FCA US LLC*, 546 F.Supp.3d 635, 658 (E.D. Mich. 2021) (recognizing the "split in authority" on this issue under the GFBPA); *Miller v. Ford Motor Co.*, — F. Supp. 3d —, 2022 WL 3229503, at *19 (E.D. Cal. Aug. 10, 2022) (collecting cases and explaining that "[f]ederal district courts are divided on whether the prohibition of [G]FBPA class action claims applies in federal court").

That being said, the Court finds the *Shady Grove* analysis that concludes that plaintiffs are barred from bringing a class action under the GFBPA to be more persuasive. Under Justice Stevens' approach in *Shady Grove*, the inquiry should "focus on whether the state law had a substantive purpose and acknowledge the possibility that state rules that are otherwise procedural may in some instances become so bound up with the state-created right or remedy that it defines the scope of the substantive right or remedy and . . . should not be preempted by a conflicting federal rule." *Shady Grove*, 559 U.S. at 420. In other words, the Court looks beyond what is "traditionally described as substantive or procedural" and looks to whether the state rule affects the scope of the right itself. *See id.*

Many courts have found that Georgia's limitation on class actions in this context define the scope of the state-created right. *Delgado v. Ocwen Loan Servicing,*

*LLC*, No. 13CV4427NGGST, 2017 WL 5201079, at *10 (E.D.N.Y. Nov. 9, 2017) ("[T]he court concludes the specific inclusion of the class action bar within the . . . Georgia consumer protection statutes under which Plaintiffs' claims are brought differentiates them from the "pan-statutory" bar in *Shady Grove* and demonstrates that they incorporate a substantive policy choice."); *In re Target Corp. Data Sec. Breach Litig.*, 66 F. Supp. 3d 1154, 1165 (D. Minn. 2014) (collecting cases); *Matanky*, 370 F. Supp. 3d at 798–99 (same); *Danielkiewicz v. Whirlpool Corp.*, 426 F. Supp. 3d 426, 438 (E.D. Mich. 2019) ("To ignore the state statute and apply Rule 23 in federal courts would abridge and enlarge the scope of the state-created rights and 'encourage forum shopping and the inequitable administration of laws.'" (quoting *In re Asacol Antitrust Litig.*, No. 15-CV-12730, 2016 WL 4083333, at *15 (D. Mass. July 20, 2016))); *In re Chevrolet Bolt EV Battery Litig.*, — F. Supp. 3d —, 2022 WL 4686974, at *30 (E.D. Mich. Sept. 30, 2022). As one court explained, the decision to prohibit bringing consumer-protection claims as class actions "was a choice made not simply because of procedural convenience, but for reasons relating to the substantive nature of class action lawsuits." *Chapman*, 531 F. Supp. 3d at 1301. Such reasoning is further supported by the fact that Georgia has enacted this class-action bar specific to its consumer-protection statute, as opposed to the general class-action bar at issue in *Shady Grove. See* 559 U.S. at 432.

So the Court will dismiss Jordan and Scott's class claims under the Georgia Fair Business Practices Act.

### 4. Maryland

For Roller's claims under the Maryland Consumer Protection Act, GM argues that Roller cannot establish an "identifiable loss" because he never paid for any repairs to his vehicle and he did not allege any continuing problems, "so he received what he paid for—a vehicle that would be repaired free of charge under the warranty." (ECF No. 42, PageID.5353.)

But that is not true. Even accepting GM's premise that receiving a vehicle that is repaired under warranty negates any claim of an identifiable loss, Roller did not receive such a vehicle—according to his allegations, he received a vehicle that GM failed to properly repair. Indeed, Roller explains that he (at the very least) expected a car that would be repaired if it had a defect. (*Id.* at PageID.2565.) But he did not receive a repair that cured the defect. In fact, he says his car still maintains this defect. (ECF No. 27, PageID.2567.) That is sufficient to state a claim under the Maryland CPA. *See Singh v. Lenovo (United States) Inc.*, 510 F.Supp.3d 310, 328 (D. Md. 2021) (rejecting defendant's argument that no ascertainable damages were pled because plaintiff does not have to have paid to repair the defect—"[a]ll that was required was to articulate some manifestation of loss including a difference between what was expected and what was received as a result of a misrepresentation"). So Roller's claim under the Maryland CPA survives.

### 5. Missouri

GM asserts that Saffell may not bring claims under the Missouri Merchandising Practices Act because a dealer, as opposed to GM, was part of the initial transaction.

GM's assertion is contrary to Missouri law. *See Tucker v. Ethicon, Inc.*, No. 4:20-CV-1543 RLW, 2021 WL 410058, at *8 (E.D. Mo. Feb. 5, 2021). The MMPA's "plain language does not contemplate a direct contractual relationship between plaintiff and defendant, and Missouri courts have not imposed such a requirement through statutory construction." *Gibbons v. J. Nuckolls, Inc.*, 216 S.W.3d 667, 669 (Mo. 2007) (en banc); *see Conway v. CitiMortgage, Inc.*, 438 S.W.3d 410, 416 (Mo. 2014) (explaining that "[t]he Gibbons court found a plaintiff can maintain a suit under the MMPA against a party with a connection to the merchandise before a buyer enters the transaction. Similarly, the MMPA may cover parties who enter the relationship after a buyer enters the transaction, including a loan servicer.").

So Saffell's claims under the Missouri Merchandising Practices Act will survive.

### 6. Nevada

GM raises two issues with Hess and Martin-Wasser's claims under the Nevada Deceptive Trade Practices Act—that a duty to disclose is required for an omissions-based claim, and that Hess and Martin-Wasser must plead reliance, which they cannot do because they did not interact with GM. Neither wins the day.

51

As with other states, Nevada allows superior or exclusive knowledge to satisfy a duty to disclose requirement. *See In re Volkswagen Timing Chain Prod. Liab. Litig.*, No. CV 16-2765, 2017 WL 1902160, at \*19 (D.N.J. May 8, 2017) (finding duty to disclose under Nevada law in part because "Plaintiffs have also alleged the presence of various TSBs and Defendant's decision to redesign the Timing Chain System as further proof of its superior knowledge"); *Heldenbrand v. Multipoint Wireless, LLC*, No. 2:12-CV-01562, 2012 WL 5198479, at \*4 (D. Nev. Oct. 18, 2012) ("Also, a duty to disclose may arise from 'the existence of material facts peculiarly within the knowledge of the party sought to be charged and not within the fair and reasonable reach of the other party.'" (quoting *Villalon v. Bowen*, 273 P.2d 409, 415 (Nev. 1954))). Since the Court has already found that Plaintiffs plausibly pled that GM had superior or exclusive knowledge of the alleged defect, it finds that Hess and Martin-Wasser have also pled such knowledge to establish a duty to disclose under Nevada law.

As for reliance, the Court agrees with Hess and Martin-Wasser that for omissions-based claims, a reliance requirement is not necessarily read into the Nevada Deceptive Trade Practices Act. The cases cited by GM, and the ones found by the Court, include a reliance requirement for misrepresentation-based claims under the Act. *See, e.g.*, *Picus v. Wal-Mart Stores, Inc.*, 256 F.R.D. 651, 658 (D. Nev. 2009) ("Because Defendants here allegedly made an affirmative misrepresentation and Plaintiff could prove she sustained damages as a result of Defendants' alleged misrepresentation only by demonstrating she relied upon a "Made in the USA" label, the Court concludes causation includes reliance in this case."); *Motogolf.com, LLC v.*

*Top Shelf Golf, LLC*, 528 F. Supp. 3d 1168 (D. Nev. 2021) (specifically referencing misrepresentations and relying on case law referencing representation-based deceptive acts). Yet it is clear that Nevada law allows for an omissions-based claim under its consumer-protection laws. *See Leigh-Pink v. Rio Properties, LLC*, 512 P.3d 322, 327 (2022) ("NRS 41.600(1) provides a cause of action to victims of consumer fraud. . . . A person who knowingly fails to disclose a material fact related to the sale of a good or service has engaged in a deceptive trade practice."). Since GM has not persuaded the Court that Nevada law requires reliance for omissions-based claims under the Nevada DTPA, the Court will not dismiss Hess and Martin-Wasser's claims for this reason.

Thus, Hess and Martin-Wasser's omissions-based claims under the Nevada Deceptive Trade Practices Act survive.

### 7. New Jersey

GM contends that the New Jersey Consumer Fraud Act requires a duty to disclose for an omissions-based claim.

But GM has not persuaded the Court that its contention is correct. GM cites a decision by a federal court in New Jersey, which analyzes the plaintiff's claim under the CFA, and states, "[i]mplicit in the showing of an omission is the underlying duty on the part of the defendant to disclose what he concealed to induce the purchase. Obviously, there can be no [unlawful conduct], or reliance for that matter, if the defendant was under no obligation to disclose the information in the first place." *Mickens v. Ford Motor Co.*, 900 F. Supp. 2d 427, 441 (D.N.J. 2012). In turn, the case

*Mickens* cites for that proposition is another federal court decision. *See Arcand v. Brother Intern Corp.*, 673 F. Supp. 2d 282, 297 (D.N.J. 2009). And *Arcand* does not provide a citation for the proposition that the NJCFA requires a duty to disclose for omissions-based claims. Moreover, neither *Mickens* nor *Arcand* analyze the duty to disclose—*Arcand* decided that the case before it was only about affirmative acts, and *Mickens* only addressed the defendant's arguments, which apparently did not raise the duty to disclose. So the duty to disclose did not provide the rule of decision in either case. *See Arcand*, 673 F. Supp. 2d at 298; *Mickens*, 900 F. Supp. 2d at 442–45. And notably, *Mickens* allowed a claim to survive that is similar to the claim Mouradjian brings here—"that Ford knowingly concealed the galvanic corrosion defect from Mickens and the class members with the intent that they rely on the absence of such information when purchasing the affected vehicles." *See Mickens*, 900 F. Supp. 2d at 441.

The Court further notes that other district courts have recently allowed similar claims to survive without any mention of a duty to disclose. *See Haft v. Haier US Appliance Sols., Inc.*, 578 F. Supp. 3d 436, 461–63 (S.D.N.Y. 2022) (finding Plaintiff sufficiently pled a NJCFA claim based on "Defendant knowingly conceal[ing] the defective soda lime glass doors," the warranty being inadequate to protect consumers, and Plaintiffs paying out-of-pocket to repair the goods); *DeFrank v. Samsung Elecs. Am., Inc.*, No. CV1921401, 2020 WL 6269277, at *10 (D.N.J. Oct. 26, 2020) ("I conclude these allegations adequately plead a claim under the NJCFA, because, if true, they establish that SEA knew the dryers were defective and were likely to fail

54

due to that defect."). So GM has not persuaded the Court that a duty to disclose is required for omissions-based claims under New Jersey's CFA.

Thus, the Court will allow Mouradjian to pursue his claim under the New Jersey CFA.

### 8. Ohio

There are three distinct parts to GM's argument against Hayford and Podojil's claims under the Ohio Consumer Sales Practices Act.

For one, GM claims that, contrary to Ohio law, Hayford and Podojil have not pled notice as required by Ohio Code § 1345.09(B). *See Johnson v. Microsoft Corp.*, 802 N.E.2d 712, 720 (Ohio Ct. App. 2003) ("Under R.C. 1345.09(B), a class action is permitted under the Act if the plaintiff alleges that the substantive provisions of the Act have been violated, and (1) a specific rule or regulation has been promulgated under R.C. 1345.05 that specifically characterizes the challenged practice as unfair or deceptive, or (2) an Ohio state court has found the specific practice either unconscionable or deceptive in a decision open to public inspection."). For their part, Hayford and Podojil concede they did not plead a rule, regulation, or court decision. But they argue that doing so is not a pleading requirement, but rather a class-action requirement, and should be left to class certification.

It appears that a majority of courts, including the Sixth Circuit, have decided the notice issue under Ohio law at the motion-to-dismiss stage, though the Court acknowledges that Plaintiffs have cited a couple of cases where the issue was deferred to class certification. *Volbers-Klarich v. Middletown Mgt., Inc.*, 929 N.E.2d 434, 502

(Ohio 2010) (finding plaintiff's claim "seeking certification of a class action alleging a violation of the OCSPA does not state a claim upon which relief can be granted" because it failed to comply with the statutory notice requirement); *Gerboc v. ContextLogic, Inc.*, 867 F.3d 675, 680 (6th Cir. 2017) (affirming dismissal of OCSPA class-action claim for failure to comply with notice requirements); *Foster v. Health Recovery Servs., Inc.*, 492 F.Supp.3d 622, 637 (S.D. Ohio 2020) ("Plaintiff cannot proceed with his Ohio OCSPA class claims because he failed to plead the notice requirement in his complaint by pointing to a rule or Ohio courts' decision that would put Defendant on notice of the alleged unfair or deceptive conduct."); *Chapman*, 531 F. Supp. 3d. at 1302 (dismissing OCSPA claim for failure to satisfy notice requirement); *Miranda v. Xavier Univ.*, 594 F. Supp. 3d 961, 978 (S.D. Ohio 2022) ("Plaintiff has failed to allege that Xavier had notice, and, therefore, cannot state a class claim under OCSPA."); *In re Porsche Cars N. Am., Inc.*, 880 F. Supp. 2d 801, 869 (S.D. Ohio 2012) ("If a plaintiff fails to identify a rule or case in his or her complaint that satisfies Section 1345.09(B), dismissal of the claim as a class action is proper and the plaintiff may proceed in his or her individual capacity alone.").

Indeed, the notice rule does not squarely fit into any of the Federal Rule of Civil Procedure 23 requirements such that it makes sense to address them together. *See Raymond v. Avectus Healthcare Sols., Inc.*, No. 1:15cv559, 2020 WL 3470461, at *9 (S.D. Ohio Mar. 27, 2020) (stating the OCSPA class claim "requires a separate discussion" in the context of a class-certification order). And it is not clear what Plaintiffs would get by deferring the question to class certification, except perhaps

more time to form their argument. The argument for notice presumably remains the same at the motion-to-dismiss stage as it does the class-certification stage. So the Court will dismiss the OCSPA class claims.

That leaves Hayford's and Podojil's individual Ohio consumer-protection claims.

Starting with Hayford, GM says his claim is untimely. Hayford does not dispute that he brings his claim beyond the statute of limitations but argues that the statute of limitations is subject to tolling under Ohio law for fraudulent concealment.

Ohio has a high standard, however, for a plaintiff to receive tolling due to fraudulent concealment. To fall within the "limited circumstances" in which tolling applies, "the plaintiff must allege some affirmative act by the defendant designed to prevent discovery of the cause of action. Indeed, as the Ohio Supreme Court has explained, plaintiffs must 'establish that subsequent and specific actions by defendants somehow kept them from timely bringing suit.'" *Szep v. Gen. Motors LLC*, 491 F. Supp. 3d 280, 298 (N.D. Ohio 2020) (quoting *Doe v. Archdiocese of Cincinnati*, 849 N.E.2d 268, 279 (2006)); *see also Unifund CCR Partners v. Young*, No. 11-MA-113, 2013 WL 5447666, at *7 (Oh. Ct. App. Sept. 27, 2013) ("However, '[e]quitable tolling is only available in compelling cases which justify a departure from established procedure. Thus, Ohio law requires a showing of actual or constructive fraud by a party in the form of representations that the statute of limitations was larger than it actually was, promises of a better settlement if the lawsuit was not filed, or other similar representations or conduct' before a party can get relief through

the doctrine of equitable tolling."); *Matanky v. Gen. Motors LLC*, 370 F. Supp. 3d 772, 802 (E.D. Mich. 2019) ("The doctrine of fraudulent concealment does not apply to Plaintiffs' OCSPA claim because Plaintiffs fail to allege that any subsequent and specific actions by GM were designed to prevent, and did prevent, them from discovering their cause of action.").

Here, Hayford alleges that the dealership told him it found a collapsed lifter and a bent push rod and warned him that the same lifter or other lifters could fail again. (ECF No. 27, PageID.2605–2606.) He does not allege that GM attempted to conceal the defect by saying his valve-train problems were normal or denying him a repair, as other Plaintiffs have. Thus, Hayford has not alleged that GM engaged in subsequent concealment after it failed to disclose the defect at the time of sale. *See Thornton v. State Farm Mut. Auto Ins. Co.*, No. 1:06-CV-00018, 2006 WL 3359448, at *6 (N.D. Ohio Nov. 17, 2006) ("From that point forward, Thornton can only point to inaction."); *Kondash v. Kia Motors Am., Inc.*, No. 1:15-CV-506, 2016 WL 11246421, at *20 (S.D. Ohio June 24, 2016) (noting that even if active concealment applied, the Court would not be persuaded to toll the statute of limitations under Ohio law because "the facts to support the application of either theory are that Plaintiff bought a Kia with a sunroof prone to spontaneous shattering, and Kia never revealed the defect to him at the time of purchase"). So Hayford's OCSPA claim is barred by the two-year statute of limitations as he has not plausibly pled active concealment to toll the statute of limitations.

Only Podojil's Ohio consumer-protection claim remains, and the Court finds that it is plausibly pled. GM is correct that "mere non-disclosure" is not enough to bring a claim under the Ohio Consumer Sales Practices Act. To make out a prima facie claim under the OCSPA, the plaintiff "must show a material misrepresentation, deceptive act or omission that impacted his decision to purchase the item at issue." *Ewalt v. Gatehouse Media Ohio Holdings II, Inc.*, No. 2:19-CV-4262, 2021 WL 825978, at *16 (S.D. Ohio Mar. 4, 2021) (citing *Temple v. Fleetwood Enters.*, 133 F. App'x 254, 265 (6th Cir. 2005)). But pleading a knowing omission is sufficient. *See Grgat v. Giant Eagle, Inc.*, 135 N.E.3d 846, 851 (Ohio Ct. App. 2019) ("Rather than applying strict liability, courts have held that whether a supplier's act or omission is a violation of the CSPA depends on how a reasonable consumer would view it. . . . [T]he test is whether the alleged act or practice has the likelihood of inducing a state of mind in the consumer that is not in accord with the facts." (internal citations omitted)). As discussed, Plaintiffs' allegations make it reasonable to infer that GM had knowledge of the alleged defect. And Podojil has plausibly pled that GM's omission of the alleged defect from the materials he viewed before purchasing the car could mislead a reasonable consumer. So Podojil's individual OCSPA claim survives.

In sum, the class claims under the Ohio Consumer Sales Protection Act are dismissed without prejudice, Hayford's individual claim is dismissed as time-barred, and Podojil's individual claim survives.

### 9. Rhode Island

Deery brings her claim under the Rhode Island Deceptive Trade Practices Act. GM argues that she did not allege a representation or omission that is likely to mislead customers. But GM provides no further argument on the issue. "A party waives issues that he adverts to in a perfunctory manner, unaccompanied by some effort at developed argumentation." *Thomas v. United States*, 849 F.3d 669, 679 (6th Cir. 2017); *Calvey v. Village of Walton Hills, Ohio*, 841 F. App'x 880, 885 (6th Cir. 2021). GM has not provided any reason why Deery's omission-based claim should not survive given the allegations that GM knew about the Valve-Train Defect and did not disclose it to Deery, and that if Deery had known, she would have bought a different car or paid less for it. Such an omission plausibly could mislead consumers, *see Long v. Dell*, 93 A.3d 988, 1003 (R.I. 2014), and thus Deery's claim under the Rhode Island DTPA will survive.

### 10. Tennessee

GM challenges the Burtons and Dittman's claims under the Tennessee Consumer Protection Act (based only on GM's omissions) by arguing that the Burtons and Dittman have failed to allege proximate causation.

The Burtons and Dittman have the better argument. They argue that for an omissions-based claim, allegations that GM had the opportunity to disclose the defect to them but failed to do so are sufficient to show proximate cause. *See Cloud Nine, LLC v. Whaley*, 650 F. Supp. 2d 789, 798 (E.D. Tenn. 2009) (finding proximate cause at summary judgment because there was evidence showing the plaintiffs were "privy

to the alleged unfair and deceptive acts" and that the defendants had "at least some interaction" with the plaintiffs); *Act for Health v. Case Mgmt. Assocs., Inc.*, 128 F. Supp. 3d 1020, 1036 (E.D. Tenn. 2014) ("Ordinarily, proximate cause is a question for a jury "unless the uncontroverted facts and inferences to be drawn from them make it so clear that all reasonable persons must agree on the proper outcome"). GM does not provide any response to this argument in its reply.

So the Court will not dismiss the Burtons and Dittman's TCPA claims for failure to allege proximate cause.[4]

### 11. Texas

GM says that the Jetts did not comply with the 60-day notice requirement under the Texas Deceptive Trade Practices Act. But even if the Jetts did not comply with this requirement, Texas law remedies lack of notice by holding the claims in abeyance until the 60-day notice requirement is complied with. *Franklin v. Apple Inc.*, 569 F. Supp. 3d 465, 483 (E.D. Tex. 2021) ("Apple is entitled to have this action held in abeyance until Franklin complies with the DTPA's notice requirement." (citing *Oppenheimer v. Prudential Secs. Inc.*, 94 F.3d 189, 194 (5th Cir. 1996))); *see also*

---

[4] The Court notes that it is not clear under which TCPA provision the Burtons and Dittman's omissions-based claims fall. Many of the provisions Plaintiffs cite in their complaint reference affirmative representations, not omissions. And though perhaps omissions-based claims are captured by the catch-all provision, enforcement of that provision has been left to the Tennessee Attorney General following amendments in 2011. *See Harding v. BMW of N. Am., LLC*, No. 3:20-CV-00061, 2020 WL 5039439, at *3 (M.D. Tenn. Aug. 26, 2020) ("In 2011, however, the catch-all provision was amended to state that its enforcement was vested exclusively in the office of the attorney general and reporter and the director of the division [of consumer affairs in the department of commerce and insurance].").

*Oppenheimer*, 94 F.3d at 194 (finding that the proper remedy for insufficient notice is abatement). And since the Jetts sent their first letter to GM on November 8, 2021 (and their last letter on February 10, 2022), more than 60 days have passed since GM first received notice. So the Court finds that the Jetts have now complied with the notice requirement to bring their Texas DTPA claim, and there is no need to hold the claim in abeyance.

GM also argues that under Texas law, a breach of contract, without more, does not violate the DTPA. *Ashford Dev., Inc. v. USLife Real Estate Servs. Corp.*, 661 S.W.2d 933, 935 (Tex. 1983). To determine whether there is "more," Texas courts instruct that "the inquiry is whether the alleged unconscionable conduct could have resulted in the absence of a contract between the parties." *Crawford v. Ace Sign, Inc.*, 917 S.W.2d 12, 13 (Tex. 1996). Put another way, "where the breach of the contract causes the harm, a plaintiff cannot maintain a claim for unconscionable conduct under the DTPA." *Malsom v. Match.com, L.L.C.*, 540 F. App'x 412, 415 (5th Cir. 2013). Here, the alleged deceptive conduct of omitting the defect when advertising and selling the vehicles could have occurred regardless of whether GM agreed to the warranty with the Jetts, as would the harm that resulted from buying a car the Jetts did not want or paying too much for the car. Thus, the Court finds that this is more than just a breach-of-contract action, and so the Jetts may pursue their claims under the Texas DTPA.

## H. Claims for Injunctive Relief

One final word on remedies. Plaintiffs ask for the following injunctive relief in addition to monetary damages: that GM be compelled to offer remediation solutions under warranty; that GM be enjoined from further deceptive distribution, sales, and lease practices with respect to the vehicles in question; that GM be compelled to provide class members with replacement components; and that GM be compelled to change its warranty to cover the alleged defect and notify all class members that the warranty has been reformed. (*See* ECF No. 27, PageID.2743.)

GM argues for dismissal of any claims for injunctive relief. The Court finds that request to be premature. As another court in this District explained, "[i]f plaintiffs succeed on any of their claims—a question that likely will not be resolved for a significant period of time—the Court will entertain arguments from the parties about whether [injunctive relief] is an appropriate or allowable remedy." *Milsits v. FCA US LLC*, No. 20-cv-11578, 2021 WL 3145704, at *15 (E.D. Mich. July 26, 2021) (citing *Bossart v. Gen. Motors,* LLC, 20-CV-11057, 2021 WL 5278191, at *12 (E.D. Mich. May 19, 2021)). So that issue is left for a different day.

## IV.

For the foregoing reasons, the Court GRANTS IN PART and DENIES IN PART GM's motion to dismiss. The attached chart should aid the parties in determining which claims remain in this litigation.

At the scheduling conference, the parties should be prepared to discuss severing this lawsuit based on the specific part that is allegedly defective in each

plaintiff's vehicle. The Court is concerned that discovery will be unmanageable if Plaintiffs litigate a general valve-train defect in one case.

      SO ORDERED.

      Dated: January 19, 2023

                            s/Laurie J. Michelson
                            LAURIE J. MICHELSON
                            UNITED STATES DISTRICT JUDGE

**Claims Chart for Non-Arbitration Plaintiffs**

| | State | Fraud By Omission | Unjust Enrichment | Express Warranty | Implied Warranty | Magnuson-Moss | State Consumer Protection |
|---|---|---|---|---|---|---|---|
| **Harrison** | Alabama | Survives | DISMISSED (barred by express warranty claim) | Survives | Survives | Survives | N/A |
| **Reidhars** | Arkansas | Survives | DISMISSED (barred by express warranty claim) | DISMISSED (No repair within warranty) | DISMISSED (No repair within warranty) | DISMISSED (fall with warranty claims) | DISMISSED (statute of limitations) |
| **Cheshire** | Florida | Survives | DISMISSED (barred by express warranty claim) | DISMISSED (No repair within warranty) | DISMISSED (No repair within warranty) | DISMISSED (fall with warranty claims) | Survives |
| **Luster** | Florida | Survives | DISMISSED (barred by express warranty claim) | Survives | DISMISSED (No privity) | Survives | Survives |
| **Speno** | Florida | Survives | DISMISSED (barred by express warranty claim) | Survives | DISMISSED (No privity) | Survives | Survives |
| **Jordan** | Georgia | Survives | DISMISSED (barred by express warranty claim) | Survives | DISMISSED (Lack of factual allegations as to 2021 vehicle & statute of limitations as to 2015 vehicle) | Survives | DISMISSED IN PART (GUDTPA dismissed; GFBPA class claim is dismissed, individual claim survives) |
| **Scott** | Georgia | Survives | DISMISSED (barred by express warranty claim) | Survives | Survives | Survives | DISMISSED IN PART (GUDTPA claim dismissed; GFBPA class claim is dismissed, individual claim survives) |

| | State | Fraud By Omission | Unjust Enrichment | Express Warranty | Implied Warranty | Magnuson-Moss | State Consumer Protection |
|---|---|---|---|---|---|---|---|
| **Roller** | Maryland | Survives | **DISMISSED** (barred by express warranty claim) | Survives | Survives | Survives | Survives |
| **Attia** | Massachusetts | Survives | **DISMISSED** (barred by express warranty claim) | **DISMISSED** (No repair within warranty) | **DISMISSED** (No repair within warranty) | **DISMISSED** (fall with warranty claims) | Survives |
| **Purshagas** | Massachusetts | Survives | **DISMISSED** (barred by express warranty claim) | **DISMISSED** (No repair within warranty) | **DISMISSED** (No repair within warranty) | **DISMISSED** (fall with warranty claims) | Survives |
| **Saffell** | Missouri | Survives | **DISMISSED** (barred by express warranty claim) | Survives | Survives | Survives | Survives |
| **Mouradjian** | New Jersey | **DISMISSED** (No knowledge exception to duty to disclose requirement) | **DISMISSED** (barred by express warranty claim) | **DISMISSED** (No repair within warranty) | **DISMISSED** (No repair within warranty) | **DISMISSED** (fall with warranty claims) | Survives |
| **Hess & Martin-Wasser** | Nevada | Survives | **DISMISSED** (barred by express warranty claim) | Survives | Survives | Survives | Survives |
| **Hayford** | Ohio | Survives | **DISMISSED** (barred by express warranty claim) | **DISMISSED** (No repair within warranty) | **DISMISSED** (No repair within warranty) | **DISMISSED** (fall with warranty claims) | **DISMISSED** (class claims are dismissed, individual claim barred by statute of limitations) |
| **Podojil** | Ohio | Survives | **DISMISSED** (barred by express warranty claim) | Survives | Survives | Survives | **DISMISSED IN PART** (class claims are dismissed, individual claim survives) |
| **Deery** | Rhode Island | Survives | **DISMISSED** (barred by express warranty claim) | **DISMISSED** (No repair within warranty) | **DISMISSED** (No repair within warranty) | **DISMISSED** (fall with warranty claims) | Survives |
| **Burtons** | Tennessee | Survives | **DISMISSED** (barred by express warranty claim) | Survives | **DISMISSED** (No privity) | Survives | Survives |
| **Dittman** | Tennessee | Survives | **DISMISSED** (barred by express warranty claim) | Survives | **DISMISSED** (No privity) | Survives | Survives |

| | State | Fraud By Omission | Unjust Enrichment | Express Warranty | Implied Warranty | Magnuson-Moss | State Consumer Protection |
|---|---|---|---|---|---|---|---|
| **Jetts** | Texas | Survives | **DISMISSED** (barred by express warranty claim) | **DISMISSED** (No repair within warranty) | **DISMISSED** (No repair within warranty) | **DISMISSED** (fall with warranty claims) | Survives |
| **McClave** | Not provided | **DISMISSED** (No factual allegations) | **DISMISSED** (No factual allegations) | **DISMISSED** (No factual allegations) | **DISMISSED** (No factual allegations) | **DISMISSED** (No factual allegations) | **DISMISSED** (No factual allegations) |